**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

BONNIE MARCUS, ROMAN WYPART,        :
ERNEST SENDEROV, and                :
MARY ELLEN CALLAGHAN,               :
                                    :
            Plaintiffs              :        **CIVIL ACTION NO.:  07-02075**
                                    :
      v.                            :
                                    :
PQ CORPORATION                      :
                                    :
            Defendant               :

**PLAINTIFFS' BRIEF RESPONSE TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

The ultimate question that this Court must decide in addressing Defendant PQ Corp.'s

Motion for Summary Judgment is whether there is sufficient evidence – viewed in the light most

favorable to Plaintiffs – for a reasonable jury to conclude that Plaintiffs were terminated as a

result of their age.  This determination is not a close call.  Indeed, there is overwhelming

evidence that Defendant PQ discriminated against the Plaintiffs because of their age in

terminating them as part of a reduction in force in 2005 (the "RIF" or "2005 RIF").  As set forth

herein, among other things:

- **100%** of employees who were RIF'd by PQ in the Plaintiffs' Department (Research and

    Development or "R&D") were age 55 or older, despite the fact that employees aged 55

    and older comprised only 30.4% of the R&D work force.  As Plaintiffs' statistical expert

    found, this disparity in the proportion of older employees RIF'd is statistically significant,

    and has only a 1 in 58,507 probability of occurring by chance.

- The alleged decision-maker, John Lau, directly informed one of the Plaintiffs that older employees were going to be targeted in the layoffs.

- Another one of the decision-makers, Colleen Delmonte, told John Lau during a personnel discussion that "we need to get rid of some of these old farts."

- Following the RIF, a third decision-maker, Rosalyn Kutchins, stated that it was time for people like Plaintiff Bonnie Marcus (then 60 years of age) to leave graciously and to leave the door open for "younger" employees.

- Despite the fact that numerous employees under age 55 were – according to Defendant's own explanations – similarly situated to Plaintiffs Marcus, Senderov and Wypart, not a single R&D employee under age 55 was terminated as part of the 2005 RIF.

- Contemporaneous documents show that PQ considered the ages of employees in connection with the RIF.

- Defendant has repeatedly changed its positions on virtually every critical issue in this case, including among other things:

  o The reasons for the decision to terminate Plaintiffs and the other RIF'd R&D employees.

  o The identity of the alleged decision-makers.

  o Whether and to what extent Plaintiffs' work was assumed by others following the RIF.

  o The identity of the projects that were eliminated contemporaneously with the RIF.

- Many of the positions that Defendant has taken on central issues in this case are demonstrably false.

In short, the evidence is more than sufficient to defeat summary judgment, whether this Court applies a *McDonnell Douglas* or a "mixed motives" framework.  Thus, Defendant's motion for summary judgment must be denied.

## II.    STANDARD OF REVIEW

Summary judgment may be granted only where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In making its determination, the Court is required to view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor.  *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 150 (2000).  Thus, a Court may only award summary judgment where "the evidence of record is such that [no] reasonable jury could return a verdict for the nonmoving party." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995).

These requirements are to be applied "with added rigor in employment discrimination cases, where intent and credibility are crucial issues."  *Stewart v. Rutgers University*, 120 F.3d 426, 431 (3d Cir. 1997); *see also Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000).  Indeed, for this reason the Third Circuit has warned that summary judgment is "rarely appropriate" in employment discrimination cases.  *See, e.g., Marzano v. Computer Science Corp., Inc.*, 91 F.3d 497, 509 (3d Cir. 1996).

## III.   FACTUAL BACKGROUND[1]

Defendant PQ Corporation underwent a Reduction in Force in May 2005.  Attachment A (Excerpts from the Deposition of John Lau) (*hereinafter* "Lau Dep.") at 13.  As part of that Reduction in Force, eight individuals – including the Plaintiffs – were terminated from PQ's Research and Development Department.[2]  Exhibit P-52[3] (R&D "Exhibit A").  All eight of those individuals were age 55 or older.  *Id.*  Plaintiffs contend that the RIF in general, and their own terminations in particular, were infected by age bias.  Taken in the light most favorable to the Plaintiffs, as this Court must for the purposes of this motion, the evidence shows the following facts:

---

1.   In the interest of space, Plaintiffs do not address each of Defendant's factual allegations herein.  Plaintiffs note, however, that many of Defendant's factual allegations are clearly disputed (and indeed in some circumstances directly contradict Defendant's own prior positions in this case).  Where Plaintiffs do not dispute facts that are set forth in Defendant's motion, they have cited directly to Defendant's brief instead of to the record.  All facts set forth herein are stated solely for the purposes of responding to Defendant's motion for summary judgment and do not constitute admissions.

2.   PQ has contended throughout this litigation that two of these individuals voluntarily retired.  *See, e.g.,* Def. Br. at 24.  Both of these individuals disputed this characterization in their depositions, and thus, for the purposes of this motion should be considered to have been included in the RIF on an involuntary basis.  *See, e.g.,* Attachment B (Excerpts from the Deposition of Eleanor Tickner) (*hereinafter* "Tickner Dep.") at 18-27, 44-46, 52-57; Attachment C (Excerpts from the Deposition of John Slobogin) (*hereinafter* "Slobogin Dep.") at 29-33, 42-46, 51.

3.   For ease of reference, all exhibits that were marked by the parties during depositions in this case are referred to by their original exhibit number.  (Exhibits marked by Plaintiffs in depositions are designated with a "P," whereas Exhibits marked by Defendant in depositions are designated with a "D").  Attachments to this motion that were not previously marked in depositions are referred to as "Attachments" and are designated by letter, not number.

**The RIF**[4]

Prior to 2005, PQ was a private, family owned business.  Def. Br. at 3.  In 2004, PQ's owners began exploring other alternatives, including the sale of the company.  *Id.*  Meetings with a number of potential purchasers – including JP Morgan Partners ("JPMP") – then took place in late October of 2004.  Attachment A (Lau Dep.) at 84; Attachment D (Excerpts from the Deposition of Rosalyn Kutchins) (*hereinafter* "Kutchins Dep.") at 62, 64-65.  Around that same time, JPMP emerged as a front runner for the sale.  Attachment E (Excerpts from the Deposition of Michael Imbriani) (*hereinafter* "Imbriani Dep.") at 145.

Contemporaneously, in late October 2004, John Lau (then Vice President of Research and Development at PQ) had a conversation with Ms. Marcus in which he told her that the company would be getting rid of older people, especially those who were making more money or in the bonus plan.  *See* Attachment F (Excerpts from the Deposition of Bonnie Marcus) (*hereinafter* "Marcus Dep.") at 93-94, 134, 150-158, 366-374; *see also* Exhibit D-131 (Marcus Notes).  Ms. Marcus – upset and surprised by Dr. Lau's comment – recorded it in her own notes, and also informed her husband Michael Bennett, and her colleague Dick Hinchey, of the remark.[5]  *See* Exhibit D-131 (Marcus Notes); Attachment F (Marcus Dep.) at 96, 110-12.  Although Ms. Marcus could not have known at the time, Dr. Lau's comment would ultimately prove to be

---

4.   Because Plaintiffs were all a part of the Research & Development Department, Plaintiffs focus on the RIF process in R&D for the purposes of this motion.

5.   Dr. Hinchey did not contradict Ms. Marcus's testimony on this issue, and in fact PQ never even asked him whether Ms. Marcus told him that Dr. Lau had told her in advance that age was going to be a consideration in the RIF.  *See* Attachment G (Excerpts from the Deposition of Richard J. Hinchey (*hereinafter* "Hinchey Dep.") at 81.

remarkably accurate: all eight of the R&D employees terminated in the RIF were age 55 or older. Exhibit P-52 (R&D "Exhibit A").

The sale to JPMP was finalized on February 11, 2005.  Def. Br. at 3.  Shortly after the acquisition, PQ's new CEO announced that the company was going to be undergoing a restructuring.  Exhibit P-11 (2/25/05 Organizational Announcement); *see also* Def. Br. at 15; Exhibit P-12 (2/27/05 Boyce Email).  Around that same time, Dr. Lau again approached Ms. Marcus and reiterated that unfortunately he had been correct in his earlier statement – the company was going to be getting rid of people, and that "older people and people making more money and that would be in the bonus plan" would be targeted.  Attachment F (Marcus Dep.) at 152-54, 366-74.

Consistently with Dr. Lau's comments, documents reflecting the ages of employees were created and reviewed by PQ as part of the RIF decision-making process.  Exhibits P-16 (3/21/05 Actives VF R&D); P-83 (5/1/05 Possible RIF by Dept); P-84 (5/1/05 Active After RIF); P-85 (4/27/05 Summary Stats); *see also* Attachment H (Excerpts from the Deposition of Kevin Doran) (*hereinafter* "Doran Dep.") at 138-141, 144-149.  The proportion of older employees included in the RIF <u>increased</u> substantially after the initial creation and review of these documents.[6]  *Cf.*

6.   For this reason, PQ's statement on page 2 of its brief that "the analysis performed by PQ at the time of the RIF shows that the average age of the terminated employees was not significantly greater than the average age of the employees being retained" is deliberately misleading.  In fact, as PQ is certainly aware, this statement is based on an <u>early</u> version of the analysis, which does not reflect the final RIF figures.  *See* Def. Br. at 15-16 (citing to PQBM 4361 in support of this argument); and Attachment H (Doran Dep.) at 147-150 (acknowledging that PQBM 4361 does <u>not</u> reflect the final RIF numbers, and indicating that there should be a document – never produced to Plaintiffs in discovery – that reflects the final numbers).  Uncontested documentation produced by PQ makes clear that the <u>final</u> numbers in the RIF did in fact show a significant age disparity – in R&D, an average age of 44.8 for those retained versus 62.5 for those RIF'd.  *See* Exhibit P-51 (Valley Forge, R&D, and Potters Field Sales "Exhibit A"s) (identifying the ages of employees who were RIF'd

Exhibit P-83 (5/1/05 Possible RIF by Dept) (identifying the ages of R&D employees expected to be RIF'd, the mean of which is 51.1); P-85 (Summary Stats) (identifying the mean age of those expected to be laid off company-wide as 49.8) *with* Exhibit P-51 (Valley Forge, R&D, and Potters Field Sales "Exhibit A"s) (identifying the ages of all employees actually terminated as part of the RIF, the mean of which is 62.5 in R&D and 53.4 companywide).

Although there were ongoing discussions regarding who should be terminated at least as early as January or February of 2005 (starting even prior to the purchase of the company), the final structure of R&D remained unresolved until late in the RIF decision-making process.  *See* Exhibits P-8 (1/3/05 Delmonte Email); P-20 (4/12/05 Delmonte Email); P-83 (5/1/05 Possible RIF by Dept); P-25 (5/6/05 Lau Memo); P-27 (5/9/05 Lau Memo); P-28 (5/9/05 Possible RIF Chart); P-30 (Draft of 5/16/05 RIF Proposal); P-32 (5/16/05 RIF Proposal); *see also* Attachment D (Kutchins Dep.) at 187-89; Attachment I (Excerpts from the Deposition of Colleen Delmonte) (*hereinafter* "Delmonte Dep.") at 73-75.  Ultimately, it was decided that the employment of eight individuals – all aged 55 or older – would be terminated as part of the R&D RIF process.  Exhibit P-52 (R&D "Exhibit A").  Contrary to Defendant's position throughout this litigation, Dr. Lau was not the sole or even principal decision-maker in the R&D RIF decision-making process, and in fact opposed the final RIF decisions for R&D.  *See* P-32 (5/16/05 RIF Proposal); P-37 (Lau Response to Final R&D RIF Proposal); *see also* Attachment A (Lau Dep.) at 357-59; Attachment F (Marcus Dep.) at 122-123, 133-134, 283-285, 307-308.  Those decisions were based largely on a proposal which was made by PQ managers Colleen Delmonte, Rosalyn Kutchins and Michael

and those who were not).

Imbriani,[7] which was ultimately substantially carried into effect by PQ's CEO (Michael Boyce), with the approval of PQ's Vice President of Human Resources, Kevin Doran.  *See* P-30 (Draft of 5/16/05 RIF Proposal); Exhibit P-32 (5/16/05 RIF Proposal); Exhibit P-53 ("Exhibit A"s With Supplemental Information) at PQBM 4341-4343; Attachment J (Excerpts from the Deposition of Michael Boyce) (*hereinafter* "Boyce Dep.") at 131; Attachment AL (Defendant's Amended Supplemental Answer to Mary Ellen Callaghan's Interrogatory Number 21), #21; Attachment F (Marcus Dep.) at 296-297.

Ms. Delmonte – in direct contradiction to PQ's position throughout this litigation – testified that the employees who were selected for termination as part of the Reduction in Force, including scientist Plaintiffs[8], were selected for termination because she viewed them as being the weakest performers in their jobs.  Attachment I (Delmonte Dep.) at 135-37.  She further testified that had any of the employees slated for termination been a better performer than an incumbent in another position, she would have kept them instead of the incumbent employee.  *Id.* at 190-92; *see also* Attachment D (Kutchins Dep.) at 228-29.  Ms. Delmonte acknowledged, however, that she had little contact with several of the employees on the list, and that her impressions of many of the employees as weak performers were based on subjective considerations that did not even relate to their individual performance.  Attachment I (Delmonte Dep.) at 150-152, 157-161, 191-92.

---

7.    The only employee who Delmonte, Kutchins and Imbriani suggested for termination in R&D who was <u>not</u> ultimately terminated was Dr. Lau.  *Cf.* Exhibit P-32 (5/16/05 RIF Proposal); *with* Exhibit P-53 ("Exhibit A"s With Supplemental Information) at PQBM 4341-4343.  Notably, Dr. Lau was also the only employee included on Delmonte, Kutchins and Imbriani's list who was under age 55.  *Id.*

8.    Throughout this brief, the term "scientist Plaintiffs" is used to refer to Plaintiffs Marcus, Senderov and Wypart.

Ultimately, eight employees were let go from R&D, all of whom were age 55 or older. Exhibit P-52 (R&D "Exhibit A").  In R&D, the average age of the employees who were RIF'd was 62.5 years old – almost 20 years more than the average age of those who were retained.  *Id.*

**Facts Relating to the Individual Plaintiffs**

Roman Wypart

Plaintiff Roman Wypart was 56 years old at the time of the RIF.  Exhibit P-53 ("Exhibit A"s With Supplemental Information).[9]  At the time of the RIF, Plaintiff Wypart had been employed with PQ for more than 6 years, and was employed as an Engineering/Research Fellow I.  Def Br. at 4, ¶ 9 and at 6, ¶ 33.  PQ has admitted that Plaintiff Wypart was qualified for the position he held at the time of the RIF, and that his performance was not one of the reasons for his inclusion in the RIF.  *See* Attachment S (Complaint), ¶¶ 39-40; Attachment T (Answer), ¶¶ 39-40.  Plaintiff Wypart consistently received positive performance evaluations during his time at PQ, and received a 5% merit increase at the time of his last performance review prior to the RIF.  *See, e.g.,* Attachment AU (PQBM 3108-3109).

Plaintiff Wypart is a plastics expert, and his work at PQ focused in this area.  Attachment A (Lau Dep.) at 315; Attachment K (Excerpts from the Deposition of Philip Connolly) (*hereinafter* "Connolly Dep.") at 72-73, 172-73.  In addition to traditional research and development activities in the plastics area, Plaintiff Wypart dedicated a considerable amount of his time to marketing and sales efforts related to certain PQ plastics products.  Attachment L (Excerpts from the Deposition of Roman Wypart) (*hereinafter* "Wypart Dep.") at 50-52, 86-

---

9.    Except as otherwise indicated, all ages set forth in the remainder of this brief are as of the time of the RIF, and are based on information set forth in Exhibit P-53 ("Exhibit A"s With Supplemental Information).

96; Attachment K (Connolly Dep.) at 72-73, 172-73.   Prior to his termination, Plaintiff Wypart supervised a younger employee named Erin Fisher (age 35), who also performed some R&D work in the plastics area.  Attachment L (Wypart Dep.) at 94, 96-97.  At the time of the RIF, Ms. Fisher had been recently promoted to an Associate Chemist.  Attachment AV (PQBM 3681).

Throughout this litigation, PQ has contended that the vast majority of Mr. Wypart's work was eliminated and that only a very minimal part was assumed by Ms. Fisher following her termination.  *See, e.g.,* Attachment AM (Defendant's Supplemental Responses to Plaintiff Roman Wypart's First Set of Interrogatories), #1, 5.  In fact, Ms. Fisher assumed the overwhelming majority of Mr. Wypart's job duties, spending 80 to 85% of her post-RIF time performing tasks that were performed by Mr. Wypart prior to the RIF.  Attachment M (Excerpts from the Deposition of Erin Fisher) (*hereinafter* "Fisher Dep.") at 13.

In the year preceding the RIF, Plaintiff Wypart's work related to two principal projects at PQ – Wood Polymer Composites ("WPC") and PVC (also known as Advera).  *See, e.g.,* Attachment L (Wypart Dep.) at 105-106; Attachment M (Fisher Dep.) at 26-27, 29; *see also* Attachment AU (PQBM 3108-3109); Attachment AA (Chart Summarizing Project Employee Information).  PQ has contended that except for a very minimal amount of work on WPC, these two projects were eliminated.  *See, e.g.,* Exhibit P-78 (EEOC Position Statements) at Plaintiffs 441, 443; Attachment AM (Defendant's Supplemental Responses to Plaintiff Roman Wypart's First Set of Interrogatories), #1 (contending that funding for the research that Wypart was conducting was eliminated); *see also* Attachment F (Marcus Dep.) at 132, 288.  Contrary to PQ's contention, work in both of these areas continued after the RIF.  Attachment AB (Project Continuation Chart).  Younger employees who were performing work on PVC and/or WPC at or around the time of the RIF were not terminated, whereas older employees who were performing

work on these projects were terminated.[10]  *See* Attachment AA (Chart Summarizing Project Employee Information).

Ernest (Eric) Senderov

Plaintiff Senderov was 69 years old at the time of the RIF.  Plaintiff Senderov had been employed by PQ Corp. for a total of more than 10 years, including more than 7 years of continuous employment at the time of the RIF.  *See* Attachment S (Complaint), ¶ 44; Attachment T (Answer), ¶ 44; Def. Br. at 10, ¶ 46.  Plaintiff Senderov was employed as an Engineering/ Research Fellow I at the time of the RIF.  *See* Attachment AT (PQBM 3007-3008).  PQ has admitted that Plaintiff Senderov was qualified for the position he held at the time of the RIF, and that his performance was not one of the reasons for his inclusion in the RIF.  *See* Attachment S (Complaint), ¶¶ 47-48; Attachment T (Answer), ¶¶ 47-48.  Less than two months prior to the RIF, Plaintiff Senderov received a glowing annual review, accompanied by a very significant (9.11%) merit pay increase.  *See* Attachment AT (PQBM 3007-3008); *see also* Attachment N (Excerpts from the Deposition of Neil Miller) (*hereinafter* "Miller Dep.") at 131-132 (testifying that a merit pay increase above 5% would be considered "high" at the time of the RIF).

Plaintiff Senderov was a materials synthesis expert, and his work at PQ focused in this area.  *See* Attachment AT (PQBM 3007-3008); Attachment A (Lau Dep.) at 194-195; Attachment K (Connolly Dep.) at 163-164, 170.  A number of other PQ employees also performed synthesis work, including Dick Hinchey (age 67), Phil Connolly (age 47), Hong Xin Li (age 41), and Dave Cooper (age 47).  *See* Attachment AI (Defendant's Amended

---

10.  Except as otherwise indicated, "younger employees" is used throughout this brief to refer to employees under age 55 at the time of the RIF, and "older employees" is used to refer to employees age 55 or older at the time of the RIF.

Supplemental Answers to Plaintiff Bonnie Marcus' Interrogatory Numbers 17 and 24), # 24; *see also* Attachment A (Lau Dep.) at 315-317; Attachment K (Connolly Dep.) at 163-164. 100% of the individuals age 55 and older performing synthesis work prior to the RIF were terminated as part of the RIF, while 100% of those under age 55 were retained. *See id.*; *see also* Exhibit P-53 ("Exhibit A"s With Supplemental Information) at PQBM 4341-4343. Three of the synthesis employees (Connolly (age 47), Hinchey (age 67), and Senderov (age 69)) were directly compared for the purposes of deciding who should be retained following the RIF to perform synthesis work. *See* Exhibit P-20 (4/12/05 Delmonte Email); *see also* Attachment D (Kutchins Dep.) at 403-404, 650-652. Ultimately only the youngest and least qualified – Connolly – was retained. *See* Exhibit P-53 ("Exhibit A"s With Supplemental Information) at PQBM 4341-4343; *see also* Attachment K (Connolly Dep.) at 163-164.

In the year preceding the RIF, Plaintiff Senderov's work focused primarily on three projects: Nano A, Siliceous Zeolite (Olefin Cracking) and TS-PQ. *See* Attachment AA (Chart Summarizing Project Employee Information); Attachment O (Excerpts from the Deposition of Earnest Senderov) (*hereinafter* "Senderov Dep.) at 112-113. PQ has contended that all of these projects were eliminated at the time of the RIF. *See* Exhibit P-78 (EEOC Position Statements) at 434, 443; Attachment AP (Defendant's Supplemental Responses to Plaintiff Ernest Senderov's First Set of Interrogatories), #1 (contending that funding for the research that Senderov was conducting was eliminated); Attachment AO (Defendant's Amended Responses to Plaintiff Roman Wypart's Second Set of Interrogatories), #18 (contending that most CD projects – including Nano A and TS-PQ – were eliminated at the time of the RIF); *see also* Attachment AH (Defendant's Responses to Bonnie Marcus's Second Set of Interrogatories), #19 (identifying PQBM 2715 as setting out CD projects in 2005); Exhibit P-60 (PQBM 2715). Contrary to PQ's

contention, work continued or resumed on two of the three projects that Plaintiff Senderov was involved in shortly following the RIF.[11]  Attachment AB (Project Continuation Chart).  Indeed, Plaintiff Senderov himself was retained as a consultant following the RIF through September 2005 to continue work on the Siliceous Zeolite project.  *See* Attachment O (Senderov Dep.) at 110.  Younger employees who were performing work on these projects at or around the time of the RIF were retained, whereas older employees who were performing work on these projects were terminated.  *See* Attachment AA (Chart Summarizing Project Employee Information).

Bonnie Marcus

Plaintiff Marcus was 60 years old at the time of the RIF.  At the time of the RIF, Plaintiff Marcus had been employed by PQ for more than 10 years, and was employed as a "Manager: Technical Market Development."  Attachment F (Marcus Dep.) at 59; Attachment S (Complaint), ¶ 28; Attachment T (Answer), ¶ 28.  PQ has admitted that Plaintiff Marcus was qualified for the position she held at the time of the RIF, and that her performance was not one of the reasons for her inclusion in the RIF.  Attachment S (Complaint), ¶¶ 31-32; Attachment T (Answer), ¶¶ 31-32.  According to Dr. Lau, Ms. Marcus was a "very gifted individual," Attachment A (Lau Dep.) at 209, who had "a very broad knowledge of the application of Zeolite product in the market place."  *Id.* at 212-213.

Plaintiff Marcus's work at PQ focused on the management of employees who were working on CD Projects, and on project management, marketing, customer service and technical

---

11.  Even as to TS-PQ, there is evidence that PQ intended to continue work in this area after the RIF.  *See, e.g.,* Attachment AZ (PQBM 009843-9844); Attachment F (Marcus Dep.) at 249-251; *see also* Attachment O (Senderov Dep.) at 64-66, 71 (explaining that from a chemist's perspective, TS-1 and TS-PQ are the same thing).  Work did not actually resume in this area until some time later due to delayed negotiations with a third-party company.  *See* Attachment K (Connolly Dep.) at 117-120.

service in relation to a number of R&D projects.  Attachment F (Marcus Dep.) at 71-77, 194-195, 237-239, 242-243, 245-247, 251, 255-256; *see also* Attachment K (Connolly Dep.) at 23-28. Phil Connolly (age 47) – who was not terminated as part of the RIF – testified that Ms. Marcus's position involved a very similar array of functions to his own position at the time of the RIF.  *See* Attachment K (Connolly Dep.) at 23-28.  Ms. Marcus also provided technical service and customer service to detergent zeolites customers and to the Asian PQ Detergent Zeolites plants. Attachment AI (Defendant's Amended Supplemental Answers to Plaintiff Marcus's Interrogatory Numbers 17 and 24), #24.  Mr. Connolly assumed the detergent zeolites component of Ms. Marcus's work following the RIF.  *See id.*; *see also* Exhibit P-2 (9/10/04 Kutchins Email) (suggesting that Phil Connolly – who was not at that time performing this function – assume responsibility for Ms. Marcus's job duties in this area).

PQ also directly compared Ms. Marcus to another employee, Ed Myszak (age 54), in determining who would fill a new position that was being created in connection with the restructuring of R&D.  Exhibit P-34 (Zeolite Development Engineer Position Chart); Exhibit P-35 (Zeolite Development Engineer Position Chart); Attachment D (Kutchins Dep.) at 261, 270. In a highly subjective decision-making process, which did not even involve consultation with Ms. Marcus's supervisor, Mr. Myszak was awarded the new position.  Attachment D (Kutchins Dep.) at 254, 274-275, 297-298.  Indeed, in "evaluating" Ms. Marcus, as compared to Mr. Myszak, not even the most rudimentary steps were taken to verify the accuracy of even objectively verifiable criteria.  Thus, for example, the younger Mr. Myszak was assigned a "4" rating for patents (on a scale of 1 to 5), despite the fact that he held only a single patent at that time, while Ms. Marcus – who held 36 patents at the time – was rated only one point higher ("5").  *See* Exhibit P-34 (Zeolite Development Engineer Position Chart); Attachment P (Excerpts

- 14 -

from the Deposition of Ed Myszak) (*hereinafter* "Myszak Dep.") at 186; Attachment U
(Declaration of Bonnie Marcus), ¶ 2.  Even more strikingly, Mr. Wypart, (who was also being
considered for the same position) was ranked <u>lower</u> than Mr. Myszak on the patent criteria,
despite the fact that <u>he held 7 patents at that time</u>.  Exhibit P-34 (Zeolite Development Engineer
Position Chart); Attachment V (Declaration of Roman Wypart), ¶ 2.  Roughly 50% of
Mr. Myszak's job duties in the new position were comprised of duties being performed by
Ms. Marcus immediately prior to the RIF.  Attachment M (Fisher Dep.) at 14; *see also* Exhibit
P-131 (6/6/06 Fisher Email).

During the last year of her employment with PQ, Ms. Marcus's work focused on the
following R&D projects: Wood Polymer Composites (WPC), Lucite (MMA), Nano A, PVC,
Biocides II and TS-PQ.  *See* Attachment AA (Chart Summarizing Project Employee
Information).   PQ has contended that except for a minimal amount of work on WPC, all of these
projects were eliminated.  Exhibit P-78 (EEOC Position Statements) at 427, 443; Attachment AF
(Defendant's Second Supplemental Responses to Plaintiff Bonnie Marcus's First Set of
Interrogatories), #1 (contending that funding for the research that Marcus was overseeing was
virtually eliminated); Attachment AO (Defendant's Amended Responses to Plaintiff Roman
Wypart's Second Set of Interrogatories), #18 (contending that most CD projects – including
Nano A, Biocides II and TS-PQ – were eliminated at the time of the RIF);[12] *see also* Attachment
F (Marcus Dep.) at 132, 288.  Contrary to PQ's contention, work on the vast majority of these
projects continued following the RIF.  Attachment AB (Project Continuation Chart). Younger

---

12.  Nano A, TS-PQ and Biocides II are identified as CD projects in Defendant's Responses to
     Bonnie Marcus's Second Set of Interrogatories, # 19.  *See* Attachment AH (Defendant's
     Responses to Bonnie Marcus's Second Set of Interrogatories), #19 (identifying PQBM 2715
     as setting out CD projects in 2005); Exhibit P-60 (PQBM 2715).

employees who were performing work on these projects at or around the time of the RIF were not terminated, whereas older employees who were performing work on these projects were terminated.  *See* Attachment AA (Chart Summarizing Project Employee Information).

<u>Mary Ellen Callaghan</u>

Plaintiff Mary Ellen Callaghan was 55 years old at the time of the RIF.  At the time of the RIF, Plaintiff Callaghan had been employed with PQ for nearly two years and held the position of "Office Supervisor."  *See* Attachment S (Complaint), ¶ 53-54; Attachment T (Answer), ¶¶ 53-54.

Contrary to the position PQ takes in the instant motion, PQ has previously admitted that Plaintiff Callaghan was qualified for the position she held at the time of the RIF, and that her performance was not one of the reasons for her inclusion in the RIF.  *See* Attachment S (Complaint), ¶¶ 56-57; Attachment T (Answer), ¶¶ 56-57.  Indeed, just weeks prior to the RIF, Plaintiff Callaghan's supervisor requested and obtained approval for a 5% merit increase for Plaintiff Callaghan, *see* Exhibit P-109 (5/16/05 Merit Increase), an increase that he testified: (1) would have been based exclusively on individual performance, *see* Attachment N (Miller Dep.) at 32-33; (2) would <u>not</u> have been awarded if he did not feel it was merited by performance considerations, *see id.* at 137-138; and (3) was just shy of a what would be categorized as a "high" merit increase, *see id.* at 132.  Ms. Callaghan also received a 3% merit increase from her supervisor after only 6 months of employment (in January 2004), *see* Exhibit P-111 (7/27/04 Performance Evaluation) at PQBM 2855, an award that Ms. Callaghan's supervisor testified was an exception to his usual policy of only giving merit increases on an annual basis, and reflected the fact that she was "doing well" in her position.  Attachment N (Miller Dep.) at 136-138.

Plaintiff Callaghan's work at PQ involved a variety of functions, including administrative work, facilities management and cost savings projects. Attachment Q (Excerpts from the Deposition of Mary Ellen Callaghan) (*hereinafter* "Callaghan Dep."), at 34-35. At the time of the RIF, Plaintiff Callaghan was directly compared to another employee who performed similar functions at PQ's Valley Forge Facility, John Farrer (age 41). Exhibit P-78 (EEOC Position Statements) at Plaintiffs 0430-0431. It was anticipated that Mr. Farrer would take over the substantial "bulk" of Ms. Callaghan's work after her termination. *Id.*; *see also* Attachment F (Marcus Dep.) at 351-352. In addition to Mr. Farrer, three other employees under age 55 – Neil Miller (age 52), Ria Schueren (age 39) and Robbie Holland (age 50 or 51) – also assumed smaller parts of Ms. Callaghan's job duties following the RIF. Attachment AK (Defendant's Second Supplemental Responses to Mary Ellen Callaghan's First Set of Interrogatories), #5; Attachment AJ (Defendant's Responses to Mary Ellen Callaghan's Second Set of Interrogatories), #19; Attachment Q (Callaghan Dep.) at 141-144; *see also* Attachment W (Declaration of Mary Ellen Callaghan), ¶ 2 (setting out age of Robbie Holland).

## Age Bias of Individual Decision-Makers

John Lau

As described, *supra*, John Lau directly informed Ms. Marcus that the RIF was going to target older employees. *See* Attachment F (Marcus Dep.) at 93-94, 134, 150-158, 366-374; *see also* Exhibit D-131 (Marcus Notes). Thus, Dr. Lau's own statements very directly link him to age bias.

Colleen Delmonte

Similarly, Colleen Delmonte stated to John Lau that "we need to get rid of some of these old farts." Attachment P (Myszak Dep.) at 95; *see also* Exhibit P-144 (Myszak Notes). This

remark – which was made in the context of personnel discussions – clearly evidences age bias on the part of Ms. Delmonte.  *Id.*

Michael Imbriani

Michael Imbriani expressly told Ms. Kutchins to get rid of an employee (Mr. Myszak) and to fill his position with "new or younger blood."  Attachment D (Kutchins Dep.) at 359-361. Despite the fact that Ms. Delmonte reported this incident immediately to HR, no steps were ever taken to address Mr. Imbriani's discriminatory behavior.[13]  *Id.* at 360-370; *see also* Attachment E (Imbriani Dep.) at 148.  Instead, Ms. Kutchins was criticized for her handling of the situation, and was ultimately demoted as a result.  *Id.* at 363-364, 819-820; *see also* Attachment P (Myszak Dep.) at 86, 112-114.  Mr. Myszak's position was ultimately filled with a younger employee as directed by Imbriani.  Attachment D (Kutchins Dep.) at 363.

Roz Kutchins

As noted above, Ms. Kutchins had, in the past, protested what she perceived as discriminatory behavior.  As a result, she was subjected to retaliation.  *See supra.*  This caused Ms. Kutchins to be "afraid" of Mr. Imbriani, and she determined that she had to go to "bitch school" to learn to be more like senior management.  Attachment P (Myszak Dep.) at 85-86, 112-114; Exhibit P-142 (Myszak Notes) at Myszak 18; P-134 (Myszak Notes) at Myszak 2.

By the time of the 2005 RIF, Ms. Kutchins had fallen in line with upper management's age biased approach, telling Plaintiff Bonnie Marcus that it was time for people like Ms. Marcus

---

13.   Indeed, the memo that Ms. Kutchins filed with HR regarding this incident was never produced in discovery, and apparently was destroyed.  *See* Attachment AF (Defendant's Second Supplemental Responses to Bonnie Marcus's First Set of Interrogatories), # 12; *see also* Attachment D (Kutchins Dep.) at 359-361 (confirming that Ms. Kutchins filed a complaint with the HR Department).

(then 60 years of age) to leave graciously and to leave the door open for "younger" employees. Attachment F (Marcus Dep.) at 274.

Kevin Doran

Mr. Doran – who coordinated the overall RIF efforts – created documents expressly showing the ages of employees slated for termination.  Exhibits P-16 (3/21/05 Actives VF R&D); P-83 (5/1/05 Possible RIF by Dept); P-84 (5/1/05 Active After RIF); P-85 (4/27/05 Summary Stats); *see also* Attachment H (Doran Dep.) at 138-141, 144-149.  Although Mr. Doran testified that those documents were created to prevent age discrimination, *see* Attachment H (Doran Dep.) at 138-141, 144-149, the facts suggest quite the opposite – the age profile of the employees slated for layoff became considerably older <u>after</u> the creation and review of those documents.  *Cf.* Exhibit P-83 (5/1/05 Possible RIF by Dept) (identifying the ages of R&D employees expected to be RIF'd, the mean of which is 51.1); P-85 (Summary Stats) (identifying the mean age of those expected to be laid off company-wide as 49.8) *with* Exhibit P-51 (Valley Forge, R&D, and Potters Field Sales "Exhibit A"s) (identifying the ages of all employees actually terminated as part of the RIF, the mean of which is 62.5 in R&D and 53.4 companywide).

**Statistical Evidence**[14]

As noted, *supra*, 100% of those terminated from R&D were age 55 or older, despite the fact that only 30.4% of the R&D workforce was comprised of employees age 55 or older.  *See* Attachment X (Report of Dr. Stephanie Thomas) (*hereinafter* "Thomas Report") at 13. Plaintiffs' statistical expert found that this disparity was 4.3 standard deviations from what one

---

14.  Plaintiffs' expert examined a number of different age groups in conducting her analysis, and found statistically significant results for most of them.  Since it appears that PQ specifically targeted employees age 55 or older in the R&D RIF, this section sets forth the results of Plaintiffs' expert's analysis for that age group only.

would expect to see in an age-neutral process, a statistically significant result.  *See id.*; *see also*

*Maddow v. Proctor & Gamble*, 107 F.3d 846, 852 (11th Cir. 1997) ("A standard deviation of two

or three is enough to support an inference of discrimination.").  There is a less than 1 in 58,500

chance that such a large disparity would exist absent consideration of age.  Attachment Z

(Declaration of Dr. Stephanie Thomas) (*hereinafter* "Thomas Decl."), ¶ 3.  Company-wide,

Plaintiffs' expert also found a statistically significant correlation between age and the RIF

decisions.  *See* Attachment X (Thomas Report) at 11 (indicating for the 55+ age category that the

observed number of employees RIF'd was 3.68 standard deviations from the expected value).

Plaintiffs' expert also analyzed the R&D RIF outcomes, controlling for the principal

justifications that have been provided by PQ for the elimination of positions in R&D.[15]

Specifically, Plaintiffs' expert conducted analyses controlling for: (1) 2005 membership in the

CD Group[16]; (2) 100% assignment to CD projects in 2005; (3) 100% funding through the CD

---

15.  Plaintiffs' expert did not have the opportunity to perform an analysis based on the precise
justification articulated by Defendant in the instant Motion, since that justification was
stated for the first time in Defendant's summary judgment brief.  *See* Section IV.B.iii.,
*infra*.  However, several of the analyses performed by Plaintiffs' expert correspond very
closely to Defendant's current justification, and would in fact include a greater number of
older employees, thereby understating the extent of the link between age and the RIF
decisions.  *See* Attachment AC (Employees Similarly Situated to Plaintiffs in Relation to
Defendant's Articulated Non-Discriminatory Justifications); *see also* Attachment X
(Thomas Report); Attachment Y (Supp. Thomas Report).

16.  Despite the fact that there is a disputed issue of fact as to who the members of the CD group
were, Plaintiffs' expert relied on PQ's most recent official position on this issue (which is
the position most favorable to PQ) in conducting her analysis.  *See* Attachment X (Thomas
Report) at 7-8 & n.9; *cf.* Attachment AF (Defendant's Second Supplemental Responses to
Plaintiff Bonnie Marcus's First Set of Interrogatories) (*hereinafter* "2nd Supp. Responses to
Marcus's Rogs"), # 13, (identifying PQBM 212-215 and PQBM 233-236 as setting forth the
membership of the CD Group); Exhibit P-3 (PQBM 233-236) (identifying a significant
number of additional younger employees who were not terminated as being members of the
CD Group); Exhibit P-80 (PQBM 212-215) (same).  Since PQ's most recent official
position is ambiguous as to the propriety of including Dr. Lau as a member of the CD

program in 2005[17]; (4) Elimination at the time of the RIF of the CD projects to which the

employee was assigned[18]; and (5) Receipt of any CD funding in 2005.[19]  *See* Attachment X

(Thomas Report); and Attachment Y (Supplemental Report of Dr. Stephanie Thomas)

(*hereinafter* "Supp. Thomas Report").  The results – which show that there continues to be a

statistically significant relationship between age and the RIF decisions, even controlling for these

factors – are set out below.

| Factor Controlled For | Standard Deviations from Expected Age Distribution (Age 55+) | Probability of Observed Age Distribution Occurring By Chance (After Controlling for Factor Noted) |
|---|---|---|
| None (Analysis of R&D) | 4.3 | 0.00001709204 (1 in 58,507) |
| 2005 CD Group Membership | 3.76 / 3.65[20] | 0.00016996676 (1 in 5,884) / 0.00026230767 (1 in 3,812) |

group, Plaintiffs' expert conducted this analysis both including and excluding Dr. Lau.  *See* Attachment X (Thomas Report) at 8.  Both results are set forth in the text below.

17.   For the purposes of her original analysis, Plaintiffs' expert assumed that Ms. Marcus and Mr. Hinchey were 100% funded through CD funds in 2005, despite the fact that this was a contested issue of fact.  PQ itself later abandoned this position, conceding that Ms. Marcus and Mr. Hinchey were, respectively, only 50% and 10% funded through CD funds, *see* Def. Br. at 14 (quoting PQ's response to Callaghan Interrogatory # 23), and so Plaintiffs' expert also conducted an analysis excluding Ms. Marcus and Mr. Hinchey.  Both sets of results are set forth in the text below.

18.   Two analyses were performed because Defendant has produced conflicting documentation regarding who was assigned to what CD projects, and in what proportions in 2005.  *Cf.* Exhibit P-3 (PQBM 233-236) *with* Exhibit P-80 (PQBM 212-215); *see also* Attachment AF (2nd Supp. Responses to Marcus's Rogs), # 13.  Both sets of results are set forth in the text below.

19.   Although the evidence would support a finding that additional younger employees received CD funding in 2005, *see, e.g.,* P-3 (PQBM 233-236) and P-80 (PQBM 212-215), Plaintiffs' expert relied only on the most recent numbers provided by PQ, which are those most favorable to PQ.  Attachment Y (Supp. Thomas Report) at 2-3.

20.   Lau included/excluded from CD group.

- 21 -

| 100% Assignment to CD Projects in 2005 | 3.65 | 0.00026230767 (1 in 3,812) |
|---|---|---|
| 100% CD Funding in 2005 | 3.65 / 3.97[21] | 0.00026230767 (1 in 3,812) / 0.00007190467 (1 in 13,907) |
| Elimination of CD Projects at Time of RIF | 4.06 / 3.96[22] | 0.00004909781 (1 in 20,368) / 0.00007498265 (1 in 13,336) |
| Receipt of CD Funding in 2005 | 4.04 | 0.00005347773 (1 in 18,699) |

*See* Attachment X (Thomas Report) at 13-16; Attachment Y (Supp. Thomas Report) at 4-5; *see also* Attachment Z (Thomas Aff.) at ¶ 3.

## IV.   ARGUMENT

Defendant PQ asks this Court to conclude that no reasonable jury could determine that it discriminated against Plaintiffs on the basis of their age.  *See, e.g., Goodman v. Lukens Steel Co.*, 777 F.2d 113, 130 (3d Cir. 1985).  Because a reasonable jury clearly could conclude that Plaintiffs were subjected to age discrimination, PQ's motion must be denied.

Below, Plaintiffs address: (1) the application of the mixed motives framework; (2) the application of the *McDonnell Douglas* framework; and (3) specific evidentiary arguments made by PQ.  As this discussion shows, Plaintiffs have introduced more than sufficient evidence to survive summary judgment no matter what burden-shifting framework is applied by this Court.[23]

---

21.   With/without Marcus and Hinchey as 100% CD funded personnel.

22.   Based on PQBM 235/PQBM 215.

23.   If this Court concludes that Plaintiffs have introduced sufficient evidence to prevail under either a mixed motives or a *McDonnell Douglas* paradigm, Defendant's motion for summary judgment must be denied.

- 22 -

A.      **Mixed Motives Analysis**

        Summary judgment must be denied if a genuine issue of fact exists applying the mixed

motives burden-shifting paradigm.  Under the mixed motives paradigm, once the Plaintiff has

introduced sufficient evidence that discriminatory animus was a consideration in the decision-

making process, the burden shifts to the Defendant to prove that it would have taken the same

action, even in the absence of discrimination.[24]  Because Plaintiffs have introduced sufficient

evidence to qualify for mixed motives burden-shifting, and because Defendant clearly has <u>not</u>

conclusively proved that it would have taken the same actions absent bias, summary judgment

must be denied under the mixed motives paradigm.

---

24. Two versions of the mixed motives test are applied by courts in the Third Circuit and in
    Pennsylvania: (1) the version adopted in the Supreme Court's decision in *Price Waterhouse
    v. Hopkins*, 490 U.S. 228 (1989); and (2) the version adopted in the Civil Rights Act of
    1991 (hereinafter "CRA 1991"), *see* 42 U.S.C. § 2000e-2(m).  These tests are the same
    except for two key features: (1) a Plaintiff is required to make a heightened evidentiary
    showing in order to qualify for burden-shifting under *Price Waterhouse*, but need not do so
    under CRA 1991, *see Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003); and (2) once
    an initial showing has been made that discrimination was a factor, a Defendant cannot
    escape liability under CRA 1991, *see* 42 U.S.C. § 2000e-2(m), although it may be able to
    limit the relief available to the Plaintiff, *see* 42 U.S.C. § 2000e-5(g)(2)(B).

    Although this issue is currently under review by the Supreme Court, *see Gross v. FBL
    Financial Services, Inc.*, Docket No. 08-441, under current Third Circuit authority, the
    *Price Waterhouse* version of the mixed motives test clearly applies to Plaintiffs' ADEA
    claims.  However, state court authority – which is binding on this court in its interpretation
    of the PHRA – makes clear that the CRA 1991 version of the mixed motives test should
    instead be applied to Plaintiffs' PHRA claims.  *See, e.g., Spanish Council of York v.
    Pennsylvania Human Relations Commission*, 879 A.2d 391, 398-99 & n.19 (Pa. Commw.
    Ct. 2005) (applying the CRA 1991 version of the mixed motives test in a PHRA case).  As
    set out in the text above, Plaintiffs have made out even the more stringent showing required
    under *Price Waterhouse*, and therefore clearly also qualify for burden-shifting under the
    CRA 1991 formulation of the test.

I.      **Plaintiffs Qualify For Burden Shifting Under *Price Waterhouse***

Under the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228

(1989), plaintiffs qualify for mixed motives burden-shifting where they introduce "evidence. . .

sufficient to allow the jury to find that the decision-makers placed a substantial negative reliance

on the plaintiff's age in reaching their decision." *Glanzman v. Metropolitan Management Corp.*,

391 F.3d 506, 512 (3d Cir. 2004).  Although this showing has sometimes been referred to as

"direct evidence," this term is a misnomer as the Third Circuit has held that a plaintiff's *Price*

*Waterhouse* showing can involve circumstantial evidence, "direct" evidence, or a combination of

the two.  *See, e.g.*, *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 n.2 (3d Cir. 2002); *see also*

*Shellenberger v. Summit Bancorp*, 318 F.3d 183 (3d Cir. 2003) (relying both on timing and on

the nature of comments made to Plaintiff in concluding that she had introduced sufficient

evidence to qualify for mixed motives burden-shifting).

Contrary to Defendant's argument, Plaintiffs have clearly introduced sufficient evidence

to qualify for *Price Waterhouse* burden-shifting.  Among other things:

●      The Vice President of R&D, John Lau, directly informed Ms. Marcus on several

occasions that the RIF was going to target older employees.  *See* Attachment F (Marcus

Dep.) at 93-94, 134, 150-158, 366-374; Exhibit D-131 (Marcus Notes).[25]

●      Another decision-maker, Colleen Delmonte, previously stated in the context of personnel

discussions that "we need to get rid of some of these old farts."  *See* Attachment P

(Myzak Dep.) at 95; Exhibit P-144 (Myszak Notes).

---

25.   Although it concedes for the purposes of summary judgment that these comments were
made, PQ makes a number of unsupported arguments for why they are not probative of age
discrimination.  These arguments are addressed in Section IV.C., *infra*.

- 24 -

- Another decision-maker, Rosalyn Kutchins, told Ms. Marcus following the RIF that it was time for people like Plaintiff Bonnie Marcus (then 60 years of age) to leave graciously and to leave the door open for "younger" employees.  *See* Attachment F (Marcus Dep.) at 274.

- PQ created documents showing the ages of potential candidates for the RIF, and these documents were considered in making RIF decisions.  *See* Exhibits P-16 (3/21/05 Actives VF R&D); P-83 (5/1/05 Possible RIF by Dept); P-84 (5/1/05 Active After RIF); P-85 (4/27/05 Summary Stats); *see also* Attachment H (Doran Dep.) at 138-141, 144-149.

- 100% of those terminated in R&D were age 55 or older, a result that is exceedingly unlikely to have resulted absent consideration of age.[26]  *See* Attachment X (Thomas Report).

- Even when controlling for the predominant justifications that PQ has put forth for why R&D employees were selected for inclusion in the 2005 RIF, there remains a substantial correlation between age and selection for inclusion in the RIF.  *See* Attachment X (Thomas Report); Attachment Y (Supp. Thomas Report).

Indeed, Dr. Lau's comments to Ms. Marcus – standing alone – would be sufficient to permit a reasonable jury to conclude that the decision-makers placed substantial negative reliance on plaintiffs' age in making the RIF decisions in this case.

Strikingly, Defendant does not cite to a *single* case in which any court has come to the conclusion that a Plaintiff did not qualify for *Price Waterhouse* burden-shifting on the basis of evidence comparable to that at issue in the instant case.  In fact, the Third Circuit Court of

---

26.   Defendant's arguments attacking the admissibility of Plaintiffs' statistical analysis are addressed in Section IV.C., *infra*.

Appeals has found that plaintiffs qualified for *Price Waterhouse* burden-shifting on the basis of evidence that is *less* persuasive than that at issue here.  Thus, for example, in the case of *Shellenberger v. Summit Bancorp*, 318 F.3d 183 (3d Cir. 2003), the Third Circuit concluded that a Plaintiff had qualified for *Price Waterhouse* burden-shifting in a retaliation case on the basis remarks that provided far more ambiguous evidence of animus than the remarks made here.  *See e.g., Id.* (in a retaliation case, finding that Plaintiff could qualify for *Price Waterhouse* burden-shifting on the basis of the following remarks: (1) a remark when Plaintiff requested a reasonable accommodation that "I know you're taking the legal route, so you probably just want to consider – just continue in that vein"; and (2) remarks at the time of Plaintiff's termination that "[w]e can't get along with you or we-we just can't work out our relationship with you"); *see also Fakete v. Aetna, Inc.*, 308 F.3d 335, 336, 339 (3d Cir. 2002) (finding mixed motives burden-shifting to be appropriate in a case with remarks that are similar to the remarks made in this case).

      ii.      **Defendant Cannot Show That It Would Have Taken the Same Actions Even in the Absence of Discriminatory Animus**

Defendant PQ also contends that – even if Plaintiffs qualify for mixed motives burden-shifting – it must be awarded summary judgment, since any reasonable jury would be <u>required</u> to conclude that it would have taken the same actions even in the absence of discrimination.  On the record presented in the instant case, *see* Section III, *supra* and Section IV.B., *infra*, this contention is absurd.  Indeed, the lone case that Defendant cites in support of this argument – in which the Plaintiff had been caught trying to steal a dishwasher, was frequently not at work during working hours, used company employees to perform tasks for her own personal business, accepted $1000 worth of personal collect calls on the company phone and introduced essentially

no evidence to contradict Defendant's contentions regarding her misconduct – simply serves to

highlight the extremely high showing that is required for a Defendant to prevail on summary

judgment in a mixed motives case.[27]  *See Glanzman v. Metropolitan Management Corp.*, 391

F.3d 506, 509-510, 514-515 (3d Cir. 2004).  Moreover, Defendant is subject to liability on

Plaintiffs' state law claims *even if* they could demonstrate that they would have taken the same

actions in the absence of discrimination, and summary judgment must be denied for this

independent reason.  *See* note 24, *supra*.

**B.**     ***McDonnell Douglas* Analysis**

Summary judgment must also be denied if Plaintiffs can create a genuine issue of fact

applying the *McDonnell Douglas* burden-shifting framework.  *See McDonnell Douglas Corp. v.

Green*, 411 U.S. 792 (1973).  Under the *McDonnell Douglas* framework, the parties' proof

proceeds in three steps: *First*, a plaintiff bears the burden of establishing "a relatively simple

*prima facie* case," *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981);

*Second*, the Defendant must come forward with evidence of a legitimate nondiscriminatory

---

27.   Notably, Defendant does not contend that it is entitled to prevail on the basis of a showing
      that Plaintiffs would have been terminated even in the absence of a RIF.  Although PQ
      repeatedly insinuates that Ms. Marcus (and perhaps Mr. Wypart and Ms. Callaghan) were
      slated for termination even before the RIF, *see, e.g.,* Def. Br. at 7, 8, 12, 13, 14, it ultimately
      does not rely on this argument, and its contentions in this regard therefore should be
      disregarded by this Court.  Moreover, even a cursory review of the documentation that
      Defendant relies on to make its argument on this point makes clear that its arguments on
      this issue are unsupportable.  *See, e.g.,* Attachment AR (PQBM 00017) (indicating that
      funding was going to be cut for a number of employees – including both several (older)
      employees that were ultimately terminated as part of the RIF and (younger) employees who
      were not – also stating that the business unit had determined that it "need[ed]" to maintain
      funding for several older employees who were ultimately terminated); *see also* Attachment
      A (Lau Dep.) at 280 (stating that the process leading to the termination of Mary Ellen
      Callaghan did not start until – at the earliest – February 2005); and Def. Br. at 14
      (insinuating that Ms. Callaghan was slated for termination as early as January 2005).

reason for the adverse employment action, *see id.* at 255-56 & n.9; *Third*, if the Defendant has come forward with a legitimate non-discriminatory justification for the action, the Plaintiff must introduce sufficient evidence from which a reasonable jury could either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that it an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

As the Third Circuit has emphasized, the *McDonnell Douglas* framework is "simply [a] tool[] designed to aid in the analysis of evidence.  The ultimate question remains whether the defendant has discriminated. . ." *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 130 (3d Cir. 1985) (affirming the decision of this Court, Fullam, *J.*); *see also Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 355-56 (3d Cir. 1999) ("The central focus of the inquiry in a case such as this is always whether the employer is treating some people less favorably than others because of their [protected class status]. . .The method suggested in *McDonnell Douglas* for pursuing this inquiry. . .was never intended to be rigid, mechanized, or ritualistic.") (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)).  For all of the reasons set forth below, a reasonable jury clearly could conclude that discrimination was the cause of Plaintiffs' termination, and therefore summary judgment must be denied.

## I.    *Prima Facie* Case

The *McDonnell Douglas prima facie* case was developed in the Supreme Court case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny.  Under the basic formulation of the *McDonnell Douglas prima facie* case, a Plaintiff must show: (1) that he or she is a member of a protected class; (2) that he was qualified for the position for which he was applied; (3) that he was not hired despite his qualifications; and (4) that "after his rejection, the

position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Id.* at 802.  As the Third Circuit has emphasized, the requirements of the *prima facie* case must be adapted to the circumstances of a particular case, and are "not onerous."  *See, e.g., Doe v. C.A.R.S. Protection Plus*, 527 F.3d 358, 365 (3d Cir. 2008); *see also EEOC v. Metal Service Co.*, 892 F.2d 341, 347-348 (3d Cir. 1990)

Indeed, under controlling Third Circuit law, a *prima facie* case is, as a matter of law, made out "when sufficient evidence is offered such that the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons," regardless of whether the Plaintiff has technically complied with the requirements of the four part test.  *EEOC v. Metal Service Co.*, 892 F.2d 341, 348 (3d Cir. 1990) (emphasis added); *see also Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 355-56 (3d Cir. 1999) (in order to make out a prima facie case, a Plaintiff need only introduce "evidence adequate to create an inference that an employment decision was based on illegal discriminatory criterion") (quoting *O'Connor v. Consolidated Coin Caterers Corp*, 517 U.S. 308, 312 (1996)); *Iadmarco v. Runyon*, 190 F.3d 151, 161-163 (3d Cir. 1999) (holding that a discrimination plaintiff "needs only to present sufficient evidence to allow a fact finder to conclude that the unexplained decision that forms the basis of the allegation of discrimination was motivated by discriminatory animus.").  Moreover, the Third Circuit has repeatedly reiterated that the fourth element of a plaintiff's prima facie case – the only element that is disputed here, *see* Def. Br. at 31 – can be made out simply by showing that the Plaintiff was terminated "under circumstances that give rise to an inference of unlawful discrimination." *Waldron v. SL Industries, Inc.*, 56 F.3d 491, 494 (3d Cir. 1995) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Hampton v. Borough of Tinton Falls Police Dep't*, 98 F.3d 107, 112 (3d Cir. 1996);

*see also Gupta v. Sears, Roebuck & Co.*, No. 07-243, 2009 WL 890585, *20-22 (W.D. Pa. Mar. 26, 2009); *Landon v. Northwest Airlines*, 72 F.3d 620, 625 (8th Cir. 1995) (concluding that the Plaintiff's evidence was "sufficient to meet the fourth prong's minimal requirements of some evidence allowing for an inference of improper motivation.")

Applying this standard, there can be no question that Plaintiffs have established a *prima facie* case.  Indeed, it is difficult to see how PQ can seriously contend that Plaintiffs have failed to meet their limited burden of coming forward with sufficient evidence to establish a *prima facie* case.  Clearly, the evidence proffered by the Plaintiffs would allow, if not compel, this Court to conclude that age motivated their discharge, if otherwise unexplained.  This evidence includes, among other things:

- Comments directly stating that older employees would be targeted in the RIF, *see e.g. Doe v. C.A.R.S. Protection Plus*, 527 F.3d 358, 368-369 (3d Cir. 2008);

- A showing that <u>all</u> of the employees terminated in the RIF were age 55 or older, a result that is statistically significant and exceedingly unlikely to occur by chance, *see, e.g., Seasonwein v. First Montauk Securities Corp.*, 189 Fed. Appx. 106, 110-11 (3d Cir. June 27, 2006); and

- A showing that many similarly situated <u>younger</u> employees were retained, *see infra, see also C.A.R.S.*, 527 F.3d at 366-367.

Even if this Court were to apply the unjustifiably rigid formulation of the *McDonnell Douglas prima facie* case that Defendant suggests – which focuses solely on the most common ways of creating an inference of discrimination in the RIF context, and ignores the flexible case-by-case approach to the evidence that the Third Circuit has mandated – Plaintiffs have clearly satisfied their minimal *prima facie* case burden.  The courts of the Third Circuit have recognized

that the following are among the specific ways in which a Plaintiff can make out the fourth prong of a *prima facie* case in a RIF situation: (1) by showing that younger similarly situated employees were retained at the time of the RIF, *see, e.g, Monaco v. American General Assurance Co.*, 359 F.3d 296, 300-301 (3d Cir. 2004); <u>or</u> (2) by showing that younger employees substantially assumed their job duties after they were terminated, *see, e.g.*, *Carlson v. Youth Services Agency*, No. 3:06-cv-495, 2008 WL 4671804, *3-4 (M.D. Pa. Oct. 20, 2008); *Smith v. Thomas Jefferson University*, No. 05-2834, 2006 WL 1887984, *3-4 (E.D.Pa. June 29, 2006). As set forth below, each of the Plaintiffs can make one or both of these showings.

Before proceeding to address this issue, however, it is necessary to address as a preliminary matter the unreasonably stringent standard that Defendant would have this Court apply to the issue of whether employees are "similarly situated."  In its argument, Defendant identifies no less than 6 distinct factors, all of which it contends at various locations in its brief must be present in order for Plaintiffs to make out a "similarly situated" showing.  *See* Def. Br. at 32 ("level" of job, salary, independent contractor vs. full-time employee status, substantial reassignment of job tasks), 33 (job tasks pre-RIF, whether the employee was similarly situated from the vantage point of the Defendant's alleged non-discriminatory justification).  This argument is, however, inconsistent with controlling Third Circuit authority.  *See, e.g., Bennun v. Rutgers State Univ.*, 941 F.2d 154, 177-80 (3d Cir. 1991) (holding that the "similarly situated" standard must not be applied so rigidly that it would in effect become an "identically situated" standard); *Hill v. City of Scranton*, 411 F.3d 118, 127-128 & n.13 (3d Cir. 2005) (same).  Indeed, the Third Circuit has held in at least three cases that a "similarly situated" showing can be made on the basis of only <u>one</u> or <u>two</u> of the many factors that Defendant identifies.  *See, e.g., Doe v. C.A.R.S. Protection Plus*, 527 F.3d 358, 366-367 (3d Cir. 2008) (looking only to Defendant's

non-discriminatory justification in determining that Plaintiff had showed that similarly situated

employees were treated differently); *Hill*, 411 F.3d at 127-130 (same); *Monaco*, 359 F.3d at 305-

06 (looking only to job tasks and job level in determining that another employee was similarly

situated).  Moreover, courts in the Third Circuit have repeatedly recognized that where a Plaintiff

was directly compared to another employee for the purposes of determining who should be laid

off, that employee must be considered to be similarly situated for the purposes of the *prima facie*

case analysis.  *See, e.g., Brodsky v. Hercules, Inc.*, 966 F.Supp. 1337, 1346 (D. Del. 1997)

("Napolitano and Brodsky where similarly situated because both were candidates for termination

in the 1994 RIF and were subject to the same scrutiny. . . Hercules admits the same supervisor,

Ken Steller compared Napolitano and Brodsky before the 1994 RIF and selected Brodsky for

termination.  In essence, then, Brodsky and Napolitano were in direct competition for retention of

their jobs) (internal citations omitted); *see also Anderson v. Consolidated Rail Corp.*, 297 F.3d

242, 250 (3d Cir. 2002) (recognizing that the court should look to how a company actually

approaches employment decisions in determining whether employees are similarly situated).

Thus, PQ employees must be considered to be similarly situated to Plaintiffs if any of the

following factors are present: (1) they were similarly situated vis-a-vis Defendant's alleged non-

discriminatory justification, *see, e.g., C.A.R.S.*, 527 F.3d at 366-367; (2) they were directly

compared to Plaintiffs during the RIF process, *see, e.g., Brodsky*, 966 F.Supp. at 1346 ; or

(3) their job was at a roughly equivalent level and involved roughly equivalent job duties to those

carried out by the Plaintiffs[28], *see, e.g., Monaco*, 359 F.3d at 305-06.

---

28.   Not even Defendant has argued that Plaintiffs cannot be compared to employees outside
      their specific job unit.  Clearly, such an argument would be inappropriate where, as here,
      there is ample evidence of routine shuffling among PQ's job units.  *See, e.g.,* Attachment
      BF (PQBM 5436); Attachment K (Connolly Dep.) at 13-17; Attachment I (Delmonte Dep.)

Applying this standard, it is clear that each of the Plaintiffs can make out one or both of the RIF-specific fourth prong showings identified, *supra*.[29]

As an initial matter, all of the scientist Plaintiffs were – according to Defendant's articulated explanations – similarly situated to younger employees who were retained as part of the RIF.  *See* Attachment AC (Employees Similarly Situated to Plaintiffs in Relation to Defendant's Articulated Non-Discriminatory Justifications) (*hereinafter* "Similarly Situated Employees").  Even using only PQ's most recent articulation of why scientist Plaintiffs were terminated – the elimination of scientist Plaintiffs' funding, *see* Def. Br. at 34 – the fact remains that two younger employees (Erin Fisher and Reggie Thompson) were identically situated, but

---

at 154; Attachment F (Marcus Dep.) at 21-36; Attachment O (Senderov Dep.) at 36-38; Attachment A (Lau Dep.) at 54, 61-66; Exhibit P-79 (Lau Resume); Exhibit P-80 (PQBM 212-215) (employees from various departments assigned to work on same projects, amount of funding of employees through CD program changed from year to year).

29.  Defendant PQ repeatedly conflates these two ways of making out the fourth prong of a *prima facie* case in a RIF setting, treating Plaintiffs' burden as a requirement that they show both that similarly situated employees were retained, and that their job duties were substantially reassigned.  *See, e.g.,* Def. Br. at 32 (arguing that Plaintiff Callaghan must show that the employees who assumed her job duties were similarly situated to her); Def. Br. at 31 (noting that Plaintiffs can make out their prima facie case by showing that younger employees "were treated more favorably," but then contending that Plaintiffs' cannot meet the fourth prong requirement because "there is no evidence that the Plaintiffs were replaced.").  This is not the law.  Plaintiffs can make out the fourth prong of their prima facie case by showing either that their job duties were substantially reassigned or that similarly situated employees were retained.  *See, e.g., Steward v. Sears Roebuck & Co.*, 231 Fed. Appx. 201, 210 n.5 (3d Cir. Aug. 14, 2007) (non-precedential) (concluding that the Court did not need to consider whether younger similarly situated employees were treated more favorably than the Plaintiff, because Plaintiff had shown that his job duties were substantially assumed by one or more younger employees); *see also Carlson v. Youth Services Agency*, No. 3:06-cv-495, 2008 WL 4671804, *3-4 (M.D. Pa. Oct. 20, 2008); *Smith v. Thomas Jefferson University*, No. 05-2834, 2006 WL 1887984, *3-4 (E.D.Pa. June 29, 2006).

were not terminated.  *See* Attachment AC (Similarly Situated Employees).  Thus, on the basis of this consideration <u>alone</u>, scientist Plaintiffs' have made out a *prima facie* case.

Consideration of other prior formulations of PQ's justification for scientist Plaintiffs' termination also consistently shows the that older employees (including scientist Plaintiffs) were terminated, while younger similarly situated employees were retained. *See* Attachment AC (Similarly Situated Employees) (showing that: (1) younger employees receiving CD funding were retained[30]; and (2) younger members of the CD Group were retained[31]); Attachment AA (Chart Summarizing Project Employee Information) (showing that younger employees working on the same projects as Plaintiffs were retained at the time of the RIF.[32])  The treatment of other employees vis-a-vis prior formulations of PQ's justification for scientist Plaintiffs' termination also suffices – without further inquiry – to establish scientist Plaintiffs' *prima facie* case.

Other, individual-specific facts also mandate the conclusion that each of the Plaintiffs have made out the fourth prong of their *prima facie* case:

---

30. Defendant's prior statement of its reasons for terminating scientist Plaintiffs focused exclusively on the elimination of <u>CD</u> funding, in particular, and did not make reference to the alleged elimination of Ms. Marcus's business unit funding.  *See* Section IV.B.iii., *infra.*

31. Defendant contended in its EEOC position statements that Plaintiffs were eliminated as part of the elimination of the CD Group.  *See* P-78 (EEOC Position Statements).

32. Defendant contended in its answers to interrogatories that Plaintiffs were terminated because their projects were discontinued.  *See* Attachment AF (Defendant's Second Supplemental Responses to Plaintiff Bonnie Marcus's First Set of Interrogatories), #1; Attachment AM (Defendant's Supplemental Responses to Plaintiff Roman Wypart's First Set of Interrogatories), #1; Attachment AP (Defendant's Supplemental Responses to Plaintiff Eric Senderov's First Set of Interrogatories), #1.

**Wypart (age 56)**

- 85% of Wypart's work was assumed by a substantially younger (age 35) and less highly qualified employee immediately following the RIF, *see* Attachment M (Fisher Dep.) at 13.  (Younger employee assumed job duties).

- Of the five Engineering/Research Fellow I's (Senderov (age 69), Wypart (age 56), Hinchey (age 67), Berg (age 50) and Fuess (age 43)) employed by PQ at the time of the RIF, only the youngest two (Berg and Fuess) were retained, despite the fact that both of the retained Engineering/Research Fellow I's were currently or previously supported by CD funds, *see* Def. Br. at 32; Exhibit P-53 ("Exhibit A"s With Supplemental Information); Exhibit P-80 (PQBM 212-215).[33]  (Younger, similarly situated employees treated differently).

**Senderov (age 69)**

- The work of four other PQ employees focused, like Plaintiff Senderov's work, on materials synthesis prior to the RIF: Dick Hinchey (age 67, Principal Scientist), Phil Connolly (age 47, Research Manager), Hong Xin Li (age 41, Engineering Fellow II), and Dave Cooper (age 47, Chemist V).[34]  *See* Attachment AI (Defendant's Amended

---

33. Although Defendant PQ contends that Berg and Fuess were not similarly situated to Plaintiffs Senderov and Wypart because they did not conduct research in identical areas, this is the type of detailed inquiry that is more properly carried out at the pretext phase of the analysis.  *See, e.g., Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995). Indeed, Defendant itself cites to a document in support of its summary judgment motion that sets out a singular "general job scope" for all "Engineering/Research Fellow I's," and that differentiates that job scope from other job classifications.  *See* Declaration of Kevin Doran, Exhibit C at PQBM 00098 (attached to Defendant PQ's Brief in Support of its Motion for Summary Judgment).

34. Each of the younger employees who were performing synthesis work prior to the RIF received comparable compensation to Dr. Senderov.  *See* Exhibit P-16 (3/21/05 Actives VF

- 35 -

Supplemental Answers to Plaintiff Bonnie Marcus' Interrogatory Numbers 17 and 24), # 24; Attachment A (Lau Dep.) at 315-317; Attachment K (Connolly Dep.) at 163-164; *see also* Exhibit P-16 (3/21/05 Actives VF R&D).  100% of the individuals age 55 and older (including Plaintiff Senderov) who were performing synthesis work prior to the RIF were terminated as part of the RIF, while 100% of those under age 55 were retained.  *See id.*; *see also* Exhibit P-53 ("Exhibit A"s With Supplemental Information).  (Younger, similarly situated employees treated differently).

- Plaintiff Senderov was directly compared to two other synthesis employees (Connolly (age 47) and Hinchey (age 67)), for the purposes of deciding who should be retained following the RIF to perform synthesis work.  *See* Exhibit P-20 (4/12/05 Delmonte Email); *see also* Attachment D (Kutchins Dep.) at 403-404, 650-652.  Ultimately only the youngest and least qualified – Connolly – was retained.  *See* Exhibit P-53 ("Exhibit A"s With Supplemental Information) at PQBM 4341-4343; *see also* Attachment K (Connolly Dep.) at 163-164.  Mr. Connolly also assumed some of Plaintiff Senderov's job duties following the RIF.  *See* Attachment K (Connolly Dep.) at 83-84, 89-91, 167-68. (Both fourth prong showings).

- See above regarding the treatment of the five PQ Engineering/Research Fellow I's at the time of the RIF.  (Younger, similarly situated employees treated differently).

---

R&D) at PQBM 11573.  Salary information is provided throughout this section only where necessary to establish that employees performed a job that was at a roughly equivalent level to that performed by the Plaintiffs.  As noted, *supra*, this is one of three independent ways that Plaintiffs can demonstrate that other employees were similarly situated.

**Marcus (age 60)**

- Ms. Marcus was directly compared to another employee – Ed Myszak (age 54, Manager – Technical Service) – in determining who should fill a newly created position following the RIF.[35]  *See* Exhibit P-34 (Zeolite Development Engineer Position Chart); Exhibit P-35 (Zeolite Development Engineer Position Chart); Attachment D (Kutchins Dep.) at 261, 270.  Mr. Myszak was ultimately selected for the position, despite the fact that roughly 50% of the position's duties were comprised of job responsibilities that were carried out by Ms. Marcus at the time of the RIF.[36]  Attachment M (Fisher Dep.) at 14.  (Both fourth prong showings).

- A younger employee, Phil Connolly (age 47, Research Manager), who performed similar job tasks to Ms. Marcus, was not terminated as part of the RIF.[37]  *See* Attachment K (Connolly Dep.) at 23-28; *see also* Exhibit P-53 ("Exhibit A"s With Supplemental

---

35.  Mr. Myszak's compensation was comparable to the compensation of Ms. Marcus prior to the RIF.  *See* Exhibit P-16 (3/21/05 Actives VF R&D) at PQBM 11571, 11573.

36.  Defendant contends that Plaintiff Marcus cannot make out a *prima facie* case based on the comparison of her to Mr. Myszak because: (1) the comparison was not used by Lau or Boyce in connection with the R&D RIF; and (2) Myszak was 6 years younger than Ms. Marcus at the time of the RIF, an age gap that PQ contends (citing only to non-controlling authority) is too minimal to allow an inference of discrimination.  The first factor is irrelevant in view of the fact that it is uncontested that Ms. Marcus would not have been terminated had she been selected for the position that was ultimately given to Mr. Myszak.  PQ's second argument ignores Third Circuit authority finding that age gaps of 5 years or more are sufficient to make a *prima facie* showing.  *See, e.g., Showalter v. Univ. of Pittsburgh Med. Center*, 190 F.3d 231, 236 (3d Cir. 1999); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729-30 (3d Cir. 1995); *see also Douglas v. Anderson*, 656 F.2d 528, 533 (9th Cir. 1981) (5 year age gap adequate); *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1002-1003 (11th Cir. 1997) (3 year age gap adequate).

37.  Mr. Connolly's compensation was comparable to the compensation that was being received by Ms. Marcus prior to the RIF.  *See* Exhibit P-16 (3/21/05 Actives VF R&D) at PQBM 11573.

Information) at PQBM 4341-4343.  Mr. Connolly also assumed some of Ms. Marcus's

job duties following the RIF.  *See* Attachment AI (Defendant's Amended Supplemental

Answers to Plaintiff Marcus's Interrogatory Numbers 17 and 24), #24; *see also* Exhibit

P-2 (9/10/04 Kutchins Email).  (Both fourth prong showings).

**Callaghan (age 55)**

● Ms. Callaghan was directly compared to a substantially younger employee (John Farrer,

age 41, Supervisor of Facilities & Office Services) who performed similar job functions

for PQ's Valley Forge facility.[38]  Exhibit P-78 (EEOC Position Statements) at Plaintiffs

430-431.  Mr. Farrer was retained, while Ms. Callaghan was terminated.  *See* Exhibit

P-53 ("Exhibit A"s With Supplemental Information).  (Younger, similarly situated

employee treated differently).

● It was originally anticipated that Farrer would assume the substantial bulk of

Ms. Callaghan's job duties.[39]  Exhibit P-78 (EEOC Position Statements) at Plaintiffs 430-

431.  (Younger employee assumed job duties).

● Ms. Callaghan's job duties were ultimately assumed by Farrer or other substantially

younger employees.[40]  *See* Exhibit P-78 (EEOC Position Statements) at Plaintiffs 430-

_____

38.  Mr. Farrer's compensation was comparable to the compensation that was being received by
     Ms. Callaghan prior to the RIF.  *See* Exhibit P-16 (3/21/05 Actives VF R&D) at PQBM
     11572-11573.

39.  Defendant makes much of the fact that – according to certain witnesses – Mr. Farrer did not
     ultimately take over a substantial portion of Ms. Callaghan's duties.  This is irrelevant given
     that it was believed at the time of the RIF decisions that he would take over the bulk of her
     duties.  *See* Exhibit P-78 (EEOC Position Statements) at Plaintiffs 430-431.

40.  Defendant's contention that certain of Ms. Callaghan's duties were assumed by two older
     employees – Ms. Bireley and Ms. Luciani – is directly contradicted by their own
     interrogatory responses, and therefore is clearly a contested issue of fact.  *See* Attachment

431; Attachment F (Marcus Dep.) at 351-352; Attachment AK (Defendant's Second Supplemental Responses to Mary Ellen Callaghan's First Set of Interrogatories), #5; Attachment AJ (Defendant's Responses to Mary Ellen Callaghan's Second Set of Interrogatories), #19; Attachment Q (Callaghan Dep.) at 141-144.  (Younger employees assumed job duties).

### ii.      Articulation of a "Legitimate Non-Discriminatory Justification"

Under the *McDonnell Douglas* paradigm, the Defendant must articulate, through admissible evidence, a legitimate non-discriminatory justification for Plaintiffs' termination. Although this burden is one of production, not persuasion, a failure to meet it requires that judgment be entered in Plaintiffs' favor (and thus obviously would necessitate the denial of PQ's motion for summary judgment).  As set forth below, neither of Defendant's current "legitimate non-discriminatory justifications" are adequate to explain the reasons for Plaintiffs terminations. Thus, for this reason alone summary judgment must be denied.  *See, e.g., Seasonwein v. First Montauk Securities Corp.*, 189 Fed. Appx. 106, 110-11 (3d Cir. June 27, 2006) (non-precedential) (reversing an award of summary judgment, and finding that the defendant had failed to come forward with a legitimate non-discriminatory justification where they claimed a need to eliminate positions due to financial considerations, but did not articulate a reason for selecting among similarly situated employees); *see also Iadimarco v. Runyon*, 190 F.3d 151, 166-

---

AK (Defendant's Second Supplemental Responses to Mary Ellen Callaghan's First Set of Interrogatories), #5.  Moreover, Defendant's contention that a third older employee – Bill Cormier – assumed a small portion of Ms. Callaghan's duties at the time of the RIF is unsupported by any record citation, and contradicts its own assertion that Mr. Cormier had resumed these duties prior to the time of the RIF, *see* Def. Br. at 12.

67 (3d Cir. 1999) (finding that Defendant's articulated non-discriminatory justification was insufficient to rebut the Plaintiff's *prima facie case*).

Defendant's current "legitimate non-discriminatory justification" for termination of Plaintiffs is stated as follows in its brief: "Marcus, Senderov and Wypart were all terminated because funding for their positions was eliminated.  Callaghan was terminated because PQ eliminated the Office Supervisor position at the R&D facility."  Def. Br. at 34; *see also* Def. Br. at 2.

On this record, neither of these explanations – in and of themselves – actually explains the reasons for Plaintiffs' termination. As an initial matter, the CD program was internal to PQ, and thus its elimination did not actually result in any less money being available to the company for budgeting purposes.  *See* Def. Br. at 5, ¶¶ 11-12 (explaining that the CD program was funded by a "holding company" that was not a separate legal entity but simply an accounting line item); *see also* Attachment A (Lau Dep.) at 8-10 (the "holding company" was an accounting term for the central pot of money available to PQ).  Thus, PQ did not "have" to get rid of anyone as a result of the elimination of the CD program, unlike the situation where, for example, a company has lost a grant or another external source of revenue.  Consistent with this fact, many younger employees who were funded in whole or in part through the eliminated CD program were – unlike Plaintiffs – retained at the time of the RIF.  Attachment AC (Similarly Situated Employees).  PQ has never explained how these other, younger employees' salaries were funded after the elimination of the CD program, and it appears that at least some of them simply continued to be funded through the corporate holding company.  *See, e.g.,* Attachment N (Miller Dep.) at 59-64.  Thus, it is clear that the elimination of the CD program itself did not necessarily result in the termination of employees funded in whole or in part through the program.

Moreover, ample evidence also shows that R&D employees were not limited to consideration for their own incumbent positions at the time of the RIF, and that scientist Plaintiffs therefore would have been able to continue their employment – even if their own positions were eliminated – had they been deemed the best candidate for a remaining position. *See, e.g.,* Attachment I (Delmonte Dep.) at 190-92; Attachment D (Kutchins Dep.) at 228-229; Exhibit P-12 (2/27/05 Boyce Email); *see also* Section III, *supra* (discussing new positions filled by Erin Fisher (age 37) and Ed Myszak (age 54) at the time of the RIF, that were comprised substantially of Plaintiffs' pre-RIF job duties). Thus, PQ's explanation as to scientist Plaintiffs is materially incomplete, as it provides absolutely no explanation for why: (1) Defendant declined to continue to fund scientist Plaintiffs' positions with non-CD money; and (2) Defendant declined to employ scientist Plaintiffs in another position in the organization.[41]

Similarly, Defendant PQ's explanation as to Plaintiff Callaghan is materially incomplete as it fails to provide any explanation for why Ms. Callaghan – instead of the Valley Forge office manager John Farrer – was terminated. At the EEOC, Defendant PQ stated that Plaintiff Callaghan was directly compared to Mr. Farrer as part of the RIF decision-making process, and that the "bulk" of her job duties were expected to be reassigned to Mr. Farrer upon her termination. Exhibit P-78 (EEOC Position Statement) at Plaintiffs 0430-0431. In view of these statements, PQ is required to come forward for an explanation for why it selected Ms. Callaghan – instead of Mr. Farrer – for termination. Nevertheless, Defendant PQ has never come forward

---

41. Defendant PQ *did* continue to fund other, younger, employees that were funded in whole or in part through CD funds before the RIF, *see* Attachment AC (Similarly Situated Employees), and also moved other, younger, employees to new positions following the RIF, *see* Section III, *supra*.

with admissible evidence providing a reason for its selection of Ms. Callaghan – instead of

Mr. Farrer – for termination as part of the RIF.[42]

Notably, these omissions go to the very heart of substantial weaknesses in Defendant

PQ's case.  As set forth at greater length, *infra*, each of the fuller explanations that PQ has

previously stated are contradicted by abundant evidence in this record and are pretextual.  It is for

this reason, undoubtedly, that PQ attempts to avoid focusing the Court's attention on these issues

by providing a full explanation for its actions.  Because PQ has failed to direct the Court to a full

explanation for the termination of any of the Plaintiffs, its motion for summary judgment must be

denied.[43]

**iii.    Pretext**

Under *Fuentes v. Perksie*, Plaintiffs can prevail at the third stage of the *McDonnell*

*Douglas* analysis by introducing sufficient evidence for a reasonable jury to either:

"(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that it an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the

---

42.  The only location in which PQ has ever addressed this issue is in its position statement
     before the EEOC.  While PQ's statements in this document are admissible evidence if
     offered by Plaintiffs as party-opponent admissions, they are inadmissible hearsay to the
     extent PQ may seek to rely on them.

43.  In fact, PQ itself makes much in its brief of the fact that this Court cannot consider
     explanations beyond the narrow reasons it has directly articulated.  Def. Br. at 35-36.  PQ is
     correct that this Court should not speculate as to what other lawful factors may have
     motivated PQ's determination, beyond those actually put forth by Defendant.  Thus, for
     example, this Court should disregard Defendant's repeated insinuations that the level of
     positions held by employees at PQ had some bearing on the RIF decision-making process.
     *See, e.g.,* Def Br. at 4, 17-19, 43-44.  Quite simply, these insinuations are inappropriate
     since <u>PQ does not contend that the level of Plaintiffs' positions was part of the reason for
     their selection for termination as part of the RIF.</u>  *See* Def. Br. at 34-36 (very clearly setting
     out PQ's justifications for Plaintiffs' termination, and not mentioning this consideration).

employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  As set forth below –

although Plaintiffs are only required to introduce adequate evidence to make <u>one</u> of these

showings – they have in fact introduced ample evidence that would permit a jury to reach <u>both</u>

conclusions.  *Cf. Showalter v. University of Pittsburgh Med. Center*, 190 F.3d 231, 236-237 (3d

Cir. 1999) (reversing grant of summary judgment in a case with much weaker evidence than the

instant case on the grounds that the Plaintiff had introduced adequate evidence of pretext).

Although each of the types of evidence put forth by Plaintiffs are discussed separately, *infra*, all

of Plaintiffs' evidence must be considered collectively in determining whether a reasonable jury

could conclude that they have made the required showing.  *See, e.g., Aman v. Cort Furniture

Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996).

**<u>Direct Evidence of Age Bias at PQ</u>**

As discussed at length, *supra*, the Vice President of R&D, John Lau, directly informed

Ms. Marcus on several occasions that the RIF was going to target older employees.  This

evidence – which Defendant PQ accepts as true for the purposes of summary judgment, *see* Def.

Br. at 27 – is alone sufficient to permit a reasonable jury to conclude that discrimination

occurred.[44]

---

44. The lone case cited by Defendant for a contrary proposition – *Keller v. ORIX Credit
Alliance, Inc.*, 130 F.3d 1101 (3d Cir. 1997) – dealt with a very different constellation of
facts from those at issue in the instant case and is clearly not applicable.  In contrast to the
statements made by Dr. Lau, which related directly to the employment decision at issue in
the instant case, the comment that was made to the Plaintiff in *Keller* was totally unrelated
to the employment decision at issue.  *See id. at* 1112.  Moreover, the Plaintiff had only very
limited evidence of pretext, *see id. at* 1109-1111, and was replaced by an employee who
was less than five years his senior, *id. at* 1113.

Moreover, the record is riddled with additional direct evidence of age bias at PQ, which the jury will also consider in making its determination.  To reiterate (*see* Section III, *supra* for record citations):

- A key decision-maker, Colleen Delmonte, previously stated in the context of personnel discussions that "we need to get rid of some of these old farts."

- Another key decision-maker, Rosalyn Kutchins, told Ms. Marcus following the RIF that it was time for people like Plaintiff Bonnie Marcus (then 60 years of age) to leave graciously and to leave the door open for "younger" employees.

- PQ created documents showing the ages of potential candidates for the RIF, and these documents were considered in making RIF decisions.

- Ms. Kutchins had previously been retaliated against for reporting age discrimination.

- Mr. Imbriani, another decision-maker, had previously demoted an employee because of his age.

All of this evidence obviously provides powerful proof from which a reasonable jury could infer that the RIF decision-making process was infected by age bias.

**<u>Statistical Evidence</u>**

Plaintiffs' statistical evidence provides further and independent powerful proof of discriminatory animus.  Strikingly, Defendant's brief utterly ignores the actual outcome of the 2005 Reduction in Force: the termination of eight R&D employees – <u>all of whom were age 55 or older</u>.  As Plaintiffs' statistical expert found, this outcome is exceedingly unlikely to have occurred absent consideration of age.  *See* Section III, *supra.*  Even controlling for the principal justifications provided by Defendant, it remains overwhelmingly unlikely that the RIF would

have been comprised – as it was – of exclusively older employees, absent consideration of age.

*Id.*

**Changes in Defendant PQ's Position**

As the Third Circuit has held, changes in the Defendant's articulated non-discriminatory justification also provides powerful evidence of pretext. *See, e.g., Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 281 (3d Cir. 1998) (holding that a difference in explanations at the EEOC and at trial was sufficient for a reasonable jury to find pretext); *see also Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997) ("one who tells the truth need not recite different versions of the facts.")  Defendant PQ apparently acknowledges this fact, but argues that they have not, in fact, changed their articulated non-discriminatory justifications.  Defendant's contentions on this point are perplexing in view of the fact that in this very motion, Defendant has again changed its position from those it has previously articulated.  Indeed, in this motion PQ argues for the very first time:

● that Plaintiff Callaghan was discharged in part because of her performance, *cf.* Attachment S (Complaint), ¶ 57 and Attachment T (Answer), ¶ 57 (admitting that Ms. Callaghan was not selected for termination because of performance considerations), *with* Def. Br. at 19 (arguing that Ms. Callaghan's position was eliminated because of her performance); and

● that Plaintiff Marcus was discharged in part because of the elimination of her detergent zeolites funding, *cf.* Exhibit P-78 (EEOC Position Statements) at Plaintiffs 425-427 and Attachment AF (Second Supplemental Responses to Plaintiff Bonnie Marcus's First Set of Interrogatories), #1 (stating that Ms. Marcus was terminated exclusively because of the elimination of the funds for the CD program) *with* Def. Br. at 17 (acknowledging that

Ms. Marcus was only 50% funded through CD funds, and arguing that she was terminated in part because of the elimination of her detergent zeolite funding).

These recent changes are only the most recent in a long string of modifications that the Defendant has made to its explanations of the reasons for Plaintiffs' termination.  Thus, for example – apparently recognizing that the elimination of CD funding did not provide a basis for differentiating Plaintiffs from other, similarly situated employees –  Defendant PQ originally contended that each of the scientist Plaintiffs' work was wholly or virtually completely eliminated.  *See* Exhibit P-78 (EEOC Position Statements) at Plaintiffs 427, 434, 441, 443; *see also* Attachment F (Marcus Dep.) at 132, 288.  PQ later changed its position on this central issue, acknowledging that portions of scientist Plaintiffs' work continued.  *See, e.g.,* Attachment AF (Defendant's Second Supplemental Responses to Plaintiff Bonnie Marcus's First Set of Interrogatories), #5; Attachment AP (Defendant's Supplemental Responses to Plaintiff Eric Senderov's First Set of Interrogatories), #5; Attachment AI (Defendant's Amended Supplemental Answers to Marcus Interrogatories # 17 & 24), #24 (identifying a number of employees as assuming job duties similar to those performed by the Plaintiffs pre-RIF only <u>after</u> the RIF).  (In fact the record supports the conclusion that even an greater amount continued than PQ acknowledged even in its later admissions, *see, e.g.,* Attachment M (Fisher Dep.) at 13-14.)  Similarly, PQ originally contended at the EEOC that Plaintiff Callaghan was selected for termination instead of Mr. Farrer because "it would make sense for Mr. Farrer, who had more duties for a larger facility, to take over Callaghan's facilities management functions," Exhibit P-78 (EEOC Position Statements) at Plaintiffs 430, a contention it has never reiterated, and that is unsupported by any admissible evidence.  These changes in PQ's positions are not minor, as PQ would have the Court believe, but instead go to the central reasons why Plaintiffs – as

- 46 -

opposed to other similarly situated employees – were selected for termination as part of the RIF. *See* Section IV.B.ii., *supra*.

In fact the record reflects that Defendant has repeatedly changed its position on virtually every critical central issue in this case.  Among other things, PQ has:

- Taken directly contradictory positions on who were the decision-makers in this case, *cf.* Exhibit P-78 (EEOC Position Statements) and Def. Br. (identifying Lau as the decision-maker for scientist Plaintiffs' terminations) *with* Attachment AF (Defendant's Second Supplemental Responses to Plaintiff Bonnie Marcus's First Set of Interrogatories), #3 (identifying Lau, Doran, Boyce, Imbriani, Kutchins and DelMonte as decision-makers in scientist Plaintiffs' terminations); Attachment AP (Defendant's Supplemental Responses to Plaintiff Eric Senderov's First Set of Interrogatories), #3 (same); Attachment AM (Defendant's Supplemental Responses to Plaintiff Roman Wypart's First Set of Interrogatories), #3 (same); *with* Attachment AL (Defendant's Amended Supplemental Answer to Callaghan Interrogatory #21), #21 (identifying only Lau and Doran as decision-makers in scientist Plaintiffs' terminations).

- Taken directly contradictory positions on whether and to what extent Plaintiffs' work was assumed by others following the RIF, *see supra*.

- Taken directly contradictory positions on who were members of the CD group in 2005, *cf.* Attachment AF (Defendant's Second Supplemental Responses to Marcus's First Set of Interrogatories), #13 (identifying PQBM 212-215 and PQBM 233-36 as setting forth the members of the CD Group); Exhibit P-3 (PQBM 233-36); and Exhibit P-80 (PQBM 212-215); *with* Attachment AG (Defendant's Third Supplemental Responses to Marcus's First Set of Interrogatories), #13 (amending PQ's prior response to omit many of the younger

employees who were not terminated, and who had previously been identified as being members of the CD Group).

- Changed its position on the reasons for the termination of other older employees as part of the RIF. *Cf.* Def. Br. at 24, ¶ 118 (contending that Dick Hinchey's employment was terminated "because his funding in 2005 came from CDP, which had been eliminated") *with* Attachment AQ (Defendant's Answers to Senderov's Third Set of Interrogatories), #20 ("Richard Hinchey was terminated because the research work he was doing <u>in the detergent zeolite area, which was his primary source of funding</u>, was no longer needed"); *see also* Def Br. at 14 (acknowledging that Dr. Hinchey received only 10% of his funding through the CD Program in 2005).

- Repeatedly changed its position on what Corporate Development projects were eliminated at the time of the RIF. *Cf.* Exhibit P-78 (EEOC Position Statements) at Plaintiffs 443 (contending that all CD Projects except WPC were eliminated); *with* Attachment AN (Defendant's Responses to Wypart's Second Set of Interrogatories), #18 (acknowledging that WPC, Wood Treatment Project and TS-PQ continued); *with* Attachment AO (Defendant's Amended Responses to Wypart's Second Set of Interrogatories), # 18 (amending prior response to indicate that only WPC and Wood Treatment Project were continued); *with* Attachment AP1 (Defendant's Supplemental Answers to Senderov Interrogatories Nos. 23 and 24), #23 (identifying a very limited number of projects as having been substantially or completely eliminated at the time of the RIF, and omitting many of the projects previously identified as 2005 CD Projects in

Defendant's answers to interrogatories, including WPC, Conductives, Glass Beads, Starlite and Government Relations).[45]

These repeated changes of position – many of which were directly made in response to the failure of discovery to support earlier contentions by the company –  constitute powerful evidence of pretext.[46]  *See, e.g., Borough of Wilkinsburg*, 147 F.3d at 281.

**Other "Weaknesses, Implausibilities, Inconsistencies, Incoherencies or Contradictions"**

In addition to PQ's ever-shifting positions in this litigation, the record is riddled with additional "weaknesses, inconsistencies, incoherencies and contradictions," *Fuentes v. Perksie*, 32 F.3d 759, 765 (3d Cir. 1994), in PQ's articulated reasons for terminating older employees as part of the 2005 Reduction in Force.  Thus, for example:

●    Defendant's articulated non-discriminatory justifications – that scientist Plaintiffs were all terminated because funding for their positions was eliminated, *see* Def. Br. at 34, and that Plaintiff Callaghan was terminated because PQ eliminated her position as a result of her weak performance, *see* Def. Br. at 19 –  are contradicted by the record.  For example, as set forth partially *supra*:

---

45.   For a list of CD Projects provided by Defendant PQ, *see* Attachment AH (Defendant's Responses to Bonnie Marcus's Second Set of Interrogatories), #19 (identifying PQBM 2715 as setting out CD projects in 2005); Exhibit P-60 (PQBM 2715).

46.   The lone case cited by Defendant for a contrary proposition is both non-binding, and fundamentally distinguishable.  *See Berhnhard v. Nextstar Broadcasting Group, Inc.*, 146 Fed. Appx. 582, 585 (3d Cir. Aug. 31, 2005) (non-precedential).  The "new" reason articulated by the Defendant in *Berhnhard* was not in any way inconsistent with its prior position, and did not permit the Defendant to escape inconsistencies or errors in its prior position.  Moreover – unlike the instant case – the Plaintiff in *Bernhard* had virtually no other evidence to support her third prong showing.  *Id.* at 584-587.

o        Two key decision-makers for R&D – Colleen Delmonte and Roz Kutchins – did
         <u>not</u> attribute scientist Plaintiffs' terminations to the elimination of CD funding,
         but instead attributed their selection for termination to other considerations,
         including the perception that scientist Plaintiffs were poor performers.
         Attachment I (Delmonte Dep.) at 135-37, 190-92; Attachment D (Kutchins Dep.)
         at 228-29.  (Notably, the perception that scientist Plaintiffs were poor performers
         was largely based on subjective considerations and is inconsistent with
         contemporaneous documentation of Plaintiffs' superior performance, *see, e.g.,*
         Attachment I (Delmonte Dep.) at 150-152, 157-161, 191-192; Attachment AU
         (PQBM 3108-3109); Attachment AT (PQBM 3007-3008); Exhibit P-109 (5/16/06
         Merit Increase)).

o        The elimination of the CD program did not change the net amount of funds
         available to PQ, and thus did not require the termination of <u>any</u> employees.  *See
         generally* Section IV.B.ii., *supra*.  Indeed, many employees who were wholly or
         partially CD funded were retained following the RIF.  *See* Attachment AC
         (Similarly Situated Employees).

o        Even if the elimination of CD funding somehow required the elimination of
         scientist Plaintiffs' positions (which it did not), this <u>still</u> would not have
         necessitated the termination of Plaintiffs, since Plaintiffs could have been placed
         elsewhere in the company.  Contrary to PQ's prior explanation that "there were no
         openings at the senior levels of the other R&D departments, and Lau felt that the
         senior researchers who were serving those departments were performing well, and
         should not be displaced from their jobs," *see* Exhibit P-78 (EEOC Position

Statements) at 426, 433-434, 440-441, there <u>were</u> open positions at Plaintiffs' "level", *see, e.g.,* Exhibit P-34 (Zeolite Development Engineer Position Chart, and, indeed, all positions were in effect "open" since skill – not incumbency – was the basis for decisions as to who would fill remaining positions following the RIF, *see, e.g.,* Attachment I (Delmonte Dep.) at 190-92; Attachment D (Kutchins Dep.) at 228-229; Exhibit P-12 (2/27/05 Boyce Email).

o  PQ's current contention that Ms. Callaghan's position was eliminated in part because of her performance directly contradicts its own prior admissions, and is inconsistent with contemporaneous documentation showing that Ms. Callaghan was performing well at the time of the RIF.  *See* Attachment S (Complaint), ¶ 57; Attachment T (Answer), ¶ 57; Exhibit P-109 (5/16/05 Merit Increase); *see generally* Section III, *supra*.

•  Defendant's articulated non-discriminatory justifications for Plaintiffs' terminations are facially insufficient to explain why Plaintiffs were treated differently than similarly situated employees.[47] *See generally* Section IV.B.ii., *supra*.

---

47.  Although some PQ employees have provided testimony in their depositions for why Plaintiffs were treated differently than some of similarly situated employees discussed in the text below, PQ has never adopted these reasons as its own, instead electing to argue strenuously that its reasons for terminating Plaintiffs are simple and limited.  *See* Def. Br. at 34-36; *see also* Def. Br. at 2; *see generally* Section IV.B.ii., *supra*.  As noted *supra*, PQ must be bound to the reasons *it*, as Defendant, has articulated for Plaintiffs' terminations, since allowing PQ to adopt others' deposition testimony *sub silentio* would not afford Plaintiffs a fair opportunity to respond.  *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255-256 (1981) (noting that in setting forth its legitimate non-discriminatory justification, Defendant must "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.")

&#9675;    Defendant has never provided <u>any</u> explanation for why scientist Plaintiffs were treated differently than the vast majority of younger PQ employees who were funded in whole or in part through CD funds.[48]  *See* Attachment AC (Similarly Situated Employees) for a listing of CD funded employees.

    +    As to the few CD funded employees for which PQ has stated some explanation as to why they were treated differently than Plaintiffs, PQ's explanations are entirely illogical.  Thus, for example, PQ contends in its brief that Erin Fisher (who was age 35 and 100% funded through CD funds, *see id.*) was not laid off "because she was a much lower level than the other scientists and her lower level skills could used [sic] on other R&D work. . ." Def. Br. at 19.  Ms. Fisher, however, testified that 80-85% of her job after the RIF was comprised of job tasks performed by Mr. Wypart (age 56) before the RIF.  Attachment M (Fisher Dep.) at 13.  Obviously, the fact that Ms. Fisher had "lower level skills" than Mr. Wypart is not a reason to hire her – instead of Mr. Wypart – to perform a job comprised substantially of Mr. Wypart's existing job duties.  Indeed, Ms. Fisher's lower level skills counsels against hiring her to perform Mr. Wypart's job duties.

---

48.  PQ contends in its current motion that Mr. Hinchey was terminated because some of his funding came from CD funds, *see* Def. Br. at 24, despite the fact that it also acknowledges in its brief that Mr. Hinchey was only 10% funded by CD funds in 2005, *see* Def. Br. at14.  Thus, according to PQ's own argument, the loss of as little as 10% CD funding was a basis for termination.  For this reason, this Court should consider all of the individuals whose salaries were funded in part through CD funds (even if those salaries were not fully funded by CD funds) as comparators for the Plaintiffs.

○    Aside from its EEOC position statement – which is not admissible evidence as to

Defendant PQ – PQ has never articulated any explanation for why it terminated

Ms. Callaghan (age 55) instead of alternatively terminating Mr. Farrer (age 41)

(who performed a similar function to Ms. Callaghan's at PQ's Valley Forge

facility, *see* Exhibit P-78 (EEOC Position Statements) at Plaintiffs 430).  In fact,

testimony in this litigation directly contradicts the explanation given by PQ in its

EEOC position statement – that Dr. Lau was advised by Mr. Doran that Mr. Farrer

had more extensive duties than Ms. Callaghan and could pick up her facilities

management duties.  *See* Attachment A (Lau Dep.) at 307 (Lau didn't think at the

time of the RIF that Farrer could pick up Ms. Callaghan's job duties); *see also*

Attachment A (Lau Dep.) at 281-82 (denying that Mr. Doran had any substantive

input into the decision to let Ms. Callaghan go).

○    PQ has never provided any clear explanation for why it terminated 100% of the

older Engineering/Research Fellow I's, while retaining 100% of the younger

Engineering/Research Fellow I's.  While it implies in its brief that the younger

Engineering/Research Fellow I's were retained because they performed different

work than Plaintiffs Senderov and Wypart, *see* Def. Br. at 33, this explanation

would only make sense if Plaintiffs Senderov and Wypart's work was eliminated,

while the retained employees' (Berg and Fuess) work was not.  In fact, there is

substantial evidence showing that Plaintiffs' work was not eliminated, *see, e.g.,*

Attachment M (Fisher Dep.) at 13; Attachment AF (Defendant's Second

Supplemental Responses to Plaintiff Bonnie Marcus's First Set of Interrogatories),

#5; Attachment AP (Defendant's Supplemental Responses to Plaintiff Eric

- 53 -

Senderov's First Set of Interrogatories), #5; *see generally* Section III, *supra*, and thus it is irrelevant that Berg and Fuess may have performed different research.

○ PQ has never provided any explanation for why younger employees who engaged in materials synthesis – and in particular Mr. Connolly (age 47), who Plaintiff Senderov (age 69) was directly compared to – were retained, while Plaintiff Senderov was terminated.  *See* Section IV.B.i., *supra.*

○ PQ has never provided any explanation for why Ed Myszak (age 54), instead of Ms. Marcus (age 60) was selected for a position which was 50% comprised of duties that were being performed by Ms. Marcus prior to the RIF.  *Id.*

○ PQ has never provided any explanation for why Mr. Connolly (age 47) was terminated instead of Ms. Marcus (age 60), despite the fact that both employees performed comparable job functions, and comparable amounts of CD-related work.  *See* Attachment K (Connolly Dep.) at 19-20, 23-28 (testifying that Ms. Marcus performed similar job duties to his own, and that he spent roughly 50% of his time on CD work); Def. Br. at 14 (acknowledging that Ms. Marcus was only 50% funded through the CDP in 2005).

○ PQ has never provided any explanation for why younger employees who were performing work on the same projects as Plaintiffs were not terminated, while Plaintiffs were terminated.  *See* Attachment AA (Chart Summarizing Project Employee Information) for a list of the younger employees assigned to the same projects as Plaintiffs.

• Other key positions taken by Defendant in this case are also demonstrably false:

- 54 -

- PQ continues to stand by the demonstrably false position that Dr. Lau was the principal if not exclusive decision-maker for Plaintiffs' terminations, despite the fact that contemporaneous documentation makes clear that he was, at best, one of several key decision-makers.  *See* Section III, *supra*.

- PQ has contended that substantially all of scientist Plaintiffs' work was eliminated, *see, e.g.,* Exhibit P-78 (EEOC Position Statements), a proposition that is demonstrably false, *see, e.g.,* Attachment M (Fisher Dep.) at 13-14, and that PQ itself has contradicted in other sworn statements.  *See, e.g.,* Attachment AF (Defendant's Second Supplemental Responses to Plaintiff Bonnie Marcus's First Set of Interrogatories), #5; Attachment AP (Defendant's Supplemental Responses to Plaintiff Eric Senderov's First Set of Interrogatories), #5; Attachment AI (Defendant's Amended Supplemental Answers to Marcus Interrogatories # 17 & 24), #24; *see also* Attachment AP1 (Defendant's Supplemental Answers to Senderov's Interrogatories Nos. 23 and 24), #23 and 24.

- PQ has taken the position that two of the eight older employees included in the RIF retired on an entirely voluntary basis, *see, e.g.,* Def. Br. at 24, which is demonstrably false.  *See* Attachment B (Tickner Dep.) at 18-27, 44-46, 52-57; Attachment C (Slobogin Dep.) at 29-33, 42-46, 51.

- PQ has contended that – except for a small amount of work on Wood Polymer Composites – all CD projects were eliminated at the time of the RIF, a proposition that is demonstrably false, and that PQ itself has since contradicted in other sworn statements.  *See supra* note 45 and accompanying text.

○ PQ has contended that all of the members of the CD group were terminated except a technologist and a technician, *see* Exhibit P-78 (EEOC Position Statements) at Plaintiffs 426,434, 441, a proposition that is demonstrably false, *see* Attachment AC (Similarly Situated Employees); *see also* Exhibit P-53 ("Exhibit A"s With Supplemental Information) (listing employee job titles); Attachment AV (PQBM 3681) (indicating that Ms. Fisher had been promoted to Chemist at the time of the RIF).

**Favoring of Younger Employees Over Older Employees in RIF Decision-Making**

Finally, the jury would be permitted to consider the overwhelming number of contexts in which younger employees were favored over older employees in assessing whether the RIF decision-making process was infected by bias.  Thus, for example, the jury would be able to consider the fact that:

- 100% of those terminated in R&D were age 55 or older, despite the fact that only 30.4% of the R&D workforce was comprised of individuals age 55 or older.  *See* Exhibit P-52 (R&D "Exhibit A").

- Of the PQ employees funded through CD funding in 2005, 100% under age 55 were retained, whereas 100% of those age 55 or older were terminated.  *See* Attachment AC (Similarly Situated Employees).

- Of the PQ employees who were members of the CD group in 2005, 100% under age 55 were retained, whereas 100% of those age 55 or older were terminated.  *Id.*

- Of the PQ employees who were members of the Exploratory Research Group in 2005, 100% under age 55 were retained, whereas 100% of those age 55 or older were terminated.  *Id.*

- Of the PQ employees whose funding Defendant contends was 100% eliminated at the time of the RIF, 100% of those under age 55 were retained, whereas 100% of those age 55 or older were terminated. *Id.*

- Company wide, 4 out of 5 times that PQ selected among employees with the same job title to terminate, PQ selected the oldest employees for termination. *See* Exhibit P-51 (Valley Forge, R&D, and Potters Field Sales "Exhibit A"s).

Collectively, this repeated favoritism for younger employees that is shown in the RIF decision-making process strongly buttresses the conclusion that the RIF was motivated by age bias.

\* \* \* \*

For all of the forgoing reasons, Plaintiffs have introduced ample evidence supporting their case under the *McDonnell Douglas* burden-shifting regime, and summary judgment must be denied.

## C.    Evidentiary Issues

Defendant PQ does not even address the overwhelming majority of the evidence that supports a finding of discrimination in this case.  It does, however, attempt to argue that this Court should discount or not consider: (1) Plaintiffs' statistical evidence; and (2) the age comments regarding the RIF that were made by John Lau.  Because PQ sets out lengthy arguments against the Court's consideration of these key aspects of Plaintiffs' evidence, and because these two categories of evidence are pertinent to multiple aspects of this Court's analysis, they are addressed below, separately from the substance of Plaintiffs' discussion of the applicable burden-shifting frameworks.

## I.      Statistical Evidence

As set forth *supra*, Plaintiffs' statistical expert (Dr. Stephanie Thomas) found a statistically significant correlation between age and the RIF decisions in this case.  Defendant PQ argues that the Court should disregard this evidence on three grounds: (1) the allegedly small sample size used in conducting the analysis; (2) the alleged failure of Dr. Thomas's analysis to control for pertinent factors; and (3) Plaintiffs' inadvertent failure to initially disclose the compensation Dr. Thomas received and the cases in which she has testified in the last 4 years. As set forth below, each of these considerations – at best – goes to the weight of the evidence, and thus Plaintiffs' statistical analysis must be considered for the purposes of summary judgment.

## Sample Size

Defendant PQ argues that this Court should disregard Dr. Thomas's report on the grounds that her analysis allegedly relies on a "sample size of four people."  Def. Br. At 44.  This Court should immediately reject this argument because PQ has dramatically misrepresented the sample size relied on by Dr. Thomas.  In fact, Dr. Thomas's analyses relied on sample sizes ranging from a minimum of 56 to a maximum of 239.  *See* Attachment X (Thomas Report) at 11-16; Attachment Y (Supp. Thomas Report) at 4-5; *see also* Attachment Z (Thomas Aff.) at ¶ 1.  On this basis alone, PQ's argument should be disregarded.

Moreover, where (as in this case) a result is statistically significant using appropriate statistical tests, the size of the sample – by definition – is sufficiently large for a legally and scientifically meaningful result.  *See, e.g., McDissi v. Valmont Industries*, 856 F.2d 1054, 1058 & n.3 (8th Cir. 1988) ("[t]here is no minimum sample size prescribed either in federal law or in statistical theory"); *Bouman v. Block*, 940 F.2d 1211, 1226 (9th Cir. 1991) (refusing to disregard

a plaintiff's statistical analysis based on the sample size, and noting that a showing of statistical

significance at the .05 level (a showing which has been not only met but substantially exceeded

in this case) indicates that "*taking into account the effect of the small numbers* -the disparity is

statistically significant") (emphasis in the original); *Freeman v. Package Machinery Co.*, 865

F.2d 1331, 1342 n. 5 (1st Cir. 1988) (rejecting challenge based on small sample size and noting

that the proper approach is to examine all of the facts and require a showing that the disparity is

statistically significant, applying proper statistical tests); *McAlester v. United Airlines*, 851 F.2d

1249, 1258 (10th Cir. 1988) (refusing to reverse reliance on statistics based on sample size where

the Plaintiff's expert introduced uncontradicted testimony that he obtained statistically significant

results, even taking into account the small sample size).   Indeed, in *Jones v. Pepsi-Cola Metro.*

*Bottling Co.*, 871 F.Supp. 305 (E.D. Mich. 1994), a case relied on by <u>Defendant</u> in purported

support of <u>its</u> argument, the Court recognized that a statistically significant result is admissible

evidence of discrimination even where there is a comparatively small sample size.  *Id.* at 311-12

& n.19 (identifying the "Fisher's Exact" and "Chi-square" tests as reliable tests in the context of

small sample sizes, and refusing to dismiss Plaintiff's age case based on a finding of statistical

significance under the Fisher's Exact test).  Moreover, the Court identified the two tests relied on

by Plaintiffs' expert in this case as the appropriate tests to use where a relatively small sample is

available for analysis.[49] *See id.*; *see also* Attachment X (Thomas Report) and Attachment Y

(Supp. Thomas Report).

---

49.  None of the cases cited by Defendant contradicts the proposition that – where the use of
appropriate statistical tests results in statistically significant results – that analysis is
probative and admissible, despite a seemingly small sample size.  Defendant has not
contended that the tests relied on by Dr. Thomas are not appropriate for the sample size
relied on in her report.  *See also* Attachment Z (Thomas Aff.), ¶ 2 (affirming that the tests
relied on are appropriate for the sample sizes used in her report).

In short, Defendant has identified no arguable basis – scientific or legal – for disregarding Dr. Thomas's analyses based on the sample size she employed.

**Controls**

Defendant also contends that Plaintiffs' statistical analysis should be disregarded based on an alleged failure to control for relevant factors.  As an initial matter – contrary to Defendant's representation – Plaintiffs' expert did control for the predominant justifications offered by Defendant for the inclusion of R&D employees in the RIF.  *See* Section III, *supra*.  More importantly, Defendant's argument utterly ignores (and indeed fails to cite at all) the controlling Third Circuit case on this issue.  In *Bruno v. W.B. Saunders Co.*, 882 F.2d 760 (3d Cir. 1989), the Third Circuit held that in an individual disparate treatment case, a Plaintiffs' statistical analysis can be considered as evidence of age discrimination <u>even where it does not control for *any* of the possible reasons for the observed age disparity</u>.  *See id.* at 766-767 (upholding the admissibility of studies that did not control for any of the possible reasons for the observed disparity, and noting that in individual disparate treatment cases statistical analyses "need not be so finely tuned"); *see also Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1099 n. 11 & 12 (3d Cir. 1995) (admitting evidence showing age disparities, without analysis controlling for pertinent explanations); *Abrams v. Lightolier*, 50 F.3d 1204, 1216-1217 (3d Cir. 1995) (same); *Freeman v. Package Machinery Corp.*, 865 F.2d 1331, 1336, 1338-39 (1st Cir. 1988) (same); *McDissi v. Valmont Industries*, 856 F.2d 1054, 1057-58 (8th Cir. 1988) (same); *McAlester v. United Airlines*, 851 F.2d 1249, 1257-59 (10th Cir. 1988) (similar, in a race case).

Thus, Plaintiffs were not required to control for <u>any</u> of the justifications provided by PQ in order for their statistical analysis to be considered probative evidence of age discrimination.[50] They nevertheless did control for each of the predominant justifications that have been offered by PQ for the inclusion of R&D employees in the RIF.  *See* Section III, *supra*.  Therefore, their analysis is clearly admissible under *Bruno*, and must be considered by this Court in assessing whether summary judgment should be denied.

Finally, even if *Bruno* were not controlling (which it plainly is) the <u>only</u> consideration that Defendant has even identified that it apparently believes Plaintiff should have controlled for is the level of job classification.  *See* Def. Br. at 43-44.  Defendant, however, <u>does not contend that employees were selected for inclusion in the RIF based in whole or in part on their level of job classification</u>.  *See* Def. Br. at 2, 24, 34 (stating PQ's alleged reasons for including Plaintiffs and other R&D employees as part of the RIF).  Thus, controlling for this factor would be wholly inappropriate in this case.

_____

50.   Notably, Defendant does not contest that the *Bruno* decision is binding on this issue, and indeed does not cite to a single published Third Circuit decision in its argument.  Even the non-binding Third Circuit authority cited by Defendant deals with the entirely distinct issue of whether numerical information is admissible absent <u>any</u> baseline information that would permit even a basic statistical analysis.  (For example, a showing that 60% of terminations were women, without any data about what proportion of women were employed at the company).  This is entirely distinct from the issue Defendant raises in the instant case, as has been recognized by pertinent Third Circuit authority.  *Cf. Bruno,* 882 F.2d at 766-767 (upholding admissibility of a basic statistical analysis that did not control for any potentially relevant explanatory factors, but provided a comparison between the proportion of employees over age forty at the employer and the proportion of employees over age forty who received promotions or transfers) *with Ezold v. Wolf Block Schorr & Solis-Cohen*, 983 F.2d 509, 542-43 (3d Cir. 1993) (finding that raw numerical information about the number of women partners was not relevant where the plaintiff did not even provide the baseline information (*i.e.*, the proportion of women associates in the pool of those being considered for partner during the relevant time frame) that would be required in order to perform a basic statistical comparison).

**Disclosure**

Finally, PQ's shameless argument to exclude Plaintiffs' statistical expert report due to alleged noncompliance with Rule 26(a) (*i.e.*, a temporary failure to state the amount of compensation and to identify the recent cases in which Plaintiffs' expert has testified) is made in bad faith and is baseless under the law.

PQ's argument is made in bad faith because, rather than simply notifying Plaintiffs of their oversight, PQ chose to sandbag Plaintiffs by raising the issue for the first time in its summary judgment motion to the Court.  This is in direct contravention of both the letter and spirit of the Federal and Local Rules of Civil Procedure, which require prior attempts to resolve discovery disputes among counsel.  *See* Fed. R. Civ. P. 37(a)(2)(A); E.D.Pa. Local R. 26.1(f). Had PQ simply called the mistake to Plaintiffs' attention, the issue would have been mooted immediately by the provision of the missing information, which is exactly what happened upon Plaintiffs' receipt of PQ's summary judgment motion.  Attachment AE (4/22/09 Goldshaw Email).[51]  Further underscoring PQ's bad faith, PQ deliberately misleads the Court by stating as part of its argument that "PQ provided Plaintiffs with additional time for Thomas to submit a supplemental report,"  Def. Br. at 41, implying that it provided Plaintiffs with additional time to provide the missing testimony and compensation information.  In fact, Plaintiffs' supplemental report did not relate in any way to the missing testimony or compensation information, since Defendant had never – prior to this motion – called the oversight to Plaintiffs' attention. Moreover, contrary to Defendant's implication, the information contained in Plaintiffs'

---

[51].  Even after Plaintiffs' prompt provision of the missing information, PQ has *still* insisted on pursuing its baseless arguments for exclusion.  Attachment AE (4/22/09 Goldshaw Email); *see also* Attachment X1 (Compensation and Testimony Appendices to Thomas Report).

supplemental report could not have been provided earlier, since it was based on discovery that was disclosed by Defendant after the date of Dr. Thomas's original report (February 20, 2009).[52] *See* Attachment Y (Supp. Thomas Report) at 2.

In addition to being in bad faith, PQ's argument is baseless under the law. Rule 37(c)(1), which is the Rule upon which PQ bases its arguments, does not provide for exclusion of the expert report as a whole, but rather provides only for exclusion of the non-disclosed information – none of which Plaintiffs or PQ have actually sought to use in connection with this motion. Fed R. Civ. P. 37(c)(1). Furthermore, Rule 37(c)(1) – which PQ misquotes in its brief by omitting key language from the operative provision – provides that the exclusion sought by PQ is not permitted where the non-disclosure "is harmless." *Id.* ("If a party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.") (emphasis added). Here, the initial failure to attach information regarding Plaintiffs' expert's compensation and prior testimony to Plaintiffs' expert report was most certainly harmless, in that the absence of this information cannot possibly have had any impact at all on PQ's defense of this case.[53] Accordingly, PQ's argument under Rule 37(c)(1) must fail under the plain language of the rule.

---

52. This additional discovery was originally requested by Plaintiff on October 28, 2008.

53. The only argument that PQ makes for why Plaintiffs' omission might be considered material – that the omitted information somehow goes to the qualifications of Dr. Thomas – is nonsensical. PQ does not argue that Dr. Thomas's report should be excluded on the basis of her qualifications, nor does it, in any event, specify how Plaintiffs' inadvertent and temporary omission could have possibly harmed its ability to make this argument.

For all of these reasons, Dr. Thomas's report is plainly admissible and must be considered in connection with Defendant's motion.

### ii.    Age-Related Comments By John Lau

Defendant also argues that this Court should disregard the highly probative comments made by Dr. Lau to Ms. Marcus.  Notably, <u>Defendant does not contest for the purposes of this motion that Dr. Lau actually made these comments to Ms. Marcus</u>, *see* Def. Br. at 27, but simply argues based on their context – and on a blatant misrepresentation of the nature of the comments – they are not probative evidence of age discrimination.[54]  As set forth below, each of PQ's arguments is meritless.

PQ's principal – and most outrageous – argument for why this Court should not consider Dr. Lau's comments as evidence of age discrimination is based on a blatant misrepresentation of Ms. Marcus's testimony.  <u>Ms. Marcus testified that Dr. Lau told her that the RIF would target older employees, particularly those who were making more money and in the bonus plan.</u>  *See* Attachment F (Marcus Dep.) at 93-94, 134, 150-158, 366-374; *see also* Exhibit D-131 (Marcus Notes). Defendant PQ – apparently recognizing that this statement provides clear evidence of age bias – ignores Ms. Marcus's actual testimony, instead mischaracterizing Ms. Marcus's testimony as having stated that Dr. Lau told her that "PQ was going to get rid of employees who were making more money, some of whom were older," Def. Br. at 2, and that "the Company would be terminating people, particularly older people <u>because</u> they were making more money and were in

---

54.  For this reason (and because this Court is, in any event, required to accept Ms. Marcus's testimony as true for the purposes of this motion), PQ's attempts to undermine the veracity of Ms. Marcus's testimony on this issue are utterly irrelevant.  Plaintiffs therefore do not address them herein, except to point out that they are based on a highly contested version of the facts.  *See generally* Section III, *supra*.

the bonus pool," Def Br. at 27 (emphasis added).  PQ then goes on to argue based on its

mischaracterization that terminating older employees because they were making more money

does not constitute age discrimination.  Because PQ's salary argument is based on a fictionalized

account of Ms. Marcus's testimony – and Ms. Marcus's actual testimony clearly evidences age

bias on the part of PQ – PQ's first argument is utterly irrelevant.

 PQ also contends in a footnote that the comments that Dr. Lau made to Ms. Marcus in

February should be disregarded because they are "vague."  As an initial matter, PQ's

characterization of the February comments as "vague" is again based on a misrepresentation of

Ms. Marcus's testimony.  In fact, Ms. Marcus testified that Dr. Lau told her in February that

unfortunately he was correct – the company was going to be "was getting rid of people, and it

would be directed at older people," a comment that is in no way vague.  *See* Attachment F

(Marcus Dep.) at 152-54, 366-74.  Moreover, even if PQ's account of Dr. Lau's February

comment were correct – which it is not – it would still be the province of the jury to decide

whether that comment was probative of age bias.  *See, e.g., Ash v. Tyson Foods*, 546 U.S. 454,

456 (2006) (per curiam); *Waldron v. SL Industries, Inc.*, 56 F.3d 491, 502-03 (3d Cir. 1995).

 PQ's also argues that Dr. Lau's comments are not reflective of age bias in the RIF process

because they do not reflect his personal view, and because, they argue, other evidence supports

the conclusion that Dr. Lau lacked age bias.  Clearly, Dr. Lau's comment need not reflect his own

personal bias (as opposed to the bias of other decision-makers) in order to be probative evidence

of age discrimination by PQ.   The Defendant in this case is PQ, not Dr. Lau.

 Finally, PQ makes two arguments relating to the timing of Dr. Lau's comments to

Ms. Marcus: (1) that they cannot be probative of age bias because they were allegedly made

before Dr. Lau was aware of who would be purchasing the company; and (2) that they cannot be

probative of age discrimination because they were allegedly made before the final decision was made to eliminate CD funding and terminate Plaintiffs.  As set forth below, both arguments are based on a contested version of the facts, and are in any event logically erroneous.

PQ's first argument – based on the timing of the purchase of PQ by JPMP – is based on a version of the facts that is contradicted by the testimony of several of its own witnesses.  In fact, several PQ witnesses (including John Lau, prior to conferring with counsel during his deposition[55]) testified that meetings with JPMP took place in late October 2004, and that JPMP had emerged as a front-runner for the sale by around that time.  *See* Attachment A (Lau Dep.) at 84; Attachment D (Kutchins Dep.) at 62, 64-65; Attachment E (Imbriani Dep.) at 145.  Thus, the

---

55.  Dr. Lau initially testified as follows in relation to this issue:

> Q:  Prior to hearing or seeing the announcement that J. P. Morgan was the purchaser, did you know that J. P. Morgan was one of the potential purchasers?
> A:  I learned that J. P. Morgan was one of the potential purchasers around October, late October.
> Q:  Of 2004?
> A:  2004
> Q:  How did you learn that?
> A:  I was asked to attend a meeting where J.P. Morgan Partners was going through their due diligence, and they had a few questions on the research projects that we were working on.

Attachment A (Lau Dep.) at 84.

Shortly thereafter, the parties broke for lunch.  Attachment A (Lau Dep.) at 86. Immediately after returning from lunch, Dr. Lau's testimony on this issue changed to the following:

> THE WITNESS: Scott, before we begin, I was thinking more about the -- you know, the question about the encounter with J. P. Morgan Partners, my first encounter, I think I misspoke.  It was not October '04, it was actually November, and is in my calendar, I recall that.

Attachment A (Lau Dep.) at 86-87.

timing of the comments to Ms. Marcus – made initially just following when the meetings with JPMP took place, and repeated at the time that the restructuring was announced, *see* Section III, *supra* – is highly suggestive, and reinforces the probative nature of the comments.

Moreover, even if the timing were as PQ argues, a jury could still find the comments to be highly probative evidence of age animus.  As set forth in Section III, *supra*, several decision-makers in the 2005 RIF were already employed with PQ in October 2004 and by then had revealed a clear bias against older employees.  Thus, Dr. Lau's comments are highly probative evidence of age discrimination whether or not this accepts PQ's contested timing argument.

PQ's second timing argument is similarly flawed.  There is ample evidence in this case – including evidence cited by Defendant PQ in its brief – that older employees in R&D were targeted as likely candidates for termination long before the final decisions were made in May 2005.  *See, e.g.,* Exhibit P-2 (9/10/04 Kutchins Email); Exhibit P-20 (4/12/05 Delmonte Email); Def. Br. at 13-14.  Morever, when the final decisions were made is totally irrelevant to whether Dr. Lau was aware early on that the intent of the RIF decision-makers was to target older employees.

PQ's contention that the comments are not probative because they were made before the decision to terminate the CD program also lacks merit.  First, the facts show that the elimination of the CD program had little, if anything, to do with Plaintiffs' termination.  Indeed, this issue – *i.e.*, whether Plaintiffs were in fact terminated because of the elimination of the CD program – is at the heart of this case, and is fundamentally contested by the parties.[56]  Moreover, John Lau

---

56.   The timing of the decision to eliminate the CD program is also contested.  *See* Attachment J (Boyce Dep.) at 199-200 (stating that the decision to eliminate the corporate development program was made in "February or March, much earlier than May.")

need not have known the precise mechanism by which older employees were going to be targeted in the RIF, in order to be aware that it was the intention of the company to target them for termination.  Indeed, the Third Circuit has recognized that where a decision-maker selects among criteria for termination with an awareness of what individuals will be adversely effected by the decision, this can itself be evidence of age bias.  *See, e.g., Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 237-38 (3d Cir. 1999).  Thus, PQ's argument on this point is meritless.

Finally, Plaintiff notes that in assessing the probative weight of Dr. Lau's comments, PQ ignores entirely the ultimate result of the RIF decision-making process: <u>the termination of eight employees, all age 55 or older</u>.  This result – which obviously strongly buttresses the probative weight of Dr. Lau's comments – could (and likely would) be given significant weight by a jury in assessing the meaning of those comments.

For all of these reasons, PQ cannot escape the powerful evidence of age bias revealed by Dr. Lau's comments.

## V.    CONCLUSION

For all of the forgoing reasons, Plaintiffs respectfully request that PQ's motion for summary judgment be denied.

Respectfully submitted,

BY:    /s/ Katie R. Eyer
        Katie R. Eyer - ID. 200756
        SALMANSON GOLDSHAW, P.C.
        Two Penn Center
        1500 J.F.K. Blvd., Suite 1230
        Philadelphia, PA  19102
        215-640-0593
        215-640-0596 (fax)

Date:  May 8, 2009

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

BONNIE MARCUS, ROMAN WYPART,       :
ERNEST SENDEROV, and               :
MARY ELLEN CALLAGHAN,              :
                                   :
        Plaintiffs               :       **CIVIL ACTION NO.:  07-02075**
                                   :
    v.                            :
                                   :
PQ CORPORATION                     :
                                   :
        Defendant                :

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on May 8, 2009, I caused a true and correct copy of the foregoing *Response to Defendant's Motion for Summary Judgment* of to be filed via the Official Court Electronic Document Filing System, and that said Response is therefore available for viewing and downloading from the ECF system.  By virtue of this filing, service upon the following counsel, being Electronic Case Filing Users, is complete upon counsels' receipt of the Court's e-mail notification of the Notice of Electronic Filing:

                      Elizabeth A. Malloy

       Copies of the exhibits and attachments to the forgoing Response were served by hand delivery on the Court on this date and on the following counsel:

                      Elizabeth A. Malloy
                      Buchanan Ingersoll & Rooney PC
                      Two Liberty Place
                      50 S. 16th Street, Suite 3200
                      Philadelphia, PA 19102-2555

                      BY:   /s/ Katie R. Eyer
                            Katie R. Eyer - ID. 200756