**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BONNIE MARCUS, ROMAN WYPART, | : | |
| ERNEST SENDEROV, and | : | |
| MARY ELLEN CALLAGHAN, | : | |
| | : | |
| Plaintiffs | : | **CIVIL ACTION NO.:  07-02075** |
| | : | |
| v. | : | |
| | : | |
| PQ CORPORATION | : | |
| | : | |
| Defendant | : | |

**PLAINTIFFS' MEMORANDUM OF LAW
IN RESPONSE TO DEFENDANT'S MOTION IN LIMINE**

Defendant's Motion in Limine is nothing more than a thinly veiled attempt to keep out highly probative evidence of its discriminatory bias in terminating plaintiffs.  It is little wonder that defendant is trying so hard to keep out this evidence, given its damning nature.  As set forth more fully herein, far from being irrelevant prejudicial, and/or hearsay, the evidence in question – especially the ageist comments from the decision-makers in this case – is highly probative, and cuts to the heart of this case:  the decision-makers' state of mind when they decided to terminate several of the Company's older employees as part of a reduction in force.

I.    **ARGUMENT**

   A.    **THE TESTIMONY OF PLAINTIFF'S STATISTICAL EXPERT
         IS ADMISSIBLE AND PROBATIVE OF AGE DISCRIMINATION**

      1.    **Factual Background**

   100% of those terminated from Defendant's R&D group were age 55 or older, despite the fact that only 30.4% of the R&D workforce was comprised of employees age 55 or older.  (*See* Report of Dr. Stephanie Thomas, Attachment X to Plaintiffs' Response to Defendant's Motion

for Summary Judgment) (*hereinafter* "Thomas Report") at 13.  Plaintiffs' statistical expert found

that this disparity was 4.3 standard deviations from what one would expect to see in an age-

neutral process, a statistically significant result.  *See id.*; *see also Maddow v. Proctor & Gamble*,

107 F.3d 846, 852 (11th Cir. 1997) ("A standard deviation of two or three is enough to support

an inference of discrimination.").  There is a less than 1 in 58,500 chance that such a large

disparity would exist absent consideration of age.  (*See* Declaration of Dr. Stephanie Thomas,

Attachment Z to Plaintiffs' Response to Defendant's Motion for Summary Judgment)

(*hereinafter* "Thomas Decl."), ¶ 3.  Company-wide, Plaintiffs' expert also found a statistically

significant correlation between age and the RIF decisions.  *See* Thomas Report at 11 (indicating

for the 55+ age category that the observed number of employees RIF'd was 3.68 standard

deviations from the expected value).

Plaintiffs' expert also analyzed the R&D RIF outcomes, controlling for the principal

justifications that have been provided by PQ for the elimination of positions in R&D.

Specifically, Plaintiffs' expert conducted analyses controlling for: (1) 2005 membership in the

CD Group; (2) 100% assignment to CD projects in 2005; (3) 100% funding through the CD

program in 2005; (4) Elimination at the time of the RIF of the CD projects to which the

employee was assigned; and (5) Receipt of any CD funding in 2005.  *See* Thomas Report; and

Supplemental Report of Dr. Stephanie Thomas, Attachment Y to Plaintiffs' Response to

Defendant's Motion for Summary Judgment (*hereinafter* "Supp. Thomas Report").  The results –

which show that there continues to be a statistically significant relationship between age and the

RIF decisions, even controlling for these factors – are set out below:

| Factor Controlled For | Standard Deviations from Expected Age Distribution (Age 55+) | Probability of Observed Age Distribution Occurring By Chance (After Controlling for Factor Noted) |
|---|---|---|
| None (Analysis of R&D) | 4.3 | 0.00001709204 (1 in 58,507) |
| 2005 CD Group Membership | 3.76 / 3.65[1] | 0.00016996676 (1 in 5,884) / 0.00026230767 (1 in 3,812) |
| 100% Assignment to CD Projects in 2005 | 3.65 | 0.00026230767 (1 in 3,812) |
| 100% CD Funding in 2005 | 3.65 / 3.97[2] | 0.00026230767 (1 in 3,812) / 0.00007190467 (1 in 13,907) |
| Elimination of CD Projects at Time of RIF | 4.06 / 3.96[3] | 0.00004909781 (1 in 20,368) / 0.00007498265 (1 in 13,336) |
| Receipt of CD Funding in 2005 | 4.04 | 0.00005347773 (1 in 18,699) |

*See* Thomas Report at 13-16;  Supp. Thomas Report at 4-5; *see also* Thomas Affidavit at ¶ 3.

**2.**   **Legal Analysis**

Defendant's first argument takes a single statement from Dr. Thomas's report – that the outcome of the layoff could not have "reasonably occurred by chance" and wrenches it out of its context, as if it were the *sole* conclusion in the report, completely ignoring the fact that Dr. Thomas then analyzed the "pool" of candidates as a whole, and ran various regression analyses to take into account the characteristics of the pool – and more importantly, the purported

---

1.    Lau included/excluded from CD group.

2.    With/without Marcus and Hinchey as 100% CD funded personnel.

3.    Based on PQBM 235/PQBM 215.

justifications for the selection of the plaintiffs for the RIF – in order to reach the ultimate

conclusion that age likely played a factor in the termination of plaintiffs.[4]

Defendant's argument is simply foreclosed by the decision in *Bruno v. W.B. Saunders*

*Co.*, 882 F.2d 760 (3d Cir. 1989), in which the Third Circuit held that in an individual disparate

treatment case, a Plaintiffs' statistical analysis can be considered as evidence of age

discrimination <u>even where it does not control for *any*</u> of the possible reasons for the observed age

<u>disparity</u>.  *See id.* at 766-767 (upholding the admissibility of studies that did not control for any

of the possible reasons for the observed disparity, and noting that in individual disparate

treatment cases statistical analyses "need not be so finely tuned"); *see also Starceski v.*

*Westinghouse Electric Corp.*, 54 F.3d 1089, 1099 n. 11 & 12 (3d Cir. 1995) (admitting evidence

showing age disparities, without analysis controlling for pertinent explanations); *Abrams v.*

*Lightolier*, 50 F.3d 1204, 1216-1217 (3d Cir. 1995) (same); *Freeman v. Package Machinery*

*Corp.*, 865 F.2d 1331, 1336, 1338-39 (1st Cir. 1988) (same); *McDissi v. Valmont Industries*, 856

F.2d 1054, 1057-58 (8th Cir. 1988) (same); *McAlester v. United Airlines*, 851 F.2d 1249, 1257-

59 (10th Cir. 1988) (similar, in a race case).

Thus, Plaintiffs were not required to control for <u>any</u> of the justifications provided by PQ

in order for their statistical analysis to be considered probative evidence of age discrimination.

They nevertheless did control for each of the predominant justifications that have been offered by

---

4.    Hence, the case is distinguishable from *Sanders v. Southwestern Bell Telephone, LP*, 544
      F.3d 1101 (10th Cir. 2008), cited by defendant,  in which the plaintiff simply presented raw
      numbers, without attempting to take into account other potential non-discriminatory criteria.
      As set forth, infra, plaintiffs' expert in fact did run analyses taking into account such
      criteria.  In any event, to the extent that the Tenth Circuit's opinion suggests a more
      stringent standard than that articulated by the Third Circuit, it is of course not a basis for
      exclusion.

PQ for the inclusion of R&D employees in the RIF.  Therefore, their analysis is clearly

admissible under *Bruno*.

Defendant appears to concede that the Third Circuit's binding precedent in *Bruno v. W.B.*

*Saunders Co.*, 882 F.2d 760, 766-67 (3d Cir. 1989), and its progeny requires that the Court admit

Dr. Thomas's testimony (Defendant's brief at 4).  Defendant nevertheless suggests that "lower

courts have been more restrictive in applying that standard."

But defendant's examples actually highlight the inherent differences between mere

conclusory allegations in those cases and the sophisticated analysis performed by plaintiffs'

expert.  In *Dowling v. Citizens Bank*, 295 Fed. Appx. 499 (3d Cir. 2008)(non-precedential), the

plaintiff merely pointed to raw numbers (only 8 persons over 50 were hired or promoted to the

position of branch manager, out of 39 applications, without looking at the ages of the relevant

pool); in *Cameron v. Infoconsulting Int'l, LLC*, 2006 U.S. Dis. LEXIS 32463 (E.D. Pa. 2006),

the plaintiff and a witness did "not even go so far as to offer 'raw number' comparisons, but

offer[ed] a belief [based] on their own subjective observations."  *Cameron*, 2006 U.S. Dist.

LEXIS 32463 at *29.

In other words, in those cases, the plaintiffs fell short for failing to provide the very type

of analysis done here.  By contrast, it can hardly be argued that a proper statistical analysis is not

probative.  Indeed, as this Court itself has previously recognized, "the facts that most courts

emphasize when evaluating an ADEA claim" include "statistical evidence regarding the number

of protected employees fired and the number of younger employees retained."  *Brown v.*

*Delaware & Hudson Railway Co.*, 1992 U.S. Dist. LEXIS 17040 (E.D. Pa. 1992)(Fullam,

J.)(denying summary judgment in ADEA case based on layoffs of older individuals in context of

reorganization).  The analysis here is not just probative, but compelling.

**Sample Size**

Defendant PQ argues that this Court should disregard Dr. Thomas's report on the grounds that her analysis allegedly relies on a "sample size of four people." Def. Br. At 4. This Court should immediately reject this argument because PQ has dramatically misrepresented the sample size relied on by Dr. Thomas. In fact, Dr. Thomas's analyses relied on sample sizes ranging from a minimum of 56 to a maximum of 239. *See* Thomas Report at 11-16; Supp. Thomas Report at 4-5; Thomas Aff. at ¶ 1. On this basis alone, PQ's argument should be disregarded.

Moreover, where (as in this case) a result is statistically significant using appropriate statistical tests, the size of the sample – by definition – is sufficiently large for a legally and scientifically meaningful result. *See, e.g., McDissi v. Valmont Industries*, 856 F.2d 1054, 1058 & n.3 (8th Cir. 1988) ("[t]here is no minimum sample size prescribed either in federal law or in statistical theory"); *Bouman v. Block*, 940 F.2d 1211, 1226 (9th Cir. 1991) (refusing to disregard a plaintiff's statistical analysis based on the sample size, and noting that a showing of statistical significance at the .05 level (a showing which has been not only met but substantially exceeded in this case) indicates that "*taking into account the effect of the small numbers* -the disparity is statistically significant") (emphasis in the original); *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1342 n. 5 (1st Cir. 1988) (rejecting challenge based on small sample size and noting that the proper approach is to examine all of the facts and require a showing that the disparity is statistically significant, applying proper statistical tests); *McAlester v. United Airlines*, 851 F.2d 1249, 1258 (10th Cir. 1988) (refusing to reverse reliance on statistics based on sample size where the Plaintiff's expert introduced uncontradicted testimony that he obtained statistically significant results, even taking into account the small sample size).

Indeed, it is somewhat telling that, in contrast to the motion for summary judgment, defendant is no longer relying on *Jones v. Pepsi-Cola Metro. Bottling Co.*, 871 F.Supp. 305 (E.D. Mich. 1994).  Undoubtedly, this is because in *Jones* the Court recognized that a statistically significant result is admissible evidence of discrimination even where there is a comparatively small sample size.  *Id.* at 311-12 & n.19 (identifying the "Fisher's Exact" and "Chi-square" tests as reliable tests in the context of small sample sizes, and refusing to dismiss Plaintiff's age case based on a finding of statistical significance under the Fisher's Exact test).  Moreover, the Court identified the two tests relied on by Plaintiffs' expert in this case as the appropriate tests to use where a relatively small sample is available for analysis.[5]  *See id.*; *see also* Thomas Report and Supp. Thomas Report.

Finally, the defendant argues that the evidence should be precluded under Fed. R.Evid. 403, because the report takes into consideration numerous termination decisions in different facilities.  There are several critical problems with this argument.

First, defendants contend that the job requirements and/or functions varied.  To the extent that the expert did not control for these differences, it is because Defendant itself did not assert that these differences mattered.  The <u>only</u> consideration that Defendant has even identified that it apparently believes Plaintiff should have controlled for is the level of job classification.  *See* Def. Summary Judgment Memorandum at 43-44.  Defendant, however, <u>does not contend that employees were selected for inclusion in the RIF based in whole or in part on their level of job</u>

---

5.    None of the cases cited by Defendant contradicts the proposition that – where the use of appropriate statistical tests results in statistically significant results – that analysis is probative and admissible, despite a seemingly small sample size.  Defendant has not contended that the tests relied on by Dr. Thomas are not appropriate for the sample size relied on in her report.  *See also* Thomas Aff., ¶ 2 (affirming that the tests relied on are appropriate for the sample sizes used in her report).

classification.  *See* Def. Summary Judgment Memorandum  at 2, 24, 34 (stating PQ's alleged

reasons for including Plaintiffs and other R&D employees as part of the RIF).  Thus, controlling

for this or any of the other factors – differences in location and/or classification –  would be

wholly inappropriate (and certainly not necessary) in this case.

Second, defendant's contention, without any legal support, that admission of the

statistical evidence would require 30 "mini-trials" on why each person was terminated is

completely unfounded.  Indeed, what defendant is really arguing is that *Bruno* was wrongly

decided.  For defendant's argument that too *large* a sample creates an undue burden inherently

contradicts their position that too *small* a sample is unreliable.  By its very nature, statistical

evidence presents an aggregate picture, not an individualized one.  If the sample size is

appropriate, then it is the *aggregate* picture – coupled with the individual, particularized

decision-making as to each *plaintiff*, not the company as a whole – which provides the probative

value to the jury.[6]

In short, Defendant has identified no arguable basis – scientific or legal – for disregarding

Dr. Thomas's analyses based on the sample size she employed.[7]

### B.    MR. MYSZAK'S NOTES AND TESTIMONY SHOULD BE ADMITTED AS PROBATIVE, NON-HEARSAY EVIDENCE

Defendant's next argument regards the notes and testimony of Mr. Myszak, related to an

ageist comment made or relayed by several high level managers and/or decision-makers.

---

6.    At worst, this is a question of weight, not admissibility.  If defendant believes that the jury should not give the expert testimony weight, it is certainly free to point out any weaknesses through vigorous cross-examination of plaintiffs' expert.

7.    We note that the admissibility of Plaintiffs' statistical expert testimony is further discussed in Plaintiffs' briefs opposing summary judgment, and we respectfully incorporate those arguments herein.

Plaintiffs have addressed many of the arguments raised by defendant in their own motion in limine to admit this testimony, and will not repeat them here.  However, a few additional comments are in order.

First, defendant claims that Mr. Myszak's notes and testimony should be excluded because they relate to a process involving different employment actions, different decision-makers, different corporate ownership and a different time frame than those ultimately at issue here.

Defendant misrepresents the most critical element – in fact the notes reflect comments made by Ms. DelMonte (a decision-maker) that "we need to get rid of some of these old farts," which was passed to at least one additional decision-maker in this case.[8]  When a decision-maker (in this case, Ms. DelMonte) has made clear and unequivocal comments evidencing age bias, a jury is certainly entitled to conclude that such direct evidence "leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it" when making the challenged employment action.  *Fakete v. Aetna, Inc.*,  308 F.3d 335 at 338 (3d Cir. 2002), quoting *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1097 (3d Cir. 1995).

The fact that Ms. DelMonte's comment was made within a different time frame logically does not make it any less admissible or probative.  This was not a "stray remark" capable of a different, benevolent interpretation (or at least one that suggests an inappropriate joke or comment) which does not necessarily mean that the person would discriminate in making employment-related decisions.  Instead, the comment shows precisely the opposite – that

---

8.    The fact that the ownership changed is simply a red herring.  The managers making or receiving the discriminatory remarks, who Defendant itself contends were involved in the decisions at issue in this case (DelMonte, Lau, Kutchins and Imbriani) were at PQ both before and after the change in ownership.

Ms. DelMonte who, for at least two years, hoped to get rid of some of the "old farts," *finally* had an opportunity to act on that desire, and did so at the first opportunity.

For similar reasons, the comments are relevant to the extent they reflect the effect on the listeners. It is a reasonable inference that Dr. Lau and Ms. Kutchins "got the message" loud and clear from Ms. DelMonte, and similarly made sure that they were going to comply therewith.

Finally, defendant's argument that Myszak's testimony would constitute multiple layers of hearsay is simply incorrect. As defendant admits, the evidence is not hearsay if plaintiff can demonstrate that the comments by Ms. DelMonte, and repeated by Dr. Lau and Ms. Kutchins, were made within the scope of their agency.

Indeed, it is somewhat telling that in this section of the brief, the defendant cites to the District Court's opinion in *Armbruster v. Unisys Corp,* 914 F. Supp. 1153 (E.D. Pa. 1996), without noting the subsequent opinion of the Third Circuit reversing in part that decision. *Armbruster v. Unisys Corp*. 32 F.3d 768 (3d Cir. 1994), which it cites elsewhere. While the Court of Appeals agreed with the lower court that certain stray remarks did not demonstrate age bias in that case, it did so on two different grounds: (1) some of the comments were passed down from an unidentified source; and (2) the comments were not made by the relevant decision-makers, and therefore could not be linked to the employment decisions in question.

Hence, the situation is factually distinguishable on both grounds – and under Third Circuit case law, is admissible based on these very distinctions. Indeed, the Court in *Ambruster* specifically noted that where, as here, the speaker **was** specifically identifiable, the comment **was** admissible as an admission under F.R.E. 801(d)(2)(D). *Armbruster*, 32 F.3d at 779 n. 16, citing *Big Apple BMW of North America, Inc.*, 974 F.2d 1358, 1373 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993). The Court also noted that where, as here, discriminatory comments are made

by someone with "significant influence on the attitudes and procedures of the . . . decision-makers" they are admissible to show that very effect on the listeners.  *Id.*, quoting *Roebuck v. Drexel University*, 852 F.2d 715 (3d Cir. 1998).[9]

Defendant tries to suggest that the comments are inadmissible under Rule 403, because other courts have called similar "old fart" comments "stray" remarks of little or not value.  But defendant's creative attempt to rely on two non-precedential opinions from the Sixth Circuit in which the term "old fart" was used is insufficient to prove that such words have no or little evidentiary value.  Thus, in *Bigelow v. ANR Pipeline Co.,* 121 F.3d 707 (6th Cir. 1997)(non-precedential), the Court noted that the "old farts" comment referred to a group of pilots who were terminated for failing their FAA health certification.  In *Boyle v. Mannesmann,* 991 F.2d 794 (6th Cir. 1993)(non-precedential), the Court admittedly went further and – over a vigorous dissent – held that the "old fart" comment of a decision-maker was too temporally remote to be relevant.  Plaintiffs respectfully suggest that the dissent's analysis is correct:

> I do not agree with the characteristic [sic] of Kurowski's comment as a 'stray remark.'  The remark contains a clear age bias that I believe is highly probative of the decision-maker's motivation in making firing decisions.  Moreover, those cases indicating stray remarks are insufficient to prove discrimination do not indicate that

---

9.    The Ninth Circuit's opinion in *Breneman v. Kennecott Corp.*, 799 F.2d 470 (9th Cir. 1986) is similarly distinguishable – in that instance, the plaintiff laid no foundation to show that the remarks were made or passed along to the relevant decision-makers.  Further, they were offered *only* to prove the truth of the matter asserted not to show state of mind or for the effect that the remarks had on the listener.  Similarly, in *Harry v. Nat'l Railroad Passenger Corp.,* 2005 WL 1791884 (E.D. Pa. 2005), as noted by defendant the Court excluded the testimony, among other reasons because there was "no contextual support that allows the statements to be admitted – there is no indication of when or where these comments were made" and therefore the Court was not convinced that the comments were made within the scope of the speaker's authority or was sufficiently tied to the decision at issue.   One can assume that if, as here, the Court *had* such a context, it would have allowed the testimony as an admission.

> such remarks are inadmissible, nor do they indicate that such
> remarks in conjunction with other evidence would necessarily fail
> to support a finding of discrimination.

*Boyle*, 991 F.2d 794, 1993 WL 113734 at *4 (J. Gilmore, dissenting).

Although defendant claims that plaintiff's cannot show that Ms. DelMonte's comment was made in the course of her employment, or its repetition by Lau and Kutchins were in their respective courses of employment, defendant fails to cite any legal support for its contention.  It is little wonder: As plaintiff has pointed out, the argument is foreclosed by the Third Circuit's decisions in *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286 (3d Cir. 2007)(being a "direct decision-maker. . . constitutes strong proof that a statement was made within the scope of employment" (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 275 (6th Cir. 2003)) and *Abrams v. Lightolier, Inc.*, 50 F.3d 1203 at 1215-1216 (3d Cir. 1995)("Where a supervisor is authorized to speak with subordinates about the employer's employment practices, a subordinate's account of an explanation of the supervisor's understanding regarding the criteria utilized by management in making decisions on hiring, firing, compensation, and the like is admissible against the employer, regardless whether the declarant has any involvement in the challenged employment action.").  *See also Hubert v. Hearst Corp.*, 900 F2d 1050, 1053 (7th Cir. 1990)("[D]irect warnings by [plaintiff's immediate supervisor], himself a member of management, given to [the plaintiff], his subordinate, as to the attitude, intentions and/or policy of the higher-ups in management" was admissible under rule 801(d)(2)(D), even though supervisor was not involved in decision at issue).[10]

---

10.   Defendant attempts to muddy the waters by suggesting, for example that Mr. Myszak's notes are "self-serving"; that he did not even "know if it, in fact, happened"; that Mr. Myszak himself "admitted" that the 2005 RIS was non-discriminatory and directed by "whole new management";  and that Ms. Kutchins was not involved in any decision-making

### C.   MS. KUTCHINS TESTIMONY REGARDING MR. IMBRIANI'S MESSAGE TO HER THAT HE WANTED "YOUNGER BLOOD" SHOULD BE ADMITTED AS PROBATIVE, NON-HEARSAY TESTIMONY

For the reasons set forth in the prior section, Ms. Kutchins' testimony regarding

Mr. Imbriani's comments to her are likewise admissible.[11]

As a threshold matter, defendant argues that plaintiffs' use of the ageist comment directed

against Mr. Myszak is inconsistent with Mr. Myszak's later retention in the layoff, and that this

alleged inconsistency somehow "calls into question" the plaintiffs' attempt to use the facts

related to Mr. Myszak's earlier demotion.  Defendant is simply wrong.  Mr. Myszak's demotion

in favor of a younger employee, and his subsequent retention at the expense of an even older

employee, is hardly inconsistent evidence of age bias – it quite clearly demonstrates a consistent

pattern of favoring younger comparators over older ones.

The statement by Mr. Imbriani, as reported by Ms. Kutchins, is relevant for several

reasons.  Mr. Imbriani was one of the key-decision makers in the 2005 RIF at issue in this

litigation.  Clearly, Mr. Imbriani's state of mind is a central issue in this case.  His stated desire to

favor "younger blood" and, more importantly, his immediate association of Mr. Myszak's

_____

in 2003 (Defendant's brief at 6, 8-9).  It is hard to imagine how Mr. Myszak's notes or testimony is "self-serving" as he has no stake in this case.  Second, it is hardly surprising that Mr. Myszak couldn't swear that the "it" happened – the "it" to which he was referring was whether Ms. DelMonte made the comment to Dr. Lau (not whether Ms. Kutchins repeated the remark to him), and Mr. Myszak was not present for that conversation.  As to Mr. Myszak's "admissions " about the nature of the RIF and those responsible, he was not a decision-maker in the RIF, and his "admission" is nothing more than his personal, not fully informed view (and not, in fact carried out by 'whole new management').  Finally, the contention that Ms. Kutchins was allegedly not a decision-maker in *2003* is of no moment – she was a decision-maker for the discriminatory acts at issue in this case.

11.  The defendant seems to concede that Mr. Imbriani's statement is not hearsay, and the only issue is as whether it is sufficiently probative of discriminatory animus.

allegedly poor performance in a sales meeting with the need for younger blood, is highly

probative of Mr. Imbriani's views equating performance with age.

Indeed, defendant simply conflates the question of whether remarks are *sufficient* to

establish discriminatory animus, with whether they are *probative* and *admissible* as part of the

overall evidence admissible to establish such animus.  Thus, in *Pivirotto v. Innovative Systems,*

*Inc.*, 191 F.3d 344 (3d Cir. 1999), the remarks of a supervisor who, while having "ultimate"

authority was not the primary decision-maker in the case, were admitted into evidence for

consideration by the jury; and the speaker himself took the stand to explain their context, thus

giving the jury to opportunity to give them whatever weight it thought appropriate.  The Court in

*Pivirotto* simply rejected the notion that the remark, *in and of itself*, was sufficient to demonstrate

that an error in a jury instruction was not harmless error.  In doing so, the Court relied on its prior

decision in *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509 (3d Cir. 1992) that certain

remarks "were insufficient, without more, to support a verdict in favor of the plaintiff."  In other

words, the question is one of the sufficiency of the evidence, not its probity.  The Sixth Circuit's

decision in *Gagne v. Northwestern Nat'l Ins. Co.*, 881 f.2d 309, 314 (6th Cir. 1989), similarly

held that a single, ambiguous remark was not *sufficient* to establish pretext.  *Id.* ("This solitary

remark, however, was insufficient to create an issue of material fact which would preclude entry

of summary judgment in favor of defendant").  Sufficiency and relevancy simply are not the

same.

Defendant's citation to *Pollish v. Harvey*, 2006 U.S. Dist. LEXIS 96586 *8 (M.D. Pa.

2006), is even more curious.  Defendant describes *Pollish* parenthetically as follows:

"(representative's statements regarding 'aging workforce' and the need to 'pump young blood'

into company did not deal directly with decision not to hire plaintiff and were, therefore, not

direct evidence of discrimination)." Defendant fails to note that *the Court, in fact, held that the statements were relevant, and sufficiently probative of pretext to preclude summary judgment for defendant*:

> [P]laintiff has presented evidence that the defendant was concerned about the aging workforce and sought to hire younger applicants. Although this evidence was not sufficient to establish direct evidence of discrimination *it may be utilized by the plaintiff as indirect/circumstantial evidence to establish that the reason for not hiring him was merely pretextual.*

*Pollish*, 2006 U.S. Dist. LEXIS 96856 at *12-13. Hence, *Pollish* butresses plaintiff's contention that Mr. Imbriani's comment is probative of age discrimination.

Defendant's contention that the remark is too temporally remote to have any evidentiary value is similarly unavailing. Defendant's cases stand not for the proposition that temporally remote remarks are not relevant, but instead – especially if made by non-decision-makers, which is not the case here – that they are not *sufficient*, in and of themselves, to establish pretext. In considering whether the remarks are probative, the court should consider three factors: (1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement. *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997). Here, the statement was made by Mr. Imbriani, one of the key decision-makers, and Ms. Kutchins' second-level supervisor. Clearly Mr. Imbriani played a key role in the corporate hierarchy, and in the layoff determinations. The purpose and content of the statement hardly counted as a "stray remark" but instead was a clear expression of Mr. Imbriani's bias, both by his willingness to leap to the conclusion that Mr. Myszak's alleged poor performance merited not only a demotion, but by his replacement not just with a better performer, but specifically with someone with  younger

blood – a directive so clear that Ms. Kutchins felt compelled to former object to Human Resources about Mr. Imbriani's discriminatory intent. This was not just a vague reference or comment about age – it was a clear expression by a key decision-maker that he wanted his subordinate Ms. Kutchins, to use *age as a relevant factor* in an employment decision.

As noted in plaintiffs' memorandum in support of its motion in limine, the statement is also relevant because of the impact on the listener, Ms. Kutchins, who subsequently became a decision-maker herself in the RIF in question. There is no evidence that Mr. Imbriani disavowed his directive, even after Ms. Kutchins complained to human resources. In fact, the evidence will establish the contrary: that the Company de facto ratified Mr. Imbriani's actions, and that Mr. Kutchins was reprimanded for even raising the issue. A jury could reasonably infer that the next time Ms. Kutchins was part of an HR discussion involving Mr. Imbriani, she was more likely to agree to any discriminatory actions rather than risk his wrath a second time.

Hence, the only factor even arguably weighing against the statement's admission is the alleged temporal remoteness of the comment. But a lack of temporal proximity standing alone would not render the comment inadmissible. There is no evidence that Mr. Imbriani changed his views in the interim, or even if he had, that he expressed his change of heart to Ms. Kutchins. Under the specific facts of this case, and placing the comment in its specific factual context, the fact that the comment was not made at the time of the RIF actually has no particular bearing or weight whatsoever.

### D.    THE SUCCESSION PLANNING TESTIMONY IS ADMISSIBLE.

Many of the arguments regarding the admissibility of the decision-makers' comments, infra, are applicable as well to the admissibility of evidence regarding the prior succession planning discussions.

Defendant again tries to wholly divorce the prior discussions from the RIF in question. But the record shows the opposite.

First, again, defendant elides over the distinction between the change of ownership in the Company, as opposed to an alleged change in management.  While some managers did change over time, both Mr. Imbriani and Ms. DelMonte were active participants in various stages of succession planning as a member of the Operations Committee, and were two of the key-decision-makers in the 2005 RIF.  See Doran dep. at 34-35, (Exhibit 1 attached hereto) (describing input by the Operations Committee in the succession planning process generally); Doran dep. at 44 (Imbriani was member of Operations Committee from 2002 through 2004); Doran dep. at 45 (DelMonte joined Committee).  Clearly, then, the discussions which occurred during the succession planning process – particularly to the extent that they clearly focused on the company's long term personnel objectives, and how to achieve them (Doran dep. at 30-31) – provide highly relevant background to the decisions for the RIF in 2005.  This is especially, but not exclusively true, for the active succession planning which occurred from May to September, 2004 just a few months before the RIF was implemented.  (Doran dep. at 23).  *Indeed, defendant has not pointed to any evidence that the RIF in 2005 represented a change in direction or approach from all the prior discussions leading up to the RIF.*  If succession planning is, as Defendant asserts, a "best practice" and Defendant in fact engaged in such best practices for several years leading up to the RIF, then it is simply illogical that the same managers for Defendant would simply jettison its allegedly careful, deliberative best practices when it considered employee terminations in 2005.

Aside from the general discussion of succession planning, there is also specific relevance to two particular items within the context of those processes which are relevant to this lawsuit.

- 17 -

The first is the fact that one of the Plaintiffs, Ms. Marcus, plainly appeared as a person to be considered for further development within the Company as a potential successor to Mr. Cormier. (Doran dep. at 76-78).  She was judged by the Operations Committee as a high potential individual who greatly exceeded expectations in terms of overall performance and as promotable in terms of potential.  (Doran dep. at 81-85).  Her clear value to the company raises serious questions as to "what changed" (other than the fact that she got older) to make her expendable just a few years later.

As the documents showing the ages of the employees during the Company's succession planning, they expressly included the ages of the employees.  Defendant is quite right that the fact that the documents contain employee's ages is not *necessarily* evidence of age discrimination.  The cases cited by defendant, *Armbruster*, infra, and *Maidenbaum*, 870 F. Supp. 1254 (D.N.J. 1994), stand for the unremarkable proposition that the inclusion of dates of birth may be explained by wholly benevolent reasons – such as to ensure that there *is not* an obviously discriminatory pattern.  In other words, "an employer's preparation of documents which evaluate employees' ages is not per se *direct* evidence of discrimination unless plaintiffs can show the age notations evidence an intent to discriminate."  *Maidenbaum*, 870 F. Supp. at 1261 (emphasis added).  Thus, the use of age in documents may be admissible either: (1) as direct evidence if plaintiffs can show the age notations evidence an intent to discriminate; or (2) indirect evidence from which a jury could reasonably infer, along with other evidence, that it was used to discriminate.  "An employer's knowledge of the protected characteristics of its work force is equally consistent with an intent to comply with the laws against discrimination as it is with the contrary inference."  *Maidenbaum*, 870 F. Supp. at 1261.  Which way that inference should run is ultimately up to the trier of fact, and dependent on the facts and circumstances of the case.  In

*Armbruster* for example, the defendant articulated that its reasons for including the ages of

individuals, was as a check against discrimination, thereby tipping the inference in one direction.

Defendant was certainly free to explain its reasons for including the ages in the succession

planning documents – except that it should now be estopped from doing so based on the fact that

its designated corporate representative on the question of succession planning, Mr. Doran was

completely *unable* to articulate such a legitimate reason.  (Doran dep. at 93-95).  Absent such an

articulation of a legitimate basis, a jury is more likely to infer that an illegitimate basis was the

motive.[12]

There is imply no risk of undue prejudice, confusion or waste of time.  The very specific

issues related to succession planning are highly probative, and an important piece of the overall

puzzle from which a jury is reasonably likely to conclude that plaintiffs' termination was the

result of intentional and wilful age discrimination on the part of defendant.

---

12.   This is especially true given that age was more likely illegitimately noted in documents used
in the later RIF itself.  Defendant has not explicitly sought to exclude these later documents,
nor are they properly excludable.  Mr. Doran – who coordinated the overall RIF efforts –
created documents expressly showing the ages of employees slated for termination.
Although Mr. Doran testified that those documents were created to prevent age
discrimination, Doran Dep. at 138-141, 144-149, the facts suggest quite the opposite – the
age profile of the employees slated for layoff became considerably older <u>after</u> the creation
and review of those documents.  *Cf.* Exhibit P-83 to Plaintiffs' Response to Defendant's
Motion for Summary Judgment (5/1/05 Possible RIF by Dept) (identifying the ages of R&D
employees expected to be RIF'd, the mean of which is 51.1); P-85 (Summary Stats)
(identifying the mean age of those expected to be laid off company-wide as 49.8) *with*
Exhibit P-51 (Valley Forge, R&D, and Potters Field Sales "Exhibit A"s) (identifying the
ages of all employees actually terminated as part of the RIF, the mean of which is 62.5 in
R&D and 53.4 companywide).  These facts demonstrate perfectly why the admission of
such documents may evidence an intent to discriminate.

## **CONCLUSION**

For all of the foregoing reasons, defendant's motion in limine should be denied it its

entirety.

                                        Respectfully submitted,

                                        _____
                                        Scott B. Goldshaw - ID. 85492
                                        Katie R. Eyer - ID. 200756
                                        SALMANSON GOLDSHAW, P.C.
                                        Two Penn Center
                                        1500 J.F.K. Blvd., Suite 1230
                                        Philadelphia, PA  19102
                                        215-640-0593

Date:  June 26, 2009

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BONNIE MARCUS, ROMAN WYPART, | : | |
| ERNEST SENDEROV, and | : | |
| MARY ELLEN CALLAGHAN, | : | |
| | : | |
| Plaintiffs | : | **CIVIL ACTION NO.:  07-02075** |
| | : | |
| v. | : | |
| | : | |
| PQ CORPORATION | : | |
| | : | |
| Defendant | : | |

### CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2009, I caused a true and correct copy of the foregoing

*Plaintiffs' Memorandum of Law in Response to Defendant's Motion in Limine,* to be filed via the

Official Court Electronic Document Filing System, and that said document is therefore available

for viewing and downloading from the ECF system.  By virtue of this filing, service of the

motion upon the following counsel, being Electronic Case Filing Users, is complete upon

counsel's receipt of the Court's e-mail notification of the Notice of Electronic Filing:

Elizabeth A. Malloy
Peter J. Ennis
*Counsel for Defendant*



Scott B. Goldshaw