IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

BONNIE MARCUS, et al.      :  CIVIL ACTION NO. 07-02075
                          :
          v.         :  Philadelphia, Pennsylvania
                          :  November 2, 2009
PQ CORPORATION        :  10:32 o'clock a.m.
. . . . . . . . . . . . . . . .

JURY TRIAL - DAY 1
BEFORE THE HONORABLE JOHN P. FULLAM
UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiffs:      SCOTT B. GOLDSHAW, ESQUIRE
                     KATIE EYER, ESQUIRE
                     Salmanson Goldshaw, PC
                     Two Penn Center, Suite 1230
                     1500 John F. Kennedy Boulevard
                     Philadelphia, PA  19102

For the Defendant:       ELIZABETH A. MALLOY, ESQUIRE
                     PETER ENNIS, ESQUIRE
                     Buchanan Ingersoll & Rooney, PC
                     1835 Market Street, 14th Floor
                     Philadelphia, PA  19103-2985

- - -

ESR Operator:          Dennis Taylor

Transcribed by:        Jo-Anne L. Hutt,
                     Laws Transcription Service

(Proceedings recorded by For The Record Gold digital sound
recording; transcript provided by transcription service.)

- - -

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

1          (The following occurred in open court at 10:32

2   o'clock a.m.:)

3          THE COURT:  Good morning.

4          MR. ENNIS:  Good morning, your Honor.

5          MR. GOLDSHAW:  Good morning, your Honor.

6          MS. EYER:  Good morning, your Honor.

7          THE COURT:  Be seated, please.

8          We're about to start a trial, I hope, fairly soon.

9   And we have expended a great deal of paper on motions.  Is

10  there any motion that anybody's really interested in, that

11  needs to be disposed of?

12         MR. ENNIS:  Yes, your Honor.

13         THE COURT:  What might that be?

14         MR. ENNIS:  First, we didn't move in paper, but we

15  would first move to bifurcate liability and damages for this

16  trial.

17         MS. EYER:  Yes, your Honor, one of our two clients

18  up here from Virginia.  He took a great deal of time off

19  during the first trial, did not have the ability to come back

20  up for a second trial.  The total amount of time that are

21  damages testimony takes up is roughly an hour.

22         THE COURT:  Well --

23         MS. EYER:  So it should not unduly defer the trial

24  to move forward with the damages testimony intact.  And we

25  also were not notified of this request until this morning --

                              Mr. Goldshaw                    3

1          THE COURT:  How many plaintiffs are left here?

2          MS. EYER:  Two, your Honor.

3          MR. ENNIS:  Your Honor, the last time obviously we

4   didn't reach a verdict, so one of the benefits of bifurcating

5   would be to make sure everyone is focusing on liability,

6   making sure we get to a verdict.

7          THE COURT:  That's what lawyers are for, to make

8   sure they do that.

9          The motion is denied.

10         MR. ENNIS:  Okay.  Now --

11         THE COURT:  Now what else have we got?

12         MR. ENNIS:  Your Honor, there seems to be some

13  misunderstanding about what can come in from the first trial,

14  and --

15         THE COURT:  Very, very little.  This is a new trial,

16  and the fact that one of the plaintiffs or two of the

17  plaintiffs did not succeed in persuading the jury, and the

18  jury did not accept their case, doesn't have anything to do

19  with whether these plaintiffs recover or not.

20         MR. ENNIS:  And, your Honor, so in that regard, let

21  me give you some examples of what is going happen.

22         The plaintiffs have told us, for example, that they

23  are going to say Mary Ellen Callaghan, they're going to

24  provide Mary Ellen Callaghan's age and the fact that she was

25  terminated.  Mary Ellen Callaghan is going to be relied upon

Mr. Goldshaw                                4

1    by their statistical expert to come to a conclusion.  So

2    they're going to rely on Mary Ellen Callaghan to prove, to

3    help prove discrimination in this case.

4           THE COURT:  Well, from their perspective, the fact

5    that Mary Ellen Callaghan was fired is relevant.

6           MR. ENNIS:  Except if that's true, your Honor, then

7    we should be entitled, since a jury has already rejected that

8    claim on age discrimination, we should be able to say at a

9    minimum that -- well, first of all, I think we should be able

10   to say that the jury reached a verdict against her.

11          How can they -- because, otherwise, we're being

12   prejudiced.  They're being able to relitigate the claim of

13   Mary Ellen Callaghan that's already been rejected.

14          THE COURT:  How are they relitigating it?

15          MR. ENNIS:  By being able to tell the jury that,

16   Look at these people who were terminated, they were

17   terminated on the basis of their age, including Mary Ellen

18   Callaghan.

19          THE COURT:  Are you estopped by a verdict?

20          MR. GOLDSHAW:  No.  Two quick points, your Honor.

21          First off, our intention with Mary Ellen Callaghan

22   is simply to note that as part of this reduction in force,

23   she was a person terminated and her age.  We're not going to

24   go into the individual reasons for her at all.

25          The nature of the statistical analysis requires the

1  statistician to look at the outcomes for everybody regardless

2  of age, and it is not --

3          THE COURT:  Well, how about this?  You get in as

4  little as you need to get in, and I will instruct the jury

5  that Mary Ellen Callaghan -- whatever her name is -- her case

6  is not before them.  There may have very well been other

7  reasons.

8          MR. GOLDSHAW:  And --

9          MR. ENNIS:  Well --

10          MR. GOLDSHAW:  -- your Honor --

11          MR. ENNIS:  Okay.  Sorry.

12          MR. GOLDSHAW:  -- just point on that, because I

13  think it's important for me to emphasize that a jury verdict

14  for the defendant, in her case, means one of two things;

15  either they found there was no discrimination, or they found

16  it was equally likely as not that there wasn't.  It is a

17  mischaracterization of the verdict to say that --

18          THE COURT:  I think you should quit while you're

19  ahead over it.  I've already ruled in your favor on that.

20          MR. GOLDSHAW:  Oh, thank you, your Honor.  I'll sit

21  down.

22          MR. ENNIS:  Well, let me just explain the prejudice

23  to the defendant.

24          THE COURT:  Yes.

25          MR. ENNIS:  Your Honor has just made the statement

1   that you're going to say to the jury that Ms. Callaghan may

2   have been let go for other reasons.  We're going to have to

3   explain that.  So we're going to say Ms. Callaghan's job was

4   eliminated.

5           Are the plaintiffs now going to come in and say,

6   Well, in fact, what about all these answers you gave the last

7   time?  We're going to litigate Callaghan again.

8           THE COURT:  No, we're not.

9           MR. ENNIS:  So how we do avoid the prejudice when

10  they say, as evidence of their case now, that Callaghan was

11  discriminated against?

12          MR. GOLDSHAW:  Your Honor, I think there's an easy

13  answer, if I may?

14          If they want to spend their time explaining why they

15  fired Mary Ellen Callaghan, it doesn't bother us.  We're not

16  planning on calling her as a witness or litigating her case,

17  and if they want to do that, I'll just simply inform the jury

18  that they're trying to distract the attention away from the

19  plaintiffs.  And I'm comfortable, I'm comfortable with that

20  if they want to do that, in other words, so I don't see

21  there's any prejudice.

22          MR. ENNIS:  Your Honor, if your Honor would instruct

23  the jury that the parties have stipulated that Mary Ellen

24  Callaghan's job was eliminated, maybe that would avoid the

25  prejudice to the defendant, because otherwise we have to

Mr. Goldshaw                                      7

1    explain it in some way.

2           MS. EYER:  And, respectfully, I don't think having

3    to explain it is a prejudice to the defendant.  That's not --

4           MR. ENNIS:  You're going to relitigate Callaghan.

5           THE COURT:  We'll cross that bridge when we come to

6    it.  I'm going to expect all the lawyers in the courtroom to

7    act like lawyers and try the case the way it should be tried.

8           MR. ENNIS:  Okay.  And then, your Honor, there's an

9    issue with one of the exhibits they want to use, and I think

10   that --

11          THE COURT:  What might that turn out to be?

12          MS. MALLOY:  Your Honor, I was on the telephone call

13   last week with your Honor, and my recollection of the phone

14   call was that you said that there should be no reference to

15   the prior trial.  If there was a compelling reason why prior

16   testimony had to be referred to, it should be used as prior

17   testimony and not trial testimony.

18          THE COURT:  Right.

19          MS. MALLOY:  And then the plaintiffs asked about

20   this one exhibit, which I can hand up to you, and I recalled

21   your ruling to be that you were not ruling that this was --

22   could come in.  This is a demonstrative exhibit from the last

23   trial.  Because you needed to rule on it in the context in

24   which it was --

25          THE COURT:  What does it demonstrate?

1          MS. MALLOY:  -- offered, and I believe plaintiffs

2    disagree with my recollection of the phone call.

3          THE COURT:  A demonstrative --

4          MR. GOLDSHAW:  May I respond briefly?

5          THE COURT:  -- exhibit of what?

6          MR. GOLDSHAW:  I'm sorry.  May I respond briefly,

7    your Honor?

8          THE COURT:  If you'd let me look at this first.

9          MS. EYER:  This was an exhibit that was moved into

10   evidence by the defendant during the last trial of this

11   matter.

12         THE COURT:  Then why does it say Plaintiffs' Exhibit

13   281?

14         MS. EYER:  Because we --

15         MR. GOLDSHAW:  We intend to use it --

16         MS. EYER:  -- during --

17         MR. GOLDSHAW:  -- in this trial as evidence of

18   pretext.

19         THE COURT:  You have 280 previous exhibits?

20         MR. GOLDSHAW:  No, no, no, no.  We have skipped

21   numbers for reasons which I now may regret, but we have gaps

22   in the numbers.

23         This document -- the disturbing point of what I'd

24   like to say, your Honor, is we had a telephone conference

25   about it.  Your Honor ruled that we may use this exhibit.  We

Mr. Goldshaw                          9

1    are not going to refer to the prior trial.  Your Honor said

2    if there is some unforeseen circumstance where it must be

3    referenced, that your Honor would do a limiting instruction,

4    but I have no intention of asking about this being presented

5    at a prior trial.

6              THE COURT:  What on earth is it?

7              MS. MALLOY:  Your Honor, it's a demonstrative

8    exhibit that --

9              THE COURT:  That is --

10             MS. MALLOY:  -- pulls together two hours of Dr.

11   Lau's testimony, and it needs to be explained in the context

12   of his testimony, and I think consistent with your ruling

13   that there should be as little referral to a last trial --

14   there should be no referral to the last trial -- it's

15   essentially impossible to do that if they're going to use a

16   demonstrative exhibit from a prior trial with a witness.

17             THE COURT:  You keep saying "demonstrative exhibit."

18   What does it demonstrate?  It's not a demonstrative exhibit

19   of any kind.  It's just a piece of paper with a lot of

20   numbers on it.

21             MS. MALLOY:  It was not a PQ document.  It was put

22   together by attorneys for purposes of illustrating something

23   to the jury.  It's not like a company memo or something like

24   that.

25             MS. EYER:  Respectfully, your Honor, it was moved

1   into evidence in relation to the central explanation that

2   defendant's have given for plaintiff's termination.  At the

3   last trial, this matter -- we demonstrated that it was

4   inaccurate in several regards, and we believe that it goes to

5   -- very much to both pretext and credibility.

6          THE COURT:  You mean you want to get this into

7   evidence as something that the defendant's made up and that

8   it's inaccurate; is that the whole point?

9          MR. GOLDSHAW:  Yes, there's two points, your Honor.

10          One is, as we contended at the last trial, we

11   contend one of our pieces of evidence of pretext is that

12   their explanation continues to change.  This is an example of

13   yet another change in their explanation which presents

14   figures that are inaccurate.

15          So the purpose is really twofold:

16          One is changing explanation is absolutely evidence

17   of pretext and we're entitled to present it.

18          No. 2 is it does present a serious credibility issue

19   that their key witness gave testimony in support of a

20   document that contained inaccurate figures.

21          THE COURT:  What is inaccurate?  What figures are

22   inaccurate?

23          MR. GOLDSHAW:  Several.  During the last trial, the

24   witness showed that at least four of the figures were

25   directly contradicted by prior statements by the same

1  witness.  If this witness is going to argue on behalf of the

2  defendant that these figures informed the decision-making,

3  which is their position, I have the right to show that these

4  figures that he's presented continually change.

5         THE COURT:  Well, my problem is I don't know what

6  they're going to -- what's going to precede the offer of

7  this.  We'll thrash it out when the time comes.  I don't know

8  what you're talking about, either of you.

9         MR. GOLDSHAW:  Which is fine.

10         MS. MALLOY:  Which is my recollection of what your

11  ruling was before.

12         THE COURT:  Yes, okay.  Let's get a jury.

13         MS. EYER:  Respectfully, your Honor, plaintiffs also

14  have two motions that we were hoping that you could rule on

15  in advance of the trial.

16         One of them was in relation to several references

17  that were made by Mr. Doran during the last trial to the

18  advice of counsel in relation to this matter.

19         During discovery, Defense counsel repeatedly

20  objected to the extent we tried to obtain deposition

21  testimony on what the advice of counsel was in relation to

22  the RIF, and what should go on the documents in relation to

23  the RIF?

24         THE COURT:  What advice of counsel do you -- are you

25  trying to get in?

1           MR. ENNIS:  We weren't getting in any advice of

2    counsel, your Honor.  The testimony related to Mr. Doran, and

3    it related to the creation of some exhibit which is not

4    central at all to their case, and he was just saying how was

5    the exhibit created.  I prepared it and I talked to a lawyer

6    about it.

7           MS. EYER:  And, respectfully, your Honor, this was

8    the exact issue that they objected to as discussing during

9    the deposition of Mr. Doran, and, therefore, we did not have

10   the opportunity to inquire into it.

11          MR. ENNIS:  It's not -- it's totally -- I shouldn't

12   say totally unrelated, but it's on -- it's an Exhibit A to a

13   release document, your Honor.

14          THE COURT:  The most that can happen, as far as I'm

15   concerned, is that if it doesn't resolve itself in the

16   meantime, and you go into that, we'll do it in the absence of

17   the jury and see where you go, okay?

18          MS. EYER:  I'm sorry, your Honor?

19          THE COURT:  You may be permitted to explore that in

20   the absence of the jury, if necessary.

21          MS. EYER:  Okay.  That was why we were asking for a

22   ruling in advance --

23          THE COURT:  Yes.

24          MS. EYER:  -- of -- should we do it before his

25   testimony or?

1    THE COURT:  It depends on what he says, no.

2    MS. EYER:  Okay.  Respectfully, your Honor, since it

3  came out during our direct exam of Mr. Doran, we were hoping

4  to have a ruling from your Honor in advance of the testimony

5  as --

6    THE COURT:  I find --

7    MS. EYER:  -- to whether it would be permitted.

8    THE COURT:  -- it difficult to understand why that

9  should come out through your direct testimony.  Let's see

10  what happens.

11    MS. EYER:  The second motion that we were hoping we

12  could get a ruling on in advance of trial was the last time

13  Defense counsel had elicited certain testimony from Ms.

14  Marcus about her failure to relocate to places such as Texas,

15  Florida, in order to seek another job.

16    Under the law that is not --

17    THE COURT:  That stays out, yes.

18    MS. EYER:  -- something she is required to do, and

19  we were hoping that we could get a ruling on that.

20    THE COURT:  I rule on that in your favor.  It's

21  clear that under Third Circuit law that's not an issue.

22    MR. ENNIS:  And, your Honor, just so it's clear,

23  while Texas -- we understand -- but in terms of what is

24  reasonable within the Greater Philadelphia area, the Third

25  Circuit has not ruled on that, so there's going to be some

1    leeway.

2            THE COURT:  Well, let's get geographical.  Where was

3    she not willing to go?  Texas was one.

4            MS. EYER:  They had specifically asked about

5    companies that are situated in other states, such as Texas --

6    you would know better than I would what you intend to do in

7    your exam, so --

8            MS. MALLOY:  Some of them were New Jersey companies.

9    Kevin Doran --

10            MS. EYER:  New Jersey is perfectly acceptable.

11            MS. MALLOY:  New Jersey's acceptable, okay.

12            MR. ENNIS:  New Jersey, Delaware, and Pennsylvania.

13            THE COURT:  Well, you mean you expect somebody to

14    move to New Jersey?

15            (Laughter.)

16            Okay.  Let's get a jury in and see where we go.

17            MR. ENNIS:  And, your Honor, we're going to have a

18    continuing issue over hearsay testimony from Ed Myszak.

19            THE COURT:  Well, I should have mentioned that.  In

20    the in limine briefing, there seems to be a confusion as to

21    what is hearsay and what isn't.  If Witness A heard some

22    responsible official of the defendant make some remark which

23    makes it appear that they were discriminated on the basis of

24    age, that comes in.  The statement that they were

25    discriminated on account of age is not a hearsay statement

1   that's being introduced for the fact that it was said.

2          But that does not mean that somebody who did not

3   hear the statement made can say, Oh, well, X told me that he

4   heard somebody make a remark.  That would be hearsay and keep

5   it out.  So any direct evidence of statements that suggest

6   age discrimination come in, okay?

7          MR. GOLDSHAW:  May I just very concisely state what

8   I think is the key reasoning that I'd like to present, your

9   Honor, before a final ruling?

10          THE COURT:  Key what?

11          MR. GOLDSHAW:  I'd like to be very specific as to

12   what I would like to argue, and I can present it very

13   concisely?

14          What I'd like to show is that one of the decision-

15   makers had a belief that another higher-level decision-maker

16   wanted to get rid of the older people.  My contention --

17          THE COURT:  And what is the basis of that belief?

18          MR. GOLDSHAW:  I'm sorry?

19          THE COURT:  And what is the basis for that alleged

20   belief?

21          MR. GOLDSHAW:  She was told by a high-level

22   corporate official.  My contention is, even if she was told

23   by an anonymous note, if this witness believed that the

24   person she was making a joint recommendation --

25          THE COURT:  What was she told?

1        MR. GOLDSHAW:  She was told -- the exact quote I

2   believe -- is that this other person, she was making a

3   recommendation with, said, quote, "We need to get rid of some

4   of these old farts," close quote.

5        And my contention is that if this witness believed

6   that is the state of the other person she's recommending

7   with, who is a higher-level official at the company, it is

8   relevant to her state of mind, even if it was just -- even if

9   she made it up.  It doesn't matter.  I goes to her state of

10  mind.

11       THE COURT:  I believe --

12       MR. ENNIS:  It's pure hearsay.

13       THE COURT:  -- it would be reasonable only if it

14  were based on direct evidence.  I disagree with you on that.

15       MR. GOLDSHAW:  May I refer -- because I want to make

16  sure that I scrupulously follow your Honor's ruling -- may I

17  ask the witness, herself, is she believed that this other

18  person had that belief?

19       THE COURT:  Certainly.

20       MR. GOLDSHAW:  And if she denies it -- I have two

21  parts.  I want to ask the witness, herself, if that was her

22  understanding of this other witness's belief, and if she

23  denies it, the second --

24       THE COURT:  Now, wait a minute, wait a minute, wait

25  a minute.  You were going to ask the witness, Mrs. Witness,

1   do you believe that a discrimination was taking place?

2          MR. GOLDSHAW:  But specifically, and this isn't an

3   exact quote, but I'm going to ask her, You were writing this

4   memorandum to recommend the termination of the plaintiffs

5   with this other person, Colleen Delmonte, correct?

6          And did you believe, when writing this memorandum,

7   that Colleen Delmonte wanted to get rid of the old farts?

8          I want to ask her if that was her belief?  And if

9   she denies -- that's part one, which I think stands on its

10  own, and I think it's a direct inquiry into the mindset of a

11  decision-maker at the time, as to who she was working with in

12  this recommendation.  And if she denies it, I do believe that

13  I'm entitled to impeach her denial, because she told somebody

14  else that's what she thought.

15         MR. ENNIS:  Your Honor, that is just getting around

16  the hearsay ruling.  Pure and simple.

17         MR. GOLDSHAW:  State of mind of a decision-maker is

18  the most -- arguably the most relevant issue in a

19  discrimination case.

20         THE COURT:  Well, is she the decision-maker?

21         MR. GOLDSHAW:  Yes.

22         MS. EYER:  She was.

23         MR. GOLDSHAW:  Both of them were.

24         MR. ENNIS:  Well, that's in dispute, your Honor.

25  That is in very big dispute.

```
                         Mr. Goldshaw                    18
 1         But the point is it is -- she's relying on triple --
 2    they're relying upon triple hearsay.
 3         THE COURT:  I think it's quadruple, actually.
 4         MR. ENNIS:  Yes, it might be, but your Honor has
 5    ruled, this is the way your Honor has ruled in the previous
 6    trial.
 7         THE COURT:  That's why I'm going to rule this time,
 8    too.  We'll see where we go.
 9         MR. GOLDSHAW:  I'm sorry, I --
10         THE COURT:  I'll hear you at the time if need be,
11    but I'm not going to rule in your favor now.
12         MR. GOLDSHAW:  Thank you.
13         THE COURT:  Let's bring in the jury.
14         (The jury panel entered the courtroom.)
15         (The jury voir dire occurred from 11:16 o'clock a.m.
16    until 3:32 o'clock p.m. off the record.)
17         THE COURT:  May I have your attention, jurors?  When
18    I call your name and number, would you please take all of
19    your belongings and have a seat in the jury box.
20         Starting in the first row, we have Juror No. 146,
21    Kimberly Leonowitz.  Just have a seat right here in this row.
22    Juror No. 41, Nancy Kosowski.  Juror No. 18, Andrew Hanson.
23    Juror No. 68, George Gilbert.
24         Okay.  Starting in the second row, Juror No. 110,
25    Carl Ackerman.  Juror No. 71, Carol Baker.  Juror No. 43,
```

1   Chad Maran.  And Juror No. 145, Matthew Bakey.

2            Okay.  Are counsel satisfied with the seating of the

3   jury?

4            MR. GOLDSHAW:  Yes.

5            MR. ENNIS:  Yes.

6            THE COURT:  All right.  The remaining jurors, thank

7   you for your attention, and your patience, and you can return

8   to the second floor to Room 27 -- I believe it's 2710 on the

9   second floor to the jury selection room.

10            (The jury panel exited the courtroom.)

11            (A recess was taken from 3:24 o'clock p.m. until

12   3:30 o'clock p.m.)

13            (The jury entered the courtroom.)

14            THE COURT:  Everybody but the jury may sit down, and

15   we'll swear the jury in while they're standing up.

16            (The jury was sworn at this time.)

17            THE COURT:  Be seated.  Thank you.

18            Congratulations.  Because we have other hearings

19   scheduled for later, we will just proceed with the opening

20   speeches today, okay?

21            You may open on behalf of the plaintiffs?

22            MR. GOLDSHAW:  Thank you.

23            THE COURT:  I don't know why we have to have

24   cardboard blocking everybody's view, but --

25            MR. GOLDSHAW:  Your Honor, I've checked with

Mr. Goldshaw                        20

1    opposing counsel.  I know this easel placement is good.  Does

2    this block your Honor's view from the jury?

3         THE COURT:  I'm just old fashioned.  I'm not used to

4    this sort of thing.

5         Go ahead.

6              PLAINTIFFS' OPENING STATEMENT

7         MR. GOLDSHAW:  Good afternoon, everybody.  As you

8    may recall, my name is Scott Goldshaw.  I represent the

9    plaintiffs in this action, Bonnie Marcus and Roman Wypart.

10        This case is about a reduction in force.  It's not

11   against the law to have a reduction in force.  But if you're

12   going to have a reduction in force, it is against the law to

13   target just the older workers, and that's exactly what

14   happened here.

15        I'll show you.  The plaintiffs were working in the

16   defendant's Research and Development Department.  The

17   Research and Development Department had a total of 56 people;

18   17 of them were under the age of 40, 22 of them were between

19   the ages of 40 and 54, and 17 of them were 55 or older.

20        In total, in May 2005, when this RIFs took place,

21   eight people were targeted for termination.  And let me

22   emphasize now that while you see stick figures on this

23   diagram, the eight people who were terminated were real

24   people, with real lives, who suffered real harm as a result

25   of their termination.

1            Let me tell you who they picked.  No. 1 -- these are

2    the eight people selected for termination -- No. 1,

3    Plaintiff, Bonnie Marcus, who's seated over here.  She was in

4    the 55 and older category, age 60 at the time of termination.

5            No. 2, Roman Wypart.  He was in the 55 and older

6    category, age 56.

7            No. 3, Eric Senderov.  He was in the 55 and older

8    category, age 69.

9            No. 4, Richard Henchey.  He was in the 55 and older

10   category, age 67.

11           No. 5, Al Behan.  He was in the 55 and older

12   category, age 66.

13           No. 6, Mary Ellen Callaghan.  She was in the 55 and

14   older category, age 55.

15           No. 6 -- excuse me -- No. 7, John Slabogin.  He was

16   in the 55 and over category, age 64.

17           The 8th and last person targeted for termination,

18   Eleanor Tickner.  She was in the 55 and older category, age

19   63.

20           These are the results of the reduction in force in

21   which the plaintiffs were terminated.  All eight people

22   targeted for termination were over the age of 55.  Nobody

23   under the age of 55 was targeted for termination.

24           The defendant in this case is going to tell you that

25   there's no pattern here, and that these selections for

1   termination are not related to age.

2           Your job as jurors is going to be to determine

3   whether the selection of people for termination was more

4   likely than not based on their age.  And that means, under

5   the law, if you find that you are 51 percent or more sure

6   that the plaintiffs' age is what got them fired, then you are

7   required to return a verdict in favor of the plaintiffs.

8           Let me get something out of the way here.  This case

9   is not about the plaintiffs' performance, it's not about

10  their level of salary, and the defendant has never claimed

11  otherwise.

12          I now want to tell you about the people responsible

13  for the termination of the plaintiffs and others in this

14  department.

15          The plaintiffs were terminated on the recommendation

16  of three people.  I've written their names here.  I hope you

17  can see this.  Michael Imbriani, Rosalyn Kutchins, Colleen

18  Delmonte.  These are the people who wrote the recommendation

19  that got the plaintiffs' fired, and these are the people you

20  need to focus on in the trial.

21          Mr. Imbriani, at the time of the reduction in force,

22  was the head of the largest division in the entire company.

23  He was also the person charged with the responsibility of

24  compliance with the Equal Opportunity Policy at the company,

25  which prohibited age discrimination.  While Mr. Imbriani was

1  in that role, he directly ordered Rosalyn Kutchins to engage

2  in age discrimination.  This occurred shortly before the

3  reduction in force in which the plaintiffs were fired.

4        What he told her is to demote of her employees and

5  replace him with quote, "younger blood."  Those are Mr.

6  Imbriani's words to Ms. Kutchins, "younger blood."

7        At first Ms. Kutchins resisted, and she filed a

8  complaint against Mr. Imbriani with both the Human Resources

9  Department, and with the Legal Department, because she knew

10  he was asking her to break the law.

11        How did the company respond?  Well, Ms. Kutchins was

12  reprimanded by her boss for issuing a complaint against the

13  head of the largest division in the company.

14        And what happened to the employee that Mr. Imbriani

15  told her to demote?  Well, he was demoted anyway, despite her

16  complaint, and she was forced to find a replacement who was

17  younger.

18        But this is no isolated incident at this company.

19  At the time Mr. Imbriani, and other top-level managers at the

20  company in the Executive Management Team, had an objective to

21  make the company younger.

22        Ms. Delmonte was also on that committee with Mr.

23  Imbriani that pushed this objective, and they dubbed it as

24  the company's succession planning.  By the time that the

25  reduction in force, when the plaintiffs got fired, Ms.

Mr. Goldshaw                                    24

1    Kutchins had gotten the message, and she knew what was

2    expected of her.

3         After the plaintiffs were notified of their

4    termination, Ms. Kutchins went to lunch with Ms. Marcus, the

5    Plaintiff, Ms. Marcus here, and some others, and Ms. Kutchins

6    told Ms. Marcus it was time for her to go graciously and

7    leave the door open for younger employees.

8         Now, the objective of these three people against the

9    older workers is not exactly a well-kept secret at the

10   company.  And, in fact, the head of Research and Development,

11   where the plaintiffs' worked, six months before the layoff

12   occurred, spoke to Bonnie Marcus, and he told her the company

13   was in the process of being sold, and when it was sold, they

14   were going to be layoffs.  And he told her that the layoffs

15   were going to target the older workers.  And as you can

16   plainly see, he was right.

17        During the course of this litigation over time, the

18   company has offered three excuses for why they targeted just

19   the older workers for termination.

20        Excuse No. 1, the corporation said that the

21   plaintiffs were working in the Corporate Development Group,

22   which was entirely eliminated.

23        Fact, only the employees age 55 and older in the

24   Corporate Development Group were fired.  And all of the

25   employees under the age of 55 in the Corporate Development

1    Group were not.

2           THE COURT:  I would point out that this is not the

3    time to make your closing argument.  Just tell them what your

4    case is about.

5           MR. GOLDSHAW:  The second explanation that the

6    corporation has offered is that the Corporate Development

7    funding source, which supported the plaintiffs' salaries, was

8    eliminated.

9           Fact, the younger employees under the age of 55 who

10   salaries were supported by the exact same funding source,

11   were not fired.

12          And Excuse No. 3, the corporation said that the

13   projects the plaintiffs were working on were discontinued.

14          The facts will show that the younger employees

15   assigned to the exact same projects were not fired.  Only the

16   employees age 55 and older on those projects were fired.

17          During the course of this trial, I expect that the

18   defendant will try to distract your attention away from these

19   three people who were the ones who were responsible for

20   targeting the plaintiffs for termination.  They will try to

21   distract your attention away from the people who have a past

22   history of age discrimination.  And I expect what they will

23   do is they will have a corporate official named John Lau try

24   to take responsibility for the decision.

25          If and when that happens, I ask you to keep your eye

Mr. Goldshaw                          26

1   on the ball.  These three people are the ones who held the

2   power.  These there people are the ones who controlled the

3   money.  And these three people are the ones that made the

4   actual recommendation that got the plaintiffs and others in

5   their department fired.

6        At the end of this case, I'm going to ask you to

7   return a verdict in favor of the plaintiffs, and at the time

8   I'm going to ask you to award them the full compensation

9   they're entitled to under the law.  To compensate them for

10  their harm both financial and otherwise.  One of your

11  important jobs in this case is going to be to place a value

12  on the harm that the plaintiffs have suffered.

13       In a moment, in a moment I'm going to sit down and

14  it will be time for the corporation's attorney to speak with

15  you.  And under the rules, I don't get a chance to speak with

16  you until the very end of the case in closing argument.

17       When the corporation's attorney addresses you, I

18  expect that she may say something like, Bad things happen to

19  everybody, and that's just life, and it doesn't mean that

20  anybody did anything wrong.

21       Well, I ask you to remember, when the bad things are

22  targeted just at the older workers, that's not just life,

23  that's age discrimination and it's against the law.

24       Thank you.

25       THE COURT:  You may open on behalf of the defendant.

Ms. Malloy                                    27

DEFENDANT'S OPENING STATEMENT

1

2          MS. MALLOY:  Good afternoon.  My name's Liz Malloy.

3  We met very briefly before and I'm counsel for PQ with peter

4  Ennis and Kevin Doran, who is the vice president of Human

5  Resources for PQ, and Colleen Jones is at the end of the

6  table, and she's helping us with some of the documents, and I

7  will introduce her again later.

8          When you got up this morning, when you came to

9  court, you probably didn't hear anything, or know anything

10  about PQ, and you're going to hear a lot about PQ.  We are a

11  chemical company which manufactures and sells chemicals that

12  for the most part are used in other people's products.  And

13  if you drive a car, if you do a lot of laundry like I do, if

14  you enjoyed a beer watching the World Series -- that's all I

15  say about the World Series, okay -- you've touched PQ

16  products.

17          A box of Tide Laundry Detergent is about 50 percent

18  zeolites, and you're going to hear about this chemical called

19  zeolites.  The zeolite product goes into beer to make it

20  clear as opposed to cloudy.  And our chemicals are also used

21  in a lot of refinery applications, and asphalt, and things

22  like that.  So you probably do know a little bit about

23  zeolites, even though you don't know that right now.

24          I very much appreciate the conversation that we had

25  in the courtroom earlier, and I know it was a long day, and

1  it still is a long day, but it's important for us to have

2  that conversation, and I appreciate the honesty with which

3  you approached that conversation.  As some of you said, You

4  think it's possible that a company could discriminate.  You

5  think it's possible that a company could cover that up.  And

6  I appreciate that you were honest, and I think we all need to

7  be honest with each other.

8        But I also know that you all said that you could

9  listen to the evidence, listen to all the evidence, listen to

10  the law as the Judge will instruct you, and hold judgment

11  until you've heard the whole case, and had an opportunity to

12  retire to the jury room.  So when I talk to you again at the

13  end of the case, that will be when you're instructed on the

14  law, and you've had an opportunity to hear -- to hear all the

15  facts.

16        Let me tell you a little bit more about PQ, and

17  about the facts that gave rise to this reduction in force

18  which took place in May of 2005.

19        PQ is divided up into business units, and a business

20  unit is like a little corporation, a profit and loss center.

21  And we have three main business units.  One is Industrial

22  Chemicals.  For example, that's the laundry detergent, the

23  asphalt, the paving, et cetera.  Catalysts and Absorbants is

24  the second business unit.  That's the beer gel, and the

25  refinery products, and other things.  And the last business

1   unit is called Potters.  Potters doesn't have much to do with

2   this case at all, but they are the business unit that is

3   responsible for the highway paint, the reflective paint on

4   the -- on the highways that keeps us all on the straight and

5   narrow there.  And they were their own profit and loss

6   centers, and PQ manufactures and sells chemicals.

7         There was also a Research and Development Unit, and

8   the plaintiffs, Ms. Marcus and Mr. Wypart, worked in PQ's

9   Research and Development Unit, and the Research and

10  Development Unit was out in Conshohocken, off the Blue Route

11  of the Schuylkill there, and the corporate headquarters where

12  the business unit heads all had offices was out on 202, out

13  by the -- out by the King of Prussia Mall.

14        And, so, R and D traditionally was paid for --

15  somebody has to pay for it -- was paid for by the business

16  units, so they would have to allocate their funds to pay for

17  the salary, the overhead, the lab equipment, the training,

18  everything that would come along with about 55 R and D

19  employees.

20        In 2001, the former chairman of the company, CEO of

21  the company, a man by the name of Stan Silverman, came up

22  with what was called the Corporate Development Program.  And

23  the idea of the Corporate Development Program was that the

24  company would give corporate funding to Corporate Development

25  projects so it didn't have to come from the business group,

1    because there was a little bit of tension between the

2    business groups and R and D.  The business groups wanted

3    Research and Development to do products that could be sold

4    quickly, short-term research projects that could then be

5    manufactured and sold, because they were paying for R and D.

6         And Mr. Silverman thought, Let's come up with a way

7    to fund more long-terms projects, or exploratory projects,

8    projects that weren't really expected to hit the market to be

9    sold, to be manufactured in plants for more like a three to

10   five-year range.  So the idea was that there would be

11   separate funding for the Corporate Development Program.

12        And if you could do that slide for us?

13        And the Corporate Development funding came from what

14   is called the holding company, and the holding company was

15   corporate funds that were not -- they didn't have to be paid

16   for by any business unit.  So the holding company funded the

17   Corporate Development Program, which supported the Corporate

18   Development Group, which worked on Corporate Development

19   projects.

20        If you could do the next slide, please?

21        So after the Corporate Development Program was

22   established in 2001, R and D is then funded two different

23   ways.  The vast majority of R and D is funded by the various

24   business units, and there is a separate Corporate Development

25   Program funded by the holding company.

1        Now, John Lau, who was the vice president of R and

2    D, you'll hear him testify, is the person, as the vice

3    president of R and D, who had to keep track of this money.

4    He had to keep track of the funding that was given by the

5    holding company to the Corporate Development Program.  And

6    you'll hear him testify about his manpower matrices, and how

7    he kept track of that money.  Something had to fund these

8    individuals' salary, overhead, benefits, et cetera.

9        PQ was a family-owned business for about 170-some

10   years, and the company went up for sale at the end of 2004,

11   and actually the company was sold, the sale date was

12   mid-February of 2005.  So new people come in.

13       And you'll hear testimony from Mike Boyce, who is

14   the new CEO.  He was not a previous PQ employee.  He's new.

15   Mike Boyce was a chemist himself by training.  He had worked

16   in lots of different positions at chemical companies for 30

17   years.  Mike Boyce and PQ engaged in an organizational

18   review, where the new owners, What would we do differently?

19       And there was a 90-day period in which the company

20   looked at how would we do business differently, what do we

21   want to change?  And Mike Boyce made the decision -- not

22   these three people who are up on the poster board -- listen

23   to the testimony.  Mike Boyce made the decision that based on

24   his experience, if a business unit did not want to pay for

25   research, it wasn't worth doing.  If a business unit couldn't

1  get excited enough to even want to put its own money towards

2  this, that it was not worth doing.

3         So Mike Boyce made the decision to eliminate the

4  holding company's money, which funded the Corporate

5  Development Program, and which supported the Corporate

6  Development Group.  And John Lau, who was the vice president

7  of R and D, is the person, based on his budgets, who decided

8  which people would be affected by that layoff.

9         Now, Mr. Goldshaw drew your attention to his stick

10  figure chart in which he talked about every single person in

11  R and D who was laid off in May of 2005, was over the age of

12  55.

13         You will hear evidence that there were nine people

14  in R and D who were over the age of 55 who were not let go.

15  And what's so magic about the age of 55?

16         You'll also hear testimony that there were five more

17  people over the age of 50, who were not let go in this

18  layoff.  So that's a total of 14 people over the age of 50 in

19  R and D -- I'm just talking about the R and D Unit, who were

20  not let go.

21         So I would encourage you to look at all of the facts

22  as a whole, and you will hear the explanation for each one of

23  those eight people in R and D who was ultimately -- who was

24  ultimately let go.

25         Ms. Marcus lost her job.  She was laid off in the

1    reduction in force, because the funding that supported her

2    position was eliminated.  And Mr. Wypart was let go because

3    the funding that supported his position was eliminated.

4            And no one was hired to replace them.  No one was

5    hired to this very day, November of 2009, to replace them.

6            If you could do the organization announcement?

7            So this layoff took place in May of 2005, and this

8    is the announcement, this is the announcement that was issued

9    in mid-June of '05.

10           If you could emphasize that paragraph there?

11           Plaintiff says the defendant keeps changing their

12   position.  This is the explanation that was given in June of

13   '05.

14           The Corporate Exploratory Development Projects will

15   no longer be funded by corporate, and therefore the

16   respective businesses will determine which aspects of those

17   projects they wish to continue to fund.  These changes offer

18   the opportunity for each business line to work closely with

19   their development teams to insure we continue to lead the

20   market in each of our key product areas.

21           Thank you for your attention.  You will hear from a

22   number of witnesses.  We will have an opportunity to talk

23   again at the end of the case.  But the issue you will be

24   asked to decide at the end of the case is whether the

25   plaintiffs have met their burden of proving that the

1   terminations of their employment were on account of their

2   age.

3          My last comment has to do with the projector here.

4   We will try to show you documents in this format.  We think

5   it helps a little bit.  We can enlarge parts, highlight

6   parts, but when you do go into the jury room to deliberate,

7   you will be given copies of -- hard paper copies of the

8   documents that were introduced into evidence.

9          Thank you very much.  I know it's been a long day

10  for you.

11         THE COURT:  All right.  We'll recess at this point

12  until tomorrow morning when we will start to hear the

13  evidence in the case.

14         I'm going to give you certain instructions which

15  will apply throughout the trial.

16         No. 1, of course is, that you should not discuss the

17  case until you've heard all of the evidence.  You shouldn't

18  discuss it with anybody who's not on the jury for obvious

19  reasons, but it's also a good idea not to discuss it among

20  yourselves either, because you might express some opinion

21  early on that you would like to change and be embarrassed to

22  change it later.  So just your own counsel, listen closely to

23  the evidence, and we'll see when the case is over.

24         If the lawyers or the parties happen to pass you in

25  the hall and don't speak, it's because they're not supposed

1   to talk to you about anything.  Anybody who's not involved in

2   the case, you can talk to about things other than the case,

3   but the lawyers in the case, and the witnesses, and so forth,

4   you shouldn't talk to about anything at all, because it would

5   look bad.

6          Thank you for coming, and we'll see you tomorrow

7   morning at 10:00 o'clock.

8          (The jury exited the courtroom.)

9          THE COURT:  We'll recess until ten after 4:00 for

10  the next criminal case.

11         (Pause.)

12         I would point out that it's still not too late to

13  settle the case if you found convincing the arguments of the

14  opponents.  You might want to reconsider your position on

15  some of them.

16         I'll see you tomorrow morning.

17         MR. ENNIS:  Thank you.

18         MR. GOLDSHAW:  Thank you, your Honor.

19         MS. EYER:  Thank you, your Honor.

20         MS. MALLOY:  Thank you, your Honor.

21         THE COURT:  Court will recess until the criminal

22  case is ready.

23         (Court adjourned at 3:59 o'clock p.m.)

1                              I N D E X

2   OPENING STATEMENT                                    PAGE

3   By Mr. Goldshaw                                       20

4   By Ms. Malloy                                         27

5                              *   *   *

<u>CERTIFICATION</u>

      I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


Geraldine C. Laws, CET         Dated 12/14/09
Laws Transcription Service