IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

BONNIE MARCUS, et al.          :   CIVIL ACTION NO. 07-02075
                               :
              v.               :   Philadelphia, Pennsylvania
                               :   November 3, 2009
PQ CORPORATION                 :   10:10 o'clock a.m.
. . . . . . . . . . . . . . .

JURY TRIAL - DAY 2
BEFORE THE HONORABLE JOHN P. FULLAM
UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiffs:        SCOTT B. GOLDSHAW, ESQUIRE
                           KATIE EYER, ESQUIRE
                           Salmanson Goldshaw, PC
                           Two Penn Center, Suite 1230
                           1500 John F. Kennedy Boulevard
                           Philadelphia, PA  19102

For the Defendant:         ELIZABETH A. MALLOY, ESQUIRE
                           PETER ENNIS, ESQUIRE
                           Buchanan Ingersoll & Rooney, PC
                           1835 Market Street, 14th Floor
                           Philadelphia, PA  19103-2985

- - -

ESR Operator:              Dennis Taylor

Transcribed by:            Jo-Anne L. Hutt,
                           Laws Transcription Service

(Proceedings recorded by For The Record Gold digital sound
recording; transcript provided by transcription service.)

- - -

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

```
 1              (The following occurred in open court at 10:10
 2   o'clock a.m.:)
 3              THE COURT:  Good morning.
 4              MR. ENNIS:  Good morning, your Honor.
 5              MR. GOLDSHAW:  Good morning, your Honor.
 6              MS. EYER:  Good morning, your Honor.
 7              THE COURT:  Everybody be seated, please.
 8              I understand there's something you want to discuss?
 9              MR. ENNIS:  Yes, your Honor.  It was just a little
10   unclear to me -- we're going to have Roz Kutchins on the
11   stand first -- and Ms. Kutchins is the subject of the triple
12   hearsay comment.  And I just wasn't sure whether you had
13   ruled yesterday whether you were going to wait until the
14   testimony, or whether you wanted us to address it now?
15              THE COURT:  Well, who's calling her as a witness?
16              MR. ENNIS:  The plaintiff.
17              THE COURT:  And what's she going to say?
18              MR. GOLDSHAW:  She's going to say exactly what I
19   said to everybody in my opening statement.  I --
20              THE COURT:  And what was that?
21              MR. GOLDSHAW:  I'd like to --
22              THE COURT:  I didn't memorize your opening
23   statement.
24              MR. GOLDSHAW:  She's going to say a lot.  I would
25   like clarity on what point is being challenged, so I can
```

1   accurately represent the --

2              THE COURT:  What's the problem?

3              MR. ENNIS:  Your Honor, the issue that I understand

4   is that someone told someone told Ms. Kutchins that Colleen

5   Delmonte referred to people as old farts.

6              THE COURT:  That doesn't get in.

7              MR. GOLDSHAW:  No?  I'm sorry, your Honor, may I?

8              I think your Honor has ruled on this already.

9              THE COURT:  I thought so.

10             MR. GOLDSHAW:  And what I -- my understanding --

11             THE COURT:  You're going to adhere to my previous

12   ruling.

13             MR. GOLDSHAW:  -- is that I would like that, yes, I

14   understand, and this is where the confusion comes in, that I

15   can directly ask this witness about her mindset as to the

16   other person, and if she doesn't give me the answer --

17             THE COURT:  Yes.

18             MR. GOLDSHAW:  -- I'm not going to go into the

19   triple --

20             THE COURT:  Of course.

21             MR. GOLDSHAW:  -- but I can ask her if she believes

22   this other person had a discriminatory attitude she's writing

23   a memo with.  I'm asking about her mindset.

24             And I think your Honor said that, when I asked the

25   question, if it's objectionable, your Honor will rule on it

1    then.

2              THE COURT:  Fair enough.

3              MR. GOLDSHAW:  Thank you.

4              THE COURT:  I think we might be able to use a jury

5    if we had one.

6              (Discussion held off the record.)

7              (The jury entered the courtroom.)

8              THE COURT:  Good morning, everybody.  Be seated,

9    please.

10             We're now about to start with the testimony in the

11   case.  Proceed.

12             MR. GOLDSHAW:  Your Honor, we'd like to begin by

13   presenting evidence of an admission made in the answer to the

14   complaint filed in this matter.

15             THE COURT:  Well, if you would like to begin, why

16   don't you?

17                        PLAINTIFFS' EVIDENCE

18             MR. GOLDSHAW:  Thank you.

19             In what I'm going to be reading are allegations from

20   the formal complaint filed with the Court by the plaintiffs,

21   and the defendant's official response to that complaint

22   called the answer.

23             Paragraph 32 of the complaint states:

24             "The selection of Ms. Marcus for layoff was not

25   based on her performance."

1          Answer provided by the defendant, Paragraph 32:

2          "The allegations contained in Paragraph 32 are

3   admitted."

4          Paragraph 40 of the complaint states:

5          "The selection of Mr. Wypart for layoff was not

6   based on his performance."

7          The answer of the defendant:

8          "The allegations contained in Paragraph 40 are

9   admitted."

10          At this time we'd call Rosalyn Kutchins to the

11   stand.

12          THE COURT:  You're going to have to call her louder

13   than that.

14          ROSALYN KUTCHINS, after having been first duly sworn

15   as a witness, was examined and testified as follows:

16          THE COURT:  What was the last letter?

17          THE WITNESS:  Excuse me?

18          THE COURT:  What was the last letter of your name?

19          THE WITNESS:  S.

20          THE COURT:  Kutchis?

21          THE WITNESS:  Kutchins.

22          THE COURT:  N-S.  Thank you.

23          THE WITNESS:  Thank you.

24                        DIRECT EXAMINATION

25   BY MR. GOLDSHAW:

1   Q    You held the title Director of Marketing at PQ from

2   roughly 1997, through the fall of 2005; is that right?

3   A    Yes.

4   Q    And that was the position you held at the time the

5   plaintiffs were fired as part of the reduction in force in

6   May 20005, correct?

7   A    Yes.

8   Q    Your position was in the Chemicals Division?

9   A    Yes.

10  Q    That was the largest business unit in the corporation,

11  correct?

12  A    Yes.

13  Q    Was Michael Imbriani the head of the Chemicals Division

14  up until the time he left in 2006?

15  A    Yes.

16  Q    As the Director of Marketing in Mr. Imbriani's division,

17  were you aware that PQ had an Equal Employment Opportunity

18  Policy?

19  A    Yes.

20  Q    And under that policy, age discrimination was

21  prohibited, correct?

22  A    Yes.

23  Q    And during the time you worked in Mr. Imbriani's

24  division, we were aware that age discrimination was against

25  the law --

1    A    Yes.

2    Q    -- correct?

3         I would now like to ask you to look at a document

4    which I will display on the easel.  It's Plaintiffs' Exhibit

5    P-274.

6         (Pause.)

7    A    Oh, okay.

8    Q    Is this the Equal Employment Opportunity Policy that was

9    in effect during the time you were in Mr. Imbriani's

10   division?

11   A    Yes.

12   Q    Under this policy --

13        THE COURT:  Is it possible that anybody else would

14   be able to see that?

15        MR. GOLDSHAW:  I've tried to check the placement

16   before the jury came in.

17        THE COURT:  Is it going to be displayed on screens

18   or not?

19        MR. GOLDSHAW:  We don't have that technology, your

20   Honor.  We have to use the poster boards.  We have copies --

21        THE COURT:  You don't have to use them at all.

22        MR. GOLDSHAW:  -- we have paper copies we have

23   provided for your Honor, and I will try to ask the

24   questioning in such a way that it can be followed, even

25   without the document.

1        THE COURT:  I don't see why you feel it necessary to

2   put up an exhibit every time you ask a witness a question.

3        MR. GOLDSHAW:  Not every time, just the important

4   ones.

5        THE COURT:  We want to hear what the witness has to

6   say, not what you tell the witness to say.

7        Go ahead.

8   BY MR. GOLDSHAW:

9   Q    Am I correct that under this Equal Employment

10  Opportunity Policy, age discrimination was prohibited?

11  A    Yes.

12       THE COURT:  That's what she said three times.  Would

13  you please stop wasting our time.

14  BY MR. GOLDSHAW:

15  Q    Under this policy, the person responsible for insuring

16  equal employment opportunity was Mr. Imbriani, correct?

17  A    Yes.

18  Q    And that meant that Mr. Imbriani was the person charged

19  by the corporation to make sure that age discrimination did

20  not occur in his division, correct?

21  A    Under this policy, yes.

22  Q    Now, in 2003, just two years before the plaintiffs'

23  termination, Mr. Imbriani directly ordered you to engage in

24  age discrimination, correct?

25  A    Yes.

1  Q    And Mr. Imbriani told you to demote one of your

2  employees named Ed Myszak, correct?

3  A    He told me to fire Mr. Myszak --

4  Q    Did he --

5  A    -- not demote.

6  Q    Did Mr. Imbriani tell you to replace Mr. Myszak with new

7  or younger blood?

8  A    He wanted new younger blood.

9          THE COURT:  Would you talk into the microphone,

10 please.

11         THE WITNESS:  He wanted new younger blood.

12 BY MR. GOLDSHAW:

13 Q    And --

14         THE COURT:  Excuse me, ma'am.  You're talking away

15 from the microphone.  Talk into the end of it.

16         THE WITNESS:  Oh, okay, sorry.

17         He wanted new younger blood.

18 BY MR. GOLDSHAW:

19 Q    And Mr. Imbriani used those words exactly, correct, new

20 or younger blood?

21 A    He said new younger blood.

22 Q    And when Mr. Imbriani ordered you to engage in age

23 discrimination against Mr. Myszak, you knew that he was

24 asking you to break the law, right?

25 A    Yes.

1   Q    In response to Mr. Imbriani's directive that you

2   discriminate against Mr. Myszak, you wrote a memorandum of

3   complaint, correct?

4   A    I wrote a memo, yes.

5   Q    Was the memo complaining about the age discrimination

6   Mr. Imbriani had asked you to engage in?

7   A    It was objecting to his terms, yes, his words.

8   Q    The words new or younger blood?

9   A    New younger blood, yes.

10  Q    Now, you filed your complaint against Mr. Imbriani with

11  the Human Resources Department, right?

12  A    I gave a hard copy of the complaint to Human Resources,

13  yes.

14  Q    And you also gave a hard copy of the complaint against

15  Mr. Imbriani to the Legal Department, correct?

16  A    Yes.

17  Q    And you provided a copy of your complaint to the Legal

18  Department because you knew it raised a legal issue, correct?

19  A    Yes.

20  Q    In response to your complaint of age discrimination

21  against Mr. Imbriani, you were chastised by your boss, right?

22  A    Not for filing the complaint, no, sir.

23  Q    You gave sworn testimony in this matter in 2008,

24  correct?

25  A    Yes.

1    Q    I am going to read a portion of the testimony that you

2    gave on that date.  Page 363, beginning Line 20.

3           (Pause.)

4           Are you ready?

5           "Question:  What happened with respect to your

6    complaint?

7           "Answer:  I was told that I did not do a good job

8    reviewing Mr. Myszak's performance, because I didn't

9    interview all the people in his performance review.

10   Evidently, I didn't go to Mr. Imbriani and ask him his

11   opinion.  I went to our normal peers and associates.

12          "Question:  Okay.

13          "Answer:  And actually I was chastised as not doing

14   my job well.

15          "Question:  And who was it who chastised you in this

16   regard?

17          "Answer:  Joe Caruso.

18          "Question:  Did you have any conversations, aside

19   from -- with Mr. Caruso -- well, let me first ask you:  Was

20   it your understanding that Mr. Caruso was familiar with your

21   complaint at the time he came to you?

22          "Answer:  Oh, he became familiar with it after I

23   took it upstairs, yes.

24          "Question:  So at the time that you're describing,

25   when he chastised you about how you had performed the

1   evaluation, was that after he became aware of the complaint?

2            "Answer:  Yes."

3            When Mr. Caruso chastised you --

4            THE COURT:  Are you still reading from your previous

5   --

6            MR. GOLDSHAW:  No, I'm asking --

7            THE COURT:  -- testimony?

8            MR. GOLDSHAW:  -- a new question now, your Honor.

9            THE COURT:  Well, what is it?

10  BY MR. GOLDSHAW:

11  Q    The question is:  When your boss, Mr. Caruso, chastised

12  you, wasn't it your understanding that the real reason you

13  were being chastised is not because of how you did a

14  performance rating, but because you had made a complaint

15  against Mr. Imbriani?

16  A    No, he never said that.  He chastised me or repri --

17           THE COURT:  It's your belief, not what he said.

18           THE WITNESS:  No, he -- he talked to me about not

19  doing a proper performance review, because when they first

20  asked me to fire Mr. Myszak, they had said -- I had told them

21  there was not cause for firing him based on performance, and

22  that's when Mr. Imbriani made the comment, I want new younger

23  blood.

24           THE COURT:  We understand that.  And afterwards when

25  you were chastised for not doing your -- not doing your job

1  correctly, did you personally believe that it was related to

2  the fact that you made a complaint?

3          THE WITNESS:  I had to wonder about it.

4  BY MR. GOLDSHAW:

5  Q    Are you saying that you weren't sure?

6  A    I wasn't sure.

7  Q    Up until last year, when you gave your deposition, you

8  were sure, right?

9  A    No, I wasn't sure.  I even said here --

10         THE COURT:  The deposition says --

11 BY MR. GOLDSHAW:

12 Q    I'm going to --

13         THE COURT:  -- what it says.

14 BY MR. GOLDSHAW:

15 Q    -- read another portion of the sworn testimony --

16         THE COURT:  Well, just do it.

17 BY MR. GOLDSHAW:

18 Q    you gave earlier.

19         THE COURT:  Don't waste time telling us what you're

20 going to do before you do it, just do it.

21         MR. GOLDSHAW:  Okay.  I just wanted the record to be

22 clear I'm reading from a previous statement.

23 BY MR. GOLDSHAW:

24 Q    This is on Page 822.

25         "Question" --

1   A    Wait.  I don't have a copy.  822?

2   Q    If you'd like to follow along --

3   A    Yes, I would, please.

4   Q    -- I'll get you a copy.

5            THE COURT:  Of course.

6            (Pause.)

7   BY MR. GOLDSHAW:

8   Q    Are you ready?

9   A    Yes.

10  Q    "Question:  I believe you testified yesterday that Mr.

11  Caruso did chastise you at some point in time for how you had

12  handled the performance rating; is that correct?

13           "Answer:  Yes, that is true.

14           "Question:  And in your mind you connected this with

15  your having filed a complaint?

16           "Answer:  I did.

17           "Question:  And do you still believe the two are

18  related today?

19           "Answer:  Yes."

20           THE COURT:  Do you agree that's what you said on the

21  previous occasion?

22           THE WITNESS:  I guess so, if it's here.

23  BY MR. GOLDSHAW:

24  Q    And when you made those statements on the previous

25  occasion, you understood that you were under oath providing

1  testimony, correct?

2  A    Yes.

3  Q    When you wrote the complaint of age discrimination

4  against Mr. Imbriani, you drafted it on the computer network

5  at work, right?

6  A    I drafted it on my laptop from work, yes.

7  Q    And did you keep a copy of the memorandum for yourself

8  at the time?

9  A    I did, but I no longer have it.

10  Q    Am I right that at the time you filed this complaint,

11  there were four copies; one you sent to HR, one you sent to

12  the Legal Department, one you kept for yourself, and one was

13  on the network?

14  A    I don't know if there was one on the network.  There

15  might have been.  But there were three hard copies that I

16  knew of, yes.

17  Q    When you wrote the complaint to the network, did you

18  delete it from the network?

19  A    I -- I might have done it on my hard drive.  I don't

20  know.  I don't remember.  I'm sorry.

21  Q    Were you aware that in this lawsuit the plaintiffs have

22  requested a copy of the complaint of discrimination that you

23  had filed against Mr. Imbriani?

24  A    Yes.

25  Q    Are you aware that the corporation contends that it has

1    been able to find the copy with the Legal Department, or with

2    the HR Department, or on their network?

3    A    If they can't find it, they can't find it.  All I know

4    is that I gave it to those individuals.

5    Q    Did you look for the copy that you kept for yourself?

6    A    Yes, I did.

7    Q    Did you provide it to PQ's attorneys, so they could

8    provide it to us in this litigation?

9    A    I -- I couldn't find the copy that I had kept.  I didn't

10   keep it in my office.  I kept at home.  And I don't know

11   where my files went at home.  There's just nothing there any

12   more.  I threw away a lot of stuff early in 2003, 2004, when

13   we were cleaning out a room.

14   Q    Did the corporation ask you to look for your copy?

15   A    Yes, they did.

16   Q    When the corporation asked you to look for their copy,

17   had they already told you that they weren't able to find the

18   copy with the Legal Department or the Human Resources

19   Department?

20   A    I -- I don't recall that.

21   Q    At the time that Mr. Imbriani asked you to engage in age

22   discrimination against Mr. Myszak, am I correct that you

23   understood that was part of a larger corporate-wide objective

24   to promote quote, "younger individuals," close quote?

25   A    No, I didn't understand that that was part of a larger -

1  -

2  Q    Let's look at the --

3  A    -- program.

4  Q    -- sworn deposition testimony you gave earlier.  I'm

5  looking at Page 372.  If you'd like to follow along, please

6  tell me when you find it.

7           (Pause.)

8  A    Oh, 372, sorry.  I'm on the wrong page.

9           (Pause.)

10          Okay.

11 Q    "Question:  In terms of your recollection, do you --

12          "Answer:  Ed may have put things together.  There

13 was at the time a desire for the company to look for the next

14 group of leaders in the company, and I know they were going

15 through succession planning.  So there were a lot of things

16 going on at that time going on, looking for younger

17 individuals to bring into the business.

18          "Question:  Okay.  And when you say that, what do

19 you mean by that?

20          "Answer:  They were looking for the next -- at that

21 point we had a lot of people all in a certain age group, and

22 there was no next group of people to grow for management.

23 And I know that there was an active program to bring in the

24 next group to be promoted.

25          "Question:  And do you know who was involved in that

1    effort?

2            "Answer:  That was executive management.

3            "Question:  Okay.  Would you identify Mr. Imbriani

4    as being involved in that effort?

5            "Answer:  He was part of the executive team."

6            I'm now done reading from your deposition, and I'm

7    asking a new question of you now.

8            You learned about this so-called succession planning

9    effort directly from the company's lawyer, Walter Stickley;

10   is that right?

11   A    Yes, that's correct.

12   Q    And Mr. Stickley, the company's lawyer, told you about

13   succession planning while he was sharing with you the future

14   of the company, and what the company was looking for in order

15   to move forward; is that right?

16   A    Yes, that is correct.

17   Q    And Mr. Stickley told you that the scope of the

18   succession planning was corporate-wide; is that right?

19   A    Yes, that's correct.

20   Q    Now, John Lau was on the executive management team,

21   correct?

22   A    Yes.

23   Q    And so was Colleen Delmonte?

24   A    Yes.

25   Q    Colleen Delmonte was a direct report of Mr. Imbriani,

1  right?

2  A    Yes.

3  Q    And Mr. Imbriani and Colleen Delmonte were, to use your

4  words, very, very close?

5  A    Yes, she worked for him, so I would expect that they

6  would be close, yes.

7  Q    You believed and understood that they weren't --

8         THE COURT:  You're turning away from the microphone

9  again and dropping your voice.

10        THE WITNESS:  Oh, sorry.  Yes, they were close.

11  They were very close.

12  BY MR. GOLDSHAW:

13  Q    In August 2004, you became aware that the corporation

14  was going to be sold; is that right?

15  A    Yes.

16  Q    And you were asked to help in the effort to sell the

17  company at that time?

18  A    Yes.

19  Q    And in this time period of August and September of 2004,

20  you helped prepare documents for presentation to prospective

21  buyers, right?

22  A    Yes.

23  Q    And you participated in the sales presentations to the

24  prospective buyers?

25  A    Yes.

1  Q    The sales presentations to prospective buyers took place

2  during the last two weeks of October of 2004, right?

3  A    Yes.

4  Q    Now, some time in the fall of 2004, your boss, Mr.

5  Caruso, told you that there would be a reorganization to

6  reduce costs if the company were sold, right?

7  A    I -- I don't remember.  He may have, yes.  I really

8  don't remember.

9  Q    If you'd like to refresh your recollection, you can look

10  at Pages 70 and 71 of your deposition.

11  A    Okay.

12  Q    So please read that and tell me when you're done.

13  A    Which one, 78?

14  Q    70 and 71.

15  A    Thank you.

16         (Witness complies.)

17         Yes, we did, we talked about it.

18  Q    Okay.  Your recollection's been refreshed?

19  A    Yes, thank you.

20  Q    And Mr. Caruso told you that you should start looking at

21  making changes now, or else somebody else meaning the new

22  buyers, would do it for you?

23  A    Yes, that's correct.

24  Q    Mr. Caruso is the manager who chastised you after you

25  filed the complaint of age discrimination against Mr.

1    Imbriani, right?

2    A    Yes.

3    Q    Now, am I right that Mr. Caruso told you to start

4    looking at changes to reduce costs as part of a budgeting

5    process for 2005?

6    A    It may have been then.  It was somewhere around that

7    time frame, yes.

8    Q    Mm-hmm.  The budgeting process for 2005 actually began

9    in the fall of 2004, right?

10   A    Yes, we began in the September-October time frame.

11   Q    And also in the fall of 2004, you spoke with Mr.

12   Imbriani about the possibility of layoffs after the sale of

13   the company, correct?

14   A    It was late fall, maybe wintertime, yes.

15   Q    Of 2004?

16   A    2004.  Late in the year, I believe.

17   Q    I'd like to ask you to look at an exhibit that's been

18   marked as P-7.  You should have it in the binder up in front

19   of you.

20   A    Is it under Tab 7?

21   Q    Yes.

22   A    Okay.

23        (Witness complies.)

24   Q    I can put a copy up on the easel as well.

25        (Pause.)

1              No, I can't.  I don't have a poster board for

2    everything.

3              Do you recognize this exhibit, P-7, as an e-mail

4    string dated January 3rd, 2005, between you, Colleen Delmonte

5    and Michael Imbriani?

6    A    Yes, I do.

7    Q    The e-mails that you're looking at now, dated January

8    3rd, 2005, concern a meeting between you, Ms. Delmonte, and

9    Mr. Imbriani, to discuss R and D correct?

10   A    That's what the e-mail says, yes.

11   Q    Okay.  And the subject of the e-mail is R and D?

12   A    Yes.

13   Q    Please look at the next exhibit, which is P-8.

14   A    (Witness complies.)

15   Q    Do you recognize this exhibit that you're looking at

16   now, P-8?

17   A    Yes.

18   Q    It's an e-mail from Colleen Delmonte to you dated the

19   same date as the e-mail we just reviewed, January 3rd, 2005,

20   right?

21   A    Yes.

22   Q    The subject of this e-mail, P-8, is R and D, right?

23   A    Yes.

24   Q    That's the department where the plaintiffs' worked,

25   right?

1   A    Yes.

2   Q    Attached to this e-mail are a number of proposed

3   organizational charts for R and D; am I right?

4   A    Yes.

5            (Pause.)

6   Q    I'd like to read the e-mail, and have you tell me if I'm

7   reading it correctly?

8            It states:

9            "Roz, I added my slides and modified the last two.

10  Let me know what you think and when you want to meet with

11  Kevin to get an idea on the costs.  I figure we would use

12  this presentation to talk to him.  Also, for this round, I

13  kept in Rosemarie."

14           And it's signed "Colleen."

15           Did I read that correctly?

16  A    Yes.

17  Q    The reference to meeting with Kevin; am I correct that

18  that's a reference to meeting with Kevin Doran, the head of

19  Human Resources?

20  A    Yes.

21  Q    And am I correct that this e-mail, that we are

22  discussing, reflects that you and Colleen Delmonte were

23  preparing a presentation for Kevin Doran regarding Research

24  and Development?

25  A    Yes, we had been asked by Mr. Imbriani to -- what would

1  be our recommendation for how we would handle R and D --

2  Q    But this --

3  A    -- the business, yes.

4  Q    This presentation that you and Colleen Delmonte were

5  preparing for a structure at R and D, occurred before the

6  time the new CEO, Michael Boyce, arrived at the company,

7  right?

8  A    This one, yes.

9  Q    It's before the sale actually took place?

10 A    Well, the sale was announced, but it wasn't finalized

11 until February.

12 Q    Some time in February of 2005, the company was sold for

13 more than $600 million; is that right?

14 A    Yes.

15 Q    And after the sale of the company in February of 2005,

16 Michael Boyce became the new CEO, right?

17 A    Yes.

18 Q    At some point in time prior to the reduction in force,

19 Mr. Imbriani asked you and Colleen Delmonte to write a

20 memorandum to the new CEO, Michael Boyce, right?

21 A    I don't know if it was to Mr. Boyce personally.  I know

22 it was to Mr. Imbriani.  I never heard him say, I want you to

23 write a memo to Mr. Boyce.  It was to --

24 Q    Well, let's take a look at the memo.  It's Exhibit P-32.

25 This is the one very large poster board we will be having

1    presented at this trial.

2            (Pause.)

3            If I can manage this one, the others will be a piece

4    of cake.

5            (Laughter.)

6            Do you recognize this as a memorandum addressed to

7    Michael Boyce and Michael Imbriani?

8    A    Yes.

9    Q    Dated May 16th, 2005?

10   A    Yes.

11   Q    This is the memorandum that Mr. Imbriani had asked you

12   and Colleen Delmonte to write, correct?

13   A    Yes, he had asked us to write it.

14           MR. GOLDSHAW:  Your Honor, the parties have

15   stipulated that the handwritten notations on this document,

16   with the exception of one word "Potters," were made by

17   Michael Boyce.

18           THE COURT:  Fascinating.

19   BY MR. GOLDSHAW:

20   Q    This is a memorandum that you wrote with, in conjunction

21   with Colleen Delmonte, correct?

22   A    Yes.

23   Q    And when writing this memorandum with Ms. Delmonte, was

24   it your understanding that Ms. Delmonte's objective was,

25   quote, "To get rid of some of these old farts," close quote?

1   A    No.

2   Q    Are you aware that Ed Myszak, another manager at the

3   corporation, has given testimony that you relayed to him a

4   comment from Ms. Delmonte, quote, "We need to get rid of some

5   of these old farts"?

6          MS. MALLOY:  Objection, your Honor.

7          THE COURT:  Objection sustained.

8   BY MR. GOLDSHAW:

9   Q    Please take a look at the second page of this Exhibit

10  P-32.  There's a table listing various positions and people

11  next to them, correct?

12  A    Yes, positions and the current incumbents.

13  Q    That table sets forth your recommendations for the

14  termination of people and positions, correct?

15  A    For the positions the people happen -- happen to be in

16  those positions.

17  Q    Were you recommending the termination of the people

18  whose names appear there?

19  A    I was recommending the termination, or the removal, or

20  elimination of the positions.

21  Q    Okay.  I didn't ask you about the positions now.  I

22  asked you about the people.

23          THE COURT:  Well, she's telling you what she said

24  what she thought.

25  BY MR. GOLDSHAW:

1    Q    Okay.  I understand that you were recommending the

2    termination of the positions.  I'm now asking, Were you also

3    recommending the termination of people holding those

4    positions?

5    A    No, those were just the incumbents.  If there had been

6    another business unit that could have used or wanted those

7    people, they had -- the other businesses could have taken

8    them.  Those were just the incumbents that were currently in

9    those positions at that time.

10   Q    You recall giving sworn testimony in this matter in July

11   of this year, correct?

12   A    Yes.

13   Q    I'm now going to read a portion of the testimony that

14   you had given on that date.  If you'd like to follow along,

15   please tell me when you find it.  I'm looking at Page 23.

16          (Pause.)

17          Are you there?

18   A    Yeah.

19   Q    "Question:  And in this memo you recommend the

20   termination of Plaintiff, Bonnie Marcus, Plaintiff, Roman

21   Wypart, and Eric Senderov, correct?

22          "Answer:  I recommended the termination or

23   elimination of positions which those individuals held, yes.

24          "Question:  And you recommended the termination of

25   the people as well holding those positions?

1          "Answer:  The people that were in the positions,

2    yes."

3    A    Well, it makes sense that the people -- if the positions

4    were there, the people were in those positions.

5    Q    I'm just asking if you recommended a termination?

6    A    I didn't -- I recommended -- I recommended the positions

7    be eliminated.  It says, "We recommend the elimination of the

8    positions."

9          Unfortunately, those people happened to be in those

10   positions and being there they're probably the ones that

11   would be let go.

12   Q    You said "probably"?

13   A    Pardon?

14   Q    Would you agree that since you picked those people out,

15   they're the ones that would get fired?

16   A    Those were the positions that would be gone and they

17   were in those positions.

18          THE COURT:  I think we've been over this enough.

19   Go on to something else.

20   BY MR. GOLDSHAW:

21   Q    Plaintiffs Bonnie Marcus and Roman Wypart are among the

22   people you recommend for termination in this memorandum to

23   the new CEO, correct?

24   A    I recommended the positions.  They happen to be in those

25   positions.

1   Q    Let's do it this way:   Bonnie Marcus's name appears here

2   in this table, correct?

3   A    Yes.

4   Q    So does Roman Wypart's?

5   A    Yes.

6   Q    The other people are John Lau with a handwritten

7   notation crossed off?   Richard Hinchey, Al Behan, and Eric

8   Senderov, correct?

9   A    Yes.

10  Q    John Lau, the top person who's name has a handwritten

11  notation crossed off by the CEO, he was the head of R and D,

12  correct?

13  A    Yes.

14  Q    And at the time of the RIF, he was moved out of that

15  position into a new position in the company, right?

16  A    Yes.

17  Q    As to all other five people on that table, am I correct

18  that they were terminated as part of the reduction in force?

19  A    Yes.

20  Q    Please focus on the first sentence of this memorandum

21  which states:   "We reviewed John Lau's suggestion, and

22  propose the following structure at R and D."

23           Do you see that?

24  A    Yes.

25  Q    Am I correct that that referenced the John Lau

1  suggestion relates to something that happened way back in the

2  fall of 2004?

3  A    Yes, I believe it was his last proposal.

4  Q    And following the fall of 2004, up until the time you

5  wrote this memorandum dated May 16th, 2005, you didn't speak

6  at all with Dr. Lau about the RIF recommendations you have,

7  correct?

8  A    No.

9  Q    And you didn't speak with him about the recommendations

10  appearing in that table at the end of the memorandum,

11  correct?

12  A    No.

13  Q    Am I right that one of the things you recommend in this

14  -- I'm sorry -- this memorandum was written less than two

15  weeks before the actual reduction in force, right?

16  A    That's the date on it, yes.

17  Q    One of the things you recommend in this memorandum was a

18  position to manage the research and development for zeolite,

19  correct?

20  A    Yes.

21  Q    And the candidates for that position included Ed Myszak

22  and the two plaintiffs, Bonnie Marcus and Roman Wypart,

23  right?

24  A    Well, earlier in the year we had that -- that first

25  table that you went back to back in January -- we had

1   proposed a position called zeolite engineer or process

2   engineer, and that's what those candidates were being

3   evaluated for.

4   Q    I'm not asking you about their evaluation now.  I just

5   want to know if the plaintiffs were candidates for the

6   position that you're recommending be given to Ed Myszak in

7   this memorandum called -- the position to manage the R and D

8   for zeolite?

9   A    I believe so.

10  Q    And at the time of the reduction in force, that position

11  was, in fact, filled by Ed Myszak, correct?

12  A    Yes, that is correct.

13  Q    When Ed Myszak got that position over the plaintiffs, it

14  was a promotion for Ed Myszak, correct?

15  A    Yes, it was.

16  Q    And he got a higher-level position at that time, right?

17  A    It was a promotion, so, yes.

18  Q    When you were writing this memorandum at Mr. Imbriani's

19  request marked P-32, were you still afraid of Mr. Imbriani,

20  because he had previously been chastised for making a

21  discrimination complaint against him?

22  A    No, I was not afraid of Mr. Imbriani.

23  Q    A few months after the reduction in force, in September

24  of 2005, your position was changed too, right?

25  A    Yes, that is correct.

1  Q    And at that time you lost responsibility over R and D,

2  right?

3  A    No, I believe Mr. Myszak still reported to me, but I

4  didn't have the other piece of R and D that I had had before.

5           THE COURT:  Excuse me.  You keep dropping your

6  voice.

7           THE WITNESS:  I'm sorry.  No, in September of 2005,

8  Mr. Myszak continued to report to me with zeolite.  The piece

9  that I lost was a portion where Neil Miller, Dr. Miller, who

10  covered the Analytical Group went to report to Colleen

11  Delmonte, and her organization.

12  BY MR. GOLDSHAW:

13  Q    When you had this position change in September of 2005,

14  you began reporting to Colleen Delmonte, too, right?

15  A    Yes, that is correct.

16  Q    And when this change in position for you occurred, at

17  first you viewed it as a demotion, right?

18  A    Yes, that's correct.

19  Q    And when you were informed of this position change in

20  September of 2005, after the reduction in force, am I right

21  that you believed the real reason for your demotion was that

22  you had previously complained against Mr. Imbriani for age

23  discrimination?

24  A    It crossed my mind.

25           MR. GOLDSHAW:  I have no further questions at this

1  time.

2          THE COURT:  Perhaps others do.

3          MS. MALLOY:  We're going to call Ms. Kutchins in our

4  case, so I have no questions for her now.

5          THE COURT:  Okay.  Call your next witness.

6          You may step down temporarily.

7          (Witness excused.)

8          THE COURT:  Call your next witness.

9          (Discussion held off the record.)

10         MR. GOLDSHAW:  Your Honor, at this time I'd like to

11  read a stipulation that the parties have reached regarding

12  this document.

13         Prior to trial, the parties have stipulated that the

14  ages of these people on this table were as follows:

15         John Lau, 50, Bonnie Marcus, 60, Richard Hinchey,

16  67, Roman Wypart, 56, Al Behan, 66, and Eric Senderov, 69.

17         THE COURT:  As of what date were those ages?

18         MR. GOLDSHAW:  As of the date of the reduction in

19  force.  Obviously, they're all older now.

20         THE COURT:  Thank you.

21         MR. GOLDSHAW:  For our next witness we call

22  Plaintiff, Bonnie Marcus.

23         I will move that document for you.

24         BONNIE MARCUS, after having been first duly sworn as

25  a witness, was examined and testified as follows:

 1          THE COURT:  Bonnie is I-E on the end of it?

 2          THE WITNESS:  Yes, please.

 3          THE COURT:  Thank you.

 4                    DIRECT EXAMINATION

 5   BY MR. GOLDSHAW:

 6   Q    Good morning.

 7   A    Good morning.

 8   Q    You've already stated your name for the record and on

 9   all those exhibits; am I right -- I'm sorry.  I might have

10   missed that and I want to --

11   A    Yes, I did.

12   Q    Okay.  Ms. Marcus, did you attend college?

13   A    Yes, I did.

14   Q    When did you begin college?

15   A    I began college late.  I began when my son was in the

16   first grade.

17          THE COURT:  Well, that doesn't tell us when, because

18   we don't --

19          THE WITNESS:  Oh, seventy -- it was about '74, '75.

20   1974, 1975.

21          THE COURT:  Which?

22          THE WITNESS:  '75.

23          THE COURT:  Thank you.

24   BY MR. GOLDSHAW:

25   Q    What college was that?

1  A    It was the State University of New York College at

2  Purchase.

3           THE COURT:  That's P-U-R-C-H-A-S-E, is it?

4           THE WITNESS:  Yes.

5           THE COURT:  Thank you.

6  BY MR. GOLDSHAW:

7  Q    While attending college, did you go straight through, or

8  did you take any time off?

9  A    That time I went straight through.

10 Q    Had you previously attended any college courses?

11 A    Yes, when I got out of high school, I went to Syracuse

12 University for one year, until I ran spectacularly out of

13 money.

14 Q    What did you do during that break of roughly 13 years

15 between you stopped attending Syracuse and you began college

16 again?

17 A    When I was in high school, I had gotten a position doing

18 some research at a local hospital, and they trained me to be

19 a medical technician in addition.  So when I went to Syracuse

20 the first time, I went to classes full time, and then I

21 worked from 4:00 in the afternoon until 12:00 at night as a

22 medical technician covering night call at the hospital.

23           And when I came back to New York -- when I came back

24 home after I ran out of money -- I went to work at the local

25 hospital as a medical technician.  And I worked there, and

1   when I was 25, I got married to someone I had met, and I
2   continued working.

3          And then in 1968, my daughter was born, and two
4   months after she was born, I found out I had cancer, so I
5   went through a whole period of a couple years of, you know,
6   therapy and chemo and all that stuff.  So I couldn't go back
7   to work.  So then when they said I could have a second child,
8   in 1971 my son was born.  And in 1973, I had cancer again,
9   and I had a long bout of surgery, and all the stuff that goes
10  along with that.

11         And then I reached an age where I said, you know, I
12  want to do something with myself.  I'd been volunteering, I
13  had been president of all different kinds of organizations,
14  and stuff, and I wanted to do something that made me a little
15  bit happier.  I had always wanted to be a chemist and I
16  remember one of my friends saying, At your age, you're too
17  old, you're going to be 30, you can't be a chemist, you're
18  too stupid when you get to that age.

19         And that was sort of a challenge, and I applied, and
20  took a full four-year degree at Sunie Purchase, and after
21  that one of my professors there recommended that I interview
22  at Union Carbide, and got me the interview, because her
23  husband worked there, and I got a position.  And I was a
24  technician for the first two years, because they didn't have
25  the exempt openings, and they paid for college.

1          So starting -- I started in July 1980 or '81 -- '80

2    I think it was -- and then I -- in December I went back to

3    Fordham University in the Bronx at night, and I took a

4    Master's Degree in Chemistry, and I finished in just about

5    two years.  I graduated in '84, so I was working full time

6    and going pretty much to school full time, too, and then I

7    worked for Union Carbide.

8    Q    Okay.  Let me --

9    A    Then I became exempt very quickly.  As soon as they had

10   openings, they made me an exempt.  And then in order to catch

11   up, because I had had to come in as a technician to get the

12   job, they promoted me rapidly.  I got a series of promotions.

13   Over maybe four, five years I got several promotions.

14   Q    After working at Union Carbide, what was your next place

15   of employment?

16   A    I didn't really change employment, but Union Carbide

17   took the Zeolite Molecular Sieve Group that I was in, which

18   was a large entity, and spun it off into a joint venture with

19   another company called UOP, and the initials don't stand for

20   anything.  It's just UOP.  And we assumed the name UOP.

21         So I had the same job, but within a different name.

22   And I had gone from, when I first started I was in the

23   Research Group for 1980 to about '84, doing research and

24   development of pure research kind of things, like academic

25   research.

1       And then in 1984, I switched to a Technical

2   Marketing Group, which I was actually going out to customers,

3   and getting our materials into their products, getting them

4   to buy them, getting them tested, and commercializing

5   materials for them to use and for Carbide to make.

6   Q    What do you mean by "commercializing"?

7   A    Getting somebody to take a look at the material, try it

8   in their formulations, and then buy it.  Commercialization is

9   when somebody buys something.  And part of my job was to see

10  was there viability in the project, would it ever go to

11  commercialization?  Or would it just be a lab curiosity that

12  you put on the shelf and hope some day somebody will use it?

13  Q    What was the next position you held?

14  A    In 1990, I got remarried and my husband -- oh, I got

15  divorced.  I forgot to tell you that.  Some time in the '76

16  -- '78 I got -- no, '85 I got divorced.  In 1990 --

17            THE COURT:  Well, one of those years?

18            THE WITNESS:  Huh?

19            THE COURT:  One of those years?

20            (Laughter.)

21            THE WITNESS:  '85, I'm sorry, I got divorced.

22            And in 1990, I remarried, and my husband was working

23  for Union Carbide, but he was not part of UOP.  And UOP

24  wanted to move me to Chicago, and he was going to stay in New

25  York, and I thought that didn't bode well for a new marriage,

1   so we both changed jobs.  He got a job at Mobile Oil and I

2   took a job with a small consulting company in Pennsylvania,

3   so we moved down here in 1990.

4   BY MR. GOLDSHAW:

5   Q    How long did that small consulting job last?

6   A    The company went under in six months.  It was, you know,

7   it was a -- he did a good sales job on me, but it died.

8            And then I went to work for Sunoco in their Research

9   and Development Department, and I was working there doing

10  basic research, and I was going to transfer into a Marketing

11  Group selling lubes -- lubrication fluids and oils, and

12  instead I got solicited -- well, solicited is the wrong word

13  -- I got approached by people from PQ asking me if I was

14  interested in working for them.  So I got approached and I

15  joined PQ in '94, working for a joint venture within the

16  company known as zeolite, which is a Zeolite Catalyst Group

17  that's a joint venture between PQ and Shell.

18  Q    What is a Zeolite Catalyst Group?

19  A    I think we should start with what is a zeolite.

20  Q    What is a zeolite?

21  A    A zeolite basically is a rock, and it's a rock that is

22  -- it's got specific pores like your skin, and it allows

23  things in and out, but only of specific sizes, so when you

24  make a zeolite, you can have a pore that will let water in,

25  but nothing else.  And that zeolite would used in your

1   insulated glass windows, so when you put them together, it

2   absorbs that last little bit of water, and when it clouds up,

3   that means the seal's been broken, and the water's gotten in,

4   and has been overwhelmed.  And you can put them in mufflers,

5   so when you stop your car, the water goes into the zeolite,

6   and when you start your car, it gets blown off, and it keeps

7   the muffler from rotting.

8           And there is -- there's about 200 or 300 different

9   kinds of zeolites, but only about ten are commercial.  The

10  rest are some natural zeolites and ones that just aren't

11  useful in industry.  And you can make all these different

12  materials in plants, and when you use it as a catalyst, it's

13  used to help a reaction go faster, so it's used in making

14  gasoline.  So every gallon of gasoline has seen zeolites at

15  least a couple of times, and it makes the reaction go better,

16  it makes your higher octane and stuff.  So there's constant

17  work going on trying to make them better to increase your

18  gasoline yield and your diesel yield.

19          So I hope that helped.

20  Q    During what period of time did were you employed by PQ

21  Corporation?

22  A    I started in November '94, and I was fired in '09.

23  Q    2005?

24  A    2005 -- I'm sorry -- May 2005, I was fired.

25  Q    Okay.  While you were employed at PQ, did you hold any

1   management positions?

2   A      Yes.

3   Q      What were they?

4   A      When I started there, they hired me at a lower level

5   because, again, they couldn't afford to bring me in at a

6   higher level, and after I had been there about six months,

7   they gave me a 10 percent increase in salary, which I was

8   surprised at.

9            And the person I worked for was Jerry Dover, who was

10  the president of Zeolite, and Bill Cormier who's the director

11  of R and D, and I started doing more marketing work rather

12  than straight science work, and Jerry came to me -- Jerry

13  Dover the president -- came to me and said, Let's write up a

14  job description that more accurately reflects what you're

15  doing.

16           And he wrote up the job description with my help and

17  with Bill Cormier's help, and I was then promoted to manager

18  of Technical Market Development in Zeolite and Catalyses, and

19  I had a group reporting to me that was doing tech service,

20  and I was going out to customers with the sales and marketing

21  people, and things like that, so I had a marketing/technical

22  role.

23  Q      Have you now identified the various people that you

24  reported directly to as a manager?

25  A      No.   I reported to John Lau also for R and D.

1   Q    During what period of time did you report to John Lau?

2   A    I reported parts of my time, from I think about 2001 to

3   2005, and then I think it was full time at the end.

4   Q    What was your relationship like with John Lau while you

5   were reporting to him?

6   A    When I worked for him, I liked him very much.  I thought

7   he was a very good director of R and D.  I thought that he

8   did an excellent job of keeping morale up, and pushing R and

9   D as far as being a really good organization.  I thought he

10  did an excellent job.

11  Q    What kinds of things would you talk about with John Lau

12  in general?

13  A    He confided in me about projects, about people, where he

14  was going, what conferences were going on, just all sorts of

15  stuff.

16  Q    Did you receive any performance reviews while you worked

17  at PQ?

18  A    Yes.

19  Q    Can you describe generally how they were?

20  A    I got raises from every one, and they generally -- I

21  mean, they were positive, you know, I got steady raises right

22  up through, and I think when I left I was at a hundred and

23  something percent of midpoint.

24  Q    What do you mean by "of midpoint"?

25  A    Midpoint is what you should -- is the average of what

1   the job pays.  And if you do a better job, you get -- you

2   just go up above the midpoint.  If you do a steady job, you

3   always are kept at about 100 percent of midpoint.

4   Q     Mm-hmm.

5   A     So, you know, if you're at midpoint, it usually means

6   you're doing that job adequately.

7         When I've had people work for me, if I brought them

8   above midpoint, it was because they were doing a better job.

9   Q     Please basically describe your job duties while you were

10  a manager reporting to John Lau.

11  A     While I was reporting to John Lau?

12  Q     Yes.

13  A     My job duties were to manage the people that were

14  working for me in the various projects and to manage the

15  projects, as an overall director.  So you know when you have

16  a manager, the manager is not going to go down and micro-

17  manage and make sure you've got everything done, but is going

18  to talk to you, and make sure you've got the projects going

19  on in the proper direction, and focus properly, and, you

20  know, that everything's going along.

21        You're, in effect, the person that brings it all

22  together, so you don't have six dispirit people doing what

23  they want to do.  So you bring them together.  It's like a

24  manager of any other group.  And that is what I did for a

25  variety of different projects within John's group.  And he

1   told me which projects we were working on, and what their

2   priorities were, and where we should be going, and what our

3   goals were, and set those goals together.

4   Q    Did you have any involvement in how various projects

5   were staffed with particular people?

6   A    Yeah, we had to look at a project, and if it was a

7   project that involved something like -- say as an example,

8   plastics.  We only had one plastics person and that was Roman

9   Wypart.  And so we would pull him in.  And if other groups

10  needed somebody with plastic expertise, Roman would be

11  assigned partially to that.  If we needed somebody who knew

12  silica catalysts, we would pull someone in from the Silicas

13  Group.  So people were assigned based on what you needed them

14  to do within the group to make the project run, so people

15  were sort of in R and D like a smear.  You took a piece of

16  the smears and put them all together and made a project.  So

17  people had parts of times working in different projects.

18  Q    Did you do any work that involved commercialization?

19  A    I did a lot of it when I was in zeolist.  Zeolist was a

20  heavily-commercializing group and I worked on doing several

21  projects.  I think the first one I ever had was working with

22  an outside consultant company to determine which projects

23  would go forward within the R and D structure of zeolist as

24  to what we thought was viable to work on.

25          One of them being auto catalyses, and that did go

1   forward.  There were customers using it.  There were

2   materials developed.  I had two people working for me in my

3   group who did the research work to present to customers in

4   the auto catalyst area.

5          And after I left, that was continued, it was

6   continued, and it's been going on with new materials, so our

7   original materials are now sort of the last generation and

8   they're working on the next generation.

9   Q    In the field, what does market development mean?

10  A    To me or in the general field?  I mean, it depends on

11  the industry.

12         But to me what it means is you take a look at a

13  product, and you say, Is there a market for this?  Is

14  somebody going to buy it?  You know, it's great to develop a

15  widget, but if you don't need it, what's the point?

16         So you go and look and you do first a market study.

17  See if there is something there.  And then I would do a

18  patent study to make sure that we had wanted to do wasn't

19  already patented, because if it's patented, you can develop

20  the best thing, but you can't sell it, because somebody owns

21  the rights to do it.

22         So look at the patents, then look at how we would go

23  about trying to develop the material, what kind of material

24  to develop, and roughly get an idea of costing.  How much the

25  raw materials cost.  Can you make it in the plant?

1         We had one material which was the methyl

2    methacrylate catalyst, which makes a plastic, and we realized

3    that this material could be commercialized, but not in our

4    silica plants, because ours were running with one unit

5    operation over here, and another unit operation over there,

6    and another operation over there, so you'd be moving the

7    catalyst all over the place, and it just wasn't feasible.

8         So Utal Who (ph) and I went and found a series of

9    tollers that could it as a flow cheaper, and veted a couple

10   of them, and actually got the product made for the customer.

11        And there was just a large article in Chemical and

12   Engineering News that the company we did it for has built a

13   huge plant in Singapore, is planning another plant, and just

14   got themselves sold based on that for about $1.6 billion, and

15   they're just a one-product company.

16        So that would be commercialization.  Getting it in

17   the plant, getting the stuff made, dealing with the customer,

18   finding the tollers, giving them the right samples.  That's

19   what I think of as commercialization.

20   Q    Who was responsible for commercialization or market

21   development over the projects assigned to you while you were

22   working at PQ?

23   A    I did a lot of it and sometimes there was a sales person

24   or a marketing person assigned to us, but they were more of

25   an interface with the business unit than they actually did

1  any practical day-to-day on the material -- on the projects.

2  Q    Did you have any particular type of project that fell

3  within your area of responsibility?

4  A    Zeolites.

5  Q    Were all zeolite projects within your area of

6  responsibility in R and D?

7  A    No.  Zeolist had their own projects, and there were some

8  projects that were managed toward the end in late 2004, 2005,

9  by some other people, too.

10 Q    If a project was in R and D, and it was a zeolite

11 project, who would that project be assigned to?

12 A    Normally John would have assigned it to me.

13 Q    Do you recall as of 2005, obviously before you were

14 fired, what were the major projects you were working on?

15 A    I was working on PVC, which is polyvinyl chloride.  It's

16 a plastic.  And we had developed -- actually that projected

17 started way before I took it over.  It was started in like

18 '94, '95, when PQ started a new division called the Molecular

19 Sieve Division.

20      And it started in there and then it moved into

21 another -- the detergent business unit.  Then it moved into

22 -- Bill Cormier for zeolist took it over.  And then I finally

23 got it in about 2000, 2001, somewhere in that range.

24      So they had developed a zeolite to put into

25 polyvinyl chloride to be -- to make it work better, and that

1   was a specific zeolite, and we were still working on parts of

2   it.  It was going to go to sales for general sales, but there

3   was still more to be done to get it into some polymers.

4           And everyone who does a polymer, has their own

5   recipe.  It's like a cake.  So, you know, you may add two

6   eggs, you add three eggs, you know, and that changes how the

7   polymer behaves.

8           And what Roman's job was, was to help the customer

9   figure out what to take out or what to put in to make this

10  material work, and it was much cheaper than the material it

11  wa replacing, so it would be a cost saving.  We had to prove

12  that to them.

13  Q    Why was that something that Roman Wypart did instead of

14  leaving it to the customer to figure out for themselves?

15  A    Because plastic customers don't really know very much

16  about inorganic materials.  They tend to deal with plastics,

17  and carbon, and you know, things that don't smell great

18  coming out of oil.  And when you hand them a white powder,

19  they're not sure how to handle it, or what to do, or what the

20  properties are.

21          So we had to take those formulations that Roman knew

22  really, really well, and figure out how to back stuff off or

23  add stuff to make it work.  And that was his expertise and I

24  managed the project.

25          And we did an outgrowth of that was taking a look at

1   the zeolites in wood polymer composites, so these would be

2   like the Trex decking, and putting it into there, and

3   basically on that one we had only done enough work to be able

4   to define ranges so we could get a patent.  So if we went out

5   there, somebody couldn't scoop us or take our data and

6   develop their own patent.

7         So we had done just the basic works for the patent,

8   and we're starting to work on other areas of it, and we had a

9   big matrix of things we were going to do.

10  Q   I think you had better explain what you mean when you

11  say when you hand the customer a white powder.

12        (Laughter.)

13  A   Well, to begin with, it's not illegal.

14  Q   What are you referring to?

15  A   Zeolites are a -- a very fine white powder, and they

16  feel like talc.  So if you think of what you would get if you

17  put baby powder in your hand, that's what a zeolite feels

18  like.  It's not gritty, it's not -- it shouldn't be gritty --

19  it's not big, it's not big crystals like salt, it's just a

20  real fine white powder, but it has all the characteristics of

21  a rock.  So you're putting it into a plastic, where you're

22  going to have little chunks of rocks, so you had to talk to

23  them about the little chunks of rocks.

24        And I would give presentations and Roman would

25  handle the technical part, and we went to a lot of

1   conferences to push this material.

2   Q    Now, without describing in full detail the nature of the

3   projects, in addition to PVC, can you just identify the other

4   projects that you were working on in 2005, shortly before the

5   reduction in force?

6   A    Yes, the wood polymer composite, the PVC.  We were

7   working on another one called TSPQ, which was a titanium

8   zeolite used for making another material, another plastic.

9   Q    You can explain it a little, if you want.

10  A    Okay.

11  Q    Go ahead.

12  A    Making a little -- sorry, I like zeolites -- making, you

13  know, another plastic, and we were doing that with an outside

14  company.  I was also working on helping with the nano A

15  project, which was making a very, very, very small crystal

16  material, so you could use it in something like a liquid

17  detergent, so it wouldn't sink, it would stay suspended.  And

18  -- I forgot what else.

19  Q    Was there a project named Biocides?

20  A    Oh, yeah, biocides.  We were looking at seeing -- we had

21  filed an invention disclosure to our Legal Department about

22  looking at various zeolites and other PQ products, such as

23  silicates and things like that, and seeing if they had

24  biocidal tendencies, so they wouldn't grow -- they would keep

25  mold and mildew and stuff like that from growing on the

1    products.

2          And we were concerned about this with sick building

3    syndrome, which was really big at that point, so we had set

4    up -- one of the people, again, we borrowed from the Silica

5    Group -- he set up a chamber with molds and mildews growing

6    in it, and we made various formulations of plastics and stuck

7    them in there with all different things in them, and then we

8    coated some stuff, and then we, you know, investigated every

9    couple of weeks to see how they were doing mildew-wise.  And

10   I was also working partially, as part of that project, on

11   looking at silver to see if we could figure out a way to put

12   silver in it, a silver zeolite, and that's known for killing

13   bacteria, and we wanted to see if that would work, too, but

14   everything turned black.

15   Q    You had mentioned earlier a project, MMA?

16   A    Oh, the methyl methacrylate project.  I had been working

17   on that for a long time, and in January -- I guess it was

18   February -- I went to Korea to meet with the customer that

19   was going to buy it, and to do the final approvals of this

20   toller that we had found who could do it all in one process.

21   And I met with the customer to show them the toller, and to

22   see how things were going, and that was in February of 2005.

23   Q    How many patents do you hold?

24   A    U.S. patents, I have 38.

25   Q    Why did you restrict your answer to U.S. patents?

1  A    It's easier to get foreign patents.  U.S. patents are

2  usually sort of the gold standard.  It's harder to get a U.S.

3  patent.  There was a lot more investigation.

4            And sometimes in some of the European countries, you

5  just publish the patent, and a year later it's awarded if

6  nobody says, You're infringe on my patent.  So I don't really

7  spend a lot of time counting foreign patents.

8  Q    As of the date you were fired from PQ, how many patents

9  did you hold?

10  A    I think it was either 35 or 36.

11            THE COURT:  Well, do you have any foreign patents?

12  Let's finish the picture.

13            THE WITNESS:  Yes, I have a lot of foreign patents.

14            THE COURT:  Thank you.

15  BY MR. GOLDSHAW:

16  Q    Was it with Union Carbide that you first became part of

17  the zeolite community?

18  A    Yes.

19  Q    At the time you first became part of the zeolite

20  community, were women well represented in the community?

21  A    No, not on a -- on a commercial basis.  There were

22  academics that were doing stuff, and students, but in

23  companies making zeolites, no.

24            THE COURT:  Suppose we pause here for ten minutes to

25  give the jury a break.  Ten-minute recess.

1              (The jury exited the courtroom.)

2              (A recess was taken from 11:18 o'clock a.m. until

3    11:31 o'clock a.m.)

4              (The jury entered the courtroom.)

5              THE COURT:  Be seated, please.

6              Proceed.

7    BY MR. GOLDSHAW:

8    Q    As a manager of R and D, were you familiar with the

9    skills and job duties of other people in the department?

10   A    Yes.

11   Q    Are you familiar with Roman Wypart's skills and job

12   duties?

13   A    Yes, he reported to me.

14   Q    Please describe his skills set?

15   A    Roman's had years of plastics experience, and we didn't

16   have any of that experience.  He was the person that could

17   bring a plastics lab together, which he did.  He helped

18   establish and buy the equipment.  He knew how to use it.  He

19   trained the technician that we had.  He was able to talk to

20   customers on a one-to-one relationship about how to -- how to

21   make the plastics work with our materials in them.  And he

22   set up the tests that were done in order to be able to do

23   this, and prepare presentations, and talked to customers, and

24   he was very well known in the industry.  Whenever we went to

25   a conference to look for new customers, Roman would have a

1    little crowd around him, and it was the way we got into a lot

2    of people's formulations.

3            And he's also well known.  He's been president of

4    the Vinyl Division for the Plastics Association, which is a

5    large group of people that do PVC.  And he was the president,

6    and he served on the board, and we got a lot of visibility

7    because of that, because he was known.  And every time he had

8    to sign something, he would sign, you know, that he was our

9    chemist, and which company it was.

10           So it was very good for that, too.  And he had years

11   of experience, that we just didn't have as part of our skill

12   set.

13   Q    Did you play any role in the performance evaluations of

14   Mr. Wypart?

15   A    Yes, I did them.

16   Q    How were his performance evaluations?

17   A    His performance evaluations were very good, and he got

18   promoted, I think it was in 2004.  Got him promoted, and when

19   you get promoted, you had to go before the committee in R and

20   D, and everybody had to agree.  It wasn't just my

21   recommendation that he get promoted.  It was sent around to

22   the senior managers and they had to agree.

23   Q    All right.  Was that the same process that applied when

24   you were promoted at PQ?

25   A    No.  When I was promoted, it was within zeolist, and

1   zeolist, as the joint venture, kind of did things their own

2   way, and it was just a decision that was made among the

3   senior people that I was going to get promoted.  So I guess

4   it was similar, but it wasn't quite as formal.

5   Q    All right.  Returning to Mr. Wypart.

6        What were the major projects that he was working on

7   in the months leading up to his termination?

8   A    In January the PVC area for current customers had gone

9   into the Sales Group, and we were told that at that point we

10  were supposed to be doing training for those sales people,

11  and for the managers who were going to work with the sales

12  people, including Chris Sennick (ph) and Ed Myszak, because

13  they needed training on how to deal with customers in that

14  application area.

15  Q    Roman was also supposed to be attending conference,

16  drumming up new customers, and finding new application areas

17  within other plastics that we could use this material in.

18  But the only thing he wasn't doing was making sales calls,

19  because we're not sales people.

20       So he was working on that.  And then he was also

21  working on the wood polymer composite, because as I said, we

22  wanted to file a general patent that would show that you

23  could use our material from say this level up to that level,

24  and then work down to where it was the optimum level, so we

25  could give it to customers, but the patent would be broad.

1    So were working on broad patent coverage to get that

2  patent filed, and it did get filed.  It got filed after we

3  left.

4  Q    Did Mr. Wypart's job duties include commercialization of

5  projects?

6  A    Yes, he had to go to customers and talk to them, and

7  when a customer would try it in their regular formulation and

8  it didn't work, they call up and Roman would say, Well,

9  looking at your formulation, I'd take some of this out, and

10  maybe add a little bit more of this, and a little less of

11  that, and then it should work.

12    So that is a way of getting the customer to use the

13  material to try it, to commercialize it.  It's telling them

14  how to use the product and getting them interested in it.

15  Q    As to the PVC project Mr. Wypart was working on, was

16  that a corporate development project?

17  A    It was originally funded by the Mold Sieve Department

18  back when it started.

19  Q    In 2005, was it a corporate development project?

20  A    No.  It was supposed to have gone into sales for the

21  sales part, and it was supposed to have just, you know, been

22  in that area.

23  Q    Are you familiar with Eric Senderov's job duties and

24  qualifications?

25  A    Yes.

1  Q    Could you provide just a basic overview for Dr.

2  Senderov?

3  A    Eric was probably one of the premier zeolite chemists

4  and other mineral chemist.  He wrote several books that were

5  like, you know, this thick on rocks, and minerals, and

6  zeolites, and clays, and everything, and he was very well

7  know, and he was in Russia.  And it was interesting because

8  you didn't hear that much about the Russians or the

9  Chinese-type of people, because -- of chemists -- because

10  they weren't allowed out very much, and they didn't get a

11  chance to come to conventions and things, so you didn't know

12  about them.  But you knew Eric because his writings were so

13  extensive.

14        And he was probably one of the best synthesis people

15  as far as determining how to make new zeolites, how to work

16  on old zeolites, how to change their size, how to change

17  other things in them.  He was -- he was a word-renowned

18  expert -- I mean he is a world-renowned expert.

19  Q    Okay.  Are you familiar with what were the major

20  projects Dr. Senderov was working on before he was fired as

21  part of the 2005 reduction in force?

22  A    Yes, he was --

23  Q    Would you --

24  A    -- working on the TSPQ, which is the titanium material

25  that was being partially funded by an outside company to make

1   another plastic.  And then he was working on trying to make

2   the standard PQ material, which is used in detergents and is,

3   you know, a cheap material, it's a commodity-type thing,

4   trying to make it really, really small and he succeeded.

5          And it was interesting, because people had been

6   trying for years and years and years to do this, and he was

7   able to make it ultra small.  It still didn't work in the

8   application, because it's still a rock, but he made it in an

9   incredible small way, and unfortunately it didn't work.

10          He was also working on a project for zeolist, which

11  was olefin cracking, and olefins are types of molecules, and

12  you want to crack them, and make them into smaller particles,

13  because the smaller pieces give you better octane numbers in

14  gasoline, if that make sense, okay?

15          So you take the big stuff and chop it down and put

16  it into gasoline, and this was a catalyst that he was working

17  on.  And he basically was the person that we went to for a

18  lot of different synthesis stuff, because he knew what he was

19  doing.

20  Q   Was the olefin cracking project that Dr. Senderov was

21  working on before he was fired in 2005, was that a corporate

22  development project?

23  A   No, it was funded by Shell into zeolist.  Shell gave

24  them the money, because they are the ones that wanted that

25  product made, and they gave it to -- they gave money to cover

1   him to zeolist.

2   Q    Would you please briefly describe the general skill set

3   and qualifications of Dr. Richard Hinchey who was fired as

4   part of the 2005 RIF?

5   A    Yeah, I've known Dick since my days at Carbide.  He was

6   at Carbide.  And what he was known for there was being the

7   person that could figure out how to take something out of the

8   laboratory and into the plant.

9        So he was one of the people that could equate

10  taking, say making a dozen cupcakes, and then moving them

11  into the Tastykake factory and making a bazillion cupcakes.

12  He knew how to do that transition.  He knew all the equipment

13  that you could use to do that and stuff.

14       And it's not trivial.  You don't just take that

15  little recipe and, you know, make a lot.  So he was -- he was

16  excellent at doing that, plus he knew so much about the

17  actual chemistry, the -- what was in the water, what was in

18  the formulation, how the molecules were acting.  I mean, you

19  always felt with him like you were -- sometimes when you

20  talked to him, standing in the molecule when he would explain

21  it to you, and you could feel like where the molecule was

22  going, and what it was doing.

23       And he just really, you know, Dick is just a wealth

24  of information.  I mean, you can ask him stuff like that and

25  he's just great.

1    Q    Do you know what projects he was working on before he

2    was fired as part of the 2005 reduction in force?

3    A    He was working on the TSPQ with us.  He was also working

4    on the nano A project making the small material.  He was

5    working on -- he was helping with the PVC.  He also had come

6    to meetings for wood polymer composites to try and help us

7    with some of what we could do to try and make it work better.

8              He was the asset.  He was on a number of those

9    projects.  And he may have been on some others for zeolist

10   also.

11   Q    Returning to you for a moment, have you served on any

12   committees within the zeolite community?

13   A    Yes, I have.

14   Q    What committees?

15   A    Every three years the International Zeolite Association,

16   which has a lot of people, has an international conference

17   spread out over the world, and I've been on the executive

18   committee for two of them.  And I've also edited the

19   proceedings, so we ended up with like three books of about

20   1400 pages each that I edited.  And I also ran two

21   preconference schools, which were for introduction to

22   zeolites, sort of 101, like everything you wanted to know,

23   and people would come, and we would have regular classes by

24   people skilled in the art, and then have discussions

25   afterwards, and I chaired those two schools, two of the

1   schools.

2          I also served on the National Institute of

3   Standards, NIS it's called now, but it used to be the old

4   Bureau of standards, which they make the standards like if

5   you want to know how long an inch is, you buy something from

6   them that's certified as being exactly one inch.  They

7   decided to set up a zeolite one, and there were -- I think it

8   was about 15 of us that were asked from the National Zeolite

9   community, both academic and industrial, to serve on that

10  committee to develop the standards that would be used world

11  wide from the National Bureau of Standards.

12         And I've been a peer reviewer for journals, so --

13  Q    What is a peer reviewer?

14  A    A peer reviewer, if you send an article in to a

15  technical journal, you have to make sure that it's

16  technically correct.  So when they send an article in -- if I

17  sent an article in, they would take a look at the subject and

18  send it to somebody who knew that area to review my paper,

19  and tell me whether it was right or wrong, and, you know, you

20  didn't label this right, or can you explain this a little

21  further, are you sure these results are correct.

22         So it's like -- it's like getting checked, and I was

23  like a peer reviewer for a number of different journals.  I

24  served on an NSF panel, National Science Foundation panel for

25  the Government to -- to award NSF grants to people, and not

1   just within the zeolite community.  I also did other

2   inorganic materials like clays and stuff like that, some

3   other rocks.

4   Q    Have you won any awards?

5   A    Awards?  I -- when I was at Carbide, I got an award for

6   -- well, they didn't advertise them, and I didn't know

7   anything about them, but they gave corporate recognition

8   awards that they didn't talk about, where you had to get

9   nominated by somebody, and that it had to go through the

10  entire chain of command, and then somewhere up at the upper

11  echelons that I had no clue who they were, would give you a

12  recognition award that you weren't allowed to talk about, but

13  it was 20 percent of your salary, and it was for long-term --

14  for doing a good job long term.  And I got it -- I got it I

15  think like in 1988 or '87, just before we became UOP I got a

16  20 percent bonus.

17  Q    How did your employment at PQ come to an end?

18  A    I got fired.

19  Q    When you were fired, did it come as a surprise to you?

20  A    No, not really.

21  Q    Why not?

22  A    We had heard about the sale going on and John Lau had

23  told me in September, before the announcement came out, that

24  he had been told the company was being sold.  And in -- I

25  guess it was about Octoberish, he had me in his office,

1   October, November, and started talking to me about the fact

2   that, you know, there were going to be changes, and that

3   chances are what they would be doing, or what he told me they

4   were going to be doing was getting rid of older,

5   higher-salaried middle managers, you know, a list of what the

6   potential people would be -- to be getting.

7          And I kind of thought, Well, I fit the bill, you

8   know, I'm older, I'm middle manager, I have a salary, so, you

9   know, I kind of figured that I'd be on that list.

10  Q    What did you do after -- I'm sorry -- withdrawn.

11         What was your reaction to being told by John Lau

12  that the people who would be on the list would be, among

13  other things, older people?

14  A    I was really shocked, because, you know, it just didn't

15  -- it wasn't right, and I tend to internalize a lot.  I don't

16  like talking about myself or doing anything like that.  I

17  like -- I internalize all my problems.  And I got really like

18  everything went inside, and I got like a cold core, and I

19  think the only other time I remembered having that happen to

20  me was the first time I got -- told I had cancer.

21         Otherwise, it was like, you know, I just was like --

22  it was like all the blood went into my -- my internals and I

23  just like froze.  I was just so shocked and really upset,

24  because, you know, I had spent a long time getting to where I

25  was, and just to have like maybe an expiration date on my

1   forehead, just -- just -- I got -- I got really pissed.

2   Q    Do you recall saying anything to Dr. Lau during that

3   conversation?

4   A    Not after he said that.  I really... I don't know.  I

5   don't remember.  I just remember him telling me and me

6   getting just, you know, really upset, and -- and really like

7   I just wanted to get the hell out of there.

8   Q    After that meeting, did you tell anybody else about the

9   comments that Dr. Lau had made to you regarding the people

10  who were going to be let off -- let go being older?

11  A    Yeah, yes, I -- I got out of there, and I went to talk

12  to Dick Hinchey.  John had told me not to tell anybody, but I

13  was really upset, and I went down the hall to see if I could

14  find Dick, because Dick and I shared a lot of things.  And,

15  you know, I went to look for him and his light was off in his

16  office, but our building had the offices along a hallway, and

17  then there was a big bank of windows looking out on the

18  parking lot, and I saw Dick walking down from the back door

19  toward the parking lot.  So I banged on the glass, and I went

20  to the door, and he came back.

21       And, you know, I was really upset and I think he knew

22  it.  And we talked and, you know, I told him what had

23  happened, and that, you know, I was upset.  And he said that

24  John had basically said the same thing to him, and that, you

25  know, he had been, you know, thinking that wait and see what

1    would happen, but he had basically been told sort of the same

2    thing.

3    Q    Do you remember the exact words used in that

4    conversation between you and --

5    A    Dick?

6    Q    -- Dick Hinchey?

7              MS. MALLOY:  Objection, hearsay.

8              THE COURT:  I didn't hear the question.

9    BY MR. GOLDSHAW:

10   Q    I asked in the conversation you just relayed between you

11   and Dick Hinchey, do you remember the exact words that were

12   used or not?

13             THE COURT:  Objection sustained.

14   BY MR. GOLDSHAW:

15   Q    Aside from telling Dick Hinchey about this conversation

16   where John Lau told you that older workers were being let go,

17   did you tell anybody else to your recollection?

18   A    Well, I went home and told my husband, you know, what

19   was going on, and that after he poured me a glass of wine, we

20   had a, you know, he tried to calm me down.  But, yeah, I told

21   him all about it.

22   Q    Did you receive any indication why Dr. Lau was telling

23   you in advance that there would be layoffs and that they

24   would -- older workers would be on the cut list?

25   A    At the time, no, I thought he was just warning me.

1   Q    I'm going to ask you to please take a look at a document

2   marked P-177.

3   A    (Witness complies.)

4   Q    Please describe first how many pages are in that

5   exhibit?

6   A    Two.

7   Q    Do you recognize that document?

8   A    Yes.

9   Q    What does it consist of?

10  A    It's two pages from my daytimer with notes that I took.

11  Q    Are you referring to handwritten notations?

12  A    Yes.

13  Q    Do any of the notes on your daytimer, which appear

14  before you now, relate to the conversation you described with

15  John Lau when he warned you about the upcoming layoffs, and

16  that older workers would be on the list?

17  A    The bottom third of the first page and the second page.

18  Q    Would you, please --

19           THE COURT:  And the what?

20           THE WITNESS:  And the second page.

21           THE COURT:  You dropped your voice and backed away

22  from the microphone.

23           THE WITNESS:  I'm sorry.

24  BY MR. GOLDSHAW:

25  Q    I think you can pull the microphone up, if it's more

1   comfortable.

2           (Pause.)

3           Maybe it's not.

4   A    It's a little intimidating, but...

5   Q    Would you please read out loud the portion of your notes

6   that relate to the conversation you had with Dr. Lau that you

7   just described?

8   A    Around October 21 to 22, before John Lau went to K-2004,

9   called in and told that when PQ sold, that the new owners

10  would be looking at middle managers, especially older ones,

11  especially those in the bonus plan.  Told there would be no

12  funding for me in three to six months.  To get -- or to get

13  rid of is in there somewhere.

14          THE COURT:  No, there would be no what?

15          THE WITNESS:  To get rid of me -- hmm?

16          THE COURT:  No what for you?

17          THE WITNESS:  No funding --

18          THE COURT:  Funding.

19          THE WITNESS:  -- for me.  To get rid of me in three

20  to six months.  Told not to say anything to anyone.  However,

21  told Dick Hinchey right after the meeting that I would not be

22  funded.  Told Dick and Eleanor Tickner -- oh, told Mike and

23  Eleanor Tickner also about it.

24          During meeting I asked if John was displeased with

25  me.  He said, No.  I asked if others were being told they

1    were being fired.  Told that Eric S., Dick, and I were on the

2    bubble, but that Eric and Dick were partially funded, and

3    then I had nixed by Colleen and Roz, and been bad mouthed

4    again by them even though positive results.

5              December before final sale, John Lau told me that he

6    was fighting to get an Exploratory Research Group, and that

7    Stan Silverman had agreed in principle.  John said he wanted

8    me and that he told Stan that I had done a lot for the

9    company, and that the problem with the other women was a

10   personality conflict, or could be a personality conflict, or

11   some other problem they had.

12             When sales announced Stan no longer CEO, John L.

13   still fighting for an Exploratory Group.  Told to wait to see

14   what happens, but probably not funded.

15   Q    When did you take these notes?

16   A    I probably took those -- I don't know -- at times.  I

17   think it was probably all at the same time.  And since it was

18   -- goes to when the sale was announced, I would think it went

19   -- was probably around February, but I can't be 100 percent

20   sure.

21   Q    Why did you take those notes?

22   A    Because I internalize, and one of the ways I internalize

23   is writing things down like this to clarify them in my head,

24   and because they just make sense to me if they're written.  I

25   tend to write stuff down, you know.  I don't really have a

1   great explanation.  It's not like I keep a diary.  It's just
2   that I periodically tend to do something like this if I'm
3   particularly stressed.
4   Q   Following the conversation that you've related with Dr.
5   Lau, did you ever speak with him again regarding the same
6   topic?
7   A   Yes, it was like a continuum.  Every once in a while
8   from then on he'd, you know, kind of bring it up and say
9   something, and discuss -- discuss it again, usually that, you
10  know, at that point I think we also knew that the buyer was
11  going to be not another chemical company, but was going to be
12  an investment company.  And, you know, John kind of kept
13  saying, you know, remember what I told you, it's pathetic,
14  you know, just a continuum.  I don't remember the exact
15  words.  But every once in a while he'd start again, and I'd
16  just get... pissed again.
17  Q   When were you officially told that you were being fired?
18  A   Officially?
19  Q   Yes.
20  A   It was the Tuesday after Labor Day -- after Memorial Day
21  -- I think it was May 25th of 2005.
22  Q   Who told you?
23  A   I got called into the conference room and Kevin Doran
24  and John Lau were there.
25  Q   At that meeting, were you provided with any documents?

1   A    I was given a letter which told about the standard

2   severance.  You get X number of weeks for the number of years

3   of service and you're allowed to COBRA, and, you know, you

4   should apply for unemployment.  That was one set.

5            And then the second set of documents were a legal

6   agreement that if you promise not to sue us, we'll give you

7   an extra six weeks or something like that.

8   Q    Please take a look at Exhibit P-52.

9   A    (Witness complies.)

10           MR. GOLDSHAW:  And we'll display this in case

11  anybody's interested in looking at it.

12           (Pause.)

13  BY MR. GOLDSHAW:

14  Q    Do you recognize this document?

15  A    Yes.

16  Q    What is Exhibit P-52?

17  A    P-52 is a list of the titles that were in R and D, and

18  then there's the number of people in the first column that

19  were RIF'd, reduced in force, the ones fired, and then the

20  second column is the ages of the people who were fired, and

21  then the number of people who in that position were not

22  fired, and the ages of the people not fired.

23  Q    Was there any reference to this document in the

24  documents that you were provided in your termination meeting?

25  A    Yes, the -- the one that said if you, you know, we'll

1    give you a couple extra weeks, or six extra weeks if you

2    don't sue us, this was referenced as being there, but it

3    wasn't there.

4    Q    What do you mean by "it wasn't there"?

5    A    It wasn't attached.  It didn't come with those papers

6    and I really, you know, I didn't realize it until after I

7    left that it wasn't there.

8    Q    How did you first come into possession of this document?

9    A    It came in the mail about a week or so later.

10          MR. GOLDSHAW:  Your Honor, I'd move for the

11    admission of Exhibit P-52 into evidence.

12          MS. MALLOY:  No objection.

13          THE COURT:  There being no objection, it will be

14    received.

15          (Plaintiffs' Exhibit No. 52 was admitted.)

16    BY MR. GOLDSHAW:

17    Q    When was your actual last day of work?

18    A    I think it was June 30th.

19    Q    How did you spend your time at work between the time you

20    were notified of your termination on May 25th, 2005, and your

21    actual last day?

22    A    I was told I was to transition my work to other people,

23    so I was transitioning my work.  I was giving them files, I

24    was bringing them up to speed on the projects, I was bringing

25    them up to speed on the customers that we were talking to,

1  what our future plans for were in each of those projects and

2  stuff, so I basically was turning my job over to Ed Myszak

3  and Erin Fisher.

4          THE COURT:  Who told you whom to turn it over to?

5          THE WITNESS:  I believe it was a memo -- I don't

6  know who told me.  I think it may have been John Lau or it

7  may have been a note from Roz Kutchins.

8          THE COURT:  Thank you.

9  BY MR. GOLDSHAW:

10 Q    I'm going to ask you to take a look at Exhibit P-45.

11 A    (Witness complies.)

12         MR. GOLDSHAW:  Which I will also display.

13         (Pause.)

14 BY MR. GOLDSHAW:

15 Q    P-45 is an e-mail from Rosalyn Kutchins directed to a

16 number of recipients, including Plaintiff, Bonnie Marcus, and

17 Plaintiff, Roman Wypart, dated June 7th, 2005.  Subject:

18 Zeolite Projects.

19         Do you recognize this exhibit, P-45?

20 A    Yes, I got it as an e-mail.

21 Q    Would you, please, read the e-mail out loud?

22 A    "It has come to our attention that many of you think

23 that the WPC and other zeolite projects have been cancelled.

24 This is not true.  We view these projects as vital to the

25 success of the zeolite business and plan to forge ahead to

1  commercialization.  We appreciate the help of Bonnie and

2  Roman during this transition period.  We will be over to R

3  and D later this week to discuss the details, Ed and Roz."

4  Q    The e-mailed is signed Ed and Roz.  Do you know who that

5  is referring to?

6  A    Ed Myszak and Roz Kutchins.

7             MR. GOLDSHAW:  Your Honor, at this time I move for

8  the admission of Exhibit P-45 into evidence.

9             MS. MALLOY:  No objection.

10            THE COURT:  It's received.

11            (Plaintiffs' Exhibit No. 45 was admitted.)

12 BY MR. GOLDSHAW:

13 Q    Do you know how old Ed Myszak is in relation to you?

14 A    I think he's about --

15            THE COURT:  Or in relation to anybody else.  How old

16 is he, do you know?

17            THE WITNESS:  He's six years younger than me, and

18 I'm 65, so that would make him, I guess, about 59 now.

19 BY MR. GOLDSHAW:

20 Q    Do you have an understanding of the job that Ed Myszak

21 got following the reduction in force?

22 A    Erin Fisher told me that essentially he was doing my --

23            MS. MALLOY:  Objection, hearsay.

24            THE COURT:  Objection sustained.

25 BY MR. GOLDSHAW:

1  Q    Did any manager at PQ, such as Ed Myszak himself or Roz

2  Kutchins, provide you with any indication of what job Ed

3  Myszak got following the reduction in force?

4          MS. MALLOY:  The same objection until he identifies

5  a manager.

6          MR. GOLDSHAW:  My question is not asking for the

7  contents of the statement yet, it's asking whether there is a

8  manager that can be identified.

9          THE COURT:  Do you know what job he got?

10         THE WITNESS:  Yes.

11         THE COURT:  What job did he get?

12         THE WITNESS:  He basically was doing the job that I

13  had been doing, as far as going out and doing zeolite

14  projects, and heading the wood polymer composite project, and

15  giving talks on it.

16         THE COURT:  Thank you.

17  BY MR. GOLDSHAW:

18  Q    Please turn to a document which either is before you, or

19  I'll get it momentarily, marked as Exhibit P-188.

20  A    (Witness complies.)

21  Q    Do you recognize this document marked P-188?

22  A    Yes.

23  Q    What is it entitled, please?

24  A    "NAI Business Development Review, May 2006."

25  Q    Okay.  How did you come into possession of this

1   document?

2   A    It was part of the documents supplied by PQ for this

3   trial.

4   Q    As a former manager in R and D, do you understand how to

5   read this document?

6   A    Yes.

7   Q    Please describe the document to the jury.

8   A    It's a Power Point presentation being given to explain

9   what business -- what they're working, what the projects are,

10  and it's usually given to management.  So you go in and you

11  tell them what projects you're working on, what the potential

12  for the projects are, and where you stand on the projects, so

13  it's a standard Power Point presentation for management.

14  Q    Does this document in May 2005, a year after the

15  reduction in force --

16  A    Mm-hmm.

17  Q    -- reference any of the projects --

18  A    2006.  You said 2005.

19         THE COURT:  2006.

20         MR. GOLDSHAW:  My apologies.

21  BY MR. GOLDSHAW:

22  Q    Is the document before you, P-118, which is dated May

23  2006, which was a year after you were terminated, right?

24  A    Correct.

25  Q    Does it make reference to any of the projects that you

1   or Plaintiff, Roman Wypart, were working on at the time of

2   your terminations?

3   A    Yes.

4   Q    How so?

5   A    On Page 3 it has NAI Business Development Projects, and

6   it has the names of people who were assigned to the projects.

7   And in the middle is Ed Myszak, and it has him working on the

8   wood polymer composites.  It also -- it also has him working

9   on the silver zeolite biocide and the nano A materials, and

10  those were materials that I was also working on.

11            THE COURT:  What does NAI stand for?

12            THE WITNESS:  North American Industrial Chemicals I

13  think.  It was founded after I was there or changed after I

14  was there.  After I left, rather, sorry.

15  BY MR. GOLDSHAW:

16  Q    Thank you.  You can put that document away now.  I'm

17  done asking you questions about it for the moment.

18  A    (Witness complies.)

19            It's okay.  It's out of the way.

20  Q    Following your notification of termination on May 25th,

21  2005, did you ever go to lunch with Roz Kutchins?

22  A    Yes.

23  Q    Where was the lunch or when was the lunch?

24  A    It was in June some time, but I don't remember the exact

25  date.  I'd have to look it up.

1          THE COURT:  Where?

2          THE WITNESS:  Where?  It was in Plymouth Meeting

3    near the Plymouth Meeting Mall.  It was across the street

4    from the Spaghetti Factory.  I don't remember which

5    restaurant that -- what the name of it was, but it was the

6    one across the street from the Spaghetti Factory, I'm pretty

7    sure.

8    BY MR. GOLDSHAW:

9    Q    Did anyone else attend that lunch meeting with you?

10   A    Ed Myszak and Erin Fisher.

11   Q    Do you recall anything that was said at that meeting?

12   A    Yeah, Roz was very cheerful, and, You know this is a

13   great thing for the company, it's being sold, we're going

14   forward, it's going to be wonderful, and everything's going

15   to be great.

16          And then she looked at me like, Oops, and it was

17   like, You know it's going to be great for everybody, you

18   know, you're not going to be part of it, and, you know, it's

19   not a bad idea, you know, you going forward and retiring or

20   leaving and letting young people like Erin have a career here

21   is really, you know, sort of what was going to go in the

22   future and wasn't it great.

23   Q    In the course of this litigation, have you had an

24   opportunity to review documents produced by the corporation

25   in response to the request by the plaintiffs?

1   A    Yes.

2   Q    I'd like you to please look at an exhibit marked as

3   P-263, which I will now display on the easel.

4            Do you recognize this document?

5   A    Yes.

6   Q    What is it?

7   A    It's a list of the R and D employees at 2005, sorted by

8   age.

9   Q    Oldest at the top or the bottom?

10  A    Oldest at the top.  And the people who were in bold and

11  capitals were part of the reduction in force.

12  Q    When you say "part of the reduction in force" --

13  A    We were fired.

14  Q    At the bottom of the document there is a notation,

15  "Documents Summarized, Exhibit P-263-A."

16  A    Mm-hmm.

17  Q    Have you reviewed, personally reviewed, the documents

18  contained in P-263-A?

19  A    Yes, they were what -- I reviewed the documents to help

20  make up this chart, so I went through all of the documents

21  that are here, that you have labeled at P-263-A, to -- to do

22  this document.

23  Q    Are all of the documents contained in P-263-A, documents

24  produced by PQ Corporation in this litigation?

25  A    There's one that's isn't, which is P-52, because that's

1  labeled "Plaintiffs' 0004," but all the rest, which was that

2  other exhibit, Exhibit A, with the people who were RIF'd in R

3  and D, but all the rest seem to have PQ stamps on them.

4  Q    The one document you identified as not being produced in

5  the course of this litigation, is it this document, P-52,

6  that you stated earlier was provided to you by PQ shortly

7  after your termination?

8  A    Right, and it's not in here.  I don't if they didn't

9  provide it afterwards, but it was the one that's in here in

10 the book.

11 Q    Does this Exhibit, P-263, that's now on the easel,

12 accurately summarize the information contained in the

13 documents in the stated source, P-263-A?

14 A    Yes, it's what I pulled together from all of those

15 documents that they gave us.

16          MR. GOLDSHAW:  At this time I move the admission of

17 P-263.

18          MS. MALLOY:  No objection.

19          THE COURT:  It will be received.

20          (Plaintiffs' Exhibit No. 263 was admitted.)

21 BY MR. GOLDSHAW:

22 Q    Now, please look at Exhibit P-262, which I am now

23 displaying on the easel.

24          (Pause.)

25          Do you recognize this document, P-262?

1    A    Yes, I do.

2    Q    What is it?

3    A    It's one that, again, I helped prepare with Katie Eyer

4    from the things that we received from PQ, and this time it's

5    got people sorted by salary.  And, again, the people that

6    were fired are in -- or termination were in dark capitals.

7    Q    In case anyone needs a remainder, is Katie Eyer one of

8    your attorneys?

9    A    Oh, I'm sorry.  Yes, that's Katie.

10   Q    At the bottom of P-262 it states, "Documents Summarized,

11   Exhibit P-262-A."

12        Have you personally reviewed the documents in

13   P-262-A?

14   A    Yes, they were the ones -- these are the ones that I

15   went through to pull out salaries and ages.  And, again,

16   except for that Exhibit A, which has a plaintiffs thing on

17   it, P-52, all the rest were supplied by PQ.

18   Q    Are all the documents in Exhibit P-262-A, documents that

19   were either provided by PQ to you following your notice of

20   termination or in the course of this lawsuit?

21   A    Yes.

22        MR. GOLDSHAW:  I move the admission of P-262.

23        MS. MALLOY:  No objection.

24        THE COURT:  It will be received.

25        (Plaintiffs' Exhibit No. 262 was admitted.)

1  BY MR. GOLDSHAW:

2  Q    Please take a look at Exhibit P-257, which I will now

3  display on the easel.

4          (Pause.)

5          Do you recognize this document?

6  A    Yes.

7  Q    What is it?

8  A    This is a list of people that were listed as being

9  members of the Corporate Development Group in 2005.  And,

10  again, the old -- it's sorted by age, and the people who were

11  terminated are on the top in bold capitals.

12  Q    The document, P-257, states that it is a summary of

13  documents contained in Exhibit P-257-A.

14          Did you personally review the information contained

15  in P-257-A to verify the accuracy of the information in this

16  exhibit now being displayed, P-257?

17          (Pause.)

18  A    Yes, I did.

19  Q    Are all of the documents contained in P-257-A, PQ

20  documents?

21  A    Yes.

22          MR. GOLDSHAW:  I move for the admission of P-257.

23          MS. MALLOY:  We contend it's accurate, but we don't

24  object on any other ground.

25          THE COURT:  It will be received.

1          (Plaintiffs' Exhibit No. P-257 was admitted.)

2     BY MR. GOLDSHAW:

3     Q    Please take a look at Exhibit P-256, which I will now

4     display on the easel.

5          (Pause.)

6          Do you recognize this document?

7     A    Yes, this is -- this was ones that were uncontested

8     employees only, that we agreed were in the CD Group, and it

9     came with a -- it came in one of the explanations that PQ

10    gave us, that these were the people who were in the CD Group.

11    Q    When you say "came in one of the explanations that PQ

12    gave us," what do you mean?

13    A    They gave two sets of explanations.  I think their --

14    Q    For what?  Explanations for what?

15    A    Who was in the CD Group and what percent of time was in

16    it, and I think they were Interrogatories 2 and 3.

17         And in 2 there was one set of numbers, and in 3

18    there was another set of numbers.  And that was true for like

19    2004 and 2005.  So this is the ones -- this is the ones that

20    came with one of the set of interrogatories that are

21    supported here.

22    Q    When you refer to --

23    A    The third interrogatory, according to the papers.

24    Q    When you refer to interrogatories, are you referring to

25    sworn answers that PQ has provided a response to questions

1   submitted to them in the course of this litigation?

2   A    Until this trial, I didn't know that, but now I do, that

3   it's sworn answers, you know, we ask you a question, you

4   supply the answer, and you swear it's true.

5             THE COURT:  We're going to recess at this point for

6   lunch.  I'll excuse the jury and ask counsel to remain behind

7   for a few minutes.

8             Have a nice lunch, members of the jury, don't eat

9   too much.  I'll see you at 1:45 this afternoon.

10            (The jury exited the courtroom.)

11            THE COURT:  Be seated.  You may step down.

12            THE WITNESS:  Thank you.

13            THE COURT:  I would suggest that you take advantage

14  of this lull to try to get your ducks in a row.  What we've

15  been going through makes absolutely no sense at all to

16  anybody on the jury or me, and if the -- I assumed that the

17  object of a trial was not to bore the jury to death, and

18  confuse them, but to shed some light on the issues in the

19  case.  And, frankly, what we've been going through with these

20  so-called documents, you could have gotten in in a

21  stipulation in 30 seconds.  So see if you can't get yourself

22  straightened out a little better.

23            Recess until 1:45.

24            (A luncheon recess was taken from 12:20 o'clock p.m.

25  until 1:46 o'clock p.m.)

1           (The jury enters the courtroom.)

2           THE COURT:  Good afternoon.

3           MS. EYER:  Good afternoon.

4           THE COURT:  Be seated, please.

5           Proceed to continue to resume.

6           MR. GOLDSHAW:  Your Honor, to expedite matters, I

7    would like to move for the admission of this and several

8    other exhibits that will be used substantively later in the

9    trial.  A stipulation was reached between counsel.

10          They are Exhibit 256, Plaintiffs' Exhibits 256,

11   256-A, 259, 259-A, 258, 258-A, 255, 255-A through G, 264,

12   264-A, and P-262-A and P-257-A.

13          And on that basis, I move for their admission.

14          MR. ENNIS:  And, your Honor, we don't object to the

15   admissibility of the documents.  We just don't agree that

16   they were accurate summaries, but we deal with that during

17   the course of the trial.

18          THE COURT:  Thank you.

19          MR. GOLDSHAW:  Let me 263-A to the list.  As I have

20   been reliably informed, I have missed in my recitation.

21          THE COURT:  You just did add it to the list.

22          MR. GOLDSHAW:  Thank you, your Honor.

23          THE COURT:  I'm assuming these all purport to be

24   summaries of the records from the -- the defendant's records?

25          MR. GOLDSHAW:  Yes, all of the exhibits are both the

1   summaries of defendant's records, which will be used in

2   further in the trial, plus the underlying documents that they

3   summarize.

4              THE COURT:  Okay.

5              (Plaintiffs' Exhibits 256, 256-A, 259, 259-A, 258,

6   258-A, 255, 255-A through G, 264, 264-A, and P-262-A and

7   P-257-A and 263-A were admitted into evidence.)

8   BY MR. GOLDSHAW:

9   Q    At the time of your termination, were you ready to stop

10  working?

11  A    No.

12  Q    Did you have any plans to retire at any point?

13  A    Eventually.  I thought I'd like to go until I was about

14  70.  My husband wanted 65, but I -- I'm an independent

15  spirit.

16             THE COURT:  He is older than you or younger?

17             THE WITNESS:  Older.

18  BY MR. GOLDSHAW:

19  Q    Following your termination from PQ in May of 2005, did

20  you attempt to find a new job?

21  A    Yes.

22  Q    When did you start looking for a new job?

23  A    Before my termination.

24  Q    Meaning before or after your notice of termination?

25  A    Before my termination in May.

1          THE COURT:  Had you been notified it was likely that

2   --

3          THE WITNESS:  It was after the conversation with

4   John Lau.  I basically during the beginning of the following

5   year --

6          THE COURT:  Right.

7          THE WITNESS:  -- toward March or so, started making

8   inquiries in the field.  If anybody knew of anything, keep me

9   in mind.

10  BY MR. GOLDSHAW:

11  Q    How did you go about trying to find a new job?

12  A    I networked.

13  Q    And, more specifically, what did you do in that regard?

14  A    The zeolite community has a large number of people, and

15  a lot of them are students and academics.  The actual

16  community where people are making zeolites, and marketing

17  them, and doing commercialization, there's core companies,

18  and we all pretty much know each other, you know, it's --

19  it's well known, we know each other.  And I made a lot of

20  calls to people, and, you know, had to say, I'm getting

21  fired, I think, and, you know, I'd like to -- if you hear

22  anything, or even if you hear anything like consulting or

23  something that I can do, I'm -- I don't want to stop working.

24          So I contacted people, because I've always gotten my

25  jobs through -- through networking.  You don't find very many

1   zeolite jobs on Monster.com, you know, or one of those

2   things.

3          So you call the people you know, and you say, If you

4   hear of anything, you know, keep me in mind.  And people do

5   the same thing to me.  I still get phone calls from people

6   saying, you know, In your travels if you hear of anything

7   that I fit into, you know, remember my name.

8   Q    After you were fired from PQ, were you successful in

9   finding new work?

10  A    I got a consulting job, like I think it started in July

11  or June or July or August, somewhere in there, with another

12  company called Tricad, and they had me on a retainer, a

13  monthly retainer to do consulting for the company.

14  Q    And how long did that last approximately?

15  A    Actually, I think it lasted a couple of months, and then

16  they decided that -- which was very nice of them -- that I

17  was putting in more time than I was billing for.  So they

18  offered me a half-time job at half my old salary, which

19  turned out to be a full-time job at half my old salary.

20         And I basically did the same sort of thing with

21  commercialization, and, you know, finding customers for them,

22  but on a much more worldwide basis.  I went to China a couple

23  of times for them, and places like that, to drum up

24  customers, and to look at plants, and see what we could do.

25  So I did that and I seem to have bad luck, because the

1   following December, after it was a year, they sold themselves

2   to another company, and we got let go, so it was one year.

3           You know, at that point I was like 62, but I kept

4   calling people up to see, Is there anything out there?  And

5   I've been consulting every since basically.

6   Q    Aside from that consulting position with Tricad, have

7   you held other consulting positions?

8   A    Yes.

9   Q    Roughly how many?

10  A    I have a long-term one with Rive Technology.  I'm still

11  consulting for Tricad on a limited basis and I'm actually

12  doing a project for them right now, and a project for a

13  Chinese company right now.  And I am listed with the Catalyst

14  Group as one of their consultants when they need me.  I did a

15  market study for another company, a big market study, and

16  probably a couple others that I don't -- don't exactly

17  remember, but I'm doing one right now, also.

18  Q    Through these various consulting positions, were you

19  able to replace the income that you had while working as an

20  employee of PQ?

21  A    No.

22  Q    Is it anywhere close?

23  A    No, but I want to work.  And, you know, I like what I

24  do, I like zeolites, and this gives me the opportunity to --

25  to do it, you know, and I'd like something better, but

1  consulting is what I could find right now.

2  Q    Following the termination of your employment at PQ, were

3  you ever able to successfully find an opportunity for a

4  permanent full-time position of employment?

5  A    Well, if you kept the Tricad one as permanent.  It was

6  supposed to be permanent and it really was full time, it was

7  really just at half price.

8  Q    How about --

9  A    Even during that time I was still looking to see if

10 there was something else around, and I was trying to make

11 contacts through some of the people who we were dealing with

12 there.

13 Q    Were you able to ever find a permanent position of

14 employment as opposed to consulting?

15 A    The Tricad one year one was sort of permanent.  They

16 gave me a check every month and they sent me a W-2 at the end

17 of the year.  Is that what you mean?  It wasn't just by the

18 hour or by the day, it was -- I considered employed, but I

19 had no benefits.

20 Q    Let me try it this way.

21 A    Okay.

22 Q    Did you ever turn down an opportunity to work?

23 A    No.

24      THE COURT:  Have you told us about all the jobs you

25 were able to get?

1          THE WITNESS:  I think so.  There's maybe some others

2   --

3          THE COURT:  All right.

4          THE WITNESS:  -- but I do not 100 percent remember

5   them all.

6   BY MR. GOLDSHAW:

7   Q    Have you ever chosen not to pursue a lead that was known

8   to you for a new position?

9   A    There's only one, and it wasn't a lead, it was a company

10  in the area in Allentown, and it was Air Products.  And when

11  I worked for Tricad, they were working with Air Products'

12  direct competitor in the air separation field.  And we had

13  developed a material for them, and I didn't feel it was right

14  to go work for a company where I knew the technology that

15  their main competitor was using, and the technology was

16  better.  And I -- I was uncomfortable with having to deal

17  with that, and that was the only zeolite position that that

18  company would have had.

19  Q    Other than that position at Air Products, was there ever

20  a lead for a position that you did not pursue?

21  A    When Tricad was sold, they were sold to a company that

22  had a branch in Knoxville, Tennessee, and they offered me a

23  plant operator position, which would be a laborer, putting 50

24  pounds sacks into synthesis pots, and I didn't think I could

25  carry a 50 pound sack of anything.  So I didn't -- I didn't

1   even think about that.  That wasn't something I could do.

2   Q    Was there ever a lead for a position that was

3   appropriate to your skill set and ability, aside from Air

4   Products that you did not pursue?

5   A    No.

6   Q    How many companies in the region have positions for

7   people with your skill sets in zeolites?

8   A    My specific skill set in zeolites would be best utilized

9   by someone making zeolites, and marketing zeolites as a

10  product.  And there aren't any others in the area, in the

11  immediate area, and the companies that use them I did talk

12  to, but, again, it's a limited subset and I would say there's

13  probably, maybe 12, 15.  There's probably more that use it.

14  I don't know.  You don't know everybody that's using them.  I

15  called the ones -- I talked to the people I knew and the ones

16  that I knew.

17  Q    Of the 12 or 15 companies using zeolites in the area,

18  how many of them did you contact as part of your effort to

19  secure work?

20  A    I talked to people informally by networking.  I called

21  people up I knew at the companies, and, also, there is a

22  meeting once a year of the Northeast Corridor of the United

23  States has a Zeolite Association, and we meet once a year in

24  December at Penn, and do a technical presentation and

25  everybody gets together, and there's usually about maybe 50,

1   60 people there from the local area, local companies, and I

2   talked to them there.  I talked to a lot of the people there

3   and found out what was going on, what wasn't going on, who

4   was looking, who wasn't looking, and what they were looking

5   for.

6   Q    In the course of your job search efforts in networking,

7   did you hit all of the 12 or 15 companies in the region that

8   work in zeolites?

9   A    No, I didn't talk to Exxon Mobile because I was told

10  that they weren't hiring by somebody that was -- had just

11  left them, as a matter of fact, and been, you know, he had

12  retired, sort of like he was told to retire, and this was

13  close to the time when Exxon and Mobile got together and they

14  merged.  And they were trying to merge the two facilities, so

15  they still shaking out a lot as to what was going on, as to

16  who was doing what.

17         And a lot of the stuff that I would have done, which

18  would have been market development, was done in Beaumont,

19  Texas, and never been to Beaumont, Texas, and I don't want to

20  live in Beaumont, Texas.  But they had a lot of stuff down

21  there, but they didn't have much -- their basic research was

22  up in -- in Princeton, and I think that was just not

23  something, you know, I would do.  I would be going back -- I

24  hadn't been in synthesis enough to be able to do that

25  reasonably.

1          MR. GOLDSHAW:  I'll just take a momentary pause when

2     somebody deals with something.

3          (Pause.)

4          THE COURT:  What's going on?

5          MR. GOLDSHAW:  I think there may be a cell phone

6     issue, your Honor, that somebody is dealing with, and I

7     thought best to wait to ask a question.

8          THE COURT:  A cell phone issue is that all cell

9     phones in the room will be sacrificed to the Government

10    immediately.

11         (Laughter.)

12         Turn them off.  We don't allow cell phones in the

13    courtroom.

14         MR. GOLDSHAW:  I did not mean to call anybody out.

15    I'm just trying to handle this as smoothly as possible, so

16    we'll continue now, please.

17    BY MR. GOLDSHAW:

18    Q    I wanted you to, please, tell the jury whether, in your

19    networking efforts for the zeolite companies you know of, if

20    you left any stone unturned?

21    A    Well, you can't say you haven't left a stone unturned,

22    because you don't know 100 percent of the companies.  I

23    didn't know about Rive Technology until I got -- somebody

24    sent them to me as a customer, as a client.

25    Q    How hard did you try?

1  A    I talked to people I knew constantly.  And, you know,

2  they were sending me e-mails, I was sending them e-mails on

3  my system --

4          THE COURT:  He wants to know --

5          THE WITNESS:  -- you know, we were talking back and

6  forth.

7          THE COURT:  -- how hard you tried.  Did you try

8  hard?

9          THE WITNESS:  I wanted a job.

10          THE COURT:  Just listen to the question --

11          THE WITNESS:  Sorry.

12          THE COURT:  -- and answer the question, please.

13          Yes, she did try hard.  What else have you got?

14          MR. GOLDSHAW:  Mm-hmm.

15  BY MR. GOLDSHAW:

16  Q    Currently are you still looking for work?

17  A    I just accepted a consulting job.  I talk to people.  I

18  don't think --

19          THE COURT:  Excuse me --

20          THE WITNESS:  Yes.

21          THE COURT:  -- that does not answer the question.

22          Would you listen to the question?  He didn't ask you

23  whether you had a consulting job.  He asked you are you still

24  looking for work.

25          THE WITNESS:  Yes.

1   BY MR. GOLDSHAW:

2   Q    All right.  Are you still looking your hardest?

3   A    Yes.

4   Q    Okay.  Aside from the financial harm, which you suffered

5   as a result of your termination from PQ, were you hurt in any

6   other way by your termination?

7   A    Well, when you're well known in the industry, it's a

8   little demeaning to have to call up your buddies and network

9   by saying, I got fired, you know, and most of the reaction

10  was, You're kidding, why would they fire you?

11       But it happened, and, you know, it was -- it was

12  humiliating, you know, on a business standpoint it was fairly

13  humiliating, because, yes, somebody may say something, but

14  it's still happened.  You got fired.  And you can give all

15  the excuses you want, and you can tell them all the excuses

16  you've been told, but the bottom line is you were fired.

17       And, you know, it wasn't exactly a pleasant time at

18  home.  I can be rather snippy when I'm unhappy, and I

19  certainly was very unhappy.  And my kids knew it, and my

20  husband knew it, and everybody was sort of on tender hooks

21  around me for a while.

22       And I certainly knew I was drinking more wine than I

23  should have been drinking, and just the sort of stuff that

24  happens when you just feel like you've been crushed.  Like

25  you've been sort of discarded.  And, you know, it's just not

1   a nice feeling, and all of the stuff that goes with it just

2   sucks, and that's what happened.

3          I felt lousy, I was sleeping too much I think, you

4   know, I was just -- I was very upset and it took a while, but

5   I managed to pull it together a little bit, so I didn't snarl

6   at everybody around me all the time.  My kids could come in

7   the house without getting hollered at.  But, still,

8   internally it still hurts.

9          It still -- it's still something that, you know,

10  even now when I have to talk to somebody, it's like, Jesus,

11  why did they fire you?  And the answer is, I guess I just

12  reached my expiration date.  And, you know, yeah, it bothered

13  me.

14          MR. GOLDSHAW:  I have no further questions at this

15  time.

16          THE COURT:  You may cross-examine.

17          (Pause.)

18                      CROSS-EXAMINATION

19  BY MS MALLOY:

20  Q    You started working for PQ in November of 1994; is that

21  correct?

22  A    Correct.

23  Q    And you were 50 years old when you were hired by PQ?

24  A    Correct.

25  Q    And isn't it correct that John Lau was the person who

1  was responsible for the corporate development program

2  budgets?

3  A    He was given the by the corporate company, and then he

4  did the budgets within R and D.

5  Q    Okay.  And isn't it correct that you had no

6  responsibility for those corporate development program

7  budgets?

8  A    Correct.

9  Q    Okay.  And Dr. Lau reported to Stan Silverman; is that

10  true?

11  A    Yes, before the purchase.

12  Q    And what title was Mr. Silverman?

13  A    CEO and President.

14  Q    Okay.  And do you believe that Mr. Silverman was a

15  supporter of the corporate development program?

16  A    Yes, he set it up.

17  Q    Now, your employment with PQ spanned about ten years,

18  right?

19  A    Correct.

20  Q    And you were always assigned to the Research and

21  Development Unit, correct?

22  A    I was -- when I was in zeolist, zeolist was a larger

23  corporation, you know, was a larger entity, and I was

24  stationed at R and D, but I did a lot of the sales and

25  marketing work.

1    Q    Okay.  But you were assigned to the R and D Unit, even

2    when you were partially assigned to zeolist, correct?

3    A    Yes, and when I was fully assigned to zeolist, I was

4    with the zeolist R and D Unit.

5    Q    And after you moved out of zeolist, you continued to be

6    in the R and D Unit at PQ?

7    A    Correct.

8    Q    And once you came in to the corporate development

9    program your title was Manager, Technical Market Development?

10   A    Yes.

11   Q    Okay.  And you described your duties as an umbrella

12   role, are they your words?

13   A    Yes.

14   Q    Okay.  And your role was managing people?

15   A    And projects, yes.

16   Q    And the projects were the projects that you were working

17   on?

18   A    Yes.

19   Q    Okay.  And you pulled together meetings?

20   A    Yes.

21   Q    And you reported on what people were doing?

22   A    Yes.

23   Q    And you made sure that things moved along?

24   A    Yes.

25   Q    And your duties included who was working on corporate

1    development projects; is that correct?

2    A    It was in conjunction with John Lau, but he would be the

3    person that would assign people to corporate development in

4    conversations with who was needed in the project, with me and

5    other people.

6    Q    Okay.  And isn't it true that in the year 2005, you did

7    no lab work whatsoever?

8    A    Correct.  I may have done a little bit for Erin, but

9    that was it.

10   Q    Okay.  And you're referring to Erin Fisher?

11   A    Yes.

12   Q    Okay.  And in the year 2004, isn't it true that your

13   estimate of the amount of lab work that you did was about 10

14   percent?

15   A    Correct.

16          MS. MALLOY:  If we could look at Plaintiffs' Exhibit

17   177, please?

18          (Pause.)

19   BY MS MALLOY:

20   Q    Do you have it in your binder, Ms. Marcus?

21          THE COURT:  Can the jury --

22          THE WITNESS:  Oh, yes.

23          THE COURT:  -- see the billboard?

24          THE WITNESS:  Pardon me?

25          THE COURT:  Apparently, they can.

1          THE WITNESS:  Yes, I have it.

2     BY MS MALLOY:

3     Q     You have 177?

4     A     Yes.

5     Q     Okay.  You testified on direct examination as to some

6     later, but I wanted to talk about the first part.  Could you

7     read the first two lines there?

8     A     Section of the project not successful was Pam's.  Sales

9     Novian business (ph).

10    Q     Okay.  And these are your notes, correct?

11    A     Correct.

12    Q     And what does that refer to?

13    A     I was told that some of the project for a specific

14    customer named Novian was not successful, because there

15    weren't sales, but I wasn't in charge of sales, Pam Clipstein

16    (ph) was.

17    Q     Okay.  And why did you write that down in your diary?

18    A     Because I was told that I had done -- hadn't gotten the

19    sales, but in reality it wasn't my job to get the sales.

20    Q     And who told you about that?

21    A     John Lau told me about it.

22    Q     Okay.  And could you please read the next line after

23    "August of '03"?

24    A     Appeared to be no problems.  September '03.  Informed by

25    John Lau that Colleen said not doing the PVC job.  Novian not

1   contacted enough.  And then I had, PHK job, question mark.

2           Do you want me to go to the left where it says

3   "Division was Pam's to contact"?

4   Q    Yes, please.

5   A    Okay.  And then, Sales not up enough, et cetera, and it

6   was contact question mark.  And informed that CD would

7   support only RW and EF.  Colleen had PC manage out of zeolite

8   also -- out of ZI also.

9   Q    Okay.  Why don't you stop there for a second, please.

10          So the entry after September '03 says, Informed by

11  John Lau that Colleen said not doing PVC job; is that

12  correct?

13  A    Correct.

14  Q    And that's information that came to you from Dr. Lau?

15  A    Yes.

16  Q    Okay.  And why did you write that down?

17  A    Because as it says a little further down, I was

18  blindsided, that there was no indication that there was any

19  problem, and I had very limited contact with Colleen to begin

20  with, and that when this project was divided up, she had

21  decided that Pam Clipstein would be contacting this company,

22  Novian, would be in charge of sales, and would be in charge

23  of being their direct contact, so it would only go through

24  sales.  So I was being criticized for not doing a job that I

25  wasn't supposed to do.

1   Q    Informed that CD would support only -- RW is Roman

2   Wypart?

3   A    Yes.

4   Q    And EF is Erin Fisher?

5   A    Correct.

6   Q    Who told you that?

7   A    John.

8   Q    Okay.

9   A    And that CD is Colleen Delmonte.

10  Q    Okay.  And could you please the entry after October

11  31st?

12  A    John Lau had to fight to keep me since Colleen telling

13  Mike Imbriani that I am not of any use and nonproductive.

14  And the sidebar said, Blindsided.  No indication before

15  9/03.

16  Q    Okay.  And does that actually communicate what John Lau

17  told you?

18  A    Probably, yes.

19  Q    Okay.  On more than one occasion did John Lau talk to

20  you about how you may have been viewed by people in the

21  business units?

22  A    Not directly, no, and this wasn't related to anything

23  for me.  This was his performance appraisal that he got.  So

24  it was never told to me.  It was told to him to his

25  performance appraisal.

1   Q    And he repeated it to you?

2   A    Yes.

3   Q    Okay.  Do you know how Ms. Delmonte viewed Dr. Lau?

4   A    How she viewed Dr. Lau?

5   Q    Yes.

6   A    Not from anything directly, no.

7   Q    Okay.  And do you know how Ms. Kutchins may have viewed

8   Dr. Lau's performance?

9   A    Except for what I've heard, you know, through testimony

10  in this trial, and through the documents, no.

11  Q    Okay.  But while you were employed, you didn't know one

12  way or the other; is that correct?

13  A    They all seemed to get along as far as I knew.

14  Q    Okay.  If you could please read the entry under the line

15  there that says, "2004"?

16  A    2004, took credit for all sales.  Continued bad-mouthing

17  despite no contact and reporting scheme.  Appears to be due

18  to any disagreement with her viewed as an attack.  Steve

19  Darlack example.  Told by a number of people that she is out

20  to get me.

21           January 2004, good PID and raise.  No problems.  And

22  then it says, PID form.  And --

23  Q    Why did you write down that you got a good review in

24  January of '04?

25  A    Because of the dichotomy of what she was saying or what

1  I've been told she said versus the kind of reviews I was

2  getting from my manager who had to go to these people to get

3  the comments.

4  Q    In August of '03, when you began getting this news, did

5  you feel that your job was on the line?

6  A    No, because John Lau told me to ignore it.

7  Q    In September of '03, did you feel that your job was on

8  the line?

9  A    No, because I don't think he told me until October, and

10  when he told me in October, he basically said, Don't worry

11  about it.

12  Q    Well, your notes say September '03, informed by John

13  Lau, correct?

14  A    Yeah, and I -- but it says "October 31st," which would

15  have been an actual day I wrote it.  When it's something I

16  write, I put the exact date and sometimes I'll go back and do

17  other things in time, and if they don't have an exact date,

18  that means I probably wrote them around the exact date time.

19  Q    Okay.  And you kept notes like this when things annoyed

20  you; is that correct?

21  A    Annoyed, bothered.  I don't think I have a set criteria

22  for deciding to do it, but, yes.

23  Q    Okay.

24           THE COURT:  What --

25  BY MS MALLOY:

1    Q     And the --

2              THE COURT:  -- what's the time lag between -- do you

3    make these notes contemporaneously with events you're

4    recording or?

5              THE WITNESS:  The last event that would have the

6    actual date where I put a date, you know, like the 31st of

7    October.

8              THE COURT:  Is that the date when you wrote the note

9    or?

10             THE WITNESS:  Yeah, and I probably went back and

11   reconstructed the first ones.  And there's two different

12   printings here, so some of it would have been done at an even

13   later time, in a different print to the left and to the top.

14   BY MS MALLOY:

15   Q    Okay.  And these two pages of notes are the only notes

16   like this that you kept at PQ, correct?

17   A    Yeah.

18   Q    Okay.

19             MS. MALLOY:  Could you please enlarge the last part

20   under... correct.

21   BY MS MALLOY:

22   Q    Could you read your handwriting there, Ms. Marcus?

23   A    Yeah.

24   Q    Do you see where we are, the last part underneath?

25   A    I'm going to read it from here --

1    Q    Thank you.

2    A    -- is that okay?

3    Q    Thank you.

4    A    Around October 21 to 22, before J. Lau went to K 2004,

5    called in and told that when PQ's sold, that the new owners

6    would be looking at middle managers, especially older ones,

7    especially those in bonus plan.  Told there would be no

8    funding for me in three to six months, and above it says, To

9    get rid of.

10   Q    Okay.  And do you believe those notes accurately reflect

11   your conversation with Dr. Lau?

12   A    The gist of it, yes.

13   Q    Okay.  And when do you believe you actually recorded

14   those notes?

15   A    Probably later.  I don't have an exact date.

16   Q    Okay.  But you believe the date it was communicated to

17   was around October 21st to 22nd of 2004; is that right?

18   A    Yes, because I know it was just before John went to K

19   2004, and he had told me a bunch of stuff he was going to be

20   doing there, and he called me in and, you know --

21              THE COURT:  Okay.  What is --

22              THE WITNESS:  -- that is when he told me.

23              THE COURT:  -- K 2004?

24              THE WITNESS:  K 2004 is one of the largest plastics

25   symposiums in the world in Europe, and it's -- it's held over

1   there, and he was going.

2          THE COURT:  Just a meeting?

3          THE WITNESS:  Yes, it's a meeting and a conference.

4          THE COURT:  Thank you.

5   BY MS MALLOY:

6   Q    Okay.  I want to ask you some questions about other

7   people.

8          Was Mr. Wypart in the PQ bonus plan?

9   A    No.

10  Q    Was Mr. Senderov in the PQ bonus plan?

11  A    No.

12  Q    Ms. Callaghan?

13  A    No.

14  Q    Mr. Slobogin?

15  A    No.

16  Q    Mr. Tickner -- I'm sorry -- Ms. Tickner?

17  A    No.

18  Q    Mr. Behan?

19  A    No.

20  Q    Mr. Hinchey?

21  A    Yes.

22  Q    Okay.  So of the eight individuals that your counsel

23  believe were terminated as part of the RIF in R and D in May

24  of 2005, is it correct that only two of these eight were in

25  the bonus plan?

1    A    Correct.

2    Q    Okay.  Who is Bill Cormier?

3    A    Bill Cormier is the director of R and D for Zeolist

4    International.

5    Q    Was he in the bonus plan?

6    A    Yes.

7    Q    And he was not terminated; is that correct?

8    A    No one at zeolist was terminated --

9    Q    Okay.

10   A    -- except for Al Behan.

11   Q    Was Mr. Cormier terminated?

12   A    No.

13   Q    Okay.  And who was Neil Miller?

14   A    Neil Miller was the -- I guess he was the manager of the

15   Analytical Group, and he also ran the building, site manager.

16   Q    Was Mr. Miller in the bonus plan?

17   A    Yes.

18   Q    Was Mr. Miller's employment terminated in May of '05?

19   A    No.

20   Q    And who is Bob Patterson?

21   A    Director of Silica Technology.

22   Q    And was Mr. Patterson in the bonus plan?

23   A    Yes.

24   Q    And was Mr. Patterson terminated in the May 2005 RIF?

25   A    No.

1  Q    Okay.  Is it correct that as of October 21st or 22nd of

2  2004, you didn't know who the buyer of the company may be?

3  A    No, all we knew was that it was probably going to be not

4  another company, but an Investment Group.

5  Q    And when Dr. Lau made these comments to you, as you

6  contend, reflected in your notes, did you complain to HR?

7  A    No.

8  Q    Did you go to the Legal Department?

9  A    No.

10 Q    Erin Fisher reported to you at the time your employment

11 ended; is that correct?

12 A    She was in my group.  She reported directly to Roman

13 Wypart.

14 Q    Okay.  And Mr. Wypart reported to you?

15 A    Correct.

16 Q    Okay.  Would you consider her a friend?

17 A    Yes.

18 Q    And did you continue to meet with her socially after the

19 layoffs?

20 A    Yes.

21 Q    And is it correct that Ms. Fisher earned about $53,000

22 in May of '05?

23 A    I'm not sure of her exact salary.  We had just promoted

24 her into the exempt ranks.

25 Q    Okay.  And so prior to that, she was an hourly employee,

1   correct?

2   A    Yes.

3   Q    And is it true that Mr. Wypart earned about $105,000

4   when his employment ended?

5   A    Probably, yes.

6   Q    Okay.  Isn't it true you earned $122,000 when your

7   employment ended?

8   A    Yeah, I believe that's correct.

9   Q    And you had received, in addition to that, a $50,000

10  bonus the year before?

11  A    In 2004, not counting we had to sell the stock back?

12  Q    Not counting the stock.

13  A    Yes.

14  Q    About $50,000 in a bonus, correct?

15  A    Yes.

16  Q    Now, you don't think Ms. Fisher was qualified to do Mr.

17  Wypart's job, do you?

18  A    No.

19  Q    And you don't think Ms. Fisher was qualified to do your

20  job; is that correct?

21  A    No, I don't.

22  Q    And Ms. Fisher had a Bachelor's Degree in Marine

23  Biology; is that right?

24  A    Yes.

25  Q    Okay.  Did you supervise Ms. Fisher and Mr. Wypart?

1    A    Yes.

2    Q    Okay.  And is it true that Mr. Wypart would make the

3    formulations, and give them to Ms. Fisher?

4    A    He would make up the formulation sheets as to what was

5    going to be done, yes, and then she would make them up.

6    Q    Okay.  He would design the experiments?

7    A    Yes.

8    Q    And then she would make the product and put it through

9    the extruder?

10   A    Yes.

11   Q    Okay.  And the lunch where -- with Ms. Kutchins, there

12   were four people at that lunch; is that correct?

13   A    Yes.

14   Q    Myszak, correct?

15   A    Yes.

16   Q    Yourself?

17   A    Yes.

18   Q    Ms. Kutchins and Ms. Fisher, correct?

19   A    Yes.

20   Q    Okay.  And did you complain to HR after that lunch?

21   A    I had already been fired.  What was I going to complain

22   to the same people that had already fired me?

23            THE COURT:  Well, the answer is --

24   BY MS MALLOY:

25   Q    Did you take any notes?

1          THE COURT:  Just answer the question.  No, you did

2    not.

3          THE WITNESS:  The answer is no.

4    BY MS MALLOY:

5    Q    Okay.  Did you take any notes on that meeting?

6    A    No.

7    Q    Okay.  Now, Ed Myszak, would you agree that he has been

8    employed at PQ longer than you?

9    A    Yes.

10   Q    And he was always assigned to a Business Unit; is that

11   correct?

12   A    I really don't actually know what he did.  He was not in

13   our building.  He was over in headquarters and....

14   Q    And when you say your building, you're referring to the

15   R and D Center --

16   A    Right.

17   Q    -- in Conshohocken?

18   A    He was over at -- he was at Valley Forge at the

19   headquarters.  And I know he moved around from

20   group-to-group, but what he actually did, I don't know.

21   Q    Okay.  And how many years younger than you is Mr.

22   Myszak?

23   A    I think he's about six.

24   Q    And how many years younger than Mr. Wypart is Mr.

25   Myszak?

1  A    I don't know.  One, two, three, six?

2  Q    How old was Mr. Wypart at the time of the layoff, do you

3  know that?

4  A    Off the top of my head right now, no, I don't remember.

5  Q    Okay.  Mr. Wypart's younger than you, correct?

6  A    Yes.

7  Q    Okay.  Now, you received severance pay from PQ in the

8  amount of $30,000, right?

9  A    That was, yes, for X number of weeks per year of working

10 there.

11 Q    Right.

12 A    So for ten years, yes.

13 Q    Okay.  And you received that.  You didn't have to sign

14 any agreement to get that, correct?

15 A    No, that's what was in the policy.

16 Q    Okay.  And then you now receive a pension from PQ as

17 well, correct?

18 A    Yes.

19 Q    And that's about $28,000 a year?

20 A    About that, yes.

21 Q    Okay.  Did you begin looking for a job in September of

22 '03, after you learned from Dr. Lau that some people may have

23 had problems with your performance?

24 A    No, I started doing it toward the beginning of 2005.

25 Q    And when you worked for Tricad, you earned about $50,000

1   in that position; is that correct?

2   A    Correct, with no benefits.

3   Q    Okay.  Now, you didn't look for any other jobs when you

4   were at Tricad, did you?

5   A    Yes --

6   Q    And you --

7   A    -- I did.

8   Q    And what did you do to look for jobs while you were at

9   Tricad?

10  A    Well, I networked, and then there were a couple

11  companies that we were working with who were using Tricad to

12  make materials for them, and I spoke to a couple of them

13  about, you know, are there any opportunities?  If you hear of

14  anything, please tell me.

15        And my deal with Tricad was, if I could find

16  something to do the other 50 percent of my time, I could do

17  it.

18  Q    Have you ever written a letter, a formal letter to the

19  Human Resources Department at any of these companies,

20  enclosing your resume and saying you were interested in a job

21  if one became available?

22  A    I did to the Catalyst Group, and got a consulting

23  position with them.

24  Q    You got a position after you sent that letter, correct?

25  A    Well, I answered a newspaper ad.  They had a newspaper

1   ad to see if -- for a job, but it was so low-level, I was way

2   overqualified for it.  So instead they put me in their expert

3   consultants pool.

4   Q    Okay.  And other than the letter to Catalyst, have you

5   written any other letters to the Human Resources Department,

6   or any other official, enclosing your resume, saying you were

7   interested in work?

8   A    No, I've done it strictly by networking verbally.

9   Q    Okay.  Did you ever contact a Johnson Mathee (ph) in

10  Wayne, Pennsylvania, to say you were interested in work?

11  A    I spoke to somebody I know who works there, and he said

12  that they were shipping off their -- all their zeolite work

13  to their English group, because they're basically an English

14  company, and they were just doing some slipcoating at the

15  facility in Pennsylvania, and they were doing the basic

16  research over, and the basic marketing over in England.

17  Q    Did you ever contact BASF in New Jersey regarding

18  possible employment?

19  A    No, I didn't think they would have anything.  Oh, that's

20  the old Englehart.  No, they were already laying people off

21  and I was getting phone calls from people when BASF bought

22  Englehart, that they were going to close that facility, and

23  that there were people looking for jobs, so they were calling

24  Q    Isn't it also true in 1994, when you applied to PQ, that

25  PQ was laying off at the time as well?

1   A    I had no knowledge of them laying anybody off.  They

2   just approached me about a job and zeolist did its own hiring

3   separate from PQ.  Zeolist was a standalone group and they

4   weren't letting people go.

5   Q    Did you ever apply for a job at -- reapplied for a job

6   at Sunoco where you actually had worked before you came to

7   PQ?

8   A    No, they closed their R and D facility completely.  They

9   bought a chemical company up in Pittsburgh and they switched

10  whatever little bit they were doing up there, but that

11  facility is now completely empty.

12  Q    Did you ever apply for a job at Exxon Mobile in New

13  Jersey?

14  A    No, I told you before that -- or told Scott, sorry --

15  before that they were in the process of merging the two

16  companies, and there wasn't much there.  When I spoke to a

17  bunch of people like Art Chester and Jim Bartulli, and a

18  couple of the guys who were up there, they said, you know,

19  the kind of thing you would want to do, the commercial

20  development is going to be down in Beaumont, the thing up in

21  Mobile -- Mobile in Princeton up there was going to be the

22  synthesis.

23          And, as you said, I hadn't been in a lab for a

24  while, so that wasn't going to be something that I was going

25  to look at.  And I got told informally by one of them that,

1   or I don't remember which one it was, but got told informally

2   that they weren't going to take a chance on somebody my age,

3   who would only last maybe for a couple of years.

4   Q    And you think this one person that you talked to

5   informally speaks for the whole company?

6   A    No, but he was a senior manager and --

7   Q    Did you file a discrimination charge against them?

8   A    No, it was informal.  It was, you know, for your own

9   good, you might as well know.  You can send it in, but you'll

10  be overqualified.

11  Q    Now, you testified that you were -- excuse me -- looking

12  for jobs within your skill set.

13        What do you describe your skill set to be?

14  A    Working with customers and developing.  What I've done

15  since 1984 is worked with customers about getting a material

16  made at a reasonable price within a company, and doing

17  commercial development of that product to go into the

18  customer's product.  And my skill set is working with people

19  on the outside getting things done, getting them tested, and

20  getting them out to them.

21  Q    That skill set sounds pretty broad.  Did you ever look

22  into jobs outside the zeolite community?  Getting a project

23  done, managing a project, selecting people?

24  A    I did talk to one person and it looked -- my neighbors

25  with GlaxoSmithKline and I talked to them about it.  And they

1   said, you know, basically if you don't have some sort of

2   pharmaceutical background, they're not really interested.

3   They have no clue what a zeolite was and no use for an

4   inorganic chemist.

5   Q    Did you ever apply for a more entry-level job that might

6   have been below your skill set?

7   A    Well, the one at the Catalyst Group was definitely way

8   below my skill set.  Tricad monetarily was, was below my

9   skill set.

10  Q    Because you would agree, when you came to PQ, you were

11  at a job that you thought was lower level than you should be,

12  and you were quickly promoted, correct?

13  A    I didn't think that they thought that.

14  Q    You took a job that was less than you expected and you

15  were quickly promoted at PQ?

16  A    It was a lateral --

17          MR. GOLDSHAW:  Excuse me, your Honor.  I must

18  object.  There was no --

19          THE COURT:  You don't have to.  Objection overruled.

20          THE WITNESS:  When I left Sunoco, and I got

21  recruited by Zeolist, it was about the same salary.  I just

22  wanted to go back to doing zeolites full time, so I took the

23  position, and I was not unhappy with the position.  They felt

24  that they were underpaying me, and I had been under-hired was

25  what Jerry Dover told me.  So --

1   BY MS MALLOY:

2   Q    How about --

3   A    -- then they promoted me.

4   Q    I'm sorry.  How about when you were at Union Carbide,

5   was your original position there a lower-level position and

6   you were quickly promoted?

7   A    Yes, they didn't have any exempt openings, so I went in

8   as a technician with the understanding I would get an exempt

9   position quickly.

10  Q    Okay.  Let's talk about these eight other people who

11  your attorneys identify as laid off in R and D.

12        Dr. Senderov is older than you, correct?

13  A    Correct.

14  Q    And isn't it true that he's currently working full time?

15  A    Yes.

16  Q    And he's earning more than he did at PQ?

17  A    I don't know that, but it could be true.

18  Q    Okay.  And isn't it true that Ms. Callaghan is working

19  full time?

20        MR. GOLDSHAW:  Objection, relevance.

21        THE COURT:  Objection sustained.

22  BY MS MALLOY:

23  Q    You testified as to documents that you helped your

24  attorneys prepare that were admitted in your examination,

25  correct?

1  A    Correct.

2  Q    Those summary documents?

3  A    Yes.

4  Q    Yes.  Did you spend a lot of time working on them?

5  A    An afternoon maybe or longer.  I don't -- I didn't keep

6  track of time.

7  Q    Okay.

8  A    I think they had been done pretty much by Katie Eyer,

9  and I came in and reviewed the documents to make sure that

10  they were accurate, and that they reflected what she had had

11  on there.

12  Q    Okay.  And you do believe that they're accurate?

13  A    They're accurate from the papers that were given to us

14  that were used to make them up, yes.

15  Q    Okay.  On the biocides project, is it true that your

16  main role on that supervising Ken Berg?

17  A    No, my main role was helping set up what Ken Berg was

18  going to do and discussing with him what the results were,

19  and where we should go next, and what material should go into

20  that project to be tested.

21  Q    Okay.

22  A    But he set it up himself, he did the evaluations, and

23  called us over to look at the -- the mold growing or not

24  growing on a regular basis.

25  Q    Okay.  But is it true that your work on that was

1  substantially done once Berg started putting things in his

2  chamber?

3  A    Well, the reports came through and we were supposed to

4  be using that for a patent application, which would have gone

5  on if I had still been there.  And the other thing was -- it

6  wasn't like we gave him a set, he put them in, and that was

7  the end of it.  There was a continuous process of new

8  materials going on, because especially in the wood polymer

9  composite, we had a graph, a chart of what we wanted to do

10 with different kinds of wood, different kinds of additives,

11 different this, different that, a matrix.  And as each part

12 of those matrix were made up, Ken got those sections to test,

13 so it was continuing.

14 Q    Now, the first time you learned about that you were

15 going to lose your job in May 2005, was a phone call from Dr.

16 Lau, correct?

17 A    Correct.

18 Q    And you were at a conference in Wisconsin?

19 A    Correct.

20 Q    And who else was at that conference with you?

21 A    Erin Fisher, Roman Wypart, and Barry Schwartz.

22 Q    And who is Barry Schwartz?

23 A    Barry Schwartz was a marketing and sales person who

24 worked for Roz Kutchins, who was the interface between the

25 business unit and R and D.

1   Q    So Mr. Schwartz was assigned to the wood polymer

2   composite project from the Business Group?

3   A    Correct.

4   Q    Okay.  And do you remember this phone call from Dr. Lau?

5   A    Yes.

6   Q    Do you remember when it took place?

7   A    The day?

8   Q    Yes.

9   A    It was like I think Wednesday or Thursday of that week.

10  Q    And when you -- you then, after that conference,

11  returned back to Pennsylvania?

12  A    Correct.

13  Q    And isn't it true that Dr. Lau also came to your house

14  to tell you in person about the layoff?

15  A    Yes.

16  Q    And was that on a Friday?

17  A    Yes.

18  Q    Okay.  And how many days before the Friday when he shows

19  up at your house was that phone call with Dr. Lau?

20  A    It was either the day directly before or the day before

21  that, so it was either Wednesday or Thursday.

22  Q    Okay.  But you're sure he came to your house on a

23  Friday; is that correct?

24  A    Yes.

25  Q    Okay.  And that's when you returned?  You had returned

1   --

2   A    I got --

3   Q    -- to Pennsylvania?

4   A    -- really late Thursday night.

5   Q    Okay.  And what did Dr. Lau tell you at your home?

6   A    He just said, you know, what he had thought was going to

7   come to pass, had come to pass, and that I would be laid off

8   on Tuesday, along with Dick, and Eric, and Roman.

9   Q    Did he tell you he tried hard to keep everybody?

10  A    I think John had fought for a long time to keep people,

11  yes.

12  Q    Okay.  Isn't it true that you don't think anybody should

13  have been let go from R and D in May of 2005?

14  A    Well, it was business decisions, and I see no reason

15  that people couldn't get laid off.  I just don't see why you

16  laid off all the old guys.

17  Q    Is there anybody younger who you think should have been

18  laid off instead of you?

19  A    I'm not -- I don't want to make that decision.  I have

20  no idea what it was based on other than age.  I have no idea

21  why you got rid of people.

22  Q    Okay.

23         MS. MALLOY:  I have nothing further, your Honor.

24         THE COURT:  Anything further?

25         MR. GOLDSHAW:  Yes, your Honor.

REDIRECT EXAMINATION

1

2   BY MR. GOLDSHAW:

3   Q    I want you to please direct your attention to the

4   portion of your testimony during questioning by Ms. Malloy,

5   where you said that of the eight people included in the

6   reduction in force, two of them were in the bonus plan.

7   A    Correct.

8   Q    Of the eight people in the reduction in force, how many

9   of them were in the 55 and older age group?

10  A    All of them.

11  Q    Please direct your attention to the testimony you gave

12  in response to questioning from Ms. Malloy concerning --

13          THE COURT:  Just ask a question, for heaven's sake.

14  The question will tell her what to think about.  What's your

15  question?

16  BY MR. GOLDSHAW:

17  Q    In discussing your salary level and Erin Fisher's salary

18  level --

19  A    Correct.

20  Q    -- is Erin Fisher the person who got your job after the

21  RIF?

22  A    No.

23  Q    Who was that?

24  A    Ed Myszak.

25  Q    How did his salary level compare to yours?

1   A    I don't know what his salary level was, except from

2   documents that I've seen since the trial, and he was making

3   afterwards about the same amount that I was, and he was then

4   put into the bonus plan.

5   Q    Has anyone at PQ ever, including in the course of this

6   litigation, ever contended that your salary level had

7   anything to do with your selection for termination?

8   A    Except for the one comment from John Lau that it was

9   going to be, you know, higher salaried, older, middle

10  managers, no, I never heard that it was, you know, salaries.

11  Q    Following your termination, in the explanations that PQ

12  has offered for your termination, have they ever contended

13  that your salary had anything to do with it?

14  A    I'm trying to remember the answers that we got.  There

15  were a number of them, a number of explanations, but I don't

16  think any of them included salary.

17  Q    Excuse me.

18       When you heard from John Lau that Colleen Delmonte

19  may have had some sort of problem with you, who was Colleen

20  Delmonte reporting to at that time?

21  A    I think she was reporting to Mike Imbriani.  I really

22  didn't have enough to do with her to absolutely know who she

23  was reporting to at every time.  She reported to Jack Rams

24  for a while, and then he left, and then she reported to

25  Imbriani, but I'm not sure when that crossover was.  I just

1   didn't have that much to do with her.

2   Q    Was she somewhere in the Chemicals Division that Michael

3   Imbriani headed?

4   A    Yes.

5   Q    Do you understand what my question is?  I'm saying

6   whether she reported directly to Mr. Imbriani or not --

7   A    Yes, she was --

8   Q    -- she was within his area --

9   A    Yes.

10  Q    -- of responsibility?

11  A    Yes.

12  Q    And when you first found out that Colleen Delmonte may

13  have had some sort of problem with you, when was that in time

14  in relation to the time that Mr. Imbriani had ordered age

15  discrimination against Ed Myszak?

16  A    I don't know.  I don't remember the date.  It was -- I

17  know --

18  Q    In 2003.

19  A    Oh, it was the same time.

20           MR. GOLDSHAW:  Nothing further.

21           THE COURT:  Anything further?

22           MS. MALLOY:  No, your Honor.

23           THE COURT:  You may step down.  Thank you.

24           THE WITNESS:  Thank you.

25           THE COURT:  We'll take a ten-minute recess at this

1    point.

2              (The jury exited the courtroom.)

3              (A recess was taken from 2:37 o'clock p.m. until

4    2:50 o'clock p.m.)

5              (The jury entered the courtroom.)

6              THE COURT:  Good afternoon, again.  Be seated,

7    please.

8              Call your next witness, if any.

9              MS. EYER:  At this time the plaintiff calls

10   Plaintiff, Roman Wypart.

11             THE COURT:  You called somebody, but we don't know

12   who.

13             MS. EYER:  Plaintiff, Roman Wypart.

14             THE COURT:  Thank you.

15             MS. EYER:  My apologies, your Honor.

16             (Discussion held off the record.)

17             ROMAN W. WYPART, after having been first duly sworn

18   as a witness, was examined and testified as follows:

19                         DIRECT EXAMINATION

20   BY MS. EYER:

21   Q    Good afternoon, Mr. Wypart.

22   A    Good afternoon.

23   Q    You are a plaintiff in this lawsuit, correct?

24   A    That's correct.

25   Q    And would you please tell the jury where is it that

1  you're originally from?

2  A    I grew up in Poland.  I immigrated to the United States

3  in 1979.  I was not happy living in the communist country and

4  I didn't like how communist treated people.

5            THE COURT:  Would you do it a little closer to the

6  microphone and talk into the end of it, please?

7            THE WITNESS:  Yes.

8            THE COURT:  And you've already answered the

9  question, so wait for another one.

10  BY MS. EYER:

11  Q    Why did you come to this country, Mr. Wypart?

12  A    Because I lived previously in the communist country.  I

13  didn't like how communists treated people and I wanted to

14  live in free country.

15  Q    Are you a U.S. citizen, Mr. Wypart?

16  A    Yes, I am.

17  Q    And when did you become a U.S. citizen?

18  A    In 1985.

19  Q    And when were you hired by PQ?

20  A    I was hired by PQ in November -- on November 9th, 1988.

21  Q    Sir, could you please briefly summarize for the jury

22  what your qualifications were at the time you were hired?

23  A    At the time when I was hired, I had five-and-a-half

24  years experience of performing tech service work.  At that

25  time, before PQ, I work for the General Electric Company,

1   they're GE Specialty Chemical Business, as a technologist.  I

2   was doing technical service for them both in the U.S. and in

3   Europe.  I support their additive business for PVC

4   applications and for other polymers blending.

5   Q    How long had you been in the plastics field at that

6   time?

7   A    Before that job, I been with BF Goodrich for 12 years.

8   It was over -- it was closer to 20 years.

9   Q    Did you have any patents at the time you were hired by

10  PQ?

11  A    Yes, I develop patents working for BF Goodrich, and for

12  General Electric, and I have total five patents.

13  Q    And what about publications, did you have any

14  publications at that time?

15  A    Yes, I had -- I had publications at that time about 12,

16  and one of them was chapter in the book.

17  Q    Did you also hold any advanced degrees at the time you

18  were hired by PQ?

19  A    Yes, I graduated from Technical University in Poland

20  with two degrees.  With Bachelor's Degree in Organic

21  Chemistry and with Master's Degree in Technology of Polymers.

22  Q    During the time that you were at PQ, did you continue to

23  advance in your career?

24  A    Yes, I attended conferences, I presented papers to

25  support zeolite business, and also I took sales course on

1    request of John Lau.

2    Q     Did you ever develop any patents for PQ?

3    A     Yes, I developed two patents, and the third patent was

4    published after my termination.

5    Q     Did you give any technical presentations while you were

6    employed by PQ?

7    A     Yes, I -- I gave for technical presentations, two in --

8    in conferences in United States and one in England.

9    Q     Were you ever promoted during your time at PQ?

10   A     Yes, I was promoted in -- in 2003, to Research Fellow.

11   Q     And was that the position that you held at the time you

12   were terminated?

13   A     That's correct.

14   Q     Did you receive performance evaluations during your time

15   at PQ?

16   A     Yes, I received performance evaluation every year and my

17   performance evaluation was very good or excellent.

18   Q     Do you know whether your performance was a factor in

19   your termination from PQ?

20   A     No, it was not.

21   Q     How many patents did you hold in the spring of 2005?

22   A     In -- in spring of 2005, I had seven patents.

23   Q     And how many publications?

24   A     It would be close to 19 --

25   Q     And how --

1   A    -- total.

2   Q    -- how long had you been employed as a plastics chemist

3   at the time of the 2005 RIF?

4   A    It was -- it would be close to 30 years.

5   Q    Did you hold any positions in any technical or trade

6   associations at the time of the RIF?

7   A    Yes, at that time in May of 2005, I was elected to be a

8   Chairman of Society of Plastics Engineers Vinyl Division.

9   That is the division which has about 900 members.  And I was

10  running that division for two years and I fortunately, during

11  that period, most of the period of time when I was running

12  the division, I was unemployed.

13  Q    And how did that make you feel, to be unemployed and

14  running this professional division?

15  A    Well, it's -- it was -- it didn't make me comfortable.

16  I was really frustrated with my situation, but my friends

17  from the Society of Plastics Engineers couldn't help me.

18  Q    What was your understanding of what you were originally

19  hired to do at PQ?

20  A    I was hired by PQ because of my previous tech service

21  experience, and experience which I had in area of PVC and

22  other polymers.  They were looking for somebody who will

23  organize plastic laboratory for them, develop tests, and

24  develop improved products, zeolite products, for plastics

25  applications, and also develop technical literature.

1   Q    In 2005, what were the primary areas or projects that

2   you were working on?

3   A    In 2005, I was generally performing most of the market

4   development function.  75 percent was roughly my work on

5   development of new customers in area of PVC applications, and

6   about 25 percent of my time was occupied with development,

7   polymer wood composites, the practical development of patent

8   for that application.

9   Q    So that would be PVC and WPC that appear on this chart;

10  is that correct?

11  A    That's correct.

12  Q    In terms of your work in the PVC area, you've described

13  a little bit what the nature of that work was.  Could you

14  please describe it in a little greater detail?

15  A    Yes, zeolite, and in this case 48 zeolite is unique to

16  inorganic compound, which has a large surface area.  Zeolite

17  work generally as good stabilizer for PVC, hydrogen chloride

18  absorber.  And the applications which I developed for

19  zeolite, it was production of -- zeolites were used in

20  following applications:  PVC siding, PVC window frames, PVC

21  pipes, and also PVC fencing and -- and downspouts and other

22  things, mostly built -- I mean, products which are used for

23  building and construction applications.

24  Q    And in 2005, what was the nature of the work you were

25  doing in relation to PVC?

1   A     During that period of time, I focused on -- on major

2   producers of PVC products, which still were not using

3   zeolite.  And at that time, and that year, I worked with, for

4   example, Veka (ph), which was number one producers for PVC

5   window applications.  I -- I worked also with -- with few

6   other customers, Diamond Plastics, who was a producer of

7   large diameter, a pipe for the sewer applications.  And all

8   these applications and few others were looking for low-cost

9   stabilizer for PVC applications.

10          In United States there are two types of stabilizers

11  are used.  It's tin mercaptide stabilizers, which costs

12  currently around $4 per pound, and zeolite was a

13  low-cost offset, because with zeolite, which is roughly we

14  were selling at that time, when I worked for -- for PQ -- at

15  about .50 per pound.  But zeolite could replace roughly 30

16  percent of the tin mercaptide stabilizer this way, because of

17  the low cost.  It was practically priced the same like PVC

18  resins.  It was really economical cost stabilization for PVC

19  applications.

20  Q     And in dealing with these customers with people who had

21  not yet become customers of PQ, what was your role in

22  interfacing with them?

23  A     It -- it was new technology for PVC industry.  That way

24  they needed somebody with experience and -- and -- and with

25  reputation, and I worked with them.  During my presentation

1   at the technical conferences, I showed them how zeolite

2   works, how the formulation needs to be changed, and what are

3   the key applications where zeolite would work.

4   Q    So your role was to bring them in and sell the

5   technology to them; is that correct?

6   A    That's correct, yes.

7   Q    Did you have any experience dealing with customers prior

8   to your time at PQ?

9   A    Yes, at General Electric I was doing tech service all

10  the time at -- on job prior, which was BF Goodrich, 12 years.

11  I interacted with the customers, I mean, on day-to-day basis,

12  but still roughly once per month, you know, I was working on

13  some kind of projects for customer, and occasionally I had

14  contacts with customers and I generating technical literature

15  which other people were presenting to -- to customers.

16  Q    And GE where you were doing tech service entirely --

17  A    Yes.

18  Q    -- how long were you employed there?

19  A    I been employed for five-and-a-half years.

20  Q    And if you could turn briefly to WPC, what was the

21  nature of the work that you were doing on that project in

22  2005?

23  A    In 2005, we were finishing off the development work to

24  -- to file the patent.  Polymer wood composites were three

25  component blends.  One of them was polymer, polymer woods, a

1    wood fibers, and zeolite.  And I needed to find the optimum

2    ratio of these three ingredients to -- to make the composite.

3    That's what was the whole purpose of the patent, to find out

4    what is the optimum range where zeolite would work.

5           The next step would be required to further optimize

6    for its blend select the sweet spots which would work for

7    particular customer and particular application.

8    Q    During the time that you were employed at PQ, did you

9    know how either PVC or WPC was funded, how that work was

10   funded?

11   A    No, because that was changing on yearly basis.

12   Q    Through the course of this litigation, have you come to

13   have any understanding as to how PVC versus WPC was funded in

14   2005?

15   A    Yes, reviewing documents which PQ presented, I found out

16   that -- that PVC stabilizer projects was -- was funded from

17   the zeolite business, and the polymer wood composite projects

18   was funded from CD projects, which was roughly 25 percent of

19   my -- of my time.

20   Q    And PVC was the other 75 percent?

21   A    75 percent, yes.

22   Q    Mr. Wypart, was there anybody reporting to you in the

23   year leading up to the 2005 RIF?

24   A    Yes, Erin Fisher reported to -- to me prior to my

25   termination.

1   Q    And, Ms. Fisher, did she also do work in the plastics

2   area?

3   A    Yes, she was completing projects which I issued for her,

4   and she was running extrusions and testing of profiles, and

5   then she provided -- I mean, the results to me for my review

6   and development of -- of technical report for the customers.

7   Q    And were you and Ms. Fisher the two primary individuals

8   working on zeolites for plastics applications at PQ at that

9   time?

10  A    That's correct.

11  Q    What, if any, was the extent of Ms. Fisher's direct

12  contact with customers prior to the 2005 RIF?

13  A    She didn't have any contacts with -- with customers.  I

14  think we took her once to customer to kind of get her more

15  involved with customers, but her background was in

16  microbiology.  She didn't know that -- anything about

17  plastics when she joined, you know, PQ.  And when she started

18  working on plastics applications, I -- I taught her plastics

19  technology, and additives, the best as I could.

20  Q    Sir, in your opinion, was Ms. Fisher qualified to do the

21  job that you were doing before you were terminated in the

22  2005 RIF?

23  A    No, she was not.  She didn't have that much experience.

24  I think PQ thought that she could perform that job, but in

25  reality she did not have enough experience to deal with

1  customers.

2  Q    Sir, were you qualified to do any of the tasks that Ms.

3  Fisher was performing before the 2005 RIF?

4  A    Yes, yes.

5  Q    I'd like to come back to the WPC project for a moment.

6  As that project progressed towards commercialization, would

7  you have expected your role in the project to change?

8  A    Yes, after completing the patents, I would develop the

9  list, a target list of customers, equipment which they are

10 using, and forecast on formulations which would potentially

11 work for them.

12 Q    Would you have been involved in putting together the

13 technical literature for those customers?

14 A    Yes, that's correct.

15 Q    And would you also have been involved in approaching

16 those customers?

17 A    Yes.

18 Q    Is the type of role that you would have played on WPC

19 similar to what you were already doing on PVC before the time

20 of the 2005 RIF?

21 A    That's correct.  You are right.

22 Q    And would you expect that you would have been the one to

23 do this work, instead of Ms. Fisher, had you remained at the

24 company?

25 A    Yes, that's correct.

1   Q     Did Ms. Fisher have any experience doing that type of

2   work?

3   A     No, she did not.

4   Q     Mr. Wypart, how closely would you say you worked with

5   Ms. Fisher before the 2005 RIF?

6   A     Well, I generally was telling her to which customers I'm

7   visiting, what is the application, what kind of trials will

8   be run, and that way she knew what was -- what was going on

9   at each customer.

10  Q     And so would she be in a position to know what it was

11  that you were --

12          MS. MALLOY:  Your Honor, these are becoming

13  increasing leading.  Objection.

14          MS. EYER:  You haven't heard my question.

15          THE COURT:  It seems to be par for the course

16  throughout the trial.

17          Go ahead.

18  BY MS. EYER:

19  Q     Would she be in a position to know what you were doing

20  during the five months leading up to the 2005 RIF?

21  A     Yes.

22  Q     If Ms. Fisher were to testify that she had --

23          THE COURT:  We can't assume --

24  BY MS. EYER:

25  Q     -- taken over --

1    THE COURT:  -- what she's going to testify.  Just

2  ask him a question.

3  BY MS. EYER:

4  Q    Do you have any reason to believe that Ms. Fisher has

5  taken over some or all of your job duties since the time of

6  the 2005 RIF?

7  A    I think she took over my -- my position, yes.

8  Q    And what is the basis for that belief?

9  A    My basis, there were functions which she was performing

10  after my -- my termination.  On my job previous to this one,

11  which I'm handling, I was -- I had a contact with her as a

12  customer, and she was a person who send me the technical

13  literature, she was the person who arranged sample for me,

14  and she send me literature which I developed.

15  Q    So you interacted with her at a subsequent job as a

16  customer; is that correct, and she performed the position

17  that you had been performing before the RIF?

18  A    That's correct.

19    MS. MALLOY:  Objection, leading.

20    THE COURT:  That's helpful.

21  BY MS. EYER:

22  Q    Sir, did you have any other basis for believing that she

23  was performing tasks that you had performed before the RIF?

24  A    Yes, I mean, she -- she attended conferences, she also

25  ran into problems with some customers, and she sent e-mails

1   to me for help.  That way -- I mean, these facts are

2   definitely proving that she took over my functions.

3   Q    And when you say "customers," those are PQ customers

4   that she --

5   A    Yes.

6   Q    -- e-mailed you in relation to?

7        Mr. Wypart, how old was Ms. Fisher at the time of

8   the 2005 RIF?

9   A    35.

10  Q    And how old were you?

11  A    56.

12  Q    And was Ms. Fisher terminated as part of the 2005 RIF?

13  A    No, she was not.

14  Q    How did you find out that you were going to be

15  terminated?

16  A    Well, as a part of WPC project, I attended polymer wood

17  composites conference in Madison, Wisconsin, and Bonnie --

18  Bonnie Marcus also, and Erin Fisher, and I think Barry

19  Schwartz attended that conference.  And during that

20  conference, Bonnie Marcus told me that I would be terminated,

21  and -- and she said that PQ made decision, and in their

22  termination decision, they terminated all older employees.

23  Q    Were you surprised when Ms. Marcus told you that you

24  were going to be terminated?

25  A    Yes, I was surprised, because I work very hard for that

1   company, I work long hours, I increase their business, and

2   there was no reasons why they should terminate me, because I

3   was getting good performance appraisals every year.

4   Q    Did you also have a formal termination meeting?

5   A    Yes, I had formal termination meeting after I came back

6   from the conference on Monday.  That was, I think, May 25th,

7   if I'm not mistaken.

8   Q    And what were you told at that time?

9   A    I was told that my position is being terminated, and --

10  but they allowed me to stay additional three weeks to

11  transfer projects, and -- and -- and finish some things

12  related to customers.

13  Q    And who was it that you were transferring projects to?

14  A    I was transferring all projects and all files to Erin

15  Fisher.

16  Q    At the time of your termination, were you informed by PQ

17  exactly who else was being let go in R and D?

18  A    No, I was not informed.  I found out, you know, from

19  other employees who was terminated, but I didn't get the list

20  of -- of -- of people who were terminated.

21  Q    At some point in time did you receive official

22  information from PQ about who else it was who was let go in R

23  and D?

24  A    No, I think I received that -- that letter that -- I

25  mean attachment to the letter from my lawyer.

1    Q    And when you refer to the attachment from the letter, is

2    that... this document, as to which there's been some

3    testimony that this represents the individuals who were let

4    go as part of the 2005 RIF?

5    A    Yes, that is correct.

6    Q    What did you think when you first saw this document?

7    A    Well, I reviewed the list of people who were terminated,

8    and ages, and it was obvious to me that it was age

9    discrimination.

10   Q    And what made it obvious to you?

11   A    I mean, I even didn't two minutes, you know, to come up

12   with that conclusion.

13   Q    And why is that?

14   A    Because I was terminated previously, and it was like,

15   for example, with BF Goodrich, it was large group of people

16   who were terminated, but they terminated people different

17   ages, and -- and there was no doubt that it was across the

18   board termination.

19   Q    And in viewing the results in R and D, what was your

20   opinion of those results?

21   A    I mean, the reviewing that -- that list, I -- it was

22   obvious to me that -- that PQ targeted always -- sorry --

23   back me up.

24        It was obvious to me that PQ targeted older, I mean,

25   older employees.  That was their primary target.

1   Q    After you were terminated by PQ, did you look for

2   another job?

3   A    Yes, I did.

4   Q    Why is that?

5   A    Well, I -- I have three children to support, and I had

6   to pay mortgage on -- on my house, and I cannot afford to not

7   work.

8   Q    And the house that you referenced, is that a house that

9   you personally live in?

10  A    No, I -- I don't live in that house.  I'm divorced.  I'm

11  paying for the house in which my ex-wife and my three

12  children are living.

13  Q    How long did it take you to find another permanent job?

14  A    It took me 13 years -- yeah -- 13 months, sorry.

15  Q    And did you --

16           THE COURT:  Excuse me.  How many was that, 30 or 13?

17           THE WITNESS:  13 months, sir.

18           THE COURT:  T-H-I-R-T-E-E-N?

19           THE WITNESS:  That's correct, sir.

20           THE COURT:  Thank you.

21  BY MS. EYER:

22  Q    And did you have any temporary employment during the

23  time, that time that you were unemployed?

24  A    Yes, I -- I was very frustrated that I couldn't find a

25  job.  I during the Christmas 2005, I took seasonal job at

1   Macy's.

2   Q    And what was it that you did there?

3   A    I was working as salesman selling bedding.

4   Q    Did you have any other consulting or temporary

5   employment prior to finding a full-time job?

6   A    I was looking for all options, including consulting.

7   The only consulting temporary job I got from PQ, because they

8   wanted me to complete review of polymer wood composites

9   project and patent.

10  Q    And how did that make you feel to be consulting for PQ

11  in those circumstances?

12  A    It was sad situation, and I was not very happy about it,

13  but I -- I started that work, my name was on the patent, that

14  way I felt that it is my moral responsibility to finish that

15  project -- that project, and -- and complete the patent.

16  Q    And how much was it that you were paid for that

17  consulting work?

18  A    It was $1,000.

19  Q    Could you please summarize for the jury the efforts you

20  made to find full-time employment during the period of time

21  after you were fired from PQ?

22  A    I started immediately looking for a job.  I worked with

23  about 15 job hunters.  My resume was posted on three job

24  search websites.  I had ad in Plastics Engineers Magazine.  I

25  talked with all people who I knew at the Society of Plastics

1  Engineers.  And I was on the website, the Monster website

2  every day checking on any new leads.

3  Q    And were you making e-mail or sending e-mails and making

4  phone contacts during that time?

5  A    Yes, I was sending roughly around 15 e-mails every day

6  and then calling to job hunters.  Of course, I couldn't call

7  them, you know, every -- every day, but I was checking with

8  them on weekly basis, if there is any -- any new opportunity

9  which showed up.

10  Q    And did you ever turn down a job interview?

11  A    No, I did not.

12  Q    Did you ever turn down a position?

13  A    No, I didn't.

14  Q    When did you ultimately find a permanent position?

15  A    I found a permanent position at -- at the Clervex

16  Company (ph), which is part of Suki Suey Corporation (ph).

17  That was in July of 2006.

18  Q    And how much did that position pay?

19  A    It paid $72,000 per year.

20  Q    And how did that compare to what you were being paid at

21  PQ?

22  A    At PQ I've been paid $101,350.

23  Q    Did you continue to look for a job after you obtained

24  the position with Clervex?

25  A    Yes, I did.  I was still very active.  Still talking

1  with job hunters and -- and I ended up finding better job.

2  Unfortunately, the job still doesn't pay that much like --

3  like PQ job paid, but it's closer to -- to that what I was

4  making at PQ Corporation.

5  Q    And what is that position that you now hold?

6  A    I am currently raw materials engineer working for

7  Klockner Pentaplast.  I handle raw materials for plants in

8  North America.  That company has six plants in North America

9  and total of 22 plants all over the world.

10  Q    And what is your position pay?

11  A    It pays 90,000 per year.

12  Q    And was your pay reduced at some point in time?

13  A    Yes, because of current economy down term, they -- they

14  reduced my -- my salary from 95 to 90, and my latest pay

15  check from October still shows the same pay cut.

16  Q    And was this an across-the-board pay cut or did it

17  affect only you?

18  A    That was across-the-board pay cut of all people handling

19  -- actually, having salary positions, and also managers and

20  higher-level managers, they had even significant, more

21  significant pay cut.

22  Q    Do you currently receive any kind of pension or

23  retirement contributions from Klockner Pentaplast?

24  A    No, I don't.

25  Q    And when were those cancelled?

1   A     Those were cancelled on December 1st, 2008.

2   Q     And was that in relation to the same pay cut that

3   affected your salary?

4   A     That's correct.

5   Q     And do you know how long these changes to your

6   compensation are expected to last?

7   A     I don't know.

8   Q     Where do you live currently?

9   A     I live in Gordonsville, Virginia.  I moved there because

10  of the job.

11  Q     And are your expenses lower in Virginia than they were

12  when you were living in the Philadelphia area and working for

13  PQ?

14  A     Not -- not significantly.  Most of my income goes to --

15  to my family in -- in Florida.  The only difference is in the

16  apartment in King of Prussia I was paying $700 per month.  I

17  have a small apartment in Gordonsville.  I pay $575 per

18  month.  That's the only difference.  Food costs the same in

19  Virginia like in Pennsylvania.

20  Q     And your cost for your family, supporting your family

21  are the same?

22  A     The same.

23  Q     How long do you intend to keep working?

24  A     Well, taking into consideration that I was unemployed

25  for -- for over a year, and also the fact that my children

1  are relatively young, and I need to get them through college,

2  I could be working to age 75.

3  Q    And why until then?  Oh, for college.

4         How old are you children?

5  A    My oldest son is 20, my middle son is 16, and my

6  daughter is 14.

7  Q    Leaving aside any pay or benefits you have lost, have

8  you suffered any other financial harm as a result of the 2005

9  reduction in force?

10 A    Yes.

11 Q    I unfortunately, in my situation, I had to discontinue

12 living in King of Prussia.  I moved to -- to Florida to

13 temporarily live with my children and my ex-wife.  And I

14 continued to -- to search for -- for another job.

15 Q    And how did that make you feel, to be living with your

16 ex-wife?

17 A    It's kind of hard to describe, you know, it's very

18 unpleasant situation.  I never expected that something like

19 that would happen to me, especially that I always work very

20 hard, and -- and -- and I always delivered good performance

21 from all my employers.

22 Q    Did you incur any costs in having to make that move?

23 A    Yes, I had to -- to pay about $2,500 to move to Florida.

24 Q    And did you incur any costs in relation to leaving your

25 apartment here in Philadelphia?

1  A    Yes, I had to -- to break up the contract and pay $1400.

2  Q    Were there any other financial harms, aside from your

3  lost pay and benefits, that you suffered as a result of the

4  2005 reduction in force?

5  A    Well, my -- my whole family was -- was affected.  My

6  children were affected.

7  Q    Sir, I'm sorry, at this point I'm just asking you about

8  the financial -- the specific financial losses that you had.

9  For example, did you hire an out-placement agency?

10 A    Yes, at certain point PQ discontinued their service, and

11 I had to hire a placement agency, and -- or so I had to pay

12 about $1,000 for cost associated with my function of the

13 Society of Plastics Engineers.

14 Q    And when you mentioned the outplacement agency, how much

15 was it that you had to pay the outplacement agency?

16 A    $1500.

17 Q    Did you incur any losses in relation to your retirement

18 funds?

19 A    Yes, I -- I lost about $100,000, because I had to -- to

20 -- to withdraw money from my 401K Plan.  I paid extra $16,000

21 taxes to the U.S. Government.

22 Q    And why was it that you were withdrawing that money?

23 A    To support myself and to support my family.

24      MS. EYER:  Your Honor, the parties have stipulated

25 to the admission of P-252, P-254, and P-254-A, and I hereby

1  move their admission.

2          THE COURT:  They will be received.

3          (Plaintiffs' Exhibit Nos. 252, 254, and 254-A were

4  admitted.)

5  BY MS. EYER:

6  Q    Mr. Wypart, I want to come back to talking --

7          THE COURT:  We learned his name a long, long time

8  ago.  You're repeating it with every question.  I wish you

9  would stop it.

10         MS. EYER:  Thank you, your Honor.

11  BY MS. EYER:

12  Q    I want to move to talking for a moment about how all

13  this affected you personally, not in an economic sense.  How

14  did it feel to be terminated by PQ?

15  A    Well, it -- it was sad and also especially that I

16  couldn't find job for such a long time.  It was depressing,

17  it affected my family, my children worried about the

18  situation, they were afraid that we lose house in Florida.

19  My daughter sometime crying for no reason.  My children were

20  not performing well at school.

21         It's -- it looks like simple to fire -- to fire

22  somebody, but it affects a lot of people, and -- and does a

23  lot of damage.

24  Q    Sir, how did that make you feel as a parent to be unable

25  to provide for your children?

1   A     Terrible.

2              MS. EYER:  I have nothing further.

3              THE COURT:  Does anybody else have any questions?

4                        CROSS-EXAMINATION

5   BY MS. MALLOY:

6   Q     In 2005, is it your estimate that you spent about 20

7   percent of your time on the wood polymer composite project?

8   A     It was 25.

9   Q     25 percent.

10  A     25 percent, yes.

11  Q     And was Barry Schwartz also working on that project?

12  A     He got involved very shortly before my termination.  It

13  was maybe one month before my termination.  It looks like he

14  was assigned maybe to work on that project, and he wanted to

15  learn.  In reality, I don't know who was handling Barry.  If

16  that was Barry Schwartz or if that was handling Ed Myszak.

17  Q     Do you know one way or the other whether Barry Schwartz

18  was a Business Unit manager assigned to the wood polymer

19  composite project?

20  A     I think at the time when we went to the conference, I

21  think he was, because he was interested in it, and he wanted

22  to learn, you know, about the technology, what is going on.

23  Q     Do you know whether Barry Schwartz was presenting to the

24  Corporate Development program reviews on the wood polymer

25  composite?

1   A    I don't know.

2   Q    Is it --

3   A    I --

4   Q    -- true you did not go to Corporate Development program

5   reviews?

6   A    That's correct.

7   Q    Okay.  At the time your employment with PQ ended, what

8   percentage of the patent had already been completed on wood

9   polymer composites?

10  A    I -- I think a majority of that, if I had to guess, was

11  probably something like 80, 90 percent.

12  Q    Did you believe at the time of your termination that the

13  wood polymer composite project was ready to be sold to --

14  wood polymer composite product was ready to be sold to a

15  customer?

16  A    No, because, I mean, the patent only covered the basics,

17  I mean, what are the ranges, acceptable ranges that the --

18  the technology work for.  Each customer -- each customer has

19  different equipment, different occupations, and -- and

20  formulations need to be developed for particular customer.

21  Q    Your name does appear on that wood polymer composite

22  patent, correct?

23  A    That's correct.

24  Q    Okay.  How many years did you work on the PVC product?

25  A    On PVC product?  Are you talking about zeolite for PVC

1    applications?

2    Q    PVC heat stabilizer?

3    A    Since I joined the company.

4    Q    That would be about five years then?

5    A    Yes, yes.

6    Q    Now, isn't it true that you were laid off from two other

7    jobs before you joined PQ?

8              MS. EYER:  Objection, your Honor, relevance.

9              THE WITNESS:  Well, it's --

10             THE COURT:  Overruled.

11             THE WITNESS:  -- it was from one company, yes, I was

12   laid off after 12 years of employment.  From GE, GE was

13   downsizing, and they asked me if I would be interested to

14   accept the offer, and I accepted it.  GE, I wanted to leave

15   GE, because my family told me that I have to choose between

16   GE or -- or family, because I'd been working too long hours.

17   BY MS. MALLOY:

18   Q    You were not employed, correct, at the time you were

19   hired by PQ?

20   A    That's correct.

21   Q    And you were 50 years when you were hired by PQ?

22   A    About, yes.

23   Q    Okay.  And prior to that, you had worked for General

24   Electric in West Virginia?

25   A    That's correct.

1   Q    And General Electric made you an offer to leave, because

2   they were cutting back; is that correct?

3   A    Yes, at that time they were -- the issue with -- with

4   that business was that the previous chairman felt that

5   specialty chemicals is too small business to -- to continue,

6   and they wanted to grow the business by acquisition.  They

7   couldn't.  That way the next step for Jack Welch was -- was

8   to download the business, and I knew that that's what is

9   coming.  That way I -- I decided to -- to leave on my own,

10  and because before they were planning to sell the business,

11  they actually decided to trim, and they offered package to

12  myself and to my marketing manager.

13  Q    Okay.

14  A    And because I wanted to leave anyway, I took it.

15  Q    Okay.  And would you agree that GE made you an offer to

16  leave, because they were cutting back?

17  A    Yes.

18  Q    Okay.  And that was not because of your performance; is

19  that right?

20  A    That's correct.

21  Q    Okay.  And before GE, you worked for BF Goodrich,

22  correct?

23  A    That's correct.

24  Q    And your employment with BF Goodrich left -- ended

25  because they had a layoff, correct?

1  A    They had layoff.  I forgot how many.  But it was

2  something like 25, 30 percent of layoff.  Like 15 people were

3  -- were affected by that.

4  Q    And you believe that that layoff was not due to your

5  performance, right?

6  A    That's correct, yes.

7  Q    Okay.  And would you agree that you were selected for

8  layoff from BF Goodrich, because the project you were working

9  on was no longer a high priority?

10  A    That's correct.

11  Q    Okay.  Now, you had move several times geographically

12  even before coming to PQ, right?

13  A    That's correct.

14  Q    And BF Goodrich was in Ohio, correct?

15  A    Yes, it was -- the Technical Center was in Avon Lake,

16  Ohio.

17  Q    Okay.  And then you moved to West Virginia to work for

18  General Electric?

19  A    Yes, Parkersburg, West Virginia.

20  Q    And then you moved to Pennsylvania to work --

21  A    Yes.

22  Q    -- for PQ, correct?

23  A    That's correct.

24  Q    Okay.  And you testified you -- you contacted -- was it

25  15 or 18 recruiters when you were looking for a job after PQ?

1    A    It's about 15, about 15 recruiters.

2    Q    Okay.  And the job at Klockner, did you find that job

3    through a recruiter?

4    A    No.

5    Q    How did you find the Klockner job?

6    A    I -- I found out by networking, and it was tech service

7    manager who was serving my previous employer before Klockner,

8    and he told me about the job, and I applied.

9    Q    Okay.  And when you started at Klockner, you made

10   $95,000 a year, correct?

11   A    That's correct.

12   Q    Okay.  And that was bumped down $5,000 because of the

13   economy; is that your understanding?

14   A    Yes, yes.

15   Q    Okay.  And since you've been employed at Klockner, have

16   you looked for any other jobs?

17   A    I still keep contact with -- with job hunters.  Yes, I

18   looked, but I couldn't find anything better.

19   Q    Have you interviewed for any jobs since you started

20   working at Klockner?

21   A    No.

22   Q    Okay.  And the job at Clerdex, did you find that through

23   a recruiter?

24   A    Clerdex, yes, yes.

25   Q    Okay.  And isn't it true that while you were still

1    employed by PQ, you were working at a department store part

2    time?

3    A    Yes, at certain point I went through -- through the

4    divorce, and I needed some extra money, and I worked on the

5    weekends, yes, at Strawbridge's.

6    Q    Okay.  And isn't it also true that while you were still

7    employed by PQ, you made withdrawals from your 401K plan?

8    A    I don't really remember that, but maybe, it's possible.

9    I don't keep track of all my withdrawals.

10   Q    Okay.  And so you became divorced in 2003; is that

11   right?

12   A    That's correct.

13   Q    Okay.  And when you were working for PQ, would you visit

14   with your family in Florida?

15   A    Yes, I visit them on regular basis, yes.

16   Q    Okay.  And did you stay in the house with your children

17   and your ex-wife?

18   A    Yes.

19   Q    Now, your title at PQ was Engineering Research Fellow;

20   is that correct?

21   A    Yes, and that -- yes, Engineering Research Fellow 1, I

22   think.

23   Q    Okay.  And that was a promotion for you, correct?

24   A    Yes.

25   Q    And that --

1   A    I started as a principal chemist and was promoted.

2   Q    Okay.  And would you agree that there were two others

3   who also held the title of engineering research fellow?

4   A    Two or three, I -- I didn't pay that much attention to

5   -- to other peoples, you know, titles.

6   Q    Okay.  How about an individual by the name of Ken Berg,

7   was he also a research fellow?

8   A    My understanding that he was research fellow.

9   Q    Okay.  And would you agree that Mr. Berg was working in

10  an area totally different than you?

11  A    Yes.

12  Q    All right.  And Mr. Fuse, was he an engineering research

13  fellow?

14  A    Yes, he was.  He worked in the pilot plant.

15  Q    Okay.  And would you agree that that was a totally

16  different area than you?

17  A    Yes.

18  Q    Okay.  Isn't it true, sir, that you don't think that

19  younger employees should have been laid off instead of you?

20  A    I -- I'm not saying that, ma'am.  I'm just saying that

21  layoffs should be done according to the law.

22  Q    Do you --

23  A    Not to discriminate older employees.

24  Q    Do you believe that Mr. Fuse should have been laid off

25  instead of you?

1   A     No.

2   Q     Do you believe that Mr. Berg should have been laid off

3   instead of you?

4   A     It's not my decision to decide who supposed to be laid

5   off.  I was not running PQ business, ma'am.  Why are you

6   asking me that question?

7           MS. MALLOY:  I have no further questions.

8           THE COURT:  Anything further?

9           MS. EYER:  I have just a couple of further

10  questions.

11                    REDIRECT EXAMINATION

12  BY MS. EYER:

13  Q     Sir, in relation to your testimony regarding your

14  departure from BF Goodrich and GE, did you sue either of

15  those prior employers?

16  A     These prior em --

17  Q     GE or BF Goodrich when you were laid off or offered a

18  package?

19  A     Well, I -- I have contact with some people, but in case

20  of -- of BF Goodrich, the Technical Research Center still

21  exists, and I know, still know some people who work there.

22  Q     Sir, my question for you was --

23          THE COURT:  Did you sue them, she wants to know?

24          THE WITNESS:  Oh, okay.  I mis -- I misunderstood

25  you, ma'am.  No, I didn't sue anybody.

1   BY MS. EYER:

2   Q    And why not?

3   A    Because I didn't feel that I was discriminated.

4   Q    And what was the difference between that circumstance

5   and the circumstances here?

6   A    Well, it's -- in case of other employers, in this case I

7   probably -- a good example is BF Goodrich.  They terminated

8   people across the board.  I mean, there were younger people,

9   older people, there were women, men that way, and they done

10  it according to -- to the law based on what I knew.

11  Q    Sir, you testified, I believe, that you were hired at

12  age 50; is that correct?

13  A    Yes.

14          THE COURT:  Was that word hired or fired?

15          MS. EYER:  Hired.

16          THE WITNESS:  Hired.  Sorry.

17          THE COURT:  Please spell is for the record.

18          MS. EYER:  Hired?

19          THE COURT:  Because --

20          MS. EYER:  H-I-R-E-D at age 50.

21          THE COURT:  H-I-R-E-D.  Thank you.

22          MS. EYER:  For the record, I'm displaying P-32.

23  BY MS. EYER:

24  Q    And I will ask you, sir, as far as you know, did Ms.

25  Delmonte have any role in your hiring?

1   A    She did not.

2   Q    Did Ms. Kutchins have any role in your hiring?

3   A    She did not have any role.

4   Q    What about Michael Imbriani?

5   A    I didn't even talk to Mr. Imbriani that way.  He had

6   nothing to do with my performance evaluation.

7   Q    Did he have anything to do with your hiring, sir?

8   A    No, he did not.

9        MS. EYER:  I have nothing further.

10        THE COURT:  Is everybody happy?

11        MS. MALLOY:  I have nothing further.

12        THE COURT:  You may step down.  Thank you, sir.

13        MS. EYER:  You can step down.

14        THE WITNESS:  Thank you.

15        (Witness excused.)

16        THE COURT:  Anything further?

17        MS. EYER:  Yes, your Honor, at this time the

18   plaintiffs are going to read an excerpt of the sworn

19   deposition testimony of Erin Fisher.  This is testimony from

20   Ms. Fisher given at her deposition November 20th, 2008, and

21   the parties have stipulated that Ms. Fisher is unavailable to

22   testify at trial, and that is the reason you are being read

23   excerpts of her deposition in lieu of live testimony.

24                     DIRECT EXAMINATION

25        (Excerpts of Erin Fisher's deposition were read as

 1    follows:)

 2              MS. EYER:  Beginning on Page 12, the question was:

 3              "Do you recall there was a reduction in force in

 4    2005?

 5              "Answer:  Yes, sir.  Yes.

 6              "Question:  At the time just before the reduction in

 7    force in 2005, you were reporting to Roman Wypart, right?

 8              "Answer:  Yes.

 9              "Question:  And at that time he was reporting to?

10              "Answer:  Reporting to Bonnie Marcus.

11              "Question:  Okay.  Right after the reduction in

12    force of 2005, you began reporting to Ed Myszak, right?"

13              THE COURT:  Excuse me.  But are you aware you're

14    nowhere near any microphone.  The record won't --

15              MS. EYER:  I apologize, your Honor.  I will move the

16    lectern.  Thank you.

17              THE COURT:  Read it more slowly so people can get at

18    least a general idea of what you're reading.

19              (Pause.)

20              MS. EYER:  So I will go back to, the question being:

21              "Question:  Okay.  Right after the reduction in

22    force of 2005, you began reporting to Ed Myszak, right?"

23              "Answer:  Yes, sir.

24              "Question:  Right after the reduction in force in

25    2005, did you take over any job duties that Roman Wypart had

1   been performing?

2          "Answer:  Yes.

3          "Question:  What job duties?

4          "Answer:  Basically, I was now taking care of all

5   the marketing side where people would call in and I would

6   talk to them and give them technical expertise.  Roman would

7   usually handle that.  And I was also going out and seeing

8   customers, which Roman was definitely specializing in.

9          "Question:  After the 2005 reduction in force, can

10  you estimate how much of your time was spent doing things

11  that Roman Wypart had been doing before the reduction in

12  force?

13         "Answer:  Probably about 80 to 85 percent.

14         "Question:  Did the work that you took over for

15  Roman Wypart include as well things like solving problems as

16  to formulations with customers?

17         "Answer:  Yes.

18         "Question:  Did you ever visit customers with Mr.

19  Wypart?

20         "Answer:  Yes.

21         "Question:  Can you recall how many times?

22         "Answer:  Only a couple.

23         "Question:  Did you visit customers after Mr.

24  Wypart's employment ended?

25         "Answer:  Yes.

1      "Question:  How many?

2      "Answer:  A lot.  With the wood project we did a lot

3  of customer visits and presentations.

4      "Question:  Could you estimate how many times a

5  month you actually visited a customer site?

6      "Answer:  At least, probably, two to three times a

7  month.

8      "Question:  And did anybody go with you?

9      "Answer:  Ed on occasions and a lot of times we had

10  part of the sales force would go with me or -- I guess that

11  was about it.  Yeah, the technical managers, business

12  managers, and that was basically it, talk, you know, about

13  pricing and stuff that I wasn't able to talk about.

14      "Question:  After the 2005 reduction in force, did

15  Ed Myszak take over any job duties that Bonnie Marcus had

16  been performing before she was let go?

17      "Answer:  Yeah, she was doing marketing duties and

18  he was now in charge of that.

19      "Question:  When you say `marketing duties,' what

20  are you talking about?

21      "Answer:  Marketing, basically calling customers,

22  trying to get us basically in the door, so we could give

23  presentations to them as to what our product was, and then

24  try to get sales.

25      "Question:  Did the job duties that Ed Myszak took

1   over from Bonnie Marcus include project management?

2         "Answer:  Yes.

3         "How about going to conferences?

4         "Answer:  Yes.

5         "Question:  Giving presentations?

6         "Answer:  Yes, it did.

7         "Question:  Plaintiffs' Exhibit 131 is a document

8   that is one page, and is an e-mail from you to Ed Myszak on

9   June 6th, 2006.

10         "Answer:  Okay.

11         "Question:  Now, I want to ask you about the last

12   line of the e-mail, which states, `Also introduce yourself as

13   the new PQ WPC head honcho so they know it's not Bonnie.'

14         "Answer:  Yes, sir.

15         "Question:  What did you mean by that?

16         "Answer:  Basically, he was taking over her duties,

17   and he would be the contact person instead of Bonnie, or the

18   question person.

19         "Question:  Okay.  Do you recall ever having a

20   conversation with Ed Myszak in which he told you that he had

21   a memo or something saying he was once going to be let go

22   based on his age?

23         "Answer:  Yes.

24         "Question:  When did that conversation take place?

25         "Answer:  It took place several times.

1          "Question:  Can you tell when?

2          "Answer:  I don't know exactly when.

3          "Question:  Can you tell me what Ed Myszak said to

4     you in those conversations?"

5          MR. GOLDSHAW:  Objection, hearsay.

6          THE COURT:  Overruled.

7          MS. EYER:  "Answer:  He said that he was worried

8     about age discrimination, because he had been up against PQ

9     before.

10          "Question:  What else, if anything, did he say?

11          "Answer:  I don't know.  He just felt as though he

12     was not going to be let go, because -- that -- because he was

13     holding something over their heads.  I don't know what it

14     was.

15          "Question:  Did you understand whether the something

16     that he was holding over their heads had to do with age

17     discrimination?

18          "Answer:  Yes."

19          MS. EYER:  And, your Honor, at this time we'd like

20     to move the admission of P-131, which is the e-mail

21     referenced in Ms. Fisher's testimony.

22          MR. ENNIS:  No objection.

23          THE COURT:  Received.

24          (Plaintiffs' Exhibit No. 131 was admitted.)

25          MR. ENNIS:  And I'm going to read from the same

1   deposition, but just different sections of it.

2                        CROSS-EXAMINATION

3          MR. ENNIS:  By Attorney Goldshaw, Page 8, Lines 12

4   to 15.

5          "Is there any reason today that you're unable to

6   give truthful, complete, and accurate answers to my

7   questions?

8          "Answer:  No, no."

9          Page 10:

10          "Would you please provide me with just a basic

11   overview of your education?

12          "Answer:  My education?

13          "Question:  Yeah.

14          "Answer:  I have a Bachelor of Science Degree from

15   the University of Tampa and that's in Biology Marine Science,

16   and I went to Northampton Community College when I was

17   working at PQ, and I was specializing in Plastics Technology.

18          "Question:  Okay.  And did you take graduate courses

19   for that or?

20          "Answer:  I have some graduate courses, but it's in

21   business.

22          "Question:  Okay.  Did you get a degree in it?

23          "Answer:  No, I didn't finish that.

24          "Question:  When did you get your Bachelor of

25   Science Degree?

1         "Answer:  I finished University of Tampa in '91."

2         Page 11.

3         "Question:  Throughout the time that you were

4 employed with PQ, you were working as a technician?

5         "Answer:  Yes.

6         "Did you hold various titles at PQ?

7         "Answer:  At various levels of technician, yes.

8         "Question:  Okay.  And as a technician, you did

9 analytical work?

10         "Answer:  Yes, absolutely.

11         "Question:  Meaning you worked with chemicals in the

12 lab?

13         "Answer:  Initially, most of the work I did towards

14 the end of my employment there was physical testing.

15         "What do you mean by that?

16         "I made plastics and then I would break them, and

17 basically is what it is."

18         Page 13.

19         "After the 2005 reduction of force, Ed Myszak take

20 over job duties that Bonnie Marcus had been performing before

21 she was let go?

22         "Answer:  Yes, she was doing marketing duties, and

23 he was now in charge of that.

24         "Question:  When you say `marketing duties,' what

25 are you talking about?

1      "Answer:  Marketing, basically calling customers,

2  trying to get us basically in the door, so we could give

3  presentations to them as to what our product was."

4      THE COURT:  I would suggest that you might want to

5  slow down.  You're reading very, very fast.

6      MR. ENNIS:  Thank you, your Honor.

7      "So we could give presentations to them as to what

8  our product was, and then try to get sales.

9      "Did the job duties that Ed Myszak took over from

10  Bonnie Marcus include project management?

11      "Yes.

12      "Question:  How about going to conferences?

13      "Answer:  Yes.

14      "Question:  Giving presentations?

15      "Yes, it did.

16      "Question:  Are you able to estimate how much of Ed

17  Myszak's job after reduction of force consisted of things

18  that Bonnie Marcus had been doing prior or just prior to the?

19      "I would say about 50 percent of his job.  He was

20  also in charge of other projects.

21      "Question:  Return this.  Thank you.

22      "Do you recall that shortly after 2005, whether you

23  went to lunch with Roz Kutchins, Ed Myszak, and Bonnie

24  Marcus?

25      "Yes, I did.

1          "Question:  Do you recall whether, at that lunch,

2    Roz Kutchins made comments to the effect that it's an

3    exciting time for PQ and its new -- and it's a new PQ?

4          "Answer:  Yes.

5          "Question:  Okay.  You can answer my question.  Do

6    you recall it?

7          "I recall the lunch.  I recall what I had.

8          "Question:  I want to keep talking to you about this

9    lunch that you had with Roz Kutchins, Ed Myszak, and Bonnie

10   Marcus, okay?

11         "Answer:  Okay.

12         "This happened shortly after the RIF; is that right?

13         "Yes.

14         "What do you recall happening at that lunch?

15         "Answer:  Besides what I ate?

16         "Question:  Besides what you ate.  As you recall

17   being said, if anything, at that lunch?

18         "Basically, Roz was telling us -- well, she was

19   supposed to tell us what their plans are going to be for the

20   project and everything.  At first they talked about shutting

21   down the wood polymer project, then she denied that they were

22   saying that.  And they were telling us that it would be a new

23   PQ, there would be a new leadership, and it would be going in

24   new directions, but she never stated exactly where that would

25   be.  And to be honest with you, I was basically a fish out of

1  water for several months, until there was a transition with

2  Ed Myszak.

3          "During that lunch with Roz Kutchins, Ed Myszak,

4  you, and Bonnie Marcus, did Roz Kutchins make any comments

5  related to the ages of any current or former employees?

6          "I don't remember.

7          "Question:  I'm going to represent to you that in a

8  prior deposition in this case, that there was testimony that

9  quote, `Roz took us out to lunch, and as part of the

10 conversation, she was discussing the fact that the new PQ was

11 going to be an adventure and exciting, and it was a time for

12 people like me to leave graciously, and leave the door open

13 for younger people like Erin, to have a successful career at

14 PQ,' end quote.

15         "I'm going to represent to you that that was the

16 testimony given by Bonnie Marcus.

17         "Okay.  I don't remember that.

18         "You don't remember either way?

19         "I don't."

20         THE COURT:  You left the word "No."

21         MR. ENNIS:  Yes.

22         "Question:  You don't remember that either way?

23         "Answer:  No, I don't.

24         "Question:  To make sure I understand what you're

25 saying, are you saying that --

1              "Answer:  I remember the lunch, but I do not

2     remember that comment."

3              Page 25.

4              "Your familiar with the term `corporate development

5     projects'?

6              "Answer:  Yes, we are the Corporate Development

7     Group, yes."

8              Page 26.

9              "I want to discuss the wood polymer composite

10    project that's known as WPC.

11             "Answer:  Right.

12             "Was that a project that you were working on prior

13    to the RIF?"

14             THE COURT:  The 2005 RIF.

15             "The 2005 RIF?

16             "Answer:  It had started, yes.

17             "Question:  Do you know whether that project

18    continued after the 2005 RIF?

19             "Answer:  Yes, it did.

20             "Can you describe in what form the project

21    continued?

22             "Answer:  Basically, we were doing research on

23    taking detergent grade zeolite and put it into wood polymer

24    composite.  I continued to do all the research on the

25    projects, and then I" --

1            THE COURT:  Excuse me.  On all the projects.

2            MR. ENNIS:  "On all the projects, and then I

3    contacted the customers trying to get us in the door once it

4    was finished.

5            "In the period following the 2005 RIF, how much of

6    your time was spent on working on the wood polymer composite?

7            "Answer:  About 90 to 100 percent of my time."

8            THE COURT:  No, you left out the -- she didn't say

9    anything about her time.

10           MS. EYER:  "About 90 to 100 percent.

11           "Question:  Prior to the 2005 RIF, who was working

12   on that project?

13           "Answer:  Prior to that, I had started.  It was me,

14   and Bonnie Marcus, and Roman Wypart.  We were all together in

15   the Composite Group.

16           "Question:  Okay.  Now, following the May 2005 RIF,

17   was anyone other than you doing that project?

18           "Answer:  We had brought Reggie in, so Reggie was

19   working physically with myself, and Ed was handling all of

20   the business end of it, I would say.

21           "When you say `Ed,' you mean Ed Myszak?

22           "Yes."

23           Page 27.

24           "Are you familiar with the nano A project?

25           "Yes, I did know about that for a while.

1          "You know what I'm talking about, though?

2          "Answer:  Yes, sir.

3          "After the May 2005 RIF, did you do any plant trials

4     regarding nano A?

5          "Answer:  Not to my knowledge, no.  Nano A was

6     dropped as far as I understand."

7          Page 28.

8          "Okay.  Are you familiar with the biocides II

9     project?

10         "Yes.

11         "Did work on the biocides II project continue after

12    the May 2005 RIF?

13         "Answer:  There was some testing done of it, and it

14    was deemed not viable, so there wasn't that much done.

15         "When you say there was some testing done, what do

16    you mean?

17         "Answer:  I believe Ken Berg had taken some testing,

18    and he was doing some microbio work" --

19         THE COURT:  Microbial work.

20         MR. ENNIS:  "Microbial.  We had also tested with

21    wood composites and that had started before Bonnie left."

22         Page 29.

23         "Are you familiar with the PVC project?

24         "Answer:  Yes.

25         "Was the PVC Project active before the May 2005 RIF?

Fisher - Cross                    175

1          "Answer:  Yes.

2          "Was it after the May 2005 RIF?

3          "Almost in the same manner, yes.

4          "Who was working on the PVC project before the May

5     2005 RIF?

6          "It would be me, and Bonnie Marcus, and Roman

7     Wypart, and basically the PVC project had pretty much done as

8     far as testing" --

9          THE COURT:  You left out the word "been."

10         Would you start over again?

11         MR. ENNIS:  Okay.  Yes, sir.

12         "It would be me, and Bonnie Marcus, and Roman

13    Wypart, and basically the PVC project had pretty much been

14    done as far as testing.  It was moving into the marketing

15    sales stage.  There wasn't very much work at all done

16    afterwards, because it was a -- it was already a product, and

17    we believed that it could basically sell itself.

18         "Can you tell me who was working on the project

19    after the RIF in May 2005?

20         "It would be me and Ed Myszak, but like I said, a

21    lot of work did not go on."

22         Page 32.

23         "Question:  During your employment with PQ, did you

24    always work out of the Conshohocken R and D facility?

25         "Yes.

1          "Where was Mr. Myszak's office?

2          "Answer:  Valley Forge.

3          "Did you visit him in Valley Forge from

4     time-to-time?

5          "Occasionally.

6          "Could you estimate how many times a month?

7          "Answer:  Once a month if you were lucky.

8          "And did he visit you at Conshohocken?

9          "Answer:  Oh, yes, all the time.  At least two or

10    three times a week, depending upon his travel schedule.

11         "Question:  And how many hours would he spend with

12    you on average, if he visited you at Conshohocken?

13         "Oh, it wasn't hours.  It was maybe five, ten

14    minutes."

15         Page 35.

16         "At some point in time is it true that there was a

17    problem discovered on the WPC with respect to water

18    absorption?

19         "Answer:  Yes.

20         "Could you describe what that issue was?

21         "Basically, after extruding the strips, we realized

22    that the zeolite was taking up water, and that it was not

23    desirable, because one of the contributors to mold is water."

24         Page 35.

25         "Did a customer bring to your attention, or Mr.

1  Myszak's attention, a water absorption problem?

2           "Answer:  We had one customer complaint to that

3  effect, yes.

4           "Question:  Okay.  And was that after the May 2005

5  layoff?

6           "Answer:  Yes.

7           "Question:  Okay.  Due to that customer's complaint,

8  did you have to do any work on --

9           "Answer:  Oh, I did a lot of work, yes.

10           "If you could let me finish -- on the water

11  absorption issue?

12           "Answer:  Yes, absolutely.

13           "Question:  Okay.  And what did you have to do in

14  response to that complaint?

15           "Answer:  Basically, I went back and I extruded

16  strips, and, in fact, all the future work we did, we soaked

17  all the strips for water absorption then measured it.

18           "Were you personally aware of the water absorption

19  issue prior to the May 2005 RIF?

20           "Answer:  No.

21           "Question:  Was anyone at PQ, to your knowledge,

22  aware of the water absorption issue prior to the RIF?

23           "Answer:  We knew it was a possibility, but we --

24  no, we had not verified that.

25           "Are you able to estimate in hours or days or weeks,

1 | whatever is easier for you, how much time after the 2005 RIF,

2 | you had to spend on the water absorption issue?

3 |      "At least 50 percent of the time was spent on the

4 | water absorption."

5 |      (Pause.)

6 |      THE COURT:  Anything further you want to get in

7 | today?

8 |      MR. GOLDSHAW:  We're prepared to call Colleen

9 | Delmonte as our next witness.

10 |      THE COURT:  Well, we won't finish her testimony, and

11 | I have something to do at 4:15, so we'll recess at this

12 | point.

13 |      Members of the jury, have a nice evening.  Don't

14 | talk about the case.  We'll see you tomorrow morning at 10:00

15 | o'clock.  Recess until then.

16 |      (The jury exited the courtroom.)

17 |      (Court adjourned at 3:58 o'clock p.m.)

18 |                 * * *

```
 1                        I N D E X

 2     WITNESSES:              DIRECT  CROSS  REDIRECT  RECROSS

 3     Rosalyn Kutchins

 4          By Mr. Goldshaw      6

 5     Bonnie Marcus

 6          By Mr. Goldshaw      34              124

 7          By Ms. Malloy               96

 8     Roman Wypart

 9          By Ms. Eyer         127             159

10          By Ms. Malloy              151

11     Erin Fisher - Deposition

12          By Ms. Eyer         162

13          By Mr. Ennis               167

14                       E X H I B I T S

15     NUMBER                        ADMITTED INTO EVIDENCE

16     P-52                            71

17     P-45                            73

18     P-263                           79

19     P-262                           80

20     P-257                           82

21     P-256, 256-A, 259, 259-A, 258, 258-A,
22     255, 255-A, 264, 264-A, 262, 262-A, 263-A   83

23     P-252, 254, 254-A                150

24     P-131                           166
```

<u>CERTIFICATION</u>

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Geraldine C. Laws, CET                    Dated 12/14/09
Laws Transcription Service