IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

BONNIE MARCUS, et al.          :   CIVIL ACTION NO. 07-02075
                               :
            v.                 :   Philadelphia, Pennsylvania
                               :   November 4, 2009
PQ CORPORATION                 :   10:29 o'clock a.m.
. . . . . . . . . . . . . . . .

JURY TRIAL - DAY 3
BEFORE THE HONORABLE JOHN P. FULLAM
UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiffs:        SCOTT B. GOLDSHAW, ESQUIRE
                           KATIE EYER, ESQUIRE
                           Salmanson Goldshaw, PC
                           Two Penn Center, Suite 1230
                           1500 John F. Kennedy Boulevard
                           Philadelphia, PA  19102

For the Defendant:         ELIZABETH A. MALLOY, ESQUIRE
                           PETER ENNIS, ESQUIRE
                           Buchanan Ingersoll & Rooney, PC
                           1835 Market Street, 14th Floor
                           Philadelphia, PA  19103-2985

- - -

ESR Operator:              Dennis Taylor

Transcribed by:            Jo-Anne L. Hutt,
                           Laws Transcription Service

(Proceedings recorded by For The Record Gold digital sound
recording; transcript provided by transcription service.)

- - -

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

1          (The following occurred in open court at 10:10

2     o'clock a.m.:)

3          (The jury entered the courtroom.)

4          THE COURT:  Good morning.

5          MR. ENNIS:  Good morning, your Honor.

6          MR. GOLDSHAW:  Good morning, your Honor.

7          MS. EYER:  Good morning, your Honor.

8          MS. MALLOY:  Good morning, your Honor.

9          THE COURT:  Be seated, please.

10         Proceed to continue.

11         MS. EYER:  Thank you, your Honor.

12         The plaintiffs at this time are going to read to the

13    jury, an excerpt from the deposition of Michael Boyce who was

14    PQ's CEO at the time of the 2005 RIF, and is also their CEO

15    today.  This is an excerpt from the sworn testimony of

16    Michael Boyce starting on Page 42.

17                     DIRECT EXAMINATION

18         "Question:  What position do you hold at PQ,

19    referring not just to PQ Corporation, but PQ in the broader

20    sense?

21         "Answer:  The position I hold at PQ, and have held

22    is the Chairman of the Board, since the inception, since we

23    bought the company, and the CEO of PQ."

24         Starting at Page 131, Line 5.

25         "Question:  In the end, were you the person who

1  alone had final authority as to which positions and people

2  would be eliminated as part of the reduction in force?

3          "Answer:  Ultimately, yes.  I left it to the

4  business unit or the functional managers, but ultimately it

5  was my decision."

6          The following testimony relates to the exhibit that

7  is up on the stand there, P-32, and this is another portion

8  of Mr. Boyce's testimony.

9          Page 220, Line 10.

10         "Question:  Does this memo from Colleen Delmonte and

11 Roz Kutchins basically set forth the proposal that was

12 ultimately accepted?

13         "Answer:  Yes, to the best of my knowledge.

14         "Question:  Did John Lau agree with the proposal, to

15 your knowledge?

16         "Answer:  At least he discussed it with them and he

17 was involved in it.  Whether there was 100 percent agreement,

18 I am not sure, but he told me that this would work as far as

19 supporting the programs that we had.

20         "Question:  You had a conversation with John Lau

21 about this memo from Delmonte and Kutchins where he told you

22 that their proposal would work?

23         "Answer:  Yes, and his recommendations were not

24 necessarily accepted, but listened to, and he could live with

25 this organization and this document."

1          MR. GOLDSHAW:  Plaintiffs call Colleen Delmonte.

2          Your Honor, while the witness is arriving, we've

3   stipulated to the admission of certain exhibits, and I would

4   move for them --

5          THE COURT:  Sorry.  You got out of hearing range

6   when you bent down.  What are you doing?

7          MR. GOLDSHAW:  Let me try again.

8          While the witness is being retrieved, the parties

9   have stipulated to the admission of certain documents.

10          May I move them now as a house --

11          THE COURT:  Go right ahead.

12          MR. GOLDSHAW:  The documents are P-274, P-7, P-8,

13   P-32, P-188, P-250, P-254, P-254-A, and P-177.  I move for

14   their admission.

15          MS. MALLOY:  No objection.

16          THE COURT:  They will be received, I guess.  Nobody

17   knows what you're talking about, but perhaps you do.

18          (Plaintiffs' Exhibit Nos. 274, 7, 8, 32, 188, 250,

19   254, 254-A, and 177 were admitted.)

20          COLLEEN DELMONTE, after having been first duly sworn

21   as a witness, was examined and testified as follows:

22          THE COURT:  What was the first name?

23          THE WITNESS:  Colleen.

24          THE COURT:  Pardon?

25          THE WITNESS:  Colleen.

1          THE COURT:  Colleen.  With two Ls?

2          THE WITNESS:  Two Ls and two Es.

3          THE COURT:  Thank you.

4                      DIRECT EXAMINATION

5   BY MR. GOLDSHAW:

6   Q    At the time of the May 2005 reduction in force, you were

7   the head of a business unit called Zecad?

8   A    Yes.

9   Q    And your business unit was within Michael Imbriani's

10  division?

11  A    Yes.

12  Q    Are you aware that PQ's official position in this

13  litigation is that the plaintiffs were fired as a result of a

14  decision by business unit to discontinue particular CD

15  projects?

16  A    We cancelled the CD projects.  Mike Boyce made the final

17  decision.

18  Q    Let's do it this way.  I'm going to show you a document

19  marked as P-288, which are certain answers to interrogatories

20  provided by PQ in this litigation.  You have a copy here if

21  you need it and we'll read it out loud.

22          Beginning with the No. 1, which is the question.

23          "Set forth in full detail the reason or reasons why

24  PQ eliminated Ms. Marcus's position?"

25          The sworn response by PQ is:

1           "PQ decided to eliminate funding from the Corporate

2   Holding Company, which supported the research and development

3   conducted by corporate development program, CDP.  The

4   business units were then authorized to determine what, if

5   any, research and development projects would continue to be

6   funded by the business units.  As a result of this process,

7   the funding for the research and development projects which

8   Marcus was overseeing, was virtually eliminated, and her

9   position was no longer needed."

10          That pertains to Plaintiff, Bonnie Marcus.

11          And for Plaintiff, Roman Wypart, the Exhibit is

12  P-290.  The question states:

13          "Set forth in full detail the reason or reasons why

14  PQ eliminated Mr. Wypart's position."

15          And PQ's sworn response is:

16          "PQ decided to eliminate funding from the Corporate

17  Holding Company, which supported the research and development

18  conducted through the corporate development program, CDP.

19  The business units were then authorized to determine what, if

20  any, research and development projects would continue to be

21  funded by the business units.  As a result of this process,

22  the funding for the research, which Wypart was conducting,

23  was eliminated."

24          My question for you now, Ms. Delmonte -- I'm

25  stopping reading, I'm asking you a question now, is as a

1  business unit manager, am I right that you know firsthand

2  that PQ's official position as stated in the documents we

3  just read are false?

4  A    I don't think they're false.

5  Q    Isn't it a fact that the events that PQ has used to

6  explain the plaintiff's termination did not even occur until

7  after they were already fired?

8  A    We have been discussing cancelling the CD program for

9  months, and the CD program, and the people's position were

10  basically cancelled at the same time.  I think the memos that

11  came out on it were different times, but, you know, we

12  cancelled the program and the people were let go.

13  Q    Focusing on the sentence in the answer, that the

14  business units were then authorized to determine what, if

15  any, research and development projects would continue to be

16  funded by the business units, and then as a result of that

17  process, the funding for Wypart was eliminated.

18       Isn't it true that when the business units were

19  authorized to determine what, if any, research and

20  development projects would continue, that occurred after the

21  plaintiffs had already been fired?

22  A    The business, the Zecad business that I was running had

23  no CD programs at the time.

24  Q    Can you tell me whether my statement is correct?  Did it

25  occur before or after the plaintiffs were already fired?  I'm

1   looking for a time period here.

2   A    They happened at the same time.  As I said, the memo

3   trail probably doesn't show that, but we weren't going to

4   continue funding the -- the $2 million a year corporate

5   development program.

6   Q    If that's what happened, why wouldn't the memo trail

7   probably not show up?  Why would you say the memo trail

8   probably wouldn't show up?

9   A    I don't know.

10  Q    I'm going to show you a document that's been marked as

11  P-46, and it is the same document that has been marked as

12  Defendant's Exhibit 9, which was I believe shown in the

13  opening statement by Ms. Malloy.

14       This is an organizational announcement dated June

15  16th, 2005.  That was roughly three weeks after the RIF,

16  correct?

17  A    We're still --

18       MS. MALLOY:  If you could let her have a minute to

19  find it.

20  BY MR. GOLDSHAW:

21  Q    If you need a moment to find it, it should be in the

22  exhibit before you, P-46.

23  A    Okay.

24  Q    My question now is that this organizational announcement

25  is dated approximately three weeks after the plaintiffs were

1  notified of their termination, and the RIF of May 2005, had

2  taken place, right?

3  A    Yes.

4  Q    And looking at the sentence that begins after the bullet

5  points, it states:  "As of the date of this announcement in

6  June, the corporate/exploratory development projects" -- I'm

7  looking here -- "will no longer be funded by corporate, and

8  therefore the business" -- "respective business will

9  determine which aspects of those projects they wish to

10  continue to fund."

11        Is that, in fact, what happened?

12  A    Yes.

13  Q    And have you previously testified that the decision made

14  by business units, such as the one that you were in charge

15  of, to continue the projects on which the plaintiffs were

16  funded, to not take place until after they were already

17  fired?

18  A    Before the -- this announcement came out, as well as

19  before the people were let go, there was discussion that the

20  corporate development program would end, okay?  And the

21  corporate development program was roughly a $2 million

22  program that funded research that probably wouldn't bear

23  through until maybe three to five years down the road.

24        So now the businesses could choose to bring that

25  research in to their own R and D Groups, okay?  But normally

1  the businesses would do R and D that would be like you have a

2  product come out in a year or two.

3        So they had the choice to -- to, you know, work on

4  the long-term or not, and that's kind of what that memo was,

5  and the Business Group would decide that.

6  Q   Ms. Delmonte, you've previously given sworn testimony in

7  this matter; is that correct?

8  A   Yes.

9  Q   You're going to be provided with a copy.  I'm going to

10 read some to you.  And if you'd like to follow along, I'm

11 first going to begin on Page 112.

12        (Pause.)

13        Please tell me when you've found it, so I can

14 continue.

15 A   Okay.

16 Q   Beginning at Line 4, the question to you:

17        "And this announcement indicates that the

18 corporate/exploratory projects will no longer be funded by

19 corporate.  Therefore, the respective businesses will

20 determine which aspects of those projects they wish to

21 continue to fund.  Did that actually take place after the

22 layoff?"

23        Your answer:

24        "Yes."

25        Now I'd like you to, please, turn to Page 117.

1  A    Okay.

2  Q    "Question:  You didn't find out that the projects were

3  going to be discontinued at the time you wrote the memo" --

4  referring to P-32 -- "but you recommended their termination

5  anyway, correct?

6         "Answer:  Okay.  I think we have a different

7  understanding of projects continuing, okay?  And I go back to

8  the situation with MMA.  I pulled out the MMA from the

9  corporate development program, okay?  There were people in

10 the  Corporate Development Group working on it.  I pulled

11 into the silica catalyst business.  Other people, you know,

12 with their other responsibilities, picked it up as additional

13 work, so the program still continued, but the corp -- but,

14 you know, I didn't do it in corporate development.

15         "So in this Exhibit 9" -- which was referring to

16 Defendant's Exhibit 9, the same as this -- "you know, the

17 businesses were going to determine which programs they would

18 work on and which ones they didn't.

19         "Question:  The businesses were going to make that

20 determination at some point after the decision had already

21 been made to terminate the plaintiffs; am I correct about the

22 time period?

23         "Answer:  Yes."

24         Is that how you testified?

25 A    Yes.

1    Q    Okay.  Now, I'd like to focus your attention on the

2    summer/fall period of 2004.

3              In the summer and fall of 2004, you became involved

4    in preparing for the sale of the company, right?

5    A    Yes.

6    Q    And at that time you realized that there would be some

7    sort of reorganization coming --

8    A    Yes.

9    Q    -- right?

10   A    Mm-hmm.

11   Q    And in the summer and fall of 2004, you began having

12   discussions with Michael Imbriani on the topics of

13   reorganization and reducing head count, right?

14   A    We started discussing all through the fall.

15   Q    And what you were discussing is reorganization and

16   reducing head count, among other things, correct?

17   A    We probably talked about that more at the beginning of

18   the year during the fall, but we did start at high levels

19   thinking about what we would need to do.

20   Q    Okay.  And you also had discussions with Roz Kutchins

21   starting back in at least late 2004, about proposing a new

22   structure for  The Research and Development Department,

23   correct?

24   A    Yes.

25   Q    Okay.  And in January of 2005, before Michael Boyce came

1   on the scene, you and Roz Kutchins had already created

2   proposed organizational charts for R and D, right?

3   A    We had collected organization charts, and we started

4   discussing what we'd want to do at R and D.

5   Q    Did you also create proposals of new organizational

6   charts for R and D?

7   A    I think there were copies I received from Bill Cormier

8   and BoB Patterson, the charts I had.

9   Q    Would it refresh your recollection to take a look at an

10   e-mail and attachment that was dated January 3rd, 2005?

11   A    Mm-hmm.

12   Q    Okay.  Why don't you take a look at P-8, which should be

13   before you, and tell me whether that refreshes your

14   recollection that you and Roz Kutchins actually created

15   proposed organizational charts for R and D?

16   A    These were the slides that I did receive from Bob

17   Patterson and Bill Cormier.  The two slides I contributed to

18   this was the Zeolist R and D, and the Silica Gel R and D.

19   Q    This document's already been admitted into evidence.

20   It's P-8.  I'm going to direct your attention to the first

21   page.  This is an e-mail from you to Rosalyn Kutchins dated

22   January 3rd, 2005, right?

23   A    Mm-hmm.

24   Q    You have to answer verbally.

25   A    Yes.

1   Q    The subject is R and D?

2   A    Yes.

3   Q    And the e-mail is written by you, right?

4   A    Yes.

5   Q    It reads, "Roz, I added my slides and modified the last

6   two.  Let me know what you think and when you want to meet

7   with Kevin of an idea on the costs.  I figured we would use

8   this presentation to talk to him.  Also, for this round, I

9   kept in Rosemarie."

10          Do you agree that at this time in early January

11  2005, before Michael Boyce had arrived, you and Rosalyn

12  Kutchins were preparing a presentation to Kevin Doran of

13  Human Resources regarding a reorganization in research and

14  development?

15  A    The point of this is, I believe, Michael Imbriani asked

16  me to gather slides.  I don't believe we ever talked with

17  Kevin about it.

18  Q    Were you preparing a presentation for him, is my

19  question?

20  A    I was collecting the R and D slides -- organization

21  slides.  I don't think we had it at the headquarters in -- in

22  Berwyn.

23  Q    I'm asking you if you were preparing a presentation for

24  Kevin Doran, the head of HR, regarding this R and D

25  organizational structure?

1   A    I gathered these slides.  I never met with Kevin Doran.

2   I don't know what else to say.

3   Q    Do you see the sentence that says, "I figure we would

4   use this presentation to talk to him"?

5   A    Yes.

6   Q    Do you agree that that indicates that at this time you

7   were preparing a presentation to talk to Kevin Doran in Human

8   Resources --

9   A    Okay, yes.

10  Q    -- about these slides that contain organizational

11  structures for R and D?

12  A    Yes.

13  Q    Okay.  Now I'd like you to take a look at an exhibit,

14  P-32, which has been admitted into evidence, that I will

15  display on the easel.

16          (Pause.)

17          Do you recognize P-32 as a memorandum dated May

18  16th, 2005, from you and Rosalyn Kutchins to the new CEO of

19  the company, Mr. Boyce?

20  A    Yes.

21  Q    And if you'd flip to P-32-A in front of you?

22  A    (Witness complies.)

23          Okay.

24  Q    Please tell the jury if you recognize those as proposed

25  organizational structures that were attached to this

1   memorandum you sent to the CEO?

2   A    Yes, they look like the -- these slides.

3            MR. GOLDSHAW:  I move the admission of P-32-A, which

4   consists of those slides attached to this memorandum?

5            MS. MALLOY:  No objection.

6            THE COURT:  Received.

7            (Plaintiffs' Exhibit Nos. 32-A was admitted.)

8   BY MR. GOLDSHAW:

9   Q    This memorandum dated May 16th, 2005, is actually the

10  culmination of a process that began back in the fall of 2004,

11  right?

12  A    This memo -- Mike -- Michael Boyce -- I'm sorry --

13  Michael Imbriani asked Roz and myself to his office to

14  discuss how we would want to organize R and D.  We discussed

15  it with Michael and he asked us to put it in writing.  That's

16  what we did.

17  Q    And my question is, whether this is the culmination of

18  that process that began back in the fall of 2004?

19  A    It was an evolution of that process, yes.

20  Q    And it was the result of a running conversation between

21  you, Michael Imbriani, and Rosalyn Kutchins?

22  A    No, I wouldn't say it was a running conversation.  We --

23  we talked about it under the old management.  We talked about

24  ending the CD program in the fall.

25            And then once the company was sold, everything

1   changed.  I mean, we had new management, new owners.  And we

2   did have some contact prior to when the sale closed in

3   February -- the sale closed February 2005.  We did have some

4   contact with the new owners at that time.

5          So by the time May came around, this is when Michael

6   had asked us to look at our organization.  So I looked at R

7   and D, as well as I looked at my own Zecad organization, and

8   -- and, you know, discussed changes that could be made.

9   Q    My specific question is, whether this memorandum is the

10  result of a running conversation that you had with Michael

11  Imbriani and Roz Kutchins?

12  A    No, it's a result of the meeting that we had a couple

13  days before this.

14  Q    Okay.  Before you is a transcript of your sworn

15  deposition testimony.

16  A    Mm-hmm.

17  Q    Do you see it?

18  A    Here?

19  Q    Yes.

20  A    Okay.

21  Q    Turn to Page 74 if you'd like to follow along, and just

22  tell me when you're there.

23  A    (Witness complies.)

24         Okay.

25  Q    "Question:  So am I understanding correctly that while

Delmonte - Direct                               18

1    you were describing a conversation you had with Kutchins and

2    Imbriani, it was actually more of a running conversation that

3    took place over the course of several weeks before that

4    meeting?

5              "Answer:  Yes.  There may have been discussions on

6    and off about R and D.  Usually we would discuss it if

7    Michael Imbriani brought it up.  And I don't know why he --

8    you know, sometimes he brought it up.  I assumed Boyce said

9    something to him.  This was to kind of -- he wanted to meet

10   to kind of -- I don't know, get something down on paper, so

11   we talked about it.  He was agreeable to it.  Roz and I wrote

12   it down."

13   A    Yes, that's correct.

14   Q    And would you agree that while this memorandum states

15   it's from you and Rosalyn Kutchins, it in fact represents the

16   recommendations by you, Ms. Kutchins, and Michael Imbriani?

17   A    Correct.

18   Q    Looking at the second page of this memorandum, which on

19   the easel is the page on the right, of course, you see the

20   table?

21   A    Yes.

22   Q    It lists six people and six positions, correct?

23   A    Yes.

24   Q    Am I correct that this memorandum recommends the

25   termination of those six people?

1    A    Yes.

2    Q    And those six people, the termination was recommended as

3    a joint recommendation by you, Michael Imbriani, and Roz

4    Kutchins, right?

5    A    Yes.

6    Q    Am I right that that table appearing at the end of the

7    memorandum was driven by the identity of the people, not the

8    positions they happened to be holding?

9    A    The -- the point of this memo was we're cancelling the R

10   and D, Corporate R and D Development Program, and these are

11   the people that would be eliminated.

12   Q    Right.  My question is, whether that table was driven by

13   the identity of the people as opposed to the positions they

14   happen to be holding?

15   A    Well, the positions were -- I mean, you could see their

16   titles, but their main work was in the corporate development

17   program.  So they were the people in the corporate

18   development.  Those were the people who were on the list.

19   Q    Do you still have before you the copy of the other

20   transcript of your sworn deposition?

21   A    Yes.  Yes.

22   Q    Looking on Page 85 -- 84 -- excuse me.

23          "Question:  So the answer to his question is, Yes,

24   they were driven by the identity of the people being fired,

25   not just the positions" --

1    A    Yes, because --

2    Q    -- and your answer is:

3         "Yes."

4    A    Yes, because they were in the corporate development

5    program.

6    Q    Now, you contend that those six people you recommend for

7    termination are there because you viewed them as the weakest

8    performers at their jobs --

9    A    They were --

10   Q    -- is that right?

11   A    -- they were the weakest or they had a skill set we no

12   longer needed.

13   Q    What was that part about the skill set?

14   A    The skill set we longer needed.

15   Q    Previously, didn't you testify quite clearly that it

16   wasn't about their skill set, it was because they were the

17   weakest performers at their jobs?

18   A    Yes, and when we talked about it some more, I had

19   realized that with Roman, I have no knowledge of his -- his,

20   whether his performance was good or not, but we didn't need a

21   plastic engineer.

22   Q    Okay.

23   A    So I correct my -- and I -- I believe that came up in

24   one of these -- this testimony in the past.

25   Q    To make sure I have the chronology correctly, you

1   initially testified that you recommended those six people for

2   termination, because they were the weakest performers at

3   their jobs, but then something happened that changed your

4   mind and now you contend it was that, and also that you don't

5   need their skill sets; is that right?

6   A    No, I -- I think I jumped the gun and said they were --

7   they were weak players, until I looked at Roman, he had the

8   skill set that we did not need.  So I -- I was in error.

9   Q    How many months lapsed between the time you testified

10  and the time you attempted to correct your error?

11              MS. MALLOY:  Objection.

12              THE COURT:  Objection sustained.

13  BY MR. GOLDSHAW:

14  Q    Let's look at Plaintiff, Roman Wypart, who appears on

15  the list of people you're recommending for termination.

16              It's a fact, is it not, that you have no actual

17  basis to believe that he's a poor performer?

18  A    I agree.

19  Q    And at the time you recommended his termination, you

20  knew that he was one of the older employees though, right?

21  A    I didn't know how old he is.

22  Q    I didn't ask you if you knew his age.  I asked if you

23  knew he was among the older employees?

24  A    He seemed to be of the average age at R and D of a

25  scientist.

1   Q    Haven't you previously given testimony that you knew he

2   was one of the older employees?  Why don't you take a look --

3   A    I don't --

4   Q    I'm sorry.  Why don't you take --

5   A    Okay.

6   Q    -- why don't you take a look at Pages 85 and 86, and

7   tell me if that refreshes your recollection?

8   A    (Witness complies.)

9         What line is it on?

10        Yes, I had said I didn't know how old he was.

11        And you asked, "Did he" -- "did he know he was one

12   of the older employees?"

13        I said, "Yes."

14   Q    Okay.  Eric Senderov is also on the list of employees

15   you recommend for termination, correct?

16   A    Yes.

17   Q    Now, you weren't actually familiar with his day-to-day

18   work at all, right?

19   A    Correct.

20   Q    But you knew that he was among the older employees at

21   the time you added his name to the list of people to be

22   fired, right?

23   A    His name is on the list, because he was working with a

24   program with Dow Chemical, and Dow Chemical was no longer

1  going to fund it.

2  Q    Isn't it a fact that Dow Chemical didn't decide to pull

3  the funding until after you had written this memorandum

4  already recommending Eric's termination?

5  A    That is correct.  But Bill Cormier and I strongly

6  suspected that they would pull the funding, because they did

7  not want to have the research done under the zeolist company

8  which was a joint venture between PQ and Shell.

9  Q    Isn't it true the only reason that would take place is

10  because you laid off -- you were firing these employees and

11  had to have the work done within another unit?

12  A    Right, it had to be done in another unit.  Yes, that's

13  correct.

14  Q    So you were anticipating that Dow Chemical would pull

15  the funding for Eric's position because you were anticipating

16  that your recommendation to have this restructuring would go

17  forward?

18  A    If Dow had kept the funding, allowing Eric to do the

19  research under the zeolist umbrella, he would have kept his

20  job.  I think we testified to this also.

21  Q    Okay.  Am I correct that at the time you recommended the

22  termination of the five people who were fired on that list,

23  Bonnie Marcus, Richard Hinchey, Roman Wypart, Al Behan, and

24  Eric Senderov, they were all reporting to John Lau, correct?

25  A    Yes.

1   Q    And when you recommended the termination of those

2   people, you didn't consult with John Lau to ask them

3   questions about their performance or their skill set or

4   anything at all, right?

5   A    We were eliminating the whole Corporate Development

6   Group.

7   Q    My question is, whether you actually consulted with

8   their manager, who would be in a position to know their

9   performance and their skill set, when you recommended their

10  termination?

11  A    No, I did not consult with John Lau.

12  Q    I'd like to direct your attention to this sentence in

13  the memorandum, which I will read.

14       "Our key programs are wood polymer composites, WPC,

15  biocides, and nano A."

16       Do you see where I'm reading?

17  A    Yes.

18  Q    Eric Senderov, who you recommend for termination, was

19  working on one of those key projects, nano A, correct?

20  A    I did not write this section on details.  Roz Kutchins

21  wrote this section.

22  Q    My question is, whether Eric Senderov was working on the

23  project identified as a key project?

24  A    I think Roz Kutchins said that.  I mean, this is what

25  she wrote, whether she felt that was key or not.

1   Q    Was Eric Senderov working on nano A?

2   A    If it says it, then I believe he was.

3   Q    Okay.  Eric Senderov was a synthesis expert, correct?

4   A    Yes.

5   Q    I slurred over my word.  Synthesis is what I tried to

6   say, a synthesis expert.

7   A    Mm-hmm.

8   Q    And according to this memorandum, you would need a

9   synthesis expert until at least the following year, right?

10  A    I'm not familiar with the nano A project.  As I said

11  again, this was something that Roz Kutchins has managed.

12  Where the program was, what type of research, I don't know.

13  Q    Roz Kutchins would be familiar with that?

14  A    Yes.

15  Q    Isn't it true that before you recommended Eric

16  Senderov's termination, Roz Kutchins specifically told you,

17  quote, "Senderov is critical to the synthesis work on nano,"

18  end quote?  Do you recall her informing you on that?

19  A    Is that in this memo?

20  Q    No, this is prior to the memo.  This is back, I think,

21  in 2004, she identified him as critical, correct?

22  A    As I had mentioned earlier, in 2004, the programs

23  change.  We had different management.  We had a corporate

24  development program.  You could do a lot more than what you

25  could do in May of 2005.

1    Q    As of May 2005, would you agree that according to the

2    memo that synthesis work was still needed?

3             (Pause.)

4             Here, why don't you look at this sentence?

5    A    Yes, zeolist synthesis to complete the nano A process.

6    Yes.

7    Q    Okay.  And with respect to nano A, which according to

8    the memo is a key program, Eric Senderov was critical in

9    Roz's words, right?

10   A    She said that in 2004.  This is six or seven months

11   later.

12   Q    I'd like you to take a look at an exhibit marked as

13   P-20, and tell me when you find it, please?

14   A    (Witness complies.)

15            Okay.

16   Q    Do you recognize Exhibit P-20 as an e-mail that you sent

17   to Roz Kutchins on April 12th, 2005, with the subject line "R

18   and D"?

19   A    Yes.

20   Q    In this e-mail you identify the three synthesis experts

21   as being Eric Senderov, Richard Hinchey, who's also on that

22   list of people to be terminated, and Phil Connolly, correct?

23   A    Yes.

24   Q    As part of the reorganization in R and D, you kept only

25   one of the three synthesis people, right?

1  A    Correct.

2  Q    And you personally would have no basis to judge which of

3  the three synthesis people were the best, right?

4  A    Correct, that's why I talked to Bill Cormier about it.

5  Q    You talked to Bill Cormier about it?

6  A    Yes.

7  Q    Are you aware that Bill Cormier has testified for the --

8           MS. MALLOY:  Objection, relevance.

9           THE COURT:  The objection's overruled.

10 BY MR. GOLDSHAW:

11 Q    Are you aware that Bill Cormier has testified under oath

12 that he never gave you a recommendation as to which synthesis

13 expert should be chosen?

14 A    No, I'm not aware of that.

15 Q    The synthesis expert that you chose to recommend was

16 Phil Connolly, correct?

17 A    I talked to Bill Cormier, and of the three he forced

18 ranked them whether we had to let one or two go, and he chose

19 to keep Phil.

20 Q    Is it --

21 A    And I had let him, you know, since this is his group,

22 he's responsible for getting these projects done, he was the

23 one that needed to decide who was going to stay and who was

24 -- who was going to go.  It was his team.  These people are

25 going to work for him.

1  Q    So is it your testimony that it was Bill Cormier, not

2  you, who chose to keep Phil Connolly over Richard Hinchey and

3  Eric Senderov?

4  A    Yes.

5         MR. GOLDSHAW:  Your Honor, Bill Cormier is the

6  managing agent of the corporation.  I'd like to read an

7  expert from --

8         MS. MALLOY:  We --

9         MR. GOLDSHAW:  -- his deposition.

10        MS. MALLOY:  -- we -- we disagree with that.

11        THE COURT:  Pardon?

12        MS. MALLOY:  We disagree that Bill Cormier is the

13  managing agent of the corporation.  We --

14        THE COURT:  What is his --

15        MS. MALLOY:  -- stipulated to five or six managing

16  agents, and Cormier's not one of them.

17        THE COURT:  What is his position with the company?

18        MS. MALLOY:  He was the manager of the zeolite

19  international, in the R and D Unit, not in the Business Unit.

20        THE COURT:  If that's an objection, it is sustained.

21        (Pause.)

22  BY MR. GOLDSHAW:

23  Q    Do you have any documents to corroborate your testimony

24  that Bill Cormier actually was the one who made that

25  recommendation and not you?

1  A    I mean, I talked to him on the phone.  I -- I guess the

2  other evidence I would have is just with my management style,

3  I let the people who were going to, you know, their direct

4  reports.  They had to choose them.  They had to justify them.

5  They had to want to work with them.  Because, you know, they

6  would succeed or fail based on the staff that they had.  So I

7  let them pick who they wanted to have on their staff, and see

8  how things go.  I mean, that's -- that was my style.

9  Q    In the end the recommendation is set forth in this

10 memorandum that you authored with Roz Kutchins and Michael

11 Imbriani, was to fire the two synthesis experts in their 60s,

12 and keep the one who was more than 20 years younger; is that

13 correct?

14 A    I picked Phil Connolly.  He was already in the Zeolist

15 Group.  These two were in the corporate development program.

16 In my opinion, the reason they were in the corporate

17 development program for the last several years is they did

18 not have the best skill set to be in the Zeolist R and D

19 Group.

20        THE COURT:  Well, it would help if you'd listen to

21 the question and just answer the question which he asked.

22        Do you agree that the ones that were fired were much

23 older than the ones --

24        THE WITNESS:  Yes.

25        THE COURT:  -- remaining?

1            THE WITNESS:  They were much older.

2            THE COURT:  Pardon?

3            THE WITNESS:  Yes, they were much older.

4            THE COURT:  Thank you.

5    BY MR. GOLDSHAW:

6    Q    This reduction in force in 2005, isn't the first time

7    you had been accused of age discrimination, correct?

8            MS. MALLOY:  Objection.

9            THE COURT:  Objection sustained.

10   BY MR. GOLDSHAW:

11   Q    By the time you wrote this memorandum marked as P-32,

12   recommending the termination of plaintiffs and other older

13   employees, you knew full well it was against the law to pick

14   out older workers for termination based on their age,

15   correct?

16   A    Correct.

17           MR. GOLDSHAW:  I have no further questions at this

18   time.

19           THE COURT:  Anything at this time of this witness?

20           MS. MALLOY:  Your Honor, my testimony -- her

21   testimony would be very short.

22           May I call her as on direct, so she doesn't need to

23   come back?

24           THE COURT:  Okay.  This is part of the Defense case.

25   Go ahead.

1                          DEFENDANT'S EVIDENCE


2                          DIRECT EXAMINATION

3   BY MS. MALLOY:

4   Q    Could you please tell the jury about your educational

5   background?

6   A    I have a Bachelor's Degree in Chemical Engineering, and

7   an MBA in Marketing.

8   Q    And what positions did you hold prior to joining PQ?

9   A    Prior to joining PQ, I held a variety of sales and

10  marketing positions at Union Carbide and UOP.

11  Q    And when did you join PQ?

12  A    I joined PQ in November 1996.

13  Q    Are you currently employed by PQ?

14  A    No, I'm no longer employed at PQ.

15  Q    And about when did you leave?

16  A    I left May of this year.

17          THE COURT:  While we're at it, where did you get

18  your degrees?

19          THE WITNESS:  I received a Chemical Engineering

20  Degree from Rensselaer Polytechnic Institute and an MBA from

21  Case Western Reserve.

22  BY MS. MALLOY:

23  Q    Mr. Goldshaw questioned you about --

24          THE COURT:  We heard what he did.  You just ask your

1    own questions.

2    BY MS. MALLOY:

3    Q    Could you please turn to Page 85 of the prior testimony

4    that you have in front of you?

5    A    (Witness complies.)

6         Okay.

7    Q    And I want to read starting at Line 2.

8         "Question:  When it comes right down to it, you

9    assumed that these people were the weak performers" --

10        MR. GOLDSHAW:  Objection.  This is hearsay.

11        THE COURT:  Objection overruled.

12        MR. GOLDSHAW:  Can I ask for clarity of what's being

13   read?  Is this witness's prior testimony on what page?

14        MS. MALLOY:  Page 85.

15        (Pause.)

16        MR. GOLDSHAW:  What line is this?

17        MS. MALLOY:  2.

18   BY MS. MALLOY:

19   Q    "Question:  When it comes right down to it, you assumed

20   that these people were the weak performers, because they were

21   older; is that correct?

22        "Answer:  No, that's not correct.

23        "Question:  Let's talk about Plaintiff, Roman

24   Wypart.  You see him on the list, correct?

25        "Answer:  Yes.

1       "Question:  You have no actual basis to support your

2   statement that you believe he's a poor performer, correct?

3       "Answer:  In Roman's, I'd say yes.  In Roman's case,

4   he had a skill set that, ah.

5       "Question:  I'm not asking you about a skill set

6   now.  I'm asking for if you have a basis to believe" -- oh,

7   I'm sorry --

8       Question, ah, the witness, which is you, "He had a

9   skill set in polymer science that we were not going to be

10  funding any more."

11      Is that accurate testimony you gave in a prior

12  instance?

13  A    Yes.

14  Q    Where was your office located when you worked at PQ?

15  A    My office was in the Berwyn facility.

16  Q    And --

17      THE COURT:  Excuse me.  When you came to the

18  location, you dropped your voice.  Would you talk into the

19  end of the microphone and keep your voice up till you finish?

20      THE WITNESS:  My office was in the Berwyn location.

21      THE COURT:  Thank you.

22  BY MS. MALLOY:

23  Q    That was the corporate headquarters?

24  A    Yes.

25  Q    And where was R and D located?

Delmonte - Direct                          34

1  A    R and D is in Conshohocken, about ten or 15 miles away.

2  Q    Okay.

3          THE COURT:  Just a matter of curiosity, did you

4  visit back and forth a lot or spend most of your time in

5  Berwyn?

6          THE WITNESS:  I was there maybe once a month.

7          THE COURT:  "There," being in?

8          THE WITNESS:  Being in Conshohocken.

9          THE COURT:  Once a month.  Thank you.

10 BY MS. MALLOY:

11 Q    I'm going to show you a document that's been marked as

12 Defendant's Exhibit 62.

13          (Pause.)

14          Could you identify this document, please?

15 A    Yes, this is the draft -- the memo I had -- Roz and I

16 had prepared for Michael Imbriani on the R and D

17 reorganization.

18 Q    And could you identify the first page of that Exhibit

19 62?

20          THE COURT:  Could you give us the date?

21          THE WITNESS:  The first page is the cover sheet

22 dated Monday, May 16th, 2005, subject, reorganization, sent

23 to Michael Imbriani and Roz Kutchins.

24          It says, "Michael and Roz:  Here is the draft we

25 prepared."

1  BY MS. MALLOY:

2  Q    And that's an e-mail, correct?

3  A    Correct.

4          MS. MALLOY:  May I show them to the jury?

5          (Pause.)

6          P-62.  The screen's not working?

7  BY MS. MALLOY:

8  Q    And what is the date of the e-mail which is the first

9  page?

10  A    May 16th, 2005.

11  Q    And what is the attachment to this e-mail?

12  A    The attachment is the R and D organization draft.

13  Q    And what is the date on the attachment?

14  A    May 22nd, 2008.

15  Q    And could you explain why that date doesn't make sense?

16  A    Right, that -- in the Word document, when we were

17  collecting documents for the -- the depositions in discovery,

18  when this was printed out, it had whatever the current date

19  was, so we must have printed it out May 22nd, 2008.

20  Q    Okay.  And I apologize, because we seem to have a

21  technical difficulty, but is the attachment the same as P-32,

22  the big poster, which has been up on the screen?

23  A    Yes.

24          MS. MALLOY:  I have no further questions.

25          THE COURT:  You may step down.  Thank you.

1           (Witness excused.)

2           THE COURT:  Suppose we take a ten-minute recess at

3    this point.

4           (The jury exited the courtroom.)

5           (A recess was taken from 11:14 o'clock a.m. until

6    11:31 o'clock a.m.)

7           (The jury entered the courtroom.)

8           THE COURT:  Be seated, please.

9           Proceed.

10          MR. GOLDSHAW:  Your Honor, during the break, counsel

11    worked out the dispute regarding whether we can read the

12    deposition testimony of Bill Cormier, and have agreed we can,

13    so I'd like to read that briefly?

14          THE COURT:  Go right head.

15          MR. GOLDSHAW:  He's the Director of Zeolite

16    Technology.

17                    DIRECT EXAMINATION

18          MR. GOLDSHAW:  Okay.  From the sworn deposition of

19    Bill Cormier beginning Page 112, Line 25:

20          "At any point in 2005, prior to the reduction in

21    force, did anyone ever ask you for your opinion as to which

22    employee or employees should be let go in the event somebody

23    had to go?

24          "Answer:  There would be one general conversation I

25    had with Colleen Delmonte, which she kind of, she asked kind

1  of like, Who could do what?  Who could do what kinds of

2  projects?  My opinion as to what Dick Hinchey could do, what

3  Eric Senderov could do, what, you know, things -- how -- what

4  Phil Connolly might be able to do, but there was never --

5  there was nothing ever specific.  And I believed, by the way,

6  I had discussed it with her -- well, I don't know how to

7  answer that unless you tell me what needs to be done.  Then I

8  could tell you how to staff it, but you first have to tell me

9  what you want done."

10         "Question" -- I'm now skipping to 115.

11         "So, in other words, if I'm understanding correctly"

12  --

13         THE COURT:  At some point will the jury be informed

14  who this gentleman is that's testifying?

15         MR. GOLDSHAW:  Yes, I -- Bill Cormier who was --

16         THE COURT:  Who is he?

17         MR. GOLDSHAW:  Sorry?

18         THE COURT:  Who is he?  What's his position?

19         MR. GOLDSHAW:  He's the Director of Zeolite

20  Technology.  Ms. Delmonte testified regarding whether or not

21  she had conversations with him as to who -- which zeolite --

22  which synthesis expert to terminate.

23         THE COURT:  It's your case.  Go ahead.

24         MR. GOLDSHAW:  Thank you.

25         Continuing --

1          MR. ENNIS:  I'm sorry, Scott, what line on 115?

2          MR. GOLDSHAW:  4.

3          "So, in other words, if I'm understanding correctly,

4    the part of the conversation between you and Colleen Delmonte

5    concerning if one or more synthesis employees had to go, who

6    would it be, was a conversation that took place at a time

7    where only you and Colleen Delmonte were present?

8          "Answer:  It was never framed like, Who of the

9    synthesis people would go.

10          "Question:  How was it?

11          "Answer:  It was framed, Who has knowledge of what

12    areas?  It was never crossed that line.  It was very, I don't

13    know, very obviously not meant to go there.  I just took that

14    to mean, then decided because I kept on asking, Well, I can't

15    answer this unless you tell me what it is you want done.  All

16    of them had knowledge in that particular area, depending on

17    what, in my view what needed to be done, one or more of them

18    would have been better suited.  And I kept on asking that

19    question, and I never got an answer.  My impression was then

20    they didn't know."

21          MS. EYER:  At this time, your Honor, the plaintiffs

22    call Philip Connolly.

23          PHILIP CONNOLLY, after having been first duly sworn

24    as a witness, was examined and testified as follows:

25          THE COURT:  You might as well spell, Philip, too.

1    Do you use Ls or one --

2            THE WITNESS:  One L in Philip, P-H-I-L-I-P.

3            THE COURT:  Thank you.

4                        <u>DIRECT EXAMINATION</u>

5    BY MS. EYER:

6    Q    Good morning, Dr. Connolly.

7    A    Good morning.

8    Q    Are you currently employed at PQ?

9    A    Yes, I am.

10   Q    And would you please tell the jury what your position is

11   at PQ?

12   A    I'm a research manager for the synthesis --

13           THE COURT:  Could you talk into the end of the

14   microphone, please?

15           THE WITNESS:  I'm a research manager for Zeolist

16   International for synthesis and modification.

17   BY MS. EYER:

18   Q    And did you hold that same position at the time of the

19   2005 RIF?

20   A    Yes, I did.

21   Q    Could you please tell the jury how old you were at the

22   time of the 2005 RIF?

23   A    I was 47.

24   Q    At this point I'd like to direct your attention to P-20,

25   which is in the binder in front of you?

1          MS. EYER:  I believe that was admitted with the last

2    witness; is that correct?

3          MR. ENNIS:  Mm-hmm.

4    BY MS. EYER:

5    Q    And I'm going to -- I'll take a moment for you to find

6    it.

7          I'm going to read to you from this document which

8    has been admitted into evidence.  It's an e-mail from Colleen

9    Delmonte to Rosalyn Kutchins on April 12th, 2005.  Subject, R

10   and D.  Sensitivity.  Private.

11         It states, "Roz:  I talked to Bill Cormier

12   delicately about our synthesis folks; Bill, Eric, and Dick,

13   and what he would suggest if one had to go and detergent

14   zeolites would take one."

15         To the best of your understanding, is that a

16   reference to yourself, Dr. Hinchey, and Dr. Senderov?

17   A    Yes.

18   Q    At the time in April of 2005, were you aware that there

19   was a discussion as to who to keep between you, Dr. Senderov,

20   and Dr. Hinchey?

21   A    No, I was not.

22   Q    Sir, do you consider yourself to be a synthesis expert?

23   A    I'm familiar with that, with synthesis, but I'm not --

24         THE COURT:  I'm sorry.  But you're too far away from

25   the microphone and grumbling.  Would you please keep your

1   voice up?

2           THE WITNESS:  I am familiar with synthesis, but I

3   don't have the breadth and the knowledge that Dr. Senderov or

4   Dr. Hinchey has.

5   BY MS. EYER:

6   Q    Do you consider yourself to be an expert?

7   A    I'm not an expert like they are.

8   Q    Okay.  The parties have stipulated that Dr. Senderov was

9   age 69 at the time of the RIF and Dr. Hinchey was age 67, so

10  both of them would have been roughly 20 years older than you

11  at the time of the RIF; is that correct?

12  A    I guess that's right.

13  Q    And you were not terminated as part of the 2005 RIF; is

14  that correct?

15  A    I was not.

16  Q    And Dr. Hinchey and Dr. Senderov were; is that also

17  correct?

18  A    I believe so.

19  Q    Would you characterize synthesis work as a generalizable

20  skill that can be applied to various different research

21  areas?

22  A    Yes, I would.  I think it's a generalizable skill for a

23  chemist.

24  Q    And are you -- am I correct in understanding that there

25  are two kinds of synthesis, synthesis of high-silica type

1  zeolites, and low-silica type zeolites?

2  A    Broadly speaking, yes.

3  Q    And someone with skills in both areas would be capable

4  of doing synthesis in any number of areas; is that correct?

5  A    I believe that's so.

6  Q    To your knowledge, did Dr. Senderov possess skills in

7  both areas?

8  A    I think so.

9  Q    So you would agree that he spanned the range in terms of

10 his knowledge of zeolite synthesis?

11 A    Yes.

12 Q    And what about Dick Hinchey, would you agree that he

13 also spanned the range?

14 A    Yes.

15 Q    Your own work at PQ has mostly been in the area of

16 low-silica zeolites; is that correct?

17 A    At -- at the -- yes.

18 Q    As far as you know, has any synthesis work gone on at PQ

19 since the time of the RIF?

20 A    We man -- we manufacture zeolite so, yes, there's always

21 synthesis work going on.

22 Q    Are you familiar with a project known as nano A?

23 A    Yes.

24 Q    Did you perform synthesis work on nano A following the

25 2005 reduction in force?

1   A      Some.

2   Q      To the best of your recollection, did you perform any

3   synthesis work on nano A before the 2005 reduction in force?

4   A      Please describe what you mean by "work."

5   Q      I believe you've previously testified that you did not

6   perform synthesis work?

7   A      I -- I did not --

8   Q      On nano A?

9   A      -- physically direct somebody to do synth -- synthesis

10  work, nor did I actually hands-on put chemicals together to

11  do synthesis.

12  Q      So the answer to the question is no, you did not?

13  A      Well, but I participated in discussions about what was

14  going to happen, so that is also -- could be considered work.

15  Q      My question was specifically whether you performed

16  synthesis work on nano A prior to the 2005 RIF?

17          THE COURT:  Well, he says it depends on what you

18  mean by "work."

19  BY MS. EYER:

20  Q      Okay.  Allow me to read to you from your prior sworn

21  testimony, Page 71.

22          (Pause.)

23          "Question:  And did you perform synthesis work on

24  nano A following the 2005 reduction in force?

25          "Answer:  Some.

1          "Question:  And to the best of your recollection,

2   did you perform any synthesis work on nano A before the 2005

3   reduction in force?

4          "Answer:  No."

5   A    Mm-hmm.  I did not physically perform work.

6   Q    Dr. Senderov was the person who developed the synthesis

7   method for nano A, correct?

8   A    That's correct.

9   Q    And do you have any reason to doubt that Dr. Senderov

10  was, in fact, performing synthesis work on nano A prior to

11  the 2005 --

12  A    No, he working on nano A.

13  Q    Okay.  You also knew Dr. Wypart while he was employed

14  with PQ, correct?

15  A    Yes, I know Roman.

16  Q    Is it your understanding that Mr. Wypart is a PVC

17  expert?

18  A    Yes.

19  Q    And for the laypeople in the jury, PVC is a common kind

20  of plastic; is that right?

21  A    Yes, it is.

22  Q    During the time leading up to the 2005 RIF, what was

23  your understanding of the type of work Mr. Wypart was

24  performing?

25  A    He -- he -- I know he was visiting customers, trying to

1   do technical sales, you know, educating potential customers

2   on what the -- the material is, and he had developed some of

3   the testing methods, that sort of thing.

4   Q    Would it be fair to characterize much of the work he was

5   doing as a marketing type role?

6   A    It seemed at -- at that time that's what it was.

7   Q    And to your understanding, did he continue to have an

8   active role in the project known as PVC during the first half

9   of 2005?

10  A    I believe that he was doing PVC work.

11  Q    Prior to the 2005 RIF, were you working on corporate

12  development projects?

13  A    Yes, I was.

14  Q    And roughly what proportion of your time would you say

15  you spent on corporate development work in the year leading

16  up to the 2005 RIF?

17  A    It varied, but it could have been up to 50 percent.

18  Q    Do you recall that you had previously testified that it

19  was approximately 50 percent of your time?

20  A    Yeah, I guess.

21  Q    Okay.  During that time, was it your understanding that

22  you were assigned to specific projects within the CD program;

23  is that correct?

24  A    I worked on several projects, yes.

25  Q    And you would also engage in collegial discussions

1  around the projects generally; is that correct?

2  A    That's correct.

3  Q    Were there other employees who would typically be

4  involved in these discussions?

5  A    Yes.

6  Q    And who were those employees?

7  A    Typically John Lau, Bonnie Marcus, Eric Senderov, Dick

8  Hinchey, myself.

9  Q    And is it correct that yourself and John Lau are the

10  only employees you listed who were not let go as part of the

11  2005 RIF?

12  A    Yes.

13  Q    And as far as you're aware, is it also correct that

14  yourself and John Lau were the only employees under the age

15  of 55 on that list?

16  A    I can't comment on John's age, but I know I was 47.

17  Q    The parties have stipulated, for the record, that Dr.

18  Lau was age 50.

19        You would characterize your work on the CD projects

20  before the RIF as basically performing a consulting role or a

21  technical leader role; is that correct?

22  A    I was technical leader.

23  Q    And Ms. Marcus, she was performing a similar role in the

24  CD projects before the RIF; is that also correct?

25  A    I -- I think that's partly -- partly correct.  Maybe a

1    little more on the customer interaction.

2    Q    Okay.  If you've previously described your roles as

3    similar, would you have any reason to doubt that that's

4    accurate here today?

5    A    I guess more or less equivalent.  As I said, she was

6    more towards the customers side.

7    Q    And you were more focused towards the R and D side?

8    A    The technical side, yes.

9    Q    You also performed non-corporate development work,

10   correct?

11   A    Yes.

12   Q    And that work was generally managerial in nature?

13   A    With Zeolist International, yes.

14   Q    You managed a specific group within R and D?

15   A    Yes.

16   Q    And did Ms. Marcus play a similar role with respect to a

17   different research group within R and D?

18   A    I think she did.

19   Q    If you've previously testified that she did, do you have

20   any reason to --

21   A    No.

22   Q    -- to doubt that that testimony is accurate?

23   A    No.

24   Q    So would it be fair to say on a general level that the

25   array of tasks you performed before the RIF were similar to

1   those performed by Ms. Marcus?

2   A    I'm sorry.  Please repeat the question.

3   Q    Would it be fair to say on a general level that the

4   array of tasks you performed before the --

5             THE COURT:  I think the reason he asked you to

6   repeat the question is you're going so fast, nobody can

7   understand any of your questions.

8             MS. EYER:  I will slow it down, your Honor.

9   BY MS. EYER:

10  Q    Would it be fair to say on a general level that the

11  array of tasks you performed before the RIF were similar to

12  those being performed by Ms. Marcus?

13  A    I -- I -- that one, I -- it's hard to say.

14  Q    Well, let me direct your attention to your prior

15  testimony at Page 75.

16            (Pause.)

17            I asked you:  "So would it be fair to say that the

18  general array of tasks you performed on a general level were

19  similar to those performed by Ms. Marcus prior to the 205

20  RIF?

21            "At a high level, yes."

22  A    Yeah, okay.  I would agree with that, at a high level,

23  that's correct.

24  Q    And, Ms. Marcus, she was terminated as part of the 2005

25  RIF, correct?

1    A    Yes.

2    Q    And you were not; is that also correct?

3    A    Yes.

4    Q    Dr. Connolly, as part of your supervisory

5    responsibilities, you supervised an employee named Al Behan,

6    correct?

7    A    Yes, I did.

8    Q    And Mr. Behan, he was let go at the time of the 2005

9    RIF?

10   A    Yes, he was.

11   Q    The parties have stipulated that Mr. Behan was age 66,

12   does that sound about right to you?

13   A    Yes, it does.

14   Q    Did you think highly of Mr. Behan's skills?

15   A    Yes, I did.

16   Q    And you wanted to see Mr. Behan continue at the time of

17   the RIF; isn't that right?

18   A    I would like to -- yes.

19   Q    But he was, in fact, let go during the 2005 RIF?

20   A    Yes.

21   Q    And since the time of the RIF, your job has changed to

22   include certain responsibilities that were previously

23   performed by Mr. Behan; is that correct?

24   A    That is correct.

25   Q    And an employee named Terry Ann Sidbury, she has also

1    taken over some of Mr. Behan's work?

2    A    She was a chemical technician that did some of the

3    hand's on measurements.  I took over the interpretation of

4    the data.

5    Q    Okay.  And she did, in fact, take over some of the work

6    that Mr. --

7    A    The hand's on work.

8    Q    -- that Mr. Behan was doing --

9    A    Yes.

10   Q    -- before the 2005 RIF?

11          And the parties have stipulated that Ms. Sidbury was

12   age 37 at the time of the RIF, does that sound about right to

13   you?

14   A    Yes.

15   Q    Okay.  And she was retained at the time of the RIF,

16   correct?

17   A    Yes.

18   Q    Okay.

19          MS. EYER:  I have nothing further of this witness.

20          MR. ENNIS:  Briefly.

21                      CROSS-EXAMINATION

22   BY MR. ENNIS:

23   Q    Dr. Connolly, could you describe for the jury your

24   educational background?

25   A    I have a Ph.D. in Inorganic Chemistry.

1   Q    And where did you get that?

2   A    Iowa State University.

3   Q    And how long have you been employed by PQ?

4   A    Almost 13 years.

5   Q    And do you recall how long you had been manager of

6   synthesis and modification for ZI?

7   A    I'm not exactly sure of the date.  Somewhere in the

8   2002, 2003 time frame --

9   Q    Okay.

10  A    -- maybe.

11  Q    And in that position, you supervise other people?

12  A    Yes, I did.

13  Q    You supervised other people before the reduction in

14  force?

15  A    Yes.

16  Q    Did you continue to supervise people after the reduction

17  in force?

18  A    Yes, I did.

19  Q    And in regard to Mr. Behan who you talked about, had you

20  had discussions with anyone regarding funding for Mr. Behan

21  before the reduction in force?

22  A    Yes, I did.  For several years prior to the reduction in

23  force, every year during the budgeting cycle, I had a

24  conversation with my boss, Bill Cormier, and he said that it

25  was getting increasingly hard to -- to keep Al.

1    Q    Okay.  And that's from a funding perspective?

2    A    From a funding perspective.

3    Q    But he managed to fill up Mr. Behan's time; is that

4    right?

5    A    Yes.

6    Q    And was Mr. Behan replaced by anyone after he was let

7    go?

8    A    No.

9    Q    So the work that he was doing, you took over some of it?

10   A    Yes.

11   Q    And what was Mr. Behan's title or position?

12   A    Research fellow or senior research fellow.  I can't

13   remember which.

14   Q    A senior --

15   A    A senior scientist, yes.

16   Q    A senior scientist.

17             And Ms. Sidbury is what?

18   A    A chemical technician.  I forget her exact title, but

19   she's a technical person.

20   Q    And in the -- at PQ, in terms of levels of skill and

21   experience, so I understand it, the lowest level are the

22   technicians?

23   A    Yes.

24   Q    And then you get to a chemist level?

25   A    Yes.

1    Q     There's a number of levels of chemists?

2              MS. EYER:  Objection, your Honor, leading.

3              THE COURT:  Objection overruled.

4    BY MR. ENNIS:

5    Q     And then after the chemist's level, there is the

6    research fellows?

7    A     That's correct.

8    Q     And Ms. Sidbury's at the lowest level?

9    A     Yes.

10   Q     And you testified that she was doing hand's-on work?

11   A     Yes.

12   Q     Can you just very briefly describe what that involves?

13   A     It involves mixing the chemicals, putting them into the

14   instrument, make the measurements, printing out the -- the

15   data, and that's about it.

16   Q     And you would be directing her what to do?

17   A     Yes.

18   Q     And, so, you continued to manage the group, you took on

19   Mr. Behan's duties, you also directed Ms. Sidbury's duties?

20   A     Yes.

21   Q     I'd like to talk about your role in the corporate

22   development program a little bit.

23              You said you were a technical leader?

24   A     Yes.

25   Q     And in that regard, who was responsible for writing the

1  original proposal for nano A?

2  A    I wrote that.

3  Q    And in terms of the synthesis work that you talked

4  about, after the RIF, how much synthesis work did you do?

5  A    It wasn't very much.

6  Q    And at what level was it done?

7  A    It was at the development lab scale, so 50, 100-gallon

8  scale.

9  Q    All right.  And there's been some testimony, but I just

10  want to have you explain to the jury --

11         THE COURT:  Just ask a question, please.

12  BY MR. ENNIS:

13  Q    What are the various levels of synthesis work at PQ?

14  What's the -- is there something called bench scale?

15  A    Yes, at the bench scale one typically works at about the

16  two-liter scale or maybe slightly smaller.  The idea is to

17  find the -- the important composition that's necessary to

18  make what you want, some of the important conditions like

19  temperature and time.

20         From there, we typically move to what's called a

21  development scale that -- that's somewhere on the order of 30

22  gallons to 100-hundred scale.  At that point, we're trying to

23  make sure that the recipe is -- is compatible with -- with

24  going into the plant, and we're further refining the, you

25  know, the process variables.  And from there it goes into the

1  plant.

2  Q    And was there, in fact, a plant trial on nano A before

3  the RIF?

4  A    Yes, there was a -- I believe it was in March, but...

5  Q    And was that successful?

6  A    It was not.

7  Q    And have you been brought into nano A as part of the

8  plant trial?

9  A    Yes, I participated in that.

10  Q    Did you supervise Ms. Marcus?

11  A    No.

12  Q    She was a peer?

13  A    A peer, yes.

14  Q    And, in fact, she performed similar to a technical

15  leader?

16  A    Yes, and -- yes.

17  Q    And she was the manager in charge of the corporate

18  development program?

19  A    I -- I don't know if that's right.

20  Q    Okay.  And who brought you in as a technical leader on

21  some of these projects?

22  A    I was approached by John Lau, the vice president of

23  research and development.

24  Q    And was Mr. Lau also Ms. Marcus's supervisor?

25  A    I believe so.

1        (Pause.)

2              MR. ENNIS:  That's all I have, your Honor.

3              THE COURT:  Anything further?

4              MS. EYER:  I have just one brief area of

5    questioning.

6                    <u>REDIRECT EXAMINATION</u>

7    BY MS. ENNIS:

8    Q    Dr. Connolly, you testified just now that there was a

9    plant trial for nano A during the first part of 2005,

10   correct?

11   A    That's what I remember.

12   Q    And you testified that that plant trial failed; is that

13   correct?

14             THE COURT:  We heard what he said.  What's your

15   question?

16   BY MS. ENNIS:

17   Q    The plant continued to run trials on nano A samples

18   after the initial trial, and indeed after the 2005 RIF; isn't

19   that correct?

20   A    I -- I think that several -- several things had gone on,

21   yes, but I don't remember the details of them.

22   Q    Okay.  If you previously testified that the plant trials

23   continued after the time of the 2005 RIF, would you have any

24   reason to doubt that testimony?

25   A    No.

1  Q    Okay.

2          MS. EYER:  Nothing further.  Thank you.

3          THE COURT:  You may step down.  Thank you, sir.

4          (Witness excused.)

5          MR. GOLDSHAW:  The plaintiffs call Eric Senderov.

6          ERIC SENDEROV, after having been first duly sworn as

7  a witness, was examined and testified as follows:

8          THE COURT:  And what is your first name?

9          THE WITNESS:  Officially I'm Ernest, but I use as a

10  nickname Eric.

11         MR. GOLDSHAW:  You can sit down.

12                    DIRECT EXAMINATION

13  BY MR. GOLDSHAW:

14  Q    Where were you born?

15  A    I was born in country which is now not exist, in Soviet

16  Union, Moscow.  Moscow still exists.

17  Q    Are you currently a U.S. citizen?

18  A    Yes, I am.

19  Q    Mm-hmm.  Are you currently employed?

20  A    Yes.

21  Q    Where are you employed?

22  A    I'm employed in company which is called Rive

23  Technologies.

24  Q    Is that a permanent full-time position?

25  A    Yes.

1   Q    Would you, please, briefly summarize for the jury your

2   educational background?

3   A    I got in -- in former Soviet Union two scientific degree

4   which probably corresponds both to Ph.D. in U.S.   It's

5   candidate -- Candidate of Science in Geology, Mineralogy, and

6   I'm Doctor of Science in Chemistry.

7   Q    Do you have any publications?

8   A    Yes, I do.

9   Q    What are your publications?  What types of publications?

10  A    There's article -- articles in scientific magazines and

11  books.

12  Q    How many books have you authored?

13  A    I'm author and co-author for four books.

14  Q    And, roughly, how many articles have you published in

15  the field?

16  A    There's probably 80, 90.

17  Q    How many patents do you hold?

18  A    I'm -- I'm holding around dozen patents.

19  Q    Would you please provide the jury with a basic

20  description of your skills?

21  A    I'm an organic chemist and geologist and mineralogist,

22  so my skills is studying of rock, minerals, of silicate

23  materials, and of zeolite materials, which is used in many

24  application in technology now.

25  Q    Have you ever been employed at PQ?

1   A    Yes.

2   Q    When?

3   A    I was employed in PQ with interruption, actually, twice

4   since I guess 1992 and up to 2005.

5   Q    So you were employed on two separate occasions with a

6   break in between?

7   A    Yes.

8   Q    Can you provide a basic description of the type of work

9   you did at PQ the first time you were employed, I think you

10  said between 1992 and 1995?

11  A    This work was in the area of zeolite technology,

12  synthesis, preparation of zeolite material which is used in

13  oil refinery technique, in absorption gas separate technique.

14  Q    What positions did you hold at PQ from 1997, when you

15  returned, until 2005, when you were fired?

16  A    As I remember, it was position that we are called --

17  position that we are called chemists and then research

18  fellow.

19  Q    What was the basic nature of the job you were doing in,

20  say, the years leading up to the time you were fired?

21  A    Please repeat it.

22  Q    What kind of work were you doing at PQ in the year or

23  two leading up to the time you were fired?

24  A    Yeah, it was practically very -- the same type of job

25  that I just described.  It was research in area of technology

1    of materials, which PQ and Zeolist International are

2    producing with the zeolite and other silicate materials.

3    Q    While you worked at PQ, did you interact with potential

4    customers?

5    A    Yes, I did.

6    Q    How so?

7    A    It is actually interaction on regular base, because the

8    specific of product, which PQ and Zeolist are producing, is

9    not just produced product at final stage, and then sell it to

10   the customer.  It was inter -- constant interaction,

11   adjustment, alignment of property, which required in customer

12   application, so I directed on constant basis for many years

13   with Dow Chemical with preparing product for Dow Chemical,

14   with Shell.  We also interacted with Shell.  So it was -- it

15   was regular, constant interaction.

16   Q    And in the lab, did you also do work on -- did you do

17   work in synthesis?

18   A    Yes, I do it by my hand very often.

19   Q    The modification of zeolites?

20   A    Yes, I do.

21   Q    Did you do any catalyst work?

22   A    Yeah, the zeolite, which I was involved in preparation,

23   are main -- major companion of catalyst.

24   Q    In 2005, do you recall what the major projects you were

25   working on or --

1   A    Yes, I -- I can tell this.  So it was zeolite for olefin

2   cracking, it was titanium salicylate, and it was nano A

3   project.

4   Q    Is titanium salicylate also known as the TSPQ project?

5   A    Yes, it is.  It's a more narrow definition of this

6   project, yeah.

7   Q    Prior to the time you were fired, would you, please,

8   describe what proportion of your time you were spending on

9   those three major projects you identified?

10  A    I would say it was 40 percent olefin cracking, 30 -- 30

11  percent the other two projects.

12  Q    All right.  Let's talk about nano A just for a minute.

13  A    Mm-hmm.

14  Q    What was the nature of the work you were doing at the

15  time leading up to the time of your termination on the nano A

16  project?

17  A    I was main researcher of the project, and the goal of

18  the project was to produce very small crystal of this

19  material below one micro-size, which is actually source of

20  the name.  Nano means one-thousandths of micron.  So I -- I

21  found the way how to make this crystal, and this was the main

22  contents of what I was doing in this project.

23  Q    Was anyone else involved in doing synthesis work on nano

24  A at the time you were working on it?

25  A    Yeah, I -- I did the major part of the job, but Dick

1   Hinchey was also involved, and a Phil Connolly was interfaced

2   between actually research and interaction with customer, and

3   application of the research.

4   Q    What was the nature of the work you were doing on the

5   titanium --

6   A    And Bonnie Marcus -- I'm sorry -- I'm sorry -- Bonnie

7   Marcus was also involved in this project, yeah.

8   Q    Focusing on the titanium silicate project, the TSPQ

9   project, can you please describe basically the type of work

10  you were doing on that before your termination?

11  A    This project stayed for several years actually, and it

12  was done with interaction with Dow Chemical, who budgeted

13  significant part of this job, because they were interesting

14  to develop this product for their application in oxidation

15  catalysis.  So from the point of your scientific contents of

16  this project, it was necessary to be able to introduce

17  titanium items in specific crystallographic position in this

18  structure of this materials.

19  Q    Was the work you were doing on that project, TSPQ,

20  complete at the time you were fired?

21  A    No, it was not complete.

22  Q    Okay.  You had --

23  A    We had progress, but it was not complete, yeah.

24  Q    Do you know at what point in time Dow Chemical pulled

25  its funding for that project?

1  A    I believe that it was done.  That Dow felt that the

2  people who involved in the project was allowed to go.

3  Q    All right.  Are you referring to the people who were

4  fired as part of the RIF?

5  A    Yeah, when Bonnie Marcus, Dick Hinchey, was -- was

6  fired, yes, and me.

7  Q    Mm-hmm.  Did you have any conversations with anyone at

8  Dow following the date of the reduction in force?

9           MS. MALLOY:  Objection, hearsay.

10          THE COURT:  Objection, depending on -- I can't tell

11  yet, but I'll find out.

12  BY MR. GOLDSHAW:

13  Q    Did you have any conversations with anyone at Dow after

14  the reduction in force?

15  A    Yes, I did, because --

16          THE COURT:  What about?  A conversation about the

17  weather or what?

18          MR. GOLDSHAW:  That's my follow-up question.

19  BY MR. GOLDSHAW:

20  Q    What did you talk to Dow about?

21  A    Well, I -- I was interesting to preserve -- to keep --

22  to keep working in some way, and because Dow gave money for

23  this project to run at PQ, I ask them, If I found a place

24  where to do the job, will they continue to support this

25  project?

1  Q    And what did you learn?

2  A    They at first told me, Yes, I have negotiation with --

3  actually with University of Delaware with Professor Lobe (ph)

4  to do this, but then by some reason it is -- it failed

5  because probably Dow got a feeling that it is not enough

6  facilities in laboratory of University of Delaware to fulfill

7  their requirements for the product.

8  Q    At the time of the reduction in force, what was the

9  basic nature of work you were doing on the olefin cracking

10 project?

11 A    Olefin cracking project was initiated on request of

12 Shell in Amsterdam, and they have idea that certain type of

13 zeolites will be useful in their application.  So my task was

14 to synthesize this new type -- new from the zeolist, type of

15 zeolites, for the application, and in order they will be able

16 to test them, and to give announce, build the zeolites work

17 and the application or will -- or will not.

18 Q    Do you know whether the type of work you were doing on

19 the olefin cracking project continued after you were fired on

20 May 25th, 2005?

21 A    I believe that the work was continued.

22 Q    How do you know?

23 A    Because I -- what I was doing was the original stage of

24 the project, and the results were promising.  I talk by phone

25 with people in Amsterdam who tested this project, and it was

1    logical that if project is going, why just to stop it.

2    Q    After you were fired as part of the reduction in force,

3    did you ever work again for PQ?

4    A    Yes, I was hired as a consultant by Zeolist

5    International, which is part of PQ, to continue this job.

6    Q    When did you begin working as a consultant after you

7    were fired?

8    A    I would say it was probably in August.

9              THE COURT:  Of what year?

10             THE WITNESS:  2005.

11             THE COURT:  Thank you.

12   BY MR. GOLDSHAW:

13   Q    When you returned to work as a consultant for PQ, two

14   months after you were fired, was the nature of the work you

15   were doing on the olefin cracking project different in a

16   significant respect?

17   A    No, it was not different.

18   Q    Okay.  How did it make you feel to be hired back as a

19   consultant, after you were fired, to do the same type of work

20   you were doing as an employee on the project?

21   A    I was not happy that I was transformed from regular

22   employee to consultant, but I was happy that I was able to

23   earn money.

24   Q    How did you learn that you were going to be fired as

25   part of the May 2005 reduction in force?

1  A    John Lau, who was vice president of the company, invited

2  me a day before official announcement in his office, and told

3  me about this.  It was, I believe, May 24th, 2005.

4  Q    What did you learn about the reduction in force at that

5  time?

6  A    Well, I -- I was shocked, and I learned that my -- at

7  that -- at this moment on May 24th, I learned only that my

8  job is eliminated.

9  Q    Did Dr. Lau tell you why?

10 A    No, he -- no, his explanation was that my position was

11 eliminated as I believe now.

12 Q    And at that point in time that he told you your position

13 was eliminated, did you know there was an intention to hire

14 you back as a consultant to do the exact same work you were

15 doing on the olefin cracking project?

16 A    Yes, he let me know that it is a possibility that I will

17 be rehired as a consultant.

18 Q    Prior to your conversation with Dr. Lau on May 24th,

19 2005, did you ever receive any indication that you might be

20 laid off?

21 A    No.  Nowadays, yes, I can tell that I received, but at

22 that time I did not take them as a signal that it is a

23 possibility.  And, actually, I can tell you what I mean by

24 the signal.  At the end of 2004, we decided with my wife to

25 buy a new house, because we live too far from PQ, and it was

1   very long commuting for me, and we decided to move closer to

2   Conshohocken, and we even put a deposit to -- for a new

3   townhouse, and I told Bonnie Marcus about this.  And when I

4   told her, she mentioned that it's not good time to buy a

5   house, but I probably will be more optimistic than she was at

6   that moment, and only now I understood that what she -- not

7   only now, after -- after my firing understood what she meant.

8   Q    When PQ hired you back as a consultant, how long did

9   that position last?

10  A    I believe it is -- it was more than two months.

11  Q    Following the reduction in force, did you attend a town

12  hall meeting with the new CEO, Michael Boyce?

13  A    Yes, I -- I did.

14  Q    What do you recall being said at that meeting?

15  A    I was stracted (ph) that Mike Boyce stated at that

16  meeting that nano A project will continue, and Reggie

17  Thompson, who sat behind me, raise hand and ask him a

18  question, How you are going to continue if you -- you let

19  people who did the project to go?

20        And answer of Mike Boyce was that, We will continue.

21  Q    I'd like you to please turn to an exhibit in front of

22  you marked as P-45, which I will display on the easel as

23  well.

24  A    Yeah, maybe it is easier for me to see it here -- oh,

25  okay.

1          (Pause.)

2              Mm-hmm.   Okay.

3    Q    Have you ever seen this e-mail before -- I'm sorry --

4    before I ask that question.

5              What's being displayed is an exhibit that is an

6    e-mail from Rosalyn Kutchins to various recipients, dated

7    June 7th, 2005, with the subject Zeolite Projects.

8              Have you ever seen this e-mail before?

9    A    Yes, I'm familiar with this e-mail.

10   Q    When did you see this e-mail?

11   A    It's difficult for me to -- to remember exact time, but

12   I guess it was at the time of reduction in force.

13   Q    The e-mail reads:

14             "It has come to our attention that many of you think

15   that the WPC and other zeolite projects have been cancelled.

16   THIS IS NOT TRUE."

17             Which of your projects were zeolite projects, as

18   referred to in this e-mail?

19   A    I guess my project was nano A, but -- at that time.

20   Q    Mm-hmm.

21   A    And I know that Roz was manager of, in some way, of nano

22   A project, yes.

23   Q    Did you come to learn that after your termination, the

24   synthesis work you were doing for nano A was continued by

25   Phil Connolly?

1  A    I do not know this exactly, but I guess Phil Connolly,

2  the best -- if I am out -- the person to continue this

3  project, the best person.

4  Q    What is your understanding of why you were fired?

5  A    My understanding is this is my age.

6            MR. GOLDSHAW:  I have no further questions at this

7  time.

8            THE COURT:  Will this be lengthy?  In which case we

9  will --

10           MS. MALLOY:  No, it will not.

11           THE COURT:  Okay.  Go ahead.

12                        CROSS-EXAMINATION

13 BY MS. MALLOY:

14 Q    The nano A work that you're referring to, was that with

15 respect to small particle size for liquid laundry detergent?

16 A    It is right, but at the end it was many ideas that nano

17 A may find application in other areas.

18 Q    Okay.  And at the time your employment ended in May of

19 2005, was the synthesis work that you were performing on nano

20 A completed?

21 A    Philosophically nothing may be completed in technology

22 research, so it was success, we got small nano A, but

23 adjustment of product to application should be continued.

24 Q    And what does the term scale-up mean to you?

25 A    Scale-up for me means production in -- on larger scale,

1   on a pilot plant scale.

2   Q    So going from the laboratory to the pilot plant?

3   A    Right.

4   Q    And then to a --

5   A    Yes.

6   Q    -- large quantity for a customer, correct?

7   A    Yeah.

8   Q    Is it true that the scale-up on nano A had already

9   started as of the end of May of 2005?

10  A    No, I guess Dick Hinchey for a long time before was

11  involved scale-up with Reggie Thompson.

12  Q    On nano A?

13  A    On nano A, yeah.  In interaction with me, of course.

14  Q    Right.  Was Phil Connolly also involved in that scale-up

15  on nano A?

16  A    He was, I would say, manager of this project at that

17  time, so he -- his job was regulation what we are doing, but

18  the job was performed by me, by Dick Hinchey, and by Reggie

19  Thompson.

20  Q    Okay.  And is it accurate that Dow is a competitor of

21  Shell?

22  A    You ask me business questions.  I am not very familiar.

23  Probably, yeah, probably.

24  Q    Okay.  No, I completely understand that.

25          Do you know whether Shell was part of the joint

1   venture with PQ for Zeolist International?

2   A     Yes, I know.

3              THE COURT:  And was it?

4              THE WITNESS:  Yeah, zeolist is a joint venture

5   between PQ and Shell.

6              THE COURT:  Okay.  Thank you.

7   BY MS. MALLOY:

8   Q     The olefin cracking, what did you do on that project as

9   a consultant?

10  A     I need to use some technical terms.  I'm sorry.  But

11  there are certain family of molecular sieves, which have a

12  certain diameter of pore, and for olefin cracking, it was

13  very important to have zeolite with this certain size of

14  pore.

15             And my task was to produce all possible structure,

16  which have this size of micro-pore in zeolite.  It was

17  probably five zeolites.  It was necessary to make them as a

18  pure phase without a mixture with -- in necessary amounts,

19  and this was my job at that time.

20  Q     And approximately how long were you working as a

21  consultant?

22  A     Two, and a little bit more -- I do not remember exactly.

23  I guess it started at the first of August and finished on

24  September 25, so --

25  Q     Okay.

1  A    -- a little less --

2  Q    About --

3  A    -- than --

4  Q    About two months?

5  A    -- two months.

6  Q    Okay.  Thank you.

7       And the second time you were hired by PQ, sir, was

8  in 1997; is that correct?

9  A    I believe so.

10 Q    Okay.  And is it true that you were 61 years old when

11 you were hired by PQ in '97?

12 A    Yes, it is true.

13 Q    Okay.

14      MS. MALLOY:  Thank you.  I have nothing further.

15      MR. GOLDSHAW:  Very briefly, your Honor.

16      THE COURT:  Pardon?

17      MR. GOLDSHAW:  Very briefly, please?

18                  REDIRECT EXAMINATION

19 BY MR. GOLDSHAW:

20 Q    When you were hired at age 61, did Michael Imbriani have

21 anything to do with the decision to hire you at that age?

22 A    I doubt.  Michael Imbriani is not a person who would

23 hire me.

24 Q    What about Colleen Delmonte?

25 A    No, she is not involved.  It was -- I guess efforts of

1   Dick Hinchey, Bonnie Marcus, and Bill Cormier.

2   Q    Was Roz Kutchins involved in the decision to --

3   A    No.

4   Q    -- hire you at 61?

5   A    No.

6          MR. GOLDSHAW:  Nothing further.

7          THE COURT:  As a matter of curiosity, how long have

8   you been in this country?

9          THE WITNESS:  I came to this country in November

10  1990.

11         THE COURT:  Thank you very much.

12         THE WITNESS:  So it is almost 20 years.

13         THE COURT:  Thank you.  You may step down.

14         THE WITNESS:  Okay.

15         (Witness excused.)

16         THE COURT:  We'll take a recess now until 1:45 this

17  afternoon.  Don't eat too much, but eat enough.

18         (The jury exited the courtroom.)

19         (A luncheon recess was taken from 12:24 o'clock p.m.

20  until 1:48 o'clock p.m.)

21         (The jury entered the courtroom.)

22         THE COURT:  Good afternoon.

23         MS. MALLOY:  Good afternoon.

24         MS. EYER:  Good afternoon.

25         MR. GOLDSHAW:  Good afternoon.

1           MR. ENNIS:  Good afternoon.

2           THE COURT:  Please proceed.

3           MS. EYER:  At this time the plaintiffs call John

4    Slobogin.

5           JOHN SLOBOGIN, after having been first duly sworn as

6    a witness, was examined and testified as follows:

7           THE COURT:  Could you spell your last name again

8    more slowly?

9           THE WITNESS:  S-L-O-B-O-G-I-N.

10          THE COURT:  Thank you.

11                      DIRECT EXAMINATION

12   BY MS. EYER:

13   Q    Good afternoon, Mr. Slobogin.

14          Could you please tell the jury when you were last

15   employed by Defendant, PQ Corp.?

16   A    July 31st, 2005.

17   Q    And how long had you been employed by PQ at the time

18   that you left the company?

19   A    It was 31-1/2 years.

20   Q    And how old were you at the time that you left the

21   company?

22   A    63.

23   Q    And did you leave PQ at or around the same time as a

24   number of other people who were let go as part of a reduction

25   in force in 2005?

1   A    Yes.

2   Q    What were the circumstances that led to you departing

3   from PQ?

4   A    About the middle of May of 2005, my manager, Dr. Bob

5   Patterson, came into my office.  And usually when he comes

6   into the office, or I go to his office, we usually have a

7   discussion and talk about different things.

8        This time he came into the office and said, You are

9   strongly encouraged to call Kevin Doran at HR, and he left.

10  There was no --

11       THE COURT:  I'm sorry.  I -- you mumbled that.

12  Could you repeat that again.  What did he strongly encourage?

13       THE WITNESS:  He strongly encouraged me to call

14  Kevin Doran at HR.

15       THE COURT:  Thank you.

16       THE WITNESS:  And he left.

17  BY MS. EYER:

18  Q    And Dr. Patterson was your manager at the time; is that

19  correct?

20  A    Yes, he was.

21  Q    And did you have any subsequent conversations with Dr.

22  Patterson in relation to this issue?

23  A    Several days later he came in and asked me did I call

24  Kevin Doran, and I said, No, not yet, but I will.

25  Q    So you didn't go to Mr. Doran the first time that Dr.

1   Patterson approached you; is that correct?

2   A    No, because I talked to everyone -- with my wife for

3   several days before I called him.

4   Q    And you did ultimately go to HR; is that correct?

5   A    Yes, I did call Kevin Doran.

6   Q    And were you ultimately offered a package by PQ?

7   A    Yes, I was.

8   Q    And did you take that package?

9   A    Yes, I did.

10   Q    Why did you take that package?

11   A    Well, since I was the only salary coming into the house,

12   and they did offer me a year's salary with the benefits, and

13   I was only 63 at the time, there -- you hear these rumors

14   about if you don't take the package down the road, you

15   possibly couldn't get anything at all, they could just let

16   you go.  If it was PQ Corporation still running the company,

17   I probably wouldn't have taken it, but since they sold the

18   company to JP Morgan Partners, I was a little leery about

19   possibly getting let go and at the end receiving nothing at

20   the time.

21   Q    Sir, were you afraid that you were going to be

22   terminated if you didn't take the package?

23   A    Yes.

24   Q    Prior to being approached by Dr. Patterson, did you have

25   any intention of retiring early?

1   A    Not at that time.  Maybe five years ago I -- I was

2   thinking about retiring early, but then we had the bear

3   market in 2001, and 2000, and all the stocks went down.  The

4   same as what's happening now in the stock market.  I'm sure

5   people are thinking about retiring, but they're not going to

6   do it now, they're going to work, you know, until they're 68,

7   69, because of the stock market.

8   Q    And how much longer were you planning on working at the

9   time?

10  A    Probably until my full retirement.

11  Q    In addition to the issue of you being the sole salary,

12  did the package also include retiree medical benefits?

13  A    Yes, I asked about that.

14  Q    And were they ultimately offered to you?

15  A    Yes.

16  Q    And was that important to your decision to take the

17  package?

18  A    Yes, because that -- that was it.  I -- there was no

19  other medical other than that.

20  Q    And that would be for yourself.  Would that also include

21  your wife who would not have medical coverage?

22  A    Yes.

23  Q    Would you have continued your employment at PQ, had Dr.

24  Patterson not advised you that you should contact HR?

25  A    Yes.

1    Q    There was language in your agreement stating that it was

2    voluntary, correct?

3    A    That's correct.

4    Q    And why did you not request the removal of that

5    language?

6    A    Well, there was also a section in that agreement, and I

7    think it was Section 6, saying if you didn't sign it,

8    everything that they offered was taken off the table, and

9    that was my fear, that if I asked about -- if that was taken

10   off, he would take the whole offer off.

11   Q    Did you have a lawyer at the time that you executed the

12   agreement?

13   A    No, I didn't.

14   Q    You described your conversations with Dr. Patterson

15   earlier in your testimony.  Do you know whether anyone else

16   at PQ was approached in a similar way around the same time?

17   A    Yes, I do.

18   Q    And who was that person?

19   A    Eleanor Tickner.

20   Q    And do you know how old Ms. Tickner was at the time?

21   A    She's around my age.

22   Q    Was any of your work taken over by anybody else at the

23   time you left the company?

24   A    Yes, I discussed that with -- with Dr. Patterson, and

25   also Larisa Ding (ph) who were in the same department.

1   Q    And were both of those people younger than you?

2   A    Yes, they were.

3   Q    If you know, by roughly how much?

4   A    I think Bob was at least six, seven years younger than I

5   was, and Larisa was maybe 15 years.

6   Q    Mr. Slobogin, do you believe that you were singled out

7   because of your age?

8   A    Yes, I do.

9   Q    Do you believe that you would have continued your

10  employment with PQ in 2005, were it not for being singled out

11  on the basis of your age?

12  A    Yes.

13       MS. EYER:  I have nothing further.

14       THE COURT:  Perhaps others do.

15                        CROSS-EXAMINATION

16  BY MR. ENNIS:

17  Q    Mr. Slobogin, your supervisor was Bob Patterson; is that

18  right?

19  A    That's correct.

20  Q    And he had been your supervisor since 2001, 2002?

21  A    Approximately, yes.

22  Q    And you had been friends with Mr. Patterson for

23  approximately 30 years?

24  A    That's correct.

25  Q    And you had a good relationship with him?

1   A    I believe so, yes.

2   Q    You thought he was truthful?

3   A    He never lied to me, so I have to assume he was

4   truthful.

5   Q    And isn't it true that at no time from May, until you

6   left PQ, did you ever ask Mr. Patterson what would happen if

7   --

8   A    I --

9   Q    -- you didn't take the package?

10  A    I got the impression that he didn't want to talk about

11  it, even if I did ask him.  I -- I never did ask him that.

12  Q    You never did, even though you had a good relationship

13  with him?

14  A    Yes.

15  Q    And then what Mr. Patterson said to you was, Go talk to

16  Kevin Doran?

17  A    That's correct?

18  Q    And you had four to six discussions with Mr. Doran about

19  a package?

20  A    Yes.

21  Q    And, in fact, what Mr. Doran was doing was showing you

22  hypotheticals of what you would get if you decided to retire;

23  isn't that right?

24  A    Yes.

25  Q    It was your decision?

1  A     Yes.

2  Q     And as part of those discussions, four to six

3  discussions, which took place over about a month; isn't that

4  right?

5  A     Probably about two, three weeks.

6  Q     As part of those discussions, where you're given

7  hypotheticals, you went back to Mr. Doran and said, You know

8  what?  Can I extend the payments over 20 months?

9  A     Because I was concerned about the medical.

10 Q     Right.  So you were negotiating this with Mr. Doran; is

11 that right?

12 A     Yes.

13 Q     And the initial offer was one year's salary, right?

14 A     Yes.

15 Q     And that was about $112,000?

16 A     That's correct.

17 Q     And that included one year of fully paid medical

18 benefits?

19 A     Yes.

20 Q     And you went back to Mr. Doran and said, Listen, can you

21 spread out my 112 or $110,000 salary over 20 months, and give

22 me an extra eight months of medical benefits?

23 A     Yes.

24 Q     And Mr. Doran said, Yeah, we could do that for you?

25 A     Yes.

1   Q    And you wouldn't have retired if you had not gotten that

2   package from PQ; isn't that right?

3   A    Yes.

4              (Pause.)

5              THE COURT:  When did this discussion occur?

6              THE WITNESS:  May of 2005.

7              THE COURT:  Do you know the date?

8              THE WITNESS:  It was the end of May.  I don't recall

9   the date.

10  BY MR. ENNIS:

11  Q    It was at the end of May, and then the discussions with

12  Mr. Doran continued after that for a two or three-week

13  period; isn't that right?

14  A    I would say at the end of May.  Maybe the first week in

15  June.

16             THE COURT:  At the time you were having this

17  discussion and making these decisions, were you aware that

18  there was a RIF in progress?

19             THE WITNESS:  Yes, I was.

20             THE COURT:  Thank you.

21             THE WITNESS:  It happened right after the RIF took

22  place in corporate.

23  BY MR. ENNIS:

24  Q    These discussions took place right after the RIF?

25  A    Yes.

1   Q    And you weren't RIF'd, were you?

2   A    (No response.)

3   Q    You were not part of the RIF?

4   A    The RIF was in corporate.  It wasn't in R and D.

5   Q    Okay.  And there was no one laid off in R and D?

6   A    Not until this time.

7   Q    But then your discussions continued, right?

8   A    Yes.

9   Q    All right.  And in those four to six discussions with

10  Mr. Doran who's the HR manager, you never told him that you

11  were being singled out for age, right?

12  A    No, I didn't bring that up.

13  Q    And you didn't talk to him about what would happen if

14  you didn't take the package, right?

15  A    No.

16            THE COURT:  You mean yes, it is right, or, no?

17            THE WITNESS:  Yes, that's right.

18  BY MR. ENNIS:

19  Q    Okay.

20            MR. ENNIS:  That's all I have, your Honor.

21            THE COURT:  Anything further?

22            MS. EYER:  I have just a couple further questions.

23                   REDIRECT EXAMINATION

24  BY MS. EYER:

25  Q    Sir, just to clarify the time frame.  Dr. Patterson

1   approached you prior to the 2005 RIF in R and D, correct?

2   A     Yes.

3   Q     And, so, he had already told you to go to HR at that

4   point in time?

5   A     That's correct.

6   Q     You also referenced in your testimony that it was your

7   decision ultimately to take the package.  Would you have made

8   that decision if you didn't think that it was a possibility

9   that you would have been fired anyway?

10  A     That's correct.

11  Q     Would you have taken that package had you not considered

12  that your termination was a probability?

13  A     No, I wouldn't have taken the package.  I wanted to work

14  until my full retirement.

15  Q     Okay.

16            MS. EYER:  Thank you, sir.

17            THE COURT:  You may step down.  Thank you, sir.

18            THE WITNESS:  Thank you.

19            (Witness excused.)

20            THE COURT:  I hear a pregnant silence.

21            MR. GOLDSHAW:  The plaintiffs call Eleanor Tickner.

22            ELEANOR TICKNER, after having been first duly sworn

23  as a witness, was examined and testified as follows:

24                      DIRECT EXAMINATION

25  BY MR. GOLDSHAW:

1   Q    Have you ever been employed at PQ Corporation?

2   A    Yes, sir.

3   Q    When?

4   A    1973 to --

5            THE COURT:  Excuse me.  Get closer to the

6   microphone, please.

7            THE WITNESS:  1973 to 2005.

8            THE COURT:  Would you please get closer to the

9   microphone and talk into the end of it?

10           THE WITNESS:  1973 to 2005.

11           THE COURT:  Thank you.

12  BY MR. GOLDSHAW:

13  Q    When your employment ended in May of 2005, how old were

14  you?

15  A    64.

16  Q    Did you want to retire at that time?

17  A    Definitely not.

18  Q    Did you want to continue working at PQ at that time?

19  A    Not only wanted, but needed to.

20  Q    In 2005, did you ever speak with Kevin Doran on the

21  subject of retirement?

22  A    Yes, sir.

23  Q    Why did you speak to Kevin Doran on the subject of

24  retirement?

25  A    Because my supervisor, Neil Miller, requested that I do

1   so on three different occasions.

2   Q    What was the first occasion?

3   A    He had come into my office, and strongly suggested that

4   I call Kevin.  Not giving a reason, not understanding, I

5   didn't.

6         THE COURT:  The question was when did that happen?

7         THE WITNESS:  Sorry.  I really can't give you a

8   date.

9   BY MR. GOLDSHAW:

10  Q    All right.  Would you, please, describe the next

11  occasion on which Neil Miller spoke to you in this regard?

12  A    I believe it was via telephone.  I was at home.

13  Q    Who initiated the phone call?

14  A    Neil Miller did.

15  Q    And what happened on that conversation?

16  A    He, again, strongly urged or he had asked if I had

17  called Kevin Doran, and I said, No.  And he, again, urged me

18  to do so.

19  Q    Did you, after that second occasion?

20  A    No, sir, I was still on the fence listening to gossip.

21  Q    When you refer to gossip, you're talking about the 2005

22  RIF?

23  A    Yes, sir.

24  Q    Okay.  What do you recall of the third occasion when

25  Neil Miller, your boss, talked to you on the subject of

1   retirement?

2   A    He seemed more insistent this time where I -- I gave in

3   and called Kevin Doran.

4   Q    Please describe your conversation with Kevin Doran?

5   A    It was very professional.  I had called, you know,

6   Hello, how are you?

7            And he said, Are you calling in reference to

8   retirement?

9            I said, Yes.

10  Q    Why did you say yes?

11  A    Because the handwriting was on the wall.  I couldn't

12  ignore that subject any longer.

13  Q    At the point in time you called Kevin Doran, did you

14  feel that you had a chance to save your job at PQ?

15  A    No.

16  Q    Did you form an impression as to whether Kevin Doran

17  wanted you to retire?

18  A    I have to say yes, I felt that that was his function at

19  that time.

20  Q    Mm-hmm.  Do you believe that in connection with the

21  ending of your employment, PQ Corporation discriminated

22  against you on the basis of your age?

23  A    Yes, sir, I do believe so.

24           MR. GOLDSHAW:  Nothing further.

25           THE COURT:  Any questions?

1          Excuse me, while we're waiting, what was your job at

2    the place?  What was --

3          THE WITNESS:  Lab --

4          THE COURT:  -- your job at PQ?

5          THE WITNESS:  -- lab technician.

6          THE COURT:  Thank you.

7                    <u>CROSS-EXAMINATION</u>

8    BY MR. ENNIS:

9    Q    Ms. Tickner, six months before the reduction in force,

10   give or take, you had a discussion with Mr. Miller about

11   going on a four-day work week?

12   A    Correct.

13   Q    That was part of your evaluation by Mr. Miller?

14   A    I don't quite remember why we were together, but it very

15   likely was.

16   Q    Okay.  And that's a topic that you raised with him?

17   A    Correct.

18   Q    And you had no problem raising that issue with him?

19   A    No, sir.

20   Q    You felt comfortable with that?

21   A    Yes, sir.

22   Q    Talking about going on a reduced work schedule?

23   A    Correct.

24   Q    And, in fact, you would raise whatever -- not -- strike

25   that.

1          You felt comfortable raising concerns or

2    disagreements with Mr. Miller; isn't that true?

3    A    Correct.

4    Q    And you felt Mr. Miller wanted to keep you?

5    A    At that time, yes, sir.

6    Q    And that he -- you felt that he thought you were a good

7    employee?

8    A    Yes, sir.

9    Q    And, in fact, you had reported to him for about ten

10   years; isn't that right?

11   A    Correct.

12   Q    And despite all that, when Mr. Miller came to you and

13   said to go talk to Kevin Doran, you never asked Mr. Miller

14   what would happen if you didn't talk to Mr. Doran?

15   A    Correct.

16   Q    Okay.  And, then, when you went to talk to Mr. Doran,

17   your discussions with him took place over several months;

18   isn't that right?

19   A    I would have said less time than that.

20   Q    I'm sorry.  They started around May?

21   A    Correct.

22   Q    And you signed the agreement in August --

23   A    Correct.

24   Q    -- does that sound right?

25   A    Yes.

1    Q    And as part of that negotiating process, you were paid a

2    year's salary?

3    A    Yes, sir.

4    Q    $72,000?

5    A    Yes, sir.

6    Q    And received fully paid medical benefits for that period

7    of time?

8    A    Correct.

9    Q    And you wouldn't have retired had PQ not paid you that

10   money?

11   A    Correct.

12        (Pause.)

13   Q    You had the agreement reviewed by Mr. Goldshaw's office;

14   is that correct?

15   A    Yes, sir.

16   Q    Retiring allowed you to go into the flower business that

17   you had or the flower hobby that you had started before?

18   A    Correct.

19   Q    And that's something you had told people you wanted to

20   do?

21   A    Yes, sir.

22   Q    And about six months before the reduction in force, Ms.

23   Marcus came to you and talked to you about people leaving the

24   company; isn't that right?

25   A    Yes, sir.

1   Q    And she said that the people who would be leaving the

2   company were you, Mr. Hinchey, and Mr. Behan; is that right?

3   A    Quite possible.  I... I have not maintained that

4   information in writing.

5   Q    And she didn't mention anything about herself, did she?

6   A    I don't think she had to.  The fact that she was there,

7   indicated that she was one that was leaving.

8   Q    She was mentioning some other people, though?

9   A    Yes.

10  Q    Okay.

11          MR. GOLDSHAW:  That's all I have.

12          THE COURT:  Anything further?

13                    <u>REDIRECT EXAMINATION</u>

14  BY MR. GOLDSHAW:

15  Q    Were you ever the one to raise the issue of retirement

16  with your boss, Dr. Miller?

17  A    No.

18  Q    When you talked about the possibility of a four day work

19  week, did you ever suggest anything about the possibility of

20  retiring?

21  A    No, I do not believe.

22  Q    Was it clear in your mind that when Dr. Miller strongly

23  encouraged you to go to HR on three occasions, that he was

24  sending a message to you?

25  A    Definitely sending a message.

1    Q    In reference to the severance benefits that you

2    received, would you rather have had those benefits, or had

3    the chance to keep your job?

4    A    I've had taken the job.

5         MR. GOLDSHAW:  Nothing further.

6         THE COURT:  You may step down.  Thank you, ma'am.

7         (Witness excused.)

8         MS. EYER:  At this time the plaintiffs call Neil

9    Miller to the stand.

10        NEIL MILLER, after having been first duly sworn as a

11   witness, was examined and testified as follows:

12                    DIRECT EXAMINATION

13   BY MS. EYER:

14   Q    Good afternoon, Dr. Miller.

15   A    Good afternoon.

16   Q    You're a current employee of PQ, correct?

17   A    Yes.

18   Q    And would you, please, tell the jury what was your title

19   at the time of the 2005 RIF?

20   A    My title was R and D Operations Manager.

21   Q    And in that position, did you have supervisory

22   responsibility for an employee named Eleanor Tickner?

23   A    Yes.

24   Q    And, Ms. Tickner, she -- the parties have stipulated

25   that she was age 64 at the time of the RIF, does that sound

1  roughly right to you?

2  A    I --

3           THE COURT:  Not according to what she said.  She

4  said 64, didn't she?

5           MS. EYER:  I said 64.

6           THE COURT:  Okay.

7           MR. ENNIS:  Or I intended to.  I apologize.

8           THE WITNESS:  I actually did not know Eleanor's age.

9  BY MS. EYER:

10 Q    Until the time that she left the company, Ms. Tickner

11 was a valued member of your group, correct?

12 A    Yes.

13 Q    And you considered her job function to be essential?

14 A    Yes.

15 Q    So you wouldn't have, say, fired Ms. Tickner for

16 performance-related reasons?

17 A    No.

18 Q    Nevertheless, Dr. Lau, the head of Research and

19 Development, approached you in late 2004, early 2005, to

20 discuss the possibility of Ms. Tickner retiring; isn't that

21 right?

22 A    Yes.

23 Q    And he asked you to pursue the subject with her, even

24 though she hadn't raised it with you; is that correct?

25 A    Yes.

1  Q    And you did, in fact, broach the subject of retirement

2  with Ms. Tickner shortly thereafter; isn't that right?

3  A    I did, yes.

4  Q    And when you did so, Ms. Tickner was taken aback,

5  correct?

6  A    I remember that.  Also, in reviewing my deposition, I

7  remember that, yes.

8  Q    And it was your impression that she hadn't been thinking

9  about retirement until you brought it up with her; is that

10  right?

11  A    Yes.

12  Q    And, in fact, you, yourself, weren't interested in

13  having Ms. Tickner retire; isn't that right?

14  A    Not at all.

15  Q    Dr. Miller, it's your belief that you would have relayed

16  to Ms. Tickner that the issue of her retirement came up in

17  the context of discussing head count, correct?

18          THE COURT:  Discussing what?

19          MS. EYER:  Head count.

20          THE COURT:  Thank you.

21          THE WITNESS:  I actually don't recall, and I

22  remember in the deposition speculating that I may have raised

23  that issue with Eleanor, but I don't recall if I actually did

24  or not.

25  BY MS. EYER:

1    Q    So it's possible that you may have mentioned the issue

2    of head count at the time that you related this information

3    to her?

4    A    It's possible.

5    Q    And, in fact, you, yourself, believe that Dr. Lau was

6    initiating this conversation with you for a reason about Ms.

7    Tickner; isn't that right?

8    A    I believe he was raising the conversation in the context

9    of looking at head count and funding, right.

10   Q    Now, you were aware, correct, that there were reasons

11   that Ms. Tickner might be particularly concerned about losing

12   her job; isn't that right?

13   A    Yes.

14   Q    In fact, Ms. Tickner's husband had recently had a

15   coronary bypass, correct?

16   A    That's what I understood from Eleanor.  She took a leave

17   to attend to him.

18   Q    And it was your understanding that it was important to

19   Ms. Tickner that she not lose her health benefits for that

20   reason; is that correct?

21   A    I believe so, yes.

22   Q    And she was also the sole wage earner in the family at

23   the time?

24   A    I had the impression, yes.

25   Q    Ms. Tickner did ultimately leave PQ in 2005, correct?

1   A    Yes.

2   Q    And, as far as you know, she left as a result of the

3   sequence of events that began with John Lau approaching you

4   in 2004 or 2005, correct?

5   A    I believe that's the case, yes.

6   Q    Dr. Miller, isn't it true that the only possible reason

7   Dr. Lau could have had for approaching you about Ms. Tickner,

8   as opposed to some other technician in your group, is her

9   age?

10  A    That -- that's what I indicated in my deposition, yes.

11  Q    Is that what you believe here today?

12  A    I -- I believe it was years of service, years of service

13  and age, yes.  Her tenure, yes.

14  Q    And at the time of your deposition, you indicated age,

15  correct?

16  A    Yes, yes.

17  Q    And it was your belief that Dr. Lau may have broached

18  the subject of Ms. Tickner's retirement with you, because he

19  wanted to open up a promotion opportunity for a younger

20  employee; isn't that right?

21  A    I don't believe that.

22  Q    Okay.  Allow me to direct you to your prior sworn

23  testimony.

24  A    Okay.

25            (Pause.)

1   Q     Let me get that for you.

2   A     Thank you.  All right.

3   Q     If you could direct your attention to Page 157.

4   A     (Witness complies.)

5         Okay.

6   Q     I'll direct your attention to Line 17.  You state:

7         "No, Eleanor's function, there was no way we could

8   survive without somebody doing that job.  So I didn't believe

9   she was ever going to get laid off if, in fact, they were

10  considering it, but I think he was looking" --

11        THE COURT:  Would you slow down, for heaven's sake,

12  so people understand what you're saying?

13        MS. EYER:  Thank you, your Honor.

14  BY MS. EYER:

15  Q   "What I think he was looking at was maybe a different

16  way to position the job or, you know, as it turned out, there

17  was another individual up and coming who worked with Eleanor,

18  who I think he was looking as a way to promote her in, if it

19  made sense, and she -- and Eleanor retired.

20        "Question:  And who was that individual?

21        "Answer:  Her name is Rumbo Lee (ph).

22        "Question:  Did she, in fact, take over Ms.

23  Tickner's job duties?

24        "Answer:  Yes."

25  A     Yes.

1    Q    And that's correct, that Ms. Tickner, she did -- I'm

2    sorry -- Ms. Lee, she did ultimately take over Ms. Tickner's

3    job duties?

4    A    Yes.

5    Q    And, Ms. Lee, she was roughly 38 at the time of the RIF;

6    is that correct?

7    A    I don't know.

8    Q    Okay.  Was she substantially younger than Ms. Tickner?

9    A    She was younger, but I don't know -- I didn't know the

10   ages.

11   Q    Dr. Miller, it was your understanding that an employee

12   named Ed Myszak picked up the zeolite programs after the CD

13   program was discontinued, correct?

14   A    The z -- yes, the PVC and what we call the wood plastic

15   composite zeolite programs, yes.

16   Q    And these programs would be essentially what was left of

17   the zeolite-related CD projects after the RIF: is that

18   correct?

19   A    There were other zeolite projects, but I understood

20   these two were the ones that went to Ed.

21           MS. EYER:  I have nothing further of this witness.

22           THE COURT:  What is your present job, are you still

23   with the company?

24           THE WITNESS:  I'm still with the company.  I'm a

25   technical service manager, a business development manager?

1          THE COURT:  Thank you.

2          THE WITNESS:  Okay.

3                    CROSS-EXAMINATION

4    BY MR. ENNIS:

5    Q    Mr. Miller, could you state your educational background,

6    please?

7    A    Sure, I'm -- I have a Bachelor's, Master's, and Ph.D.

8    Degrees in Chemistry.

9    Q    And how long have you been employed by PQ?

10   A    23 years.

11   Q    And how long did you supervise Ms. Tickner?

12   A    I believe it was about ten years starting in 1995.

13   Q    And what sort of employee did you think she was?

14   A    She was an excellent employee.

15   Q    And would she have been terminated if she had not

16   decided to retire?

17   A    No.

18   Q    You wanted to keep her?

19   A    Yes.

20   Q    Okay.  And, in fact, you said -- you referred to Ms.

21   Rumbo Lee taking over some duties.

22          What happened to Ms. Rumbo Lee's duties?

23   A    She held on to them.

24   Q    So she was doing both jobs?

25   A    Yes.

1  Q    And you knew about her husband?

2  A    Yes.

3  Q    Did you know anything about her outside activities?

4  A    Eleanor --

5            THE COURT:  Who is that?

6            MR. ENNIS:  I'm sorry.  You're right.

7  BY MR. ENNIS:

8  Q    Did you know anything about Ms. Tickner's outside

9  activities?

10 A    I -- I knew some of her outside interests.  As an

11 example, her interest in flowers and gardening.

12 Q    And did Ms. Tickner ever express disagreement at work

13 with anyone?

14 A    Yes.

15 Q    And how often?

16 A    I would say on a regular basis.

17 Q    Was she one to hold back on her opinion?

18 A    No.

19 Q    And when you spoke to her on any occasion, did she ever

20 say to you that she objected to the discussion?

21 A    Oh, certainly, certainly.

22 Q    Let me rephrase that.

23           When you talked to her about going to see Mr. Doran

24 --

25 A    I'm sorry, no.

1   Q    When you spoke to her about going to see Mr. Doran, did

2   she ever object to that?

3   A    No.

4   Q    But now let me follow-up with what you were saying.

5        Did she object to things that you would tell her on

6   other occasions?

7   A    Absolutely, I -- I would visit with her regularly,

8   discuss work activities.  If she didn't agree with the work

9   plan, or the amount of information, she would let me know

10  very succinctly.

11  Q    And did you call her more than once or did you talk to

12  her more than once about seeing Mr. Doran?

13  A    I'm recalling the initial conversation and then maybe

14  one after it.

15  Q    And why did you go back to her a second time?

16  A    I wanted to see if she had, in fact, talked with

17  personnel --

18  Q    Mm-hmm.

19  A    -- and then as well, see if they were responsive to her.

20  Q    Okay.  And Ms. Tickner did not leave the company until

21  some time in July; is that correct?

22  A    I'm recalling Eleanor left in August.

23  Q    In August.

24       And the period of time from May until August, did

25  you continue to interact with her?

1   A     Yes.

2   Q     And during any of that time, did she ever object to the

3   discussions with Mr. Doran?

4   A     No.

5   Q     Did she ever express any negative thoughts about

6   retirement?

7   A     No.

8   Q     What was your relationship like with Ms. Marcus?

9   A     I would say friendly, colleagues.

10  Q     All right.  And did you ever have any discussions with

11  Ms. Marcus about a package?

12  A     We -- I remember two occasions, a casual conversation

13  where I remember Ms. Marcus saying she was interested in

14  retiring, would love a package.

15  Q     And when did these discussions take place?

16  A     I -- I don't remember an exact date and time.  It was

17  before the '05 RIF.

18  Q     Okay.

19          MR. ENNIS:  That's all I have, your Honor.

20                      REDIRECT EXAMINATION

21  BY MS. EYER:

22  Q     Dr. Miller, you just testified that Ms. Tickner would

23  not have been fired --

24          THE COURT:  We heard what he said.  Would you just

25  ask your own questions, please?

1  BY MS. EYER:

2  Q    Sir, do you believe that Ms. Tickner would have been

3  fired had she not retired?

4  A    I don't believe she would have been -- Eleanor would

5  have been fired.

6  Q    I believe you testified earlier that Dr. Lau, when he

7  approached you about this issue, it was in the context of

8  discussing head count; isn't that right?

9  A    What he said to me was, Was Eleanor interested in

10 retirement?  The conversation with Lau, I don't remember head

11 count being discussed.  I was surmising.  In my experience

12 with John, if -- if he didn't offer the information, he

13 either didn't want to say it, or didn't have it.

14       So it was a very fast conversation, Did I think

15 Eleanor was interested in retirement?

16       I broached the subject with her and asked her to

17 speak to personnel.

18 Q    And he asked you to ask her to speak personnel; is that

19 correct?

20 A    Yes, yes.

21 Q    And you weren't involved in the RIF decision-making,

22 were you?

23 A    No.

24 Q    So you don't have any way of knowing if she would have

25 been fired had she not gone to HR?

1   A    I would say no.

2            MS. EYER:  I have nothing further.

3            THE COURT:  You may step down.  Thank you.

4            (Witness excused.)

5            MS. EYER:  At this time the plaintiffs call Kevin

6   Doran.

7            KEVIN DORAN, after having been first duly sworn as a

8   witness, was examined and testified as follows:

9                        DIRECT EXAMINATION

10  BY MS. EYER:

11  Q    Sir, at the time of the 2005 RIF, you were the vice

12  president of Human Resources at PQ, correct?

13  A    Yes.

14  Q    And in that role you were responsible for managing the

15  reduction in force process?

16  A    I was.

17  Q    And part of your job in managing the reduction in force

18  process, was to make sure that PQ complied with the age

19  discrimination laws, correct?

20  A    Yes, amongst a number of things.

21  Q    And you were aware --

22           THE COURT:  You mumbled the last comment.

23           THE WITNESS:  I'm sorry.  Amongst a number of

24  things, yes.

25           THE COURT:  Thank you.

1   BY MS. EYER:

2   Q    And you were aware at the time of the 2005 RIF, that age

3   discrimination was against the law, correct?

4   A    Yes.

5   Q    The RIF process that you were responsible for managing

6   in 2005, it ultimately resulted in a number of people getting

7   let go from R and D, correct?

8   A    That's correct.

9   Q    And all of those employees were age 55 or older; isn't

10  that right?

11  A    That is correct.

12  Q    As the head of HR, you have been responsible for

13  reviewing and verifying the factual accuracy of explanations

14  that PQ has given for why those employees were terminated

15  from R and D, correct?

16  A    That's correct.

17  Q    And you have stated under oath that those explanations

18  are true to the best of your knowledge, information, and

19  belief; isn't that right?

20  A    That is correct.

21  Q    Sir, PQ has never contended, in any of its explanations,

22  that plaintiffs were selected for termination based on their

23  performance; isn't that right?

24  A    That is correct.

25  Q    And PQ, in fact, PQ has specifically admitted that the

1    selection of plaintiffs was not based on their performance,

2    correct?

3    A    I believe that's correct.

4    Q    And PQ has also specifically admitted that plaintiffs

5    were qualified for the positions that they held at the time

6    of the RIF; isn't that right?

7    A    Not disputed, no.

8    Q    And PQ has actually formally admitted that; isn't that

9    right?

10   A    I believe that's the case, yes.

11   Q    And the level of plaintiffs' salaries, that didn't play

12   any role at all in their selection for termination either,

13   did it?

14   A    No, it did not.

15   Q    Sir, the termination of the plaintiffs, it didn't have

16   anything to do with the level that they were at in the

17   organization; isn't that right?

18   A    No, I don't believe it did.

19          MS. EYER:  Could you get the binder with 286?

20          (Pause.)

21   BY MS. EYER:

22   Q    At this point I'm going to direct your attention to

23   Exhibits P-286 and 287, which Mr. Goldshaw is bringing up at

24   this time.

25          (Pause.)

1   A    Thank you.

2            (Pause.)

3            I'm sorry.  Could you refer to the number again?

4   Q    It's 286 and 287.

5   A    Thank you.

6            (Pause.)

7            Okay.  I'm looking at 286.

8   Q    If you could take a moment just to take a look at 287 as

9   well?

10  A    (Witness complies.)

11  Q    Sir, am I correct in understanding the documents found

12  at P-286 and P-287 to be PQ's statement of position before

13  the EEOC in response to claims of discrimination filed by

14  Plaintiffs Marcus and Wypart?

15  A    Exhibit 286 is our response, the company's response,

16  regarding Bonnie Marcus v. PQ Corporation, to the EEOC, so I

17  would agree.

18           And 287 is -- they're both dated November 17th,

19  2006.

20  Q    And 287 is the document in relation to Mr. Wypart,

21  correct?

22  A    It says, Regarding Roman Wypart v. PQ Corporation,

23  response to the EEOC.

24  Q    And you reviewed these documents at the time they were

25  prepared; isn't that right?

1   A    That is correct.

2   Q    And you believe them to be factually accurate --

3   A    I do.

4   Q    -- is that also correct?

5            If I could just direct your attention to 287-A?

6            (Pause.)

7            Can you identify that document as a letter that was

8   sent to the EEOC also in relation to Ms. Marcus and Mr.

9   Wypart from PQ Corporation?

10  A    It's December 15th, 2006, and it's to the EEOC.  It

11  says, Regarding PQ Corporation, and in the first paragraph it

12  talks about response to charges filed against PQ by Roman

13  Wypart and Bonnie Marcus.

14  Q    And you reviewed that letter as well at the time and

15  believed it to be factually accurate; isn't that right?

16  A    Yes, I did.

17  Q    Okay.

18           MS. EYER:  At this time I'd move the admission of

19  286 and 287.

20           THE COURT:  I hear no objection.

21           MS. MALLOY:  No objection.

22           THE COURT:  It will be received.

23           (Plaintiffs' Exhibit Nos. 286 and 287 were

24  admitted.)

25  BY MS. EYER:

1    Q    In P-286 and P-287, in these documents that were sent to

2    the EEOC, PQ claims that plaintiffs were terminated because

3    of the elimination of corporate development funding; is that

4    right?

5         And I can direct your attention specifically to Page

6    426 and Pages 440 to 441.

7    A    Thank you.  That's helpful.

8         (Pause.)

9         On Page 426 of the first response, which related to

10   Ms. Marcus v. PQ Corporation, there are a number of different

11   references to the fact that the source of funding for R and D

12   activities of the CDP were effected.

13   Q    And isn't it true that in prior sworn testimony you have

14   admitted that those references constitute a claim that the

15   plaintiffs were terminated because of the elimination of

16   corporate development funding?

17   A    I believe that's the case, yes.

18   Q    And PQ has also claimed that Dr. Eric Senderov, age 69,

19   was terminated because of the elimination of corporate

20   development funding, correct?

21   A    I believe that's the case, yes.

22   Q    And PQ has also made the same claim with respect to Dr.

23   Hinchey, age 67; isn't that right?

24   A    I believe that's the case.

25         (Pause.)

1  Q    Let me go back, sir.

2            I believe I asked you, but I wanted to clarify for

3  the record, PQ has contended that both Plaintiff Marcus and

4  Plaintiff Wypart were terminated because of the elimination

5  of corporate developing funding, correct?

6  A    That is correct.  Do I need this binder again?

7  Q    You can put it down.  You may need it again.

8  A    Okay.  Thank you.

9            (Pause.)

10 Q    If I could direct your attention to P-258.  I'm not sure

11 if you have that binder still?  Is it there?

12           (Pause.)

13 A    Thank you.  258?

14 Q    That's right.

15           (Pause.)

16 A    Okay.

17 Q    Sir, isn't it true that every single employee that

18 appears on this chart is an employee that PQ has acknowledged

19 received corporate development funding in 2005?

20 A    I think in various percentages that's accurate, yes.

21 Q    And there are six employees under the age of 55 who

22 received corporate development funding in 2005; is that

23 correct?

24 A    Are you referring to the six employees at the bottom of

25 this chart?

1    Q    Yes.

2    A    Please restate your question, please?

3    Q    My question was:  There were six employees under the age

4    of 55 who received corporate development funding in 2005;

5    isn't that right?

6    A    Yes, I would agree in some percentage.

7    Q    And all six of those individuals were retained; isn't

8    that right?

9    A    Yes, they were.

10   Q    And the four people aged 55 or older, they were all

11   terminated; isn't that right?

12   A    They were all terminated, yes.

13   Q    I'd like to direct your attention at this point in time

14   to Dr. Hinchey, age 67.

15   A    Okay.

16   Q    You referenced the percentages of funding that people

17   received, and what percentage was Dr. Hinchey funded through

18   corporate development funds in 2005?

19   A    I have no idea without referencing something that would

20   refresh --

21   Q    Let me direct your attention to PQ's sworn answers to

22   interrogatories in this case.  It would be P-218, please?

23             (Pause.)

24   A    Thank you.

25   Q    It would be the response to Question No. 23.

1           (Pause.)

2    A    Okay.

3    Q    And, if you could, the question for the record is

4    identified, "Every employee who's salary was funded in whole

5    or in part through the corporate development program in 2004

6    or 2005, and specify the percentage of each such person's

7    salary that was funded through the corporate development

8    program for 2004 and for 2005."

9           For Dr. Hinchey, under the column 2005, it states

10   that he was funded 10 percent, isn't that right?

11   A    I would agree that's what stated, yes.

12   Q    And these are PQ's sworn answers to interrogatories,

13   correct?

14   A    Yes, they are.

15   Q    And what about Ms. Marcus, age 60, in what proportion

16   was she funded through the corporate development program in

17   2005?

18   A    In 2005, it's reflected as 50 percent.

19          THE COURT:  I'm sorry.  You backed away from the

20   microphone when you got to the number.

21          THE WITNESS:  Sorry, I apologize.

22          In 2005, the percentage was 50 percent.

23   BY MS. EYER:

24   Q    And both Ms. Marcus and Dr. Hinchey were terminated as

25   part of the 2005 RIF, correct?

1    A    That is correct.

2    Q    Mr. Behan, age 66, he was also let go as part of the

3    2005 RIF; isn't that right?

4    A    Yes, he was.

5    Q    And he wasn't funded through CD funds at all, was he?

6    A    He's not reflected in this -- in this document, no.

7    Q    You're familiar with an individual named John Slobogin,

8    age 63, correct?

9    A    Yes, I am.

10   Q    And he was not funded through CD funds at all in 2005

11   either; isn't that right?

12   A    I don't know.

13   Q    Could I direct your attention to PQ's sworn answers to

14   interrogatories?  Does he appear on that list as being funded

15   through the CD program?

16   A    No, he does not.

17   Q    And that list was intended to be a comprehensive list of

18   all people funded through CD funds, correct?

19   A    I believe so, yes.

20   Q    Eleanor Tickner, age 64, was she funded at all through

21   corporate development funds in 2005?

22   A    No.

23   Q    I'd like to redirect your attention at this time to

24   P-286 and 287, those are the two EEOC documents that we were

25   referencing earlier.

1   A    Let me just get the right binders.

2            (Pause.)

3            Okay.

4   Q    Sir, PQ also contends in these documents that the

5   plaintiffs were terminated because the entire corporate

6   development group was eliminated; isn't that right?

7   A    Can you --

8   Q    I direct your attention to Page 427 in P-286, and the

9   page in 287 would be Page 441 under the conclusion.

10           It states, "The entire CDP was eliminated."

11           And I believe CDP was defined earlier in the

12   document as the Corporate Development Group on the first

13   page.

14   A    Okay.  Just give me one second and I'll take a look with

15   you.

16           (Pause.)

17           I would agree that CDP was defined as Corporate

18   Development Group on the first page.

19   Q    And if you'd go to Page 427 of P-286?

20   A    Right, and in the conclusions -- is that what you're

21   referring to?

22   Q    Right, it states that the entire Corporate Development

23   Group was eliminated.

24   A    It states a lot more than that, but, yes, it does state

25   that specific sentence as well.

1   Q    And that was given as a reason for plaintiffs

2   termination, correct?

3   A    That was -- that was the basis for the termination, yes.

4   Q    Okay.  And PQ stated the same thing in regards to 287,

5   Mr. Wypart, correct, if you take a look at Page 441 in that

6   document?

7   A    I'd be happy to do so.

8   Q    In the conclusion section as well.

9        (Pause.)

10  A    Yes, there were other words in the conclusion that

11  support it, but that was the -- in that regard the entire CDP

12  Group was eliminated.

13  Q    Sir, as far as you know, was the entire Corporate

14  Development Group terminated at the time of the 2005 RIF?

15  A    My recollection was that the key people that were

16  associated with it full time were terminated as part of the

17  RIF, with the exception of, I believe, a technician.

18  Q    Let me direct your attention to P-257.

19        (Pause.)

20        Sir, isn't it true that PQ, in a response that you

21  personally verified, originally admitted that all of these

22  people were members of the Corporate Development Group in

23  2005?

24  A    I think as we just went through in the specific

25  document, the answer was specific in the sense that every one

1   of the people listed -- and I don't disagree that some of

2   these names were listed -- had a percentage associated with

3   corporate development, and many of them had other jobs that

4   had nothing to do with corporate development.

5   Q    And if I could redirect your attention to that answer, I

6   believe you specified that Dr. Hinchey, age 67, who was

7   terminated, he was 10 percent assigned; is that correct?

8   A    I remember that as 10 percent, yes.

9   Q    And Ms. Marcus 50 percent assigned?

10  A    That's correct.

11  Q    Are you aware that there are people under the age of 55

12  who were 100 percent funded through the corporate development

13  program?

14  A    If you show something to remind me, I'm sure I'll be

15  able to -- be happy to look at --

16  Q    Let me redirect your attention to P-218.

17           (Pause.)

18  A    Are we going to come back to this one?

19  Q    We will.

20  A    Okay.

21           (Pause.)

22           218.

23  Q    Question No. 23.

24           (Pause.)

25  A    Okay.

1   Q    I believe indicates that both Ms. Fisher and Reggie

2   Thompson were 100 percent assigned or were 100 percent funded

3   through the CD program in 2005, correct?

4   A    They're both reflected as 100 percent, that's correct.

5   Q    Coming back to P-257 --

6   A    And I think they're the people I was referring to as

7   technicians.

8   Q    Let me come back to P-257 for a moment.

9   A    Sure.

10  Q    Sir, isn't it true that PQ has identified each of the

11  people that appear on this list as members of the Corporate

12  Development Group?

13  A    I -- I believe that the answer specifically stated that

14  they were funded in some portion by the Corporate Development

15  Group.

16  Q    Okay.  Well, let me direct your attention -- there's

17  actually a separate answer where PQ identifies the specific

18  members of the Corporate Development Group.

19  A    Okay.

20  Q    The question would be or the document would be P-194.

21       (Pause.)

22  A    I don't know that I have a binder that goes below 200

23  and above 140.  Sorry.

24       Thank you.

25       (Pause.)

1        I'm sorry, Ms. Eyer, what was the number again,

2    please?

3    Q    194.

4    A    Thank you.

5         (Pause.)

6         Okay.

7    Q    If you could direct your attention to Question No. 13?

8    A    (Witness complies.)

9         Okay.

10   Q    The question was:  "For the record, please identify all

11   persons assigned to the Corporate Development Group, whether

12   on a full-time, part-time, intermittent, or temporary basis

13   since January 1st, 2002, and specify for each individual the

14   proportion of their time dedicated to the Corporate

15   Development Group, and the dates which they were part of the

16   group."

17        And the defendant identifies two documents with

18   relation to R and D, PQBM-212 to 215, and 233 to 236.  I will

19   represent to you that those two documents have been marked as

20   P-3 and P-80.  And if you can take those out, we can go

21   through and verify that the -- all of the individuals listed

22   on this list were assigned to the Corporate Development

23   Group.

24   A    So P-3?

25   Q    P-3.

1           (Pause.)

2    A     And the second one was P?

3    Q     Well, why don't we go through the employees listed on P

4    -- let's go through the employees listed one-by-one.

5           Would you agree that Dr. Senderov was assigned to

6    the  Corporate Development Group?

7    A     When you're referring to P-3, so I think I'm on P-3, and

8    which part of --

9    Q     The final page, please?

10   A     Okay.  Thank you.

11   Q     Or, I'm sorry, the second to the last page, please, 235.

12   A     Thank you.

13          (Pause.)

14          Okay.  I'm on Page 235.

15   Q     Would you agree that Dr. Senderov is listed as being

16   assigned to the Corporate Development Group?

17   A     Dr. Senderov is listed as being under exploratory in the

18   Corporate Development Group.

19   Q     And Dr. Hinchey also listed as being assigned on this

20   page?

21   A     Dr. Hinchey is shown under the general framework of CD

22   program and specifically under zeolite products.

23   Q     And Ms. Marcus, she also appears as being assigned?

24   A     Ms. Marcus appears in two places.  One under exploratory

25   for .05 and then again she shows up under zeolite products.

1  Q    And, Mr. Wypart he -- I apologize -- I don't -- if you

2  could direct your attention to P-80, I believe he appears on

3  that document as assigned to the Corporate Development Group?

4  A    Sure.  Just give me one second, please?

5         (Pause.)

6  Q    It would be P-80, Page 215.

7         (Pause.)

8  A    Okay.  I'm with you.

9         The question was, please?

10 Q    On Page 215, Mr. Wypart, he appears as a member of the

11 Corporate Development Group?

12 A    Mr. Wypart shows under exploratory research, and this is

13 labeled a corporate development manpower allocation budget.

14 Q    And am I correct that this is one of the documents that

15 PQ identified as listing the individuals assigned to the CD

16 Group in 2005?

17 A    I believe that's the case, yes.

18 Q    Okay.  And Mr. Thompson, he also appears on this

19 document as assigned to the CD Group, correct?

20 A    Mr. Thompson shows under the exploratory research

21 group... yes, he does, mm-hmm.

22 Q    Dr. Lau also appears on this chart as well, correct?

23 A    He actually shows the label "Technical Administration,"

24 but he shows on the document as well.

25 Q    Ken Berg also appearing on this chart here, also appears

1   on this list?

2   A    He shows under a specific column called "Silica

3   Technology," and is reflected as 20 percent.

4   Q    Dr. Miller, he also appears on this list as being

5   assigned to the Corporate Development Group?

6   A    That's under the corporate development manpower

7   allocation budget, which is the header, and under a specific

8   column called "Analytical" --

9   Q    And --

10  A    -- and the percentage is 20 percent.

11  Q    -- just to verify for the record, again, this is a

12  document that PQ has sworn under oath lists the individuals

13  in the   Corporate Development Group, correct?

14  A    I believe that's the case.

15  Q    Okay.  Phil Connolly, he also appears on this list,

16  correct?

17  A    Mr. Connolly appears on the list under a column called

18  "Zeolite Technology," and a percentage of 30 percent.

19  Q    Harry Foyerharper (ph), he also appears on this list?

20  A    It's Fuerhopter (ph).  I think Harry would like it that

21  you said it that way.  And he shows under a column called

22  "Potters Conductive," and he shows as a 10 percent.

23  Q    If I could direct your attention back to P-3?

24  A    Sure.

25          (Pause.)

1    Which page are you going to go back to, Ms. Eyer,

2    please?

3    Q    Page 235.

4    A    Thank you.

5         (Witness complies.)

6    Q    The next two names on this chart Ufak Senter and Terry

7    Ann Sidbury (ph), they appear on this chart as part of the CD

8    Group, correct?

9    A    Yes, under the specific label of Potters R and D, which

10   is our other business entity.

11   Q    And, Mr. Abula (ph), he also appears on this list as

12   assigned to the Corporate Development Group?

13   A    That's Mr. Abuala (ph), and he shows under "Potters

14   Conductives," which is again our separate business,

15   conductive materials, and, yes, he does show on the list.

16   Q    And isn't it true that PQ has also admitted that Ms.

17   Fisher, age 35, was also a member of the group?

18   A    I don't think that's in dispute.

19   Q    Okay.  So, sir, isn't it true that PQ has admitted that

20   every single individual that appears on this chart was a

21   member of the Corporate Development Group in 2005?

22   A    I would agree with the percentages that were expressed,

23   which was part of the question that was asked.

24   Q    And none of the individuals under the age of 55 were

25   terminated; isn't that right?

1  A    According to that chart, the answer is correct.

2  Q    Sir, were there any people under the age of 55, who were

3  terminated in R and D?

4  A    No, there were not.

5  Q    So none of the individuals in the Corporate Development

6  Group, who were under the age of 55, were terminated; isn't

7  that right?

8  A    I believe I've said that before, yes, I agree with you.

9        (Pause.)

10 Q    Sir, at this time I'd like to direct your attention to

11 P-288.  Do you have that binder in front of you?

12 A    I think it's the one on the floor.  Let me check.

13       (Pause.)

14       288?  288?

15 Q    That's correct.

16       The question -- this is another sworn answer to

17 interrogatories by PQ Corporation, correct?

18       THE COURT:  We'll take your word for it.

19 BY MS. EYER:

20 Q    The question reads:  "Set forth in full detail the

21 reason or reasons why PQ eliminated Ms. Marcus's position.

22       "Response" --

23 A    Can you tell me which question you're referring to and

24 which page?  There's a number of pages here.

25 Q    I am sorry.  It's page -- P-228 -- it is the second

1    page.

2    A    Okay.  Thank you.

3    Q    "Response:  PQ decided to eliminate funding from the

4    Corporate Holding Company which supported the research and

5    development conducted by the corporate development program.

6    The business units were then authorized to determine what, if

7    any, research and development projects would continue to be

8    funded by the business units.  As a result of this process,

9    the funding for the research and development projects, which

10   Marcus was overseeing, was virtually eliminated and her

11   position was no longer needed."

12           Do you recognize the text I just read as setting

13   forth PQ's official explanation for why Ms. Marcus's position

14   was eliminated?

15   A    Yes, I do.

16   Q    And, sir, at the time you personally verified the

17   accuracy of that explanation; isn't that right?

18   A    Yes, I did.  I signed it on August 26th of 2008.

19   Q    I'd like now to direct your attention to P-290.

20           (Pause.)

21           The second page.

22   A    Okay.

23   Q    The question is:  "Again, set forth in full detail the

24   reason or reasons why PQ eliminated Mr. Wypart's position."

25           And the answer is:  "PQ decided to eliminate funding

1   from the Corporate Holding Company which supported the

2   research and development conducted through the corporate

3   development program.  The business units were then authorized

4   to determine what, if any, research and development projects

5   would continue to be funded by the business units.  As a

6   result of this process, the funding for the research which

7   Wypart was conducting was eliminated."

8            And, again, you personally verified that this

9   interrogatory response was factually accurate, correct?

10  A    Yes, I did, on July 30th of 2008.

11           MS. EYER:  I hereby move the admission of P-288 and

12  P-290.

13           THE COURT:  Hearing no objection --

14           MS. MALLOY:  No objection.

15           THE COURT:  -- they'll be received.

16           (Plaintiffs' Exhibit Nos. 288 and 290 were

17  admitted.)

18           THE WITNESS:  Are we done with this one?

19           MS. EYER:  Yes, you can put it down.  We may use it

20  later.

21           THE WITNESS:  Okay.  I'll just put it down here.

22  Thanks.

23  BY MS. EYER:

24  Q    I'm now displaying P-290, which is the explanation given

25  by PQ for Mr. Wypart's termination.

1          MS. EYER:  Your Honor, would this be a convenient

2     time to take the afternoon break?

3          THE COURT:  No, but we will anyway.

4          (Laughter.)

5          THE COURT:  A ten-minute recess.

6          (The jury exited the courtroom.)

7          (A recess was taken at 2:52 o'clock p.m. until 3:06

8     o'clock p.m.)

9          (The jury entered the courtroom.)

10         THE COURT:  Be seated, please.

11    BY MS. EYER:

12    Q   Sir, in PQ's official explanation for the reasons why

13    Mr. Wypart and Ms. Marcus were terminated, they contend that

14    the funding for the projects that plaintiffs were conducting

15    was eliminated or virtually eliminated, correct?

16    A    Are you referring to a document that I can look at with

17    you?

18    A    P-290 and P-288, the documents we were just referring

19    to.

20         THE COURT:  You read that before.  The answer is

21    yes.

22         What's your next question.

23    BY MS. EYER:

24    Q   PQ later made or also made a similar claim with respect

25    to Plaintiffs' colleague, Dr. Eric Senderov, age 69, correct?

1   A    If -- if you have a document that you'd like me to look

2   at with you, I'd be happy to.

3        THE COURT:  No.  We just want to know what you have

4   in your head.

5   BY MS. EYER:

6   Q    Could I direct you to P-291?

7        THE COURT:  No, you could not.  I'm sick and tired

8   of people having to look at documents before they can answer

9   a question.

10       THE WITNESS:  Okay.  Yes.

11  BY MS. EYER:

12  Q    Do you have any reason to doubt that PQ has contended

13  that Dr. Senderov's --

14       THE COURT:  It's in the record a half a dozen times.

15  Get on.  What's your next question?

16  BY MS. EYER:

17  Q    The research projects that plaintiffs and Dr. Senderov

18  were working on in 2005, weren't actually eliminated, were

19  they?

20  A    The funding for the corporate development program, and

21  the projects associated with the funding, were certainly

22  effected, and the funding was eliminated.

23  Q    Sir, let me ask you:  Is it your contention that the

24  projects that plaintiffs were working on were or were not

25  eliminated?

1   A    I believe that they were eliminated and the funding was

2   eliminated.

3   Q    I'll direct your attention to P-255.

4         (Pause.)

5   A    Sorry, it's at the bottom of the pile.

6         (Pause.)

7         THE COURT:  Do you have a question?  What is it?

8   BY MS. EYER:

9   Q    This chart has been admitted into evidence as a summary

10  of PQ documents relating to the continuation of projects

11  following the 2005 RIF.

12        Sir, you don't have any basis for disputing, with

13  the exception of TSPQ, each of the projects that appear on

14  this chart continued after the 2005 RIF, do you?

15  A    I'm sorry.  Can you please repeat your question, because

16  there's no 255 in these binders.

17  Q    I apologize, sir.

18        My question for you was whether you have any basis

19  for disputing that the projects that appear on this chart,

20  biocides II, MMA, nano A, olefin cracking, PVC, and WPC, all

21  of them with the exception of TSPQ, continued after the time

22  of the 2005 RIF?

23  A    I have no way of contesting that one or the other today.

24  Q    Let me at this time redirect your attention to P-290.

25        (Pause.)

1   A    Okay.

2   Q    In its formal explanation for the termination of the

3   plaintiffs, PQ directly links the termination of plaintiffs'

4   projects to the elimination of corporate development funding,

5   correct?

6   A    The funding supported the projects that were being

7   worked on.

8   Q    And that was specifically corporate development funding,

9   correct?

10  A    That's correct.

11  Q    And PQ provided a virtually identical explanation for

12  the termination of Dr. Senderov's projects, correct?

13  A    I believe that's the case, yes.

14       (Pause.)

15  Q    Sir, isn't it true that three of the projects that

16  appear here were not funded at all through the corporate

17  development program at the time of the RIF?

18  A    I don't know which ones you're referring to.  If you'd

19  like to point them out?

20  Q    Sure.  Olefin cracking, do you recognize that as a

21  project that was funded through a business unit at the time

22  of the 2005 RIF?

23  A    I don't recall.

24  Q    Can I direct your attention to P-192?

25  A    Sure.

1        MS. EYER:  Does the witness have the exhibit binder?

2        (Pause.)

3   BY MS. EYER:

4   Q    Question No. 19 requests:  "Please identify every

5   research and development, corporate development, or business

6   unit sponsored project that was funded in full or in part by

7   corporate development funds (i.e., funds as are described in

8   the PQ Corporation Annual Report 2003, Page 12), during the

9   year 2005."

10       The answer directs attention to PQBM-2715, which is

11   a document that appears as P-60.

12       (Pause.)

13       And if I could direct your attention to the lower

14   right-hand corner for 2005.

15   A    So it's PQBM-2715?

16   Q    That's correct.

17   A    In the lower right --

18   Q    In the lower right-hand corner.

19   A    Okay.  Thank you.  I'm --

20   Q    -- for 2005.

21   A    -- I'm with you.

22   Q    Olefin cracking does not appear on the list of projects

23   that are to receive CD funding during 2005; isn't that right?

24   A    If you're referring to the lower grid it says, CDP

25   expense budget summary for '05.  The answer is I don't see

1   anything referring to olefin cracking.

2   Q    MMA, also does not appear on that list; isn't that

3   right?

4   A    Well, there's four blocks.  Are you talking about the

5   same grid?

6   Q    2005, correct.

7   A    Okay.

8              (Pause.)

9              No, there's no reference to MMA.

10  Q    And PVC also does not appear on that list for 2005,

11  correct?

12  A    I don't see a reference to PVC.

13  Q    So as to those projects which PQ has identified as not

14  being funded through corporate development funds, they can't

15  possibly have been effected by the elimination of CD funding;

16  isn't that right?

17  A    I don't disagree.

18  Q    At this time I'd like to direct your attention to P-284

19  -- I'm sorry -- P-264.

20  A    I'm sorry?

21  Q    P-264.

22  A    Thank you.

23              (Pause.)

24              Okay.

25  Q    Sir, this document, which has been moved into evidence,

1  summarizes PQ documents reflecting who was assigned to the

2  biocides II project at the time of the RIF.

3        Of the four people under the age of 55 that are

4  assigned to that project, not a single one of those people

5  was let go, correct?

6  A    They're all showing as being retained.

7  Q    Okay.  And, to the best of your independent knowledge,

8  all four of those individuals in R and D were retained,

9  correct?

10 A    I think I just said that, yes.

11 Q    Let me direct your attention to the second page of that

12 same exhibit.

13 A    Okay.

14 Q    The three individuals under the age of 55 who are

15 assigned to the MMA project, all three of those individuals

16 were retained, correct?

17 A    The three people below Ms. Marcus were showing as being

18 retained, yes, that's correct.

19 Q    And to the best of your independent knowledge, were all

20 three of those people, in fact, retained at the time of the

21 2005 RIF?

22 A    Yes, they were.

23 Q    Sir, I'll direct your attention to the third page.  In

24 relation to the nano A project, the three people under the

25 age of 55 who were assigned to that project, they were also

1   retained at the time of the 2005 RIF, correct?

2   A     That's what it reflects, yes.

3   Q     I'll direct your attention now to the PVC project.

4   A     Is that in the same sequence of pages?

5   Q     Yes, it is.

6   A     Okay.  Thanks.  I'll find it.

7         (Pause.)

8   Q     Sir, the two individuals under the age of 55 that were

9   assigned to the PVC project, they were not terminated,

10  correct?

11  A     If you're referring to John Lau and Erin Fisher, that's

12  correct.

13  Q     I'll direct your attention now to the TSPQ project.  The

14  two people under the age of 55 who were assigned to that

15  project were not terminated, correct?

16  A     If you're referring to Reginald Thompson and John Lau,

17  that's correct.

18  Q     And, sir, finally the WPC project, the three individuals

19  under the age of 55 who were assigned to that project were

20  not terminated; isn't that right?

21  A     If you're referring to Reginald Thompson, John Lau, and

22  Erin Fisher, that's correct.  And I think it's been explained

23  that Mr. Lau was the VP of R and D, and the other two

24  individuals were technicians.

25  Q     Sir, in relation to Erin Fisher in particular, you are

1    aware, correct, that she has provided sworn testimony, in the

2    context of this litigation, that she took over 80 to 85

3    percent of Mr. Wypart's job duties after the time of the 2005

4    RIF, correct?

5            MS. MALLOY:  Objection, relevance as to his

6    knowledge of other testimony.

7            THE COURT:  Objection sustained.

8    BY MS. EYER:

9    Q    Sir, you have heard reference throughout this litigation

10   to something known as the Corporate Holding Company, correct?

11   A    Yes, I have.

12   Q    The Corporate Holding Company isn't actually a separate

13   company, is it?

14   A    No, it is not.

15   Q    It's just an accounting term for certain funds that are

16   controlled by upper management at PQ; is that right?

17   A    It's a -- I would say it's a fair way of describing it.

18   It's an accounting budget number and separate set of funds.

19   Q    And isn't it true, sir, that there were numerous R and D

20   employees who were under the age of 55, who were funded

21   through the Holding Company in 2005?

22   A    If you'd give me some specifics, I'd be happy to address

23   it.

24   Q    Can you see the chart or do you want to take a look in

25   the binder?

1    A    It would probably be easier in the binder.

2    Q    P-258.

3    A    Thank you.

4         (Pause.)

5         Okay.

6    Q    Sir, isn't it true that all of the employees who appear

7    on this chart who were under the age of 55 were funded in

8    whole or in part through the Corporate Holding Company in the

9    year 2005?

10   A    If there's representations to that somewhere, I have no

11   reason to dispute it.

12   Q    We had gone through that PQ has identified each of these

13   employees as receiving corporate development funds.  Are you

14   aware that, through the context of this litigation, that

15   corporate development funds came directly from the Holding

16   Company?

17   A    Yes, and I think we talked about some people getting

18   small percentages, yes.

19   Q    And some people getting large percentages as well,

20   correct?

21   A    That's correct, yup.

22   Q    At this time I'd like to direct your attention to P-52.

23        (Pause.)

24   A    Okay.

25   Q    This is a document that you were required by law -- I'm

1    sorry -- strike that.

2            This is a document that was prepared by you at the

3    time of the 2005 RIF, correct?

4    A    That's correct.

5    Q    And this is a document that you were required to provide

6    by law to people who were being let go as part of the 2005

7    reduction in force, correct?

8    A    Only to those people that were receiving a release

9    document that described --

10           THE COURT:  I'm sorry.  You're turning away from the

11   microphone.  Only what people?

12           THE WITNESS:  I apologize.

13           This document was prepared as -- as part of the RIF,

14   but it was only distributed to people, which is required by

15   law, those people who got a release document that would be a

16   suggestion that they would get additional benefits from other

17   than our normal policy severance.

18   BY MS. EYER:

19   Q    In exchange for waiving their rights under the Age

20   Discrimination Law; is that correct?

21   A    They waive rights under every type of -- of legal issue,

22   or any other things that they would hold against the company

23   in the future, as consideration for the total package.

24   Q    And this document, in particular, is a document you are

25   required to provide under the Age Discrimination Law, in

1   order to inform the employees of the ages of the other

2   individuals who are included in the RIF, correct?

3   A    I think that's where the genesis of the requirement

4   comes from.  I agree with you.

5   Q    Okay.  Sir, does P-52 accurately list the employees who

6   were let go as part of the 2005 RIF?

7            (Pause.)

8   A    Related to the R and D Group, because there was other

9   people let go, I would agree for the R and D Group.

10  Q    So you would agree, sir, that all eight employees listed

11  on this document were employees let go as part of the 2005

12  RIF?

13  A    With the exception of Ms. Tickner and Mr. Slobogin.

14  Q    And Ms. Tickner appears as the technologist II, age 64;

15  is that correct?

16  A    That is correct.

17  Q    And Mr. Slobogin, he is the engineering research fellow,

18  age 63; is that also correct?

19  A    I believe that's correct.

20  Q    Sir, were Mr. Slobogin and Ms. Tickner a part of the

21  2005 RIF?

22  A    According to this document, they were required to be

23  listed as part of the RIF, but as we've heard from direct

24  testimony, they were not reduced in force involuntarily as

25  the other people effected by the RIF were.

1          THE COURT:  They accepted the package, right?

2          THE WITNESS:  That is correct, on a voluntary basis.

3  BY MS. EYER:

4  Q    Sir, isn't it true that you have previously contended in

5  sworn testimony that Ms. Tickner and Mr. Slobogin were not

6  even in the 2005, a part of the 2005 RIF?

7  A    I think I was -- I think I characterized it as saying I

8  disagreed that they were involuntarily terminated, as was

9  everybody in the RIF, that was designated on this page.

10 Q    If I could direct your attention to your prior sworn

11 testimony?

12         MS. EYER:  The other one.  The other one.

13         (Pause.)

14         Day 2.

15         THE WITNESS:  This?  Okay.  I understand.  Thank

16 you.

17 BY MS. EYER:

18 Q    Page 123.

19         (Pause.)

20 A    Okay.

21         THE COURT:  Is there a question?

22         MS. EYER:  Yes.

23 BY MS. EYER:

24 Q    The question was:

25         "And what about Richard Hinchey, age 67, do you

1   recognize him as one of the people who was let go as part of

2   the 2005 reduction in force?

3           "Answer:  Yes, yes, I do.

4           "Albert Behan, age 66?

5           "Yes.

6           "Eleanor Tickner, age 64?

7           "Answer:  No.

8           "Question:  And what makes you say that, Mr. Doran?

9           "Answer:  Ms. Tickner left the organization at the

10  same time or approximately the same time as the other people

11  that we just referred to, but she was not part of the

12  reduction in force."

13          THE COURT:  Well, we don't want to spend time on

14  splitting hairs.  I think the evidence is clear on that.  Go

15  on to something else.

16  BY MS. EYER:

17  Q    Sir, it has been PQ's official position in this

18  litigation that Ms. Tickner and Mr. Slobogin requested to be

19  let go voluntarily; isn't that right?

20  A    That is correct.

21  Q    And that they ultimately resigned voluntarily?

22  A    That is correct.

23  Q    Sir, you were present for Ms. Tickner's and Mr.

24  Slobogin's testimony that they were both urged by their

25  managers to go to HR, correct?

1  A    I heard that in both testimonies, yes.

2  Q    Sir, I'd like to direct your attention at this time to

3  P-51.

4        THE COURT:  Why can't you just ask him the question

5  without wasting all this time and putting something in front

6  of his face?  What's your question?

7        MS. EYER:  Actually, your Honor, I wanted to

8  authenticate a number of documents, as to --

9  BY MS. EYER:

10  Q    Actually, could I direct your attention to P-53?

11       Do you recognize this document?

12       (Pause.)

13       MS. EYER:  Your Honor, the parties have reached a

14  stipulation to the admission of P-53 and P-16.

15       THE COURT:  What may they turned out to be?

16       MS. EYER:  They are documents that the parties have

17  stipulated accurately reflect the ages and positions of

18  employees at the time of the 2005 RIF?

19       THE COURT:  Oh, for heaven's sake, that's in the

20  record a dozen times.

21       They will be received.

22       (Plaintiffs' Exhibit Nos. 53 and 16 were admitted.)

23  BY MS. EYER:

24  Q    At this time I would like to direct your attention, sir,

25  to P-12.

1          (Pause.)

2    A    Okay.

3    Q    Do you recognize this e-mail as an e-mail from the PQ

4    CEO, Michael Boyce, dated February 27th, 2005, relating to

5    the process leading up to the 2005 RIF?

6          THE COURT:  We'll take your word for it.  What's

7    your question?

8          THE WITNESS:  I do.

9    BY MS. EYER:

10   Q    And you are copied on this e-mail individually, correct?

11   A    Yes, I am.

12   Q    And, for the record, the e-mail reads:

13         "Guys, we have all discussed the organizational

14   review coming up.  I wanted to confirm some date/times and

15   make sure we are all on the same page.

16         "April 1st, I would like to receive from each of you

17   your worldwide organization as you see it" -- and this is in

18   caps -- "WITHOUT NAMES.  Just the boxes.  For the staff guys,

19   I would like for you to have discussions with Jerry and

20   Michael to make sure we are not double-counting.

21         "The basic assumption will continue to be" -- and,

22   again, this is in caps -- "WE WILL HAVE AS MANY BOXES AS IT

23   MAKES SENSE OUT IN THE ORGANIZATIONS, AND AS FEW IN THE

24   CORPORATE STRUCTURE.

25         "Scott, we have Matt in Europe and you in Rome.

1          "April 15th, you should have the names in the boxes.

2    Between April 1st and April 15th, we will discuss only the

3    boxes, not the names.  On or about April 15th, we will start

4    discussing the names."

5          You agree, don't you, sir, that the approach set out

6    in this e-mail is a good one?

7    A    Yes, I do.

8    Q    And it's a good approach, at least in part, because it

9    helps guard against biases managers may have towards

10   individuals who are reporting to them?

11   A    As one element, yes.

12   Q    The approach set out in P-12 by Mr. Boyce, it wasn't

13   actually followed, was it?

14   A    I don't agree.

15   Q    Sir, did you, yourself, create a box chart without names

16   for your own organization?

17   A    No, I did not.

18   Q    Do you know if such a chart without names was ever

19   completed for R and D?

20   A    I don't.

21   Q    You've previously stated in sworn testimony that you

22   didn't believe such a chart was ever created, do you have any

23   reason to dispute that testimony now?

24   A    No.

25   Q    Can I direct your attention to P-20?

1          (Pause.)

2     A    Okay.

3     Q    For the benefit of the jury, this is an e-mail between

4     Colleen Delmonte and Rosalyn Kutchins, subject R and D, date

5     April 12th, 2005.  This is three days before Mr. Boyce's

6     deadline for talking about names, correct?

7     A    If you're referring to the April 15th date versus April

8     12th, I would agree.

9     Q    And in this e-mail Ms. Delmonte and Ms. Kutchins are

10    specifically discussing which of the three synthesis experts;

11    Phil Connolly, Eric Senderov, and Dick Hinchey should be let

12    go; isn't that right?

13    A    That's what the e-mail says.

14         THE COURT:  Excuse me.  How can there be -- they

15    both sent the same e-mail or what?

16         MS. EYER:  I apologize, your Honor.  It is an e-mail

17    from Colleen Delmonte to Rosalyn Kutchins.

18         THE COURT:  All right.

19    BY MS. EYER:

20    Q    I'm done with that e-mail, you can put it away.

21    A    Okay.

22    Q    Sir, you were responsible for managing the overall 2005

23    RIF process, correct?

24    A    That's correct.

25    Q    And in that capacity, you had a number of conversations

1  with decision-making managers about what their plans were for

2  the RIF; is that also right?

3  A    That is correct.

4  Q    And the provided you with information about what

5  employees were being considered for layoff; isn't that right?

6  A    At the end of the process, yes.

7  Q    And, in fact, as of April or May, they were providing

8  you with information about who was projected to be laid off,

9  correct?

10  A    There were some projections in April and into May.

11  Q    And you collected those projections into a document;

12  isn't that right?

13  A    Yes, I did.

14  Q    Sir, isn't it true that during the RIF process, you were

15  tracking the ages of the employees who were proposed for

16  layoff?

17  A    As one of a number of different elements, yes.

18  Q    Let's take a closer look at some of the documents, if I

19  could direct your attention to P-83?

20         (Pause.)

21         Sir, you -- oh, I'm sorry.

22         (Discussion held off the record.)

23  BY MS. EYER:

24  Q    Sir, you created this document in the beginning of May

25  or late April, correct?

1   A    The date would reflect approximately May 1st.

2   Q    And it lists the names of employees who were at that

3   time proposed for layoff; isn't that right?

4   A    Based on the discussions that had taken place to that

5   point, that was the projection at that date.

6   Q    And it also lists the ages of those employees, correct?

7   A    That is correct.

8            MS. EYER:  At this time I move the admission of

9   P-83.

10           THE COURT:  Hearing no objections --

11           MS. MALLOY:  No objection.

12           THE COURT:  -- so ordered.

13           (Plaintiffs' Exhibit No. 83 was admitted.)

14  BY MS. EYER:

15  Q    Sir, isn't it true that the average age of the employees

16  slated for termination in R and D got significantly older

17  after this document was created?

18  A    I believe that probably is the case.

19           THE COURT:  Sorry, but that doesn't make sense.

20           The average age got older as each hour of time

21  passed, for heaven's sake.

22           MS. EYER:  I will --

23  BY MS. EYER:

24  Q    This was a projection, correct, of the expected age at

25  time of layoff; isn't that right?

1   A    As of May 1st.

2   Q    That's right.

3        And, in fact --

4   A    The reduction in force took place later in that month as

5   we've described a couple times.

6   Q    That's right.

7        And the average age of the employees listed on this

8   document, who were employees in R and D, was -- the parties

9   have stipulated that it was 51.1.  The ultimate age of the --

10  average age of the employees who were terminated in R and D

11  the parties have stipulated that it was age 62.  Do you have

12  any reason to doubt that?

13  A    No, I don't.

14  Q    So the average age of the employees who were being

15  considered went from 51.1 up to age 62 in the span of a

16  month, correct?

17  A    Directly related to changes in the projections, yes.

18        THE COURT:  These are different employees, is that

19  the --

20        MS. EYER:  That's correct, your Honor.  There's

21  different employees that were significantly older.

22        THE COURT:  Very well.

23        THE WITNESS:  There's a number of employees that are

24  on here that are significantly younger that ended up being

25  projected at that time, but did not get reduced for a number

1    of different reasons, which I'm happy to go through with you.

2    BY MS. EYER:

3    Q    Sir, at this time I would like to direct your attention

4    to P-85.

5            (Pause.)

6            Sir, this is also a document that you created,

7    correct?

8    A    That is correct.

9    Q    And the document includes information about the average

10   age of both the individuals who are already with the company

11   and the potential RIF; isn't that right?

12   A    This is as of 4/27, so, again, a projection at a point

13   in time, and it's a -- the left-hand column reflects the

14   starting position of where the company -- how many people we

15   had to start, and that includes both our headquarters

16   building and the R and D building.  The average age and

17   service, and the average base pay, and the demographic

18   configuration of the group of people in place at that time,

19   compared to the projections at that point, or what

20   information had been submitted at that point through

21   discussions I was having with managers of where the ideas are

22   in terms of what people may be effected by a RIF, and we've

23   already established that some of that changed later in the

24   month.

25   Q    And it changed in the direction of th employees being

1   let go were older, correct?

2   A    I think we talked about that a minute ago, and as I

3   explained, there were certainly people on the original sheet

4   at a younger age that came off for various reasons, which I'm

5   happy to detail, and other people that ultimately were

6   decided, as the business process evolved, were put on the

7   page, and that did change the average age.

8            MS. EYER:  At this time I'd like to move the

9   admission of P-85.

10           MS. MALLOY:  No objection.

11           THE COURT:  Received.

12           (Plaintiffs' Exhibit No. 85 was admitted.)

13  BY MS. EYER:

14  Q    At this time, sir, I'd like to direct your attention to

15  P-32.

16           (Pause.)

17  A    Okay.

18  Q    The authors of this memo, Colleen Delmonte and Rosalyn

19  Kutchins, they reported up to Michael Imbriani, correct?

20  A    Yes, they did.

21  Q    And Ms. Kutchins, you were present for her sworn

22  testimony that Mr. Imbriani had previously ordered her to

23  engage in age discrimination; isn't that right?

24  A    I -- I heard her testimony.  I'm not sure I conclude the

25  same thing, but I heard her testimony.

Doran - Direct                                              149

1    Q    Well, would you like me to refresh your recollection --

2    A    I'm not going to --

3    Q    -- as to her prior testimony?

4    A    It's not necessary.

5              THE COURT:  He just doesn't agree with your

6    characterization of it.  Go on to something else.

7    BY MS. EYER:

8    Q    Ms. Kutchins, do you recall her providing sworn

9    testimony that she submitted a written complaint in relation

10   to Mr. Imbriani's discrimination to the HR Department?

11   A    I did hear that, yes.

12   Q    And did you also hear her testify that she had submitted

13   that same complaint to the Legal Department as well?

14   A    I did.

15   Q    And she also testified that she saved a copy of that

16   memorandum for herself?

17   A    Yes, I did hear that.

18   Q    And the memorandum, it was created on a company

19   computer; isn't that right?

20   A    I heard her state she did it on her laptop.

21   Q    At the time of the document production in this case,

22   none of those copies of Ms. Kutchins' complaint were

23   produced; isn't that right?

24   A    That's correct, and I think it was even stipulated that

25   we were aware that they were requested as part of the

1    discovery process, and there was a search for that document.

2    Q    Okay.  Why was that document never produced, sir?

3    A    It was not found.

4    Q    Ms. Kutchins' complaint against Mr. Imbriani, it was

5    only two years before the RIF that we're discussing here

6    today, correct?

7    A    I don't know exactly the timing.  I know it was way

8    before the RIF.

9    Q    If she testified that it was in 2003, do you have any

10   reason to doubt that?

11             THE COURT:  We'll take your word for it.  You're

12   just arguing your case.  This is supposed to add to our store

13   of knowledge about the case.  Do you have any questions that

14   --

15   BY MS. EYER:

16   Q    Sir, Mr. Imbriani was at the time of Ms. Kutchins'

17   complaint, the executive vice president of PQ's Chemicals

18   Group; isn't that right?

19   A    If you represent that.  I wasn't with the company at

20   that point.

21   Q    Did he hold that title when you came to the company?

22   A    Say the title again?

23   Q    Executive vice president of PQ's Chemicals Group?

24   A    My recollection was he was -- could have been the

25   president of the Chemicals Group when I joined the company.

1  But if it was executive vice president, I have no reason to

2  argue, I wasn't there.

3  Q    And whatever position, whether you describe it as the

4  president or the executive vice president, that was a

5  high-ranking position within the company, correct?

6  A    Absolutely, he was a senior executive.

7  Q    And, in fact, Mr. Imbriani, he reported directly to the

8  CEO; isn't that right?

9  A    That is correct.

10 Q    As the vice president of human resources, wouldn't you

11 agree that an age discrimination complaint against PQ's upper

12 management should get taken seriously?

13 A    Absolutely.

14 Q    Do you believe that PQ was taking Ms. Kutchins'

15 complaint seriously when it lost all four copies of that

16 complaint?

17 A    I can't respond to that.  I wasn't with the company at

18 that point.

19 Q    In fact, you weren't even aware of the complaint until

20 this lawsuit was filed; isn't that right?

21 A    That is correct.

22 Q    Sir, Mr. Imbriani was never reprimanded for engaging in

23 age discrimination, was he?

24 A    I'm not aware of any such reprimand.

25 Q    In fact, PQ has represented in the context of this

1   litigation that he had no EEO-related discipline; isn't that

2   right?

3   A    That is correct.

4   Q    Sir, isn't it true that Ms. Kutchins' complaint is not

5   the only time that Mr. Imbriani has sought to discriminate

6   against older workers at PQ?

7          MS. MALLOY:  Objection, he disagrees with the

8   characterization.

9          THE COURT:  Well, maybe he --

10          MS. MALLOY:  Argumentative.

11          THE COURT:  Objection overruled.

12          If the witness knows anything, he can answer.

13          THE WITNESS:  Can you repeat your question, please?

14   BY MS. EYER:

15   Q    The question was:  Isn't it true that Ms. Kutchins'

16   complaint is not the only time Mr. Imbriani has sought to

17   discriminate against older workers at PQ?

18   A    I -- I don't -- I don't understand another --

19          THE COURT:  You don't know of any other acts --

20          THE WITNESS:  No.

21          THE COURT:  -- of discrimination on his part?

22   BY MS. EYER:

23   Q    Isn't it true that Ms. Kutchins has provided sworn

24   testimony that Mr. Imbriani was involved in other efforts to

25   bring younger employees into the business?

1  A    I heard --

2           MS. MALLOY:  His recollection of her testimony is

3  not relevant.

4           THE COURT:  Precisely correct.

5           Objection sustained.

6  BY MS. EYER:

7  Q    Sir, in relation to succession planning, I would like

8  now to direct your attention to P-149.

9           (Pause.)

10 A    I don't think I have a binder with 149 in it.

11 Q    I can ask you a question while Mr. Goldshaw gets you

12 that binder.

13           Isn't it true, sir --

14           MS. MALLOY:  Excuse me a second.

15           I just wanted to assert an objection to this, which

16 is the subject of a motion on this continuing line of

17 testimony on this topic of succession planning.

18           THE COURT:  I don't know what it is yet.  We'll find

19 out.

20           THE WITNESS:  I'm sorry, Ms. Eyer.  Could you repeat

21 the number again, please?

22 BY MS. EYER:

23 Q    P-149.

24 A    Thank you.

25           (Pause.)

1          Okay.

2     Q    Sir, it is true, is it not, that Mr. Imbriani was one of

3     the individuals involved in PQ's succession planning process?

4     A    If you're referring to this --

5     Q    I'm not referring to the document now.  I'm asking to

6     your knowledge about --

7          THE COURT:  Was he involved in succession planning,

8     I think she wants to know?

9          THE WITNESS:  I can't speak before I got to the

10    company, but when I got to the company, we had some

11    succession planning discussions.

12    BY MS. EYER:

13    Q    And are you familiar with Ms. Kutchins' testimony to the

14    fact that Mr. Imbriani was associated with this --

15         MS. MALLOY:  Same objection which was sustained.

16         THE COURT:  I don't know what the issue is.

17         MS. EYER:  My question was, Are you familiar with

18    Ms. Kutchins' testimony to the effect that Mr. Imbriani was

19    associated with the succession planning process?

20         THE COURT:  His familiarity with her testimony is

21    totally irrelevant.

22         Objection sustained.

23    BY MS. EYER:

24    Q    Sir, this document that appears as P-149, this is PQ's

25    official succession plan as of 2003, correct?

1   A     This was a document that was turned in as part of

2   discovery.  It predates me.  And it's represented by its

3   title as the PQ Corporation Succession Plan Dated January

4   21st, 2003.

5   Q     Sir, isn't it true that you have previously identified

6   this document, testifying on behalf of the company, as PQ's

7   official succession plan for 2003?

8   A     If that was the term I used, I'm happy to stay with it.

9   Q     Okay.

10          MS. EYER:  I hereby move the admission of P-149.

11          MS. MALLOY:  Objection, relevance.

12          THE COURT:  I haven't seen it, so I don't know what

13   it is.

14          MS. EYER:  Sir, this document includes information

15   about all of the ages of the employees who were being

16   considered, including Ms. Marcus, as part of the succession

17   planning process, and we contend it is directly relevant that

18   such a document was created and circulated at PQ.

19          THE COURT:  There being no objection to the

20   authenticity of it, we'll let it in for the moment, but I'll

21   reconsider that when I've had a chance to read it.

22          (Plaintiffs' Exhibit No. 149 was admitted.)

23   BY MS. EYER:

24   Q     Sir, the ages of employees were an important part of

25   PQ's succession planning process; isn't that right?

1   A    I disagree with the connotation "important."  I wasn't

2   part of the process.  If you want me to ask me if there's

3   ages reflected in this document that predates me, the answer

4   is clearly yes.

5   Q    Sir, isn't it true that you provided sworn testimony on

6   behalf of the company in relation to this issue, this

7   specific issue, succession planning, you were the individual

8   designated to do that?

9   A    Yes, I did.

10           THE COURT:  When were you involved in it?

11           THE WITNESS:  I was never involved directly in it.

12  I -- I -- what Ms. Eyer is referring to, your Honor, is I was

13  called as a company official to respond to things like this

14  document that predated me.

15           MS. EYER:  It was a 30(b)(6) deposition, your Honor,

16  and Mr. Doran was the designated official to speak on this

17  issue, including as to matters before his employment at PQ.

18           THE COURT:  Proceed, and see if you can get

19  something that relates to this case.

20  BY MS. EYER:

21  Q    If I could direct your attention to the page labeled

22  "PQBM-14060"?

23           (Pause.)

24           THE COURT:  His attention has been directed.  What's

25  your question?

1  BY MS. EYER:

2  Q    My question for you, sir, is:  This is the biography for

3  Plaintiff, Bonnie Marcus, correct?

4           (Pause.)

5  A    No dispute.

6  Q    And this page appears within PQ's official succession

7  plan, which has been marked as P-149?

8  A    The one we referred to as in 2003, the answer is yes.

9  Q    And this right here is Mr. Marcus's date of birth,

10  correct?

11  A    DOB is date of birth, and DOH is date of hire.

12  Q    Still, information about Ms. Marcus's age was directly

13  incorporated in PQ's official succession plan; isn't that

14  right?

15  A    No disagreement.

16  Q    Sir, at the time of the 2005 RIF, you, yourself, made

17  the decision to terminate several employees; isn't that

18  right?

19  A    That is correct, in my own department of HR.

20  Q    Isn't it true, sir, that every single one of the

21  employees you personally made the decision to terminate was

22  age 55 or older?

23  A    That very well could have been the case.

24           THE COURT:  Were any of them married?  She referred

25  to all the single ones, but how about the married ones?

1          (Laughter.)

2          THE WITNESS:  I believe in the case of all three,

3    they were all married, happily.

4          MS. EYER:  I have nothing further of this witness.

5          THE COURT:  Any questions?

6          MS. MALLOY:  Not at this time, your Honor.

7          THE COURT:  You may step down.  Thank you, sir.

8          THE WITNESS:  Thank you, your Honor.

9          THE COURT:  You have something brief to proceed

10   with?  We'll go a little longer, but we have to get the jury

11   home in time for a very important baseball game.

12         MS. EYER:  I think, your Honor, it makes sense to

13   recess at this time, and we'll start first thing tomorrow

14   with our next witness.

15         THE COURT:  Okay.  Enjoy the game.

16         Recess until tomorrow morning at 10:00 o'clock.

17         (The jury exited the courtroom.)

18         THE COURT:  And don't direct my attention to a

19   document, whatever you do.

20         (Laughter.)

21         MS. EYER:  I'll sit down, your Honor.

22         MR. ENNIS:  Your Honor, I understand that the first

23   witness the plaintiffs -- well, they haven't officially

24   confirmed it -- but a witness they're going to call tomorrow

25   is Ed Myszak who was the subject of the Court's ruling at the

1　last trial, and we're objecting to a portion of his testimony

2　on hearsay grounds, and on other grounds.

3　　　　And, specifically, there is at least three times

4　when he says, Someone told me that they were told something

5　about older people.

6　　　　THE COURT:  I've already ruled that kind of stuff

7　doesn't come in.

8　　　　MR. ENNIS:  All right.

9　　　　And then that's part -- there are three -- let's

10　see.  There are four proposed exhibits where that is done.

11　Plaintiffs' 137, Plaintiffs' 139, Plaintiffs' 143, and

12　Plaintiffs' 144.  And then the last thing we are objecting to

13　is Plaintiffs' 145, which was a document that couldn't be

14　authenticated, was excluded last time, it has a SWAT analysis

15　from who knows when, that was given to him by someone else,

16　and he doesn't know who put any information into it, and it

17　couldn't be authenticated, and the guy died, and your Honor

18　excluded it the last time.

19　　　　THE COURT:  Well, I must have been right to do so.

20　　　　MR. GOLDSHAW:  Well, let me begin by saying I agree

21　that the precise issues being brought before your Honor now

22　are exactly the same issues that we argued in the context of

23　the last trial.  I feel, for purposes of the record, I need

24　to preserve this issue.  And if your Honor tells me that --

25　　　　THE COURT:  You want to protect --

```
 1              MR. GOLDSHAW:  --  this is --

 2              THE COURT:  -- you want to protect the record?

 3              MR. GOLDSHAW:  Yes, and if it's the same issue, I

 4    don't want to waste everybody's time.

 5              THE COURT:  What page is it on in the transcript?

 6              MR. ENNIS:  It's from his deposition, your Honor.

 7              MS. EYER:  Well, the, I think the --

 8              MR. GOLDSHAW:  I can go through the various --

 9              THE COURT:  No, I'm talking about my ruling at the

10    previous trial.

11              MR. ENNIS:  Oh, sorry.

12              MS. EYER:  The ruling -- what day was Myszak?

13              MR. ENNIS:  It's Page 83, but -- I have the page,

14    but I don't have the day number.

15              MS. EYER:  I have Day 4, I believe.

16              MR. ENNIS:  So it's Day 4, Page 83 it starts on.

17              THE COURT:  Day 4.  Good heavens, did we last that

18    long?  I've only got the first two days.

19              MS. EYER:  It's actually on Page 82, and continues

20    to Page...

21              MS. MALLOY:  We think we have it on the monitor.

22              MR. ENNIS:  It goes to 95.

23              MS. EYER:  Page 82 --

24              MR. ENNIS:  Or actually beyond that.  It goes to

25    101.
```

1          MS. EYER:  It goes to --

2          THE COURT:  It is on the screen now?

3          MR. ENNIS:  Yes.

4          MS. MALLOY:  Yes.

5          (Pause.)

6          MR. GOLDSHAW:  I would also just appreciate

7    clarification.  A number of exhibits were just rattled off,

8    and I didn't catch them all, but if he's represented it's the

9    exact same stuff we argued last time --

10          MR. ENNIS:  Yes, I can represent that.

11          MR. GOLDSHAW:  Okay.  Then I think we are squarely

12   presenting the exact same issue as last trial, and if we know

13   that the ruling is the same, and the issue's been preserved

14   --

15          THE COURT:  Yes, it's going to be the same.

16          MR. GOLDSHAW:  Okay.  I respect that and in that

17   case I've got nothing further to say other than I --

18          THE COURT:  You can --

19          MR. GOLDSHAW:  -- am not surprisingly continue to

20   believe in my position.

21          THE COURT:  You can protect yourself on the record.

22          But while we're here, why on earth don't you settle

23   this case?  They've got you nailed to the wall, but not as

24   hard as they think they have.

25          (Laughter.)

1          Are there any changes of position on settlement?

2          MS. MALLOY:  I don't think we've talked lately.  I

3   mean, I certainly have my client available.  We're --

4          THE COURT:  Will you each --

5          MS. MALLOY:  -- very far apart I think at the

6   meeting.

7          THE COURT:  Will you each write down on a piece of

8   paper what your thus far final settlement offer is?  You

9   write down what you'd accept and you write down what you

10  would offer.

11         MR. ENNIS:  Can we represent that to you in the

12  morning, your Honor?

13         THE COURT:  Yes, I guess so.

14         MR. GOLDSHAW:  Yes, we can do that.

15         THE COURT:  I'm trying to save counsel fees.

16  They're going to try to get you for counsel fees.

17         MS. EYER:  I'm sorry, what was that, your Honor?

18         THE COURT:  I said I was trying to save him counsel

19  fees --

20         MS. EYER:  Oh, right.

21         THE COURT:  -- getting it settled today rather than

22  tomorrow.

23         (Laughter.)

24         MS. EYER:  I'm sure he would appreciate that.

25         THE COURT:  We'll see you tomorrow.

1          MR. ENNIS:  Thank you, your Honor.

2          MR. GOLDSHAW:  Thank you, your Honor.

3          THE COURT:  Okay.

4          (Court adjourned at 3:57 o'clock p.m.)

5                          *  *  *

164

1                          I N D E X

2   WITNESSES:                    DIRECT  CROSS  REDIRECT  RECROSS

3   Michael Boyce - By Deposition

4        By Ms. Eyer                2

5   Colleen Delmonte

6        By Mr. Goldshaw           5

7   Colleen Delmonte

8        By Ms. Malloy            31

9   William Cormier - By Deposition

10       By Goldshaw              36

11  Philip Connolly

12       By Ms. Eyer             38                56

13       By Mr. Ennis                    50

14  Eric Senderov

15       By Mr. Goldshaw         57                72

16       Ms. Malloy                      69

17  John Slobogin

18       By Ms. Eyer             74                83

19       By Ms. Malloy                   79

20  Eleanor Tickner

21       By Mr. Goldshaw         84                91

22       By Mr. Ennis                    88

23  Neil Miller

24       By Ms. Eyer             92               102

25       By Mr. Ennis                    99

<u>E X H I B I T S</u>

| <u>NUMBER</u> | <u>ADMITTED INTO EVIDENCE</u> |
|---|---|
| P-274, 7, 8, 32, 188, 250, 254, 254-A, and 177 | 4 |
| P-32-A | 16 |
| P-286 and 287 | 108 |
| P-288 and 290 | 125 |
| P-53 and 16 | 140 |
| P-83 | 145 |
| P-85 | 148 |
| P-149 | 155 |

\* \* \*

<u>CERTIFICATION</u>

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


Geraldine C. Laws, CET                Dated 12/14/09
Laws Transcription Service