```
                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                                  - - -

BONNIE MARCUS and ROMAN        :  CIVIL ACTION NO. 07-2075
WYPART,                        :
         Plaintiffs            :
                               :
         v.                    :  Philadelphia, Pennsylvania
                               :  November 5, 2009
PQ CORPORATION,                :  10:12 o'clock a.m.
         Defendant             :
. . . . . . . . . . . . . . . . :

                        CIVIL JURY TRIAL - DAY 4
                  BEFORE THE HONORABLE JOHN P. FULLAM
                  UNITED STATES DISTRICT COURT JUDGE

                                  - - -

APPEARANCES:

For the Plaintiff:          KATIE R. EYER, ESQUIRE
                            SCOTT B. GOLDSHAW, ESQUIRE
                            Salmanson Goldshaw, P.C.
                            Two Penn Center
                            1500 J.F.K. Boulevard
                            Suite 1230
                            Philadelphia, PA  19102

For the Defendant:          PETER J. ENNIS, ESQUIRE
                            ELIZABETH A. MALLOY, ESQUIRE
                            Buchanan Ingersoll & Rooney, PC
                            One Oxford Centre
                            301 Grant Street
                            20th Floor
                            Pittsburgh, PA  15219-1410


                                  - - -

Audio Operator:        Dennis Taylor

Transcribed by:        Paula L. Curran, CET

          (Proceedings recorded by The Record Player digital
sound recording; transcript provided by AAERT-certified
transcriber.)
```

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

2

```
 1              (The following occurred in open court at 10:12

 2   o'clock a.m.)

 3              THE CLERK:  All rise.

 4              THE COURT:  Good morning.

 5              ALL:  Good morning, your Honor.

 6              THE COURT:  Be seated, please.  Are we ready to

 7   proceed?

 8              MS. EYER:  We are, your Honor.  At this time, the

 9   plaintiff calls Dr. Stephanie Thomas to the stand.

10              STEPHANIE THOMAS, Plaintiff's Witness, Sworn.

11              THE CLERK:  Please state your name and spell your

12   last name for the record, please.

13              THE WITNESS:  Stephanie Thomas, T-H-O-M-A-S.

14              THE COURT:  Stephanie with a ph?

15              THE WITNESS:  Yes, sir.

16                          DIRECT EXAMINATION

17   BY MS. EYER:

18   Q   Good morning, Dr. Thomas.

19   A   Good morning.

20   Q   Could you please state your employer for the record,

21   please?

22   A   Yes, I'm employed by Minimax Consulting.

23   Q   And what is your position with Minimax?

24   A   I am the director of the Equal Employment Advisory and

25   Litigation Support Division.
```

1  Q   And what is it that you do for a living?  How would you

2  characterize your profession?

3  A   I specialize in applied economics and statistics.

4  Q   Have you come to court today prepared to give an expert

5  statistical opinion on whether the 2005 lay-off decisions at

6  PQ Corporation were related to age?

7  A   Yes, I have.

8  Q   Before you share those opinions, I would like to ask you

9  about your qualifications.

10         THE COURT:  Just go ahead and do it.  Don't tell her

11  what you'd like to do.

12  Q   Could you please tell the jury what is your educational

13  background?

14  A   I have a Bachelor's Degree in Economics from Elmyra

15  College.  I have a Masters Degree and a Ph.D. in Economics

16  from the New School for Social Research in New York City.

17  Q   And did your course of Ph.D. study involve statistics?

18  A   Yes, it did.

19  Q   You stated earlier that you are a statistician and

20  economist.  How long have been employed in that capacity?

21  A   A little over ten years.

22  Q   And what type of work do you perform as a statistician?

23  A   All kinds of consulting work, anything that calls for the

24  application of statistics to real world problems, we work on.

25  Q   And that would include equal employment opportunity

1   matters, is that correct?

2   A   That's correct.

3   Q   Could you please give me a brief overview of your

4   employment history before you came to Minimax Consulting?

5   A   Certainly.  From August of 2003 until September 1st of

6   this year, I was employed by LECG, as a principal.  I was

7   doing the same kind of work, applied economics and

8   statistics.  From June, 1999 to August of 2003, I was

9   employed by the Center for Forensic Economic Studies in

10  Philadelphia, again, as an applied economic and statistical

11  consultant.  And from September, 1997 until June of 1999, I

12  was on the faculty of Arts & Sciences at New York University.

13  Q   And that would be as a professor, is that correct?

14  A   That's correct.

15  Q   Have you testified in court relative to the issues you

16  are here to testify about today, in other cases?

17  A   Yes, I have.

18  Q   What courts?

19  A   Various federal and state courts, New Jersey,

20  Pennsylvania, Washington, D.C., Virginia, Kentucky.

21  Q   Dr. Thomas, is your firm retained by both plaintiffs and

22  defense counsel?

23  A   Yes, we are.

24  Q   And would you be able to estimate roughly what proportion

25  of your work is defense side work versus plaintiffs side

1    word?

2    A    It really varies, depending on the current project load,

3    but I would say somewhere between 60/40 to 70/30 on the

4    defense side.

5              MS. EYER:  At this time, I would like to offer Dr.

6    Stephanie Thomas as an expert in the field of statistics.

7              MR. ENNIS:  No objection.

8    BY MS. EYER:

9    Q    Dr. Thomas, did you undertake a statistical analysis of

10   the reduction in force decisions in this case?

11   A    Yes, I did.

12   Q    And could you, please, briefly summarize for the jury

13   what you found?

14   A    Yes.  I found that there is a surplus of older workers

15   selected for RIF, even when we control for the explanations

16   offered by PQ Corp.

17   Q    And were the results that you found statistically

18   significant?

19   A    Yes, they were.

20   Q    Could you, please, briefly explain, for the jury, what it

21   means in lay terms to be statistically significant?

22   A    Sure.  Basically, what we're trying to do with statistics

23   is we're trying to figure out how likely something is to

24   occur.  And the rule of thumb that statisticians use is

25   something called two units of standard deviation.  So, if an

1    outcome is less than 5 percent, which is equivalent to two

2    units of standard deviation, if it's less than 5 percent

3    likely to occur, we say that that result is statistically

4    significant.

5    Q    And am I correct that a statistically significant result

6    is one you would not expect to see by chance?

7    A    Correct.

8    Q    Dr. Thomas, what information did you rely on in preparing

9    your analysis here today?

10   A    I reviewed the Complaint, the defendant's second

11   supplemental responses to plaintiff, Bonnie Marcus' first set

12   of interrogatories, defendant's third supplemental response

13   to plaintiff, Bonnie Marcus' first set of interrogatories,

14   defendant's second supplemental responses to plaintiff, Roman

15   Wypart's first set of interrogatories, Defendant's amended

16   responses to plaintiff, Roman Wypart's second set of

17   interrogatories.  Two documents relating to the CD program

18   allocation budgets, those would be Bates PQBM-000212 to 215.

19   And PQBM-000233 to 236.  I also reviewed Plaintiff's Exhibit

20   P-51 and P-52.  I reviewed certain pages of the October 10th

21   deposition of Mr. Neil Miller.  And I was provided with a

22   data file containing demographic information relating to the

23   PQ work force, as well as whether the employee was selected

24   for RIF.

25   Q    So, was the majority of information that you considered

1    information that was provided by PQ?

2    A    That's correct, yes, it was.

3              MS. EYER:  Your Honor, at this time, I would request

4    permission for the witness to approach the easel?

5              THE COURT:  For heaven's sake, of course.

6              THE WITNESS:  Thank you, sir.

7    Q    Dr. Thomas, could you first, please explain to the jury

8    what you found looking at R&D as a whole, without considering

9    the explanations that PQ has offered for plaintiff's

10   terminations?

11   A    Yes.  When we look at the research and development or R&D

12   work force, there were 56 individuals in that work force.

13   And of those 56 individuals, 17 of them were age 55 and

14   older.  Now, within R&D, there were eight people selected for

15   the reduction in force and all eight of those people were age

16   55 and older.

17             So, what we can do is, we can statistically

18   calculate the number of older people, meaning 55 and above

19   and younger people, under 55, we would expect to see selected

20   for the RIF.  And what we see here is that all eight of the

21   RIFs were age 55-plus, but not the entire population is age

22   55 and above.  So, we would expect some of those RIFs to be

23   under age 55 and what we actually find is that there were 5.6

24   older people that were RIF-ed, more than what we would

25   expect.

1   And that's equivalent to 4.30 units of standard deviation.

2   And remember, the rule of thumb here is any standard

3   deviation over two is considered to be substantially

4   significant.

5   Q   Dr. Thomas, what is the likelihood that you would see

6   that standard deviation if the lay-off decisions in this case

7   were unrelated to age?

8   A   The odds of that would be one in 58,507.

9   Q   Dr. Thomas, what test did you rely on in arriving at this

10  conclusion?

11  A   This test was based on Fisher's Exact Test.

12  Q   And did you rely on a similar tests in performing your

13  other analysis, which we'll get to in just a moment?

14  A   Yes, I did.

15  Q   And what test would that be?

16  A   That would be the Mantel Haenszel Chi Square Test.

17  Q   And what the sample size that you used for this analysis?

18  A   For all of my analysis the sample size was 56.

19  Q   Where your analysis found statistically significant

20  results, would that be accounting for the sample size?

21  A   Yes, it would be.

22  Q   So, to put it in language we can all understand, the size

23  of your sample doesn't make your analysis unreliable, is that

24  correct?

25  A   That's correct.

1  Q   You performed a number of other analysis relating to R&D

2  as well, correct?

3  A   That's correct.

4  Q   Could you please explain for the jury why you conducted

5  those other analysis?

6  A   I conducted the other analysis to control for the

7  explanations that PQ offered, surrounding the decisions to

8  reduce people as part of the reduction and force.

9  Q   And could you please explain, just briefly, what it means

10 to control for a particular explanation?

11 A   Sure.  What that means is we're building that into the

12 analysis.  We're not relying on pure chance. We're

13 incorporating into our study and our calculations, outside

14 factors, these explanations that were offered by PQ.

15 Q   So, once you've controlled for a factor, would any

16 results that you see in terms of a surplus of age, be already

17 having accounted for that factor, is that right?

18 A   Yes.  If the analysis controls for that factor, the

19 results incorporate that factor.

20 Q   And they are after you've already considered that factor,

21 is that correct?

22 A   That's correct.

23 Q   Dr. Thomas, what was the first explanation that you

24 controlled for?

25 A   The first explanation was whether or not somebody was a

1   member of a CD group and I reviewed some documentation about

2   CD group membership and there was some conflict in the

3   documentation as to whether or not Dr. Lau (ph) should be

4   included in the CD group or excluded from the CD group.  So,

5   I ran the analysis both ways.  If we include Lau -- if we

6   include Lau in the CD group, we find a surplus of 4.7 older

7   workers.  That means 4.7 more older workers than what we

8   would expect to see were actually laid off.  In units of

9   standard deviation, that's equivalent to 3.76 units.  Again,

10  that's a statistically significant result.

11  Q   And what is the likelihood that you would see that result

12  if they lay-offs in this case were un-related to age?

13  A   The odds there are one in 5,884.

14  Q   And you also conducted an analysis with Lau not in the

15  group, is that correct?

16  A   That's correct. If we include Lau in the non-CD group

17  portion of R&D, we repeat the analysis, we'd see that there

18  were 4.3 older workers more than what we would expect laid

19  off.  That's equivalent to 3.65 units of standard deviation.

20  Again, it's a statistically significant result and the

21  likelihood of that occurring, the odds are one in 3,812.

22  Q   Dr. Thomas, in conducting your analysis, what information

23  did you use to determine who the members of the CD group

24  were?

25  A   Documentation provided by PQ.

1   Q    And the version of the tests that you performed without

2   Lau in the group, what percentage were the individuals

3   assigned to the CD group, who you -- were listed and who were

4   included in the analysis?

5   A    I'm not sure I understand the question.

6   Q    For the portion of your analysis you conducted where Lau

7   was not in the CD group, were all of the members of the CD

8   group assigned 100 percent to that group?

9   A    Yes.

10  Q    So, you would effectively control for 100 percent

11  assignment to that group, as well, through that analysis?

12  A    That's correct.

13  Q    What was the next explanation that you controlled for Dr.

14  Thomas?

15  A    The next explanation that was offered was whether or not

16  somebody had a majority of their funding coming through a

17  project that was terminated.  Again, we have the same 56

18  people in the population.  Of those 56, 17 are age 55 and

19  above.  We have the same eight individuals RIF-ed, all of

20  whom are over age 55.  When we run this analysis, we have

21  five older workers more than what we would expect to see in

22  RIF.  That's equivalent to 4.06 units of standard deviation,

23  again, a statistically significant result.

24  Q    And Dr. Thomas, when you say terminated projects, are you

25  referring there specifically to CD projects?

1   A   Yes.

2   Q   Corporate Development projects, is that correct?

3   A   Correct, yes.

4   Q   And what is the likelihood that you would see the 4.06

5   standard deviations in the absence of a consideration of age?

6   A   The odds here are one in 20,368.

7   Q   And you conducted this analysis two different ways, is

8   that correct?

9   A   Yes. There were two differing documents provided by PQ

10  about what projects were terminated.  This analysis here is

11  based on the list that was given in PQBM-000235.  There was a

12  different array of projects listed in PQBM-000215.  So,

13  again, using the second set of information, we still see a

14  surplus of 5.0 older workers.  There were five more laid off

15  then we would expect.  The standard deviations here are 3.96,

16  again, significant.

17  Q   And what would be the odds that you would see that

18  result, if the lay-off decisions were un-related to age?

19  A   The odds here are one in 13,336.

20  Q   And Dr. Thomas, in conducting both of these analysis, did

21  you rely on information provided by PQ to determine what

22  projects continued and who was assigned to those projects?

23  A   Yes.

24  Q   Dr. Thomas, what was the next explanation that you

25  controlled for?

1          THE COURT:  We learned her name a long time ago.

2          MS. EYER:  Thank you, your Honor.

3          THE WITNESS:  The next analysis was whether or not

4    you had any funding, at all, coming to the Corporate

5    Development group, the CD group.  Again, the same 56 people,

6    17 are age 55 and above.  We have the same eight RIFs, all of

7    whom are older.   And when we repeat the analysis here,

8    controlling for whether or not a person received any funding

9    from the CD group, we have a surplus of 5.3 older workers,

10   meaning 5.3 more than what we would expect to see.  That's

11   equivalent to 4.04 units of standard deviation.

12   Q    And what is the likelihood that you would see absent

13   consideration of age?

14   A    The odds there are one in 18,699.

15   Q    What was the next explanation that you controlled for,

16   Dr. Thomas and feel free to flip that if you need more room

17   on that.

18   A    Here, we control for whether a person received any

19   funding via the CD group.  The next analysis controls for

20   whether or not somebody had 100 percent of their funding from

21   the CD group.  Again, it's the same 56 people, the same eight

22   RIFs.  When we do this analysis controlling for 100 percent

23   funding, we have a surplus of 5.3.  Again, there's 5.3 older

24   workers more than what we would expect to see.  The standard

25   deviation here is 3.97 units, again, that's statistically

1    significant.

2    Q   And again, what would be the likelihood of seeing that

3    result be absent consideration of age?

4    A   The odds here are one in 13,907.

5    Q   In determining how and what portion people were funded

6    via the Corporate Development program, what information did

7    you rely on?

8    A   That was the supplemental response Number 23.

9    Q   So, that would be information that was provided by PQ, is

10   that correct?

11   A   That's correct.

12   Q   Dr. Thomas, you can resume the stand, at this time.  Why

13   did you control for the specific factors that you just

14   identified?

15   A   They were the explanations that were offered by PQ in the

16   material that was provided to me.  When we do these kinds of

17   analysis, we want to try to mirror the process that actually

18   happened and we want to incorporate all of the explanations

19   and the factors that we used.

20   Q   And did you control for all of the reasons articulated by

21   PQ for the plaintiff's terminations in particular?

22   A   Yes.

23   Q   At this time, I would like to direct your attention to

24   P-233.  I believe Mr. Goldshaw will get you that binder in

25   just a moment.

1   A    Thank you.

2   Q    And the specific exhibits that I'd like you to take a

3   look at are 233 to 238.  Once you've reviewed those, I'll

4   give you a couple of additional numbers.

5              (Pause.)

6   A    Yes.

7   Q    Could I also direct your attention to 240 through 242?

8   A    Yes, ma'am.

9   Q    Do you recognize these charts and tables as documents

10  that were prepared by you in connection with the analysis

11  that you just testified to?

12  A    Yes, I do.

13             MS. EYER:  I hereby move the admission of P-233

14  through P-238 and P-240 through P-242?

15             MR. ENNIS:  Your Honor, we object for the reasons

16  previously described.

17             THE COURT:  You can make them part of the record.

18  I'll rule on their use later.

19  BY MS. EYER:

20  Q    Dr. Thomas, in your best professional opinion, are the

21  results that you have described here today, consistent with

22  the defendant's position that the 2005 RIF decisions at PQ

23  were the result of an age-neutral process?

24  A    No.  My analysis would support the hypothesis that the

25  process was not age neutral.

1    Q    And Dr. Thomas, the conclusions that you've expressed

2    here today, do you hold those conclusions to a reasonable

3    degree of professional certainty?

4    A    Yes, I do.

5    Q    Thank you.

6              THE COURT:  Any questions?

7              MR. ENNIS:  Yes, your Honor.

8                        CROSS-EXAMINATION

9    BY MR. ENNIS:

10   Q    Dr. Thomas, will you agree that what you were doing was

11   looking at the statistics to "infer possible discrimination?"

12   A    Correct.

13   Q    And you agree that statistics can never be used to solely

14   prove discrimination?

15   A    That's my understanding.

16   Q    And that's because you have to look at the actual reasons

17   given and the evidence for those reasons for each individual

18   decision, isn't that right?

19   A    You would certainly want to include that information.  As

20   to whether or not you'd need to under the laws, that's beyond

21   the scope of my expertise.

22   Q    Okay.  And what you did was compare the number and ages

23   of people in the work force to the number of people who were

24   removed from the work force?

25   A    Correct.

1    Q   Okay, and then you tested whether the difference in

2    outcomes observed ruled out chance?

3    A   We tested to see whether or not the results differed from

4    what we would expect under an age-neutral process, not

5    chance.

6    Q   Not chance and to rule out chance, the pool, the number

7    of people that you are looking at initially, have to be

8    similarly situated, wouldn't you agree?

9    A   It depends on how you define similarly situated.  You

10   would need to compare people who had the same likelihood of

11   being selected for RIF.

12   Q   Okay, let's use that definition, the same likelihood of

13   being chosen for the RIF.  And what sort of factors would you

14   look to, to see whether someone had the same likelihood?

15   A   Well, those were the factors that I controlled for in my

16   analysis.  Things like whether or not you worked on a

17   terminated project, whether or not you had funding through

18   the CD group, whether or not you were considered to be a CD

19   group member by PQ.

20   Q   Okay.

21   A   Those kinds of factors.

22   Q   And I'm sorry, Colleen, I should have asked you to do

23   this before.  I'm going to put up some documents here.

24              (Pause.)

25              THE COURT:  Why are you making her do all the work?

1          MR. ENNIS:  I'm sure she's much better than I am.

2          (Pause.)

3   Q   And just to be clear, the reason you have to have

4   employees who are similarly situated, is so that everyone can

5   have the same chance of being let go?

6   A   Well, you want to try to compare people who are in the

7   same positions.  If the -- the explanation is that people

8   were let go based on whether or not they worked on terminated

9   projects, it wouldn't make sense to include people in the

10  analysis who had no connection to the CD group.

11  Q   Okay.  Tell me this -- I'll ask it again.  You agree that

12  to rule out chance, employees who you're comparing have to be

13  similarly situated, right?

14  A   But it's not a chance process, it's an age-neutral

15  process.

16  Q   Did you state in your report that what you did was to

17  perform an analysis to rule out chance?

18  A   Yes, the term chance here, in the abstract, is used.

19  What we're specifically investigating with respect to these

20  claims, is whether or not the process was consistent with an

21  age-neutral process or not.

22  Q   Let's just go one step at a time.

23  A   Sure.

24  Q   You start with the idea of did it happen by chance,

25  right?

1   A    We can start with did it happen by chance.

2   Q    And to have it happen by chance, everyone in the pool,

3   all the employees, had to have the same -- going into it, had

4   to have the same chance of being let go, right?

5   A    Correct.  And that's my first analysis, looking at the

6   entire R&D work force.

7   Q    Okay.  So, let's -- and to have the same chance, you

8   agree they have to be similarly situated?

9   A    Yes.

10  Q    Okay.  Colleen, can you pull up Plaintiff's Exhibit 240.

11  Just for this analysis, why don't you make the first top half

12  broader, so, we can read it.

13  A    May I move the easel back slightly?

14  Q    You know what, sure.  Why don't we do this.

15  A    Just a little bit would be fine.

16  Q    Okay.  And you agree, just looking at -- and by the way,

17  to do this analysis, the R&D work force, 56 individuals, this

18  is the table you used, right?

19  A    This is the population, yes, that's correct.

20  Q    And your conclusion was all these people have the same

21  chance of being RIF-ed?

22  A    In the first analysis, that's correct.

23  Q    Okay.  Because you needed to do that to rule out chance?

24  A    When we looked at it at the broadest possible level.

25  Q    Okay.  And you can just eyeball this chart and see that

1    there are people in different positions?

2    A    Correct.

3    Q    Different skill sets?

4    A    Correct.

5    Q    Different job duties?

6    A    Correct.

7    Q    Performing different -- working for different parts of

8    the company?

9    A    Absolutely.

10   Q    Paid different amounts?

11   A    Sure.

12   Q    Having different educations?

13   A    Right.

14   Q    All of those people were doing their own separate thing

15   and your analysis doesn't take into account any of those

16   differences?

17   A    That's correct.  My first analysis assumes that the

18   entire population had the same likelihood.  We refined those

19   likelihoods --

20   Q    We're not at the likelihoods.

21   A    Okay.

22            THE COURT:  Let her finish her answer.

23            MR. ENNIS:  I'm sorry.

24            THE WITNESS:  When we move from the first analysis

25   that looks at R&D as a whole, where we control for things

 1    like CD group membership, the majority of funding or any

 2    funding coming through CD, we're assuming that there are

 3    differences in likelihood of RIF --

 4    Q    Okay.

 5    A    -- between people.

 6    Q    I'm not there yet.

 7    A    Okay.

 8    Q    All right.  I'm just saying that in your testimony, you

 9    put down a number of standard deviations and a possibility,

10    even though you knew all these people had different job

11    skills, education, salaries, all differences you just

12    described, isn't that right?

13    A    Correct, because in the first analysis, the only thing

14    we're controlling for is whether or not the person was in the

15    R&D work force.

16    Q    Dr. Thomas, to do your analysis, to come to a conclusion,

17    you have to make sure that all the employees are similarly

18    situated, isn't that what you testified?

19    A    Correct, but based on the documents that I reviewed, PQ

20    has several different explanations as to who was similarly

21    situated.

22    Q    I'm not sure -- you're getting ahead -- let's just stick

23    with this document, okay?

24    A    Well, this document is the foundation for all of my

25    analysis.

1    Q    I'm just, okay, let's stick with the document, all right?

2    A    Okay.

3    Q    It's your testimony they have to have the same chance of

4    being terminated?

5    A    We assumed that everyone in the same comparison group has

6    the same likelihood, that's correct.

7    Q    And you've come to this conclusion even though you

8    testified that there are, at least, six different major

9    differences between the people in this group?

10   A    In that analysis, in my first analysis, that's correct.

11   Q    And does your analysis describe the reason or account for

12   the reason that Mr. Grabanese (ph) was retained?  The 66 year

13   old shipper?

14   A    My analysis, regardless of what factors we're controlling

15   for, never look at individuals.

16   Q    Okay.

17   A    The purpose of statistics is not to look at one

18   particular individual.  We're examining the decisions as a

19   whole and we're looking at people as a collective.

20   Q    And so, your analysis did not look at why Mr. Poolek

21   (ph), the 64 year old principal scientist was retained?

22   A    Specifically, him, no.  That's not the purpose of my

23   analysis.

24   Q    And your analysis didn't look at whether Mr. Slobogan or

25   Ms. Tickner may have retired?

1   A    That's correct, we did not look at specific individuals.

2   Q    You made no individual decisions or you did not review

3   any individual decisions, right?

4   A    We reviewed decisions.  We didn't examine the work force

5   person by person.

6   Q    And you would have to examine the individual decisions to

7   test your theory of possible discrimination, isn't that

8   right?

9   A    I disagree.

10  Q    Okay.  You've already said statistics can never be solely

11  relied upon, right?

12  A    Statistics can never be used to solely prove

13  discrimination.  They can be relied on, they can't be used to

14  prove discrimination.

15  Q    And you've testified before that's because you have to

16  then look at the evidence of the individual decisions, right?

17  A    Yes.  The statistics is a supporting piece of the entire

18  picture.

19  Q    Okay.  So, now let's go to the CD group.  That was the

20  second group you tested for, is that right?

21  A    That's correct.

22  Q    And Colleen, if you would pull up 241 and if you could

23  enlarge that, please.  Is this the group that you relied upon

24  to come to your conclusion about membership in the CD group?

25  A    Yes, these are the subset of individuals that PQ

1    indicated were part of the CD group.

2    Q    So, you're looking at seven people, right?

3    A    There are seven people included in the CD group.

4    Q    And you testified earlier that you went back to -- you

5    said a couple of times -- the 56 and there is eight people

6    let go?

7    A    Correct.

8    Q    In the CD group, there was seven people, according to

9    this chart and four people let go?

10   A    Correct.

11   Q    All right.  And you can just look at it, once again, and

12   you're assuming that all those people have the exact same

13   chance of being let go, right?

14   A    Within the CD group, yes.

15   Q    And you agree that you controlled for Lau, one being in

16   and out.

17   A    Correct.

18   Q    But, Lau would be -- have a different title, right?

19   A    He has a different title, yes.

20   Q    Different level in the company?

21   A    Yes.

22   Q    Different possibility of what he may or may not be doing?

23   A    Sure.

24   Q    And the two other people who were retained, Mr. Thompson

25   and Ms. Fisher, were technicians and a technologist, is that

1   right?

2   A   Fisher was a technician and Thompson was a technologist,

3   correct.

4   Q   And your -- and obviously, they are at a different level

5   than the other four, right?

6   A   I would presume so.  I don't know for certain.

7   Q   They were -- presumably have different skill sets?

8   A   Possibly.

9   Q   Have a different education background?

10  A   Possibly.

11  Q   And be doing different things from the other four?

12  A   Possibly.

13  Q   And your analysis did not look at why those three people

14  were retained?

15  A   Correct, my analysis does not look at the reason that any

16  specific person was retained.  We'll look at the decisions as

17  a whole.

18  Q   And to test your theory, again, you'd have to look at the

19  individual decisions and evidence to support those decisions?

20  A   I'm not sure I understand what you mean by test my

21  theory.

22  Q   Okay.  Then let's go to D, I'm sorry, Plaintiff's 242.

23  And this is, I'm sorry, 242.  Okay, yeah, 242.  This is the

24  list of people who you relied upon to determine whether

25  someone had a chance of being terminated based upon funding

1   through CDP program, is that right?

2   A    These are the lists -- these are the individuals,

3   according to answer 23, that received funding through the CD

4   program.

5   Q    And for all of these, let's see, that was the CD group

6   membership, 241, right?

7   A    Correct.

8   Q    And funding is --

9   A    The last analysis.

10  Q    -- that goes to Exhibit C-1?

11  A    Correct.

12  Q    And in performing the analysis, in terms of looking at

13  those people at C-1, I think you testified that you looked

14  at, among other documents, 215 -- PQBM-214 and 215?  Does

15  that sound right?

16  A    No.  I think that 215 relates to the majority of funding

17  from a terminated project.

18  Q    Okay.  And what about 233?

19  A    I believe 233 is what I have listed as 235 and again,

20  that's the majority of funding coming from a terminated

21  project.

22  Q    Okay.

23  A    This information here is from the supplemental response

24  to Number 23.

25  Q    And I think you testified before that you did not -- how

1   did you come to the conclusion about what is a majority of

2   funding?

3   A    A majority of funding is anything that's 50 percent or

4   greater.

5   Q    And how did you come to that conclusion?

6   A    It seemed like a reasonable approximation.  We, you know,

7   common sense would say that a majority is 50 percent or more.

8   There was no definitive information provided that PQ

9   considers 80 percent, 75 percent.

10   Q    Okay.

11   A    So, I used 50.

12   Q    And there are nine people altogether?  Am I counting that

13   correctly?

14   A    I think there's ten.

15   Q    There's ten, okay, ten.  And you agree the people on that

16   list received funding from ten percent to 100 percent?

17   A    Correct.

18   Q    So, in terms of -- and who were the people who received

19   the majority of their funding?

20   A    I don't recall off the top of my head.

21   Q    And so, if you looked at 215, that would tell you,

22   apparently, as you said that was the document you looked at

23   to determine a majority of funding?

24   A    That was the majority of funding on the terminated

25   projects, this is different.

1   Q   Okay.

2   A   This is whether -- what we're looking at here, we used to

3   determine whether or not somebody had any funding, at all,

4   via the CD group.

5   Q   Okay.

6   A   Or whether 100 percent of their funding.

7   Q   And so, the -- in terms of terminated projects, let's

8   look at 215, Colleen, if you would.  I'm sorry, it's is P-8,

9   I apologize.  No, I want to go to, it is P-80 and it's

10  PQBM-215.

11          THE COURT:  You had 215 a minute ago.

12  Q   There we are.

13  A   That looks right.

14  Q   Yup and if you could just do the middle portion that's a

15  little bit taller than the other columns.  According to this

16  document, there's only three people in the group who received

17  a majority of their funding.  That would be, according to

18  your explanation, 50 percent or more, Thompson, Wypart and

19  Senderov?

20          MS. EYER:  Objection, your Honor, I think that

21  mischaracterizes the witness' testimony.

22          THE COURT:  Well, the witness can characterize her

23  own testimony.

24          THE WITNESS:  What we do is, we see here that

25  Senderov has 100 percent, according to this chart.  Wypart

1   has 50 percent and Thompson has 100 percent.  We would treat

2   them as equivalent.  We would treat the others as, who had

3   less than the majority, we would treat them as a separate

4   sub-group.

5   BY MR. ENNIS:

6   Q   Okay, so, all I'm saying is when you are testing, doing a

7   statistical analysis of the people who received the majority

8   of funding, you're just looking at three people?

9   A   No, that's not correct.

10   Q   Let me ask you, did anyone else on that table have 50

11   percent or more of their funding?

12   A   There were three people in that particular sub-group, the

13   people who received the majority.  There is another array of

14   people who received less than 50 percent.  All of those

15   people are studied together in the analysis.  We have a

16   statistical tool that allows us to account for the majority

17   of funding, which means statistically, Senderov, Wypart and

18   Thompson are going to be different.  They're not going to

19   have the same likelihood of termination as the rest of the

20   people in that group.  But we're still examining the entire

21   56 population.

22   Q   I'm sorry, I must have misunderstood your testimony,

23   because I thought you said that what you did was you looked

24   at the people who received the majority of their funding from

25   the terminated projects?

1    A    We controlled for whether or not somebody received.

2    Q    Okay, and according to 215, there's only three people who

3    received the majority of their funding?

4    A    Correct, so, those three people would be in a different

5    sub-group of the entire population.

6    Q    And you can see from the bottom there, that the range of

7    people who received funding was from 10 percent to 35

8    percent?

9    A    Is Centurk (ph) listed as zero?

10   Q    Centurk looks like zero, that's true.

11   A    So, it's from zero to 100 percent.

12   Q    And there are different, it looks like from the top,

13   they're in different businesses, right?

14   A    Yes.

15   Q    They are receiving funding from other sources?

16   A    That's correct.

17   Q    And again, you would have to look at the reasons, the

18   specific reasons why anyone in particular was retained?

19   A    Well, the explanation here, as I understand it, offered

20   by PQ, was that people who were working on projects that were

21   terminated were the ones that were let go.

22   Q    Okay.  And you would have, in terms of who was retained

23   among those, you would have to look at the reasons why they

24   were retained, wouldn't you agree?

25   A    I would presume that if the explanation is the people on

1    terminated projects were let go, the people who were retained

2    were on projects that had continued funding.

3    Q    Okay, but you would have to look at that analysis in the

4    evidence?

5    A    Sure.

6              MR. ENNIS:  That's all I have, your Honor.

7              THE COURT:  Uh-oh.

8              MS. EYER:  Just one quick question, your Honor.

9                         <u>REDIRECT EXAMINATION</u>

10   BY MS. EYER:

11   Q    Dr. Thomas, as far as you're aware, has PQ ever contended

12   that the skill set of the plaintiff, the level of their

13   position or the level of their salary played any role in the

14   decision to terminate them?

15   A    I have not seen that explanation in anything I have

16   reviewed.

17   Q    Would it be appropriate to control for those factors if

18   they were not, in fact, considerations in the decision?

19   A    If they were no considerations in the decision, we would

20   not want to control for them in the analysis.

21   Q    Thank you very much.

22   A    Thank you.

23             THE COURT:  You may step down, thank you.

24             THE WITNESS:  Thank you, your Honor.

25             MR. GOLDSHAW:  Plaintiffs call Michael Bennett.

1          MICHAEL BENNETT, Plaintiff's Witness, Sworn.

2          THE CLERK:  Please state your name and spell your

3     last name for the record, sir.

4          THE WITNESS:  My full name is John Michael Bennett,

5     B-E-N-N-E-T-T.

6                        DIRECT EXAMINATION

7     BY MR. GOLDSHAW:

8     Q   Dr. Bennett, what is your profession?

9     A   I'm a crystallographer.

10    Q   Where did you get your degree?

11    A   My degree was got in Aberdeen, Scotland.

12         THE COURT:  You said your profession, but I couldn't

13    understand, what are you, a crystallographer, did you say?

14         THE WITNESS:  I'm a crystallographer.  Basically, we

15    study how the atoms are arranged in the crystals.

16         THE COURT:  The geography of crystals?

17         THE WITNESS:  Pardon?

18         THE COURT:  You study the geography of crystals?

19         THE WITNESS:  Well, that's probably a way to put it,

20    yes.

21    Q   Do you have any relationship to Bonnie Marcus?

22    A   Yes, she's my wife, my better half, right.

23    Q   How long have you been married?

24    A   20-odd years.

25         THE COURT:  Now, let's be specific, you're expected

1    to know exactly how long you've been married.

2              THE WITNESS:  I'm only supposed to know exactly when

3    it's our wedding anniversary.  Sorry, about that.

4    Q   For my personal protection, I would like the record to

5    reflect that I did not ask that question.  Prior to your

6    wife's termination from PQ Corporation on May 25, 2005, did

7    you know that her job was in jeopardy?

8    A   I knew she was going to be fired.

9    Q   How did you know?

10   A   Well, she talked to me about it.

11   Q   What did she tell you?

12   A   She told me that she was going to be fired and a bunch of

13   other older people were going to be fired.  She specifically

14   mentioned Dick Hinchey, Eric Senderov and Al Behan.  I know

15   most of these people for almost 30 years, 30 to 40 years.

16   Q   Are you describing a conversation that you had with your

17   wife before the time she was actually terminated?

18   A   Yes.

19             MS. MALLOY:  Objection, leading.

20             THE COURT:  It's helpful though.

21             MR. GOLDSHAW:  I can rephrase it.

22   BY MR. GOLDSHAW:

23   Q   Did your wife tell you who the source of her information

24   was?

25   A   John Lau.

1    Q    What did she tell you John Lau informed her?

2    A    What he informed her or when he informed her, sorry.

3    Q    We're going to get to both, so.

4    A    Okay, what he informed her was that she and the older

5    people, that I've mentioned, were going to be laid off in the

6    future, okay.

7    Q    When did your wife tell you that John Lau had informed

8    her of that?

9    A    Late in '04.  I'm not certain I remember a specific date.

10   Q    On how many occasions did you discuss with your wife,

11   comments by John Lau that she and other older workers were

12   going to be laid off?

13   A    Oh, numerous times.  I mean, I don't really remember.

14   You know, you discuss things with your wife.  I won't say it

15   was daily, it was at least weekly.  So, it was -- I don't

16   know how many times.

17   Q    How were you able to place in time when these

18   conversations occurred with your wife, regarding the subject

19   of older workers are going to be --

20              MS. MALLOY:  Objection, leading repetitive.

21              THE COURT:  Objection is sustained.  It's

22   irrelevant.

23              THE WITNESS:  When did we discuss it?

24              THE COURT:  No, wait for another question.

25              THE WITNESS:  Okay.

1   BY MR. GOLDSHAW:

2   Q   How were you able to recall when those discussions --

3            THE COURT:  By using his mind, that's how he was

4   able to recall.  Go on to something that relates to an issue

5   in this case, please.

6            MR. GOLDSHAW:  Your Honor, respectfully, I think the

7   timing of this will prove later on to be important.  May I

8   have a little leeway?

9            THE COURT:  Try it.

10  Q   How were you able to place the conversations in time,

11  please?

12  A   Oh, when I knew she was going to be laid off, the first

13  thing I said to her was, well, you have to get all your

14  personal stuff out of the company.  You know, we've got 40 to

15  60 years of zeolite information between us.  Reprints,

16  models, conference journals, that sort of thing.  So, I

17  wanted to make certain that she got all of these out of the

18  company before she was let go.  And this was done, as I said,

19  late in '04, I remember us going there on a weekend.  She

20  went in and brought the stuff, I put it in the car and you

21  know, moving stuff out for a reasonable period of time

22  because it would look bad if all of a sudden, she completely

23  emptied her office.  Everybody else would kind of know that

24  something was going on and you know, she didn't want to, you

25  know, let out that she knew she was going to be let go.

1    Q    Did you and your wife take any actions, based on the

2    information that you had received in advance that she and

3    other older workers were going to be let go?

4    A    Bonnie and I are both very careful with our money, you

5    know, we put the maximum we can into a 401.  I persuaded her,

6    actually, persuade is not quite the right word.  I insisted

7    that she take the $5,000 catch-up for an IRA as early as she

8    could in '05.  This, you know, when you're 50, you can make a

9    catch-up and it's $5,000.  She was rather reluctant to have

10   $5,000 taken out of her paycheck at one time.  Normally, in

11   the years prior to this, she'd had it taken out, spread out

12   over the 12 months.  But we both know she wasn't going to be

13   there 12 months and I wanted to get, you know, the maximum

14   into her IRA that I could.

15                MR. GOLDSHAW:  I have nothing further, at this time.

16                THE COURT:  Any questions?

17                            CROSS-EXAMINATION

18   BY MS. MALLOY:

19   Q    It's correct, isn't it, that Ms. Marcus took the maximum

20   IRA catch-up in 2002?

21   A    2002, almost certainly.

22   Q    And how about 2003?

23   A    Almost certainly.

24   Q    And she also took the maximum catch-up in 2004?

25   A    Correct.

1    Q    And your testimony is that she took the $5,000 catch-up

2    in the year 2005, right?

3    A    Yes.

4    Q    And you said it was March, 2005?

5    A    I didn't say March, 2005.

6    Q    Do you recall when she took the catch-up --

7    A    I --

8    Q    -- in 2005?

9    A    I don't know.  All I know --

10   Q    Only one of us can talk at a time.

11   A    -- is it was very early in the year.

12   Q    Is it true that she took the $5,000 catch-up in March

13   after she received a $49,000 bonus?

14   A    I don't know, sorry.  I would think it was before that.

15   Q    Do you know?

16   A    No, I don't know.  I could go and check, but I don't

17   know.

18   Q    Are you retired, sir?

19   A    Yes, I am.

20   Q    And what is your age?

21   A    70.

22   Q    Do you consider yourself an expert in zeolites?

23   A    Yes, I do.

24   Q    And would you agree that your expertise could open a lot

25   of doors for Ms. Marcus?

1   A    It can open some doors, but not a lot of doors.  We do

2   different things in zeolite science.

3   Q    Do you agree that you're well known as a couple who are

4   zeolite chemists?

5   A    We are known as a couple, yes.

6   Q    As zeolite chemists?

7   A    As zeolite --

8   Q    I hope you're known as a couple, right.

9   A    Well, I've had 40 years with the zeolite organization and

10  you know, once I married Bonnie, yes, it's obvious we became

11  known as a couple.  We compliment one another in what we do.

12  Q    Isn't it true that you never contacted any of your

13  contacts to help Ms. Marcus find a job after she left PQ?

14          MR. GOLDSHAW:  Objection, this is way beyond the

15  scope of direct.

16          THE COURT:  Overruled.  Go ahead.

17          THE WITNESS:  Yes, I would have mentioned some

18  people to Bonnie that she could contact and mention my name.

19  BY MS. MALLOY:

20  Q    My question was, did you ever contact any of your

21  contacts to help her find a job?

22  A    No.

23          MS. MALLOY:  I have nothing further.

24          THE COURT:  You may step down.  Thank you, sir.

25          THE WITNESS:  Thank you.

1          MS. EYER:  At this time, the plaintiffs call Andy

2    Verzilli to the stand.

3          ANDREW VERZILLI, Plaintiff's Witness, Sworn.

4          THE CLERK:  Please state your name and spell your

5    last name for the record.

6          THE WITNESS:  Andrew Verzilli, V-as in Victor,

7    E-R-Z-I-L-L-I.

8                        DIRECT EXAMINATION

9    BY MS. EYER:

10   Q    Good morning, Mr. Verzilli.

11   A    Good morning.

12   Q    Could you please state for the record your employer?

13   A    I am employed with the firm of Verzilli & Verzilli &

14   Consultants.  I'm one of the Verzillis.

15   Q    And what is your profession, sir?

16   A    I'm an economist.

17   Q    Have you come to court today prepared to render an

18   opinion as to the amount of monetary losses incurred by

19   plaintiffs, Bonnie Marcus and Roman Wypart?

20   A    I have.

21   Q    Before we get to those opinions, I would like to take a

22   moment to ask you about your qualifications.  Do you have an

23   undergraduate degree, sir?

24   A    I do.

25   Q    And in what field of study is that degree?

1   A    It's a, I'm sorry, I have a Bachelors of Science and

2   Business that I received from Drexel University in June of

3   1988 and I majored in economics.

4   Q    Do you have any graduate degrees?

5   A    I do.

6   Q    And could you please state what is your graduate degree?

7   A    It's a Masters in Business from LaSalle University and I

8   received that in December of 1991.

9   Q    Please describe briefly what it is that you do as an

10  economist?

11  A    Well, first, economics, the subject matter is really

12  concerned about how we produce income, from an individual, to

13  a business, to a government to society.  That's what

14  economics is about.  And the work that I do is looking at the

15  economic impact events have on somebody, either -- and

16  businesses, either how it affects someone's earnings and

17  their ability to earn income.  Or the same with businesses,

18  an impact that something has on the business and revenues of

19  a business.  And that work that I do in those areas, those

20  involve matters in litigation.

21        There's another part of my work where I do economic

22  analysis.  I've done a lot of work for different townships

23  and police departments throughout the Philadelphia area with

24  their collective bargaining agreements.  So, I do economic

25  analysis and impact analysis of comparing a police

1    department, their salaries, their compensation and where the

2    contract, where I feel the contract should be going, looking

3    at how to adjust the contract for the next period.

4             I've done other studies, I did --

5             THE COURT:  I don't think we need all of those.  Get

6    on to something --

7             THE WITNESS:  Okay, that's the kind of work that I

8    do.

9    Q    Thank you, sir.  Do you have any teaching experience?

10   A    I taught economics at Drexel, as an adjunct instructor

11   for about seven years in the '90s.  I taught the Principles

12   of Economics I and II.

13   Q    Have you completed any research in the field of

14   economics?

15   A    I have done some research.

16   Q    And have you testified in court relative to the issues

17   that you are here to testify today?

18   A    I have testified many times in these types of matters.

19   Q    And in which court, if you can recall?

20   A    Here in Federal Court numerous times, most of the

21   counties in this part of Pennsylvania, from Harrisburg east.

22   And even up towards the northeastern corridor and I have

23   testified in other states, including New Jersey, Delaware,

24   Maryland, New York and on occasions, Arizona, a few times.

25   But basically, it's more in this part of Pennsylvania.

1    Q    Is your firm retained by both plaintiff and defendant

2    counsel in different cases?

3    A    Yes.

4              MS. EYER:  At this time, I would offer Andy Verzilli

5    as an expert in the field of forensic economics.

6              THE COURT:  Any questions at this point?

7              MR. ENNIS:  No questions.

8              THE COURT:  Go ahead.

9    BY MS. EYER:

10   Q    Mr. Verzilli, at my request, did you estimate each of the

11   plaintiffs' monetary losses resulting from the termination of

12   their employment with PQ?

13   A    Yes, I did.

14   Q    And do your estimates include both monetary losses to

15   date and losses going forward?

16   A    They do.

17   Q    In arriving at your opinion, what information did you

18   rely on?

19   A    Well, I had information specific to both Ms. Marcus and

20   Mr. Wypart.  You know, their background information,

21   information about their employment at PQ, their earnings, the

22   benefits.  That specific information to each individual.

23   What their earnings have been in employment since their

24   employment at PQ ended.  Then I had kind of information about

25   benefits and other things at PQ, specific to PQ about the

1    retirement plan and the changes in that and other information

2    that we had about -- that would apply to both Mr. Wypart and

3    Ms. Marcus.  And then, the other information would be the

4    general economic data that I rely on.

5    Q   As to Ms. Marcus specifically, how did you go about

6    estimating Ms. Marcus' monetary losses to date?

7    A   Well, I estimate, step one would be had she remained at

8    PQ, she was terminated in June of '05, had she remained there

9    up to the present, what her earnings would have been.  Her

10   earnings, she also had received bonuses.  There was a profit

11   sharing plan, all of that has since stopped and also,

12   retirement.  So, what she would have earned up to the

13   present, minus what she has actually earned.

14   Q   And your analysis, that would include the value of

15   benefits, as well, is that correct?

16   A   Right, it would include such things as the employer's

17   contributions to the retirement plan and matching 401K

18   contributions and Ms. Marcus did have some replacement health

19   insurance costs that she had incurred for awhile.

20   Q   Based on your analysis, what is the total amount of

21   compensation Ms. Marcus would have earned in the present had

22   she remained employed at PQ?

23   A   I estimated that, up to the present, it would be

24   approximately, $742,347.  That's based on her salary at the

25   time of $122,000 approximately.  I increased that salary

1   three percent a year, based on what her, kind of looking at

2   what her increases were, as well as what's happened in the

3   economy.  I considered she had bonus every year and the bonus

4   is about -- it was about 27 percent or so of earnings.  So, I

5   added that in.  There was the contributions from employment,

6   I mean, for retirement, a 401K that were about seven percent

7   a year and one year of profit sharing, which was $2,800.

8   Because that ceased in 2007.  So, when we add all that up,

9   that is the $742,347.

10  Q   And what of her actual earnings to date then?

11  A   Well, I based it on what her earnings were.  I know what

12  her earnings were in '06, '07 and '08 in alternative

13  employment.  I added those up and then, as of this year, I

14  estimated that she would continue to earn about just over

15  $15,000 a year, which was looking at what she's earned since

16  the termination and just getting an average.  And when you

17  add all that up, it's about $74,444.

18  Q   So, based on this analysis, what is your expert opinion

19  as to the net monetary losses to date for Ms. Marcus?

20  A   It's $667,903.

21  Q   Did you also conduct an analysis of Ms. Marcus' future

22  losses?

23  A   Yes.

24  Q   And how did you go about estimating those losses?

25  A   It's the same process, now, we're doing it into some

1    period into the future.  So, the first thing is to determine

2    that period of time.  Ms. Marcus is now, she was 65 in

3    September of this year.  It's my understanding that her

4    retirement that she planned to retire at age 70.  I kind of

5    looked at the economic environment about that to determine

6    the appropriateness of that and determined that was a

7    reasonable assumption.  So, the period of time would be from

8    today to age 70, just under five years.  I have what her

9    earnings would have been at PQ and project those out into the

10   future.  We still have the bonus of 27 percent, the

11   retirement contributions that broke up into four percent

12   towards retirement and three percent for 401K, that's seven

13   percent.  And there was a one-time possible -- one-time

14   restrictive stock award that would have been there at

15   retirement.

16            I added all that up and then I subtracted out how

17   she -- if she continues to earn $15,000 roughly a year today,

18   over the next five years, what that will be and you subtract

19   one from the other.

20   Q   And your estimate of Ms. Marcus' future earnings, that

21   was based on the amount that she has earned to date since her

22   termination with PQ, is that correct?

23   A   Yes.

24   Q   Sir, what was the, based on your analysis, what is your

25   estimate of the amount that Ms. Marcus would have earned from

1    today forward, if she had remained employed by PQ?

2    A    It's $872,013.  Again, it includes salary, bonus,

3    retirement contributions and this one-time stock restricted

4    stock award payment.

5    Q    And what is your estimate as to what she will actually

6    earn given her termination from PQ?

7    A    It's approximately, $70,814 and that assumes that she

8    will continue to earn just over $15,000 a year in her

9    consulting work and that will go on to age 70, as well.

10   Q    And based on your analysis, what is your expert opinion

11   as to the net monetary losses going forward for Ms. Marcus?

12   A    $801,199.

13   Q    I'm sorry, could you repeat that, sir?

14   A    $801,199.

15   Q    Did you also conduct an analysis for Mr. Wypart, sir?

16   A    I did.

17   Q    How did you go about estimating Mr. Wypart's monetary

18   losses to date?

19   A    The same process, what he would have earned from PQ up to

20   the present, from the time of his termination in May of '05

21   and subtracting out what he's actually earned.

22   Q    And did you conduct an analysis both for Mr. Wypart's

23   monetary losses to date and for his future monetary losses?

24   A    Yes.

25   Q    Based on your analysis, what is the total amount of

1   compensation Mr. Wypart would have earned to the present, if

2   he remained employed at PQ?

3   A   I estimated that to be $479,793.  That's based on his

4   earnings at PQ, of approximately, $101,354 a year, his

5   salary.  The same increase is three percent a year.  Two

6   profit-sharing payments that were in the -- one was at $2,500

7   in '06 and one was at $2,600 in '07.  And then after, just as

8   with Ms. Marcus, I didn't consider that any longer.  The same

9   health and retirement contributions and there were some

10  out-of-pocket health insurance costs.  When you add all that

11  up, that gave us $479,793.

12  Q   And did you also account for certain out-of-pocket losses

13  that Mr. Wypart incurred un-related to his salary losses?

14  A   Yes.

15  Q   And roughly how much were those losses?

16  A   That was $22,400.

17  Q   And what had Mr. Wypart's actual earnings since the time

18  of the 2005 RIF been?

19  A   It has been approximately, $312,203.

20  Q   So, based on this analysis, what is your expert opinion

21  as to the net monetary losses to date for Mr. Wypart?

22  A   $189,990.

23          THE COURT:  Excuse me, you're subtracting $312,203

24  from $479.793?

25          THE WITNESS:  And adding back in the expenses of

1    $22,400.

2              THE COURT:  Thank you.

3    Q   Sir, how did you go about estimating Mr. Wypart's future

4    monetary losses?

5    A   The same process with Ms. Marcus.  Some period of time,

6    what he would have earned at PQ, minus what he's now earning.

7    With respect to Mr. Wypart, it's indicated to me that he's

8    now 61, he intends to work to 75.  Again, I looked at the

9    reasonableness of that assumption and felt that, given his

10   intentions and what we see in the labor market, that's a

11   reasonable assumption for his earning potential at PQ.  I

12   have projected that, as of the present, his salary there

13   would have been about $114,000 a year.  Added the retirement

14   and 401 contributions and then, I subtracted out that he's

15   now making $90,250 a year in his present employment and I

16   gave some retirement contributions in that employment, as

17   well and subtracted one from the other.

18   Q   And based on your analysis -- well, let me first ask you,

19   sir, did you, in your calculations, include recent

20   adjustments to Mr. Wypart's income at Klockner Pentaplast?

21   A   Yes.

22   Q   And what were those adjustments?

23   A   In December, 2008, his salary was decreased from $95,000

24   to $90,250 a year.  So, I factored that in and they were

25   providing 401K matching contributions and they ceased those,

1   at that time, as well.

2   Q   Did you assume that those 401K contributions would be

3   terminated permanently or did you otherwise account for them?

4   A   I did give consideration that there would be, in the

5   future, some reinstatement of those contributions.

6   Q   Sir, based on your analysis, what is your estimate of the

7   amount Mr. Wypart would have earned from today forward if he

8   had remained employed with PQ?

9   A   $1,509,481.

10  Q   And what is your estimate of what he will actually earn,

11  given his termination from PQ?

12  A   $1,132,835.

13  Q   And based on your analysis, what is your expert opinion

14  as to the net monetary losses for Mr. Wypart going forward?

15  A   $376,646.

16              THE COURT:  $646 or $642?

17              THE WITNESS:  I have $376,646.

18              THE COURT:  Two?  You dropped your voice on the last

19  figure, what is it?

20              THE WITNESS:  $646.

21              THE COURT:  Thank you.

22              THE WITNESS:  I'm sorry.

23  Q   In estimating the future monetary losses as to Ms. Marcus

24  and Mr. Wypart, did you use the concept of present value?

25  A   I did.

1  Q   And could you please, just briefly, explain for the jury

2  what that means?

3  A   Present value is determining a lump sum that we need

4  today, if we invest it, that will provide those income

5  payments into the future.  So, it's just a process.  For

6  instance, if I want to have -- pay myself $100 a year for the

7  next ten years, I could take ten $100 bills and put them in a

8  box and every year, I'll take out $100 and at year ten, when

9  I take that last one out, I have zero left over.

10          However, I could also invest that money and if I

11  earn, as an example, five percent on that investment, I would

12  need to put about $750 away and that $750 would generate $100

13  every year and when I take that last $100, I have nothing

14  left.  And that's what we're doing on the future estimates,

15  we're determining how much money do we need today?  If we

16  invested it, that would replace the difference in the two

17  earnings streams for each of the plaintiffs.  I've based it,

18  in terms of, when we do present value, it's a function of the

19  period of time, so, for Ms. Marcus, it's about five years.

20  For Mr. Wypart, it's a little under 14.  The incomes streams,

21  the two levels of income.

22          We also factor in, that over these periods of time,

23  their earnings would have increased, as they had previously.

24  So, I consider them, on both individuals, a three percent

25  earnings growth rate and the discount rate, the interest rate

1    I assumed for the present vale was 4.6 percent.  And where I

2    determined that was from looking at the past, we're looking

3    at replacement of someone's earnings.  So, we need a

4    risk-less investment, we need something that's short term and

5    has some liquidity to it.  So, I generally look at short-term

6    treasury securities and I look in the last 20 years and on

7    average, short-term treasury securities have yielded 4.6

8    percent.  We also have to know right now, short-term treasury

9    securities are about zero or just over zero, if I looked

10   today, not even half a percent.

11            So, that discount rate, right not, is a little high,

12   but over these periods of time, as the economy changes, as

13   the economy starts to grow and we heard testimony yesterday

14   about the Federal Reserve.  They're keeping short-term

15   interest rates where they are now, because inflation is in

16   check, but as we grow, inflation's going to come back and

17   they're going to tighten the money supply and we'll see

18   interest rates start to increase.  So, over these periods of

19   time, on average, I feel 4.6 percent is reasonable.  And what

20   that means is, for instance, with Mr. Wypart, the $376,000,

21   we need that today to replace the difference in those

22   earnings such that as the age of 75, we have nothing left

23   over.  If we were to pay him the difference between his

24   earnings at PQ and his present earnings every year for the

25   next 14 years, we'll have nothing left over.  That's what

1   present value means.

2   Q   So, to put it simply, you lessened the amount of their

3   future losses based on the assumption that they can invest

4   the money, is that correct?

5   A   Yes, that we have a lump sum today, that lump sum will

6   generate the differences in earnings.  The higher the

7   interest rate, the lower the present value.  There's an

8   inverse relationship.  So, right now, I, again, in my

9   opinion, 4.6 is reasonable, because over the long term we'll

10  go back to that kind of a discount rate.

11  Q   Again, sir, just to summarize, you lowered -- the 800

12  value and the 376 value, those are both accounting for the

13  fact that they can invest the money and make money off of it

14  into the future?

15  A   That's correct.

16  Q   You testified that you used the plaintiff's intended

17  retirement date to estimate their future economic losses,

18  correct?

19  A   I did.

20  Q   And why is that?

21  A   Well, when we're looking at earnings and producing income

22  and an assumption of retirement, one area that we -- or one

23  factor is intention, someone's intentions about retirement.

24  So, that's a very reliable assumption, given other factors

25  and the economic setting.  For instance, except for some

1   certain occupations, we don't have mandatory retirement ages.

2   These occupations don't fall into that.  We know the labor

3   force is changing and that individuals who are 65 and over,

4   their labor force participation is growing dramatically.  And

5   also, in terms of the statistical life expectancy, how long

6   someone will live is beyond these assumptions.  So, we factor

7   those in, in my opinion, the stated intentions of each of

8   these individuals was a reasonable assumption with respect to

9   their retirement.

10  Q   Are there tables that some people in your field use to

11  estimate how long somebody is likely to continue to work?

12  A   There were tables.  There are some tables that have been

13  published about work life.

14  Q   And do you consider those tables to be reliable?

15  A   No.

16  Q   Why is that, sir?

17  A   Well, the Bureau of Labor statistics tables were last

18  published in 1986, so, they are now 23 years old.  With data

19  that was from 198\79, so the underlying data is 30 years old.

20  It doesn't factor all these changes we've seen in the

21  economy, the no more mandatory retirement ages, changes in

22  social security and when individuals can collect social

23  security.  It doesn't reflect intentions and it doesn't

24  reflect the changing economic environment of older workers

25  working longer.  So, that information to me is not reliable

1    in terms of this process and estimating the earning potential

2    of someone.

3    Q   Sir, did you account for any severance that plaintiffs

4    received at the time of their termination at PQ?

5    A   I did.

6    Q   So, your estimates of their damages would have already

7    included the amount of severance that they received?

8    A   That is correct.  For instance, Ms. Marcus received just

9    over $29,000, so I netted -- and my estimate started after

10   that payment of severance.  So, I've already accounted for

11   the severance that each of the plaintiffs received.

12   Q   At this time, I would like to direct your attention to

13   P-227 and P-228.  I believe they are in the binder in front

14   of you, but if not --

15   A   227 and 228?

16   Q   Yes, you can look at the cover and see if they are.

17   A   I found them.

18   Q   You found them, great.  Do you recognize these documents

19   as charts summarizing the analysis that you just testified

20   to?

21   A   Yes.

22           MS. EYER:  I now move the admission of P-227 and

23   P-228.

24           THE COURT:  Hearing no objection, they will be

25   received.

1          (Plaintiffs Exhibits 227 and 228 received in

2    evidence.)

3    Q   And finally, sir, are all of the opinions that you have

4    testified to here today, presented to a reasonable degree of

5    economic certainty?

6    A   They have.

7              THE COURT:  Are you finished?

8              MS. EYER:  I am finished, your Honor.

9              THE COURT:  It's your turn.

10                        CROSS-EXAMINATION

11   BY MR. ENNIS:

12   Q   You indicated that plaintiff's stated intention of

13   retirement date was a factor you considered?

14   A   Yes.

15   Q   And if Ms. Marcus had told people that she wanted a

16   package from PQ, so she could retire, that would affect your

17   calculation of damages?

18   A   If she wanted -- when you say package, I don't --

19   Q   If she had told people that she wanted a package from PQ

20   so she could retire, that would affect the calculation of

21   damages that you would have assumed that she would recover to

22   date and into the future?

23   A   If that retirement was before my assumption.  You didn't

24   say when, you said package retirement, so I didn't quite

25   understand the question.

1    Q    So, assuming it was before the dates --

2              THE COURT:  She had already retired.

3    Q    Right, assuming it's before the date that you've

4    calculated?

5    A    If that's felt that's when she would have ended her

6    employment there.

7    Q    Okay.  And you agree, I think you just testified, that

8    the number of positions for people who are a65 or older is

9    growing substantially in the work place?

10   A    Well, what I said was the labor force participation.  So,

11   in terms of older workers are going to be working more and

12   longer.

13   Q    And that meant that there would be more jobs for people

14   that age in the work force, isn't that right?

15   A    I don't know if there's going to be more jobs.  It just

16   means that in terms of the labor force growth, when the BLS

17   says the labor force is growing, that segment is growing more

18   than the other ages, so, the same number of jobs -- there may

19   be some growth in jobs, but more of them are to be taken up

20   by older workers.

21              THE COURT:  Have you expressed any view as to

22   whether it's more old people starting new jobs now than used

23   to be?  Is there a distinction between holding a job and

24   acquiring a job?

25              THE WITNESS:  I think it's both.  I think there are

1   older workers who are maintaining their jobs and some that

2   are re-entering the labor market.

3            THE COURT:  Thank you.

4   Q   And you recall giving sworn testimony in this matter

5   before, is that right?

6   A   Yes.

7   Q   And do you recall, at that time and I'll tell you what,

8   well, let me ask you.  Do you recall testifying at that time,

9   in response to a question from me, the number of employees 65

10  and above in the work force is growing substantially and your

11  answer was yes?

12  A   That's what I just said, yes.

13  Q   Okay.  And then the next question was --

14           MS. EYER:  Objection, your Honor, this is hearsay.

15  The witness is --

16           THE COURT:  No, it isn't.  Objection overruled.

17           MR. ENNIS:  And then the next question was --

18           MS. EYER:  Peter, could you at least let us know the

19  page before you --

20           MR. ENNIS:  I'm sorry, page 42.

21           THE COURT:  Go ahead, ask your question.

22           MR. ENNIS:  Okay.

23  BY MR. ENNIS:

24  Q   And the next question was, "There is more jobs for people

25  at that age?"  And the answer was, "There are going to be

1    and the labor force means those are people that are willing

2    to work, as well."  Do you recall that testimony?

3    A    That's right.

4              THE COURT:  That's what he just said.

5    Q    And I then asked you, "And it's growing --"  I think you

6    said "ten times as fast as some of the other segments of the

7    work force?"

8              MS. EYER:  Objection, your Honor, he's simply

9    reading back the witness' testimony.

10             THE COURT:  Yes, he is.  Objection overruled.

11   BY MR. ENNIS:

12   Q    "And it's growing, I think you said, ten times as fast as

13   some of the other segments in the work force, is that right?"

14   And your answer was, "Yes."

15   A    That's correct.

16   Q    Okay.

17   A    And that comes from this document right here.

18   Q    Okay.  And despite the growing market for positions for

19   people 65 and older, your assumption for Ms. Marcus assumes

20   that she never gets a full-time job again?

21   A    That's right, comparable to what she had at PQ.  That

22   she, in the last four years, hasn't secured that comparable

23   job.

24   Q    And in fact, you're assuming $15,000 per year?

25   A    That her earnings will continue.

1    Q    Sure.

2    A    Yes.

3    Q    And did you account for any earnings this year for Ms.

4    Marcus?

5    A    Yes, I did a count for -- can I just find that number for

6    you, I'm sorry.

7    Q    Sure.

8    A    I estimated as of now, that it would have been about

9    $13,000 this year.

10   Q    Okay.  And the stock award that you calculated was

11   $8,000?

12   A    It was -- no, it was a little bit less.  It was --

13   Q    That's all right, it was --

14   A    $7,614 that would have been payable when she retired.

15   Q    Okay.  And moving to Mr. Wypart, you assumed he would

16   continue to work, without any changes, for 14 years, is that

17   right?

18   A    That -- right, well, his earnings now will, the $90,000

19   will grow three percent a year.

20   Q    Without any change?

21              THE COURT:  Three percent a year he said.

22              MR. ENNIS:  I'm sorry, you're right.

23   Q    Except for the three percent, there would be no other

24   changes?

25   A    That's right.  I didn't assume he would get another job

1   that paid much higher.

2   Q   And were you aware that he had been laid off or left two

3   jobs previous to PQ?

4   A   Yes.  The one was, I think it was in '06 or '07, but I

5   had that -- well, I have his actual earnings, so I did know

6   that he worked at another firm.

7   Q   But I mean -- I'm sorry, even before PQ, he had had other

8   jobs?

9   A   Oh, I'm sorry.  It may be in the original information

10  about his background.  I'm sorry, I thought you meant since.

11  I apologize.

12  Q   That's okay.  But despite the fact that he had had other

13  jobs that he had been laid off from or had left in the past,

14  you assumed 14 years of un-interrupted work at his current

15  employer, is that right?

16  A   Yes.

17              MR. ENNIS:  That's all I have.

18              THE COURT:  You may step down.  Thank you, sir.

19              THE WITNESS:  Thank you.

20              THE COURT:  We'll take a ten-minute recess, at this

21  point.

22              THE CLERK:  All rise.

23              (Court in recess 11:36 to 11:47 o'clock p.m.)

24              THE CLERK:  All rise.

25              THE COURT:  Be seated, please.  Proceed.

1          MR. GOLDSHAW:  Plaintiffs call Ed Myszak.

2          EDWARD MYSZAK, Plaintiff's Witness, Sworn.

3          THE CLERK:  Please state your name and spell your

4    last name for the record.

5          THE WITNESS:  It's Edward Myszak, Jr.  M-Y-S-Z-A-K.

6          THE CLERK:  Thank you, sir.

7                    <u>DIRECT EXAMINATION</u>

8    BY MR. GOLDSHAW:

9    Q    Do you currently work for PQ Corporation?

10   A    Yes.

11   Q    Do you hold a management position?

12   A    Yes, I do.

13   Q    How long have you worked as a manager at PQ Corporation?

14   A    For 28 years.

15   Q    Have you ever reported directly to Roz Kutchins?

16   A    Yes, I did.

17   Q    Approximately, when?

18   A    From late-80s, I think, through 2003 and then again from

19   2005 to early 2008.

20   Q    Have you worked within Michael Imbriani's unit, during a

21   portion of the time you reported to Rosalind Kutchins?

22   A    Yes.

23   Q    Have you ever been demoted at PQ Corporation?  I'm saying

24   demoted.

25   A    Yes.

1    Q    When was that?

2    A    2003.

3    Q    Who informed you of your demotion?

4    A    Rosalind Kutchins and Bill Rathgaver (ph).

5    Q    When Ms. Kutchins informed you of your demotion, what did

6    she say?

7    A    She said that it had nothing to do with my performance

8    and it came from above.

9    Q    Did she specify who she meant when she referred to it

10   coming from above?

11   A    I took it to mean Silverman and Imbriani.

12   Q    Michael Imbriani --

13   A    Michael Imbriani.

14   Q    -- head of the chemicals division at the time?

15   A    Right.

16   Q    To your knowledge, did Ms. Kutchins file a complaint with

17   human resources, based on your demotion?

18   A    Yes.

19   Q    At the time that you were demoted by Michael Imbriani

20   and/or Stan Silverman, did Mr. Imbriani know much about you?

21   A    No.

22   Q    What was the total number of times that Mr. Imbriani ever

23   interacted with you at the time of your demotion?

24   A    At most, two.

25   Q    How were your performance reviews at the time?

1    A    Excellent.

2    Q    At the time of your demotion, you were replaced by

3    someone named Barry Schwartz?

4    A    That's correct.

5    Q    And he was in his 40s at the time?

6    A    That was my estimate, I really don't know his age.

7    Q    The parties have reached a stipulation as to his age at

8    the time of the reduction in force, which was 49.  So, in

9    2003, he would be a little younger than that.

10   A    Okay.

11   Q    Have you ever -- no, you do know Barry Schwartz is

12   several years younger than you, even if you don't know his

13   age?

14   A    Yes.

15   Q    Have you ever spoken with the company's lawyer, Walter

16   Stickley, regarding your demotion?

17   A    Yes, I did.

18   Q    When was that?

19   A    Several weeks after the demotion.

20   Q    What was said at the time of your conversation with the

21   company's lawyer, Walter Stickley?

22   A    What I said?

23   Q    What you said to each other.

24   A    Okay.  I said that I felt it was I was unfairly treated

25   and I thought it was age discrimination and I was thinking of

1    seeking outside counsel.

2    Q   When you told the company's lawyer that you thought your

3    demotion was age discrimination --

4    A   Yes.

5    Q   -- how did he respond?

6    A   Well, he responded to the dual comment of age

7    discrimination and that I thought I was unfairly treated, so,

8    I can't say what he -- which one he was assenting to, but he

9    nodded his head.

10   Q   At the time he nodded his head, did he also point out a

11   recommendation to you for an attorney?

12   A   That's correct.

13   Q   After you complained of age discrimination to Mr.

14   Stickley, did he tell you that an investigation would be

15   done?

16   A   No.

17   Q   Did anyone in human resources tell you an investigation

18   would be done?

19   A   No.

20   Q   Did anybody, in fact, ever speak to you as part of any

21   investigation into your complaint of age discrimination?

22   A   No.

23   Q   At the time of the lay-offs, excuse me, immediately prior

24   to the lay-offs in 2005, as part of a reduction in force, you

25   were not in research and development, correct?

1   A    That's correct.

2   Q    And you didn't play any role in deciding who should be

3   selected for termination as part of the 2005 RIF, correct?

4   A    That's correct.

5   Q    And you didn't play any role in deciding which CD

6   projects or other projects would be picked up by business

7   units after the RIF, correct?

8   A    That's correct.

9   Q    At the time of the May, 2005 reduction of force, did your

10  position change?

11  A    Yes, it did.

12  Q    Was your new position called Zeolite R&D Manager?

13  A    Yes, it was.

14  Q    And that was a higher level position for you, correct,

15  than you had been holding?

16  A    That's correct.

17  Q    It was a promotion?

18  A    That's correct.

19  Q    At the time of your promotion -- was it at the time of

20  your promotion in 2005, that you once again began reporting

21  to Rosalind Kutchins?

22  A    Yes, it was.

23  Q    And at the time of your promotion, you held one patent,

24  right?

25  A    At the time of my promotion, yes.

1   Q    Did you know that the plaintiffs, Bonnie Marcus and Roman

2   Wypart were candidates for the position that you got at the

3   time of the reduction in force?

4   A    At that time, no, I did not know that.

5   Q    And you're not familiar with what Bonnie Marcus' job

6   duties were at the time she was selected for termination?

7   A    That's correct.

8   Q    When you began reporting to Rosalind Kutchins again, at

9   the time of the May, 2005 RIF, she was, at that time,

10  reporting up through Michael Imbriani, correct, within his

11  chemicals division?

12  A    I believe so.  Yes, that's correct.

13  Q    And while you were reporting to her in that role, she

14  told you that she was still afraid of Mr. Imbriani, right?

15  A    On one instance, when I asked her about another

16  situation, yes.

17  Q    She was afraid to even ask him why you weren't invited

18  back into a certain meeting, is that --

19  A    Well, she never said she was afraid.  It was my

20  interpretation that she was afraid, I believe.  See, I'm a

21  little fuzzy on that part of it.

22  Q    Why don't you explain what led you to believe that Ms.

23  Kutchins was still afraid of Mr. Imbriani, at that time,

24  after you began reporting to her again?

25  A    Well, there was a meeting being held on strategic

1   planning and I was not on the list and yet, other members,

2   peers of mine were, for that particular meeting.  And I

3   approached her about it and asked her why I wasn't on that

4   and she said she didn't know, Imbriani put the list together

5   and she just didn't feel comfortable going up and talking to

6   him.

7   Q   Didn't feel comfortable even asking him why you weren't

8   invited to a meeting?

9   A   Yes.

10  Q   When you moved back into Mr. Imbriani's unit --

11  A   Mm-hmm.

12  Q   -- you were afraid that there might be a repeat pattern

13  of age discrimination against you, right?

14  A   Well, it's that same situation I just described.

15             THE COURT:  I'm sorry, talk into the microphone,

16  please and keep your voice up.

17             THE WITNESS:  Okay.

18  Q   And several months after you moved back into Mr.

19  Imbriani's unit in 2005, did you tell Kevin Doran (ph), the

20  head of human resources, that you were afraid there might be

21  a repeat pattern of age discrimination against you?

22  A   I expressed some concern there, yes.

23  Q   Now, you know Dr. John Lau, right?

24  A   Yes.

25  Q   You've described Dr. Lau as a person who, in your words,

1    tries to use a lot of smoke and mirrors?

2    A    That's correct.

3    Q    And based on your past dealings with Dr. Lau, on at

4    least, one occasion, you've come to question Dr. Lau's

5    integrity, correct?

6    A    That's correct.

7              MR. GOLDSHAW:  I have nothing further.

8              MR. ENNIS:  I have no questions.

9              THE COURT:  You may step down.  Thank you, sir.

10             MR. GOLDSHAW:  Plaintiffs call Dr. John Lau.

11             (Pause.)

12             JOHN LAU, Plaintiff's Witness, Sworn.

13             THE CLERK:  Please state your name and spell your

14   last name for the record.

15             THE WITNESS:  My name is John Lau, the last name is

16   Lau, spelled L-A-U.

17             THE CLERK:  Thank you, sir.

18                      <u>DIRECT EXAMINATION</u>

19   BY MR. GOLDSHAW:

20   Q    You were the vice president of R&D in May, 2005?

21   A    Yes.

22   Q    And in prior testimony, you have stated that the

23   termination of the plaintiffs was, in your words, entirely

24   tied to the funding of the corporate development projects, is

25   that right?

1   A   That's correct.

2   Q   You're still employed as a vice president of the company,

3   right?

4   A   Yes.

5   Q   And you want to see the company prevail in this

6   litigation?

7           MS. MALLOY:  Objection, your Honor.

8           THE COURT:  Objection overruled.  You hope the

9   company wins?

10          THE WITNESS:  I hope that the truth comes out.

11          THE COURT:  Ah-ha.

12  BY MR. GOLDSHAW:

13  Q   Are you willing to fabricate testimony in order to help

14  the company prevail in this litigation?

15  A   Absolutely not.

16  Q   I'd like to show you a document that's been marked as

17  Exhibit 281 and was the same exhibit, at one time, it was

18  previously marked as Defendant's Exhibit --

19          THE COURT:  And nobody can see it, of course.

20          MS. MALLOY:  Your Honor, may we approach the bench?

21          THE COURT:  Do you really need to?

22          MS. MALLOY:  This was the exhibit that you were

23  going to hold in -- you were holding in abeyance.

24          THE COURT:  I don't know what we're talking about.

25          MR. GOLDSHAW:  We've gone over this.  May I pass a

1    copy of the exhibit, your Honor?

2            THE COURT:  Let me take a look at it.  I'll see

3    counsel at sidebar on what the problem is.

4            (Sidebar discussion as follows:)

5            THE COURT:  Did we talk about this exhibit?

6            MR. GOLDSHAW:  Many times, many pre-trial

7    conferences.

8            MS. MALLOY:  And your Honor said that you were going

9    to withhold a ruling on it until you saw it and it was going

10   to be used.  I didn't think it was appropriate for him to put

11   it up before you did that.

12           THE COURT:  Well, what's the problem with this

13   exhibit?

14           MS. MALLOY:  It's impossible to explain it without

15   referring to a prior trial, this was a demonstrative exhibit

16   that was used in the prior trial.

17           MR. GOLDSHAW:  Your Honor, I would not refer to the

18   prior trial.

19           MS. MALLOY:  It's talking about the fact that he

20   testified --

21           THE COURT:  Frankly, what's the -- what are you

22   planning to ask the witness about it?

23           MR. GOLDSHAW:  Can I step up --

24           THE COURT:  What?

25           MR. GOLDSHAW:  I'm too short, can I step up --

1          THE COURT:  Well, just talk out loud.

2          MR. GOLDSHAW:  Okay, this document was prepared by

3     this witness, Mr. Lau --

4          MS. MALLOY:  No, it was not.

5          MR. GOLDSHAW:  I want to ask him about his testimony

6     to support the reason it is evidence of pretext, it is

7     evidence of the change in positions.  Your Honor has asked

8     us, at least three times and has ruled I can examine the

9     witness on --

10          THE COURT:  You don't need the document for that.

11          MR. GOLDSHAW:  I do, your Honor.

12          THE COURT:  No.

13          MR. GOLDSHAW:  I must say --

14          THE COURT:  I'm getting fed up with every witness

15     being shown something before they testify.  You can ask him

16     questions and get his testimony on the record.  You don't

17     need the exhibit.

18          MR. GOLDSHAW:  Your Honor, may I, at a later time,

19     make a proffer?

20          THE COURT:  I've ruled, get back to your seat.

21          (End of sidebar discussion.)

22     BY MR. GOLDSHAW:

23     Q   Sir, for purposes of your testimony in this litigation,

24     did you create a document that purported to show the

25     plaintiffs' actual CDP funding that contained false figures

1    for the plaintiffs and other older workers?

2    A    Can you repeat that question again?

3    Q    Yes.  For purposes of your testimony in this litigation,

4    did you participate in the creation of a document that

5    falsely listed the plaintiffs' CDP funding in 2005?

6    A    At no time did I falsely invent any document.

7    Q    Did you -- are you aware of a document prepared for

8    purposes of this litigation, that contains the information

9    purporting to show their actual CDP funding for 2005?

10   A    I have prepared many documents throughout this trial.

11   So, I don't -- you need to be a little bit more specific.

12   Q    You know I'm talking about the document I just showed

13   you, right?

14              MS. MALLOY:  Objection, improper.

15              THE COURT:  Objection sustained.  Do you know

16   anything about what employees got funding from various

17   sources?

18              THE WITNESS:  Yes.

19              THE COURT:  Let's get the substance of what he --

20   BY MR. GOLDSHAW:

21   Q    Isn't it a fact that you, for purposes of this

22   litigation, created a document that shows that plaintiff,

23   Bonnie Marcus, received actual 100 percent of her salary, CDP

24   funding, at the time of her termination?

25   A    Yes and this is also true that Bonnie Marcus, at the time

1   of her termination, did receive 100 percent of her salary.

2   Is that in dispute?

3   A   Isn't it a fact that you had a previous sworn statement

4   listed Bonnie Marcus as only 50 percent CD funded in 2005?

5   A   And the other 50 percent in this particular period of

6   time, was supposedly business funding and there was no budget

7   from the business funding.  So, if someone's received 100

8   percent and so, where did that money come from?

9   Q   Are you saying that you didn't know where the money came

10   from, so you doubled the amount of CD funding --

11   A   No, no, no, I'm telling you that we know the individual

12   received 100 percent of their salary.  50 percent came from

13   the Corporate Development funding.  The other 50 percent was

14   never budgeted in the business units that she was supposedly

15   to work from and so, that budget overflowed into the holding

16   company.  That's the only source of funding.

17   Q   That's not --

18   A   So, that's entirely consistent, in my view.

19   Q   But that's not what you wrote on the document you

20   prepared to supplement your testimony, right?  You doubled

21   the figure, correct, to make it look like she was more

22   reliant on CDP funding than she actually was?

23   A   I'm afraid I have to disagree with you.

24          THE COURT:  He's given his explanation.  You don't

25   have to accept it.  Go ahead.

1          MR. GOLDSHAW:  Your Honor, I must, once again, ask

2    permission to show the actual document, so the jury can see

3    it.

4          THE COURT:  No.

5    Q    Did you inflate the CDP funding for Richard Hinchey by

6    ten times the actual value of CDP funding that he had?

7    A    Richard Hinchey had received ten percent funding from CDP

8    that was proposed for 2005 and in previous testimony, we also

9    said that there was no firm decision on CDP for 2005.  And

10   Richard Hinchey, we know, received 100 percent of his salary.

11   So, where did the remaining money come from?  It came from

12   the holding company.

13         THE COURT:  Well, the question is when were these

14   estimates made?  What makes you think that he was supposed to

15   get ten percent and it turned out that there wasn't -- he had

16   to get the rest somewhere else?

17         THE WITNESS:  In September of 2004, that's when we

18   proposed a budget for 2005.  We had then proposed to put

19   Richard Hinchey at ten percent.  Those budgets were never

20   fully approved, because the front company was going through a

21   transaction.  So, we did not have a firm budget going into

22   2005.

23         THE COURT:  It became 100 percent later on, is that

24   what you're saying?

25         THE WITNESS:  Well, we had the edict then from the

1   CEO, around September or October of 2004, that there were not

2   going to be any personnel changes.  We phrased it as no

3   hiring and no firing.  So, given that we did not have a firm

4   budget going into 2005 and that the people were going to be

5   staying within the company until a decision was made, they

6   received 100 percent of their salary, so, that money could

7   only have possibly come from the holding company, itself and

8   that's what we were trying to present.

9   Q   Isn't it a fact that as recently of March this year, you

10  provided a sworn statement that Dick Hinchey was only ten

11  percent funded from the corporate development?

12  A   So, what did the remaining 90 percent.

13  Q   Is that true or not, did you provide that sworn statement

14  in March?

15  A   Yes, we did and --

16  Q   What happened between March and today?

17  A   -- and if you'll allow me to explain, the rest of it came

18  from the holding company, because he was never budgeted for

19  any part of 2005.

20  Q   What has happened between March of this year and today

21  that has caused you to change your estimate for Dick Hinchey

22  be increasing it by ten times?

23  A   Maybe the question was slightly different and we're just

24  simply trying to present it as the best way we know how.

25  Q   Was it the best way you knew how when you represented

1    that Dick Hinchey's actual 2005 CDP funding was 100 percent

2    in 205, on a document you created for purposes of this

3    litigation?

4              MS. MALLOY:  Objection, argumentative.

5              THE COURT:  It is argumentative, he's trying to get

6    an answer.  Go ahead.

7              THE WITNESS:  In March when we put in a sworn

8    statement, we answered to a particular question and we tried

9    to present what we knew in terms of 2005 and what was

10   proposed for -- what was proposed for 2005.  And what we are

11   trying to do in this particular document that -- this big

12   poster that you were representing, was to illustrate where

13   the money actually came from.  As opposed to which

14   department, which cost center, that was the -- that they had

15   been residing in, in 2004.  The information, I have to say,

16   again, is entirely consistent.

17   BY MR. GOLDSHAW:

18   Q   Isn't it a fact that in July of this year, you provided

19   sworn testimony admitting that you inflated the figures for

20   Dick Hinchey by ten times?

21   A   We never inflated --

22             THE COURT:  Read his testimony to him.

23   Q   This is testimony provided by Dr. Lau in July of this

24   year.

25             THE COURT:  2009.

1          MR. GOLDSHAW:  2009.  Page 19.

2          THE COURT:  He's being given a copy of it.

3    Q   Please tell me when you've found the page.

4    A   Yes, I have found the page.

5    Q   "This is what this column is referring to, 2005 CDP

6    funding, right?"

7          "Answer:  Yes.

8          "Question:  2005 actual funding is in the document

9    before you, that you provided a sworn verification to,

10   correct?

11         "Answer:  Correct.

12         "Question:  And for Dick Hinchey, it says not 100

13   percent, but ten percent, right?

14         "Answer:  Yes.

15         "Question:  This document inflates the CD funding by

16   ten times, correct?

17         "Answer:  Correct."

18         You did provide that testimony in July, correct?

19   A   But this is not the complete statement, too.  Is that

20   that particular column, that we also, I think, said at the

21   time, better represent the funding from holding company.

22   Q   You said this is not the complete statement?

23   A   I think so.

24   Q   Would you like me to continue reading?

25   A   Please.

1   Q   And you stop when you get to the point where you

2   testified as to what you just said.

3            MS. MALLOY:  He's badgering the witness.

4            THE COURT:  Pardon?

5            MS. MALLOY:  He's badgering the witness.  He can

6   testify if it's not his complete understanding.

7            THE COURT:  Certainly is, go right ahead.

8            MS. MALLOY:  It's not up to Mr. Goldshaw to pick the

9   portions to --

10  BY MR. GOLDSHAW:

11  Q   I'll let you pick whatever portion you want that shows --

12            THE COURT:  Just go ahead.  Don't make speeches, ask

13  questions.

14  Q   Dr. Lau, you referred to testimony you gave earlier.  I'd

15  like you to show me where it is, if you really testified that

16  way in July.  You've got the transcript in front of you.

17  A   Well, the way I look at it is that someone received 100

18  percent of the salary.

19  Q   I'm asking you to show me where in the transcript?

20  A   I'm just telling you, someone received 100 percent of the

21  salary.  We budgeted or proposed ten percent funding.  Where

22  did the remaining 90 percent come from?

23            THE COURT:  We're interested in what you testified

24  to, not answering hypothetical questions.

25            THE WITNESS:  It's my recollection, sometime in

1    June, that this -- that particular column should have been

2    better labeled as the holding company funding.

3    Q   Oh, so, you're saying it's a problem with the labeling of

4    the column?

5              THE COURT:  That's what he just said.

6              THE WITNESS:  I forgot exactly where it was.

7    Q   I want to be sure I understand.  If there was a mistake,

8    I want to know what it is, so I can examine you regarding it.

9    A   It's holding company funding, that 2005.

10   Q   And changing the column that way corrects the problem, is

11   that your testimony now?

12   A   Absolutely.

13   Q   Okay.  The first person listed on that document, you had

14   listed as Eric Senderov, 100 percent actual 2005 CDP funding,

15   correct?

16   A   Mm-hmm, yes.

17   Q   Isn't it a fact that in 2005, half of Eric Senderov's

18   salary actually came from an outside company, Dow Chemical?

19   A   Eric Senderov --

20   Q   Is that true or not?

21   A   Let me explain.  Eric Senderov never worked for Dow

22   Chemical Company.  He worked for PQ.  100 percent of his

23   salary came from PQ.  Now, Dow may have provided funding to a

24   particular project.  It does not say Dow would only fund.

25             THE COURT:  Well, does Dow's money contribute to

1    CDP?

2              THE WITNESS:  Dow's funding was contributing to a

3    particular project, but that particular project was not part

4    of the proposal in the 2005.

5              THE COURT:  Would that be part of Corporate

6    Development funding?

7              THE WITNESS:  In 2004, it was.

8    Q   Are you saying Dow Chemical, a separate company was part

9    of PQ's Corporate Development funding?

10   A   No.  What I am saying that Dow --

11   Q   That 50 percent of his salary came from Dow, right?

12   A   I'm telling you, Eric Senderov did not work for Dow.

13   Q   That's not my question, sir.  Did 50 percent of the money

14   supporting Eric Senderov's salary, which you listed as 100

15   percent out of holding company funds, in fact, come from an

16   outside company, Dow Chemical?

17   A   I'm saying that Dow supported a project within PQ, to a

18   tune of $100,000 annual rate.  That, in itself --

19   Q   I'm going to read from prior sworn testimony you gave.

20   We'll get it momentarily.  I'm reading from a deposition

21   testimony you gave, which and you understood you were under

22   oath, at that time, right?

23   A   Sure.

24   Q   Page 96.

25   A   Page 96.

1          THE COURT:  What's the date of the deposition?

2          MR. GOLDSHAW:  That deposition was dated September

3     10, 2008.

4     Q    Are you ready?

5     A    Sure.

6     Q    "Question:  In the period January through May, 2005, what

7     portion of Eric Senderov's salary was funded with CD money?

8              "Answer:  I would say about half of it.  The other

9     half came from the Dow funding, which we included as part of

10    the Corporate Development."

11             In the document you prepared for litigation, you

12    also listed Roman Wypart, correct?

13    A    Yes.

14    Q    And you listed his actual CDP funding as 100 percent,

15    correct?

16    A    Yes.

17    Q    And you listed source documents, correct?

18    A    In --

19    Q    Is that where you got that?

20    A    In 2005, in the proposed plan for Roman Wypart, 50

21    percent of his funding was to come from Corporate

22    Development.  The other 50 percent was to come from Potters

23    Industries, which is a wholly-owned subsidiary of PQ.

24    Q    Half of his salary came from Potters Industries?

25    A    That was the proposed plan.

1    Q    Potters Industries had nothing to do with the decision to

2    terminate Roman Wypart, did it?

3    A    Potters had a decision to decide on how much money to

4    fund their product development effort.

5    Q    Are you saying that affected the decision whether to

6    terminate Roman Wypart?

7    A    Well, at the time, in 2005, Potters also were reducing

8    their research and development funding.  And so, the money

9    that we thought we might get to support Roman Wypart, did not

10   materialize.

11   Q    The question is, did any of that stuff have anything to

12   do with Mr. Wypart's termination?

13   A    Well, ultimately, his source of funding went away, both

14   in Potters Industry, as well as in the Corporate Development

15   funding.  And so, that's why Roman Wypart was released.

16   Q    PQ has never contended in this litigation, has it, that

17   any decision by Potters to fund him had anything to do with

18   his termination, has it?

19   A    I think it has been our contention that funding has

20   always been the issue.

21   Q    Potters --

22   A    Funding has been the issue.

23   Q    I'm going to show you what has already been admitted by

24   defendants, is PQ's official, sworn explanation for the

25   termination of Roman Wypart.  This doesn't say anything about

1   Potters, like you just said now, does it?

2   A   It may be an incomplete answer, but what's for sure is

3   that the intent, at the time, in September, when we made the

4   proposal to the Corporate Development, was to support Roman

5   Wypart for 50 percent under Corporate Development money and

6   the remaining funding was to come from Potters Industries.

7   Q   You said that might not be the full answer?  You see the

8   question --

9              MS. MALLOY:  He said he didn't have a chance to read

10  it.  Could you please show it to him the binder?

11             THE COURT:  Okay, let's recess, at this point.  Have

12  lunch and calm down and we'll see you at 1:30 this afternoon.

13             THE CLERK:  All rise, please.

14             (Court in recess 12:19 to 1:35 o'clock p.m.)

15             THE COURT:  Be seated, please.  I understand you've

16  settled the case, is that right?  Somebody wanted to get

17  something on the record.

18             MR. GOLDSHAW:  Yes, I thought your Honor would

19  appreciate it if I do it outside the presence of the jury.  I

20  think, to protect the record, I need to actually formally

21  move the admission of P-281.  I understand your Honor's view

22  on it, but I needed to make that proffer.

23             THE COURT:  What is 281 supposed to be?

24             MR. GOLDSHAW:  I'll make the proffer now.  281 is

25  the document that was created for the purposes of Dr. Lau's

1  testimony in this litigation.

2          THE COURT:  Created by whom?

3          MR. GOLDSHAW:  One of the questions I need to ask

4  him is whether it was -- he said earlier, he and his

5  attorneys, but I believe that that may be in dispute.  But

6  the point is that it's being presented for two purposes,

7  maybe three.  I guess outside the presence of the jury, I can

8  mention that this was introduced at the prior trial in

9  support of Dr. Lau's testimony.

10         THE COURT:  What is it supposed to be?

11         MR. GOLDSHAW:  It's -- we contend it's a fabricated

12  document that he used to present to a jury in order to

13  bolster their case.  We believe that it shows that their

14  reasons are pretextual.

15         THE COURT:  Well, how do we know that this witness

16  had anything to do with it?

17         MR. GOLDSHAW:  Because he testified to this document

18  previously, in the prior trial, that resulted in the hung

19  jury.  And his representations on this document directly

20  contradict prior sworn statements in numerous respects.

21         THE COURT:  What did he say about it at the first

22  trial?

23         MR. GOLDSHAW:  He admitted that his prior sworn

24  statements contradicted the figures he presented in several

25  respects.

1             THE COURT:  Why don't you refer to that testimony?

2     I haven't heard any testimony to that effect.

3             MR. GOLDSHAW:  I tried, your Honor, but you wouldn't

4     let me show the exhibit.

5             THE COURT:  You don't have to see the exhibit to ask

6     a question, for heaven's sake.

7             MR. GOLDSHAW:  Your Honor, I do not believe --

8             THE COURT:  You said that he testified at the

9     previous trial that he -- that this was incorrect?

10            MR. GOLDSHAW:  That it contradicted the sworn

11    statements he provided earlier, yes.

12            THE COURT:  Well, why don't you read the testimony

13    to him?

14            MR. GOLDSHAW:  I read portions of it.  I had a fear

15    of violating your Honor's earlier order not to represent --

16    let the jury know there was an earlier trial.  I have to

17    really tread with trepidation on that.

18            MS. EYER:  Also, your Honor, the relevant testimony,

19    without the document, is not clear at all.  It is very

20    difficult to tell what's going on without the document

21    itself.

22            MR. GOLDSHAW:  The prior testimony continually

23    refers to the document and thus, does not make sense without

24    the --

25            THE COURT:  Well, all testimony in this trial, from

1   the very beginning, has referred to a document.  Every other

2   word is the word document.

3           MR. GOLDSHAW:  The difference is that when, in this

4   trial, when referring to a document it was being displayed on

5   the easel for the jury to see.  They can't see this document

6   and therefore, the reading of the prior testimony won't make

7   sense without having them be able to look at the document.

8           THE COURT:  Well, this doesn't make sense, even if

9   you look at the document.

10          MR. GOLDSHAW:  That is my point precisely.  The

11  document itself is inaccurate.  It demonstrates a willingness

12  by the part of their star witness to present false figures.

13          THE COURT:  Well, first of all, is there any

14  evidence that he, himself, prepared this document?

15          MS. MALLOY:  No, your Honor, I prepared the

16  document.

17          MR. GOLDSHAW:  I would like to --

18          THE COURT:  Then you're the liar then.

19          MS. MALLOY:  I'm the liar.  I think Mr. Goldshaw

20  said that last time.  I prepared the document.  It was for

21  purposes of summarizing these various manpower matrices,

22  which we'll see again this afternoon for the jury.  Dr. Lau

23  testified that it was accurate.  Mr. Goldshaw questioned him

24  about a completely unrelated topic and it -- Dr. Lau said he

25  thought it would be more accurate if the last column, that

1    red column, was labeled holding company money.  It was a

2    demonstrative exhibit to try to demonstrate something to the

3    jury.  I'd also say, your Honor, you've ruled on this twice

4    already.

5              THE COURT:  Yes.

6              MS. MALLOY:  I thought it was quite inappropriate

7    for Mr. Goldshaw to get into it all again today.

8              MR. GOLDSHAW:  Your Honor, may I respond briefly,

9    please?

10             THE COURT:  You may.

11             MR. GOLDSHAW:  Thank you.  Rather than describe it,

12   I would like to read the very brief excerpt on how he

13   testified to the document.

14             THE COURT:  Precisely, why didn't you do that

15   before?

16             MR. GOLDSHAW:  "Question:  This was a document

17   carefully prepared by you and your lawyers for purposes of

18   this litigation, is that correct?"

19             The witness answered, "Obviously, we weren't careful

20   enough."

21             "Question:  Prepared for purposes of this litigation

22   for your testimony here today, correct?

23             "Answer:  Yes."

24             That's the statement that the witness gave.

25             THE COURT:  Well, where does he admit that it's

1   wrong?

2              MR. GOLDSHAW:  Throughout the examination.  I had a

3   marker, as he confirmed the inaccuracy of various figures, I

4   x-ed it out.  We admitted it into evidence at the last trial

5   and I believe that I am entitled to show that this witness,

6   in order to advance the position in the litigation, presented

7   false figures.  He made up the document.

8              THE COURT:  Am I correct in my recollection that so

9   far, until today, this witness has not testified in this

10  trial?

11             MR. GOLDSHAW:  In this trial, that is correct.

12             THE COURT:  So, who cares whether he's truthful or

13  not, if he's not going to testify?

14             MR. GOLDSHAW:  Your Honor, this is their star

15  witness.  If he's not truthful, it's extremely important.

16             THE COURT:  How do we know?  They haven't called a

17  witness yet.  We're still in the plaintiff's case, for

18  heaven's sake.

19             MR. GOLDSHAW:  Your Honor, it also relates to

20  pretext, because even if they don't call him, if I can show

21  that they have changed their explanation over time, it

22  undercuts the credibility of their explanation.  If you tell

23  the same story --

24             THE COURT:  Had it occurred to you or your

25  co-counsel, that we are in the plaintiff's case?  That so

1   far, all you've been doing is proving the defendant's case.

2                MR. GOLDSHAW:  That's certainly not our intent,

3   obviously.  But I don't know how to respond to that

4   statement.

5                THE COURT:  Well, by -- ordinarily, the plaintiff

6   presents its case, her case, their case.  Then the defense

7   presents their case and then, if necessary, the plaintiff can

8   produce rebuttal.  And all we've been hearing for the last

9   several days is what your rebuttal would be if we'd ever

10  heard any testimony from the defense.

11               MR. GOLDSHAW:  Your Honor, this is our last witness

12  and --

13               THE COURT:  Good.

14               MR. GOLDSHAW:  -- and that's --

15               THE COURT:  Now, what precisely do you want to do

16  with this witness?

17               MR. GOLDSHAW:  What I wanted to call this conference

18  for, precisely, was to ensure I've adequately preserved the

19  record, because otherwise, I feel, even if it's in front of

20  the jury, I need to formally move for the admission of the

21  document.  And I didn't want to create a spectacle, which is

22  why I thought your Honor would appreciate if I can do it

23  before they arrive.

24               THE COURT:  If you can get somebody to identify the

25  document as something that was prepared by this witness and

1   counsel and that there are inaccuracies in it, that's fine.

2   But so far, we haven't heard that.

3          MR. GOLDSHAW:  Well, your Honor, I can establish

4   that right now.  The question from his prior testimony, "Was

5   this a document" --

6          MS. MALLOY:  Could you please tell me the page?

7          MR. GOLDSHAW:  Page 41.  "Was this a document

8   carefully prepared by you and your lawyers, for purposes of

9   this litigation, is that correct?"  His answer was,

10  "Obviously, we weren't careful enough."  And I confirmed,

11  "Question:  Prepared for purposes of this litigation for your

12  testimony here today?  Answer:  Yes."

13         THE COURT:  Well, it's your belief that by saying we

14  weren't careful enough, that that is in effect, agreeing that

15  he prepared it?

16         MR. GOLDSHAW:  Yes.  What was he referring to being

17  careful about?

18         THE COURT:  And that it's inaccurate, how does that

19  establish any inaccuracies?

20         MR. GOLDSHAW:  That, itself, doesn't establish

21  inaccuracies.  I have several pages of testimony going point

22  by point, showing how the various figures were specifically

23  contradicted by prior sworn statements by the same witness

24  once before.  And I demonstrate the inaccuracy by showing on

25  a previous occasion, he provides sworn statements, the exact

1   same numbers that were different.

2           THE COURT:  Could you name these witnesses?

3           MR. GOLDSHAW:  The witness is this same witness, the

4   same witness.

5           THE COURT:  Mr. Lau?

6           MR. GOLDSHAW:  Yes, I'm sorry, let me try to be

7   clearer.  Dr. Lau provided a sworn verification in March of

8   2009 to figures that are different than appear on the

9   document that he participated in creating for purposes of

10  this trial.

11          THE COURT:  What does the 2009 document show?

12          MR. GOLDSHAW:  The 2009 document shows the figures

13  for various employees, of how they were funded, which is

14  their central explanation for why they were fired.

15          THE COURT:  Okay, where is that exhibit?

16          MS. EYER:  That is in defendant's answers to

17  interrogatories, I believe the specific exhibit is --

18          THE COURT:  Is it an exhibit at this trial?

19          MS. EYER:  It is, your Honor and I believe it shows

20  that the numbers for several of the older employees are lower

21  in the prior sworn answer and the numbers for several of the

22  younger employees are higher.

23          THE COURT:  All right, okay, you can certainly

24  establish that.

25          MR. GOLDSHAW:  So, may I examine the witness on the

1    document?

2              THE COURT:  Of course.

3              MR. GOLDSHAW:  Thank you.  In order to examine him,

4    I obviously need to display it.

5              THE COURT:  You don't have to display it yet.  If

6    you can get him to admit that these figures are inaccurate,

7    it comes in.

8              MR. GOLDSHAW:  If I can't get him to admit it, I

9    want to impeach him, because I can prove it.

10             THE COURT:  Right, right, right.

11             MR. GOLDSHAW:  In order to prove it, I need to show

12   the document.

13             MS. EYER:  We can at least show it -- the witness

14   needs to be able to see the document, certainly.

15             THE COURT:  Well, sure, the witness can see it.

16   That doesn't mean you put it up on a billboard yet.  You have

17   approximately 32 seconds to get started in doing whatever

18   you're going to do.  Let's get the jury in.

19             (Pause.)

20             THE COURT:  What happened to the witness?

21             MR. ENNIS:  We are getting him, your Honor.

22             MS. MALLOY:  Mr. Goldshaw wanted him out of the

23   room.

24             MR. ENNIS:  And your Honor, you might want to know

25   we are being visited by law students here this afternoon.

1          THE COURT:  That's not my fault.  Glad to have you.

2    Any particular law school?

3          MR. ENNIS:  Villanova.

4          THE COURT:  I've heard of that.

5          (Pause.)

6          THE CLERK:  All rise.

7          (Jury enters.)

8          THE COURT:  Be seated, please.

9          MR. GOLDSHAW:  Your Honor, I can't remember if I've

10   identified the document and I apologize if this is

11   repetitive.  But being displayed on the  easel is answer

12   provided by PQ Corporation, under oath, the question set

13   forth in full detail for reason or reasons why PQ eliminated

14   Mr. Wypart's position.

15         THE COURT:  Okay.

16   BY MR. GOLDSHAW:

17   Q    Dr. Lau, is your explanation that Potters' funding for

18   Roman Wypart is not mentioned in this document because PQ's

19   official answers are somehow incomplete?

20   A    What does it say in this document?

21   Q    It should be before you, P-290.  I will read it.

22         "Question:  Set forth in full detail, the reason or

23   reasons why PQ eliminated Mr. Wypart's position?

24         "Answer:  PQ decided to eliminate from it, from the

25   corporate holding company, which supported the research and

1    development conducted through the corporate development

2    program, CDP.  The business units were then authorized to

3    determine what, if any, research and development projects

4    would continue to be funded by the business units.  As a

5    result of this process, the funding for the research, which

6    Wypart was conducting was eliminated."  That completes --

7    A    That's completely correct.

8    Q    Okay.  And that document doesn't mention anything about

9    Potters funding, correct?

10   A    The other business units.

11            THE COURT:  Talk into the microphone and keep you

12   voice up, please.

13            THE WITNESS:  Okay.  The other business units, that

14   includes Potters Industries.

15   Q    Potters isn't identified there, would you agree with

16   that?

17   A    Does it not identify other business units.

18   Q    The question is, to state in full detail the reasons.

19   Are we able to identify, in full detail, the reasons without

20   even mentioning the business unit you are now contending is

21   responsible?

22   A    As I mentioned before, the proposed funding for Roman

23   Wypart, in 2005, was half of it was to come from the

24   corporate development project and the other half was to come

25   from Potters Industries.  Those funding went away.

1   Q   And that's not what the official explanation says,

2   correct?

3   A   Does it not --

4   Q   Right?

5   A   Does it not say decisions by the business units under

6   funding of the project, as well.

7   Q   Potters isn't mentioned there, you agree with that,

8   right?

9   A   But Potters is a business unit of PQ.

10  Q   That had nothing to do with the Corporate Development

11  program, correct, Potters funding?

12  A   I don't know how to answer this question, how many times.

13  Q   This talks about eliminating funding from the corporate

14  holding company, which support research and development --

15          THE COURT:  Well, he can't read that from where he

16  is sitting.

17          MR. GOLDSHAW:  I'm sorry?

18          THE COURT:  He can't see that.

19  Q   Is it in front of you, 290?  My question is, this is

20  referring to -- conducted through the Corporate Development

21  program.  Potters funding isn't a Corporate Development for

22  funding, correct?

23  A   That's correct.  But half of the funding was planned for

24  Roman Wypart to receive from Potters Industries and that

25  funding did not materialize in 2005.

1   Q    I just want to know if you're changing the story for why

2   Mr. Wypart was terminated?

3   A    Mr. Wypart was terminated because we did not have funding

4   for him in the Corporate Development project and that was

5   planned for 50 percent, at the time and from Potters

6   Industries that was planned for the remaining 50 percent.

7   Q    I'm trying to ask if you're changing the story set forth

8   in the document of PQ's official explanation or not?

9   A    I'm just recalling from my own records, of what we had

10  planned for Roman for 2005.

11  Q    You mentioned as to Bonnie Marcus, that a business unit

12  decided not to fund part of her funding, as well, right?

13  A    In 2004, Bonnie Marcus received half of the funding from

14  one of PQ's business units named Zeolite Products and that

15  funding did not materialize in 2005.  And the other half --

16  and she was not considered for funding in the Corporate

17  Development project in 2005.

18  Q    The name of the business unit funding, you mention was

19  Detergent Zeolites?

20  A    Zeolite Products, which is you could call it Detergent

21  Zeolite.

22  Q    Detergent Zeolite's funding is not Corporate Development

23  money, correct?

24  A    No, it is not.

25  Q    I'm now going to display for you, a document that's

1   already been admitted as P-288, it's also before you.  Is

2   this PQ's official explanation for the termination of Bonnie

3   Marcus?  "Question:  Set forth in full detail, the reason or

4   reasons why PQ eliminated Ms. Marcus' position"

5            And the sworn answer provided by PQ Corporation

6   appears below.  That doesn't mention anything about her

7   losing any Zeolite Products or Detergent Zeolite's funding,

8   correct?

9   A   Bonnie Marcus was not budgeted for any funding in 2005.

10  Q   You mentioned that part of the reason she was terminated

11  is that she had been receiving Detergent Zeolite or Zeolite

12  Products funding, correct?

13  A   In 2004.

14  Q   All right and that's not Corporate Development money,

15  correct?

16  A   It is not Corporate Development money.

17  Q   And in explaining PQ's official position, would you agree

18  and then it doesn't say anything about Detergent Zeolites?

19  A   In 2005, Detergent Zeolite had determined that they would

20  not fund any of Bonnie Marcus' time and Bonnie Marcus was not

21  considered for funding in Corporate Development projects.

22  Q   Are you changing your story as to why Ms. Marcus was

23  terminated?

24  A   She was terminated because there was no funding from

25  Corporate Development funding and there was no funding from

1    the Zeolite Product -- Zeolite Products business.

2    Q   And you're saying that the funding with Detergent

3    Zeolite's business was part of the reason she was terminated?

4    A   Should we say, in 2004, there was half of her funding

5    came from Zeolite Products.  There was no funding in 2005.

6    If we could have found money from other sources, then that

7    would be different.  But we could not find any funding from

8    any other sources.  So, she was not budgeted in any of the

9    business units nor in the Corporate Development projects.

10   Q   I'd like you to take a look at a document that I

11   questioned you on.  I'm not permitted to display it on the

12   easel right now.  Please turn to it, it's P-281.

13   A   281.

14   Q   I understand I must question you on the document before

15   displaying it.  So, we're going to need to try to describe it

16   in a way that the jury can follow along, please.

17            THE COURT:  You can display it if you insist upon

18   it.

19            MR. GOLDSHAW:  I would greatly appreciate that, your

20   Honor.

21            THE COURT:  Go right ahead.

22   Q   Do you have it in front of you, as well?

23   A   Yes, I have.

24   Q   Isn't it true, that this document being displayed, marked

25   as P-281, was a document that was created by you and your

1    lawyers for purposes of your testimony in this litigation?

2    A    Yes.

3    Q    And isn't it a fact, looking -- I'm sorry -- let's look

4    at the red column, which is stated, actual 2005 CDP funding?

5    A    And I think we have said before that this column should

6    have been more appropriately labeled as holding company

7    funding.

8    Q    We'll get there in just a minute.  Let me first ask, do

9    you agree that this document falsely states the figures for

10   Dick Hinchey at 100 percent, when in fact, he was only 10

11   percent actual CDP funding?

12   A    In 2004, Dick Hinchey received ten percent funding from

13   Corporate Development.

14   Q    2005, sir?

15   A    But this is important, I think, to talk about something

16   happened in the fourth quarter of 2004, which flow into 2005.

17   And I think just picking on one number, in itself, doesn't

18   tell the entire story.

19   Q    My question specifically is the number that is written in

20   this box for Richard Hinchey for actual 2005 CDP funding is

21   100 percent.  Isn't it true, that the correct number is 10

22   percent.  I'm asking specifically about this number?

23   A    I'm pointing to this red column and say, if you look at

24   this as holding company money, it is absolutely 100 percent

25   correct.  Dick Hinchey received 100 percent of his salary.

1    That money came from the holding company.

2    Q   We'll get to the holding company in a minute.  If you

3    agree that this falsely states the figures as labeled, we can

4    move to the holding company.  So, let's first establish what

5    his document shows.  Do you agree the 100 percent to Dick

6    Hinchey is not correct for CDP funding?

7    A   If you look at the red column and say it's holding

8    company money, then it is absolutely, 100 percent correct.

9    Q   I think you understand my question, right?  I'm asking if

10   the document, as it --

11   A   I'm not sure you understand my answer.

12   Q   We will get there in a moment.  I promise, we'll get

13   there in a moment.  Let's first establish what the document

14   shows.  When the document, as it was created by you, for

15   purposes of litigation, at the time was correct or incorrect?

16   If you tell me it is incorrect and agree to that, we can move

17   on.

18   A   And we can agree to it if we say that red column really

19   should have been more accurately labeled as holding company.

20   Q   We don't agree with that, sir, we'll get there in a

21   minute.  I first want to know or let's do it this way,

22   Richard Hinchey, you previously provided a sworn statement

23   that his actual 2005 CPD funding was only ten percent, true

24   or false?

25            THE COURT:  It doesn't say that.

1          MR. GOLDSHAW:  It doesn't, your Honor and that's my

2    point.  His prior sworn statement was inconsistent with this

3    document, that's what I'm trying to establish here.

4          THE COURT:  Is there a distinction between CDP and

5    the holding company?

6          THE WITNESS:  CDP funding came entirely from the

7    holding company.

8    Q   My question again, is am I correct that Richard Hinchey's

9    actual 2005 CDP funding was ten percent, according to the

10   sworn statement you provided earlier?  A simple question.

11   A   Dick Hinchey received 100 percent of his salary in 2005,

12   up until June.

13   Q   So, you don't --

14   A   That money, that money came from the holding company.

15   Q   Do you not want to answer my question?  Please turn to

16   your prior sworn statement at P-218.

17   A   218?

18   Q   Yes, sir.  Do you recognize this as an answer that you

19   provided a sworn verification to on March 2, 2009, correct?

20   A   I don't recognize it, but you can say it is, yes.

21   Q   I want you to be sure, take your time.

22   A   I mean, there's a lot of documents here.

23   Q   Take your time.  We've been over this before, right?

24   A   Mm-hmm.

25   Q   You don't remember?

1          MS. MALLOY:  Objection, relevance.

2          THE COURT:  Objection sustained.

3   Q    Please tell me when you've had an opportunity to confirm

4   whether that document contains an answer that you provided a

5   sworn verification to on March 2, 2009.

6   A    So, which part of this document?

7   Q    Question 23 is what I'll be focusing on, just like I did

8   last time.

9   A    Okay, yes.

10  Q    Okay.  That number lists, for years 2004 and 2005, actual

11  funding from the CDP for various employees, correct?

12  A    That's right.

13  Q    For Dick Hinchey, I'm asking you, just repeat a number

14  that you wrote in your sworn statement, the actual 2005 CDP

15  funding.  Does this state ten percent in the document before?

16  A    Yes, it does.

17  Q    Thank you.  Bonnie Marcus, in the document before you,

18  actually states not 100 percent, but 50 percent, correct?

19  A    Yes, that's correct.  What we're trying to also -- all we

20  are trying to also show here, in this particular -- what is

21  it, 281 -- is that these individuals received 100 percent of

22  the salary from somewhere and we're trying to --

23  Q    Can we get past that quickly, if we get these couple

24  question quickly, obviously, I haven't asked the question

25  about that and I will.  Just please -- the document provides

1    a sworn verification to -- the actual 2005 CDP funding for

2    Ken Berg, who is under age 55, is 20 percent, not ten

3    percent, true or false?

4    A    True.

5    Q    For Phil Connelly, who is 47, the actual 2005 CDP

6    funding, in your earlier sworn statement was 30 percent,

7    that's true, correct?  According to the document I showed you

8    earlier, it's Phil Connelly at 30 percent, correct?

9    A    Yes.

10   Q    Okay.  And now we'll get to you saying the mistake is

11   that this should have been labeled holding company?

12   A    That's right.

13   Q    Let's change that.  What do you want it to say?

14   A    Holding company.

15   Q    Holding company, the company in 2005?

16   A    Yes.

17   Q    Okay.  Doctor, it still states the wrong figures,

18   correct?  Still inaccurate?

19            THE COURT:  For whom?

20            MR. GOLDSHAW:  As re-labeled by your correction, am

21   I correct?

22            THE COURT:  Wrong figure for whom?

23            MR. GOLDSHAW:  For several employees on the list.

24            THE WITNESS:  Who?

25   Q    Is it true that for all the older employees, this

1    document, as re-labeled, still falsehoods in place, as their

2    actual 2004 holding company payment?

3    A    How so?

4    Q    Let's take them one at a time.

5    A    Okay.

6    Q    We talked about Eric Senderov, 50 percent of his funding

7    came from Dow, correct?

8    A    100 percent of Eric Senderov's salary came from PQ.

9    Q    Do we have --

10   A    Dow provided funding to a particular project.

11   Q    Let's do it this way, I'll read back the testimony.

12   Okay, sworn deposition, page 96.

13            "Question:  In the period January through May, 2005,

14   what portion of Eric Senderov's salary was funded with CD

15   money?

16            "Answer:  I would say about half of it, the other

17   half came from Dow funding, which we included as part of the

18   corporate development."

19            Richard Hinchey, another employee over 55, you state

20   100 percent holding company, 2005, correct?

21   A    Yes.

22   Q    And at the bottom, you read the source documents that

23   support this as Plaintiff's Trial Exhibit 259 and Defendant's

24   Trial Exhibit 2?

25   A    Okay.

1    Q   You agree with that?

2    A   Okay.

3    Q   This document does show Dick Hinchey at 50 percent,

4    holding company or CD funding or anything for 2005, do they?

5    A   They might have -- I'm at a loss at how Dick Hinchey

6    received 100 percent of his salary.

7    Q   I'm at a loss, too.

8    A   And the --

9    Q   How did you come up with that number, it's not in those

10   documents, is it?

11   A   It is perfectly clear that it came from holding company.

12   Q   You read the source documents at the bottom.  Now, I'm

13   asking if you can point to anywhere, in any of those source

14   documents, that actually confirms Dick Hinchey had 100

15   percent --

16          THE COURT:  I think we've run this into the ground.

17   Go on to something else.

18          MR. GOLDSHAW:  Okay.

19   Q   Would you agree that none of the source documents show

20   Bonnie Marcus at 100 percent holding company funding in 2005?

21   A   Bonnie Marcus received 100 percent of her salary from the

22   holding company.

23   Q   My question --

24   A   In 2005.

25   Q   My question was about the source documents that you

1    listed at the bottom.  Do they show 100 percent or not?

2    Can you show me where they show 100 percent or will you agree

3    that they don't?

4    A    Well, let's look at the source document.

5    Q    Take your time.  Tell me what you, do you have any of

6    those up there now or -- 259, Defendant's 2.

7    A    Which page is it on?

8    Q    Tab 259, I think you'll find that easy, because 259

9    doesn't show any numbers, at all, so it can't be that one.

10   That doesn't show any numbers at all, right?

11   A    No, it does not.

12   Q    Okay, let's look at the -- the only other source document

13   listed in Defendant's Trial Exhibit 2.  So, if you can point

14   out where it actually shows Bonnie Marcus at 100 percent,

15   holding company funding or CD funding?

16   A    In the Exhibit 215, in 2005, the proposed funding --

17   Q    We're talking actual, sir, right?  The actual, I want to

18   know if actual, any actual funding for Bonnie Marcus 100

19   percent is shown on that document?

20           THE COURT:  What document?

21           MR. GOLDSHAW:  The document before you, that you

22   referred to, Defendant's Trial Exhibit 2.

23           THE WITNESS:  Because this document was a planning

24   document, so, it does not portray actual funding.

25   Q    Okay.  The document does not portray actual funding.

1    A    Because this document was generated in September of 2004,

2    that I have in front of me.   This is the fourth -- one of the

3    last page of the 215 exhibit.

4    Q    Let's look at Roman Wypart, would you agree that none of

5    the documents you list as a source document here, actually

6    stated 100 percent holding company funding, 2005?

7    A    The document that I have in front of me states that Roman

8    Wypart was proposed to receive 50 percent of funding from

9    exploratory.

10   Q    Like an actual RIF?

11   A    And the remaining 50 percent was proposed to come from

12   Potters Industries and since Potters Industry did not put up

13   the funding and Roman Wypart received 100 percent of his

14   salary in 2005, it could -- the only source it could have

15   come from is the holding company.

16   Q    I'm going to ask you to focus on my question, which is

17   where does it say that in the document described as a source.

18   Does it state that in the document or we just have to take

19   your word for it?

20   A    Well, this is the source document, so, it does not

21   contain all of the information.

22   Q    It doesn't contain any information about Roman Wypart

23   given 100 percent holding company funding in 2005, correct,

24   in that document?

25   A    It isn't -- the information in this source document is

1  not complete.  It was not, at the time this was generated, it

2  was September, 2004.

3  Q   I'm trying to ask you as specifically as I can.

4  A   And I'm trying to answer if you -- about this document.

5  Q   Okay, we're focusing on the actual question, which is

6  does the document that you cite as a source for this exhibit,

7  actually state 100 percent holding company funding or CDP

8  funding for Roman Wypart?

9  A   That was not the intent of this source document.

10 Q   Does the document state that or not, that is the specific

11 question.  Does it say that?

12 A   It only partially cites the information.

13 Q   You don't want to answer my question?  Does my question

14 embarrass you?

15 A   It does not embarrass me, but all I'm saying is --

16             MS. MALLOY:  Objection.

17             THE COURT:  Objection sustained.

18             THE WITNESS:  -- that I'm trying to refer to this

19 source document that you put in front of me and I'm telling

20 you that this was generated back in September, 2004 and it

21 does not contain all of the information that is being

22 presented there in terms of 2005 actual.

23 BY MR. GOLDSHAW:

24 Q   Can you or can you not point to 100 percent Roman Wypart

25 in the document.  We'll try it one more time.

1            But withdrawn, I'm going to represent that the

2     document does not show 100 percent, do you disagree and if

3     so, can you point to it?

4     A    This particular source, this source document is not a

5     complete, does not represent all the information that's being

6     shown there.

7     Q    Now, where is that (inaudible).  So that, for all the

8     employees terminated over 55, we've reviewed those now, so,

9     they are actual 2005.  And failing on this, is your

10    contention that they were terminated because they didn't have

11    actual funding in 2005 or 2004, right?

12            THE COURT:  What's your question?

13            MR. GOLDSHAW:  Are you contending the termination

14    was based on whether they had funding, actual funding, for

15    2004 or 2005?

16            THE CLERK:  They were employed in 2004.

17    Q    That's not when they were terminated.

18    A    They were terminated in May of 2005.

19    Q    And whatever decisions were made were based on where the

20    actual funding came from, not their proposed, which was never

21    accepted, right?

22    A    The proposed was never accepted, that was correct.

23    Q    The documents that you listed as source documents,

24    actually state that Phil Connelly was 30 percent CDP funded

25    and the CDP funding came from the holding company, correct?

1    A   Yes.

2    Q   So, this is too low for the younger employees and the

3    same is true for Ken Berg, who is listed at ten percent, but

4    in fact, he got at least 20 percent holding company funding,

5    because 20 percent is CD alone, right?

6    A   I don't understand your question.

7           THE COURT:  Nobody else does.  Terminate your

8    cross-examination of this witness in approximately five

9    minutes.

10          MR. GOLDSHAW:  Will do.

11   Q   I will try to end it with this.  Only CDP funding came

12   from the holding company, correct?

13   A   Yes.

14   Q   And the document before you states that Ken Berg's CDP

15   funding was 20 percent, correct?

16   A   It was proposed to be 20 percent.

17   Q   Actual, I'm talking.  Document 218 shows actual, right?

18   A   Ken Berg.  It was proposed to be for 20 percent.  The

19   2005 project proposals were never approved.  So, we assume

20   that it was continued to be the same as in the 2004 level.

21   There is -- there was a time period from when the company

22   announced that it was going to be sold, from September, 2004

23   to May of 2005, there was a time of uncertainty, projects

24   that were proposed were not formally approved.  And so, they

25   would continue as if things were allowed, but not proof.

1    Q   You know what, I'm going to take that as no, too.   I

2    think we've got the point of it in.

3           MR. GOLDSHAW:   I'm prepared to end my

4    cross-examination -- my examination, at this point.

5           THE COURT:   That's good, is there anything further

6    of this witness?

7           MS. MALLOY:   Not at this time, your Honor.

8           THE COURT:   You may step down.   Thank you, sir.

9           THE WITNESS:   Thank you.

10          MR. GOLDSHAW:   Your Honor, subject to the formal

11   motion to admit various documents, which I understand can be

12   cone later, we are prepared to rest our case in chief.

13          THE COURT:   You may proceed with your testimony.

14          MR. ENNIS:   And your Honor, we would, at this time,

15   make a motion and a --

16          THE COURT:   The usual motion will be taken under

17   advisement.

18          MR. ENNIS:   Thank you, your Honor.

19          (Pause.)

20                        DIRECT EXAMINATION

21   BY MS. MALLOY:

22   Q   Do you work for PQ Corporation?

23   A   Yes, I do.

24   Q   Here's an important question, what does that stand for?

25   A   What does that stand for?   It's a -- PQ is a very old

1    company, almost 180 years do.

2              THE COURT:  What does PQ stand for?

3              THE WITNESS:  Oh, Philadelphia Quotes or it used to

4    be.

5    Q   Could you please tell us about yourself and your

6    education?

7    A   I was born in Hong Kong.  I lived in --

8              THE COURT:  Please talk into the microphone and keep

9    your voice up.

10             THE WITNESS:  Okay.  I went to England in 1967.  I

11   was educated there.  I received a Bachelor's Degree in

12   Physics and also a Ph.D. in physics, also from the University

13   of Warwick in England.  Came to the states in 1982.  I worked

14   at UCLA for about two and a half years.  Then I joined W.R.

15   Grace for about 12 years and then I joined PQ in 1996 to head

16   their exploratory research effort.

17   Q   And what does exploratory research effort mean when you

18   joined PQ?

19   A   What that meant was that, at the time, the PQ board was

20   concerned about future growth of the company and so, they

21   wanted to start an initiative, which might have the

22   opportunity or the potential to change the future direction

23   of the company.

24   Q   And what was your title when you began at PQ, your first

25   title?

1    A    I was the Exploratory Research Manager.

2    Q    And did you have any -- what was your next title?

3    A    In 1998, I was promoted to become the Vice President of

4    Research and Development.

5    Q    And who did you report to as Vice President of Research

6    and Development?

7    A    I reported to then the CEO, a fellow by the name of Dick

8    Kelso.

9    Q    And did somebody succeed Mr. Kelso as CEO?

10   A    Yes, Mr. Stan Silverman succeeded Dick Kelso in the year

11   2000.

12   Q    Could you please explain a little bit about what the

13   research and development unit at PQ did, prior to the lay-

14   offs at issue here?

15   A    We have a research lab in Conshohocken.  This is really

16   the corporate research center.  I had the responsibility for

17   about, let's say, in 1998, we had roughly about 100 people

18   working on site and by the time we were into 2005, roughly

19   between 55 to 60 people.  And this represented the -- all of

20   the business unit have a presence in Conshohocken and we do

21   product development for all of the businesses.

22   Q    And about how many people worked at PQ outside of R&D?

23   A    The company, at the time in 2005, maybe around just

24   slightly under 2,000 employees.

25   Q    And what was the role of research and development at PQ?

1   A    Our role was to look at -- provide technical support, to

2   develop new products.  And because, ultimately, PQ is a

3   manufacturing company, we sell products.  That's how we make

4   money.

5   Q    Could you explain how the Corporate Development program

6   came about?

7   A    Yes, this really was captured in a document by Stan

8   Silverman, then the CEO, in July of 2001.  And in his mind,

9   the Corporate Development had about -- had five key elements.

10  The first of that was that there would be 100 percent holding

11  company funding.  And the second one is that they would be

12  more market oriented as opposed to more technology oriented,

13  which was the exploratory research effort that I headed.  And

14  so, this is -- the projects then to be more market oriented,

15  the third key element, was that they would be run by or

16  managed by the business units.  And there would be a CD

17  committee, Corporate Development committee, that would then

18  select the projects.  And then we would also have regular

19  review of these projects to see whether are progressing in

20  the right direction, et cetera.  And each project really, in

21  a way, looks at three phases.

22           The initial first phase is that of exploring

23  feasibility and once feasibility has been confirmed, then it

24  moves to the second phase of the scale up, can you do more of

25  the same.  And then it goes to a final phase of

1    commercialization and in this commercialization phase, it's

2    important to think in terms of money in that, when the

3    project becomes cash neutral, meaning that revenue coming in

4    from selling product, exceed that of the project expenses.

5    Then the project we call, we would call it, it graduated and

6    then it would then be transferred to the business units

7    proper.

8    Q    And was the Corporate Development program just a part of

9    the bigger R&D unit?

10   A    It's roughly about ten percent of the entire company's

11   effort.

12   Q    And what was the reason why Corporate Development would

13   be funded by the holding company?

14   A    The reason is that, as we go through say 2009 and as an

15   example, there's economic downturn, businesses have downturns

16   and Stan Silverman, at the time, was concerned that because

17   of any particular business cycle, that there would be

18   downturn and that the business units would terminate funding.

19   Therefore and he wanted to have a more sustainable

20   development effort that can weather through the downturns and

21   so, his concept was to have it funded out from the holding

22   company.

23   Q    How was research and development, that was not in the

24   Corporate Development funded?

25   A    They were funded directly by the business units

1    themselves and so, each business -- or the key business

2    manager would then determine what kind of level of product

3    development effort that they can afford each year.

4    Q    Could you tell us about the three phases of Corporate

5    Development projects, please?

6    A    The three phases, initially, is that of a combination of

7    working in the lab, you know, doing tests on a much smaller

8    scale.  Some exploratory work in terms of potential markets,

9    whether the product that is being considered would be

10   receptive by consumers and so on.

11            And then, in the second phase, this would be now can

12   you do more of that same thing if this product can be made in

13   the test tube, now can you make it in ton or thousands of ton

14   quantities?  So, those are separate, different kind of

15   questions.

16            And then, in the final phase, is that of how do you

17   now sell, you know, find the customers to sell to.

18   Q    Was there any review program associated with Corporate

19   Development projects?

20   A    Yes, initially, in the beginning, in 2002, when the

21   projects first really took off, the projects were reviewed

22   once every quarter by the Corporate Development committee and

23   this then consisted of the CEO, Stan Silverman, the Chief

24   Financial Officer of the company and the heads of the

25   business units.  And then these are the people who would then

1    review these projects and along with me, to then decide

2    whether the appropriate progress is being made, are the

3    projects being managed properly, is it funded appropriately.

4    Q    And what was your role or title with respect to the

5    Corporate Development program?

6    A    I was the manager of the Corporate Development project

7    and my role was to pull together the technical resources to

8    decide which projects have merits, how we should man them,

9    how we -- how much budget to allocate to each particular

10   project.

11   Q    And did you have responsibilities as the Vice President

12   of R&D, other than the Corporate Development program

13   administrator?

14   A    For the other parts of the businesses, I also have

15   responsibility in terms of the projects that were being

16   worked on, the manpower and also budgets.

17   Q    I'm showing the witness, Defendant 1.  Could you please

18   identify that?

19   A    This document is from Stan Silverman, the CEO, July, 2001

20   titled Corporate Development Program.

21   Q    If you could just highlight the first two paragraphs,

22   please?  Does the second paragraph of this memo accurately

23   set forth, in summary form, the Corporate Development

24   program?

25   A    Yes, this concentrate on new product and markets within

1   our current businesses, yes.

2   Q    And does this document, that's been marked as Exhibit --

3   Defendant Exhibit 1, is that sometimes referred to as the

4   Corporate Development charter?

5   A    That's right.

6   Q    How did people get assigned to the Corporate Development

7   group?

8   A    Well, when developed the projects, then we say, well,

9   what do these projects need?  What kind of talents do we need

10  in order to appropriately progress --

11  Q    If you can just make sure you're talking into the mike,

12  please.

13  A    Okay, if we can then -- so, once we looked at the project

14  that had potential to be approved, then we looked at the

15  talents that are needed in order to make sure we can drive

16  these projects forward.  And that's how we then determined

17  people working on these projects.

18  Q    How did Bonnie Marcus come into the Corporate Development

19  group?

20  A    I started working with Bonnie really on a close day to

21  day basis starting in 2001.  And so, she and I had really

22  been working on the Corporate Development program proposal

23  right from the beginning.  And her role was to, also to

24  organize the research staff in terms of their meeting

25  together, defining project goals and also, then looking at

1   potential markets.

2   Q   And do you recall when Ms. Marcus came into the Corporate

3   Development group?

4   A   My recollection is that she started receiving funding

5   from Corporate Development projects starting in 2002 and that

6   was around 50 percent time.

7   Q   Okay.  And at that point, who funded the other 50 percent

8   of Ms. Marcus' salary?

9   A   The remaining 50 percent came from Zeolite

10  International.  That's one of the joint venture companies

11  within PQ.

12  Q   Who was responsible for the Corporate Development program

13  budget?

14  A   I was.

15  Q   And could you explain your role in the budget?

16  A   My role here is that once we decided on which projects to

17  work on and the number of people whom we can put on the

18  project.  Then we start allocating their time, is it ten

19  percent of the year or is it 50 percent or 100 percent?  And

20  we also have then to budget in their salaries, their

21  overhead, meaning the health insurance plan, the pension, et

22  cetera.  And then all of the laboratory support, travel, lab,

23  office, utilities, then we start putting all of that

24  together.  In general, it costs roughly between $200,000 to

25  $250,000 to put a man year together.

1    Q    And what is a man year?

2    A    A man year is really the time that the person spent in

3    the whole year.

4    Q    I'm handing the witness Defendant's Exhibit 3.

5    A    Thank you.

6    Q    Could you please identify that document?

7    A    This is manpower matrix for 2002 Corporate Development

8    budget.  This is really a concise way of showing who's really

9    working on what project and for how much of their time.

10   Q    Let me stop you for a second, just for ease of reading,

11   if you could highlight, please, Colleen, from the first

12   column, maybe over to Thompson's name.  Is this an actual

13   document that you prepared?

14   A    Yes.

15   Q    And what is the title of it?

16   A    This is 2002 Corporate Development Manpower Allocation

17   Budget.

18   Q    And when was it prepared?

19   A    Typically, I would prepare that around September of 2001.

20   Q    Could you explain to us how you would read this chart?

21   Let's start with the left-hand column, Corporate Development

22   Projects.

23   A    So, on the left-hand column then, it lists out the

24   different projects that we were proposing to the CD committee

25   for funding.  So, in this case, the first project is entitled

1   TSPQ and then the next one, MMA and then the third one, wood

2   preservation and then intelligent highway and so on.

3   Q    And how -- what does this document show?

4   A    So, what this document then show is that there is a

5   short, few words in terms of the project description itself.

6   The technology area --

7   Q    They're short words to you, right?

8   A    Short words to me and technology area within what type of

9   area that we're dealing with.  And then it begins to list out

10  on the top column, Lau, Hu, Marcus, Thompson, the

11  individuals.  And then the fraction of their man year working

12  on these particular projects.

13  Q    Okay, let's just use for illustration, the column with

14  Ms. Marcus' name?

15  A    Yes.

16  Q    Could you explain to us what those figures mean?  How

17  would you interpret this?

18  A    Okay, in the case of Marcus, she would then be 20.2,

19  which is 20 percent on TSPQ, .1 to 10 percent on MMA project,

20  .1 to 10 percent on wood preservation, nothing on intelligent

21  highway and then 10 percent on layer silicate and adding up

22  to 50 percent, .5 of her man year.

23  Q    And .5 of her man year came from Corporate Development

24  funding, is that correct?

25  A    That's correct.

1    Q    Okay.  Handing the witness Defendant's Exhibit 2.

2    A    Thank you.

3    Q    This is a multi-page document, could you tell us what it

4    is?

5    A    This is, once again, a manpower matrix or a manpower

6    allocation budget for 2003, 2004 and 2005.

7    Q    Okay, let's look at 2003 for now and Colleen, if you

8    could please highlight up to Mr. Thompson, again?  Are the

9    Corporate Development projects identified on this document,

10   the ones that actually were proposed to receive funding?

11   A    Yes.

12   Q    And using yourself for an example, could you explain what

13   this 2003 allocation budget illustrates?

14   A    Now, in this case, in 2003, these proposed project were

15   approved, so, they became the actual projects.  So, as you

16   can see under the name Lau, that's for me, the total time

17   then is 25 percent, .25 and so, I split my time then amongst

18   the different projects, TSPQ at 5 percent, MMA at 10 percent,

19   wood preservation at 5 percent and layer silicate at 5

20   percent.

21            THE COURT:  Could I ask, where were these various

22   projects taking place, the work on them?

23            THE WITNESS:  The work on these projects were taking

24   place primarily in terms of the lab scale, in Conshohocken.

25   Wood preservation, as an example, where we, at some point in

1    time, scale up, those were actually to preserve wood using

2    sodium silicate.  And some of them went to field testing and

3    went as far as Hilo, Hawaii, as an example.

4    Q    And the column next to your name is you, Hu?

5    A    Hu.

6    Q    And who is Hu?

7    A    Dr. Hu, she was a scientist working in then exploratory

8    research department, which has a department number of 458900

9    and she was spending 30 percent of her time.

10   Q    And this shows .1, ten percent of a man year assigned to

11   the MMA project?

12   A    That's right and then 20 percent on the wood preservation

13   area.

14   Q    So, would it be accurate, according to this document,

15   that Dr. Hu was assigned 30 percent of her time was funded

16   through Corporate Development money?

17   A    That's right.

18   Q    And where did the rest of Dr. Hu's funding come from?

19   A    The rest of her time came from the zeolite -- or no, the

20   silica gel business itself.

21   Q    Why do people show up in these budgets as different

22   amounts of time?

23   A    Well, it really depends on the demands of the projects.

24   Sometimes, it does not need an entire person or they have

25   sufficient, you know, talent to be able to spread their work

1   over different projects and different businesses.

2           THE COURT:  Am I correct in my assumption that this

3   is simply a budget arrangement?

4           THE WITNESS:  Yes, that's absolutely correct.  This

5   is a budget arrangement and this is what we propose for

6   approval and we, as we go into the actual year itself, it

7   provides a guideline for the scientists to decide on how much

8   time they should be spending on each particular --

9           THE COURT:  So, am I correct in assuming that they

10  don't punch a time clock for the amount of time they spend?

11          THE WITNESS:  You are absolutely correct.  They do

12  not punch a time clock, but this is really just a rough order

13  of magnitude to guide them.

14  Q   If you could turn to the following page of Exhibit 2,

15  please?  And what does the second page show?

16  A   The second page shows the 2004 --

17          THE COURT:  That's a very fine print, that's what it

18  shows.

19          THE WITNESS:  Yes.  2004 manpower allocation budget

20  itself.

21  Q   And the document that is in your hand is a photocopy of a

22  budget you actually prepared?

23  A   Yes.

24  Q   At the time?

25  A   Yes.  And this time, I would normally have then prepared

1   it in around September of 2003.

2   Q   Okay, hold on a second, so we can get this a little

3   bigger, so people could see.  Are you able to highlight,

4   enlarge all the way up to Berg, does that work?  Okay.

5            I'm sorry, you were describing what 2004 was?

6   A   Yes, in 2004, now, these particular programs that we list

7   on the left-hand column, those projects were all -- they were

8   actually approved by the CD committee themselves and so, this

9   document then really is a good budgetary guideline for what

10  happened in 2004.

11  Q   And would this be accurate as to what, in fact, were CD

12  projects in 2004?

13  A   Yes.

14  Q   And you would -- you would read this page the same as

15  we've already described?

16  A   That's right.

17  Q   And Berg, is that Ken Berg?

18  A   That's right.

19  Q   And could you describe why he is listed as .1 man year?

20  A   Ken Berg is a biochemist and we, at the time, assigned

21  him ten percent of moldicide (ph) project, because we felt

22  that he had the necessary skills to help us move this project

23  along in demonstrating potential efficacy in zeolite.

24  Q   While we're looking at this page, could you just tell us

25  briefly, what is TSPQ, in lay terms.

1    A    Oh, in lay terms.  Well, this is a particular type of

2    zeolites and this project was a joint project with the Dow

3    Chemical Company, working with PQ.  Dow Chemical Company has

4    a great interest in this material because it could lead to

5    essentially a revolutionary change in the way they make

6    propylene oxide.  However, Dow is a competitor to Shell

7    Chemical Company and Shell Chemical Company owns 50 percent

8    of Zeolist International, the other 50 percent is owned by

9    PQ.

10            So, Dow, at the time, did not want to have this

11   project within Zeolist International, because they were

12   concerned that there could be potential information leakage

13   from Zeolist International back to Shell.  And so, but they

14   were happy enough with the PQ side that they were willing to

15   fund us, to do work within PQ itself.

16   Q    And in lay terms, what was the wood preservation project?

17   A    Wood preservation project is that some of you may have

18   outdoor lumber or wood decking that has copper chromium

19   arsenate as a --

20   Q    That's why I said lay terms.

21   A    -- it is what we call CCA, it is a very toxic compound to

22   prevent insects from eating it up.  And so, there was a

23   potential change of government regulation abandoning CCA

24   around this time frame and we were then looking to see if we

25   could use PQ sodium silicate as a substitute for these very

1    toxic materials.

2    Q   And what is, briefly, moldicide?

3    A   Moldicide, as I mentioned before, we had observed, at the

4    time, potential -- that material that's been impregnated with

5    our zeolite material, seemed to have much less mold growth

6    than material that did not.  So, we wanted to explore what

7    that meant.  Could we reproduce the results?  Could it, you

8    know, could it be confirmed, that was the moldicide.

9    Q   And how about 4-A liquid?

10   A   4-A liquid, 4-A zeolites is really the builder that goes

11   into a box of Tide detergent.  A building meaning that it

12   picks up calcium and magnesium and is a water softener.  And

13   as all of us know, as you go around to the supermarket

14   shelves, is that powder laundry detergent has been declining

15   in market share relative to liquid laundry.  And so, we

16   thought if there was a way for us to incorporate our zeolite

17   product into liquids, then we would then stop the decline in

18   our market share in powder laundry detergent.

19          So, the way that we thought we would tackle this was

20   to make the particles small enough that they could suspend in

21   liquid.  So, 4-A is really a description of the zeolite

22   material itself and liquid meaning that you could go into a

23   liquid laundry detergent.

24   Q   In 2004, what percentage of Ms. Marcus' funding, total

25   funding came from Corporate Development money?

1    A    In this, as its shown here, is 50 percent came from

2    Corporate Development funding.

3    Q    And how about Dr. Senderov, same question.

4    A    100 percent.

5    Q    Reggie Thompson?

6    A    100 percent.

7    Q    You'll have to go to the other half.  Mr. Wypart?

8    A    Mr. Wypart, 100 percent.

9    Q    What time of year were the Corporate Development reviews?

10   A    Typically, we would be around September of each year,

11   that's when we go through our annual budget and then we try

12   to schedule another one, typically, around March, April time

13   frame.

14   Q    Was there a Corporate Development review in the fall of

15   2004?

16   A    Yes, there was.

17   Q    Could you please tell us what happened at that review?

18   A    In this review then we present our 2005 proposed budget

19   and there were a number of projects that were presented for

20   funding.  And normally, at the end of each particular review,

21   then we would get the steering committee will meet behind

22   closed doors to decide which projects will be funded, which

23   projects will not be funded.

24   Q    And was Ms. Marcus on that steering committee?

25   A    She was not.

1   Q   Were you on the steering committee?

2   A   Yes, I was.

3   Q   And what happened at the steering committee in the fall

4   of '04?

5   A   In that committee meeting, essentially, we did not get

6   the approval that we were seeking for all the projects being

7   proposed.

8            THE COURT:  I'm sorry, approval from whom, Mr. Lau?

9            THE WITNESS:  From the steering committee.

10           THE COURT:  Who else was on the steering committee?

11           THE WITNESS:  On the steering committee was the CEO,

12  Stan Silverman, the Chief Financial Officer, Bill Levy, the

13  head of Potters Industries, Gerry Sheridan, Michael Imbriani,

14  who was the head of the chemicals business and Michael

15  Imbriani had also invited Colleen Delmonte into the meeting,

16  as well as Rosalind Kutchins, who had worked within the

17  chemical business.

18  Q   Do you know why the funding was not approved for the CD

19  projects in the fall of '04?

20  A   Not at that particular moment in time.

21  Q   At some point, did you learn that?

22  A   Yes, at some point, I did.

23  Q   And what was the reason that you learned?

24  A   Towards the -- towards the end of September, 2004, then

25  the company announced that it would up for sale.  And so, at

1    that point, it was then clear to me that the reason why we

2    did not get approval was that the company was up for sale and

3    then, really funding of the Corporate Development project,

4    itself, would then be left to the future owners of the

5    company.

6              THE COURT:  May I inquire, did the steering

7    committee, was it a formal meeting, were minutes kept and

8    that sort of thing?

9              THE WITNESS:  It was not that formal.  We met and

10   normally, then I will, at the end of it, announce to my group

11   whether projects were funded or not.  But there were no

12   formal minutes being kept for that meeting.

13   Q   What projects were proposed by you to be -- Corporate

14   Development projects proposed by you to be funded for the

15   year 2005, right?

16   A   For the year 2005, we had TSPQ, we had wood preservation,

17   moldicide, polymer wood composite, 4-A liquid, Starlite, this

18   is a Potters project, government relationship, that was a

19   Potters project, surface business, that was another Potters

20   project, Polymer additives and conductives, the letters were

21   all Potters projects.

22   Q   Did you communicate to Ms. Marcus the decision of the

23   steering committee?

24   A   Yes, I did.

25   Q   Let's talk about Ms. Marcus.  What was her role in 2004

1   on the Corporate Development projects?

2   A    She provided help for me to coordinate project activity,

3   you know, to help manage the individual projects,

4   particularly those and in fact, only those in the chemicals

5   area, dealing with the zeolites and primarily in zeolites.

6   Q    I'm handing the witness Exhibit 13.

7   A    Thank you.

8   Q    Can you highlight the text part of it, above where it

9   says, Roz.  Could you please identify this document, Dr. Lau?

10  A    Yes, this is an e-mail from Rosalind Kutchins to me, on

11  September 10, 2004.

12  Q    Can you put that in perspective with the steering

13  committee meeting?

14  A    The steering committee took place the day before, on the

15  9th of September, 2004.  And this was a -- the title of this

16  is regarding funding.

17  Q    And could you, please, describe what Ms. Kutchins was

18  communicating to you?

19  A    The gist of this was that she was saying -- she

20  apologized for missing each other and that they had reviewed

21  the needs and they did not feel that Bonnie Marcus was needed

22  in the Corporate Development project, because they are able

23  to manage it themselves.

24  Q    At this point, did Ms. Marcus have any funding from Ms.

25  Kutchins' group?

1    A    She had her -- at this point, in 2004, 50 percent of her

2    funding came from zeolite products, which was Roz Kutchins

3    had responsibility for.

4    Q    And where in 2004, did the rest Ms. Marcus' funding come

5    from?

6    A    The rest of it came from the Corporate Development

7    project.

8    Q    And if you could describe for us, what was going on in

9    the PVC market, at this point?

10   A    At this point, in the PVC area, we had already a number

11   of product in hand, that was being sold and Roman Wypart

12   provided technical support to help customers use these

13   materials.  So, the projects were actually already fairly

14   well under way and we were selling reasonable quantities of

15   it.

16   Q    And PVC was something in Ms. Kutchins' line of business,

17   is that correct?

18   A    Yes, that's correct.

19   Q    And was the detergent zeolite also Ms. Kutchins'

20   business?

21   A    Yes.

22   Q    And what was communicated to you regarding funding for

23   detergent zeolites in this e-mail?

24   A    In this e-mail, in 2004 time frame, a very key

25   ingredient, what we call ATH, is a aluminum trihydrate, is a

1    very key ingredient to make zeolite material.  The prices for

2    ATH was shooting up close to doubling, if not tripling, in

3    2004.  And so, part of Roz Kutchins' concern was that with

4    this rising raw material cost, she was going to be limited in

5    her ability to fund research, R&D.

6    Q    Okay.  The second paragraph, I guess, the third paragraph

7    of this e-mail, having spoken with the plants and business

8    managers, we have agreed that we need to maintain our funding

9    of the process/synthesis, Dick, Eric and Phil portion of the

10   projects, but could sacrifice the market development effort

11   at R&D, taking on that responsibility within the business.

12   Who are Dick, Eric and Phil?

13   A    Dick is Dick Hinchey.  Eric is Eric Senderov and Phil is

14   Philip Connelly.

15   Q    And were all of those three people employed in R&D?

16   A    Yes, they were.

17   Q    And the paragraph I just read, what did that mean to you

18   in terms of R&D?

19   A    What that meant was that the business, at that moment in

20   time, was willing to sustain the technical effort in

21   synthesis and process development.  So, the scientists, Dick

22   Hinchey, Eric Senderov and Phil Connelly, they were willing

23   to provide continued support.  And where they were not

24   willing to provide support was in the market development

25   area, that meant funding for Bonnie Marcus.

1    Q    Okay.  The next paragraph, I suggest that Dick and Phil

2    take over the portion of funding that supports detergent

3    zeolites in Korea and Thailand.  They are both greatly

4    respected by both groups and have offered excellent support.

5    What did that mean to you in terms of your R&D unit?

6    A    What that meant is that Dick and Phil were doing great

7    work for our businesses in Korea and Thailand.  And that they

8    will continue to provide funding, at that moment in time.

9    Q    And I think we already discussed PVC.  So, the last

10   sentence of this e-mail from Ms. Kutchins, Defendant Exhibit

11   13, reads, We can discuss further next week, but my mind is

12   made up.  Unfortunately, we have to make a tough decision and

13   drop support of Bonnie, Rome and Erin.  Bonnie refers to

14   Bonnie Marcus?

15   A    Yes.

16   Q    And Rome is Roman Wypart.

17   A    Roman, I think that was a typo there.

18   Q    Okay and who is Erin?

19   A    And Erin is Erin Fisher, she, at that point, was a

20   technician.  She reported in to Roman Wypart.

21   Q    And what did that conclusion by Ms. Kutchins mean in

22   terms of your role as the vice president of R&D here?

23   A    Well, what that meant was that the zeolite products

24   business was not willing to support funding for Bonnie Marcus

25   and the other efforts that they were happy to continue to

1    provide support was in the process and synthesis area, Dick

2    Hinchey, Eric Senderov, Phil Connelly and Erin Fisher and

3    Roman Wypart.

4    Q    Did you prepare a proposed Corporate Development budget

5    for 2005?

6    A    Yes.

7    Q    And is that the last page of Defendant's Exhibit 2?

8    A    That's right.

9    Q    Can you go over to, maybe the end of Berg, if that fits?

10   Could you, please, describe for us your proposed budget.  Why

11   was it only proposed?

12   A    This was proposed on September 9, 2004 and at the end of

13   this presentation and we met in closed session with the

14   Corporate Development committee, they did not give us full

15   approval.  They did not give us any approval.

16   Q    And the page that we're looking at here, when did you

17   actually prepare that?

18   A    It would have been sometime before the committee meeting.

19   Q    And was Ms. Marcus proposed to have any Corporate

20   Development funding for the year 2005?

21   A    Oh, in this one, actually, I have to correct myself, this

22   was actually amended after the meeting.  Sometime after the

23   September 9th.

24               THE COURT:  Is this the amended version or the

25   original version?

1          THE WITNESS:  This is the amended version.  In the

2    original proposal, Bonnie Marcus, we had proposed time for

3    her.

4    Q    And why did that change?

5    A    And that was the result of after the presentation on

6    September 9th, that they basically said, you know, we think

7    Bonnie's role could be fulfilled by the business units

8    themselves.

9    Q    In your proposed manpower allocation budget, as amended,

10   that you're looking at, was there any Corporate Development

11   funding proposed for Ms. Marcus?

12   A    No, there was not.

13   Q    How about Mr. Wypart?

14   A    Mr. Wypart, at this stage, we had 50 percent funding

15   proposed for Roman Wypart and the other 50 percent, we had

16   planned on to come from Potters Industries.

17   Q    Okay.  How about Dick Hinchey, proposed for 2005?

18   A    For Dick Hinchey, Dick's case is a little bit different,

19   in that around the third quarter of 2004, he had approached

20   me regarding potential retirement.  And at that point, I

21   said, well, there is, you know, things going on in the

22   company, at the moment.  Why don't we defer this particular

23   decision.  And so, we had then proposed in this particular --

24   we had actually then taken him out of the 2005.

25   Q    Proposed budget?

1    A    Proposed budget.

2    Q    Okay.  Now, you testified that you learned in the fall of

3    2004 that the company would be up for sale.  Did that have

4    any impact on your Corporate Development budgets or

5    proposals?

6    A    Yes, it did.

7    Q    Could you please describe that?

8    A    Basically, it meant that we did not have a decision on

9    funding of the Corporate Development proposals that we

10   presented.

11   Q    Exhibit 40.  Could you please identify this?

12   A    Yes, this is an e-mail from me to the Corporate

13   Development steering committee.

14   Q    And what is the date, sir?

15   A    And the date on this, let's see, I'm trying to find it.

16   Ah, it's September 23, 2004.

17   Q    And what is this?

18   A    This is a Corporate Development project summary and this

19   essentially, after the September 9, 2004 meeting, I was asked

20   to revise my budget based on the discussion there.  And so,

21   we came up with a new proposal and this time, then, we had

22   then eliminated Bonnie Marcus' participation in this -- in

23   the Corporate Development project.

24   Q    So, the second paragraph reads, as the plan stands and in

25   view of other budgetary pressures, Bonnie Marcus and Dick

1    Hinchey will not be involved in the 2005 CD program.

2    A    That's right.

3    Q    And that's reflected on your proposed 2005 budget, which

4    was Exhibit 2, is that correct?

5    A    That's right.

6    Q    That we just looked at?

7    A    That's right.

8    Q    Roman Wypart, a polymer processing expert, has been added

9    to support both the wood polymer composites and glass bead

10   projects.  Is that also reflected on your 2005 amended

11   budget?

12   A    That's right.

13   Q    And Eric Senderov's time distribution has been shifted

14   more to Nano-A to compensate for Dick Hinchey's absence.  Is

15   that also reflected on your proposed budget?

16   A    That's right.  And just to add that Nano-A also is

17   synonymous with a 4-A liquid, small particle size A.

18   Q    That's a laundry detergent?

19   A    That's right.

20   Q    Exhibit 6.

21   A    Thank you.

22   Q    Could you please identify this?

23   A    This is a public announcement that was regarding PQ

24   Corporation to examine strategic alternatives.  That

25   basically meant the company was putting up itself for sale.

1  Q   Did the fact that the company was for examining strategic

2  alternatives, beginning on or about September 20, 2004, have

3  any impact on the personnel decisions that were in front of

4  you?

5  A   Yes, it did.

6  Q   Please describe that?

7  A   When this and shortly after this was issued, our CEO,

8  Stan Silverman, passed along a directive which was that there

9  were going to be no hiring or firing of company employees

10  until that the transaction is complete.

11  Q   And what did that mean for the people who had been

12  assigned to Corporate Development?

13  A   What that meant was that we were, in essence, in a

14  holding pattern until the company is sold.  So, we could not

15  do anything in terms of people, whether they were funded or

16  not funded.

17  Q   Exhibit 18.  Could you please identify this?

18  A   Yes, this was an e-mail, there's two parts to this.  On

19  the bottom part is from me to Stan Silverman, on November 9,

20  2004.  And I just wanted to confirm with him his directive

21  that there were going to no personnel action to be taken

22  until the company is sold.  And he replied on the day after,

23  to confirm that that is indeed correct.

24  Q   What would have happened to Ms. Marcus' employment in

25  November of 2004, if it were not for this directive by Mr.

1    Silverman?

2    A    In, if there's such a thing as a normal year, in normal

3    circumstances, if the company was not being put up for sale,

4    upon learning that there would be no funding for her in 2005,

5    we would start a conversation in terms of how -- a

6    termination.

7    Q    Ms. Marcus did continue to work through May 25th, June

8    25th of '05, correct?

9    A    Yes.  She -- her formal termination was June 30, 2005.

10   Q    Exhibit 56.  Could you please identify this?

11   A    This is an e-mail from me to Bill Levy, who was, at the

12   time, the Chief Financial Officer and Jim Cox, who is the

13   Finance Director and the date of this January 20, 2005.  And

14   what I referred to, to them is that of Stan Silverman's

15   instruction of no hiring and firing.  So that meant that

16   certain cost centers, where we had people funding people,

17   that we had actually not budgeted for in 2005, would mean

18   that those particular cost centers, that's where the CC

19   numbers stand for, cost center, would go over budget on a

20   monthly basis and I gave the calculation of what that meant

21   on a monthly basis.

22   Q    And why did you have to account for this?

23   A    And the reason that we accounted for this is that we know

24   that we were carrying people in these particular cost

25   centers.  They were not in the budget that the business were

1   accounted for and so, those cost centers will go over budget

2   and then that would flow into the holding company itself.

3   So, the holding company will carry these particular

4   department or cost center deficits.

5   Q    I'd ask you to turn back to Exhibit 2, please?

6   A    Okay.

7   Q    The 2005 page.  Could you describe for us, from January

8   through May of 2005, Ms. Marcus remained employed, is that

9   correct?

10  A    That's right.

11  Q    And who funded her salary, benefits, overhead, et cetera?

12  A    The funding ultimately came through from the holding

13  company.

14  Q    And why was that?

15  A    Because there was no budget for her in the Corporate

16  Development projects and there were no funding from the

17  business units, themselves, in 2005.  And she received the

18  full salary up until June, 2005.  That the only source of

19  that funding could only come from the holding company,

20  itself.

21  Q    And the holding company also funded CD programs, correct?

22  A    That's correct.

23  Q    And from that same period, January through May of 2005,

24  how was Mr. Hinchey's salary and benefits funded?

25  A    The same source from the holding company.

1  Q   And how about Mr. Wypart?

2  A   The same.

3  Q   Mr. Senderov?

4  A   Exactly the same.

5  Q   When did the actual sale of PQ take place?

6  A   Around -- the transaction closed around February of 2005.

7  Q   And what was the atmosphere like in R&D in the winter of

8  '05?

9  A   It was cold and it was a period of great uncertainty,

10 great anxiety.  People really naturally asked the question,

11 do I have a job in the company?  And who am I going to be

12 working for.  And so, there was a lot of, you know,

13 confusion, there was a lot of anxiety. It was not a good

14 place to work.

15 Q   Were you asked to look at the R&D organization after the

16 sale?

17 A   No, I was not.

18 Q   Were you involved in looking at the R&D organization from

19 the prospect of potential downsizing or lay-offs?

20 A   I was involved with discussions with different business

21 units in terms of what comes to mind as an example, Potters

22 Industry.  I was counting on potential funding, say, for

23 Roman Wypart in 2004, that by the time post-February of 2005,

24 they were revising their business plans in terms of how to

25 trim costs and whatever funding that I had accounted for, did

1   not materialize. Further more to that, is that they, whatever

2   funding that they had for the people who were within Potters,

3   as an example, they were cutting your head counts.  And so,

4   within Potters, itself, they were reducing head counts.  That

5   was one.  Within Zeolite Products, that was for sure, they

6   were reducing their budget in product research and

7   development area.  So, there were a lot of conversations, at

8   that time, between February to May of 2005, that I had with

9   the different business units, to look at how much money they

10  were prepared to support for a product development area.

11  Q   Did Mr. Wypart have any Corporate Development funding in

12  2005?

13  A   Roman Wypart --

14  Q   You can look at your exhibits, if you want.

15  A   -- we can't -- we, at the time, had planned on him to

16  receive 50 percent from Corporate Development and the

17  remaining 50 percent from Potters.

18  Q   Okay.  And when you say planned, is that the same as

19  proposed?

20  A   Proposed, yes.

21  Q   And what happened to the proposed funding when the

22  company was sold or announced it was going to be sold?

23  A   For really in February to May, there was a period of

24  reorganization.  There was no firm plans, at that point and

25  by around the middle of May, then we received the decision

1   that there were going to be no Corporate Development funding.

2   So, at that point, then we realized that we had to let people

3   go.

4   Q   People continued to be -- get full salaries thought,

5   until they were let go, correct?

6   A   Absolutely, yes.  There's no dispute on that.

7           THE COURT:  Where did the information come from that

8   there was going to be no Corporate Development funding?  From

9   the steering committee or what?

10          THE WITNESS:  No, the word that I got was actually,

11  I received that message through from Kevin Doran, through a

12  voicemail and that was then that he confirmed that that

13  instruction came from Mike Boyce, that the company was

14  cancelling the Corporate Development project.

15  Q   That's exactly where we were going to go.

16  A   Thank you.

17  Q   Could you please identify Exhibit 22?

18  A   This is a memo that I wrote on May 6, 2005 to Kevin

19  Doran, our Vice President of Human Resource regarding

20  reduction in force in 2005.

21  Q   Okay, could I ask you just to hold on for a second.  For

22  purposes of us reading it, Colleen, could highlight or

23  enlarge up to the bottom of that first box, please.  I'm

24  sorry, to interrupt you.

25  A   That's okay.  And what's here, I'm detailing the

1  discussion that I had with Michael Imbriani, Colleen

2  DelMonte, these two individuals are, of course, the heads of

3  the business for the chemical business.  Bob McClune and Bob

4  Molhall (ph), who are the business managers responsible for

5  Potters Industries.  This is regarding a number of R&D

6  position based on their particular business needs.

7          And from that, came a list of individuals whom we

8  did not have funding for and that those positions then, would

9  be eliminated.  So, I list, for instance, Albert Behan, who

10  is a Senior Research Fellow, Dick Hinchey, Robiana Beagle

11  (ph), Tom Dang (ph), Larry Royer, Terry Ann Sitlery (ph) and

12  Mary Ellen Callahan.

13  Q   Were you also looking for open positions that people

14  could potentially fill?

15  A   Yes, I was, you know, part of my job then was to look

16  across the company where, say, one business could not support

17  an individual, maybe there would be openings in other parts

18  of the businesses that we can fill them.  So, at the time, we

19  were aware of two open positions.  One in silica catalyst and

20  one in zeolite catalyst.  These -- one is a, you know, the

21  former is a process engineer position and zeolite catalyst,

22  that is a technician position.  And then I had recommended

23  that the individuals who were going to be displaced, Tom Dang

24  and Terry Ann, that they be considered for those positions.

25  And it follows along to say that Mike Boyce -- following Mike

1   Boyce, who is now then the CEO of the company, that the

2   Corporate Development would be dealt separately, so we had

3   not reached a decision regarding funding of the CD program.

4   And so -- and I listed individuals who could be potentially

5   be affected by the decision in funding of Corporate

6   Development.

7   Q    Did you expect that a decision regarding the Corporate

8   Development funding would be made?

9   A    I was hoping that it would be soon, at that point.

10  Q    Was Ms. Marcus qualified for the Process Engineer II or a

11  research technician position that was open?

12  A    I don't think so.  And the salaries certainly would not

13  match her expectation.

14  Q    Does she have an engineering degree?

15  A    No, she does not.

16  Q    And was Mr. Wypart qualified for the Process Engineer II

17  or research technician position?

18  A    No.  Those positions only would pay for, maybe, half of

19  their salaries.

20  Q    Why did you address this memo to Kevin Doran?

21  A    At the time, I really wanted to lay out the situation as

22  I saw them in terms of all of the potential -- what that

23  meant in the reorganization of the company and what it meant

24  in terms of in Conshohocken, the individuals that would be

25  affected by those decisions.

1   Q    23?

2              THE COURT:  Suppose we take a ten-minute recess, at

3   that point.

4              THE CLERK:  All rise.

5              (Court in recess 3:10 to 3:23 o'clock p.m.)

6   BY MS. MALLOY:

7   Q    Can you please identify Exhibit 23?

8   A    This is a memo that I wrote to Kevin Doran on May 9,

9   2005.  It's like a continuing series on the subject of

10  reduction in force in 2005.

11  Q    At R&D?

12  A    At R&D.

13  Q    And you reference a discussion with Scott Randolph, who

14  was he?

15  A    Scott Randolph, at this point, is the President of

16  Potters Industries.

17  Q    And could you tell us why you're speaking with Mr.

18  Randolph?

19  A    I was talking in conversation with him regarding the

20  potential funding of the Potters R&D effort in Conshohocken.

21  And this was a Saturday weekend that I was sitting in the

22  parking lot talking with him and I was able to persuade him

23  to increase his support for his funding.  And as a result of

24  it and that changed some of the positions that was then, you

25  know, people that we had to lay off.

1    Q    And how did it change from the prior memo?

2    A    As an example, we were able to persuade him to retain

3    Larry Royer, so that, Larry's name then came off the list

4    itself.  Then during this time, too, from between May 6th and

5    May 9th, a lady by the name of Robiano Beagle, the Chemist I,

6    she had actually left, announced her resignation and left the

7    company.  She found another job elsewhere.  And what else?  I

8    think that was it, the changes.

9    Q    Okay.  And the parties have stipulated that Larry Royer

10   was age 55, at the time of the RIF.  As of May 9th, when you

11   wrote this memo, had you heard yet about a Corporate

12   Development program?

13   A    No, at that point, I had not and this note mentioned that

14   I was to have a meeting with Mike Boyce on the following day,

15   to discuss Corporate Development.

16   Q    And was a decision made about Corporate Development

17   funding?

18   A    Not at this point.  Not on May 9th.  And I, also, in this

19   memo, too, at that point, you notice the name Tom Dang and

20   Terry Ann Sitlery, they were still on the list and at that

21   point, there were no decisions being made about them by the

22   different business units to fill the open position.  So,

23   that's why they're still on this list on May 9th.

24   Q    Okay.  Did you learn that Mr. Boyce had made a decision

25   about Corporate Development funding?

1    A    On the Monday, late afternoon, May 16, 2005 and this was

2    through a voicemail that I received from Kevin Doran and

3    where he told me that Mike Boyce had come to a decision and

4    that the Corporate Development program was going to be

5    terminated.

6    Q    And what did that mean in terms of personnel?

7    A    What that meant was that those people how were relying on

8    Corporate Development funding, then they would no longer get

9    that support and if I were not able to find alternate sources

10   of funding for them, then I would have to let them go.

11   Q    And I'm referring you to your manpower matrices, which

12   are Exhibit 2.

13   A    Yes.

14   Q    For the year 2004, what was Ms. Marcus' funding from the

15   Corporate Development programs?

16   A    In 2004, it was 50 percent.

17   Q    And what happened in 2005?

18   A    In 2005, she was not budgeted at all for Corporate

19   Development funding.

20   Q    And how did people continue to get paid?

21   A    The only source of that was through the holding company.

22   Q    What was Mr. Wypart proposed in 2004 for Corporate

23   Development funding?

24   A    In 2004, Roman was 100 percent and that was the actual

25   funding that he received through the Corporate Development

1    program.

2    Q    And how was his salary funded for 2005?

3    A    In 2005, essentially, all of it came from the holding

4    company.

5    Q    How about Dr. Senderov, how was he funded in 2004?

6    A    2004, he was 100 percent Corporate Development program

7    and yeah, just confirmed.  He was 100 percent.

8    Q    And how was Dr. Senderov funded for 2005?

9    A    In 2005, at that point, we still did not, you know, have

10   confirmation of the 2005 program, so, all of his funding came

11   from the holding company.

12   Q    We've heard the name, Al Behan.  How was Mr. Behan funded

13   in the R&D unit?

14   A    He, Al Behan worked in Zeolist International and he was

15   funded through Zeolist International and at different times

16   in Al Behan from 2002 to 2005, there were small portions of

17   his funding in the early years.

18   Q    Small portions from the Corporate Development funds?

19   A    Small portion, yes.

20   Q    Did you do anything to try to find other jobs for the

21   people who might be affected by a Corporate Development

22   decision?

23   A    I worked incredibly hard, tried to turn over every rock,

24   every nook and cranny, talked to anyone who wanted to listen,

25   to find funding in this period from February, 2005 to May of

1    2005.

2    Q    Did you tell Ms. Marcus about her -- about the fact that

3    her employment was going to end?

4    A    I -- even as far back as in say, after the September 9th

5    meeting, September 9, 2004 meeting, with the CD committee, I

6    had already informed her, at that point, that the projects

7    were not approved, her employment could be in jeopardy.  And

8    by the time of May 16th, when the formal decision was made by

9    Mike Boyce to terminate the Corporate Development program, I

10   called her on the following day.  She was at a conference, at

11   that time, so, I called to inform her and then on the

12   following Friday, I went to her home, I met with her and her

13   husband, Mike Bennett and personally delivered the message

14   that we had eventually lost our funding in Corporate

15   Development.

16   Q    Why did you decide to convey that personally, at her

17   home?

18   A    Bonnie and I have worked very closely on a day to day

19   basis, really since 2001.  I consider her a very good

20   colleague and I felt that it was the most respectful thing to

21   do.

22   Q    Did you ever have any conversations with Ms. Marcus along

23   the lines that the company was going to have a lay-off that

24   would be focused on older workers?

25   A    No.

1   Q    Did you ever hear a concern from anybody at PQ, about the

2   age of the R&D work force?

3   A    No.

4   Q    Did you remain employed after the lay-off?

5   A    Yes, I did.

6   Q    Could you tell us about your employment?

7   A    Essentially, on the day where we did the lay-offs, I,

8   too, lost my job as the Vice President of Research and

9   Development.  I was assigned to the Strategic Planning

10  Department, where I held the title of Vice President of

11  Strategic Planning.  And so, I then reported to a fellow by

12  the name of Alan McElroy (ph), who had then joined the

13  company to head the Strategic Planning Department.

14  Q    And did you hold any jobs subsequent to that?

15  A    Until November of 2006, then I was given a new job as the

16  Vice President and General Manager of the Catalyst group and

17  this was a business unit that was reorganized in November of

18  2006.

19  Q    I'm handing you 26.  Could you please identify this?

20  A    This was a memo that I wrote on May 25, 2005 to Mike

21  Boyce and Michael Imbriani.  This is really -- the title is

22  Summary of Reduction in Force in R&D, May, 2005.

23  Q    Could I excuse you for a second.  Could you highlight

24  from the bottom of the box up?  Why did you write this memo?

25  A    Well, this happened after the lay-offs and I wanted to

1    give the senior leadership of the company a summary of the

2    people who have left the company and what that meant by way

3    of loss of skills within the company.

4    Q    And the first person listed here is Al Behan, was his

5    employment, in fact, terminated as part of the RIF?

6    A    Yes, it was.

7    Q    And why was Mr. Behan's employment terminated?

8    A    At that point, the work that Al Behan, he's a surface

9    chemist and the work that he was assigned to have been

10   completed, at that point and there was no more work to be

11   done in this area.  And so, the Zeolist International, which

12   is really the cost center that he was in, then eliminated

13   that position.

14   Q    And why was Mr. Hinchey laid off as part of the RIF?

15   A    Mr. Hinchey had already, back and as I mentioned before,

16   in the fourth quarter of 2004 or third quarter of 2004,

17   sorry, that he had already expressed his intention to retire.

18   So, he was not budgeted in any particular business nor the

19   Corporate Development program going into 2005.

20   Q    Who or what paid his salary for 2005?

21   A    Dick, certainly, up until May, received his full salary

22   and that money came from the holding company.

23   Q    And why was Bonnie Marcus selected as part of the RIF?

24   A    Bonnie Marcus was selected for RIF, really, way back in

25   around the fourth quarter or sometimes, September, 2004.  And

1    really, her termination in May was a direct result of the no

2    hiring and no firing and the reorganization that was going on

3    within PQ.  And so, this was the result of that the business

4    did not want to fund her in the Corporate Development area,

5    because they had their own people to run the projects, as

6    well as within the business units.

7    Q    And how was Ms. Marcus, who paid for her salary and

8    overhead for the period in 2005 when she worked there?

9    A    It all came out of the holding company.

10   Q    And why was Dr. Senderov selected for lay-off in the RIF?

11   A    And that, also, is the same result as the termination of

12   the Corporate Development funding, itself.  That there was no

13   other source of funding for Eric that we could find.

14   Q    And who was paying Dr. Senderov's salary and overhead for

15   2005?

16   A    The holding company.

17   Q    And why was Roman Wypart selected for the lay-off?

18   A    Likewise here, the -- although we had proposed for Roman

19   to be funded from the Corporate Development program, that

20   money went away in 2005.  The other half of Roman's funding

21   was from Potters Industry.  Potters had actually sharply

22   reduced their funding in research and development and so,

23   there was no funding for Roman.  And so, we actually had to

24   scramble to find funding for Terry Sitlery and Tom Dang, as a

25   result of Potters' decision to reduce funding.

1   Q   And who paid for Mr. Wypart's salary and benefits for

2   2005 while he was working there?

3   A   The holding company.

4   Q   Who is Erin Fisher?

5   A   Erin Fisher, at this time frame, she was promoted to

6   Chemist I from a technician position, which is the most, sort

7   of junior in terms of our technical ladder.  And she reported

8   in to Roman Wypart.

9   Q   Who paid Ms. Fisher's salary and benefits for 2005?

10  A   At this point, it was 100 percent from the holding

11  company.

12  Q   And why was Ms. Fisher not laid off?

13  A   At this point, the business decided that in -- go back

14  one step -- in 2005, the PVC project that Roman and Erin

15  Fisher had worked on in 2005, was going to be graduated.  So,

16  therefore, they were not targeted to receive funding from

17  Corporate Development money.

18  Q   What does graduated mean?

19  A   Graduate means that they would be transferred into the

20  business units themselves.  And at this particular point, the

21  decision was then made to just simply sell the product and

22  not do more technical product development work.

23  Q   And what product are you talking about?

24  A   This is then the Zeolite flooring material, itself, for

25  going into PVC.

1    Q   PVC, okay and who is Reggie Thompson?

2    A   Reggie Thompson is a very senior technician, very

3    skillful in the pilot front and he -- we were able to find

4    work for him within Zeolist International.

5            THE COURT:  Excuse me, could we see the rest of that

6    memo enlarged?  Thank you.

7            MS. MALLOY:  It's actually two pages, we'll do the

8    bottom there.

9    Q   What were you conveying in this part of the memo that's

10   highlighted, Dr. Lau?

11   A   What I was trying to convey now is that with these people

12   leaving the company, what that meant in terms of the

13   particular projects that were being funded, you know, back in

14   '04 and proposed in 2005.  As an example, there's outside of

15   synthesis expertise in Zeolist International, which is

16   dominant in pressure synthesis, PQ would eliminate most of

17   its inorganic material synthesis.

18   Q   You have to keep your voice up a little bit.

19   A   And Zeolite end use.  So, I was just trying to highlight

20   to Mike Boyce and Michael Imbriani the impact of these people

21   leaving the company.

22   Q   Are you familiar with a Corporate Development project

23   known as MMA?

24   A   Yes, I am.

25   Q   Did you, in fact, work on that yourself?

1   A   Yes, I did.

2   Q   At some point, did MMA move from Corporate Development to

3   a business unit?

4   A   Yes, it did.  It was funded up until 2003 and in 2004,

5   the project moved into silica catalyst itself.

6   Q   And you testified earlier about TSPQ?

7   A   Yes.

8   Q   Could you bring us up to date on what happened with the

9   TSPQ project between the time it was a Corporate Development

10  project and the lay-off?

11  A   The TSPQ project, in 2004, it had received $200,000 from

12  Dow Chemical to support the project itself.  And as we go

13  into 2005 and actually, Bonnie Marcus was deeply involved in

14  conversation with Dow, regarding potential funding, they were

15  only able to support us in 2005 to the tune of $100,000.  And

16  at the time of the lay-off, we lost all of our funding, then

17  Dow decided to withdraw -- to stop funding, as well.  So,

18  really, the total funding from Dow in 2005, was for half a

19  year, so that's half of $100,000, it would be $50,000.

20  Q   Are you familiar with the skills of Phil Connelly?

21  A   Very much so.

22  Q   And who was Dr. Connelly?

23  A   Phil is a -- has a Ph.D. in chemistry and he is a very

24  analytical, very good math skills, very good with -- at lab

25  scale work, pilot plant, as well as in the production

1    environment.

2    Q    And what part of R&D did Dr. Connelly work in?

3    A    Dr. Connelly worked for Zeolist International primarily

4    in the synthesis area, in making up stuff -- making of

5    zeolites.

6    Q    Are you familiar with the skills of Bonnie Marcus?

7    A    Very much so.

8    Q    Do you believe that Ms. Marcus could have filled Mr.

9    Connolly's role after the lay-off?

10   A    I don't think so.

11   Q    Why not?

12   A    Bonnie Marcus' skill, which we enjoyed having, at the

13   time, was primarily in how to use zeolites and her skills as

14   to how to explain to the potential customers how the

15   material, itself, could work, could benefit in solving

16   problems for the customer's issue, at the time.  So, her

17   skills was not in the lab nor in the pilot plant nor in the

18   production environment.

19             (Pause.)

20   Q    Could you identify Exhibit 9, please?

21   A    Okay, Exhibit 9 is an organization announcement that was

22   sent out to company-wide on June 16, 2005.

23   Q    And does this express the new organization of R&D?

24   A    Yes, this is really announced the restructuring of the

25   research and development organization itself and how the

1    groups are now restructured and how they are reporting into

2    the particular businesses and it speaks to then, the

3    corporate exploratory development projects themselves.

4    Q    Okay, hold on for a second.  If you look at those bullet

5    points, Neil Miller is now reporting to Roz Kutchins, is that

6    correct?

7    A    That's right.

8    Q    Did he used to report to you?

9    A    Yes.

10   Q    And would that be the same for Bob Patterson?

11   A    That's right.

12   Q    And Bill Cormier?

13   A    That's right and Ulfrich Senter (ph).

14   Q    And after the RIF in May 25th of '05, did the VP of R&D

15   position exist anymore?

16   A    That position was eliminated.

17   Q    And what was the reason for that?

18   A    I think it's really that of the way that Mike Boyce view

19   how product development work should be organized.  That it

20   should be deeply embedded within the business units and that

21   they should take responsibility for it.  And instead of a

22   staff member like a vice president of R&D to take care of it.

23   Q    Could you highlight the next paragraph, the Corporate

24   Development projects?

25   A    Now, this indicates that the corporate/exploratory

1    development projects will not longer be funded by corporate,

2    therefore, the respective businesses will determine which

3    aspects of those projects they wish to continue to fund.

4    A   Yes.

5    Q   Did that, in fact, happen?

6    A   Yes, it did and it is really a fellow arm of the

7    philosophy that the business should take care of their own

8    product development idea, as reflected in those four bullets

9    above.

10            THE COURT:  I will note that you read it the way it

11   should have been, but not the way it is.  The respective

12   business it says, not businesses.  It should say --

13            MS. MALLOY:  Business, correct.

14            THE COURT:  -- businesses.

15            MS. MALLOY:  Correct, correct.

16   Q   Was the funding from the holding company eliminated?

17   A   Yes, it was.

18   Q   Was the Corporate Development group eliminated?

19   A   Yes.

20            THE COURT:  Who ran those organizations?

21            THE WITNESS:  I was responsible for the Corporate

22   Development projects.

23            THE COURT:  Right.

24            THE WITNESS:  So, when the funding went away, the

25   group went away and I also lost my position, at that point.

1          THE COURT:  What is the holding company, that's just

2    an accounting term, I understand.

3          THE WITNESS:  The holding company ultimately is the

4    company that -- within, you know, this basket of businesses.

5    So, all of the business units with the profit and loss

6    reports into the holding company itself and of course, the

7    head of that holding company is Mike Boyce, our chief

8    executive.

9          THE COURT:  Does it have any existence other than on

10   paper?

11         THE WITNESS:  I think a certain --

12         THE COURT:  Does it have a separate office or

13   anything like that?

14         THE WITNESS:  -- no, it certainly has a meaning in

15   accounting terms, but it doesn't have any sort of a physical,

16   you know, is not a physical entity.

17   Q   Once the Corporate Development group was eliminated, were

18   the Corporate Development projects eliminated?

19   A   Yes, they were.

20         MS. MALLOY:  I have nothing further.

21         THE COURT:  Perhaps others do.

22                        CROSS-EXAMINATION

23   BY MR. GOLDSHAW:

24   Q   When you just testified that, "Bonnie was really selected

25   for termination back in September of 2004", that's yet

1    another change in the explanation for why she was terminated.

2              THE COURT:  Do not argue with the witness, just ask

3    questions and get answers.

4    Q   I'd like you to please look at Exhibit 288, which is the

5    official explanation for the termination of Bonnie Marcus.

6    Questions set forth in full detail the reason or reasons why

7    PQ eliminated Ms. Marcus' position.  Isn't it a fact that all

8    the reasons stated relate to events that happened well after

9    September of 2004, when you contend that the decision was

10   made to terminate her?

11   A   My answer was that in the normal times and I did say that

12   those were not normal times, that had the company not been

13   involved in a transaction, then upon learning that there was

14   not going to be business support, she would have been

15   terminated in the fourth quarter of 2004.  That was my reply

16   before.

17   Q   Do you agree that the decision to eliminate funding from

18   the corporate holding company happened long after September,

19   2004?

20   A   Yes, it did and it was the result of the no-hire and

21   no-fire edict that came from our CEO at the time.

22   Q   And would you agree that the business units were then

23   authorized to determine what any research and development

24   projects they continued, that was long after September of

25   2004?

1    A   Yes, it was.

2    Q   Okay.  As to your testimony regarding that several

3    employees aged 55 or older, such as Bonnie Marcus, Dick

4    Hinchey, Roman Wypart, Eric Senderov, were all funded through

5    the holding company.  You don't have any actual documents, at

6    that time, to corroborate that testimony, correct?

7    A   Can you repeat that again?

8    Q   Yes.

9              THE COURT:  You don't know what testimony you're

10   talking about, the jury doesn't and I don't.

11   Q   Okay, would you please recall the testimony you gave

12   concerning that several employees aged 55 or older were all

13   funded through the holding company, at the time of their

14   termination in 2005?

15   A   And many of them were funded through, actually starting

16   in 2001, 2002 --

17             THE COURT:  He wants to know whether you have any

18   documentation that supports that statement.

19             THE WITNESS:  Documentation to support, I'm sorry,

20   I'm not catching this.

21             THE COURT:  That captures the assertion that they

22   were being funded through the holding company.

23   Q   Actually, let me try it this way.  This document, which

24   we've already examined you on, P-281, we've been through

25   analysis where it's you've changed the title to Holding

1   Company, 2005, according to the testimony you just gave, 100

2   percent for employees 55 and older.

3   A    I don't have any documentation within my, you know,

4   files.  But what I do know is that the -- Bonnie Marcus, Eric

5   Senderov, Dick Hinchey, et cetera, they were all -- they all

6   received 100 percent of their salaries and we know that they

7   were not in the 2005 budget for any of the businesses.

8              THE COURT:  So, therefore, they must have been paid

9   from the holding company?

10             THE WITNESS:  Holding company.

11             THE COURT:  Okay.

12  Q    This point that you're making, that's the same -- the

13  same point that we discussed before in connection with this,

14  right?

15  A    That's right.

16  Q    I won't cover that again.  You said that the CD program

17  never actually received any funding in 2005, correct?

18  A    It was never approved.

19  Q    Did it actually receive funding in 2005?

20  A    The people were paid.  We would continue the projects as

21  if the projects were approved.  So, those funding could flow

22  through from the holding company.

23  Q    So, did the CD program actually receive funding in 2005?

24  A    I would say for the -- on the approved projects, yes, for

25  those first few -- five months of the year.

1   Q   As a current corporate official of the defendant, are you

2   trying to shift responsibility for termination decisions away

3   from Imbriani, Kutchins and Delmonte?

4            MS. MALLOY:  Objection, argumentative.

5            THE COURT:  It might not be, we haven't heard the

6   question yet.  Go ahead.

7   BY MR. GOLDSHAW:

8   Q   I'm asking whether, through your testimony, you were

9   attempting to take on responsibility for termination

10  decisions that were really the result of actions by Imbriani,

11  Kutchins and Delmonte?

12  A   In this particular time, there were funding decisions

13  that were made, not by me, but in terms of how, as a result

14  of those decisions, how I could keep the people employed,

15  those remained my decisions.  Case in point, for instance, is

16  that Potters Industry made a funding decision to reduce head

17  count.  As a result of which, Tom Dang, whom we've seen the

18  name before, Terry Ann Sitlery, whom we've seen the name

19  before, those people were slated to lose their jobs.  And

20  fortunately, there were other openings within other

21  businesses and as a result of it, we were successful in being

22  able to place them.  So, those were, I guess and you could

23  see in the memos, that we have strongly lobbied for them and

24  eventually were successful in placing them.  And Larry Royer

25  is a particular example, that we were able to change the

1   business people's mind in terms of increasing funding.  So,

2   those responsibilities fell on me and nobody else.  So, I

3   don't know --

4   Q   This is what I'm trying to ask.  The termination of the

5   plaintiffs, Bonnie Marcus and Roman Wypart, was really the

6   doing of actions by Imbriani, Kutchins, Delmonte and not

7   something that was really within your control, correct?

8   A   They made the decision and eventually, really is Mike

9   Boyce's decision to terminate Corporate Development funding.

10  That decision flows down to now having lost that funding, who

11  are the people that now would lose their jobs and that fell

12  on to my plate.

13  Q   Let's try it this way.  You didn't have anything to do

14  with the decision to eliminate funding from corporate holding

15  company --

16          THE COURT:  I'm sorry, but that's rather silly.

17  You're pointing at something that he can't see and you're

18  asking him questions?  He can't see that.

19          MR. GOLDSHAW:  It's right here.  He's looking at a

20  copy right in front of him.

21          THE COURT:  No, he's not.

22          THE WITNESS:  Which is this?

23          MR. GOLDSHAW:  I'm looking at the first sentence of

24  PQ's official explanation for why PQ eliminated Ms. Marcus'

25  position.  And I'm asking you if you had any involvement in

1    the decisions referenced in the first sentence, which states

2    PQ decided to eliminate funding from the corporate holding

3    company, which supported the research and development

4    conducted by Corporate Development programs, CDP.  You

5    weren't involved in that, at all, right?

6    A   I was not involved in terminating the Corporate

7    Development funding.

8    Q   Okay, let's look at the second sentence.  The business

9    units were then authorized to determine what, if any,

10   research and development projects would continue to be funded

11   by the business units.  You didn't have any involvement in

12   that, did you?

13   A   Well, that's true and out of those business decisions,

14   there could create openings or loose positions.

15   Q   And business units is a reference to people like

16   Imbriani, Kutchins and Delmonte, correct?

17   A   In addition to that, people like Bob Mulhall, Bob

18   McClune, Scott Randolph.

19   Q   In the case of Bonnie Marcus and Roman Wypart, who this

20   trial is about, the business units would potentially make

21   decisions that would, in fact, take positions over whether to

22   fund were Imbriani, Kutchins and Delmonte, correct?

23   A   No.  As we testified earlier, is that Roman Wypart,

24   because of his plastic processing skills, we thought he could

25   potentially get funding from Potters Industries because they

1    have glass beads which goes into polymers.  So, I wouldn't

2    agree with that assertion.

3    Q    When you gave sworn deposition testimony previously

4    regarding Roman Wypart, didn't you say you actually asked Mr.

5    Imbriani's group, not Potters, about funding his salary?

6    A    I think in these memos that I have been referenced, that

7    I've talked with all of the people involved in the

8    businesses.

9    Q    Let's read from your prior testimony.

10   A    Okay.

11   Q    Page 135.  Tell me when you're there, please?

12   A    Yes, I'm here.

13   Q    "Question:  I guess, more specifically, what I am trying

14   to determine is whether your answer that Wypart was funded

15   100 percent with CD funds, was based on your memory or the

16   document in front of you or a combination of both?

17          "Answer:  It certainly based on memory, document

18   helps me to jog my memory and I, in fact, remember when I was

19   trying to budget for exploratory for Wypart and the other

20   half was intended to be funded by the Zeolite Product

21   business and we know that didn't happen."

22          The Zeolite Product business was within Imbriani's

23   group, not Potters, correct?

24   A    That's correct, but I also have document in front of me

25   that eventually that we had targeted Roman to be funded by

1   Potters Industries.

2   Q   Did you say anything, at all, about Potters Industries

3   prior to this trial?  Prior to this year, within the first

4   four years after the termination, ever mention anything about

5   Potters in relation to Roman Wypart?

6   A   I'm absolutely sure that document that we presented

7   today, in terms of the manpower matrix, included Potters.

8   Q   Let's focus back on --

9   A   Is there a question about whether Potters Industries is

10  part of PQ?

11  Q   My question is whether Potters Industries has anything to

12  do with the termination of Ms. Marcus and Mr. Wypart, but

13  we'll return to Mr. Wypart, let's stay with Ms. Marcus for

14  just a moment longer.

15          THE COURT:  It would help if you would enunciate

16  more clearly what your question is and you can't tell if

17  you're talking to the witness or yourself, would you please

18  be specific?

19          MR. GOLDSHAW:  Okay, fair enough.

20  Q   Were you aware that at the time of the September e-mails

21  that you testified to upon examination by Ms. Malloy, for Roz

22  Kutchins, that those e-mails were part of an effort by

23  Imbriani, Kutchins and Delmonte to reorganize R&D?

24  A   No, I was not aware of that.

25  Q   Were you aware that Imbriani, Kutchins and Delmonte were

1   talking about reorganizing R&D and people like Bonnie Marcus

2   and several of the other older employees in the group, way

3   back in the fall of 2004?

4   A   No, I was not aware of that.

5   Q   Were you aware that Kutchins and Delmonte, in January of

6   2005, before Mr. Boyce was on the scene, prepared a

7   presentation with proposed organizational charts for your

8   department for human resources, Kevin Doran?

9   A   I was not aware of that and also just to add, too, in the

10  period around middle of December, 2004 --

11  Q   Does this relate to my question?

12          THE COURT:  Let him finish.

13          THE WITNESS:  -- in the period of December, the

14  middle of December, 2004 to when the deal or when the

15  transaction actually closed on February, 2005, we already

16  knew that Stan Silverman would be stepping down as the CEO

17  and that Mike Boyce would be the new CEO after close.  I just

18  want to clarify that.  So, at that particular transition

19  period, there was, you could call it, you know, there was

20  really no one in charge.

21  Q   I'm sorry, please explain how that related to the

22  question I was asking you, so I can understand?

23  A   I'm just trying to point out that, at that particular

24  moment in time, we have lame duck CEO in office and I don't

25  know whether the organization plans, how that is particularly

1    meaningful.

2              THE COURT:  Explaining why he was not aware of the

3    plan to reorganize R&D.

4    Q   I'm correct that any decision to cancel the detergent

5    zeolite's funding for Bonnie Marcus, whether it be made in

6    the fall of 2004 or in 2005, would have been made by

7    Imbriani, Kutchins and Delmonte, not you, correct?

8    A   They would decide which level of funding to support, yes.

9    Q   And so, if her funding for detergent zeolites was

10   cancelled, it would have been their decisions, not yours?

11   A   Yes.

12   Q   In talking about the funding that you were able to get

13   for Larry Royer, age 55?

14   A   Yes.

15   Q   Who was not, in fact, terminated, it was Potters that

16   gave Larry Royer, age 55, money at that time, correct?

17   A   As part of the PQ business, yes.

18   Q   The decision to fund Larry Royer, age 55, had nothing to

19   do with Imbriani, Kutchins, Delmonte, did it?

20   A   Well, we -- I could tell you that in my conversation with

21   Scott Randolph, the conversation about was how to provide

22   technical support for the business and that Larry Royer would

23   be very suitable.  His age never came into the conversation.

24   So, we never mentioned Larry Royer as age 55, please increase

25   funding.

1   Q   My question is whether in getting money for Larry Royer,

2   so that he is not fired, did Imbriani, Kutchins or Delmonte

3   given any money?

4   A   No, they did not.  But in enabling Tom Dang to take up

5   the process engineer position in silica catalyst, that

6   business unit reported up to Colleen Delmonte and Michael

7   Imbriani.

8   Q   At the time Imbriani, Kutchins and Delmonte recommended

9   the termination of Eric Senderov, Dow hadn't pulled the

10  funding yet for TSPQ that he was working on, am I correct?

11  A   It was at a much reduced level, as I've mentioned before.

12  Instead of $200,000 in 2004, it was only $100,000 in 2005.

13  Q   My question is when they pulled or reduced their funding?

14  That was after the point that Imbriani, Kutchins and Delmonte

15  had already recommended his termination, correct?

16          MS. MALLOY:  The witness already said he has no

17  recollection of this.  He has no knowledge of it.

18          THE COURT:  Well, let the witness answer the

19  question.  He can answer it again.

20          THE WITNESS:  Well, the chain of events is that we

21  cancel the Corporate Development program.  That meant that we

22  couldn't support this individual in part or whole.  And as a

23  result of this, we communicated the decision to terminate the

24  Corporate Development program to Dow.  Then they terminated

25  the funding, knowing that they could not support a whole

1    person and so -- and unless people are willing to work for a

2    fraction of their salary, there was no way to continue

3    funding the project.

4    BY MR. GOLDSHAW:

5    Q   Let's try it this way.  At the time Eric Senderov was

6    recommended for termination by Imbriani, Kutchins and

7    Delmonte, on May 16, 2005, he was, from PQ's perspective, a

8    half-priced employee, right?  Because half the money for him

9    came from an outside company?

10   A   Yes.

11   Q   Because you mentioned Tom Dang, I would like the record

12   to reflect the parties have stipulated that he was 34 at the

13   time of the reduction in force.

14   A   And he also only worked at half the rate that Bonnie

15   Marcus did.

16   Q   PQ has never contended that Bonnie Marcus' salary had

17   anything to do with her termination, does it?

18   A   I'm just trying to clarify that those are very different

19   decisions.

20   Q   Okay, so, your comment had nothing to do with the reasons

21   for her termination, we agree on that?

22   A   I agree on that, I'm just --

23   Q   Okay.

24   A   -- trying to point out that, you know, because the

25   question was asked --

1          THE COURT:  Okay, wait for another question, if any.

2          MR. GOLDSHAW:  Okay.

3   Q    Would you agree that prior to the reduction in force,

4   your level of interaction with the new CEO, Michael Boyce,

5   was very little?

6   A    Very little.

7   Q    And your very first opportunity for a one on one

8   conversation with the new CEO, Michael Boyce, wasn't until

9   just two weeks before the RIF, right?

10  A    That's right.

11  Q    And the first time you met with him, Michael Boyce, you

12  found out that he had already decided to remove you from your

13  position as the head of R&D, right?

14  A    The first time I met with Mike Boyce was in January of

15  2005 and it was in a meeting with several people.  I remember

16  definitely Scott Randolph and that was to give him an

17  introduction of R&D in Conshohocken and to lay out the

18  program, different programs that we had.  And subsequent to

19  that, there were different staff meetings, maybe one or two

20  staff meetings and then the only one on one meeting that I

21  had with Mike Boyce was on May the 11th of 2005.

22  Q    And my question is, when you had that first one on one

23  meeting with Michael Boyce, after his arrival, it was just

24  two weeks before the reduction in force, right?

25  A    Yes.

1    Q    And the very first time you met with him, you found out

2    that he had decided to remove you from your position as head

3    of R&D, correct?

4    A    No, he asked me what I wanted to do with myself.  He had

5    not told me that, at that point, that he had already made up

6    his mind to eliminate the vice president of R&D.

7              THE COURT:  He asked that question, did you think

8    maybe that was a possibility?

9              THE WITNESS:  It was certainly a possibility.  At

10   that point, as I mentioned before, there was certainly a lot

11   of anxiety, a lot of uncertainties.

12   Q    When Mr. Boyce asked you what you wanted to do in the

13   company going forward, in your first one on one meeting, you

14   had no concept that your position would be eliminated at that

15   time, right?

16   A    I went into that meeting, I had a very big presentation

17   with me, at the time, on Corporate Development projects.  My

18   intention of this one on one meeting, was to tell him all the

19   wonderful things that we were doing in Corporate Development

20   projects and that he ought to continue funding.  And that was

21   my original understanding going into the meeting itself.

22   Q    My question was when you met with him for the first time,

23   you had no concept that your position would be eliminated,

24   right?

25   A    That's right.

1   Q    Were you aware, at the time, in May of 2005, that Roz

2   Kutchins, Colleen Delmonte had submitted a written

3   recommendation to Michael Boyce to reorganize your

4   department?

5   A    I was not aware of that.

6   Q    Were you aware in May of 2005, that Imbriani, Kutchins

7   and Delmonte were recommending the termination of several

8   older employees in your department?

9   A    I was not aware of that.

10  Q    During the RIF process, nobody asked you for your

11  opinions as to these recommendations by Imbriani, Kutchins,

12  Delmonte to terminate several older workers in your

13  department, correct?

14  A    I don't know that they were recommending older workers

15  for elimination.

16          THE COURT:  But, at least, nobody asked your input?

17          THE WITNESS:  Nobody asked my input.  But I knew

18  that if the funding were terminated, that certain people

19  would be affected.

20  Q    Wouldn't it have surprised you, at the time, to learn

21  that Imbriani, Kutchins and Delmonte had submitted a written

22  recommendation to terminate employees in your department to

23  restructure it?

24  A    I guess I would be surprised and would be put out by it.

25  Q    It was Imbriani, Kutchins and Delmonte who made the

1    decision, after the elimination of the Corporate Development

2    program, not to fund Bonnie Marcus in the chemicals division,

3    correct?

4    A    You have to repeat, I just want to make sure of the

5    sequence of events here.

6    Q    It was Imbriani, Kutchins and Delmonte who made the

7    decision not to fund Bonnie Marcus, following the reduction

8    in force, in the chemicals division, correct?

9    A    They had already made up their mind in terms of support,

10   back in 2004 -- fourth quarter, 2004 -- in terms of the

11   zeolite product development funding and the CD funding, which

12   they felt could be supported internally with their business

13   managers.

14   Q    So, at some point, you learned that the funding that you

15   had to use when the Corporate Development was eliminated,

16   right?

17   A    Yes.

18   Q    And the funding that was not eliminated, in the chemicals

19   division, was money controlled by Imbriani, Kutchins,

20   Delmonte, correct?

21   A    Sure, yes.

22   Q    And so, the decision not to use that money available in

23   the chemicals division to fund Bonnie Marcus, was made by

24   Imbriani, Kutchins, Delmonte, right?

25   A    Well, the -- I think you have to separate between the

1    decision on funding as to who is going to be using that money

2    and how -- which project that they work on.  Those are

3    separate decisions.

4    Q   When funding was found for the 35 year old Erin Fisher,

5    following the reduction in force, it was Imbriani, Kutchins

6    and Delmonte who chose to give her that money, right?

7    A   I'm quite positive that Michael Imbriani does not know

8    who Erin Fisher is.

9    Q   Not my question.

10   A   But it relates to there is a separation between funding

11   and who is going to work on what.

12   Q   I'm not asking who is going to work on what.  I'm asking

13   about whose employment was saved and who was fired.  Erin

14   Fisher, 35, was not fired, correct?

15   A   Erin Fisher, as we mentioned, the business decided to

16   simply terminate product development work, which required a

17   more senior person to do and that they were only willing to

18   continue selling the product and provide cursory customer

19   support as necessary.

20           THE COURT:  And you do agree she was not fired?

21           THE WITNESS:  I agree that she was not fired.

22           THE COURT:  Just listen to the question and answer

23   the question.

24   Q   And after the reduction in force, the money that was used

25   to pay for her salary came out of the budgets of Imbriani,

1    Kutchins, Delmonte?

2    A    Sure.

3    Q    Correct?

4    A    Yes.

5    Q    And would you agree that following the reduction in

6    force, if Imbriani, Kutchins, Delmonte also chose to fund

7    Bonnie Marcus, she would not have been fired?

8    A    They had already made that decision much earlier than

9    that.

10   Q    That's not my question.

11            THE COURT:   If they had decided, if they changed

12   their mind and decided to fund her, she would not have been

13   fired?

14            THE WITNESS:   True.   If that money was available,

15   but she was not their -- she was not chosen to do that job.

16   They felt that they had other people to it.

17   Q    When you say she was not chosen, you mean she wasn't

18   chosen by Imbriani, Kutchins, Delmonte, correct?

19   A    In terms of the work force that they had, at the time,

20   that they felt they had adequate support.

21            THE COURT:   I think we've chewed this over enough.

22   We're going to recess in about ten minutes.   So, why don't

23   you finish up.

24   Q    You had no involvement in the decision to choose Ed

25   Myszak instead of Bonnie Marcus for the zeolite R&D

1   management position that was created at the time of the RIf,

2   correct?

3   A    Correct.

4   Q    And that decision was made by Roz Kutchins, Colleen

5   Delmonte?

6   A    Certainly.  At that point, post-RIF, I had already

7   essentially, took a different role.  I lost my job as the

8   head of R&D, so I had no decision there.

9   Q    Isn't it true that all of the documents that you reviewed

10  with Ms. Malloy, during her questioning of you, that none of

11  them you actually recommended termination for Bonnie Marcus

12  or Roman Wypart?  In any of those documents, correct?

13  A    Can you repeat this again?

14  Q    Yes.

15            THE COURT:  It's hard to say.  He wants to know

16  whether in any of these documents that have been floating

17  about here, did you recommend that Bonnie Marcus be fired?

18            THE WITNESS:  Bonnie Marcus lost her support of

19  funding back in the fourth quarter.

20            THE COURT:  We understand that, yes.

21  Q    I'm asking is there a document where you recommend either

22  of the plaintiffs -- withdrawn.  Is there, in fact, an actual

23  document where you, as opposed to Imbriani, Kutchins,

24  Delmonte, actually recommended termination of either of the

25  plaintiffs?

1    A    There's not a recommendation.   The only recommendation

2    that I always made is to support the Corporate Development

3    funding.   And but what I do say is that as a result of the

4    Corporate Development project losing its funding, these are

5    the people who would be affected.

6              THE COURT:   We understand that for the 17th time.

7              THE WITNESS:   Yes.

8              MR. GOLDSHAW:   I'm close to done, your Honor.

9              THE COURT:   Pardon?

10             MR. GOLDSHAW:   I wasn't sure if you were going to

11   ask me, I'm getting close to finished.

12             THE COURT:   Finish up, please.

13   Q    I'd like to ask you a question about an exhibit --

14             THE COURT:   Just go ahead and ask it, don't tell him

15   in advance.

16             MR. GOLDSHAW:   P-32, which I am displaying.

17             THE COURT:   Your displaying it to the jury, he can't

18   see it.

19             MR. GOLDSHAW:   It should be before you.

20             THE WITNESS:   Which one is this?

21   Q    P-32 is the memorandum, dated May 16, 2005, from Colleen

22   Delmonte, Roz Kutchins, addressed to Michael Boyce and

23   Michael Imbriani.

24             (Pause.)

25             THE COURT:   Can you get on the record whose

1    memorandum it is, who wrote it and to whom it was addressed?

2              MR. GOLDSHAW:  Yes, memorandum dated May 16, 2005,

3    from Colleen Delmonte, Rosalind Kutchins to Michael Boyce and

4    Michael Imbriani, subject, R&D organization.  This is the

5    exhibit with the table recommending the termination of the

6    plaintiffs and others.

7    Q   Have you found it?

8    A   It's P-35?

9    Q   Two, P-32.

10   A   32, sorry.

11             THE COURT:  What's your question?

12   Q   The first time you ever actually saw this memorandum was

13   three years after the reduction in force, correct?

14   A   Yes, that's right.

15   Q   In hindsight, wouldn't you agree that you simply did not

16   have that much influence over the RIF that took place in R&D?

17   A   In hindsight, I would say that, at the time, there was a

18   great deal of uncertainty going through this reorganization.

19   Certainly, I would, you know, say that different people were

20   doing different things and not necessarily coordinated.  And

21   certainly, I read this way after the event, I agree with

22   that.

23   Q   Would you agree, in hindsight, my question is about your

24   level of influence as opposed to Kutchins, Delmonte,

25   Imbriani's level of influence?

1              THE COURT:  May I inquire what on earth is the

2      relevance of his degree of involvement?  He's not a party to

3      the action.

4              MR. GOLDSHAW:  He's not, our contention is that

5      Imbriani, Kutchins and Delmonte had a discriminatory motive

6      in recommending their termination --

7              THE COURT:  Well --

8              MR. GOLDSHAW:  -- and that's what got them fired.

9      That's why it's important to establish that they are the ones

10     that --

11             THE COURT:  Well, you've nailed that down a dozen

12     times.

13             MR. GOLDSHAW:  Well, I --

14             THE WITNESS:  All I could tell you is that --

15             MR. GOLDSHAW:  Wrapping it up, wrapping it up.

16             THE WITNESS:  -- there were a number of people that

17     we had -- that had lost their funding, not just the

18     plaintiffs here, but other people like Tom Dang and

19     potentially, Larry Royer and Terry Ann Sitlery and I was able

20     to place some of them in different new jobs and others, I

21     could not and you know, it's a difficult decision.  We don't

22     like lay-offs, but ultimately, when you lose the funding,

23     that's what happens.

24     Q   I'm just going to wrap this up by reading from your sworn

25     deposition.

1          THE COURT:  Go right ahead.

2          MR. GOLDSHAW:  It's page 359.  Do you still have it

3    up there?

4          THE COURT:  Read from it whether he has it or not.

5          MR. GOLDSHAW:  Okay.

6          THE WITNESS:  No, I don't.

7    Q    This is from your sworn deposition in --

8    A    Oh, the 20-hour marathon that I went through, huh.

9    Q    -- September 11, 2008.

10         "Question:  Does this document cause you to believe

11   that you may not have had as much influence as to what

12   actually happened in R&D as part of the May, 2005 RIF, as you

13   once thought you did?

14         "Answer:  In hindsight, certainly, I come to the

15   conclusion that I did not have that much influence."

16   A    And if I had more influence --

17         MR. GOLDSHAW:  I have no other questions.

18         THE WITNESS:  -- and if I had more influence, I

19   would have loved to have saved their jobs.

20   Q    You're not the ones that wanted to get rid of the older

21   employees in your department, right?  It was Imbriani,

22   Kutchins, Delmonte?

23   A    I really want to make something very clear in that.  In

24   the research organization, we actually value people with

25   experience and because they have been more seasoned, they've

1   had time to solve problems and so on.  And to us, you know,

2   employees with experience are extremely valuable.

3           THE COURT:  Okay, we don't want more speeches.

4   Q    Okay and for clarification, when you say we and us,

5   you're talking about people like you, not Imbriani, Kutchins,

6   Delmonte?

7   A    I think I said company, we value people with experience.

8           THE COURT:  May I inquire, earlier there was a memo

9   that you wrote to, I believe, the new president, summarizing

10  the impact that would result from the proposed RIF for firing

11  people?

12          THE WITNESS:  That's right.

13          THE COURT:  Either in that memo or at any other

14  time, did you or anyone else, to your knowledge, call the new

15  president's attention to the age problem, the fact that the

16  RIF involved so many people that were over 55?

17          THE WITNESS:  At the time, I, for one, had never

18  considered age to be an issue.  We looked at it purely from a

19  funding perspective.  So, that was not in my consideration.

20          THE COURT:  And you don't know that anybody else

21  ever raised that?

22          THE WITNESS:  No, I don't know.

23          THE COURT:  Thank you.  Anything further that

24  anybody insists on asking today?

25          MS. MALLOY:  No, your Honor.

1          THE COURT:  Recess until tomorrow morning.  Members

2     of the jury, I hope you have a safe and reasonably prompt

3     trip home.  It took me twice as long as usual yesterday.  I

4     hope it's better today.  Recess until 10:00 o'clock tomorrow

5     morning.

6          THE CLERK:  All rise.

7          (Court adjourned 4:22 o'clock p.m.)

8                              - - -

1                                  I N D E X

2   PLAINTIFF'S WITNESSES        D        C        RD        RC

3   Dr. Stephanie Thomas

4    By Ms. Eyer                 2                 31

5    By Mr. Ennis                         16

6   Michael Bennett

7    By Mr. Goldshaw             32

8    By Ms. Malloy                        36

9   Andrew Verzilli

10   By Ms. Eyer                 39

11   By Mr. Ennis                         55

12  Edward Myszak

13   By Mr. Goldshaw             61

14  John Lau

15   By Mr. Goldshaw             68

16  DEFENSE WITNESSES

17  John Lau

18   By Ms. Malloy              111

19   By Mr. Goldshaw                     161

20                                - - -

21  PLAINTIFF'S EXHIBITS                 RECEIVED IN EVIDENCE

22  P-227 and 228                                 54

23                                - - -

<u>CERTIFICATION</u>

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


Geraldine C. Laws, CET          Dated 12/14/09
Laws Transcription Service