```
                 IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                              - - -

BONNIE MARCUS, et al.,        :  CIVIL ACTION NO. 07-2075
             Plaintiffs       :
                              :
             v.               :  Philadelphia, Pennsylvania
                              :  November 6, 2009
PQ CORPORATION,               :  10:08 o'clock a.m.
             Defendant        :
. . . . . . . . . . . . . . . :
```

                         JURY TRIAL - DAY 5
               BEFORE THE HONORABLE JOHN P. FULLAM
               UNITED STATES DISTRICT COURT JUDGE

                              - - -

APPEARANCES:

For the Plaintiffs:       SCOTT B. GOLDSHAW, ESQUIRE
                          KATIE R. EYER, ESQUIRE
                          Salmanson Goldshaw, PC
                          Two Penn Center, Suite 1230
                          1500 John F. Kennedy Boulevard
                          Philadelphia, PA   19102

For the Defendant:        PETER ENNIS, ESQUIRE
                          ELIZABETH A. MALLOY, ESQUIRE
                          Buchanan Ingersoll & Rooney PC
                          1835 Market Street, 14th Floor
                          Philadelphia, PA   19103

                              - - -

Audio Operator:           Dennis Taylor

Transcribed by:           Tracey J. Williams, CET

(Proceedings recorded by For the Record Gold digital sound
recording; transcript produced by AAERT-certified
transcriber.)

                              - - -

                    Laws Transcription Service
                     48 W. LaCrosse Avenue
                      Lansdowne, PA 19050
                       (610)623-4178

```
 1              (The following occurred in open court at 10:08
 2    o'clock a.m.:)
 3              (Jury enters the courtroom.)
 4              THE COURT:  Good morning.
 5              ALL:  Good morning, your Honor.
 6              THE COURT:  Be seated, everybody.
 7              Proceed.
 8              MS. MALLOY:  Ready to proceed?
 9              THE COURT:  I said proceed, that's what it usually
10    means.
11              MS. MALLOY:  Oh, I'm sorry.  PQ calls Mike Boyce.
12              (Pause.)
13              THE DEPUTY CLERK:  Step right up here.  Please raise
14    your right hand, sir.
15              MICHAEL R. BOYCE, Defendant's Witness, Sworn.
16              THE DEPUTY CLERK:  Please state your name and spell
17    your last name for the record, sir.
18              THE WITNESS:  Michael Ross Boyce, B-o-y-c-e.
19              THE DEPUTY CLERK:  Thank you, sir.
20                        DIRECT EXAMINATION
21    BY MS. MALLOY:
22    Q   Good morning.  If you can do your best to speak into the
23    microphone.
24              Who do you work for?
25    A   I work for PQ Corporation.
```

1  Q    And what is your title there?

2  A    I'm the Chairman and Chief Executive Officer.

3  Q    Could you tell us a little bit about yourself?

4  A    I grew up in West Virginia and worked my way through

5  college at a supermarket, and finished up when I was about 22

6  years old and went to work for Union Carbide.  And when I got

7  out of college I had a degree in chemistry and went into

8  sales for Union Carbide in New York City.  And I was in

9  training there for several months and then held various sales

10 positions for two or three years, and then ended up going

11 into a plant in Texas for two years, because I wanted to

12 learn about manufacturing, how products were made, plants run

13 and all the details around manufacturing.

14      At the end of that period, I came back out as a

15 sales manager, then a financial analyst, and then ran a

16 business for Union Carbide, and I was with them for 12 years.

17 And then I left Union Carbide, went to another chemical

18 company, but most people knew it as a typewriter company

19 called SCM, and worked there until we were hostilely taken

20 over by a company out of the U.K. called Hansen Industries.

21 At that point in time, I was part of a reduction in force.

22 And I left there and went to Phillips Petroleum, ran the

23 Catalyst business for Phillips Petroleum for a couple of

24 years, and then went to work for General Chemical in New

25 Jersey and running the soda ash, calcium chloride and

1   electronic chemicals business.  And I was there for a few

2   years and then went back to work for my old boss who had

3   bought a salt company.  And we continued to buy salt

4   companies and built it into the third-largest salt company in

5   the world, and we sold that company in '98.

6           And in 1998 we created a group called Peak

7   Investments and that group put acquisitions together, ran

8   them, and various chemical areas, and then we would sell them

9   after four or five years.

10          In about 2004, September, I was made aware that PQ

11  was coming up for sale and ended up looking at -- and I had

12  known PQ because we supplied them soda ash for a number of

13  years, and we ended up looking at PQ and buying PQ at that

14  point in time.

15  Q   About how many years have you spent in the chemical

16  business?

17  A   39 years.

18  Q   And when did your employment with PQ start?

19  A   It started in February of 2005.

20  Q   And prior to the beginning of your employment did you

21  have an opportunity as part of the sales process to look at

22  the PQ organization?

23  A   Yes, we started due diligence about October, and then I

24  think the organization charts and that information came out

25  about November to us.  So, about November of 2004.

1   Q   And what were your initial thoughts about the PQ

2   organization as a whole?

3   A   Well, I had known -- as I said earlier, I had known about

4   PQ quite a bit because of the interface I had had over the

5   previous number of years, going back almost -- not quite 20,

6   but almost 20 years.  And one of the things that I knew was

7   that the corporate headquarters was very heavily staffed and,

8   in my opinion going in, was over-staffed.  So, when we got

9   the organization charts and started looking at them, that

10  confirmed what we thought already.

11  Q   Once you became PQ's CEO, did you undertake any review of

12  the organization?

13  A   Well, which is typical when we buy a company, we look at

14  each and every function and organization.  And one of the

15  things I do with the individual managers is take out a piece

16  of paper and put a box at the top of the piece of paper and

17  say, that is you, tell me what work you want to do, need to

18  do, and we're going to do things differently than that's been

19  happening here, because we don't buy companies and not change

20  things to make them better.  We want to make the company grow

21  and also change the way people do work and do value-added

22  work.

23  Q   Did you tell employees at PQ that things might change?

24  A   Yes.  We had a town hall meeting the first or second day

25  after the purchase was completed and I made it known to the

1   headquarters people, unfortunately, that we would have to

2   have a -- have fewer people and that we would go about that

3   thoughtfully, take our time and try to do a good job in

4   getting the right number of people to fit the work that we

5   wanted done.

6   Q   What were your initial thoughts about the R and D

7   business at PQ?

8   A   Well, we didn't get a lot of information early on about R

9   and D, but when we did one of the things that stuck out to me

10  was the fact that they had a cost center and a group called

11  Corporate Development and, as I learned later, that Corporate

12  Development was funded by the previous CEO of the company.

13  Q   And what were your thoughts, initial thoughts about that?

14  A   There's several -- over the years, there's several groups

15  that I have found that aren't really that productive, one is

16  Corporate Development and one is Central Engineering, and

17  I'll talk about those for a minute.

18          THE COURT:  Excuse me, but when you said you learned

19  that that was funded by the previous CEO, do you mean from

20  his own personal funds?

21          THE WITNESS:  No, your Honor, it was funded from his

22  -- what's called the executive budget, if you will.

23          THE COURT:  What's it called?

24          THE WITNESS:  Executive budget.

25  BY MS. MALLOY:

1   Q    Is that the same as holding company?

2   A    Yes, it is.  Corporate Development projects and groups

3   typically are any projects that the R and D Group want to do

4   on their own and it's not directed by marketing or sales or

5   come from the customer.  I have found over the years that to

6   be very, very unproductive.

7              THE COURT:  Very, very what?

8              THE WITNESS:  Unproductive, sorry.

9              THE COURT:  Thank you.  Keep your voice up and talk

10  into the microphone.

11             THE WITNESS:  Okay.  And the other group that

12  existed at PQ that over the years I have found to be

13  unproductive is Central Engineering.  So, we took a hard look

14  at both of those groups and decided to basically eliminate

15  both of those.

16  BY MS. MALLOY:

17  Q    What happened in Central Engineering?

18  A    The engineers that were in that group were either moved

19  out to the businesses, if they wanted to keep the engineers

20  in that group, or they left the company.

21  Q    Did you make any decisions regarding the R and D unit at

22  PQ?

23  A    Yes.

24  Q    Could you please describe them?

25  A    I decided during the course of looking at what we were

1    going to do to eliminate Corporate Development and that was

2    my decision to do that.

3    Q    And why did you make that decision?

4    A    Because of my past experience of Corporate Development

5    not being productive and I wanted each business unit to fund

6    their own R and D for projects specific to that business

7    unit.

8    Q    Had you made a similar decision to eliminate Corporate

9    Development at any other companies you have worked for?

10   A    Yes, I have.

11   Q    Could you please describe that?

12   A    Every company that we have acquired I have eliminated two

13   groups, Corporate Development and Central Engineering.

14   Q    Did you make any decisions about which people in R and D

15   would be laid off as a result of your decision?

16   A    Only -- only one and that was John Lau, but that's the

17   only individual.

18   Q    And who made the decisions regarding the identity of any

19   other individuals who would be laid off in R and D?

20   A    John Lau, who was the vice president of R and D at that

21   time, made the decisions and he was responsible, as was the

22   vice president of Sales and Marketing or Operations, each one

23   of those groups and those levels made the decision on who

24   would go and who would not go.

25   Q    Did you have any discussions with John Lau regarding your

1  thought process regarding Corporate Development?

2  A    Yes.  And I explained to him how I felt about Corporate

3  Development and my experience over the years, and John Lau

4  did not agree with that and still does not agree with that,

5  as far as I know.

6  Q    I'd ask you to look in your binder there on an exhibit

7  which is P-32.

8           (Pause.)

9           THE COURT:  What about it?

10 BY MS. MALLOY:

11 Q    Do you see it, P-32?

12 A    I see P-32-A -- yes, here it is, I got it.

13 Q    Okay.

14 A    Yes, I have it.

15 Q    Is that your handwriting?

16 A    There's handwriting on this -- yes, it is.

17 Q    Okay.  When did you receive this memo which is P-32,

18 addressed to you and Mr. Imbriani?

19 A    If you'll note up at the top, it was faxed to me, based

20 on this document on May the 20th.

21           MS. MALLOY:  Could you highlight that fax line,

22 please?

23 BY MS. MALLOY:

24 Q    May the 20th of 2005?

25 A    Yes.

1    Q    And what is Peak Investments?

2    A    Peak Investments is the group that we created to do

3    acquisitions and then manage them after we bought them.

4    Q    Is that an office that you also used?

5    A    Yes, it's an office in Kansas.

6    Q    Did you in fact receive this memo which is P-32?

7    A    Yes, I did.

8    Q    Did you ask anybody to prepare it for you?

9    A    No, I did not.

10   Q    Did you have any discussions with Mr. Imbriani about any

11   potential personnel changes in R and D?

12   A    The only individual we talked about, and this was very

13   early on, was John Lau.  And Michael Imbriani said that I

14   should fire John Lau immediately, that he was not productive

15   and he was not a team player.

16   Q    Did you have any discussions with Ms. DelMonte about any

17   personnel moves in R and D?

18   A    Only John Lau and the same comment was that I should fire

19   John Lau immediately.

20   Q    And did you have any discussions with Rosalind Kutchins

21   regarding any specific personnel moves, potential moves in R

22   and D?

23   A    Yes and, again, John Lau.  And she wasn't quite as

24   blatant or as straightforward, but said that I should take a

25   hard look at that position because she thought it wasn't

1   productive.

2   Q    And did you in fact look at John Lau and his position?

3   A    I did and I looked -- it was hard for me to assess his

4   performance, but I knew we did not need a corporate vice

5   president of R and D.

6   Q    Did you have discussions with Mr. Lau, Dr. Lau?

7   A    Yes, I did.

8   Q    What do you remember about those?

9   A    I had a number of discussions about my philosophy around

10  corporate R and D and the fact that I was not in all

11  likelihood going to continue to fund that, and I wanted to

12  understand if it had been productive or not, and we had

13  numerous discussions around that.

14  Q    Dr. Lau in fact was not let go, correct?

15  A    He was not.

16  Q    And whose decision was that?

17  A    That was mine.

18  Q    And could you explain why?

19  A    In discussing the R and D function in general with John

20  Lau, as I said a few minutes ago, it was clear in his mind

21  that there was not going to be a corporate VP of R and D and,

22  by eliminating Corporate Development, John even said that if

23  -- if there was, he wouldn't want that job because it

24  wouldn't be meaningful.  So, we had a discussion around

25  John's -- what he wanted to do long-term.  And I told John,

1  if he wanted to be a corporate vice president of R and D, he

2  really needed to leave PQ, because we weren't going to have

3  that position; if he didn't, then we were -- I had an opening

4  in Strategic Planning, which we had set that group up to help

5  grow the company, because we had identified three or four

6  acquisitions that we wanted to work on and that group would

7  need to do that work --

8  Q   If you could --

9  A   -- on those --

10  Q   -- continue to speak into the mike, please?

11  A   Oh, I'm sorry.  That that group would continue to need to

12  -- would need to work on those acquisitions.

13        THE COURT:  Has it occurred to you that we've had

14  that exhibit up for quite a while and nobody has the faintest

15  idea what it is?

16        MS. MALLOY:  We have seen it before, this is the

17  exhibit from -- P-32, which is a memo dated May 16th of '05

18  from Ms. DelMonte and Ms. Kutchins to Mr. Boyce and Mr.

19  Imbriani.

20        THE COURT:  Well, what's it got to do with what he's

21  testifying about?

22        MS. MALLOY:  He is testifying that he's the one who

23  made the decisions and that he --

24        THE COURT:  That's got nothing to do with this memo.

25        MS. MALLOY:  We're going to continue along this

1    line, please.

2            THE COURT:  Let's get to it.

3    BY MS. MALLOY:

4    Q    Did Mr. Imbriani have any authority to make personnel

5    decisions in R and D?

6    A    No, none whatsoever.

7    Q    How about Ms. DelMonte?

8    A    No.

9    Q    And Ms. Kutchins?

10   A    No.

11   Q    And why not?

12   A    Because they had no R and D people that -- and they

13   weren't responsible for R and D, John was.

14   Q    If you could go to the second page of this memo?

15           The memo from Ms. DelMonte and Ms. Kutchins sets

16   forth certain positions and certain incumbents; are they in

17   fact, do you know, individuals who did get laid off in the

18   RIF?

19   A    Yes, I believe they are.

20   Q    Okay.  Except for John Lau, correct?

21   A    Correct.

22   Q    Did you at any time know the ages of the individuals who

23   were going to be laid off in R and D?

24   A    I did not.

25   Q    And --

1          THE COURT:  Did you make any investigation?

2          THE WITNESS:  I did not -- about the ages, your

3    Honor?

4          THE COURT:  Yes, right.

5          THE WITNESS:  No, I did not.

6    BY MS. MALLOY:

7    Q    And who in the company was performing additional

8    functions with regard to this layoff?

9    A    The Human Resources Group, which consists of Kevin Doran

10   and Bill Citzko (ph.), his boss, who I have worked with for

11   25 years, and I hold them responsible for implementing once

12   the decision is made we're going to have a reduction and the

13   individual manager selects the people, then it goes into the

14   HR Group to see if it meets all the legal requirements and

15   other requirements that we have.

16   Q    What's the most important development project that PQ has

17   right now?

18   A    That's going on right now?  It's called Warm Asphalt.

19   Q    What does that do?

20   A    We have a product, simply put, and it's mixed with

21   asphalt and it allows you to put asphalt down and work with

22   asphalt about 30 percent less energy than you use normally,

23   and that does a couple of things.  Besides less energy, it

24   allows the contractor to go further away from the asphalt

25   plant without it getting cold, and it also reduces the fumes

1    which are coming off of hot asphalt, which are under study

2    now by the Government, the EPA, as a potential carcinogen.

3    So, we're starting to move that product quite a bit.

4    Q    And who is in charge of that product for PQ?

5    A    Ed Myszak.

6    Q    Were you aware that Mr. Imbriani made any sort of an age-

7    based comment or had any discriminatory animus?

8    A    I'm sorry --

9    Q    Right.

10   A    -- I didn't get that last part.

11   Q    Were you aware prior to the litigation in this matter

12   that Mr. Imbriani, Ms. Kutchins alleged that Mr. Imbriani

13   made a comment to her regarding age of an employee?

14   A    I was not aware of that ever happening.

15   Q    Okay.  What is Ms. Kutchins' title, current position?

16   A    She's vice president of sales.

17   Q    And what was her title before that?

18   A    Director of marketing at that point when we bought the

19   company.

20   Q    Was it a promotion for her to go to a vice president

21   position?

22   A    Yes, it was.

23   Q    And who made that decision?

24   A    I did.

25   Q    Who is your administrative assistant at PQ?

1    A    A lady by the name of Joanne Kreckman (ph.).

2    Q    And how was she selected to work with you?

3    A    When we bought PQ and looked at headquarters, we knew

4    there were too many administrative assistants.  And I

5    observed Joanne and looked how she worked, and I sat down

6    with her and talked about would she like to work with me and

7    possibly another gentleman, Bill Citzko.  And she said that

8    she would very much like that.  And I said, if you want to do

9    that, then I would like to have you come and do that for us.

10   And that's how she was selected.

11   Q    And how many years of service does Joanne have with the

12   company?

13   A    46.  She's the longest-reigning employee in all of PQ

14   worldwide.

15           MS. MALLOY:  I have nothing else, your Honor.

16           THE COURT:  Perhaps others do.

17           (Pause.)

18           MS. EYER:  If you could just move that monitor a

19   little so we can see?

20           (Pause.)

21                        CROSS-EXAMINATION

22   BY MS. EYER:

23   Q    Good morning, sir.

24           You knew Michael Imbriani before you came to PQ,

25   isn't that right?

1   A    That's correct.

2   Q    You two were business school classmates at Harvard, is

3   that correct?

4   A    That's correct.

5   Q    And you finished your program at Harvard in roughly 1995,

6   is that right?

7   A    That's right.

8   Q    And between 1995 and 2005 you saw Mr. Imbriani about once

9   or twice a year, does that sound about right?

10  A    Usually once a year.  And I had seen him even before that

11  from time to time.

12  Q    So, you knew him before you went to school with him at

13  Harvard also, is that correct?

14  A    Yes.

15  Q    And every once in a while the two of you would play a

16  round of golf, is that right?

17  A    Very infrequent, maybe one that I remember.

18  Q    If Mr. Imbriani were to testify that you would play a

19  round of golf every now and again, would that refresh your

20  recollection?

21          MS. MALLOY:  Objection.

22          THE COURT:  He disagreed with you.  Go on to

23  something else.

24  BY MS. EYER:

25  Q    Would it be fair to say that you thought highly of Mr.

1   Imbriani professionally?

2   A    I thought highly of Mr. Imbriani from the standpoint of

3   his financial skills, yes.

4   Q    And in fact at the time that you came to PQ Mr. Imbriani,

5   he was already the executive vice president in charge of the

6   Global Chemicals business, is that correct?

7   A    That's correct.

8   Q    And Global Chemicals, that was the largest business at

9   PQ, is that also correct?

10  A    That's correct.

11  Q    And you promoted him further at the time that you came to

12  PQ, is that also correct?

13  A    We named his vice chairman of the -- of PQ.

14  Q    If I could direct your attention to P-11?

15  A    Could you say that again?

16  Q    P-11.

17             (Pause.)

18  Q    This is the announcement announcing the appointment of

19  Mr. Imbriani as vice chairman, correct?

20  A    Yes.

21  Q    And this is dated February 25th, 2005?

22  A    Yes.

23  Q    And the document states --

24  A    Excuse me, I can't see that, but I'm assuming it's the

25  same as this.

1  Q   It is the same --

2  A   Okay.

3  Q   -- as what you have in front of you there.

4        It states, "As vice chairman, he" -- and that's a

5  reference to Mr. Imbriani -- "will also take a lead role with

6  me and the rest of the executive management team to

7  immediately begin the work PQ needs to undertake in the next

8  90 days, namely introduction of EBITDA as a driver, the

9  reforecast of the 2005 budgets, and a complete organizational

10 review."

11       The complete organizational review that is

12 referenced in this announcement, that was the process that

13 led up to the 2005 RIF, correct?

14 A   Yes.

15 Q   Sir, you testified that you were not aware at the time of

16 the 2005 RIF and at the time these decisions were being made

17 that Ros Kutchins had been ordered to discriminate by Michael

18 Imbriani, isn't that right?

19 A   I had heard nothing about discrimination at that point in

20 time.

21 Q   If you could direct your attention back to P-32 in the

22 binder?  That's the same as what I am now putting up on the

23 easel.

24       Sir, this document is dated May 16th, 2005, correct?

25 A   Yes, it is.

1   Q   And this is a memo to you from Colleen DelMonte and

2   Rosalyn Kutchins regarding R and D organization?

3   A   Yes, and also to Mike Imbriani.

4   Q   And it was in fact faxed to you at Peak Investments,

5   correct?

6   A   Yes.

7   Q   With the exception of the small "Potters" that appears on

8   the first page, all of the handwriting that appears on this

9   document is your own, correct?

10  A   It is.

11  Q   So that would include the writing that appears up there

12  in the margin?

13  A   All of the writing except that "Potters," yes.

14  Q   Your notes that appear up in the header there, there's a

15  reference to, "Analytical, Admin. and Detergent, Ros; Zeolite

16  and Silica Gel, Colleen," that is a reference to how R and D

17  was going to be divided in the Chemical Group after the

18  restructuring, correct?

19  A   That is, yes.

20  Q   Ros would have Analytical, Administration and Detergent

21  Tech Service reporting to her, correct?

22  A   Yes.

23  Q   And Colleen DelMonte would have Z list and silica gel R

24  and D reporting in to her?

25  A   Correct.

1  Q    And that was a change from the pre-RIF structure,

2  correct?

3  A    Previous to the -- when we bought the company, yes.

4  Q    Prior to the 2005 RIF?

5  A    Yes.

6  Q    And, prior to the 2005 RIF, everybody in R and D reported

7  in to John Lau, correct?

8  A    That's correct.

9  Q    And this reporting structure that you reference there,

10  that was ultimately adopted at the time of the 2005 RIF,

11  correct?

12  A    Yes.

13  Q    Let's talk now about the notation, "John from VF."  Could

14  you please explain what the relevance of that note was?

15  A    Yes.  We have a building manager and at this point in

16  time PQ leased an 88,000-square-foot building that was

17  some -- about half full, and the building manager's name is

18  John.  And one of the things that was going on over in R and

19  D is they had PhD chemists managing putting on a new roof,

20  which we did in 2005, and working on the parking lot and

21  doing other things like that, and we were going to give the

22  building manager's work to the gentleman at Valley Forge

23  whose name is John.

24  Q    And isn't it true that John, I believe his last name is

25  Ferrer (ph.), did ultimately undertake some of the facilities

1  management duties at R and D after the RIF?

2  A    That's correct.

3  Q    Could you now take a look at the underlying -- that

4  appears under the first paragraph of the overview section?

5  Do you see where I'm referencing?  It's the first page --

6  A    Oh --

7  Q    -- the overview section.

8  A    -- yes, yes -- at the bottom?

9  A    There's an underline under the first paragraph of the

10 overview section, do you see that?

11 A    Yes.

12 Q    The sentence you have partially underlined states that

13 the Corporate Development priorities will also be

14 consolidated into the four new departments for 2005, correct?

15 A    Yes.

16 Q    And that was meaning that the business units would

17 determine what aspects of the Corporate Development projects

18 that they wanted to continue to fund, is that right?

19 A    That's correct.

20 Q    And that happened after the RIF too, isn't that right?

21 A    It happened during the RIF and continued on after that,

22 yes.

23 Q    Finally, I would like you to take a look at the second

24 page of the memo, the list of names that appears there?

25 A    Yes.

1   Q    There's a line through John Lau's name, correct?

2   A    Yes.

3   Q    And you've testified he was not terminated in the RIF,

4   isn't that right?

5   A    That's correct.

6   Q    But the rest of these people were, isn't that right?

7   A    Yes.

8   Q    Sir, isn't it true that you have given sworn testimony

9   that this memo presents the recommendation that was

10  ultimately accepted in R and D?

11  A    Yes.

12  Q    Sir, you've testified that not all of the employees in

13  Central Engineering were terminated, isn't that right?

14  A    That's correct.

15  Q    And the same is true of the CD Group as well, isn't that

16  true?

17  A    The CD Group, Corporate Development Group?

18  Q    That's correct.

19  A    Yes.

20  Q    If I could direct your attention to P-257.  I'll get a

21  binder for you with that one.

22          (Pause.)

23  Q    P-257 in that binder.

24          Sir, PQ has admitted that all of the people that

25  appear on this chart were members of the CD Group in 2005;

1   isn't it true that none of the people under the age of 55

2   were terminated in the 2005 RIF?

3   A   According to this memo, that's correct.  I would say John

4   Lau was funded as vice president of R and D over Corporate

5   Development by -- partially by Corporate Development and

6   partially by other projects.  So, he managed the whole

7   Corporate Development and other R and D work.

8   Q   Sir, were any employees under the age of 55 terminated in

9   R and D in the 2005 RIF?

10  A   Uh, on -- according to this sheet, no.  I was --

11  Q   Are you -- are you aware, sir, that none of the employees

12  terminated in R and D in the 2005 RIF were under the age of

13  55?

14  A   Until this proceeding started, I was not aware of any

15  ages under or over 55.

16  Q   Are you aware at this time that nobody under the age of

17  55 was terminated in R and D in the 2005 RIF?

18  A   According to this document, yes, ma'am.

19  Q   My question is whether you are aware independently --

20  A   I'm aware.

21  Q   Thank you, sir.

22          MS. EYER:  Nothing further.

23          THE COURT:  Is everybody happy?

24                      REDIRECT EXAMINATION

25  BY MS. MALLOY:

1   Q   Was your decision to eliminate holding company money

2   which funded the Corporate Development Program based on Ms.

3   DelMonte and Ms. Kutchins' memo to you?

4   A   Absolutely not.

5   Q   Was the decision as to the people who ended up losing

6   their jobs in R and D based on Ms. DelMonte and Ms. Kutchins'

7   memo?

8   A   No, it was based on John Lau's recommendation and his

9   decision to Kevin Doran on who would go and who would stay.

10          MS. MALLOY:   I have nothing further.

11          THE COURT:   Anything further?

12          MS. EYER:   Nothing further.

13          THE COURT:   I understand your testimony that there

14   was never any investigation by you or anyone at the top

15   decision-making levels as to what the ages of the parties

16   were --

17          THE WITNESS:   The --

18          THE COURT:   -- the ages of the people who were going

19   to be RIFed?

20          THE WITNESS:   Your Honor, the investigation was

21   conducted by Mr. Bill Citzko and Mr. Kevin Doran.  Once the

22   decision was made and the recommendation of who was going and

23   who was staying in all the departments, it went to these

24   individuals who are trained professionals.  Much like we do

25   with environmental legislation, we have the same kind of

1  | people there that would look at that and go through those and

2  | then help implement, in this case --

3  |        THE COURT:  So, it never came to your attention that

4  | all the people being fired were over 55 and the ones retained

5  | were under 55?

6  |        THE WITNESS:  No, your Honor, it did not.

7  |        THE COURT:  Thank you.

8  |        Anything further?

9  |        MS. MALLOY:  No.

10 |        MS. EYER:  No, your Honor.

11 |        THE COURT:  You may step down.  Thank you, sir.

12 |        THE WITNESS:  Thank you.

13 |        (Witness excused.)

14 |        MR. ENNIS:  PQ calls John Johnson.

15 |        (Pause.)

16 |        THE DEPUTY CLERK:  Please raise your right hand.

17 |        JOHN JOHNSON, IV, Defendant's Witness, Sworn.

18 |        THE DEPUTY CLERK:  Please state your name and spell

19 | your last name for the record, please.

20 |        THE WITNESS:  John H. Johnson, IV, J-o-h-n-s-o-n.

21 |        THE DEPUTY CLERK:  Thank you, sir.

22 |                      DIRECT EXAMINATION

23 | BY MR. ENNIS:

24 | Q   Good morning, Dr. Johnson.  And if you could remember to

25 | speak into the mike.

1          You're here to give expert testimony this morning?

2    A    Yes, I am.

3    Q    And could you tell the jury your educational background?

4    A    I have a Bachelor's degree in economics from the

5    University of Rochester --

6          THE COURT:  Get closer to the microphone, talk into

7    the end of it, please.

8          MR. ENNIS:  And you might have to lean down -- or if

9    you can pick it up, that makes it better.

10         THE WITNESS:  Okay.  I have a Bachelor's degree in

11   economics from the University of Rochester in Rochester, New

12   York, and I have a PhD in economics from Massachusetts

13   Institute of Technology, MIT.

14   BY MR. ENNIS:

15   Q    All right.  And, in terms of your study at MIT, what did

16   that involve?

17   A    I specialized in two areas of economics, one is labor

18   economics and the other was econometrics.

19   Q    And can you tell the jury what econometrics is?

20   A    Yes.  Econometrics is basically the application of

21   statistics to economic questions.

22   Q    And, after graduating with your PhD, what did you do

23   next?

24   A    Next, I was an assistant professor of economics in labor

25   and industrial relations at the University of Illinois in

1   Urbana, Champaign.

2   Q   And what courses did you teach there?

3   A   At Illinois I taught two undergraduate courses, one was

4   called Labor Problems and the other was called Women in the

5   Labor Market.  I also taught a graduate course on statistical

6   methods called, exciting, Graduate Labor Economics.

7   Q   All right.

8              THE COURT:  It was called something, but you dropped

9   your voice and turned your head away when you said it.  What

10  was it called?

11             THE WITNESS:  Graduate Labor Economics.

12             THE COURT:  Thank you.

13  BY MR. ENNIS:

14  Q   And other than the University of Illinois have you held

15  other teaching positions?

16  A   Yes, I have.

17  Q   And what are they?

18  A   I am currently an affiliated professor at Georgetown

19  University's Public Policy Institute.

20  Q   And how long have you been there?

21  A   This is my third year.

22  Q   And can you tell the jury what courses you teach there?

23  A   There I teach a course called The Law and Economics of

24  Public Policy Discrimination, I have also taught a course

25  called Antitrust in Public Policy, and I teach a Master's

1   research seminar, which is sort of a two-semester thesis-

2   supervising seminar.

3   Q   And does the seminar involve statistics?

4   A   Yes, it does.

5   Q   And do the courses you teach involve statistics?

6   A   Yes, they do.

7           THE COURT:  What did you -- you said you were some

8   kind of a professor, but I didn't --

9           THE WITNESS:  An affiliated professor.

10          THE COURT:  Affiliated?

11          THE WITNESS:  Yes.

12          THE COURT:  What does that mean?

13          THE WITNESS:  It basically means -- Georgetown

14  Public Policy Institute draws from the community quite a bit

15  for their professors.  So, an affiliated professor is a

16  person that has professional expertise and also teaches at

17  the university.

18          THE COURT:  Go ahead.

19  BY MR. ENNIS:

20  Q   And have you ever had any articles published?

21  A   Yes, I have.

22  Q   And does that include peer-reviewed articles?

23  A   Yes, it does.

24  Q   And what does it mean to be peer-reviewed?

25  A   In academics, when you write a paper, in order to get it

1    published, it gets sent to other economics who look at the

2    article, sort of a blind process, and they have to -- they

3    criticize your paper and they make corrections.  And then, in

4    order to ultimately get published in a journal, the referees,

5    who are the reviewers, have to sign off on the paper.  And

6    that's called the peer-review process.

7    Q    And have you published peer-reviewed papers?

8    A    Yes, I have.

9    Q    Have you made any presentations on the topic of

10   statistics?

11   A    Yes, I have.

12   Q    And are you a member of any professional organizations?

13   A    Yes, I am.

14   Q    And what are they?

15   A    I'm a member of the American Bar Association's Labor and

16   Employment section and Antitrust section; I'm a member of the

17   American Economic Association, which is a professional group

18   for economists; and I'm also a member of the National

19   Association of Forensic Economists and the Society for Human

20   Resource Management.

21   Q    All right.  And are you currently employed?

22   A    Yes, I am.

23   Q    And what's your position?

24   A    I'm the president and CEO of Edgeworth Economics, which

25   is a consulting firm in Washington, D.C.

1    Q    And what type of work does it perform?

2    A    Edgeworth Economics provides economic consulting to

3    various companies and other parties as well, oftentimes

4    centered around litigation, but other businesses use as well.

5    Our firm specifically does a lot of work in the areas of

6    labor and employment, antitrust, and particular things with

7    large data sets; anything where there's data involved,

8    companies often to us for advice and consulting.

9    Q    And what's your position there?

10   A    I'm the president and CEO.

11   Q    And how long have you held that position?

12   A    Seven weeks.

13   Q    Okay.  Can you briefly describe your prior positions for

14   the jury?

15   A    Sure.  Prior to starting Edgeworth Economics, I worked at

16   two other consulting firms, one was called National Economic

17   Research Associates, NERA, and the other was called Criterion

18   Economics.  They are both professional consulting firms that

19   do similar work to what I described Edgeworth does.

20   Q    And as part of your duties working for those three

21   companies did you get involved in litigation matters?

22   A    Yes, I have.

23   Q    And including providing statistical analysis in

24   litigation matters?

25   A    Yes, I have.

1   Q   And you are re -- are you retained by both plaintiffs and

2   defendants?

3   A   Yes.

4   Q   And can you tell the jury approximately what percentage

5   you represent plaintiffs versus defendants?

6   A   I would say approximately 35 percent of my work is for

7   plaintiffs and about 65 percent of my work is defendants.

8           MR. ENNIS:  Your Honor, I would move Dr. Johnson as

9   an expert subject to any questions.

10          THE COURT:  Any questions --

11          MS. EYER:  No questions.

12          THE COURT:  -- at this point?

13          MS. EYER:  Not from us, your Honor.

14          THE COURT:  Thank you.

15  BY MR. ENNIS:

16  Q   Dr. Johnson, you were asked to provide an assessment of

17  the reports prepared by Dr. Stephanie Thomas, is that

18  correct?

19  A   Yes, it is.

20  Q   Dr. Thomas is a statistician who testified yesterday, is

21  that your understanding?

22  A   That is my understanding.

23  Q   And could you tell the jury what --

24          THE COURT:  It was the day before yesterday, wasn't

25  it?  Anyway, she testified.

1          MR. ENNIS:  She did testify, yes.  Thank you, your

2  Honor.

3  BY MR. ENNIS:

4  Q   And what did you do to perform the analysis of Dr.

5  Thomas' work?

6  A   Well, when I received Dr. Thomas' work, the first thing I

7  did is I read her report.  I also reviewed all of the data

8  that was supplied with her report; I reviewed deposition

9  testimony and the complaint, and other documents in this

10  case; and then me and my team replicated her analysis, which

11  means we put all of the data into the computer and performed

12  the same tests, and then I came to some conclusions.

13  Q   Okay.  And --

14          THE COURT:  And then you what?

15          THE WITNESS:  Came to some conclusions.

16          THE COURT:  Thank you.

17  BY MR. ENNIS:

18  Q   Make sure you talk into the mike.

19          What did you understand Dr. Thomas to be doing?

20  A   My understanding is that Dr. Thomas put forward two

21  statistical tests as a basis for inferring age

22  discrimination.

23  Q   And what were those two tests?

24  A   The first test was called the Fisher Exact Test and the

25  second test was called the Cochran-Mantle Hansel (ph.) Test.

1    Q    Are there any assumptions underlying those tests?

2    A    Yes, there are.

3    Q    And can you tell the jury the key assumption?

4    A    The key assumption of both of those tests is that any

5    comparison is as good as random.  What that means is that

6    when you're comparing groups of workers in those tests it has

7    to be the case that the workers are similarly situated, which

8    means they are identical in their characteristics.

9    Q    And why is it important that they be similarly situated?

10   A    When you run those tests, what you're trying to do is

11   look at whether or not age -- whether terminations are as

12   good as random.  So, if it's the case that those workers

13   aren't similarly situated, if it's the case that you can't

14   compare them on statistics, then any result you draw is

15   invalid because it could potentially confuse what you would

16   be calling factors due to age with other factors that affect

17   the workers.

18   Q    And so when you're doing those tests everyone going into

19   the test has to have an equal chance of being terminated?

20   A    That is correct.

21          MR. ENNIS:  Colleen, can you pull up 240,

22   Plaintiffs' Exhibit 240?  And why don't you just make the top

23   half bigger so we can read it?

24   BY MR. ENNIS:

25   Q    And, Dr. Johnson, it might be easier for you just to read

1    from the binder, 240.

2            (Pause.)

3    Q    Dr. Johnson, Table -- or Exhibit B, which is Plaintiffs'

4    Exhibit 240, was the first table used by Dr. Thomas to come

5    to her conclusion in terms of the likelihood of age being a

6    factor and, in your opinion, can this exhibit be used for

7    that purpose?

8    A    No.

9    Q    Do either of the tests that you've described, using this

10   exhibit, render a valid result?

11   A    No.

12   Q    Why is that?

13   A    Well, when you look at these individuals you can see, as

14   I said, they're not similarly situated.  You see that they

15   have widely varying titles; for each of those titles there's

16   different educational requirements, didn't experience levels.

17   Underneath the surface of this, there are different salary

18   levels and the like.  So, the comparison is contaminated by

19   these different characteristics of the workers that you can

20   see in the table.

21   Q    So, it goes from you have a principal scientist, you have

22   a shipper, you have technologists, you have all different

23   types of people?

24   A    Yes.

25   Q    And would all those people have the exact same chance of

1  being terminated going into a RIF?

2  A    No.

3  Q    Based upon all those characteristics?

4  A    Yes.

5  Q    And then Dr. Thomas limited her test -- or limited her

6  analysis to funding of CDP, do you understand that to be the

7  case?

8  A    Yes, I do.

9  Q    And --

10         MS. EYER:  Objection, your Honor, that's not

11  accurate, she conducted a number of tests.

12         THE COURT:  That's nice.

13         MR. ENNIS:  All right.

14         THE COURT:  That's not a valid reason for objection,

15  though.

16         MR. ENNIS:  Can you pull up Plaintiffs' Exhibit 242?

17  BY MR. ENNIS:

18  Q    And 242 is a group of people listed as receiving funding

19  from the CD Program, is that right?

20  A    Yes.

21  Q    And, looking at this group, can you apply the two tests

22  that Dr. Thomas applied to come to any conclusion based upon

23  these people?

24  A    No.

25  Q    And why is that?

1   A    Because, once again, they are not similarly situated.  As

2   you can see, there's different job titles, which again have

3   different education levels, different levels of experience,

4   different requirements.  So, the comparison is contaminated

5   by these other factors.

6   Q    But you understand that one of the criteria or the reason

7   put forth by PQ in this case for the termination of Mr.

8   Wypart and Ms. Marcus was lack of funding from the company,

9   do you understand that to be the case?

10  A    Yes.

11  Q    And this purports to control for funding, does it not?

12  A    Yes.

13  Q    So, why doesn't this -- why can't you get to a valid

14  conclusion based upon this document?

15  A    Well, again, the -- when you look at these sets of

16  workers, the prerequisite of the test is that you have to be

17  comparing similarly situated workers.  So, here, although it

18  says it's controlling for CD funding, it's not controlling

19  for all of these other factors.

20       The second issue is the CD funding control that is

21  used is basically substantial funding, which means was it

22  greater than 50 percent or more, there's not even controls

23  for percentages or the like.

24       MS. EYER:  Objection, your Honor.  That is actually

25  a mischaracterization of Dr. Thomas' testimony in relation to

1   those tests.

2            THE COURT:  No, you make your argument at the end of

3   the case.

4            MR. ENNIS:  And, your Honor -- well, that's a

5   speech, because that's what she testified.

6            MR. ENNIS:  Can you turn to Exhibit 237, P-237?

7   Just the -- just the top where it says -- the first two

8   lines.  Yes.

9   BY MR. ENNIS:

10  Q    Source is PQBM-235, is that right?

11  A    Yes.

12  Q    And as part of your analysis did you look at PQBM-235?

13  A    Yes.

14  Q    All right.

15           MR. ENNIS:  And, Colleen, could you pull up

16  Plaintiffs' Exhibit 3 and go to the next page?  And the next

17  page?  And if you could enlarge this?  Okay.

18  BY MR. ENNIS:

19  Q    And could you look at -- I'll come up.

20           In terms of the people who have a majority of their

21  funding from, and by -- 50 percent or more, how many people

22  are on the list?  If you look through, the total is on the

23  right-hand side, is that correct?

24  A    Yes, it is.

25  Q    And there are three people that fall into that category?

1    A    Yes.

2    Q    And everyone else in this exhibit has 1.1 to point -- or

3    actually 0.1 to 0.3, is that right?

4    A    Yes.

5    Q    And did Dr. Thomas ever --

6             THE COURT:  Where are you getting these figures

7    from?  Nobody can read these.

8             MR. ENNIS:  All right.  Colleen, could you just pull

9    up the right-hand column?  The very right, right, that's the

10   left -- oh, yes, thank you.

11   BY MR. ENNIS:

12   Q    And, Dr. Johnson, those are the total funding from CDP

13   according to this document that Dr. Thomas was relying upon,

14   is that correct?

15   A    Yes.

16   Q    And the only people listed as having 50 percent or more

17   from funding from CDP are the three individuals at 0.5, 1.0

18   -- or 1.0 and 1.0, do you see that?

19   A    Yes.

20   Q    And everyone else on the list has somewhere between 0.1

21   and 0.3, is that right?

22   A    Yes.

23   Q    In your review of Dr. Thomas' work did she ever account

24   for the fact that all these other people were getting less

25   than 50-percent funding?

1    A    Dr. Thomas' work simply categorizes people as either

2    funded or not based on greater than 50 percent or less.

3    Q    And those are the three people that we've identified?

4    A    Yes.

5    Q    And, once again, can you analyze this document and come

6    to any valid statistical conclusion based upon the two tests

7    prepared by -- or conducted by Dr. Thomas?

8    A    No.

9    Q    And why not?

10   A    Because, again, the workers are not similarly situated.

11   Q    And we've already talked about some of the

12   characteristics you've mentioned, job description, education,

13   all of that, but now they're also distinguished by funding,

14   is that correct?

15   A    Yes.

16           THE COURT:  Could I inquire, where -- where do you

17   get three people out of that --

18           MR. ENNIS:  Okay.

19           THE COURT:  -- bunch of figures?

20           MR. ENNIS:  Reeny, can you -- are you able to do the

21   left-hand side and the right-hand side at one time?  I'm

22   sorry, Colleen.

23           (Pause.)

24           MR. ENNIS:  So we have the names and the total

25   funding.

1      THE COURT:  But the figures that you had up before,

2  I don't know which three you're talking about, I don't think

3  the jury does either.

4      MR. ENNIS:  You know what?  Let's try and get to a

5  document which might be easier to read and that is -- Reeny,

6  if you could pull up first 238, Plaintiffs' 238, and the top

7  two lines?

8  BY MR. ENNIS:

9  Q   And this is Table 6 from Dr. Thomas' testimony from

10 yesterday and she says that she's relying on 215, do you see

11 that?

12 A   Yes.

13 Q   PQBM-215.

14      MS. EYER:  And, your Honor, I'll object to this

15 whole line of questioning to the extent it goes to an

16 analysis that was not Dr. Thomas' analysis of which employees

17 were funded through CD funding, this is an independent

18 analysis that related to cancelled projects.  So, to the

19 extent that this line of questioning does not relate to the

20 actual CD funding analyses that she performed, she performed

21 two separate analyses, I would object to the

22 characterization.

23      THE COURT:  Well, I'm afraid the jury is going to

24 have to remember what she said.

25 BY MR. ENNIS:

1   Q   And, Dr. Johnson, what's the title of this?

2   A   This says, "Controlling for CD project funding source

3   using PQBM-000215.

4   Q   Okay.

5          MR. ENNIS:  And, Colleen, can you go to Plaintiffs'

6   Exhibit 180 and go to the -- well, I think the fourth page?

7   BY MR. ENNIS:

8   Q   And that's PQBM-215, the same document, is that correct?

9   A   Yes.

10         MR. ENNIS:  And, Reeny, can you -- Colleen, can you

11  make it bigger, please?  Let's see if we can read it if

12  that's enlarged.  In fact, let's just do from "Tech., Admin."

13  BY MR. ENNIS:

14  Q   So, now we have on the top line the names of people, is

15  that right?

16  A   Yes.

17  Q   And on the bottom line their total funding, is that

18  correct?

19  A   Yes.

20  Q   And from the CD Group, is that right?

21  A   Yes.

22  Q   And in terms of people who have a majority of their

23  funding, we still see three people, Senderov (ph.), Wypart

24  and Reggie Thompson, is that correct?

25  A   Yes.

1    Q    And everyone else has between 0.1 and 0.35, is that

2    right?

3    A    That is correct.

4    Q    And, once again, did Dr. Thomas in your review of her

5    analysis control for people who received less than 50-percent

6    funding?

7    A    No.  In Dr. Thomas' analysis it was simply either you

8    were funded or not based on the percentage.

9    Q    Okay.  A percentage -- what percentage?

10   A    A 0.50, greater or less.

11   Q    0.50 or more?

12   A    Yes.

13   Q    Yes.

14   A    I mean, it was 0.50 or greater you were funded, less than

15   0.50 you were not funded.

16   Q    Okay.  And from this exhibit can you draw any

17   statistical, valid statistical conclusions?

18   A    No.

19   Q    Why not?

20   A    Because, again, the workers are not similarly situated

21   and you have not controlled for all the different factors.

22   Q    Okay.

23            MR. ENNIS:  And that's enough for this one, Colleen.

24   And if you could turn back to Plaintiffs' Exhibit 242?  And

25   enlarge that, please?

1  BY MR. ENNIS:

2  Q    Dr. Johnson, did you perform your own statistical

3  analysis in this case?

4  A    Only in the sense that I replicated hers, I did not do

5  anything other than that.

6  Q    You didn't do your own analysis of the RIF, is that

7  right?

8  A    That is correct.

9  Q    And why not?

10  A    Well, when approaching this type of problem what you need

11  to think about is whether or not the decision process at hand

12  can actually be modeled using statistics.  And in this

13  particular case there's information about CD funding for

14  people that were terminated, but there isn't information

15  about why people were retained as well that can be --

16         THE COURT:  Excuse me, you're turning away from the

17  microphone and swallowing your words.  Would you please talk

18  into the microphone and pretend to be talking to everybody in

19  the room?

20         MR. ENNIS:  Yes.  So, look out, that would help, I

21  think.

22         THE WITNESS:  How's that?

23         MR. ENNIS:  That's good.

24         THE WITNESS:  So, because you do not have

25  information on -- or do you not have a statistical ability to

Johnson - Direct                                    45

1   test information on why people are retained, you can't really

2   develop a valid test in this context.

3   BY MR. ENNIS:

4   Q    For example, did you read Dr. Lau's deposition testimony?

5   A    Yes, I did.

6   Q    And you were aware that he was retained?

7   A    Yes.

8   Q    And he went to a different position?

9   A    Yes.

10  Q    And to do a valid statistical test would you have to take

11  that into consideration?

12  A    Yes, you would.

13  Q    And would you have to take into consideration why anyone

14  else was kept?

15  A    Yes.

16  Q    And were you able to do that in this case?

17  A    No.

18  Q    Why not?

19  A    Because you don't have sufficient data to sort of control

20  for those things, they essentially become -- each decision

21  has to be thought of with respect to the retention.

22  Q    Okay.

23              MR. ENNIS:   That's all I have, your Honor.

24              THE COURT:   Any questions?

25              MS. EYER:   Just a few, your Honor.

1                           CROSS-EXAMINATION

2    BY MS. EYER:

3    Q    Good morning, sir.

4    A    Good morning.

5    Q    You don't believe that Dr. Thomas should have controlled

6    for employee hair color, do you?

7    A    No.

8    Q    You don't believe that she should have controlled for

9    height?

10   A    No.

11   Q    No reason to believe she should have controlled for the

12   type of car people drive?

13   A    No.

14          THE COURT:  I think you got your point, what's

15   your --

16   BY MS. EYER:

17   Q    And that's because there's no reason to believe that any

18   of those factors played any role in the RIF decisions, isn't

19   that right?

20   A    Or their employment decisions.

21   Q    And you just testified that you did not prepare a report

22   -- or, I'm sorry, you did not prepare your own analysis of

23   the RIF decisions in this case, isn't that right?

24   A    Yes.

25   Q    And you stated that you did not perform such an analysis

1   because it wasn't possible, is that correct?

2   A    Yes.

3   Q    I would like to direct you to your sworn testimony in

4   July.

5          MS. EYER:  If you could hand the witness day five,

6   please?

7          (Pause.)

8          THE COURT:  What page are you on?

9          MS. EYER:  I am on Page 54.

10  BY MS. EYER:

11  Q    In response to a question from Mr. Ennis.  Question:  "As

12  a labor economist and statistician, are you able to run tests

13  that account for the types of differences that you have

14  identified today?"

15         Answer:  "Yes."

16         Isn't that right?

17  A    Yes.

18  Q    And, sir, as part of your opinions here today you are not

19  contending that age was not a consideration in the 2005 RIF

20  decisions, isn't that right?

21  A    That is correct.

22  Q    And so, sir, with respect to Ms. Marcus and Mr. Wypart

23  specifically, you don't have any basis to dispute that they

24  may have been terminated on the basis of their age?

25         MS. EYER:  Nothing further.

1            MR. ENNIS:  I just have a couple, your Honor.

2                    REDIRECT EXAMINATION

3    BY MR. ENNIS:

4    Q    Dr. Johnson, when you testified that you could take into

5    account the various factors you've described at that time,

6    what factors were you referring to?

7    A    I was referring to education, experience, job title.

8    Q    Okay.  Things like that --

9    A    Yes.

10   Q    -- measurable, objective things?

11   A    Yes.

12   Q    Are you able to look at the various reasons why Mr. Lau

13   was terminated -- or, I'm sorry, Mr. Lau was retained?

14   A    No.

15   Q    Or any of the other people?

16   A    No.

17   Q    Okay.  Thank you.

18           And are your opinions today within a reasonable

19   degree of professional certainty?

20   A    Yes.

21   Q    Thank you.

22           THE COURT:  You may step down.  Thank you, sir.

23           (Witness excused.)

24           THE COURT:  We'll take a brief recess at this point,

25   a ten-minute recess.

1          (Court in recess; 11:07 to 11:19 o'clock a.m.)

2          ROSALYN KUTCHINS, Defendant's Witness, Sworn.

3          (Pause.)

4          MS. MALLOY:  Okay?

5          THE DEPUTY CLERK:  Yes.

6   BY MS. MALLOY:

7   Q    Could you please state your name?

8   A    Rosalyn Kutchins.

9   Q    And who do you work for?

10  A    I work for the PQ Corporation.

11  Q    For how long have you worked for PQ?

12  A    I have worked for PQ for 25 years.

13  Q    And could you tell us the various positions and types of

14  work you've done for PQ?

15  A    I started with PQ in 1984 in a sales position in Los

16  Angeles for the Industrial Chemicals Group.  From there, I

17  was promoted several times in management for that particular

18  group, and in 1992 I was promoted to a position back in

19  Valley Forge, Pennsylvania as sales manager for our North

20  American Specialty Chemicals Group.  In 1995, I was promoted

21  again and moved into our Detergent Zeolite Group as our

22  worldwide business manager, and then in 1997 I moved from

23  there with another promotion to director of marketing for our

24  Industrial Group.  And in 2005 I moved to sales in Industrial

25  Chemicals and then, in 2007, I was promoted to vice president

1   of sales for our North American Chemicals Group.

2   Q    Have you ever worked in R and D at PQ?

3   A    Never.

4   Q    What is your educational background?

5   A    I have degrees in biology and work in business.

6              THE COURT:  Where did you get that?

7              THE WITNESS:  California State University, North

8   Ridge.

9              THE COURT:  Thank you.

10  BY MS. MALLOY:

11  Q    When was Mr. Myszak demoted?

12  A    It would have been early or first quarter of 2003.

13  Q    And were you the person responsible for filling the

14  position that Mr. Myszak left?

15  A    Yes, I was.

16  Q    And who replaced Mr. Myszak in that position?

17  A    Dr. Barry Schwartz.

18  Q    And what position did Dr. Schwartz take?

19  A    He became business manager for our Dry Products Group.

20  Q    Is Mr. Schwartz younger than Mr. Myszak?

21  A    Yes, he is.

22  Q    By how much?

23  A    He was in his mid to late 40s, I believe, about four

24  years younger.

25  Q    Okay.  Did Mr. Imbriani interview Dr. Schwartz?

1   A    No, he did not.

2   Q    Did Mr. Imbriani has to approve the hiring of Schwartz?

3   A    No, he did not.

4   Q    I want to talk about approximately 2002 up to the time of

5   the RIF; did your business unit work with R and D?

6   A    The Industrial Chemicals Group?

7   Q    Yes.

8   A    On a very limited basis for wood treatment.

9   Q    Okay.  And could you describe the relationship or how

10  Industrial Chemicals would work with R and D?

11  A    Industrial Chemicals did not have a formal R and D

12  Program; we had some R and D which we funded, it was for

13  analytical work, and that analytical work was done to test

14  incoming raw materials and our finished products before they

15  would go out to our customers.  We had also a small portion

16  that was worked on the Corporate Development Program for the

17  evaluation of treated lumber.

18  Q    Okay.  Could you describe for us the life of a project

19  from the time it's an idea until the time it's in a

20  customer's hands?

21  A    From a business perspective, we looked at what we called

22  a business development or sales-opportunity funnel and --

23  Q    Okay.  If you could slow down just a little bit?

24  A    Sorry.  A funnel, if you can picture, you know, a funnel

25  like you use at home or -- or your car to fill your oil,

1    you've got things coming in the top and you've got an outcome

2    coming out at the bottom.  Well, we would look for input from

3    customers as ideas and needs for our products.  And all those

4    ideas would come in and in Industrial Chemicals, for the most

5    part they came in to our Technical Service Group.  From there

6    we would evaluate, are they real?  Is it a need we can

7    satisfy for the customer?  We talked to the customer to get

8    what we call the voice of the customer, which is really what

9    do they really need and, if we were to fulfill their need,

10   could we provide the value and they actually buy product from

11   us for this particular use.

12   Q   Could you give us an idea of some kinds of ideas that

13   have actually come from customers?

14   A   Well, I could use one that ended up in the CD Program and

15   that was Nano-A.  It was a small particle zeolite that was a

16   request from Unilever Corporation who makes detergents.  Our

17   group for many, many years was selling zeolite, our powdered

18   zeolite for products like Tide, but it was the powder

19   product, and over the years liquid detergents have grown in

20   popularity and we have seen our sales to the powders decline.

21   So, we were trying to figure out how do we get into the

22   growing liquid business.  So, Unilever came to us and I said,

23   could you make a small particle zeolite that we can put into

24   our liquids?

25             So, it was customer-generated.  It then went

1    through, you know, can we make the product?  Is it worth it?

2    Can we make it at a price where they will be able to pay for

3    it?  And then we would go out and we would sell it.

4    Q    Okay.  Do all PQ products go through the R and D unit?

5    A    No.

6    Q    Did Industrial Chemicals have any Corporate Development

7    projects?

8    A    Just the wood treatment or what we call the stakes in the

9    ground.  It was a replacement in pressure-treated lumber, we

10   were looking to see if we could replace chrome and arsenic,

11   which had recently been banned.

12   Q    Did Zeolite Products have any Corporate Development

13   projects?

14   A    Yes, Zeolite did have some Corporate Development

15   projects.  Zeolite had very limited R and D, so we looked at

16   the Corporate Development as sort of a freebie for new

17   opportunities.

18   Q    Why do you describe it as a freebie?

19   A    Because it was paid for by the holding company rather

20   than through the business unit and anything that we wanted to

21   do through R and D had to be paid through the business.

22   Q    What Corporate Development projects did Zeolite Products

23   have?

24   A    There was the Nano-A project, there was another project

25   on silver zeolite.  There was a PVC project, but that had

1  graduated from the point where it was no longer R and D and

2  actually had gone out to our sales group for sales, and we

3  had trained our sales force in that in late 2004.  And then

4  there was the wood-polymer composite switch came into play

5  late 2004 and into 2005.

6  Q   Okay.  You mentioned Mr. Schwartz's name, what was his

7  title?

8  A   He was business director for our Dry Products.

9  Q   And were there other people who held the title of

10 business director?

11 A   We had three.  We had Mark Vincent, who was business

12 director for our Liquid Silicates, and we had Chris Seneck

13 (ph.), who was our business director for actually Zeolite and

14 Epsom Salt.

15 Q   And did all three of those individuals report to you?

16 A   Yes, they did.

17 Q   And did you and those business managers have any role

18 whatsoever with respect to the Corporate Development

19 projects?

20 A   Yes.  As part of the Corporate Development project, as

21 they were defined, they were to be aligned with the

22 businesses and the business units were to support each

23 project.  So, Dr. Schwartz and Mr. Seneck and Mr. Vincent

24 were all aligned with some of the projects that were there

25 over at R and D, they were actually the ones that were

1  involved more on the day-to-day or week-to-week project

2  management.

3  Q   When did the budgeting process, what time of year did

4  that start at PQ?

5  A   PQ budgeting starts around late August-September time

6  frame and we would start with the sales budget first.  We

7  would do what we call a bottoms-up projection where we would

8  ask our sales force what they thought all of our customers

9  were going to need in the next year.  We would then move

10 through what our manufacturing costs were going to be for the

11 year and, based on that and our raw material costs, come up

12 with the profitability for the business for the following

13 year.

14 Q   And did you play a role in the budgeting process?

15 A   Yes, in marketing I did.

16 Q   Okay.  I'm showing you Defendant's Exhibit 13.

17        (Pause.)

18 A   Thank you.

19        MS. MALLOY:  Just enlarge the top half and we'll see

20 how that goes.

21 BY MS. MALLOY:

22 Q   Could you identify this document?

23 A   Yes, it's a document that I had written to Dr. Lau.

24 Q   And the date is?

25 A   September 10th, 2004.

1   Q   Okay.  Could you describe for us the background --

2              THE COURT:  Excuse me, but you asked her to identify

3   the document and I don't think she identified the document.

4              MS. MALLOY:  The document is marked as Exhibit 13

5   and it is an e-mail from Rosalyn Kutchins to John Lau dated

6   September 10th, 2004.

7              THE WITNESS:  Yes, that is correct.

8   BY MS. MALLOY:

9   Q   And can you tell us about the background that led to this

10  e-mail?

11  A   At this time frame, we were well in -- we had just

12  started the budgeting process and we were talking about the

13  projects that were going to be worked on both from R and D

14  and from Corporate Development.  I believe a week or two

15  before this we had had presentations on the status of the

16  current Corporate Development projects.

17  Q   Okay.  Referring to the second paragraph of this e-mail.

18  "I had a chance to review your funding document and would

19  like to know the total project funding amounts without

20  Bonnie.  My estimates without Bonnie has our projects

21  dropping by approximately 150K."

22              Could you explain the background on what you're

23  conveying here to Dr. Lau?

24  A   Dr. Lau had given us a list of the projects with

25  allocations by person or the amount of time and dollars that

1  would be spent on each of these projects, and I was asking

2  him to please review and give me what the total would be if

3  he had taken the pieces that were allocated to Mrs. Marcus

4  out of his document.

5  Q   And what --

6        THE COURT:  Before we leave that, what's 150K, what

7  does the K stand for?

8        THE WITNESS:  Oh, thousand.  Sorry, sir, 150,000.

9        THE COURT:  Okay.  Go ahead.

10 BY MS. MALLOY:

11 Q   And why did you ask him to do that?

12 A   During the budgeting process, the Detergent Zeolite

13 business was undergoing some pressure.  We had recently

14 signed a new contract with a customer that did not allow us

15 to pass through our costs and --

16 Q   What does that mean?

17 A   Our raw material costs, the raw materials to make the

18 product had gone up.  And the contract that we had signed was

19 for a fixed dollar amount, let's say it was 25 cents, but now

20 our costs had gone from maybe ten cents to 15 cents and we

21 could not recover that additional five cents from the

22 customer based on the contract.  So, in order to maintain --

23 in addition to that, we had had raw material increases.

24 There's a -- later down it talks about ATH, which is an

25 alumina product, which is one of the main raw materials for

1  making zeolite, that price had also gone up.  So, we were

2  seeing our profitability erode.

3           THE COURT:  How long was the term of the contract

4  with the customer?

5           THE WITNESS:  The contract was signed in 2003 and

6  went through 2008.

7           THE COURT:  You signed an eight-year contract that

8  did not enable you to recover increased cost of materials?

9           THE WITNESS:  For the first three years it was fixed

10  on our raw-material components, yes, sir.  After that we were

11  able to adjust based upon our raw material prices and that

12  was due to a competitive offer from one of our competitors.

13           THE COURT:  All right.

14  BY MS. MALLOY:

15  Q   In 2004, was Ms. Marcus partially funded by Detergent

16  Zeolites?

17  A   I believe so, yes.

18  Q   And the second paragraph reads, "Having spoken with the

19  plants and business managers, we have agreed that we need to

20  maintain our funding of the process," slash, "synthesis,

21  Dick, Eric and Phil portion of the projects, but could

22  sacrifice the market development effort at R and D taking on

23  that responsibility within the business."

24           Could you explain this in more detail, please?

25  A   Well, we had spoken to our plant managers and to the

1   business managers, which would have been at the time Mr.

2   Schwartz and Mr. Seneck, and they were the projects that we

3   were working on, the Nano-A, which was a critical project to

4   us, and at the time we were working on the silver biocide

5   project.  There was still a lot of work that needed to be

6   done in synthesis and scale-up and those three individuals

7   were the ones that we really needed to continue funding, so

8   we could finalize those projects to get them closer to sales.

9   Q   Okay.  And the next paragraph, "I suggest that Dick" --

10  is that Dick Henchey (ph.)?

11  A   Yes, that's Dick Henchey.

12  Q   And Phil Connelly?

13  A   And Phil Connelly.

14  Q   -- "take over the portion of funding that supports

15  Detergent Zeolites in Korea and Thailand.  They are both

16  greatly respected by both groups and have offered excellent

17  support."

18           Could you explain the background for that

19  conclusion?

20  A   In prior years, the U.S.-based company would foot the

21  bill for our Korean and Thai R and D.  They were less

22  profitable organizations, we had more money, so we would pick

23  up the bill to help them out.  In this case, I had

24  recommended that we continue to do that.  However, later in

25  the budgeting process, the funding for Korea and Thailand was

1   also cut to improve the profitability of the unit.

2   Q   Okay.  And when Dick and Phil were contemplated to take

3   over the funding for Detergent Zeolites was that taking

4   funding away from anybody else?

5   A   It would have been I think from Mrs. Marcus, because she

6   was in that position.

7   Q   Okay.

8           THE COURT:  Excuse me.  You thought it to yourself,

9   but you dropped your voice.  What did you say?

10           THE WITNESS:  I said that -- could you ask the

11   question again?

12   BY MS. MALLOY:

13   Q   You're suggesting that Henchey and Connelly take over the

14   funding that supported Detergent Zeolites in Korea and

15   Thailand; if Henchey and Connelly were going to take over

16   that funding, did that mean that somebody else might lose

17   some?

18   A   Yes, it meant that Mrs. Marcus -- the funding that was

19   for Mrs. Marcus would be moved to them.

20   Q   Okay.  And your following paragraph says, "We decided

21   that we would not do any more development work on the PVC

22   market, but that we would just continue to use the existing

23   data for accounts.  With that decision, we will not fund

24   either Erin and Roman."

25           Could you explain this in more detail?

1  A    At the Corporate Development Program review a few weeks

2  prior to this the PVC project that had been worked on in

3  Corporate Development had what we called graduated, it went

4  from the R and D phase to the sales phase, and we were going

5  to go out into the marketplace and sell the product.  And, as

6  a matter of fact, we trained our sales force to take on this

7  function in November of 2004.

8  Q    When you say -- refer to not doing any more development

9  work, what does that mean?

10 A    We were going to take the products that we currently had

11 on the shelf and that we had been in the marketplace with for

12 a very long time and just continue to sell them, we were not

13 going to try to develop any new products for this market.

14 Q    At this time, September of '04, were you already selling

15 PVC?

16 A    Yes.  We had been selling PVC since the mid-1990s when Ed

17 Myszak developed the application.

18 Q    The following paragraph:  "Specialty Zeolites will not

19 have any R and D funding and we will hold Detergent Zeolites

20 at current levels.  We need to do this to offset increased

21 HTH pricing that we did not anticipate."

22        That's your testimony regarding the contract with

23 the customer, is that correct?

24 A    Yes, it is, yes.

25 Q    "John:  I want to focus our limited resources to support

1    the biocide and the Nano-A projects."

2            Could you explain that?

3    A   Both of those projects we thought had the most commercial

4    value moving forward, Nano-A for liquid laundry detergent.

5    There are a lot of people buying liquid laundry, we had

6    thought that the opportunity for that was very large and

7    could be -- you know, generate great sales for the company.

8    As for the biocide project, we were looking at a consumer

9    demand or a consumer need for what -- building materials that

10   did not grow mold.  There were talks -- talk of toxic

11   building syndrome and we had thought that we wanted to

12   continue pursuing this project because there is also a great

13   opportunity for sales and value for the company if we could

14   go into the construction products market.

15   Q   Okay.  "Barry will handle the Reedy portion of the WPC."

16           Who was Barry?

17   A   Dr. Barry Schwartz.

18   Q   Okay.  And what is the Reedy portion of the WPC?

19   A   There was a consultant that we had been working with that

20   wanted to use our products and some foamed PVC, our foamed

21   wood-polymer composite products that he was making, and that

22   Barry could take over that piece and work with Mr. Reedy.

23   Q   Okay.  "And we will drop the non-foamed project that

24   Bonnie was managing."

25           That's Bonnie Marcus?

1    A    Yes, it is.

2    Q    And what was the --

3    A    At that time --

4    Q    -- non-foamed project?  I'm sorry.

5    A    At that time, it was our thought and Dr. Schwartz's

6    thought that the foamed piece or opportunity had more benefit

7    or more opportunity for the company.

8            THE COURT:  She asked you what the foamed project

9    was.

10   BY MS. MALLOY:

11   Q    What was that?

12   A    Oh, it was also making a -- it's a foamed -- it's like

13   Trex, the wood-polymer composite or the plastic lumber.

14   There were two different ways to manufacture it, as I

15   understood, one was foaming or causing -- putting bubbles in

16   the product and the other one was just a non-foamed where

17   they just added the product straight as-is.

18   Q    Okay.  And your conclusion to Dr. Lau was,

19   "Unfortunately, we have to make a tough decision and drop

20   support of Bonnie, Roman and Erin," is that correct?

21   A    Yes, it is.

22   Q    And that's for the reasons that you have described?

23   A    Yes.

24   Q    Did you have any role in the sale process?

25   A    Yes, I did.

1    Q    When did that start and if you could describe it for us?

2    A    It started in August of 2004.  I was asked to attend

3    meetings with the banker that was representing PQ for sale up

4    in New York.

5    Q    And if you could continue to describe your role in the

6    sale process?

7    A    At that point, I was making presentations to Credit

8    Suisse in New York and then I got involved with putting

9    together the documents and the presentations that were going

10   to be given to prospective buyers of the company, and that --

11   we were preparing all those documents during this August-

12   September-October time frame.  And in October I accompanied

13   the executive management team and the bankers representing us

14   to give talks to prospective buyers here in Philadelphia for

15   a two-week period.

16   Q    And were you talking about the products, et cetera?

17   A    I was there as a resource for both Mr. Caruso and Mr.

18   Imbriani, as well as talking about some of our product

19   applications and opportunities, yes.

20   Q    Did Dr. Lau attend any of these presentations with the

21   prospective buyers?

22   A    No, Dr. Lau was not present.

23   Q    At some point was there an agreement to sell the company?

24   A    Yes.  It was announced to us, I believe some time in

25   December of 2004, that they had come to an agreement with a

1   possible purchaser.

2   Q    Okay.

3          MS. MALLOY:  Defendant's 16?

4          (Pause.)

5   BY MS. MALLOY:

6   Q    Defendant's Exhibit 16 is an e-mail string, as we call

7   them these days, but the top one is from Ms. DelMonte to Ms.

8   Kutchins dated September 23rd, 2004.

9          MS. MALLOY:  And actually, Colleen, if you could

10  please focus on the one below that on the first page, which

11  is from Ms. Kutchins to Ms. DelMonte dated September 23rd,

12  2004?

13         THE WITNESS:  I think first you meant to call me

14  Rosalyn, not Colleen.

15         MS. MALLOY:  Oh, I'm sorry.

16         THE WITNESS:  That's okay.

17         MS. MALLOY:  To Ms. Kutchins from Ms. DelMonte.

18         THE WITNESS:  Okay.

19  BY MS. MALLOY:

20  Q    Could you tell us what -- the background of what you're

21  conveying here and then we'll look at the e-mail?

22  A    This --

23         THE COURT:  Excuse me, but this purports to be from

24  this witness to DelMonte, it says.

25         MS. MALLOY:  Right, from Ms. Kutchins to Ms.

1    DelMonte.

2              THE COURT:  Yes.

3              THE WITNESS:  This was a continuation of our

4    discussion about the budgeting plan and which projects we

5    were going to support within the CD Program from a business

6    perspective.

7    BY MS. MALLOY:

8    Q    Okay.  And was it your thought that Dr. Senderov was

9    critical for the synthesis work for Nano?

10   A    Yes, it was.

11   Q    And what was that based on?

12   A    Because we were trying to make the smaller-particle

13   zeolite and he was a synthesis expert, and we were still

14   working on that at that time.

15   Q    Okay.  And your e-mail makes reference to, "Reggie is a

16   lab tech."  Could you tell us about that?

17   A    Reggie would take what -- the synthesis process that Dr.

18   Senderov would design and then take it down and manipulate

19   our pilot facility or the pots and pans to see if we could

20   actually make it in a way that it could be scaled up to a

21   full production unit.

22   Q    And what's Reggie's last name?

23   A    Thompson.

24   Q    Okay.  "As for the WPC project, Bonnie is out of the

25   picture.  Roman can assist Barry" -- Barry Schwartz?

1    A    Yes, Dr. Schwartz.

2    Q    -- "and pick up any of the formulation issues regarding

3    wood-plastic composites."

4              Was that your thought process?

5    A    Yes.

6    Q    And could you please describe that for us?

7    A    At the time, we knew that there were still some things

8    that had to be finished on wood-polymer composites in order

9    to file a patent for the product and Roman Wypart was the

10   right person to assist Dr. Schwartz to pull that together --

11   Q    Okay.

12   A    -- to get it ready.

13             MS. MALLOY:  I'm done with that document.

14   BY MS. MALLOY:

15   Q    Did you conduct any review of the R and D organization in

16   early 2005?

17   A    Yes.

18   Q    Could you please describe that?

19   A    Colleen DelMonte and I were asked to evaluate or to

20   recommend our suggestions for how we would organize R and D

21   if it were to come back to the business unit fully.  So, we

22   had put together -- I had worked on the Detergent Zeolite

23   portion of R and D and had put together a recommendation for

24   how I and the business units -- the business managers and the

25   operations manager would put together that organization.  It

1  wasn't just me alone, I had put together a group of people,

2  Dr. Barry Schwartz, Chris Seneck and Joe Dotson, who was

3  operations manager at the time, to talk about it.

4  Q   And what were your thoughts as to how you would do that

5  if R and D would report to the business?

6  A   Well, that we would have an R and D manager, we would

7  like to have seen a process engineer, someone that could

8  bridge the gap between R and D and the plants, and then some

9  technicians to help work on some of the projects, as well as

10 someone in the synthesis role.

11 Q   And what does synthesis mean?

12 A   Developing the -- actually, manipulating the molecules to

13 make them do what we want, the designing of the molecules.

14         MS. MALLOY:  Defendant's 41.

15         (Pause.)

16         MS. MALLOY:  Could you do the first page of

17 Defendant's 41?

18 BY MS. MALLOY:

19 Q   The first line is from -- an e-mail from Colleen DelMonte

20 to you, Ms. Kutchins, dated January 3rd, 2005, and the

21 preceding e-mail is from you to Ms. DelMonte, also dated

22 January 3rd, 2005.  Could you tell us further about this

23 process?

24 A   Like I had mentioned, Mr. Imbriani had asked us to go

25 through and come back with recommendations on how we would

1   reorganize R and D if it were to report into the business

2   unit and this was asking when we were going to review that.

3   Q    And if you could --

4           THE COURT:  The word "take" should be "talk," should

5   it?  Is that a typographical error?

6           THE WITNESS:  Yes, I imagine it is, sir.

7   BY MS. MALLOY:

8   Q    Are there colored organizational charts that are attached

9   to this?

10  A    Yes, there are.

11  Q    Could you turn to the fifth page which says, "DC" --

12  excuse me, "DGZ Development," at the top?

13  A    Yes.

14  Q    What does DGZ stand for?

15  A    Detergent Zeolite.

16  Q    And is that what reported to you at this time?

17  A    Yes.

18  Q    And could you describe this chart and what you were

19  recommending?

20  A    In early January, 2005, our thought process, the business

21  team's thought process, was to have a manager of Detergent

22  Zeolite Development and in that position we recommended Dr.

23  Neil Miller.  We thought also we would like to have the

24  process engineer, which I had previously mentioned, a

25  synthesis individual and then someone who would work on the

1  plastics piece of zeolite, the wood-polymer composites.

2  Q   And that would be a new position that didn't exist at the

3  time?

4  A   Yes.

5  Q   And the three names in the red box are "Ed Myszak, Romin"

6  (ph.) -- a little typo too, right?

7  A   Yes.

8  Q   -- "Wypart and Bonnie Marcus"?

9  A   Yes, that's correct.

10 Q   Were you in fact looking at those three people for that

11 potential position?

12 A   Yes.

13 Q   And what did you do, if anything, to evaluate those

14 individuals?

15 A   Not having done this before, I went to Joe Caruso, who

16 was my current boss, who at one time had managed our Human

17 Resources Group, and he had suggested that I put together the

18 business team.  And we get together and we look for the

19 criteria that we're looking for for the individual and put

20 together sort of a matrix, and then we have the group rate

21 all the individuals based on those parameters that we had

22 discussed as important for the position.

23 Q   And when you say the group, who was comprised of that?

24 A   It would have been Joe Dotson, the manager of operations;

25 Barry Schwartz and Chris Seneck.

1   Q   At this time, how long had you worked with Mr. Myszak?

2   A   I had worked with Mr. Myszak since 1992.

3   Q   And what types of positions did Mr. Myszak hold when he

4   reported to you?

5   A   Ed started out as a business development and research

6   person for our Colloidal Silicas Group working on plastic

7   flame retardants and that's when I first started working with

8   him.  I then brought him into our sales organization for

9   specialty when I was there between 1992 and 1995.

10          Mr. Myszak then went on -- when I moved to Zeolite

11  in 1995, I brought Ed with me as business development manager

12  for Detergent Zeolites where he developed a PVC application

13  and several other opportunities for the zeolite product line.

14  In 2000 and -- I think it was 2002, he came back to work for

15  me again over in the Industrial Group as business manager for

16  our Dry Products line, the position that Mr. Schwartz now

17  had.

18          I had had many years of experience with Ed.  He was

19  always very successful at commercializing projects and he had

20  a very proven track record of doing an excellent job.

21  Q   Do you hold any patents?

22  A   No.

23  Q   Was that position of plastics processing -- excuse me,

24  plastics process engineer ever created?

25  A   No.

1  Q   In May, 2005, did you look at the R and D organization

2  again?

3  A   Yes.  Mr. Imbriani, once again, had asked Colleen and I

4  to look at the R and D organization and how we would organize

5  it if there were not to be a Corporate Development Program.

6          MS. MALLOY:  P-32, please?  Which is in the binder

7  here.

8          THE WITNESS:  Thank you.

9          (Pause.)

10 BY MS. MALLOY:

11 Q   What was your -- this is a joint memo between you and Ms.

12 DelMonte, is that correct?

13 A   Yes.

14 Q   And what input did you have to this final product?

15 A   I had input on the portion that said, "Details," it's the

16 third paragraph down.

17         THE COURT:  Excuse me, you said this was a memo

18 between them; it's not, it's from them to Mr. Boyce.

19         MS. MALLOY:  That's correct.  I meant between in the

20 other sense, a joint memo prepared by them to Boyce and

21 Imbriani, that's correct.

22         THE COURT:  Okay.

23         MS. MALLOY:  If you could highlight, "Details,"

24 down, please, Colleen?

25 BY MS. MALLOY:

1  Q    That part, Ms. Kutchins, you contributed to?

2  A    Yes.

3  Q    Okay.  And why did you propose that Neil Miller continue

4  to manage the facility?

5  A    Neil Miller had been the facility manager and he was

6  doing a good job, there was no reason to change that.

7  Q    And why did you say that "ICD" -- that's Industrial

8  Chemicals?

9  A    Yes.

10 Q    -- "and zeolite developmental projects will require

11 minimal R and D personnel"?

12 A    Because at that time in May many of the projects were

13 ready to go out to the sales force to be sold.

14 Q    And this memo indicates, "Our key programs are wood-

15 polymer composites, biocides and Nano-A."  Did you believe

16 that to be true at the time you wrote this memo?

17 A    Yes.  And, as I had said back in September, two of them

18 were key projects back then as well, the Nano-A and the

19 biocides.

20 Q    Okay.  "Key personnel for those projects include Erin

21 Fisher for WPC, a portion of Ken Burgh for the bio testing,

22 and a portion of Phil Connelly plus a technician for zeolite

23 synthesis to complete the Nano-A process."

24        How did you come up with those names?

25 A    We needed Erin Fisher to do technical service testing on

1  any possible wood-composite formulations that may come up out

2  in the field.  Prior to that, I believe she was doing testing

3  on internal formulations; our intent was to use her out in

4  the field doing customer-formulation testing.

5          Let's see, what's next... Ken Burgh was finishing

6  the work on the biocides where he was actually testing each

7  one of our products in his biocide chamber to see if there

8  was any bacteria or mold growth and we needed to finish up

9  some of that.

10         Phil Connelly was in the process of taking what Dick

11 Henchey had worked on for synthesis for Nano-A out into the

12 plant environment.  We needed someone to work now translating

13 it from the synthesis bench out to actually making it at a

14 plant and that's what Phil was working on.

15 Q   And could you describe for us, what's the difference

16 between synthesis and making it at a plant?

17 A   Well, as I understood it, the synthesis engineer or

18 expert would actually design the process for making the

19 molecule and the person that was an application specialist,

20 or what Phil I understood was doing, was taking what Dick did

21 on the bench or on a lab scale and translating it out into a

22 full-production capability.

23 Q   To be sold to a customer?

24 A   To be sold, so we could make it in a plant.

25 Q   Okay.  Your memo continues, "At this time we are

1   utilizing plant personnel to continue development of Nano-A

2   process."

3           What was going on with Nano-A at this time?

4   A   Well, Nano-A, I think that we had developed the synthesis

5   piece, but when we got out to the plant we couldn't really

6   synthesize it.  So, one of our plant individuals, I think it

7   was a gentleman Dan Meko (ph.), had come up with an idea to

8   actually make the particle smaller by grinding it or milling

9   it.  So that's -- and he was at the plant in Jeffersonville,

10  so that's who we were using.

11  Q   "By next year we may be able to discontinue zeolite

12  requirements for a synthesis expert."

13          Was that your thought at the time?

14  A   Yes, it was.

15  Q   Okay.  And then we talked about Ed Myszak and his

16  experience

17          (Pause.)

18  Q   At the time you wrote this memo, which is dated May 16th,

19  2005, had you already decided what would be the key projects

20  from the business unit perspective?

21  A   Yes, we had.

22  Q   When --

23          MS. MALLOY:  I'm done with this memo.  Thank you,

24  Colleen.

25  BY MS. MALLOY:

1   Q    When did you learn that funding for the Corporate

2   Development Program would be eliminated?

3   A    The day of the RIF.

4   Q    And that's May 25th of 2005?

5   A    Yes.

6   Q    And who made that decision?

7   A    Mr. Boyce.

8   Q    After the layoff in May of 2005, did your business unit

9   get any additional funding?

10  A    Oh, no, we had no more money.

11  Q    Was R and D aligned to report to the business units?

12  A    Yes, it was.

13  Q    What, if any, commercial work was done on wood-polymer

14  composite after the May 25th layoff?

15  A    Do you mean sales?

16  Q    Whatever work -- whatever work was done.

17  A    I believe the patent had to be finished at that time, and

18  I think Ed Myszak was working on the patent and I believe he

19  was working with the plaintiffs, they were helping with the

20  patent as well.  And we wanted to make sure that we had filed

21  the patent before we went out into the marketplace with it to

22  protect our commercial position or a sales position from

23  competition.

24  Q    What happened to the wood-polymer composite, did it ever

25  get to a customer?

1   A    It eventually was taken to a customer where the customer

2   incorporated it in some of their products, but we had a

3   disastrous failure when the -- this was for that Trex-type

4   board -- where they made the board using our product and

5   there was a test that had not been performed on our suggested

6   formula and boards absorbed water; it became mushy, it sucked

7   up water.  So, if they were to make a deck out of it and it

8   rained, it would have absorbed water.

9   Q    Was that a surprise?

10  A    That was a big surprise.

11  Q    What if any work was done on the biocides project after

12  the layoff?

13  A    After the layoff, we finished the chamber results, Dr.

14  Burgh finished those, and then we worked on the EPA

15  registration for the Silver Zeolite to get that registered.

16  Q    Was that a product that was ever sold?

17  A    No, we never sold that either.  That was a product that

18  we had developed hoping that we could make it at the plant in

19  conjunction with two other products that we were going to

20  make and we needed all three of them to make the investment

21  worthwhile and, when the other two fell apart, the other two

22  zeolite products, we were not able to get the customer to

23  sign the contract, we couldn't justify spending the money to

24  make the Silver Ray.  And then we had another technical

25  problem, our Silver Zeolite turned everything black and no

1   one would want to use a product that turned everything black.

2   Q    Were we ever able to sell anything coming out of the

3   biocides project?

4   A    No.

5   Q    What happened to Nano-A?

6   A    Nano-A, after we made the milled product at the plant, I

7   personally took a sample of the product to Unilever in

8   Edgewater, New Jersey for them to try it in their liquid

9   laundry product.  They were pretty excited about getting it.

10  And then they ran it through all their formulations and they

11  were unable to make it work within their liquid laundry

12  formulations.  So, we were never able to sell any there

13  either.

14  Q    And how about PVC?

15  A    PVC we continue to sell today and it's sold through our

16  sales force, and there hasn't been any huge growth in that

17  market, it's running at about the same level it was back in

18  1995.

19  Q    Okay.  After the announcement of the layoffs in May of

20  2005, did you attend a lunch with Ms. Marcus, Ms. Fisher and

21  Mr. Myszak?

22  A    At first I thought I hadn't, but then, after thinking

23  about it, I went back and I checked expense reports, and I

24  had indeed.  And I believe I called you to tell you that I

25  needed to change my testimony in my deposition that I indeed

1   did have a lunch.

2   Q    You did have a lunch.

3        Did you say at this lunch along the lines of it was

4   time for Ms. Marcus to move on graciously and leave the door

5   open for younger employees or younger employees like Ms.

6   Fisher?

7   A    No, I did not say that.

8   Q    May I ask you how old you are?

9   A    I will be 59 next month.

10  Q    Okay.

11       MS. MALLOY:  I have nothing further.

12       (Pause.)

13                    CROSS-EXAMINATION

14  BY MR. GOLDSHAW:

15  Q    You were the head of a business unit at the time of the

16  2005 reduction in force, correct?

17  A    I was director of marketing.

18  Q    Was that the head of a business unit?

19  A    No.

20  Q    Were you involved in the business units?

21  A    Yes.

22  Q    Okay.  I would like you to please take a look at what has

23  already been admitted into evidence as Exhibit P-288.  It is

24  a sworn answer that PQ has provided to the question, "Set

25  forth in full detail the reason or reasons why PQ eliminated

1  Ms. Marcus' position."

2  A   Could you tell me where that is, please?

3  Q   It's the exhibit under Tab 288, I'll also read it.  "Set

4  forth in full detail the reason or reasons why PQ eliminated

5  Ms. Marcus' position."

6          PQ's sworn response.  "PQ decided to eliminate

7  funding from the corporate holding company which supported

8  the research and development conducted by Corporate

9  Development Program, CDP.  The business units were then

10 authorized to determine what, if any, research-and-

11 development projects would continue to be funded by the

12 business units.  As a result of this process, the funding for

13 the research-and-development projects which Ms. Marcus was

14 overseeing was virtually eliminated and her position was no

15 longer needed."

16         Are you familiar that that is PQ's position as

17 stated in their sworn documents in this case?

18 A   I have never seen this document but, if it says it here,

19 it must be.

20 Q   I would now like to ask you to look at the sworn position

21 in response to Roman Wypart, Exhibit P-290.  Take your time.

22 Let me know when you've had a chance to read it to verify for

23 yourself that the reasoning for the elimination of his

24 position was based on the same two events as stated here for

25 Ms. Marcus.

1          (Pause.)

2    Q    Okay?

3    A    Yes.

4    Q    As a person in the business units, isn't it true that you

5    know firsthand that the explanation PQ has offered in this

6    statement is simply not the truth?

7    A    This is the truth.

8    Q    Isn't it true that the business takeover of the CD

9    projects was not even connected with the reduction in force?

10   A    Yes, it was.

11   Q    You're saying it was connected?

12   A    No, the CD Program was -- the decision to eliminate the

13   CD Program came from Mr. Boyce.

14   Q    My question is, was the business takeover of the CD

15   projects connected with the reduction in force or not?

16   A    One more time.  Can you -- just one more -- I just need

17   you to one more time ask me the question.

18   Q    Do you understand that this document is referring to a

19   process by which the business units would decide which of the

20   CD projects to pick up, correct?

21   A    Oh, okay, okay.  I understand what you're asking now.

22   Yes, the business --

23   Q    And this --

24   A    -- the business units did make a decision of which

25   projects they would pick up, yes.

1   Q   And my question is, isn't it a fact that that decision

2   was not even connected with the reduction-in-force decisions

3   in which the plaintiffs were terminated, is that true or not?

4   A   I still don't under -- I'm sorry, I must be dense, I

5   don't understand what you're asking me.

6   Q   Is there any relationship between the actual termination

7   of the plaintiffs and the other older workers in the

8   reduction in force and the business takeover of the CD

9   projects?

10  A   The business took over the projects, the positions were

11  no longer required, that's all I can say, and they were part

12  -- as far as I assume, I guess they were part of the

13  reduction in force.

14  Q   Let's do it this way.  You've given prior sworn testimony

15  in 2004 at your deposition, right?

16  A   Yes.

17  Q   I'm going to read for you some of your testimony, it's on

18  Page 460.  It's brief.

19          (Pause.)

20  Q   Do you need a moment to get there?

21  A   Yes, thank you.

22  Q   Page 460.

23          (Pause.)

24  Q   Question:  "To your understanding was the business

25  takeover of the CD projects connected with the 2005 reduction

1    in force"?

2          Your answer, "No."

3          You gave that testimony, correct?

4    A   Okay, yes.

5    Q   Okay.  And isn't it a fact that PQ didn't even decide

6    which projects to continue until after the plaintiffs were

7    already fired?

8    A   No, we had made recommendations of which projects we

9    wanted to continue before then.

10         THE COURT:  But the decisions had not actually been

11   made at that point?

12         THE WITNESS:  No, the decisions had not been made --

13   well, I didn't know the decisions had been made.

14   BY MR. GOLDSHAW:

15   Q   Are you aware that Colleen DelMonte, who you co-authored

16   the P-32 memorandum with, has testified that those decisions

17   were not made --

18         MS. MALLOY:  Your Honor --

19   BY MR. GOLDSHAW:

20   Q   -- until after --

21         MS. MALLOY:  -- her recollection of somebody else's

22   testimony is not relevant.

23         THE COURT:  If that's an objection, it's overruled.

24         Go ahead.

25         THE WITNESS:  You will have to --

1  BY MR. GOLDSHAW:

2  Q   Are you aware that Colleen DelMonte, who you co-authored

3  the memo recommending the plaintiffs' terminations, has given

4  testimony that those events did not occur until after the

5  plaintiffs had already been fired?

6  A   I don't know which event -- you have to -- which events?

7  I'm sorry.

8  Q   The decision on which CD projects to continue, according

9  to earlier testimony by Colleen DelMonte, was not made until

10  after the plaintiffs were already fired?

11  A   I did not think that was the case.  I thought we had made

12  the decision which projects we were going to follow first.

13  Q   So, you're disagreeing with that testimony as stated by

14  Colleen DelMonte?

15  A   Yes.

16  Q   Okay.  It was at the time of the reduction in force that

17  you made a decision to give Ed Myszak the position of Zeolite

18  R and D manager, correct?

19  A   Yes.

20  Q   And there were three candidates for that position, Ed

21  Myszak and the two plaintiffs, correct?

22  A   Yes.

23  Q   And the parties have stipulated that Ed Myszak was the

24  youngest of the three, Bonnie Marcus was 60, Ed Myszak was 54

25  and Roman Wypart was 56.

1          In the process of choosing between the three

2     candidates, did you ever look at Ms. Marcus' annual

3     performance reviews?

4     A    No.

5     Q    Did you ever look at Mr. Wypart's performance reviews?

6     A    No, those were all between them and John Lau, their

7     manager.

8     Q    Did you ever talk to John Lau, their manager, about their

9     candidacy for the position that you were considering?

10    A    No.

11          THE COURT:  Did you say yes or no?

12          THE WITNESS:  No, we did not talk to --

13          THE COURT:  Then when -- when you say no, you're

14    nodding your head, it's a little hard --

15          THE WITNESS:  Oh, I'm sorry.

16          THE COURT:  -- to hear which way you mean it.

17          THE WITNESS:  I'm sorry.

18    BY MR. GOLDSHAW:

19    Q    Isn't it true that the reason you did not talk to Bonnie

20    Marcus' manager, John Lau, was because you knew that he was

21    very, very high on Ms. Marcus?

22    A    Yes, John was very high on Mrs. Marcus.

23    Q    And you didn't want to hear any of that when you were

24    deciding the position that she was applying for?  She was 60

25    at the time?

1   A    We were looking at it from a business perspective and the

2   input that we were getting was from the people that had

3   worked on the projects, Mr. Seneck and Dr. Schwartz, who had

4   worked on the projects, and we were evaluating it from a

5   commercial or a business perspective.  So, no, we did not go

6   to Dr. Lau.

7   Q    And none of those people that you just mentioned were the

8   people who were actually Bonnie Marcus' manager, right --

9   A    That's --

10  Q    -- the people you got the input from?

11  A    -- that's correct, but they had worked with her and Mr.

12  Wypart on the projects, but they were not her supervisor, no.

13  Q    Please take a look at what's been marked as Plaintiffs'

14  Exhibit 35.

15          (Pause.)

16  Q    That's now being displayed on the easel as well.

17          This exhibit, P-35, was a document that you created

18  in the process of evaluating Bonnie Marcus, Roman Wypart and

19  Ed Myszak for the position that Ed Myszak was given at the

20  time of the reduction in force, correct?

21  A    Yes, it is.

22  Q    Let's take a look -- let me first ask you generally,

23  isn't it true when filling out this evaluation sheet that you

24  weighted it against the oldest candidate, Bonnie Marcus, and

25  the second-oldest candidate, Roman Wypart, and you biased it

1  in favor of the others --

2  A   No, that's not true.

3  Q   Let's take a look at the category, "Presentation Skills."

4  You gave Bonnie Marcus a 2, correct?

5  A   The group.  You have to realize this is an average score

6  of four people; I may have given her a high mark, but someone

7  else may have given her a 1 or a 2.

8  Q   The document says a 2, correct, for presentation skills?

9  A   Yes, as an average.

10  Q   Out of 5?

11  A   Yes.

12  Q   And you knew firsthand that, in your words, Bonnie Marcus

13  was an excellent presenter, correct?

14  A   Yes, I thought she was an excellent presenter.

15  Q   If you thought she was an excellent presenter, why did

16  you give her a 2 out of 5?

17  A   Because I wasn't the only one inputting this and other

18  people did not share my opinion.

19  Q   You're the one who made the recommendation for -- made

20  the recommendation to Michael Boyce that Ed Myszak get the

21  position, right?

22  A   I and the team, yes.

23  Q   Were you basing it on information that you personally

24  knew was not accurate about Bonnie Marcus?

25  A   No.

1    Q   Let's take a look at the category of "Patents."  Do you

2    see it on the document, "Patents"?

3    A   Yes.

4    Q   Okay.  Ed Myszak got a 4, right?

5    A   Yes.

6    Q   Bonnie Marcus ranked just one above it, a 5, correct?

7    A   Yes.

8    Q   At the time, Bonnie Marcus had 30 times the number of

9    patents as Ed Myszak, right?

10   A   She had considerably more, yes.  But patents alone wasn't

11   just numbers, it was commercialization of the patents, and

12   the group or the people knew that Ed Myszak had

13   commercialized maybe the one patent he had and generated

14   sales for the company.

15   Q   That's not the explanation you gave at the time of your

16   deposition, is it?

17   A   I don't recall.

18   Q   I'll help you recall.  Please take a look at Page 297 of

19   your deposition.

20            (Pause.)

21   Q   Please tell me when you're there.

22   A   Okay, I'm getting there.

23   Q   Question:  "Going to the next ranking" --

24   A   Could you tell me --

25            MS. MALLOY:  Can you give her the line, please?

1          THE WITNESS:  -- which line are you on, please?

2          MR. GOLDSHAW:  16.

3          THE WITNESS:  16, thank you.

4   BY MR. GOLDSHAW:

5   Q    Question:  "Going to the next ranking, which is patents,

6   why was that perceived to be a relevant qualification?"

7          Answer:  "One of the group put that on the list, I

8   can't remember who it was, it was just a sign of innovation."

9          Question:  "And do you recall how that -- how it was

10  determined how to rank people along that metric?"

11  A    Mm-hmm.

12  Q    Answer:  "I think it was mostly just general knowledge

13  from the people we were working -- that we were working with

14  then is how many patents they had, their talk.  The

15  information that Bonnie shared about I have a patent in this,

16  I have a patent in that, Roman talking about patents.

17         "Was there ever -- was there any -- was there any

18  endeavor to actually -- that's obviously an objectively

19  verifiable --"

20         Answer:  "No, it was anecdotal, all based on

21  people's impressions of talking to them."

22         If you wanted to rate Bonnie Marcus and Ed Myszak

23  comparatively on patents and it's easily objectively

24  verifiable, why didn't you just ask them how many patents

25  they had?

1   A    I don't know, we didn't --

2   Q    Is it --

3   A    -- we didn't.

4   Q    -- was it because you were afraid that the information

5   you would obtain would force you to give a higher ranking to

6   the 60-year-old candidate?

7   A    No, we just didn't do it.  It had nothing to do with

8   ranking anybody by age.

9   Q    Let's take a look at Roman Wypart then, he actually

10  ranked lower than Ed Myszak in patents, right?

11  A    That was the perception of the group, yes.

12  Q    At the time he had seven times the number of patents of

13  Ed Myszak, correct?

14  A    I guess, if you say so; we didn't ask.

15  Q    You ranked Roman Wypart lower than Ed Myszak, but you

16  didn't ask to find the information you used to rank?

17  A    No, we didn't on this one.

18  Q    As to the -- would you agree that most of the categories

19  you used on this evaluation tool are purely subjective and

20  there's no objectively verifiable way to rank?

21  A    They were all based on people's -- the group's work and

22  experience for the people that we were evaluating.

23  Q    Bonnie Marcus, you contend, was supported by a Detergent

24  Zeolite cost center?

25  A    That's what I thought, yes.

1   Q    The Detergent Zeolite cost center was within Michael

2   Imbriani's group, correct?

3   A    Yes, it was.

4   Q    And it was Michael Imbriani who directed that that cost

5   center supporting Bonnie Marcus and one other employee in his

6   60s, Dick Henchey, be cut, correct?

7   A    Yes, he said that we no longer could afford the funding

8   based on the cost situation within the business, yes.

9   Q    And my question specifically is asking, that was Michael

10  Imbriani's decision, right?

11  A    He's the one directed me that -- he's the one that said

12  we can longer afford this funding, yes, he was.

13  Q    And the two employees that that cost center supported

14  were both in their 60s at the time, correct?

15  A    I don't know if he knew that, but, yes, they were.

16  Q    Now, the Detergent Zeolite funding we're discussing was

17  used to support the plants in Asia?

18  A    That's how I understood it.  I had just taken the

19  business back recently and that's what I thought that they

20  were doing, that they were helping the Asian plants, yes.

21  Q    And the work that was being done was being done by two

22  employees in their 60s, Bonnie Marcus and Dick Henchey,

23  right?

24  A    Yes.

25  Q    Now, after the RIF that work didn't stop, did it, it was

1   just given to an employee in his 40s, Phil Connelly, right?

2   A   I was under the impression that we weren't going to do

3   anything more for the Korean and Thai facilities, I don't

4   know if there was work continued.

5   Q   You're aware, are you not, that PQ has given sworn

6   statements stating that Phil Connelly, in his 40s, took over

7   the Detergent Zeolites work being done by Bonnie Marcus and

8   Dick Henchey at the time of the reduction in force?

9   A   I had not seen that document; now I'm aware of it, but I

10  wasn't at the time.

11  Q   Do you believe that the sworn statement PQ has provided

12  in that regard is incorrect or correct?

13  A   It's probably true if they gave it.

14  Q   You gave some testimony regarding information you learned

15  on projects after the RIF, I think it was from Unilever, is

16  that right?

17  A   Yes.

18  Q   You didn't have that information at the time that you

19  recommended the termination of the plaintiffs to the CEO,

20  correct?

21  A   No, no, we were --

22  Q   So, what --

23  A   -- we were finishing it, we were going out to the plant

24  to make the product.  We had already designed the product, we

25  just had to make a sample of it, from what I understood, to

1  take it to Unilever.

2  Q   So, whatever you learned from Unilever in that regard had

3  nothing to do with the decision to terminate the plaintiffs,

4  correct?

5  A   No, no.

6          THE COURT:  You mean that is correct?

7          THE WITNESS:  That is correct.

8  BY MR. GOLDSHAW:

9  Q   Would you agree that in general you had very little idea

10  of what the employees in R and D were actually doing on a

11  day-to-day basis before the reduction in force?

12  A   Yes, I did not know their day-to-day operations.

13  Q   For example, you would have no clue as to what Eric

14  Senderov was actually doing, correct?

15  A   No.  I assumed he was working on the projects that he was

16  assigned to, but I didn't know day-to-day what he was doing,

17  no.

18          THE COURT:  Could you not know it a little bit

19  louder, please?

20          THE WITNESS:  I'm sorry.

21  BY MR. GOLDSHAW:

22  Q   You didn't know what Plaintiff Bonnie Marcus was doing

23  day-to-day, correct?

24  A   No, I did not.

25  Q   And as far as Plaintiff Roman Wypart, whatever he was

1   doing was handed over to Ed Myszak or somebody else at the

2   time of the RIF?

3   A    Yes, it was.

4   Q    And you aren't able to explain a reason why Phil Connelly

5   was kept as a synthesis expert over Dick Henchey or Eric

6   Senderov, who were in their 60s, correct?

7   A    No, I don't know anything about why he was kept in that

8   position.

9   Q    You would agree that the 35-year-old Erin Fisher who was

10  retained would be in the best position to know what she took

11  over of Roman Wypart's work after he was fired?

12  A    I don't know what she took over that was Roman's.  I

13  thought she was a technician doing --

14          THE COURT:  But she would know whether she did or

15  not?

16          THE WITNESS:  She would know, not me.

17  BY MR. GOLDSHAW:

18  Q    Referring now to the e-mails in September that you were

19  involved in with Michael Imbriani, John Lau, Colleen DelMonte

20  that was shown to you during the examination by Liz Malloy?

21  A    Okay.

22  Q    All of those e-mail communications regarding the budget

23  happened after Mr. Imbriani had expressed his views to you

24  when telling you to discriminate on the basis of age, right?

25  A    In what time frame?

1  Q   By the time of all those e-mails you discussed on the

2  budget, that happened after Imbriani had already ordered you

3  to engage in age discrimination against Ed Myszak, right?

4  A   Yes.

5            MR. GOLDSHAW:  I have nothing further.

6            MS. MALLOY:  I have nothing, your Honor.

7            THE COURT:  You may step down -- oh, before you do,

8  you made some presentations to prospective purchasers when

9  the company was up for sale?

10            THE WITNESS:  Yes.

11            THE COURT:  Did any of those presentations deal with

12  the relative profitability of the company, what its balance

13  sheet looked like and that sort of thing?

14            THE WITNESS:  Yes, all the financials were included,

15  but I did not present that part, but I was there for the

16  presentation, yes.

17            THE COURT:  Was there any discussion of the

18  possibility of reducing the workforce at that point?

19            THE WITNESS:  Not that I recall in the

20  presentations, no, sir.

21            THE COURT:  Thank you.  You may step down.

22            (Witness excused.)

23            THE COURT:  We'll take a recess until 1:45 this

24  afternoon.  Don't eat too much, but eat enough.

25            (Laughter.)

1           THE COURT:  We'll recess until then.

2           (Jury out at 12:20 o'clock p.m.

3           (Luncheon recess; 12:20 to 1:48 o'clock p.m.)

4           THE COURT:  Good afternoon.

5           ALL:  Good afternoon, your Honor.

6           THE COURT:  What is the current problem?  Be seated,

7    everyone.  Somebody had a problem?

8           MS. EYER:  Yes, your Honor.  We -- the next witness

9    is the subject of a motion in limine by plaintiff, this is

10   defendant's damages expert.  She relies in her estimates on

11   assumptions about Ms. Marcus' mitigation efforts and the

12   underlying data that she relies on is not data that is at all

13   relevant to whether Ms. Marcus properly mitigated and we

14   believe it would be --

15          THE COURT:  And therefore --

16          MS. EYER:  -- highly misleading to the jury.

17          THE COURT:  -- therefore the jury should not pay

18   attention to her testimony, right?

19          MS. EYER:  I mean, we certainly have -- you know, I

20   think it would be acceptable for her to testify that these

21   estimates are subject to the jury's determination as to

22   whether or not Ms. Marcus mitigated, but the actual

23   explanation she provides for the -- she attributes a

24   fictional salary to Ms. Marcus and she bases that on data

25   that has absolutely no relevance, she had not identified a

1    single job in the Zeolites industry that Ms. Marcus should

2    have applied for.

3              THE COURT:  Ah, how dare you present such an expert?

4              MR. ENNIS:  Your Honor, Ms. Marcus, as she has

5    testified, is much more than a zeolite expert and she is an

6    economist.  So, she looks at the number of jobs in this

7    field, in this area, how long.  And so it's -- I think it's

8    pretty standard testimony.

9              THE COURT:  If that was an objection, it's

10   overruled.  Let's hear the witness.

11             MR. ENNIS:  And then the final --

12             THE COURT:  You can cross-examine to your heart's

13   content.

14             MR. ENNIS:  The final issue with this witness is

15   they have -- the plaintiffs have provided reports done by the

16   witness' firm in the past and the reports are based upon

17   files that the witness doesn't have.  So, they're going to

18   use past reports to cross-examine the witness based upon

19   information she doesn't know, which I think is highly

20   improper.

21             MS. EYER:  And, respectfully, your Honor, the

22   witness signed those reports, we certainly should be able

23   to --

24             THE COURT:  Ah-hah.

25             MS. EYER:  -- examine her as to inconsistencies in

1 | her methodology.

2 | MR. ENNIS:  Yes, she did.  In 2006, she signed the

3 | report and with a whole file behind it, which -- and, by the

4 | way, she signed the report on behalf of the plaintiffs and so

5 | -- but they don't give us the file, they just give us a

6 | report.

7 | MS. EYER:  These are publicly available reports, we

8 | got them off of Westlaw.

9 | THE COURT:  Do you have anything that they want that

10 | you haven't shown them?

11 | MS. EYER:  They have not asked us for any

12 | information.

13 | THE COURT:  He's just asking for it.

14 | MR. ENNIS:  Yes, the whole file that led to the

15 | report.

16 | MS. EYER:  Respectfully, your Honor, they've never

17 | mentioned this once before this very moment.  So, we don't

18 | have any basis for --

19 | THE COURT:  I think you people deserve each other.

20 | Sit down, we're going to hear the witness.  Go ahead.

21 | Bring in the jury.

22 | (Pause.)

23 | (Jury in at 1:50 o'clock p.m.)

24 | THE COURT:  Good afternoon.  Everybody be seated

25 | comfortably and proceed.

1        MR. ENNIS:  PQ calls Dr. Pia DiGirolamo.

2        (Pause.)

3        THE COURT:  I believe you have a wandering witness.

4        MR. ENNIS:  Yes.  Come up.

5        (Pause.)

6        PIA DiGIROLAMO, Defendant's Witness, Sworn.

7        THE DEPUTY CLERK:  Please be seated.  State your

8   full name and spell your last name, please.

9        THE WITNESS:  My name is Pia DiGirolamo.

10        THE COURT:  How do you spell it?

11        THE WITNESS:  It's P-i-a D-i-G-i-r-o-l-a-m-o.

12        MR. ENNIS:  Pia is your first name?

13        THE WITNESS:  Yes.

14        THE COURT:  And your last name begins with a D, as

15   in dog?

16        THE WITNESS:  Yes.

17        THE COURT:  Thank you.

18                    DIRECT EXAMINATION

19   BY MR. ENNIS:

20   Q   And, Doctor, you're here to present expert testimony on

21   Ms. Bonnie Marcus' damages, is that correct?

22   A   That is correct.

23   Q   And can you tell the jury your educational background?

24   A   Sure.  Hold on one second.

25   Q   And, by the way, be sure to speak into the mike and you

1  can lower that, if it would be helpful.

2  A    I received my undergraduate degree in economics,

3  quantitative economics, from Universita Federico Secundo of

4  Naples, Italy.  I also received my Master's in public

5  administration and finance from Universita Federico Secundo

6  of Naples, Italy.

7        THE COURT:  You keep dropping your voice when you

8  get to the important part.

9        (Laughter.)

10        THE COURT:  University of what?

11        THE WITNESS:  Federico Secundo of Naples, Italy.

12  Sorry.  Then I received my Master's --

13        MR. ENNIS:  Doctor, you know what, if you pull that

14  mike towards you, I think it will work better, and speak into

15  it --

16        THE WITNESS:  Can --

17        MR. ENNIS:  Yes, there we go.  Like, look out

18  straight towards me, if it would help.

19        THE WITNESS:  Sure.  Then I received my -- ah,

20  that's better -- then I received my Master of Science in

21  economics from Purdue University, Indiana; and then I

22  received my PhD in economics from also Purdue University,

23  Indiana.

24  BY MR. ENNIS:

25  Q    And what does it take to get a PhD in economics?

1  A    Too much work.

2           (Laughter.)

3  A    It takes a serious amount of classes.  It's necessary to

4  pass core classes in economics, so General Principles in

5  Microeconomics, Macroeconomics, multiple fields.  It's

6  necessary to teach economics, it's necessary to pass

7  preliminary exams, and, most important of all, it's necessary

8  to get a thesis research concept approved and then a thesis,

9  the final thesis approved for publicability (sic), for

10 publication from the academic committee.  In other words,

11 it's necessary to prepare an original and unpublished idea,

12 develop it and write three papers.  That's what my thesis was

13 about, it was about preparing three separate papers, and have

14 the academic committee of Purdue approve those papers.

15 Q    And have you won any awards?

16 A    Yes.  I won multiple teaching awards for outstanding and

17 distinguished teaching, and I won the CIBER, which is the

18 Center for International and Business Education and Research

19 Dissertation Award.  It's an award that gives you one year

20 for free with the PhD.  During the PhD, I had to teach to

21 support myself and to pay my tuition and it was fully paid by

22 my teaching, but for one year I received this award, which is

23 an award that all the PhD students compete to, and then it's

24 given to some, and it allows you to just work on your

25 research without distractions and totally paid.

1  Q    And you'll make sure you speak slowly.

2  A    I will try.

3  Q    All right.  Can you tell us your professional background?

4  A    Yes.  I worked as a fixed-income research intern and

5  economic research assistant for Merrill Lynch at the World

6  Financial Center in New York.  I also worked in the capacity

7  of instructor of economics at Purdue University teaching my

8  -- teaching undergraduates.  I used to teach classes of 55

9  students per semester on average.  And I also provided

10 research support -- not my research, it was research for

11 another professor, and I helped him with the data and the

12 research for his own paper.  So, it was research and I was

13 paid as a researcher.

14        Then I worked -- I have been working as -- sorry --

15 a forensic economist.

16 Q    For whom?

17 A    For the Center for Forensic Economic Studies.

18 Q    And how long have you held that position?

19 A    Since September, 2004.

20 Q    And can you tell the jury what is a forensic economist?

21 A    Sure.  An economist -- a forensic economist is an

22 economist.  So, somebody who by education and training is an

23 economist and uses the fundamentals of economics, uses the

24 economic knowledge that he or she has to apply that to cases

25 that pertain to the legal arena.  In other words, if there is

1    a case that goes to court and somebody needs economic

2    calculation and analysis, an economist, by training, uses his

3    training to perform the analysis in cases that go to court.

4    And as a forensic economist I work on business valuations, so

5    commercial cases, employment cases like today, and personal

6    injury and wrongful death cases.

7    Q    And does your firm represent both plaintiffs and

8    defendants?

9    A    Yes.  We receive -- we are contacted and we receive work

10   by both plaintiff and defendants.

11   Q    And can you give us an estimate of the approximate

12   percentage?

13   A    It's approximately 50-50.

14   Q    And have you testified in court before?

15   A    Yes.

16   Q    On multiple occasions?

17   A    Yes.

18   Q    And Federal and state courts?

19   A    Yes.

20   Q    And what jurisdictions?

21   A    Multiple; Pennsylvania, Maryland, Massachusetts, New

22   York, New Jersey, D.C., Georgia and Texas.  I have to read, I

23   don't remember.

24   Q    Okay.

25   A    Yes, these ones.

1        MR. ENNIS:  I would move Dr. DiGirolamo as an

2   expert, subject to any cross-examination.

3        MS. EYER:  We have several voir dire questions, your

4   Honor.

5        THE COURT:  Go ahead.

6                   VOIR DIRE EXAMINATION

7   BY MS. EYER:

8   Q    I apologize if I mispronounce your name.  It's

9   DiGirolamo, is that correct?

10  A    Yes.

11  Q    Dr. DiGirolamo, are you a vocational expert?

12  A    No.

13  Q    And do you know what a vocational expert is?

14  A    Uh, I encounter vocational expert's reports in cases

15  where people get hurt and the vocational expert provides a

16  report to identify what is the ability of that person to do

17  as a job given that that person is hurt.

18  Q    So, it's to look at the availability of jobs in the labor

19  market?

20  A    No.  A vocational expert doesn't do -- that would be --

21  that is something that vocational experts also do, but the

22  availability of labor -- of jobs in the labor market is also

23  and, more importantly, an expertise of a labor economist.

24  What --

25  Q    Let me -- I apologize.

1   A    What a vocational expert does is he looks into that, but

2   that -- then he considers, if a person is hurt, what that

3   person can do as a job.

4   Q    Do you have any knowledge or expertise relating to the

5   availability of jobs in the zeolite field?

6   A    I am not an expert in zeolite; I can analyze the labor

7   market, but I am not an expert in zeolite.

8   Q    Do you have any expertise in the labor market for people

9   who are in the zeolite field?

10  A    Uh, no, I have not been qualified as an expert in the

11  zeolite field, no.

12  Q    Do you in your expert opinion identify any actual job

13  openings in the zeolite field in the Philadelphia area since

14  2005?

15  A    To identify zeolite jobs or any jobs since 2005

16  specifically, any specific job, I would have had to consider

17  in 2005, I would have had to go on the --

18          THE COURT:  Well, her question is did you?

19          THE WITNESS:  Oh, no.  I'm sorry.

20          MS. EYER:  Your Honor, on the basis of this voir

21  dire, we would object to the proffer of any testimony by this

22  witness as to Ms. Marcus' mitigation efforts on the grounds

23  that she has no knowledge or expertise in the area.

24          THE COURT:  Objection overruled.

25          (Pause.)

CONTINUED DIRECT EXAMINATION

BY MR. ENNIS:

Q   Doctor, did you do an analysis of the damages, financial

damages suffered by Ms. Marcus in this case?

A   I did.

Q   And can you tell the jury what you considered in

performing that analysis?

A   Sure.  I considered multiple documents that pertained to

this specific case, including but not limited to the

deposition, the pleadings --

          THE COURT:  You're getting away from the microphone

again, you're turning away.

          THE WITNESS:  I'm sorry.  I considered multiple

documents, including but not limited to the deposition, for

example --

BY MR. ENNIS:

Q   The deposition of Ms. Marcus?

A   Ms. Marcus' depo -- Mrs. Marcus' deposition --

Q   Yes.

A   -- yes, I apologize; I considered her personnel file; I

considered the documents that were specific to this case.

          I also reviewed Government studies, publications by

the Government, by the Bureau of Labor Statistics, by the

Census, and I reviewed Bureau of Labor Statistics Web site

and publications and data.  And also I reviewed publications

1    published in journals in the economic field.

2    Q   Okay.  And then, taking that information, did you then do

3    an analysis of the damages suffered by or incurred by Ms.

4    Marcus?

5    A   I did.

6    Q   Okay.  And can you tell the jury, just explain to the

7    jury the process you went through to do that analysis.

8    A   Sure.  In order to provide an analysis, I first reviewed

9    all the documents, and I had to answer questions.  The first

10   question was, as of June, July, the summer of 2005, what was

11   the situation of the labor market in the Philadelphia

12   Metropolitan area?  The second question was, how many people

13   were unemployed?  How much availability of jobs was there?

14   How much availability of jobs was there in the field of

15   expertise of Mrs. Marcus.  The third question was, how much

16   money do people in her field and her occupation make in that

17   market?  And the fourth question is, once we identify how

18   long it takes in that market to get a job and how much money

19   it takes, how much money a person who gets a new job makes,

20   how long does it take to catch up?  In other words, how long

21   does it take to put the person on their feet?

22          And these are many questions and I had to answer to

23   each one of them separately by looking at statistical studies

24   and Government publications and economic publications.

25   Q   All right.  And I think you said that there were four

1   questions.  So, let's just go through the four questions and

2   the first one, I think you said, was how long someone would

3   be unemployed as of July of 2005?

4   A   Correct.

5   Q   And can you tell the jury how you went about determining

6   that?

7   A   Sure.  In order to identify the market in 2005, I looked

8   at the Government study, the Bureau of Labor Statistics.  The

9   Bureau of Labor Statistics provides data for every month of

10  every year of duration of unemployment.  In other words, if

11  somebody loses a job, how long does it take to get a job?

12  The median time, which means about 50 percent of the people,

13  is eight weeks.

14  Q   How many?

15  A   Eight weeks.

16  Q   Eight.

17  A   Eight.

18  Q   Okay.

19          THE COURT:  Is this for all jobs of every kind?

20          THE WITNESS:  Yes.

21          THE COURT:  What's that got to do with anything?

22          THE WITNESS:  That is a lower level and then I

23  continued to look into other -- into other numbers, that is

24  eight weeks for the median.  Then for all jobs it takes about

25  15 weeks, on average, and then it takes 27 weeks for 82

1    percent to get a job.

2         Then, in order to identify in the specific field of

3    scientific -- professional scientific technical services, I

4    looked --

5    BY MR. ENNIS:

6    Q   Let me just stop you there.  So, for 82 percent of the

7    people it takes 27 weeks to find a job?

8    A   Correct.

9    Q   Okay.  And this was back in July of 2005?

10   A   Correct.  In July of 2005, about 83 percent, 82.7 percent

11   of the people who were unemployed had a job within 27 weeks.

12   Q   Okay.

13   A   Then I looked at the scientific field -- oh, and --

14   sorry, I forgot -- it is important also to say that in the

15   metropolitan area -- these are national numbers; however, the

16   percentage of unemployment in Philadelphia area is similar,

17   if not slightly lower, than the unemployment percentage, the

18   unemployment rate in 2005 and up to today in the country.

19   So, the general number for the country applies -- there is no

20   reason to assume that it wouldn't be consistent with the

21   area.

22        Then I looked at the specific field.  When I looked

23   at the specific field, I had to identify how many jobs would

24   be available in the field of Mrs. Marcus.  So, I looked at

25   the Bureau of Labor Statistics, I looked at chemist jobs and

1  industrial production manager jobs.  There were about 6,400

2  individuals having those jobs and I calculated --

3  Q   And, I'm sorry, 6,400 in what geographic area?

4  A   Philadelphia, Camden, Wilmington statistical metropolitan

5  area.

6  Q   Okay.

7  A   These are jobs that are out there.  To identify how many

8  jobs were available, I used another statistical study by the

9  Government, which is median tenure; it tells you how many

10  years in a certain field do people stay in a certain job and

11  the median tenure is about six years.  So, I did some

12  mathematical calculation and I derived by this study of the

13  Bureau of Labor Statistics that there should have been --

14  there would have been approximately 568 positions, field

15  openings, per year in 2005 and 2006.

16       Then, specific to the field, I looked at the U.S.

17  Census data, another Government study.  And the Government

18  study provides information on new hires, so new jobs, new

19  hires -- not new jobs, new hires for individuals who are age

20  55 to 64 in the professional scientific service field, and

21  this data shows that there were 1,000 job -- new hires in the

22  third quarter of 2005.  So, at the end of 2005, 1,000 new

23  jobs -- new hires, 1,000 people between age 55 and 64 were

24  hired in the Philadelphia general statistic metropolitan

25  area.

1          THE COURT:  In what kind of jobs, gas station

2    attendants or what?

3          THE WITNESS:  Professional, professional scientific.

4          THE COURT:  Lawyers?

5          THE WITNESS:  No, it would have to be scientific and

6    professional, that is the specification by the Government.

7    BY MR. ENNIS:

8    Q    And so 1,000 jobs for ages 55 to 64 in the professional

9    scientific category?

10   A    That is correct.

11   Q    In the Greater Philadelphia area?

12   A    Correct.

13   Q    Okay.

14   A    And then -- so, this answers to the question, how long?

15   So, we said eight weeks, we said 15 weeks, because we want to

16   err on the side of prudency.  We don't want to say it would

17   take eight weeks because it's what takes 50 percent of the

18   people, we don't want to say 16 weeks because that's an

19   average, we are going to say 27 weeks because 82 percent of

20   the unemployed would have a job in 27 weeks.

21         So, let's assume 27 weeks.

22         So that's the first answer, how long.  The second

23   answer, how much money do these new hires, do these people

24   make?  And that is the average of the earnings shown by the

25   Bureau of Labor Statistics, by the Government, for chemists

1   and industrial production managers, and that average is

2   $80,370.  So, it's $80,000.

3           The last question, statistically, as a labor

4   economist, that I had to answer was, how long does it take to

5   get back to what she was making?  When she was separated --

6   Q   And she is Mrs. Marcus, is that right?

7   A   Yes, I apologize.

8   Q   Okay.

9   A   When Mrs. Marcus was separated, it was June, 2005 when

10  all this data referred to and she was earning $122,000,

11  approximately, $122,414 in salary.  And she had a bonus that

12  would change year-by-year but, on average, the bonus was

13  about $33,000, approximately.  So -- hold on -- it was

14  $33,662.  So, if you add 122 and 33,600, you come to

15  approximately 156,000, almost, in 2005 dollars.

16          So that is 156, the average in the market is 80.

17  So, what happens?  What I did was I provided alternative

18  calculations.  In one calculation I assumed that she would

19  continue to make $80,000 after 27 weeks and she would never

20  progress from the 80,000.  So, she wouldn't prove herself,

21  she wouldn't be able to make more, she wouldn't be able to

22  show her experience and she would be capped, she would stay

23  at the average level.  That is one analysis.

24          In another analysis I used Government data,

25  Government publication.  In a Government publication the

1    Government indicates that workers who are displaced, like in

2    the case of Mrs. Marcus, tend to get a job, the majority they

3    tend to get a job.  So -- and there is this survey, which is

4    based on the current population survey, it's every two years,

5    and they show that not only individuals 80 percent they get a

6    job, but they also catch up.  It means that over time, they

7    may start at the lower level, some of them, but they will

8    eventually improve and get to the pre-separation level.  In

9    other words, the Government studies out there show that

10   between three and five years people catch up.

11          So, if you have a spread from 156 to 80, you would

12   be expected as of 2005 to be able to get back on your feet

13   and show your market worth as a worker within three to five

14   years.  So, I assumed that within three or five years the

15   total loss would be over.  So, in five years she would be

16   able to get back to the level of earnings that she would have

17   otherwise.  So, I provided the alternative calculations, one

18   where I assumed that she has a loss and she continues to have

19   the loss, all the way to work life; and another one I assumed

20   that she's capable of proving her experience and catches up,

21   makes up for the loss in five years.

22   Q   All right.  And, Doctor, I'm going to show you what has

23   been marked as 36-C and I would ask you to review it, first

24   of all.

25          (Pause.)

1  Q   And are those the charts setting forth the analysis that

2  you've just described, the results of the analysis?

3  A   Yes.

4  Q   Okay.  What I would like you to do is go to the easel,

5  because your handwriting I'm sure is better than mine, and if

6  you would write down -- and I can do it, if that's

7  easier --

8  A   No, I can.

9  Q   Okay, let's just try it.

10  A   May I, your Honor?

11  Q   No, I'll do it, it will be -- let's see what I can do.

12  A   Okay.

13  Q   Let's -- using the catch-up method -- and by the way,

14  when you said three to five years, what did you do for Ms.

15  Marcus, three or five?

16  A   I did both three and five.

17  Q   Okay.

18  A   But here's you're showing me five.

19  Q   Just the five, okay.  And so, using that five, your

20  catch-up analysis, tell us what you did and what the result

21  was.

22  A   Sure.  With a five-year catch-up analysis, it means that

23  five years after 2005 she would have been expected to, after

24  she got a job, catch up, make up for the loss.  So, the loss

25  is over by June 30, 2010, and it's a total loss of 247,815.

1   Q    And is that to date?

2   A    Yes.

3           THE COURT:   What were the last three letters --

4   numbers?  816 or 860 or 850 or what?

5           THE WITNESS:  815, 8-1-5.

6           THE COURT:   Thank you.

7   BY MR. ENNIS:

8   Q    And when you were doing that, did you assume the number

9   that -- or the amount that Ms. Marcus was going to make in

10  2006 was three percent higher than she had earned in 2005 on

11  average?

12  A    Yes, I used -- consistent with Mr. Verzilli, but I used a

13  growth rate of three percent and a discount rate of 4.65, I

14  believe.

15  Q    Okay.  The same as Mr. Verzilli?

16  A    Yes.

17  Q    All right.  And then in terms of -- so, you add -- you

18  increased her salary each year for those five years?

19  A    Mm-hmm.

20  Q    And then you started --

21  A    Yes.

22  Q    -- in 2006 at 84,321, is that correct?

23  A    That is correct.

24  Q    And that's, again, adding three percent to the number,

25  the average that you found in the statistics?

1    A    Adding both three percent and also an increase because of

2    the catch-up, there is a small increase in that year, and

3    then there is an increase year-by-year.  So, the numbers

4    increase because of the three percent and because she will

5    catch up, she will be able to get back on track.

6    Q    And then --

7    A    That's back pay.

8    Q    That's back pay.  And then how about under the five

9    years, the five years goes into 2010, is that correct?

10   A    That is correct.

11   Q    And so, going to 2010, what's the number that you get to

12   in 2010?

13   A    So, the front pay just from 2009 -- from today to 2010?

14   Q    Right.

15   A    It's 11,984.

16   Q    11,000 --

17   A    984.

18   Q    -- 984?  Okay.  All right.  And then did you also provide

19   numbers assuming no catch-up?

20   A    Yes.

21   Q    And how far in the future did you go with the no catch-

22   up?

23   A    I went into age 67.7.

24   Q    Why to age 67.7?

25   A    Because 67.7 is the statistical work life.  In other

1  words, Dr. Chicca (ph.), a professor, has published an

2  article using data to analyze how long people of a certain

3  age continue to work and, based on Mrs. Marcus' age at the

4  time of separation, based on her age in 2005, her work life

5  would be to age 67.7.  Work life means continues work and it

6  takes into account periods of absence from the labor force

7  due to inactivity, due to diseases, due to any reason why

8  there would be a probability of being in and out of the labor

9  force, this is a statistical study.

10 Q   And using those figures and not -- and keeping it at the

11 84,000 and only increasing the 84,000 for the three percent,

12 what's the back pay number?

13 A   It is 3-5-4-5-5-6, 354,556.

14 Q   So, your testimony is, even though Ms. Marcus was making

15 on average about 154,000, you're only deducting --

16 A   156.

17 Q   -- 156 -- you're only deducting $84,000 per year plus the

18 three percent?

19 A   $80,730, yes.

20 Q   Okay.  Because you're just taking the average, you're not

21 assuming --

22 A   Correct.

23 Q   -- she would make up any of that difference?

24 A   No.

25 Q   And then what's the front pay?

1    A    The front pay after November, 2009 is 2-2-1 -- no,

2    2-2-1-6-0-5.  So, $221,605.

3    Q    And those figures are all taken from Defendant's Exhibit

4    36-C?

5    A    Yes.

6    Q    And in terms of the documents that you reviewed in

7    preparation for your testimony did you look at how many

8    contacts Ms. Marcus had made from the time that she had --

9    was laid off until the trial?

10   A    Yes.

11        MS. EYER:  Objection, your Honor, this is both

12   irrelevant to the analyses that are being testified to and

13   outside the scope of this witness' expertise.

14        THE COURT:  Objection overruled.

15        THE WITNESS:  Yes.  I received a job search list as

16   an answer to a discovery request and this job search --

17   searching list shows approximately 70 entries, which means

18   there were 70 different contacts that she made over a period

19   of 45 months, three years and nine months.  So that was, on

20   average, 1.5 contacts per month.  So, she contacted between

21   one and two prospective employers per month.

22        MR. ENNIS:  Per month.

23        That's all I had, your Honor.

24        THE COURT:  Is everyone content?

25        MS. EYER:  No, your Honor, I have a few questions.

1                        CROSS-EXAMINATION

2     BY MS. EYER:

3     Q    In your testimony here today you only relayed two

4     estimates of Ms. Marcus' back pay, correct?

5     A    That is correct.

6     Q    But in your expert report you provided five different

7     estimates of Ms. Marcus' back pay losses, isn't that right?

8     A    That is correct.

9     Q    And, to be clear, those are five different estimates of

10    what Ms. Marcus' actual losses to date have been, isn't that

11    right?

12    A    No, those are estimates that consider three years, here I

13    was asked only five-year catch-up and losses to 80.  Some

14    estimate -- one estimate is three years, another estimate is

15    stopping the analysis as of June 1st, 2006, and that is

16    because that is when she started her job and there are no

17    entries after that period of her contacting any employer.

18             So, if the finder of fact determines that that -- at

19    that point she is not looking for a job actively -- and this

20    is entirely for the finder of fact, not for me, but that's

21    why I provided multiple estimates.  If I do that, then the

22    number would be much lower.

23    Q    Let me ask you about a specific year.  For the year 2007

24    you have no less than three different estimates of what Ms.

25    Marcus' actual losses were that vary from $44,000 all the way

1    up to $79,000, isn't that right?

2    A    That is correct, because the $44,000 comes from the

3    three-year catch-up.  In other words, if she found a job and

4    was able to catch up as the average, as the majority of the

5    people catch up, then she would have 44,000.  If you go --

6    the estimates that counsel asked for me are the highest

7    estimates.  If you assume, alternatively, that it would take

8    her less to prove herself and catch up, then the numbers are

9    smaller.

10   Q    To be clear, you're aware that in the year 2007 Ms.

11   Marcus' salary did not catch up with what she was making at

12   PQ; in fact, you attribute a fictional salary to her for that

13   year, isn't that right?

14   A    That is not a fictional salary, that is the average

15   salary as per Bureau of Labor Statistics.  What her salary

16   was was not the salary, she was earning consistent -- she had

17   earnings consistent with her consulting part-time job earning

18   $500 a day, and in 2007 she was at $750 per day from home and

19   $1,000 if she was on the road.  So that is a per-day number

20   that is high, it's just that she didn't work every day of the

21   week.

22   Q    And you have no idea if that's because she couldn't find

23   jobs, isn't that right?

24   A    She indicated in her deposition that she had consulting

25   jobs.

1   Q   My question for you is, is the salary that you attribute

2   to Ms. Marcus for 2007 and other years a salary that she

3   actually got money in her pocket for?

4   A   No, it is a salary based on the statistical analysis.

5   Q   And let me ask you this:  Isn't it true that you do rely

6   on actual earnings except in cases like this where it's not

7   to the advantage of your client?

8   A   No, that is not correct.

9   Q   Let me direct your attention to Exhibit P-282.

10          MS. EYER:  Can we get the witness the exhibit,

11  please?

12          MR. ENNIS:  Your Honor, we're going to object to

13  this.  This is what we were discussing earlier.  It's a

14  document -- well, let the witness see it.

15          THE COURT:  Let's find out what it is.

16          MR. ENNIS:  Yes.

17          (Pause.)

18          THE WITNESS:  I have Exhibit P-282.

19  BY MS. EYER:

20  Q   This is a report that was prepared by yourself and

21  several of your other colleagues at the Center for Forensic

22  and Economic Studies, correct?

23  A   That is correct.

24  Q   And if I could direct your attention to Page 3?

25          MR. ENNIS:  And, your Honor, I will object, because

1    this is a report from 2006 which the witness did for Mr.

2    Goldshaw's firm and Mr. Goldshaw -- from 2006 and he hasn't

3    given us the file for this.

4           MS. EYER:  And again, your Honor, they have never

5    asked for the file and, respectfully, it's irrelevant who the

6    report was prepared for, it's available on electronic

7    databases, among others.

8           THE COURT:  I'm assuming that it's --

9           MR. GOLDSHAW:  She has the file.

10          THE COURT:  You can look at it now.  Be seated,

11   objection overruled.

12          MR. ENNIS:  She doesn't have the file.

13          MR. GOLDSHAW:  She prepared the report.

14          MR. ENNIS:  She didn't -- well --

15          THE WITNESS:  We don't have the file because your

16   firm told us to destroy it because it settled.  That's from

17   the records in the firm, so --

18   BY MS. EYER:

19   Q   Could I direct your attention to the section labeled,

20   "Base of Earnings Given the Separation"?

21   A   Sure.

22   Q   The report states, "We have used the plaintiff's 2005

23   actual earnings figure, 19,890, as our base of earnings

24   given," isn't that right?

25   A   That is correct.

1   Q    And isn't it true that this individual was somebody who

2   was earning far more at her prior job?

3   A    This individual -- first of all, I do not remember the

4   details of this case.  This was a case that was prepared in

5   2006, I do not remember the details.  Every case has specific

6   individual nuances of facts that are very pertinent to the

7   case -- no, let me explain, everything makes -- is extremely

8   important in determining how to calculate a case.  All I can

9   tell you is, based exclusively on this report, based

10  exclusively on what I read, and I don't read a lot because

11  usually we receive between five and 20 inches of paper per

12  case, I don't have the 20 inches of paper to tell you if

13  there is a factual reason to do one thing or another.

14           For example, in --

15           THE COURT:  Just a minute, is this involving

16  somebody other than the plaintiff?

17           MS. EYER:  I'm moving on, your Honor.

18           THE WITNESS:  Yes.

19           MR. ENNIS:  Yes, your Honor.

20  BY MS. EYER:

21  Q    Let me ask you about the specific --

22           THE COURT:  Oh --

23  BY MS. EYER:

24  Q    -- the specific details of this case --

25           THE COURT:  -- get rid of that other case, we're not

1   going into some other case, go on to something else.

2   BY MS. EYER:

3   Q   Let me ask you about the specific details of this case.

4   A   Which case?

5   Q   This case here today.

6   A   Oh, Mrs. Marcus?

7   Q   Yes.

8   A   Do you want me to close this?

9   Q   Go ahead.  You estimate, your --

10  A   Hold on --

11  Q   Go ahead.

12  A   -- give me a moment, because I need the facts of this

13  case now in front of me.

14          (Pause.)

15  Q   Your estimates rely on the assumption that Ms. Marcus

16  should have been able to find work within 27 weeks, isn't

17  that right?

18  A   Actually, she would be expected to find work within 16

19  weeks, but 82 percent of the unemployed population gets it in

20  27 weeks.  So, I take 27 weeks, I don't even consider the

21  eight weeks or the 16 weeks.

22          THE COURT:  So, your answer is yes.

23          Go ahead.  What's your next question?

24          THE WITNESS:  Yes.

25  BY MS. EYER:

1    Q    So that's nearly -- and you say 82 percent of people,

2    they find work in 27 weeks, is that right?

3    A    Correct, median 27 weeks.

4    Q    So that's roughly 18 percent that don't find work in that

5    time, isn't that right?

6    A    They don't find work within 27 weeks, but then when you

7    look at the next study and you look at the next percentage,

8    then it gets to 100 percent, close to 100 percent, because

9    it's the next study, so they enter into the new percentage.

10   Q    Isn't it true that it never reaches 100 percent, there

11   are always people who are unable to find work within the

12   amount of time specified?

13   A    I can imagine that might be the case.

14   Q    And as to the 20 percent that don't find work in 27

15   weeks, that's a whole lot of people, right, something to the

16   tune of 1.5 million people who haven't found jobs in 27

17   weeks?

18   A    I don't know if it is a lot of people.  What I can tell

19   you is that 82 percent do get a job and she is way above

20   average in terms of professionality, experience and work

21   experience.

22           THE COURT:  This is getting into the point of

23   useless just rambling.

24   BY MS. EYER:

25   Q    Well, let me ask you, are you aware that it is

1   significantly harder for people of Ms. Marcus' age to find

2   jobs than the average population, which is the population

3   that you relied on?

4   A    I am not aware of that fact based exclusively on what I

5   was telling you, for example -- actually, not exclusively,

6   but for example, when I studied the U.S. Census Government

7   data there were 1,000 professional scientists hired in the

8   third quarter of 2005 in the age between 55 and 64.  So,

9   there is an availability for that age bracket for

10  professionals who are in the science field.

11  Q    Well, let me direct your attention to the BLS that you

12  claim you relied on.  Could you direct your attention to P-

13  294, please?

14           (Pause.)

15  A    Yes.

16  Q    Do you recognize P-294 as data that is the BLS data that

17  you claimed you relied on in your report?

18  A    Sure.  It's actually a different type of printout.  I

19  have the printouts that I relied on in my report that is also

20  from this Web site, but it's put -- it has actually the

21  tables coming directly from the side rather than not having a

22  source of information.

23  Q    Those tables were not provided to us, so I'll direct your

24  attention to these now.  If you could take a look at Page

25  250?

1    A    Page 250.  I don't have Page 250.  Do you mean Bates 250?

2    Q    Page 250, Chart 31, under P-294.  It's one of several

3    pages, they're not all --

4    A    Well, that's -- oh, the last page of this.  Okay.

5    Q    Isn't it true that the BLS provides data about how long,

6    on average, it takes older workers, workers in different age

7    groups, to find jobs?

8    A    Yes.  And if you look at this and you look at women 55 to

9    64, you have that the average duration of weeks is 23.8 weeks

10   and I gave 27.

11   Q    And that a full 75 percent of those people have not found

12   jobs with -- a full 25 percent of those people have not found

13   jobs within 27 weeks as you assume for Ms. Marcus?  You can

14   do the calculation, if you desire; I know it's not there in

15   the chart, but you have the numbers to do the calculation.

16   A    You're using hybrid numbers.  What the number here is

17   showing is this, this is the average duration in weeks.

18   You're doing a different thing, you're taking a percentage of

19   the population.  What I am telling you here is this, this is

20   an average as of 2005, the entire year.  What I gave you,

21   and I can show you the source, is published directly from the

22   Web site with a source in the corner.  I am sure you

23   published the table, I have no reason to doubt it, but --

24            THE COURT:  Just make -- say what you're going to

25   say, don't --

1        THE WITNESS:  My source shows, and I can show it to

2   you, that this is extremely consistent.  If you look at July,

3   2005 and you actually look at the amounts after, you will see

4   15 weeks average, eight weeks median, 27 weeks at most.  If

5   you look here at men, for example, 55 to 64, you have a

6   median duration of 12 weeks, you have an average duration of

7   24 weeks, which is still very consistent, if not smaller,

8   than the 27 weeks that I took.

9   BY MS. EYER:

10  Q   My specific question for you is, of women in Ms. Marcus's

11  age range there were -- if you divide in the total, 299, by

12  the number that found a job --

13  A   Hold on --

14  Q   -- in 27 weeks --

15  A   -- I have to follow you --

16  Q   -- 80 --

17  A   -- hold on.

18  Q   If you take a look at the specific heading for women age

19  55 to 64 --

20  A   Give me only one second.  So, we are at 299 --

21  Q   80 divided into 299.

22  A   So, there are 299,000 persons.  Okay, tell me.

23  Q   80 divided into 299, that's the number of people it takes

24  27 weeks and over, and that's a full 25 percent of people in

25  that age category, isn't that right?

1  A   I have to calculate if it is -- if that is -- it adds up

2  to 299, you have to give me a minute.

3          (Pause.)

4  A   Can I -- can I write on your --

5  Q   No.

6  A   Okay, I'll write on this and then you can flip that.  And

7  I don't doubt you, I just want to double check.

8  Q   Take your time.

9          (Pause.)

10 A   299.  Okay.  So, I have the 133, plus 82, plus 84, adds

11 to 299.  Now, tell me again your question?

12 Q   My question is, isn't it true that a full 25 percent of

13 the people in Ms. Marcus' age and sex class were not able to

14 find jobs within the 27 weeks that you assume?

15 A   No.  You're using the wrong numbers, because what you're

16 doing is you're taking only the 27 weeks and over, but you

17 don't take into consideration the fact that that doesn't take

18 into account all the people 27 weeks and below that have

19 already found a job.  So --

20 Q   Isn't it true --

21 A   -- if you want to --

22 Q   -- that the total listed here is 200 --

23          MR. ENNIS:  Your Honor, can she finish her test --

24 her answer?

25          THE COURT:  She already has repeatedly.

1          Go ahead.

2     BY MS. EYER:

3     Q    Isn't it true that the total listed here is 299,000

4     people and that it states that 80,000 of those people had not

5     found jobs within 27 weeks?

6     A    No, that states that 80,000 people are -- have a duration

7     of unemployment of 27 weeks and over.  So, 80,000 over 299 is

8     26 percent.

9     Q    And that was my question precisely.

10    A    Oh --

11    Q    Let me ask you now --

12    A    -- I misunderstood, I'm sorry.

13    Q    -- isn't it true that it is also significantly harder for

14    people who are terminated like Ms. Marcus to find jobs than

15    the average worker?

16    A    No, because she was not in a termination for cause, she

17    was in a layoff concept, that's my understanding.  And so I

18    have no reason to assume that the Government study, the

19    Displaced Worker Survey, doesn't apply to her.

20    Q    Let me ask you specifically again, in relation to the BLS

21    data, isn't it true that it shows that people who are

22    permanent job losers take significantly longer to find jobs?

23    I'll direct your attention to the same exhibit, the first

24    chart.

25              THE COURT:  I'm sorry, what do you mean by a

1    permanent job loser for heaven's sake?

2                MS. EYER:  Those are as compared to a temporary

3    layoff, people who completed temporary jobs.

4                THE WITNESS:  I have lost you.  First of all, I

5    don't know where you are.  Sorry.

6    BY MS. EYER:

7    Q    The first chart that appears under 294, after the initial

8    pages just reflecting the Web site.

9                (Pause.)

10   A    So, you have -- you're talking about Table 29?

11   Q    That is correct.

12   A    Okay, let me get there.

13                (Pause.)

14   A    So, I don't see what you said.  What I see here --

15   Q    Isn't it true --

16   A    -- is a table.

17   Q    -- that the BLS, look at the first set of entries --

18   A    Yes.

19   Q    -- allows you to break out how and why somebody lost

20   their job and how long, on average, it takes them to replace

21   it, how long it -- and how long -- how many people

22   specifically it takes 27 weeks or over, and you relied on the

23   total category instead of on the category that is

24   specifically for people who are permanent job losers like Ms.

25   Marcus?

1   A    To be a permanent job loser, you have to be established

2   as a permanent job loser.  This is an ex post analysis, the

3   moment that you are without a job for a long duration

4   like -- then that's different.  Job losers -- job losers and

5   persons who completed a temporary job, then there is a

6   distinction, and when you look at the permanent job losers

7   you still have 831,000 people.

8            THE COURT:  These are people that have --

9   BY MS. EYER:

10  Q    Let me --

11           THE COURT:  -- is it possible to disagree, to just

12  have not meeting of the minds as to what is meant by a

13  permanent job loser?

14           MS. EYER:  Let me move on, your Honor.

15           THE COURT:  It can either be a person who had a

16  permanent job and lost it or it can be a person who lost his

17  job permanently, I don't know which you're talking about.

18           THE WITNESS:  Yes, I would have to see the

19  definition from the Bureau of Labor Statistics.

20  BY MS. EYER:

21  Q    Well, these are, by definition, how long people have been

22  out of work, correct?

23  A    Yes.  And if you consider 27 weeks, that is already not

24  the temporary status, that is also why the 27 weeks apply.

25  27 weeks is above six months, if you are in a temporary -- if

1  you're a seasonal worker for Macy's and you work seasonally,

2  27 weeks puts you already out of the problem that you are

3  addressing here, because if an individual is without a job

4  for 27 weeks it cannot be considered statistically as a

5  temporary layoff because that's more than six months.

6  Q   Let's cut to the chase here.  You don't have any actual

7  basis for knowing whether there were jobs available for Ms.

8  Marcus at age 60 after having been fired in the zeolite

9  field, do you?

10  A   So, you're not on this table anymore?

11  Q   Let me re-ask my question.

12  A   Sorry.

13  Q   You don't have any actual basis for knowing whether there

14  were any jobs available for Ms. Marcus at age 60, fired from

15  PQ, in the zeolite field, do you?

16  A   I have a basis to know that there were jobs in the

17  scientific professional field.  In the zeolite field

18  specifically, no.  But Mrs. Marcus has a striking experience

19  on her CV, which includes other fields.

20          THE COURT:  I think we're just wasting everybody's

21  time with this wrangling.

22          MS. EYER:  I just have one further question, your

23  Honor.

24  BY MS. EYER:

25  Q   In fact, you couldn't identify --

1        THE COURT:  No, we're not going any further with

2   this, you've had it.

3        MS. EYER:  Thank you, your Honor.

4        THE COURT:  You may step down.  Thank you.  We're

5   finished with your testimony, Ms. DiGirolamo.

6        THE WITNESS:  Thank you.

7        (Witness excused.)

8        THE COURT:  Anything further from anybody?

9        MS. MALLOY:  We have our next witness, if you're

10  ready.

11       THE COURT:  Yes.

12       MS. MALLOY:  Kevin Doran.

13       (Pause.)

14       KEVIN DORAN, Defendant's Witness, Previously Sworn.

15       THE DEPUTY CLERK:  Please raise your right hand.  Do

16  you swear or do you affirm the answers that you give --

17       THE COURT:  He's already been sworn in this case --

18       THE DEPUTY CLERK:  Oh.

19       THE COURT:  -- he is still under oath.

20                    DIRECT EXAMINATION

21  BY MS. MALLOY:

22  Q    Could you please tell us about your educational

23  background?

24  A    Yes.

25       THE COURT:  You might even start with getting on the

1   record what your name is.

2           MS. MALLOY:  Oh, okay.  I thought that went with the

3   sworn yesterday, I apologize.

4           THE WITNESS:  It's Kevin Doran, D-o-r-a-n.  And my

5   educational background is I graduated 1978 from Ryder

6   University, although at that time it was a college, it has

7   since been named a university, it's Lawrenceville, New

8   Jersey.  I have an undergraduate degree in management and

9   organizational behavior with a double major including

10  industrial relations.

11  BY MS. MALLOY:

12  Q   And what is your current position at PQ?

13  A   I'm the vice president of Human Resources and

14  Communications.

15  Q   How long have you held that position?

16  A   Since January 19th of 2004.

17  Q   And could you tell us briefly what you did before you

18  joined PQ?

19  A   Right out of school, I worked for about a year and a

20  month for a company called Congoleum Corporation, they're a

21  floor-covering, vinyl floor-covering corporation.  I started

22  in the sales and marketing area, it was a training position.

23  I was assigned to a sales territory in Virginia, it covered

24  West Virginia, Tennessee, North Carolina and parts of West

25  Virginia.  But everybody started in sales, my career path I

1  believed at that time and continues to be my educational

2  background, which was Human Resources.  So, I came back to

3  New Jersey and actually then joined Phillips Electronics,

4  Phillips at that time, in Heightstown, New Jersey.

5  Q   And anything else before PQ?

6  A   No.  From that point in 1979 through the year 2003, late

7  December, I was with Phillips Lighting and then Phillips

8  Electronics of North America.  So, for 24 years.

9  Q   And when did you join PQ?

10 A   PQ in January 19th of 2004.

11 Q   And have you always been the vice president of Human

12 Resources?

13 A   Since I joined, yes.

14 Q   And could you give us an idea of your responsibilities in

15 that position?

16 A   Yes.  As you have heard described, PQ is an international

17 company, it's inorganic chemicals on the one business and

18 Potters Industries is our glass material business.  And then,

19 subsequent to joining, we have also established out of the

20 chemical business a separate unit called a catalyst business.

21 Q   And you held the position of vice president of Human

22 Resources at the time PQ was sold in February, '05, correct?

23 A   That is correct.

24 Q   Was there an organizational review of the company

25 following the sale?

1   A   Yes, there was.  On February the 11th, which was the day

2   of close, the official day of close, we had a town hall

3   meeting, as I think you've heard referred to.  To give a

4   little more detail, the town hall meetings were a way we

5   communicated to the total organization.  So, not only were we

6   talking to the people sitting at that time in Valley Forge,

7   but we also had video connections to our European colleagues,

8   people in Conshohocken, in Toronto, Canada, which is another

9   site, and our PQ Europe operation.  And then we also had

10  dial-in connectivity for anybody around the world that wanted

11  to dial in, we put out a number so that they could listen at

12  least from an audio perspective.

13           After those meetings, we take the videotape, we make

14  CD-ROMs and send it out to any of the sites that weren't able

15  to connect indirectly so they can see and hear for themselves

16  what was said.

17  Q   And what was communicated to employees in this town hall

18  meeting?

19  A   Well, I think the first communication was that was the

20  day that Mike Boyce officially introduced himself to the

21  organization as the official CEO and, in essence, expressed

22  his pride of being appointed, because of his knowledge of the

23  company and the fact that he thought it was a good

24  organization.  And then he also shared some of his

25  philosophical ideas about what he thought PQ was capable of

1  being and actually told the organization on that day that, in

2  order for us to be the company that he thought we were

3  capable of being, even though it has been a good company for

4  a long time, with equity ownership, which is our new owners,

5  different from family ownership, there would have to be a

6  different way of looking at the business, a different way of

7  operating, and we would have to make some changes.  And he

8  communicated that very clearly to everybody in the context of

9  in the next 90 days or thereabouts we would do a full review

10 of the organization and, in essence, don't accept the status,

11 but really reexamine how we need to refocus and service the

12 market, look at our customers, and how do we do business

13 better.

14 Q   And did this organizational review in fact take place?

15 A   Yes, it did.

16 Q   And did you have any role in that?

17 A   Yes.  From day one of that announcement, it was my

18 responsibility to work with all of the line management of the

19 businesses, to do -- and help them to look at their

20 organizations, look at the way that we were doing work and

21 look at the areas where there could be change, improvement

22 and, unfortunately, when you get into those type of

23 discussions, as we found out at the end of that process,

24 there was a reduction in force in the company and people did

25 leave the organization.

1    Q    Who did you report to?

2    A    I report directly and still report directly at that time

3    to Bill Citzko, who was the chief administrative officer.

4    He's responsible for not only the HR activities from an

5    overview point of view, but he also has responsibility for

6    all the legal, environmental, health and safety, and

7    insurance liability issues for the company worldwide.

8    Q    And could you tell us about the changes at the

9    administrative assistant level that took place as a result of

10   this organizational review?

11   A    Yes.  In the Valley Forge building -- this was the

12   corporate headquarters for the operation -- there was roughly

13   about 150 people in the total building.  And, as you heard

14   Mr. Boyce describe, it was about an 80,000-square-foot

15   building and we were occupying a portion of it.  In essence,

16   there were 20-some-odd administrative assistants spread and

17   dispersed among the departments in that building.  If you

18   looked at organizations today in today's world, with the

19   technology and a lot of people doing their own administrative

20   work, e-mails, et cetera, it was clearly a large group of

21   people for the type of organization that we needed to be

22   going forward.

23   Q    And what happened?

24   A    Well, there was a couple of ways we could have approached

25   that.  We could have said we'll just simply let things happen

1   and let each department decide whether they needed an admin.

2   or not, but we felt that it had to be significant in terms of

3   the reduction in that group because they were all in a -- the

4   same role.  So, we said we would rather have it to be a more

5   positive way of dealing with a tough decision, so we offered

6   a voluntary, incentivized leave program so that people could

7   volunteer to leave, if they so choose, on their own.

8   Q    And what happened?

9   A    Well, we made presentations to all of the 20-some-odd

10  administrators and said, here's what you would get if you

11  considered it, here's the documents that you would have to

12  review.  It's a personal choice, we gave them a period of

13  time to think about it, and we had a cut-off date that said,

14  if you're interested, you can turn in your interest and we

15  will then let you know if we accept your volunteer.

16  Q    And how many administrative assistants volunteered?

17  A    I think the final number was 12 out of the 21 or 22

18  people.

19  Q    Were there any layoffs in your own department?

20  A    Yes.  When I joined PQ in 2004, there were 11 people in

21  the HR Department.  And, just to give you a very brief

22  understanding, there were three people associated with

23  recruiting, professional staffing, there were two people

24  associated with day-to-day benefits administration, there was

25  a part-time payroll manager, a part-time IT person, because

1   we have an internal Web site that supports all the HR

2   programs, and there was a payroll administrator, and then

3   there was a manager of industrial relations who handles all

4   of the labor negotiations for the North American operations.

5        And after working for a year with that group,

6   because I joined in 2004, we're now into 2005, I was

7   challenged like anybody else in the organization that said,

8   what could we do different, what would be the things that we

9   could change and would not affect the way we handle our

10  business.  And I felt that, if you looked at the volume of

11  recruiting that we were doing, we were hiring roughly 25 to

12  30 professional jobs per year.  The good thing about PQ and

13  Potters and all the other organizations, people are very

14  loyal, they're committed, we don't have a high turnover.  So

15  that volume with three people associated with it was really

16  not an efficient process.  So, unfortunately, in that case I

17  made a decision --

18       THE COURT:  Excuse me, I just want to make sure we

19  got what you mean by that.

20       THE WITNESS:  Sure.

21       THE COURT:  You hired too many people or not enough

22  or what?

23       THE WITNESS:  Well, I think if you looked at three

24  dedicated staffing people associated with hiring 30 people a

25  year, the volume of recruiting activity didn't justify the

1   staffing that we had to do it.

2          THE COURT:  You didn't need three people to hire 30

3   people?

4          THE WITNESS:  Yes, your Honor, that's correct.

5          THE COURT:  Thank you.

6          THE WITNESS:  So, I made a decision that those three

7   people were not required in the new organization and in fact

8   the solution would be a third-party recruiting source on a

9   30-hour-a-week basis and pay a firm to do that for us, that

10  was one of the decisions and that unfortunately affected

11  those three people.

12          In another area, I had two benefits administrators.

13  We have very good partnerships with long-term service

14  providers who are doing some of the administrative work for

15  us on the benefits side and we decided to let them do more.

16  So, one of the other benefits administrators was released as

17  part of that reduction.

18          And we had two admins. in our group of 11 people and

19  both admins. took the voluntary program and we --

20          THE COURT:  Admin. is an administrator?

21          THE WITNESS:  Administrative assistants, yes, sir.

22  And both of those volunteered for the program and both of

23  their suggestions were accepted.

24  BY MS. MALLOY:

25  Q   How many people did you then lose in the HR Department?

1   A    In total, two out of the staffing group that were not

2   volunteer, one benefits administrator and the two, so five in

3   total --

4   Q    Okay.

5   A    -- out of 11.

6   Q    How long was this period when the organization was

7   reviewed?

8   A    Well, it started on February the 11th with Mike Boyce

9   telling everybody that's what we would undertake, and it

10  really took all the time through roughly early May and into,

11  you know, some early part of May before we actually finalized

12  everything and then prepared for actually having to affect

13  people.

14  Q    In your capacity of vice president of Human Resources did

15  you work with any of the business units with respect to any

16  staffing changes they needed to make?

17  A    There was not one person affected in the organization

18  that I did not talk directly with the manager and work with

19  them to understand what the rationale was.

20  Q    Let's talk about R and D.  About how many people were

21  employed in the R and D unit at the time of the sale?

22  A    I think the number that's been stated here was about 55

23  to 56 and I think that's about right.

24  Q    Did you play any role in the layoff decisions in R and D?

25  A    Yes.  Similar to the work that I was doing in Valley

1   Forge, I did the similar work with John Lau to understand

2   what -- the decisions that he had to take and facilitated

3   that with him as well.

4   Q    Okay.  Could you describe that process in more detail,

5   please?

6   A    Yes.  In essence, with all of the managers, including

7   John, you know, they needed to understand and they know best,

8   you know, who's doing what.  So, I was really asking them to

9   decide based on the decisions that are being taken in the

10  organization and what's the consequence, unfortunately, for

11  the people that are associated with the work that's being

12  affected.

13  Q    Okay.  Did Dr. Lau talk to you about specific people who

14  might be affected?

15  A    Yes.  Over the course of the latter part of April and

16  early May, probably into the early May part for the most

17  part, he started to identify the people that were affected by

18  the different feedbacks and process he was going through with

19  the parts of the business that supported R and D or required

20  work from R and D.

21  Q    Okay.

22           MS. MALLOY:  I'm showing the witness Defendant

23  Exhibit 22, which has already been admitted into evidence.

24           (Pause.)

25           THE COURT:  It's invisible.

1      MS. MALLOY:  I know, I'm... could you do from the

2   bottom of the top square up, please?

3   BY MS. MALLOY:

4   Q    Did you receive this May 6th memo from Dr. Lau?

5   A    Yes.

6   Q    Did you have any discussions with him about it?

7   A    Yes.

8   Q    Do you recall those?

9   A    I mean, I recall parts of the discussions in terms of,

10  you know, the fact that he had gone through on the top part

11  of this memo, which is dated May 6th and had already

12  identified where he felt there was going to be need to have

13  conclusions and people would have to be reduced.  In the case

14  of the middle part of the memo, he had also described the

15  fact that within the research and development unit or the

16  Conshohocken operation that there were, at the same time that

17  we were talking about reducing, there were two open positions

18  that, you know, were there and had not been filled by

19  anybody.

20      MS. MALLOY:  Colleen, do you mind going down to the

21  second half of the page, please?  I think we need a really

22  tall screen, huh?

23  BY MS. MALLOY:

24  Q    What are you referring to as the two open positions?

25  A    It talks about in that paragraph, it said there are two

1   open positions, one is called a Process Engineer II and the

2   second one is a Research Technician specified in silica

3   catalyst and the zeolite catalyst groups, which are both cost

4   centers and entities of the R and D Group located in

5   Conshohocken.

6   Q   Okay.  And did you have any discussions with Dr. Lau

7   about the Corporate Development Group or the Corporate

8   Development Program?

9   A   Yes.  Because at this point in the last part of the

10  letter it talks about Mike Boyce having a pending decision

11  related to the Corporate Development Program and that in this

12  case these were the people, from John's perspective, that

13  were at that point, unfortunately, kind of in limbo until

14  that decision was made.

15  Q   As of May 6th, was the decision regarding Corporate

16  Development made yet?

17  A   No.

18            MS. MALLOY:  23?

19            (Pause.)

20  BY MS. MALLOY:

21  Q   This is a May 9th memo to you from Dr. Lau; did you in

22  fact receive this?

23  A   Yes.

24  Q   And what does this communicate?

25  A   Well, this refers to, again, another step in his work and

1   updating me as to if there's any changes to the earlier note

2   that we just looked at.  And he says in his first line that,

3   as he had been continuing to talk with the different business

4   areas, Scott Randolph, I think people heard described as the

5   president of Potters at that time, and the fact that he had

6   talked with him and one of the changes on this was there was

7   a gentleman by the name of Larry Royer, who was on the

8   previous memo, who had been identified as a possible

9   reduction and who is no longer identified because that was

10  one of the outcomes of that discussion.

11  Q   Why is Dr. Lau writing these memos to you?

12  A   Because, as he is in Conshohocken, I'm in Valley Forge,

13  I'm able to physically get access to all of the managers in

14  Valley Forge very easily.  We're talking, so he's document,

15  you know, in essence, where we are in the process, so I'm

16  aware and that I can keep track of where he's at as well.

17  Q   Okay.

18  A   This also points out to the Corporate Development side of

19  things that that decision that we're waiting for and need

20  from Mike on the Corporate Development Program was identified

21  as being that he was going to meet with Mike to try to deal

22  with that on this case, the -- it says on 5/10 or May 10th.

23  Q   Okay.  Were you paying attention to any demographic

24  information about these various employees who were showing up

25  on these lists?

1   A    Yes.  In the beginning of the process we put together, we

2   being myself and my colleague in HR, put together a -- in

3   essence, a starting point of how many people were in the

4   organization before the process started; in essence, all of

5   the demographic information that I'm responsible for, making

6   sure we comply with.  So, we put in every person's name,

7   their job title, in both Conshohocken and Valley Forge and

8   any other location that was being affected, their salary,

9   their birth date, their gender, race, sex, all the things

10  that we would normally be responsible for saying is there any

11  issues.

12          THE COURT:  You included both gender and sex?

13          (Laughter.)

14          THE WITNESS:  If I said that, that's redundant.

15  BY MS. MALLOY:

16  Q    And why were you compiling that information?

17  A    Number one -- there's actually a couple of reasons.

18  Number one, at the end of these processes, unfortunately,

19  people have to be affected and we have an obligation to

20  provide to them at the time we're talking to them, they're

21  going to have questions about, what does this mean for my

22  pension, what does this mean for my benefits, do I get these

23  kinds of coverages?  So, we were preparing for that

24  inevitable conversation.  But there's also a compliance issue

25  that says, are there any things that are incorrect or look

1    incorrect in terms of the way we're approaching things and

2    can we have supportive business information behind the

3    decision making that would, you know, make sure that we're

4    doing the right thing.

5    Q   As of the May 9th memo, had a decision yet been made

6    about Corporate Development programs?

7    A   No, it had not.

8    Q   At some point do you learn that Mr. Boyce made a decision

9    about Corporate Development?

10   A   Yes, I think it was within a week or so of that May 9th

11   memo, because John was supposed to meet with him the

12   following day, I think it ended up being a day later or

13   something to that effect.

14   Q   How do you learn, if you remember, how did you learn

15   about the Corporate Development Program?

16   A   I remember actually in my deposition trying to remember

17   exactly whether or not Mike told me directly or told John

18   directly, and I heard Mr. Lau say that it was a voicemail for

19   me and I have no reason to not say that was the case.

20   Q   And what decision was made with respect to Corporate

21   Development programs?

22   A   That there would clearly be no funding from the

23   corporation and the holding company from that point forward.

24   Q   Did Ms. DelMonte have any conversations with you

25   regarding R and D personnel who might be affected by the

1   layoff?

2   A    No.

3   Q    Mr. Imbriani?

4   A    No.

5   Q    Ms. Kutchins?

6   A    No.

7              MS. MALLOY:   26?

8              (Pause.)

9   BY MS. MALLOY:

10  Q    This is a memo -- we'll highlight a part or two -- this

11  is a memo dated May 25th from Dr. Lau directed to Mike Boyce

12  and Mr. Imbriani, Michael Imbriani, with a CC to you.

13             MS. MALLOY:   Colleen, maybe you could highlight from

14  the box up?

15  BY MS. MALLOY:

16  Q    The date in fact of the actual -- the date of the

17  communication to the layoff -- let me start again.

18             When was the official communication to employees who

19  were going to be laid off as part of this RIF?

20  A    For anybody in Valley Forge and Conshohocken, it was

21  Wednesday, May 25th.

22  Q    Okay.  And this memo in fact is dated May 25th, correct?

23  A    That's correct.

24  Q    Did you in fact know prior to this memo who was going to

25  be affected in R and D?

1    A    Yes.

2    Q    And why did Dr. Lau write this memo to you, if you know?

3    A    I can't read his mind, but I do know that, having talked

4    to John, he clearly was -- I think it was a difficult process

5    for him because these are people that he had worked with, he

6    respected, they're colleagues, they're all talented people

7    from his perspective, and I think this was typical of John in

8    a sense that he was telling the organization, these are good

9    people and this is what we're losing.

10   Q    Okay.  I think we're done with this for now right now.

11            What role did you and your department have in

12   communicating about the layoff?

13   A    Well, we knew that somewhere in the latter part of May,

14   and it finally became May 25th, that we would have to be

15   ready to sit and talk to people about what is never a

16   conversation that anybody wants to have, whether you're

17   giving it or receiving it, and it's much worse to be on the

18   receiving end.  So, we prepared for that day with all

19   seriousness by bringing in an out-placement company called

20   Wright Management.  We did a lot of preparation with them,

21   talked about what we were doing, the amount of people

22   conceivably that we would have to affect, and the fact that I

23   wanted to have personal attendants by an out-placement person

24   for every person that was affected that day so they could

25   immediately start talking to people, professional people who

1  could help them to deal with, number one, the emotion, the

2  disappointment, the sadness of that event, and also to start

3  to think about who is going to help me to start looking for

4  my next job.  Because a lot of the people in the PQ

5  organization were very loyal, they're good people, and we

6  wanted to make sure that they were treated with dignity and

7  respect that day.

8         The other element that was important for them to

9  know from the company perspective was that no -- not one

10 person in Conshohocken or in Valley Forge was asked to leave

11 the building that day.  These were not bad people, these were

12 good people; they were unfortunately affiliated with work

13 that was not needed by the company, but they did nothing

14 wrong.  So, different from maybe some other terminations or

15 RIFs that you may have heard about, nobody was escorted out

16 the door.  They were told, if you want to stay, you're

17 welcome to stay, you can stay as long as you want.  You're

18 getting paid until June the 30th regardless of whether you

19 stay today, tomorrow or the next day, after June the 30th is

20 when your severance will begin.  So, from May the 25th

21 through June the 30th, their normal pay continued and, at

22 that point and from that point forward, after June the 30th

23 is when their severance started and all of the benefits

24 continuation and the other provisions that we were providing

25 to them started.

1  Q   Was May 25th the date of the communication of the layoff

2  company-wide?

3  A   Yes, it was, with the exception of there a few

4  people out in the field in the sales organization, for

5  logistics purposes, we had to coordinate flying out to people

6  and one of my colleagues with the managers associated with

7  that part flew out.  And some of that took place I think a

8  day or two before and some actually took place a day or two

9  after, depending on scheduling.  But all of Valley Forge and

10 Conshohocken took place on the 25th.

11 Q   Can you estimate how many people in the Valley Forge

12 headquarters lost their jobs as part of the layoff?

13 A   Let me put the volunteer admins. aside for a moment,

14 there was 12.  So, there was another roughly 30-some-odd

15 people in Valley Forge who were affected and all of those

16 communications took place in the morning.  And then myself

17 and the out-placement group and another colleague went down

18 to Conshohocken in the afternoon and we then sat with the

19 people in Conshohocken, including Ms. Marcus and Mr. Wypart,

20 who were affected in that afternoon.

21 Q   Was this Memorial Day week as well?

22 A   I think it was, yes.

23 Q   Did you meet with Ms. Marcus?

24 A   Yes, I did.

25 Q   On May 25th?

1   A    I did.

2   Q    What do you remember about that meeting?

3   A    We were in -- I always get the conference rooms confused,

4   but there's a small conference room and a large conference --

5   I think it was Conference Room B.  And John and myself asked

6   Ms. Marcus to join us in the conference room, explained --

7   after John communicated the decision, I explained that -- you

8   know, the severance that Ms. Marcus was eligible for, I

9   explained the timing that I just described to you that

10  applied to everybody.  And then, in Ms. Marcus' case, besides

11  the normal severance, she was also offered the opportunity to

12  consider additional severance.  I gave her a release

13  document, which is required.  When you beyond voluntary

14  severance or what is called normal severance and you're

15  giving some individual more than everybody else is getting,

16  then there's a release document that goes along with that; it

17  has legal language in it; it also has a 45-day period where

18  the person can review it at their leisure and we advise in

19  writing in the document that we encourage them to review it

20  with a financial adviser and also legal counsel, if they so

21  choose.  After they review it, it's their choice to sign it

22  or not.

23         The other severance that would come normally, you

24  know, came either way regardless of whether they signed it or

25  not.

1  Q   Is there anything else you remember about the meeting

2  with Ms. Marcus?

3  A   Just that it was cordial, she was very professional and,

4  at the end of the meeting, because we had yet to talk with

5  Mr. Wypart who reported to Ms. Marcus, I asked Ms. Marcus if

6  she was interested in sitting in on that.  I realized that I

7  didn't expect her to, given the fact that we had just

8  communicated her own impact, but, to her credit, she said

9  that she would like to and she sat in when we talked to Mr.

10  Wypart.

11  Q   Can you estimate how many employees were affected

12  company-wide by this layoff in May of '05?

13  A   If you take into consideration Valley Forge,

14  Conshohocken, some of the field people that I talked about in

15  the sales, and then we had some also changes in Canada in the

16  North American operations that day, there was close to 50

17  people or thereabouts.

18  Q   Were there any open positions in R and D?

19  A   The two that we had already referred to were the ones

20  that I was aware of.

21  Q   And which two are they?

22  A   The ones in the document, I think one was called a

23  process engineer and one was called a technician.

24  Q   Did the company allow employees who were selected for

25  layoff to bump or replace other people who had a job?

1  A    No, we did not, because of the pre-work that had been

2  done and the fact that we didn't want to disrupt the

3  organization.  So, the people associated with the work that

4  was affected is who was affected in the RIF.

5  Q    Did you speak with John Slabogin (ph.) regarding a

6  severance package?

7  A    I did.

8  Q    Could you tell us about those conversations?

9  A    Yes.  I don't know exactly the date, but John initiated

10 the first call and in that call we talked about his interest

11 in volunteering to leave the organization.  He actually said,

12 you know, what would be the benefits if I wanted to do that.

13 I asked him some questions just to make sure I understood

14 that he was really interested.  He mentioned the voluntary

15 admin. program that I described to you in brief and I said,

16 we can talk about severance for you if you're volunteering,

17 but that admin. program is not open to anybody other than

18 admins.  So, we established that it was going to be a

19 severance discussion based on regular severance had he been

20 terminated, which he was not being terminated, and then

21 we -- I gave him that information.

22        We had a subsequent phone call, I can't remember the

23 dates, where he asked a number of other questions.  He, to

24 John's credit, was negotiating for more.  I said,

25 respectfully, that the severance is the severance, but I'm

1   happy to talk to you about different ways we can pay the

2   severance out, if you tell me what your interests are -- and

3   his interests were really to extend his benefits as long as

4   he could to get closer to avoiding Cobra payments and some

5   other things.  And I said, I'm happy to take the core

6   severance, the dollar amount that's a fixed amount, and pay

7   that in lesser amounts on a monthly basis to make it last

8   longer and your benefits can continue to that time.

9   Q    Referring to medical benefits?

10  A    That's correct.  And so we talked through those kinds of

11  scenarios and he ultimately, you know, came together with me

12  with one that he felt worked to his best interests and that's

13  the one we ended up putting in the final document.

14  Q    Was it clear to you that Mr. Slabogin was volunteering

15  for this?

16  A    I never had any inclination that he wasn't.

17  Q    Did you speak with Eleanor Tickner (ph.) regarding a

18  severance package?

19  A    Yes, I did.

20  Q    Could you please describe that?

21  A    Same general starting point.  Eleanor called me, talked

22  about, you know, could she be considered for volunteering.  I

23  described to her that's not normally what we were doing, but,

24  you know, if she was interested, we would consider it.  I

25  explained the same thing, that this would be the severance

1   and it would be the regular severance with no other

2   incentives.  I explained in both cases, both with Mr.

3   Slabogin and with Eleanor, that to do that I would have to

4   put together and give them a release document which they

5   would have, again, time to review, the 45 days, plus

6   encourage them to talk with other people about it, including

7   counsel, to make sure that they understood the language,

8   understood what they were signing it, before they signed it

9   and agreed to it.

10  Q   Was it clear to you that Ms. Tickner was volunteering for

11  this?

12  A   Yes, she indicated no other reasons other than her

13  volunteering.

14  Q   Would Mr. Slabogin have had a job, continued to have a

15  job if he didn't accept the package?

16  A   Yes, he would.

17  Q   Would Ms. Tickner continue to be employed if she had not

18  accepted the package?

19  A   Yes, she would.

20  Q   I'm going to ask you to look at Plaintiffs' 83.

21          MS. MALLOY:  I don't think we need to pull it,

22  though.

23          (Pause.)

24          THE WITNESS:  My cheap Gillette glasses just broke.

25          (Laughter.)

1          THE WITNESS:  I'm sorry, which...

2          MS. MALLOY:  P-83.  You were asked about this the

3  other day.

4          (Pause.)

5          MS. MALLOY:  You can pull it up, Colleen, for

6  people's interest, it's not really too readable.

7          THE WITNESS:  Okay.

8  BY MS. MALLOY:

9  Q   Could you tell us what this is?

10 A   This is a summary of what I knew and what we knew at the

11 time during this process of reviewing the organization.  This

12 is a preliminary list of people that were planned to be

13 reduced and the date of this projection was May the 1st.

14 Q   And who prepared this?

15 A   With help from my colleague in HR, I prepared it.

16 Q   Okay.  And the parties have stipulated that the average

17 age of the employees on this document is 51.1.

18         MS. EYER:  That's as to R and D.

19         MS. MALLOY:  As to R and D, as to R and D.

20 BY MS. MALLOY:

21 Q   If you could turn to Plaintiffs' Exhibit 52?

22         (Pause.)

23 A   Okay.

24 Q   And could you tell us what this is?

25 A   In kind of jargon terms or technical terms, it's called

1   an appendix or Exhibit A, it is a requirement to be attached

2   to any release document that's given in the course of a

3   reduction in force.  The idea behind it is that everybody who

4   is getting a release document were obligated to disclose the

5   effects of what is happening in the reduction in force.  So,

6   this describes -- you don't have to put the names of people,

7   but you do have to put the specific job titles of people both

8   in the -- all of which are in the current organizational unit

9   being affected, the ones that are actually affected in the

10  reduction in force, you have to portray the ages of the

11  person, then you have to identify those in those same job

12  categories that are not affected in the reduction in force,

13  along with the ages displayed, and that's required.

14  Q    As of what date was Exhibit A finalized?

15  A    This was what was finalized as part of the May 25th

16  reduction-in-force activities.

17  Q    Okay.  Does Mr. Slabogin's position show up on this?

18  A    Yes, it does.

19  Q    And why is that?

20  A    Well, he -- Mr. Slabogin shows under the label of

21  Engineering Research Fellow I, he's one of three that are

22  identified in the RIF.

23  Q    And why does he show up on this Exhibit A that goes with

24  the releases?

25  A    Well, that was a question that we asked during the

1  process because he was volunteering.  And we got an

2  interpretive legal input, just make sure that we were

3  reporting this correctly, because I would have normally put

4  him in the ages of those not affected by a RIF, but I was

5  advised that to be in compliance, because he's going to be

6  getting severance and going out, that he should be listed as

7  a RIF.

8  Q   And Ms. Tickner shows up on this for the same reason?

9  A   That's correct, she's showing up as -- under the

10 Technologist II down at the bottom of the page.

11 Q   Okay.  And the parties have stipulated that the average

12 age of employees selected for layoff on this document is 62.

13        Could you describe for us why the first one that you

14 did, your first cut, May 1st, which is Exhibit 83, how that

15 is different from what ended up happening on May 25th, which

16 is Exhibit 52?

17 A   Okay.  Well, that was, again, on May 1st and, as has I

18 think been described, this was a process that was evolving as

19 we went.  You saw that from some of the work that we were

20 doing with the Corporate Development topic.  What changed

21 after May the 1st was we had at that point now input on all

22 of the voluntary admin. program.  So, if I start at the top

23 of this exhibit, people like Donna Bartman, who was one of

24 the admins. from my own group, she would have come off this

25 list because we had a separate category of voluntary admins.,

1   the 12 people that ultimately took that program.  So, she

2   would have come off.

3          If you look further down, Geraldine Luciani, who is

4   in the R and D Group, it's kind of after the break in the

5   page, she came off.  She was an admin. associate in R and D.

6   By the way, we did not offer a voluntary admin. associate

7   program in R and D, there was only two admins. in the

8   building.  She did not get reduced in force --

9   Q    And what was Ms. Luciani's age?

10  A    She was 55.

11  Q    Okay.

12  A    Ms. Rosemary Bryerly (ph.) was the customer service rep,

13  slash, administrative associate, also in R and D; was

14  originally projected at that time to be a potential person

15  affected by the reduction in force, she ended up not being

16  affected in the reduction in force.

17  Q    And what was Ms. Bryerly's age?

18  A    59.

19         Further down, there's a woman by the name of

20  Robianna Beagle-Renna (ph.).  She is a Chemist I, also

21  located in the Conshohocken facility.  I forget the exact

22  date, but in the middle of all of this process she actually

23  tendered her own resignation to take a job somewhere else

24  and, therefore, came off this list.

25  Q    And what was her age?

1  A    31.

2  Q    What other changes are there between the first May 1st

3  cut and the final one?

4  A    Further down on the same list, there's a gentleman by the

5  name of Kofi Hassan (ph.).   Kofi is a systems administrator-

6  IT type of support person that's also located in the

7  Conshohocken facility and ultimately, after discussions, he

8  came off the reduction-in-force list.

9       Mr. Lau is listed and we have heard discussion on

10  him.  Originally he was on this list by virtue of the fact

11  that it was clear in the eyes of Mike Boyce and others that

12  there wouldn't be a VP of R and D, and ultimately he ended up

13  in another job.

14       There's a gentleman by the name of Thomas Dang (ph.)

15  who was listed early on and ultimately Thomas was one of the

16  people that filled one of those two open jobs that were

17  identified earlier in R and D.  He is a process engineer.

18  So, there was a process engineer job that was open, he filled

19  that.  He was 34.

20       And then the last name on the list is a gentleman by

21  the name of Doug LePlant (ph.), was a sales representative in

22  -- I want say in the Southwest, I'm struggling with exactly

23  where he was, but he also, similar to Robianna Beagle-Renna,

24  tendered his resignation during this process and ultimately

25  left the organization some time in June.

1  Q   So, is it fair to say there's individual reasons for each

2  one of those?

3  A   Yes, there is.

4  Q   And then are there individuals who ended up coming on the

5  final list who were not on your May 1st list?

6  A   Yes, there were.

7  Q   And do you recall who they were?

8  A   Off the top of my head, a couple that came on, I believe,

9  were Mr. Senderov... and I think there was Ms. Callahan, who

10 was also in R and D, both of those people were in R and D,

11 and I'm drawing a blank.

12 Q   Okay.  Would you recall Mr. Beehan (ph.) going on?

13 A   Yes, Al Beehan was --

14 Q   And Slabogin and Tickner, who you already talked about,

15 went on at the end?

16 A   Slabogin, John Slabogin and Eleanor Tickner were also

17 final -- part of the final.

18 Q   What position did Ms. Callahan hold at R and D?

19 A   Ms. Callahan was the -- her official title was the office

20 supervisor for the R and D site.

21 Q   And why was she included in the layoff?

22 A   Her job was eliminated, she was a single incumbent.

23 Q   Okay.  Did you look at the ages of the R and D employees

24 who were selected for layoff?

25 A   We looked at and we had documentation of all the ages of

1  the employees that were laid off throughout the organization

2  in this process.

3  Q   And did that raise any concern for you, their ages?

4  A   I know I was asked a number of questions on this in my

5  depositions in both abstract and hypothetical, but the fact

6  of the matter is that, having been part of the process

7  directly and sat in on every single decision making, there

8  were good business reasons to support every one of the

9  decisions taken.  So, I was very comfortable that there was

10 no age issues when it was coming to the decisions.

11 Q   Was any type of succession planning used in connection

12 with this May, 2005 layoff?

13 A   None whatsoever.

14          THE COURT:  I will note for the record that when you

15 asked that question you were shaking your head from side-to-

16 side.

17          (Laughter.)

18          MS. MALLOY:  Can I chalk it up to late on a Friday

19 afternoon --

20          (Laughter.)

21          MS. MALLOY:  -- with a SEPTA strike?

22          THE WITNESS:  Was I shaking my head or --

23          THE COURT:  She was.

24          THE WITNESS:  Oh, I'm sorry.

25          MS. MALLOY:  Oh, I'm sorry.

1          THE COURT:  She was telling you how to answer it.

2          MS. MALLOY:  No, actually I -- I'm probably just

3    tired.

4          THE WITNESS:  That one I didn't need any help on.

5    BY MS. MALLOY:

6    Q    Prior to this litigation process actually starting, had

7    you ever heard that Mr. Imbriani gave an instruction to Ms.

8    Kutchins to replace Mr. Myszak?

9    A    No, I did not.

10   Q    Could you look at Plaintiffs' Exhibit 16, please?

11         (Pause.)

12         MS. EYER:  I'll just note for the record this is not

13   Plaintiffs' Exhibit 16.

14         MS. MALLOY:  That's correct, I'm going to ask him to

15   look at 16.

16         MS. EYER:  Okay.

17   BY MS. MALLOY:

18   Q    Could you tell us what Exhibit 16 is?

19         MR. GOLDSHAW:  Can we take off this document from

20   the screen if it's not the exhibit?

21         MS. MALLOY:  I'm going to ask him to identify these

22   people and their ages as having been retained.

23         MR. GOLDSHAW:  Can we get a copy?

24         (Pause.)

25   BY MS. MALLOY:

1   Q   Mr. Doran, I was just going to ask you to confirm that

2   the individuals on the document that are on the screen were

3   actually employees who were retained in R and D after the

4   May, 2005 RIF and that their ages are accurate.

5   A   Okay.  What you asked -- can I --

6           THE COURT:  She wants you to agree with her.

7   BY MS. MALLOY:

8   Q   Well, the docu -- Exhibit 16 is what?

9   A   Exhibit 16, since we didn't explain what it is for the

10  jury, it's a complete listing of the organization by person

11  for both Valley Forge and R and D Conshohocken, and it has in

12  there -- it's projected as of 5/31 and the report was run on

13  March 21st of '05.  So, it's the starting point, as I

14  described before --

15  Q   And the parties have agreed that the dates on here are

16  accurate?

17  A   So, using this, I'll now go to the R and D section.

18          (Pause.)

19  A   And the question that you want me to answer, please?

20  Q   Can you confirm that the individuals on the screen were

21  employees who were retained after the RIF in R and D and that

22  their ages are accurate?

23  A   Okay.  I'm looking at Mr. Gravinese, and his age at the

24  time of the RIF was 66 and he was retained in the

25  organization.

1          THE COURT:  Well, do you agree that all of them are

2    correct in this?

3          THE WITNESS:  I can go through each one, your Honor,

4    but I don't think there's anything inaccurate about the

5    chart.  I can --

6          THE COURT:  We're all going to assume that it's

7    accurate.  Go ahead.

8          MS. MALLOY:  Okay.  And could you also call up the

9    second page of that?

10   BY MS. MALLOY:

11   Q   And would that also be your testimony that those

12   individuals listed from 10 to 14 were retained after the RIF

13   in R and D and that their ages are accurate?

14   A   I'll do one quick check.  Number one, all of the people

15   were retained, I know that, because they're still in the

16   organization.

17         THE COURT:  We're all going to assume that the ages

18   are accurate.

19         MS. MALLOY:  Okay.

20         THE WITNESS:  Okay.

21   BY MS. MALLOY:

22   Q   As vice president of Human Resources, would you be

23   familiar with any new hires into R and D since the layoff?

24   A   Yes.

25   Q   Has anyone been hired to replace any of the plaintiffs?

1  A   No, they have not.

2  Q   Are you familiar with job grades at PQ?

3  A   Yes.

4  Q   Could you testify as to the position that Erin Fisher

5  held prior to the layoff?

6  A   Immediately prior to the layoff, she was at the Senior

7  Level Technician and I think right around the layoff or right

8  before the layoff she was promoted into a Chemist I position,

9  which is the -- we have a job family, so there's a ladder

10  that -- the first ladder is Technician, leading to

11  Technologist; the next part of the technical ladder is

12  Chemists I through V; and then, beyond that, you get into

13  what is more the scientific community.  So, it starts with

14  Research and Engineering, and then Research and Engineering

15  Fellows, leading to Principal Scientist.  So, these are

16  pretty credentialed, educated people.

17  Q   Do you have to have a PhD to be a Principal Scientist?

18  A   At certain parts of the ladder there's PhD requirements,

19  I don't recall exactly where that starts.

20  Q   Okay.  Do you recall how much Ms. Fisher was earning at

21  the time of the layoff?

22  A   Approximately $53,000 or thereabouts.

23  Q   And Reggie Thompson held the position of Technologist, is

24  that correct?

25  A   Yes.  He was at the senior level of the Technologist

1   scale, which is right before the Chemist scale, and he's a

2   fairly long-service gentleman and was making about right

3   around 59, $60,000, something like that.

4           MS. MALLOY:  I have no further questions.

5           MS. EYER:  Yes, your Honor.  I don't know if now

6   would be a convenient time for the afternoon break; if not, I

7   can go ahead and get started.

8           THE COURT:  Go right ahead.

9                    CROSS-EXAMINATION

10  BY MS. EYER:

11  Q    You were responsible for the production of documents in

12  this case, correct?

13  A    In...

14  Q    From the PQ side?

15  A    In terms of the discovery process?

16  Q    That's correct.

17  A    I was certainly involved in that and responsible for

18  facilitating that on behalf of PQ.

19  Q    And PQ produced a lot of documents, right?

20          THE COURT:  Yes, they have.

21          THE WITNESS:  Thousands.

22  BY MS. EYER:

23  Q    In the range of 14 to 15,000?

24  A    I would say that's probably -- I would have estimated

25  more.

1  Q   Isn't it true that nowhere in that documentation is any

2  document where Dr. Lau recommends the termination of Ms.

3  Marcus or Mr. Wypart?

4  A   I would disagree.

5  Q   Okay.  Could you please direct our attention to the

6  document where Dr. Lau recommends the termination of Ms.

7  Marcus or Mr. Wypart?

8          MS. MALLOY:  Your Honor, I don't think we have that

9  much paper in the courtroom.  Objection.

10         THE COURT:  I'm going to let the witness fend for

11 himself.

12         THE WITNESS:  I believe that the documents that were

13 the updates from John Lau to me reflecting discussions and

14 decisions that he had to take certainly clearly defined that

15 Ms. Marcus was associated with a decision related to the

16 elimination of Corporate Development.

17 BY MS. EYER:

18 Q   Well, let's take a look at those --

19         THE COURT:  But it wasn't his idea, was it?

20         THE WITNESS:  Yes, sir, it was.

21         THE COURT:  All right.

22 BY MS. EYER:

23 Q   Let's take a look at this --

24 A   Not the decision to reduce --

25         THE COURT:  That's what I mean, yes.

1      THE WITNESS:  Yes, not the Corporate Development

2  decision, but certainly the effect on people was his

3  decision.

4  BY MS. EYER:

5  Q   Let's take a look at the specific documents.

6      MS. EYER:  Could I get back up D-22?

7      (Pause.)

8      MS. EYER:  If you could highlight the bottom part of

9  the chart where Bonnie Marcus and Roman Wypart appear?

10  BY MS. EYER:

11  Q   Is this the document you were referring to, sir?

12  A   Yes, it is.

13  Q   Isn't it true that this document does not recommend

14  Bonnie Marcus and Roman Wypart for termination, and in fact

15  that the third individual that appears grouped with them was

16  not terminated as part of the 2005 RIF?

17  A   I would agree that Bonnie Marcus and Roman Wypart were on

18  this document and, we can argue semantics, but this document

19  says, "The individuals listed, Bonnie Marcus and Roman

20  Wypart, and their cost centers and their positions, are the

21  ones likely to be affected when the Corporate Development

22  Program is identified."

23      THE COURT:  It says, "most likely."

24      THE WITNESS:  Yep.  And I would agree that Erin

25  Fisher was not affected.

Doran - Cross                              173

1    BY MS. EYER:

2    Q    And my question for you is, does -- is it your contention

3    that this is a recommendation by John Lau to terminate Ms.

4    Marcus and Mr. Wypart?

5    A    Based on my discussions with John Lau, I have no doubt

6    that this was his direction in terms of when the Corporate

7    Development decision was taken.

8    Q    Can I ask you, sir, then why is it that Ms. Fisher, age

9    35, was not also fired at the time that the Corporate

10   Development Project was eliminated?

11   A    Because Ms. Fisher, as has been talked about in a number

12   of different ways, was retained in the organization at a

13   lower level doing follow-on work.

14   Q    Let me ask you, sir, you were present for Dr. Lau's sworn

15   testimony yesterday, correct?

16   A    Yes, I was.

17   Q    Did you hear him admit that there is no document in which

18   he recommends the termination of Plaintiffs Bonnie Marcus and

19   Roman Wypart?

20   A    I believe I heard him say that, yes.

21          THE COURT:   I think it's a bit late in the day to be

22   testing his hearing.  Do you have anything that will add to

23   our store of knowledge?  Let's hear it.

24          MS. EYER:  I do, your Honor.

25          Can you take that down, please?

1          (Pause.)

2     BY MS. EYER:

3     Q    If I could direct your attention at this time to P-32?  I

4     don't know if you have it in the binder in front of you.  Is

5     this Plaintiffs' Exhibits?  Yes.

6     A    I'll look here because my -- rather than put these

7     glasses on and off and --

8     Q    That's fine.

9     A    Okay?

10    Q    This is a memorandum prepared by Colleen DelMonte and

11    Rosalyn Kutchins, correct?  P-32.

12    A    Yes, they are the authors.

13    Q    And Plaintiffs Wypart and Marcus, their names do appear

14    on this list, isn't that right?

15    A    I see both names on the list, yes.

16    Q    And in fact everyone on this list except Dr. Lau was

17    terminated as part of the 2005 RIF?

18    A    I would agree.

19    Q    And, Dr. Lau, he was the only one under the age of 55 at

20    the time, isn't that right?

21    A    For the people on this list?  If you represent that, I'll

22    agree with you.

23    Q    And he is also the only one that Michael Boyce, the CEO,

24    crossed off the list, isn't that right?

25    A    I think we heard --

1    THE COURT:  Yes, it is.

2    THE WITNESS:  -- testimony to that effect.

3  BY MS. EYER:

4  Q   As the head of HR you have been responsible for reviewing

5  and verifying the factual accuracies of the explanations that

6  PQ has given for why Ms. Marcus and Mr. Wypart were

7  terminated, correct?

8  A   That's correct.

9  Q   And you also stated in your testimony that at the time

10  you were aware of what the reasons for each individual

11  termination, correct?

12  A   I did.

13  Q   And you also sat through John Lau's testimony during this

14  trial regarding the reasons why Ms. Marcus and Mr. Wypart

15  were terminated, right?

16  A   I did.

17  Q   So, you heard Dr. Lau testify, correct, that Ms. Marcus

18  was terminated in part because of her Detergent Zeolites

19  funding, is that right?

20  A   I heard him say those words, yes.

21  Q   Do you believe that Ms. Marcus was in fact terminated in

22  part because of her Detergent Zeolite funding?

23  A   I have no reason to doubt it.

24  Q   Well, let's take a look at what you verified under oath

25  was, "in full detail the reason or reasons why PQ eliminated

1   Ms. Marcus' position."

2   A    Okay.

3   Q    I direct your attention to P-288.  Do you want the binder

4   or do you want to just look at it on the screen?

5   A    That depends how big it is.

6   Q    It's smaller than this.

7   A    Okay, then I probably will use the binder.

8          (Pause.)

9   A    Thank you.  288?

10  Q    For the record, the response -- the question states, "Set

11  forth in full detail the reason or reasons why PQ eliminated

12  Ms. Marcus' position."

13         The response is, "PQ decided to eliminate funding

14  from the corporate holding company which supported the

15  research and development conducted by Corporate Development

16  Program, CDP.  The business units were then authorized to

17  determine what, if any, Research and Development projects

18  would continue to be funded by the business units.  As a

19  result of this process, the funding for the Research and

20  Development projects which Marcus was overseeing was

21  virtually eliminated and her position was no longer needed.

22         Isn't it true that you personally verified the

23  factual accuracy of this response?

24  A    Yes, I did, on August 26th of 2008.

25  Q    And there's no mention in this response of any Detergent

1    Zeolites funding, is there?

2    A    No, there is not.

3    Q    Let's talk now about Mr. Wypart.  You heard Dr. Lau

4    testify that he tried to get Mr. Wypart Potters Industries

5    funding, correct?

6    A    I heard him say that, yes.

7    Q    And do you believe that Mr. Wypart was terminated in part

8    because Dr. Lau was unable to secure Potters Industries

9    funding?

10   A    I have no reason to doubt it.

11   Q    I would direct your attention to P-290

12        (Pause.)

13   Q    Again, this is what you swore was, "in full detail the

14   reason or reasons why PQ eliminated Mr. Wypart's position."

15        And for the record it is, "PQ decided to eliminate

16   funding from the corporate holding company which supported

17   the research and development conducted through the Corporate

18   Development Program, CDP.  The business units were then

19   authorized to determine what if any research and development

20   projects would continue to be funded by the business units.

21   As a result of this process, the funding for the research

22   which Wypart was conducting was eliminated."

23        There is no mention of Potters funding in this

24   response, is there?

25   A    No, there is not.

1  Q   And in fact you have previously admitted under oath that

2  PQ never raised this explanation before July of this year,

3  isn't that right?

4  A   If you have something that would suggest that in a prior

5  deposition, I have no reason to dispute it.

6  Q   And that's four years after the reduction in force,

7  correct?

8  A   Which is four years?

9  Q   July of this year.

10  A   July 30th of 2008, yes.

11  Q   I am referring specifically to your sworn testimony that

12  PQ never raised this explanation before July of 2009?

13  A   If you represent that I said that, I have no reason to

14  change it.

15  Q   Let's come back to the explanation on P-290.

16  A   Okay.

17  Q   Is it accurate that after the elimination of the CD

18  Program the business units were authorized to determine what

19  if any research and development projects they would continue

20  to fund?

21  A   Are you referring to the words in this?

22  Q   Yes.

23  A   Yes.  And your sworn response indicates that it was as a

24  result of this process that Ms. Marcus and Mr. Wypart were

25  terminated, right?

1   A    That's correct.

2   Q    Isn't it true that the decisions on what CD projects to

3   fund didn't happen until after the 2005 reduction in force?

4   A    No, I think we have heard testimony that there was a lot

5   of discussions going on and there was projections of what

6   would or wouldn't happen, and all of that was concluded with

7   the reduction in force.

8   Q    My question for you was, specifically as to the CD

9   projects and which of those would be picked up by the

10  business units, isn't it true that the decision was made

11  after the reduction in force?

12  A    Ultimately, they had to pick it up after the reduction in

13  force because there was nobody there to do it.

14  Q    I'm referring to the decision, sir.  And let me direct

15  your attention at this time to an exhibit, P-46.

16  A    Okay.

17            (Pause.)

18  A    That one is big enough to read.

19  Q    This is an organizational announcement dated June 16th,

20  2005, several weeks after the RIF, two to three weeks after

21  the RIF?

22  A    That's correct.

23  Q    And it states, "The Corporate Exploratory Development

24  projects will no longer be funded by Corporate.  Therefore,

25  the respective businesses will determine which aspects of

1  those projects they wish to continue to fund."  Isn't that

2  correct?

3  A    That's what it says.

4  Q    And in fact you yourself have previously stated under

5  oath that you didn't think that the final decisions were made

6  until after the plaintiffs' termination, isn't that right?

7  A    If you have something that says I said that, I have no

8  reason to dispute it at this point.

9  Q    I'm happy to direct you to your testimony if you have any

10  doubt that you said that.

11  A    I take your word for it.

12         THE COURT:  He's taking your word for it.  Go on to

13  something else.

14  BY MS. EYER:

15  Q    Ms. Marcus and Mr. Wypart, they both held positions that

16  had other incumbents with the same job title, isn't that

17  right?

18  A    There were other people in the organization that held a

19  similar job title because, as we have used in a couple of

20  examples, we have in some cases titles that are similar but

21  the specific jobs and what people do are different within

22  those job titles.

23  Q    My question for you, sir, is wouldn't you agree that

24  employees who hold the same job title would be considered to

25  be at the same job level?

1   A    I would agree.

2   Q    And of the employees --

3   A    Other than specifically they may be paid slightly

4   different, they might have different responsibilities, but I

5   would agree with the level part.

6   Q    And of the employees -- and the salaries would be roughly

7   the same, is that also correct?

8   A    It depends on how long they've been in the position,

9   their length of service.  So, some people that have been in

10  the same position for a long period of time conceivably could

11  have a higher salary than somebody that just got into the

12  position.

13  Q    But the company has fixed limited salary ranges for each

14  position, is that correct?

15  A    Well, we have salary ranges, but I wouldn't agree that

16  they're fixed.

17  Q    My question for you is, of the employees who shared Mr.

18  Wypart's job title in particular, every single one age 55 or

19  older was let go, isn't that right?

20          THE COURT:  Even the married ones.

21          THE WITNESS:  The answer is yes and they were doing

22  work in other parts of the business.

23  BY MS. EYER:

24  Q    And each of the employees under the age of 55 was kept,

25  isn't that right?

1   A    In that example, the answer is yes.

2   Q    And the same is true as to the employees who shared Ms.

3   Marcus' job title as well, isn't that right?

4   A    In title?  Yes.

5   Q    Every one over the age of 55 was terminated and everyone

6   under the age of 55 was kept?

7   A    In that example with the explanation I've already given

8   that those other people were doing other work, the answer is

9   yes.

10  Q    You testified that at the time of the RIF the company

11  didn't consider allowing employees to bump or displace

12  others, correct?

13  A    That's correct.

14  Q    Were you present for Ms. Marcus' testimony that a younger

15  employee, Ed Myszak, took over her job duties at the time of

16  the RIF?

17  A    I heard that.

18  Q    And were you present for the reading of the testimony of

19  Erin Fisher, age 35, that 80 to 85 percent of what she was

20  doing after the RIF were Mr. Wypart's job duties?

21  A    I heard that.

22  Q    Ms. Fisher and Mr. Myszak, they were a part of the

23  Chemicals Group after the RIF, isn't that right?

24  A    After the RIF, both Ms. Fisher and Mr. Myszak were part

25  of the Chemicals Group; before the RIF, Mr. Myszak was

1   already part of the Chemicals Group.

2   Q   And both of those individuals, the Chemicals Group, it

3   reported up to Mr. Imbriani, he was the head of that group,

4   isn't that right?

5   A   I think that's been established and you're correct.

6   Q   Sir, you've contended that Mr. Slabogin and Ms. Tickner's

7   employment, that they retired voluntarily, is that correct?

8   A   That's correct.

9   Q   You are aware, correct, that both Eleanor Tickner, John

10  Slabogin and Ms. Tickner's manager, Dr. Miller, who is a

11  current PQ employee, testified that they only approached you

12  because they were directed to go to HR by their managers?

13  A   I heard both their testimonies.

14  Q   Did you also hear Dr. Miller's testimony?

15  A   I did.

16  Q   And isn't it true that Mr. Slabogin and Ms. Tickner's

17  employment in fact ended because of the 2005 RIF?

18  A   They ended as -- at the same time frame and roughly the

19  same time frame, actually in both cases they left the

20  organization after the RIF under a voluntary agreement that

21  was talked with them and they signed.

22  Q   My specific question for you is whether their employment

23  ended because of the 2005 RIF.

24  A   I would say no.

25  Q   Sir, in your position as the vice president of HR, do you

1   ever deal with unemployment compensation matters?

2   A    Unemployment compensation matters?  Occasionally.

3   Q    And those are dealings with a state agency, right?

4   A    Yes.

5   Q    Do you consider it to be important to be truthful in your

6   dealings with the state unemployment compensation agency?

7   A    Not only with the agency, but in all my matters.

8            THE COURT:  He is always truthful.

9   BY MS. EYER:

10  Q    Let me direct your attention to P-293.

11  A    Okay.

12           (Pause.)

13  A    Which page would you like to refer to?

14  Q    First let me ask you, do you recognize this document?

15           THE COURT:  You have to tell him what page he's

16  supposed to look at.

17  BY MS. EYER:

18  Q    You can direct your attention to the second-to-last page,

19  which I believe -- or the third-to-last page, which I believe

20  bears your signature.

21  A    Page 10?

22  Q    That's correct.

23  A    Okay.

24  Q    Do you recognize this document as Eleanor Tickner's

25  severance agreement?

1   A   I recognize it as the transition agreement and general

2   release document that Eleanor Tickner executed with the

3   company as part of her voluntary separation.

4   Q   And am I correct that your signature appears on Page 10?

5   A   Yes, that's my signature.

6   Q   I would like to direct your attention to Page 4 of the

7   agreement to the section entitled, "Unemployment Compensation

8   Benefits."

9        For the record, it states, "The company agrees that

10  it will not contest Ms. Tickner's application for

11  unemployment compensation benefits.  In response to any

12  inquiries, the company will explain that Ms. Tickner's

13  employment ended because of a general reduction in force."

14       Sir, is it true that Ms. Tickner's employment ended

15  because of a general reduction in force?  I will ask you that

16  again.

17  A   No.

18  Q   So, you in this agreement are promising to lie to the UC

19  Commission, is that correct?

20  A   No.

21  Q   I would be happy to have you explain that?

22  A   As part of the total document, we're not going to protest

23  Ms. Tickner applying for unemployment insurance.

24  Q   And you specifically stated that in response to any

25  inquiries the company will explain that Ms. Tickner's

1  employment ended because of a general reduction in force,

2  correct?

3  A    That's correct.

4  Q    Sir, let me put back up P-83.

5         (Pause.)

6  Q    Sir, you acknowledge, correct, that on this document you

7  included -- you are tracking age information regarding the

8  people who were projected for termination in R and D,

9  correct?

10  A    Age is on here as one of the elements that we're

11  tracking, yes.

12  Q    And, if you could remind me, what was your explanation

13  for why that information was included?

14  A    Well, as one aspect, ultimately at the time of reduction

15  in force we have to tell people what their benefits are.

16  Some people are retirement-eligible, so they would have to

17  get pension information; some people are not, they would have

18  to get information on what they can do to make sure they keep

19  track of their pension rights if they're vested.  Everybody

20  over five years of service would be vested, so they have a

21  future pension right.  So, they need to understand what they

22  need to do to keep that connection with PQ in the future to

23  protect that right.  Many other things like that are related

24  to the age and service of the employees that we were

25  affecting.

1   Q    Let's talk about that explanation.

2   A    Okay.

3   Q    Isn't it true that you were also tracking the average age

4   of the employees slated for layoff?

5   A    Yes.

6   Q    And you wouldn't need to track that information for the

7   purposes of retirement, would you?

8   A    No.

9   Q    Sir, why were you tracking the average age of the

10  employees slated for layoff?

11  A    As part of the ultimate responsibility of making sure

12  that within the decisions and the process that we were taking

13  that we could see what the impacts were on the organization

14  in terms of all of the things that we're obligated to comply

15  with under the law.  So, how many people were affected by

16  race, by age, by sex -- and I won't repeat gender -- and so

17  on --

18  Q    So --

19  A    -- all of which are covered under the law.

20  Q    So, it's your contention that these documents were

21  created in order to comply with the age discrimination laws,

22  is that right?

23  A    As one element of complying, yes.

24  Q    Sir, isn't it true that the average age of the employees

25  who are slated for layoff became much older after these

1   documents were created?

2   A    Number one, this --

3            THE COURT:  Well, excuse me, but that question

4   doesn't make any sense, everybody's age became older after...

5            MS. EYER:  Thank you, your Honor.

6   BY MS. EYER:

7   Q    Accounting for the one-month difference, the average age

8   went up by about ten years from the employees who were listed

9   on the chart to the actual employees who were laid off?

10  A    Can you please read the exhibit number so I can look at

11  it in the book?

12  Q    Sure, P-83.

13  A    Thank you.

14           (Pause.)

15  Q    I can also, to make it a little bit quicker, I can note

16  for the record that the parties have stipulated that the

17  average age of the employees in R and D on P-83 was 51.1 and

18  that the average age of the employees who were ultimately let

19  go in R and D was 62.

20           Did you when you saw that increase in age -- which

21  is what these documents were designed to track, correct?

22  A    Mm-hmm, yes.

23  Q    Did that cause you concern?

24  A    Not in and of itself, no, because in -- as I explained in

25  the prior conversation that Ms. Malloy asked me questions on,

1   I talked about the people that were on the original list

2   projected, the changes of that list, including people that

3   were of a more senior age coming onto the list, and that

4   certainly played into an increased average age at the time of

5   the final RIF.

6   Q    You stated that you do not believe the RIF decisions were

7   related to age, correct?

8   A    I did.

9   Q    And you have worked in HR for roughly 30 years, is that

10  about right?

11  A    Approximately.

12  Q    And during that time you've worked for both large

13  companies and small companies, isn't that right?

14  A    I have worked for three companies in my career.

15  Q    And one of them had literally thousands of employees,

16  isn't that right?

17  A    That's correct.

18  Q    Have you ever concluded that an employee was actually

19  discriminated against in all of the time that you've been an

20  HR professional?

21  A    We talked about this specifically in my deposition and

22  went around and around on this discussion.  And there are

23  certainly experiences in my career where there's been issues

24  and people raising questions about how they were being

25  treated, and I explained in my deposition around these types

1    of questions that I don't think I came to a conclusion that

2    there was a discrimination.  I think there's in a lot of

3    cases, there were managers who did things with people that

4    were received incorrectly or were received wrongly, and those

5    things were misunderstood and there's reasons for those in

6    some cases.

7    Q   IN fact, sir, you've never once even suspected

8    discrimination in your whole career, isn't that right?

9    A   No.  In fact, I explained in my deposition that I was

10   through a jury trial with an age discrimination lawsuit in a

11   previous employer.

12   Q   My specific question for you, sir, was have you ever even

13   suspected discrimination?

14   A   I haven't seen age discrimination in my career.

15   Q   I'm asking you about any kind of discrimination, sir.

16   A   I --

17           THE COURT:  He's agreeing with you, let's go on.

18   You're wasting everybody's time.

19           MS. EYER:  I have nothing further of this witness.

20           THE COURT:  May I inquire?

21           THE WITNESS:  Yes.

22           THE COURT:  How long were you head of Human

23   Relations at PQ?

24           THE WITNESS:  I joined in January 19th of 2004 and

25   I've been in that role since.

1          THE COURT:  Were you -- there was some testimony

2    earlier about somebody having made a complaint that a

3    supervisor was discriminating on the basis of age and that

4    there was a complaint made to the Human Relations Department;

5    do you know anything about that?

6          THE WITNESS:  I know about it as part of the

7    discovery process, your Honor.  I was not with the

8    organization at the time of that complaint and the HR person

9    they're referring to was the person in the job prior to my

10   joining the organization.

11         THE COURT:  Thank you, that's what I wanted to clear

12   up.  Thank you very much.

13         Anything further?

14         MS. MALLOY:  I do not have anything.

15         THE COURT:  You may step down.  Thank you, sir.

16         THE WITNESS:  Thank you, your Honor.

17         (Witness excused.)

18         THE COURT:  Any further evidence?

19         MR. ENNIS:  We have one more witness, your Honor.

20         THE COURT:  Well, we're going to have to wait until

21   Monday.  We have a possible transit strike problem to cope

22   with for getting home.

23         We'll recess until Monday morning, but the case will

24   be over on Monday, rain or shine.  Have a nice weekend,

25   everyone.  We'll see you on Monday.

1          (Court adjourned at 3:54 o'clock p.m.)

2                          * * *

1                           I N D E X

2    DEFENDANT'S WITNESSES      DIRECT  CROSS  REDIRECT  RECROSS

3    Michael R. Boyce

4      By Ms. Malloy              3                24

5      By Ms. Eyer                       16

6    John H. Johnson, IV

7      By Mr. Ennis              26                48

8      By Ms. Eyer                       46

9    Rosalyn Kutchins

10     By Ms. Malloy             49

11     By Mr. Goldshaw                   79

12   Pia DiGirolamo

13     By Mr. Ennis          99, 106

14     By Ms. Eyer (Voir Dire)          104

15     By Ms. Eyer                      119

16   Kevin Doran

17     By Ms. Malloy            134

18     By Ms. Eyer                      170

19                            *  *  *

CERTIFICATION

     I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


Geraldine C. Laws, CET          Dated 12/14/09
Laws Transcription Service