```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                          - - -

BONNIE MARCUS, et al.      :  CIVIL ACTION NO. 07-02075
                           :
          v.               :  Philadelphia, Pennsylvania
                           :  November 9, 2009
PQ CORPORATION             :  10:06 o'clock a.m.
. . . . . . . . . . . . . . .

                     JURY TRIAL - DAY 6
             BEFORE THE HONORABLE JOHN P. FULLAM
             UNITED STATES DISTRICT COURT JUDGE

                          - - -

APPEARANCES:

For the Plaintiffs:        SCOTT B. GOLDSHAW, ESQUIRE
                           KATIE EYER, ESQUIRE
                           Salmanson Goldshaw, PC
                           Two Penn Center, Suite 1230
                           1500 John F. Kennedy Boulevard
                           Philadelphia, PA  19102

For the Defendant:         ELIZABETH A. MALLOY, ESQUIRE
                           PETER ENNIS, ESQUIRE
                           Buchanan Ingersoll & Rooney, PC
                           1835 Market Street, 14th Floor
                           Philadelphia, PA  19103-2985

                          - - -


ESR Operator:              Dennis Taylor

Transcribed by:            Jo-Anne L. Hutt,
                           Laws Transcription Service

(Proceedings recorded by For The Record Gold digital sound
recording; transcript provided by transcription service.)

                          - - -


                  Laws Transcription Service
                    48 W. LaCrosse Avenue
                     Lansdowne, PA 19050
                       (610)623-4178
```

```
 1              (The following occurred in open court at 10:06
 2   o'clock a.m.:)
 3              (The jury entered the courtroom.)
 4              THE COURT:  Good morning.
 5              MR. ENNIS:  Good morning, your Honor.
 6              MR. GOLDSHAW:  Good morning, your Honor.
 7              MS. EYER:  Good morning, your Honor.
 8              MS. MALLOY:  Good morning, your Honor.
 9              THE COURT:  Be seated, everybody.
10              Proceed.
11              MR. ENNIS:  PQ calls Ed Myszak.
12              EDWARD MYSZAK, after having been previously duly
13   sworn as a witness, was examined and testified further as
14   follows:
15                        DIRECT EXAMINATION
16   BY MR. ENNIS:
17   Q    Mr. Myszak, you testified in this trial before?
18   A    That's correct.
19   Q    Can you tell the jury how long you've been employed by
20   PQ?
21   A    28 years.
22   Q    And what is your current age?
23   A    59.
24   Q    What project are you working on right now?  What's the
25   biggest project you're working on?
```

1   A     Warm mix asphalt.

2   Q     And is that one of the biggest development projects that

3   PQ has?

4   A     Yes, it is.

5   Q     How long have you been working on it?

6   A     Since, roughly, 2004.

7   Q     And when were you demoted to tech service manager?

8   A     In 2003.

9   Q     Do you remember the month, approximately?

10  A     I think it was March.

11  Q     You testified earlier that you went to Kevin Doran when

12  you were excluded from a meeting; do you remember that?

13  A     That's correct.

14  Q     And when did that occur?

15  A     In 2006, I believe.

16  Q     And what did Mr. Doran say to you in response to your

17  comment about being excluded?

18  A     He said, Wait for a few weeks, maybe three weeks, and

19  I'll see how the company views me at that point.

20  Q     And what did you find out, if anything, in a few weeks?

21  A     I was given a bonus and put on bonus for the following

22  year.

23  Q     And do you have an idea how old Mr. Imbriani is?

24  A     Somewhere in his 60s.

25  Q     And is he still with the company?

1   A    No.

2   Q    When did he leave?

3   A    I believe it was 2006.

4   Q    Did you ever hear Roz Kutchins say that it was time for

5   people like Bonnie Marcus to leave graciously and make way

6   for younger people like Erin Fisher?

7   A    Absolutely not.

8   Q    Is that something that you would remember?

9   A    Absolutely.

10  Q    Could you tell the jury your educational background?

11  A    I have a B.S. in Chemical Engineering, an M.S. in

12  Chemical Engineering, and an M.B.A. in Financial Management.

13  Q    And where did you obtain those degrees?

14  A    Drexel University.

15  Q    And could you tell the jury your employment history

16  prior to PQ?

17  A    I worked for Rohm and Haas for seven or eight years, and

18  Aamco Transmissions for roughly three.

19  Q    Okay.  And you joined PQ when?

20  A    1981.

21  Q    And, again, could you briefly go through your employment

22  history at PQ?

23  A    I came in as a purchasing manager.  Then I was promoted

24  to division service manager, which is purchasing,

25  engineering, I.S., and customer service.  Then I went into

1   product management for a subsidiary of PQ's.  Then in --

2   Q    Let me just stop you there.  What does "product

3   management" mean?

4   A    I would be responsible for the profit and loss statement

5   for that segment of business, and also to increase the sales

6   in that area.

7   Q    Okay.  And how long were you in that position?

8   A    I believe it was four years roughly.

9   Q    And what was the next position you held?

10  A    Then I went into sales.

11  Q    And why did you go into sales at that point?

12  A    Rosalyn Kutchins suggested that I move into that role to

13  broaden my background.

14  Q    Okay.  And what was it that you were selling at that

15  point?

16  A    Quite frankly, the same thing I was product manager for

17  earlier.  It was colloidal silicas -- colloidal anemone

18  pentoxide and metal oxides.

19  Q    I surely don't understand.  I'm not sure anyone else.

20  Is there a lay term for that?

21  A    Flame retardants and materials used in -- in ceramics.

22  Q    Okay.  And were you selling any product that you had

23  actually developed?

24  A    Yes.

25  Q    And what was that?

1    A    It was a -- a product I had gotten a patent on.  It was

2    a new flame retardant used in poly olefin fibers, and it also

3    allowed -- we made a translucent material, which didn't exist

4    before.

5    Q    And you were able to sell that?

6    A    Yes.

7    Q    And was that product successful?

8    A    Yes.

9    Q    Is that a plastics-based product?

10   A    Yes.

11   Q    And then what was the next position you held?

12   A    Then I was business development manager for zeolites.

13   Q    Okay.

14   A    In the Zeolite Group.  Then I --

15   Q    Let me just stop you.  How long were you in that

16   position?

17   A    A couple years.

18   Q    And how did you come about to go into that position?

19   A    A position was opening up.  I had talked to Rosalyn

20   Kutchins and then interviewed with the vice president of that

21   division.

22   Q    Okay.  And in that position, what products were you

23   involved with?

24   A    PVC and the development of other -- other end use

25   applications for zeolites.

1   Q    And we've heard PVC in this trial.  What was your role

2   in the PVC project?

3   A    I ended up selling materials for that end use and

4   developing that application.

5   Q    Who started that project at PQ?

6   A    I did.

7   Q    And as business development manager, what were your

8   duties, overall duties?

9   A    To find new end use applications for zeolite outside of

10  the detergency market.

11  Q    And is that from a business perspective?

12  A    Yes.

13  Q    You weren't working in a lab?

14  A    No.

15  Q    Okay.  What was your next position?

16  A    Commercial manager for molecular sieves.

17  Q    And what were your job duties as the commercial manager?

18  A    Initially to get the plant built, and then I was

19  involved with development of the sales, getting sales for

20  that end use application.

21  Q    Were you in charge of the project getting the plant

22  built?

23  A    Yes.

24  Q    And then can you tell us what you were doing in terms of

25  sales?

1    A    For sales I was going out visiting accounts, and

2    convincing them to buy our product, even though we were the

3    new entrant in the marketplace.

4    Q    And, again, is that from a business perspective?

5    A    From the business perspective.

6    Q    You weren't in the lab at that time?

7    A    No.

8    Q    Okay.  What was your next position?

9    A    Business Group manager for industrial chemicals.

10   Q    And how long did you hold that position?

11   A    Three years.

12   Q    Is that a position you held immediately prior to the

13   tech service manager position?

14   A    That's correct.

15   Q    And who were you reporting to in that position?

16   A    Rosalyn Kutchins.

17   Q    And, very briefly, what were your duties in that

18   position?

19   A    Profit and loss for that particular business and

20   obtaining sales.

21   Q    When you say "profit and loss," what does that mean?

22   A    I'm responsible for whether that business makes money.

23   If it doesn't, I have to develop strategies in order for it

24   to turn around and -- and get those strategies implemented by

25   the sales force.

1    Q     Then you went to the tech service manager position?

2    A     That's correct.

3    Q     And can you tell the jury what your duties were in that

4    position?

5    A     Initially, they were to supply sales support to the --

6    to the sales group.  If they had questions, technical

7    questions, we would have them answered.  If a customer would

8    call, we would answer those questions also.

9    Q     Did you broaden your responsibilities at all?

10   A     Yes.

11   Q     And how did you do that?

12   A     We became more sales focused.  We would actually take

13   customer calls, and if it looked like it would be an

14   attractive new account, we would then pursue it all the way

15   up to where they were ready to purchase, and then get the

16   sales force involved.

17   Q     Is that something that the tech service manager position

18   had done previously?

19   A     No.

20   Q     Then you got your new position as the manager of

21   zeolites of R and D; is that right?

22   A     That's correct.

23   Q     Who told you that you were going to get that position?

24   A     Rosalyn Kutchins came in my office.

25   Q     And do you recall approximately when she came in and

1    told you?

2    A     It was some time in May of '05.

3    Q     Okay.  And what were you to do in that position?

4    A     Primarily, it was wood plastic composites, warm mix

5    asphalt, continuing in those areas, looking at nano A and

6    silver A, and obtaining sales in those areas.

7    Q     Okay.  And we'll come back to that -- the details of

8    that.

9          But, in general, with all those projects, what was

10   your -- what did understand your role to be?

11   A     Well, from a wood plastic composite standpoint, it was

12   to get a patent filed, and the others to -- to look at

13   growing the business from a sales standpoint.

14   Q     Okay.  In terms of wood plastic composites, WPC, what

15   was your understanding of the status of the project at that

16   time?

17   A     That the product was ready to go into the marketplace

18   for sale.

19   Q     And who did you hear that from?

20   A     Bonnie Marcus, Roman Wypart, and Erin Fisher.

21   Q     And what did you understand Ms. Fisher's role to be --

22   strike that.

23          Was Ms. Fisher going to be under you?

24   A     Yes, that's correct.

25   Q     And what did you understand her role to be at that time?

1    A    Essentially as a technician.

2    Q    Okay.  And what does that mean?

3    A    She would run any -- any lab samples that we needed to

4    run.  The customers would give us their formulations, we

5    would run those in the lab with the material.

6    Q    Was she going to do any formulations on her own?

7    A    No.

8    Q    Did her role change over time?

9    A    Yes, it did.

10   Q    And who had changed her role over time?

11   A    I did.

12   Q    Why did you do that?

13   A    Well, we were having -- we didn't have much work in the

14   laboratory standpoint, so I broadened her role into doing

15   more tech service and sales.

16   Q    Okay.  And Reggie Thompson was in your group?

17   A    That's correct.

18   Q    Can you tell the jury what Mr. Thompson's background is?

19   A    He's -- he's like an equipment expert in the lab.

20   Q    He's a technologist; is that correct?

21   A    Yes, that's correct.

22   Q    And how long had he been employed by PQ?

23   A    I honestly don't know.  A very long time.  It's got to

24   be 20 years maybe.

25   Q    And when you say he worked with the equipment, can you

1   give us an idea of what that means?

2   A    He would physically run the equipment, you know, make

3   samples, I guess.  He would identify pieces of equipment if

4   we wanted to run some stuff and put it together for us.

5   Q    Okay.  I'm going to show you what has been marked as

6   Plaintiffs' 255-A through F.

7            And in preparation for your testimony, have you

8   reviewed the documents in that binder, in terms of the

9   projects you mentioned before; nano A, silver A, PVC --

10  A    Yes.

11  Q    -- and, okay.

12           All right.  And before we go into them, let's start

13  with PVC, which I have marked as Tab A.  Do you see that --

14  A    Yes.

15  Q    -- at the top?

16  A    Yes.

17  Q    And it's actually behind E -- well, it's marked with a

18  yellow sticker with a Tab A; is that right?

19  A    Yes, it is.

20  Q    Now, before we turn to that --

21           THE COURT:  You can't do it before you turn to it,

22  but just have him turn to it.

23           MR. ENNIS:  Very good.  All right.

24           MR. GOLDSHAW:  Excuse me.  I don't have a yellow

25  sticker with a Tab A --

1          MR. ENNIS:  I'm sorry.

2          MR. GOLDSHAW:  -- can you tell me --

3          MR. ENNIS:  E.

4          MR. GOLDSHAW:  E.  Thank you.

5    BY MR. ENNIS:

6    Q    There's been testimony that Mr. Wypart spent 75 percent

7    of his time on PVC prior to the RIF.  How much time did you

8    spend on it?

9    A    Very little.  Maybe 5 percent.

10   Q    What was being done on PVC?

11   A    When I took over, all we were doing were answering

12   questions if a customer called from the outside.  That's it.

13   Q    Were either you or Ms. Fisher going out and selling PVC?

14   A    No, we were not selling PVC in North America.  We did

15   get a -- a request from our Mexican subsidiary to ask us to

16   come down and train them in 2006, and we did that.

17   Q    Okay.  And other than that, did you go out to any

18   customers?

19   A    No.

20          THE COURT:  For the record, would you please state

21   what your name is.  It didn't come out clearly before.

22          THE WITNESS:  My name?

23          THE COURT:  Your name.

24          THE WITNESS:  Edward A. Myszak, Jr.

25   BY MR. ENNIS:

1    Q    And could you spell your last name?

2    A    M-Y-S-Z-A-K.

3             THE COURT:  And you're not the same as Mr. Wymart.

4             THE WITNESS:  I'm not the same as who?

5             THE COURT:  Somebody named Wymart here?

6             MR. ENNIS:  Wypart.

7             THE COURT:  Wypart.  Okay.

8             Myszak is different from Wypart.  Got it.

9    BY MR. ENNIS:

10   Q    All right.  And this purports to be documents showing a

11   continuation of the PVC project.  The first document is a

12   study.  It says, Three-Year PVC Weathering Study, Erin

13   Fisher, February 2007 -- February 7, 2006.  Do you see that?

14   A    Yes, I do.

15   Q    And what did that involve?

16   A    That was a -- well, obviously it was a study started

17   three years ago, and all we did was get the final results in,

18   and we tabulated it and put it together in this report form.

19   Q    Okay.  The next page refers to 90-day criticals.  Do you

20   see that?

21            Oh, I'm sorry.  The next page says, Attachment ICD

22   Monthly Summary.  Do you see that?

23   A    Yes, I do.

24   Q    And is there anything in this document about PVC?

25   A    No.

1   Q     Okay.  If you'd turn about seven pages to the next

2   document, it's an e-mail from Neil Miller dated August 2,

3   2005.

4   A     Yes.

5   Q     Monthly report, analytical operations?

6   A     Yes.

7   Q     Is there anything about PVC in this document?

8   A     No, there is not.

9   Q     And if you turn to the next page -- the next document --

10  it's an e-mail from Erin Fisher to you and Chris Sennick

11  dated June 2005; is that right?

12  A     Yes.

13  Q     And that's about the weathering project?

14  A     That's correct.

15  Q     That's what you just talked about?

16  A     That's correct.

17  Q     And then finally there's a couple of e-mails from 2007,

18  regarding questions from Ms. Fisher to other people.  Do you

19  see those?

20  A     Yes, I do.

21  Q     And is that consistent with your recollection of how

22  many calls you would get regarding PVC?

23  A     That's correct.  There's only about a handful.

24  Q     The entire time that you can recall?

25  A     That's -- that's correct.

1    Q    And what was the -- how much PVC was being sold from

2    2004 to '05, or '06?

3    A    Well, it was declining.

4    Q    Okay.

5    A    Maybe a couple hundred thousand pounds.

6    Q    Next I want to talk about biocides --

7              THE COURT:  Just ask questions.

8              MR. ENNIS:  All right.

9              THE COURT:  Don't make speeches.

10   BY MR. ENNIS:

11   Q    Let's turn to Tab B.  It's marked with a B.  That's Tab

12   A.

13              And can you first tell the jury -- these are the

14   documents supporting the continuation of the silver A project

15   -- can you just tell the jury in general what was going on

16   with silver A after the RIF?

17   A    After the RIF, we were still running some samples in Ken

18   Berg's -- I call it a bug box --

19   Q    And why did you call it a bug box?

20   A    It's -- I don't know what's in it, but he's got all

21   these things and these bugs in there, and they grow on -- on

22   samples.

23   Q    Okay.  And is that something he was doing before?

24   A    It was something he was doing before.  We were doing

25   analytical work and that's what his function was at that

1    point.

2    Q    And how much time did that take?

3    A    Whatever it took him to put the samples in.  He let them

4    sit in there for three months roughly, and then pull them

5    out, and analyze them.

6    Q    Okay.  And in addition to the -- what Mr. Berg was

7    doing, was there also an EPA registration being done?

8    A    That's correct.

9    Q    And when did that start?

10   A    Boy, I think that started in 2004 or 5 --

11   Q    Mm-hmm.

12   A    -- 5.

13   Q    Okay.  All right.  And who was doing that?

14   A    The EPA registration was Phil Connolly and an outside

15   consultant we hired.

16   Q    All right.  And let's turn to the exhibit now, and the

17   first page is entitled, Work Performed on Silver A Around May

18   2005, Compiled by Ken Berg.  Is that the person you

19   referenced before?

20   A    That's correct.

21   Q    And does this appear to be what he was working on as far

22   as you were aware?

23   A    That's correct.

24   Q    And it has various samples from 2002 until December of

25   '05?

1    A    That's correct.

2    Q    And then the next group of documents is a large group

3    dealing with the EPA registration?

4    A    That's correct.

5    Q    And what's the purpose of the EPA registration?

6    A    In order to sell a product and claim that it's a

7    biocide, you need to file it with the EPA, to register it

8    with the EPA.  And we would also need that same registration

9    if we were going to be a toll manufacturer.

10   Q    Okay.  And then if you would turn about four or five

11   pages after the EPA registration to a document marked August

12   19, 2005, 90-Day Critical.  Do you see that?

13            THE COURT:  You're testing his eyesight, are we?

14            MR. ENNIS:  I was trying to mark some of these, but

15   I didn't get to all of them.

16            THE WITNESS:  What date was that again?

17   BY MR. ENNIS:

18   Q    August 19th, 2005.

19   A    Yes, I have it.

20   Q    And there's a reference there to the silver zeolite at

21   the very top?

22   A    Okay.  I have it.

23   Q    And what does it refer to?

24   A    The one I have says, "Submit EPA Registration through

25   product and Regulatory Associates," and that was completed on

1   6/20.  We were running a silver zeolite trial in the R and D

2   Development Lab, and we completed the preliminary mold study

3   at R and D on paper samples supplied by NS, which is National

4   Silicates, our subsidiary in Canada.  All samples showed mold

5   growth.  Patterson, Berg, and Connolly, to determine reasons

6   for negative results and suggest course of action."

7   Q    Were the results of the study that it didn't work?

8   A    That's correct.

9   Q    All right.  And was that as -- what was the purpose of

10  that particular study being done?  What were you going to use

11  the silver A for?

12  A    Well, as a moldicide and biocide.

13  Q    Okay.  The next thing I'd like you to do is turn to a

14  document that refers to -- it's entitled "NAI Business

15  Development Review, May 2006."

16  A    Okay.

17       MR. ENNIS:  And, Colleen, actually can you get 188,

18  Plaintiffs' 188?

19       (Pause.)

20  BY MR. ENNIS:

21  Q    And it's a very bad copy, but I can represent to you

22  that P-188 is the same document.  And what I'd like you to do

23  is turn to the third page in your book Mr. Myszak.

24       MR. ENNIS:  And Rene  -- I mean Colleen -- turn to

25  the next page.  Oh, you have it right there I think.

1              (Pause.)

2              THE WITNESS:  Okay.

3    BY MR. ENNIS:

4    Q    Okay?  Do you have that?

5    A    Yes.

6    Q    And it lists the projects under you?

7    A    That's correct.

8    Q    And one of them -- two of them at the bottom are silver

9    zeolite and nano A?

10   A    That's correct.

11   Q    All right.

12             MR. ENNIS:  And, Colleen, if would turn a few pages

13   to the budget document?

14             (Pause.)

15             Yes, you have it.  Can you make that bigger?

16   BY MR. ENNIS:

17   Q    Now, Mr. Myszak, this is from a business review in

18   November -- I mean in May of 2006; is that right?

19   A    That's correct.

20   Q    And when would the budgeting have been done for a

21   business review in May of 2006?

22   A    It would start in early fall 2005.

23   Q    And when would it be completed?

24   A    Generally, end of November, first week in December.

25   Q    All right.  So as of the end of November, beginning of

1  December, this is when this document would or the numbers on

2  this document would have been completed?

3  A    That's correct.

4  Q    And you see WPZ?

5  A    Right.

6  Q    That refers to a cost in 2006.

7  A    That's correct.

8  Q    Is that how much money you were going to spend?

9  A    That's correct.

10 Q    And, so, you were going to spend 235,000 on WPZ?

11 A    That's correct.

12 Q    And then warm mix?

13 A    Right.

14 Q    And then you have a little money -- you have 10,000 for

15 nano A and 20,000 for silver zeolite?

16 A    That's correct.

17 Q    That's what you were projecting in 2006?

18 A    That's correct.

19 Q    And why were you projecting that amount?  What was going

20 to be done?

21 A    For silver zeolite, we were contacting people who were

22 already selling into the marketplace, competitors, and asking

23 would they be interested in us becoming a toller for them,

24 and that's a -- a manufacturer, a domestic manufacturer.

25 Q    Were you going to be doing any development work

1   internally with PQ?

2   A    No.

3   Q    And, in fact, has any silver A been sold?

4   A    No.

5   Q    Ever?

6   A    No.

7   Q    All right.  And then let's go back to the end of this

8   exhibit, and you see a presentation, a Power Point

9   presentation?

10          (Pause.)

11          At the very end it says, Wood Polymer Composite

12   Resin Replacement System.

13   A    I can't find it.

14   Q    At the very end.

15   A    Very end, okay.  Okay.

16   Q    From May of 2008.  Do you see that?

17   A    May of 2008, yes.

18   Q    Does that have anything to do with the silver A project

19   that was being done in 2005?

20   A    No.

21   Q    Okay.  If you would turn to the tab that I have marked

22   C, and it is C, those are the documents that purport to be

23   the continuation of the nano A project.

24   A    Okay.

25   Q    All right?  And can you tell the jury, just in your own

1   words first, what was going on with the nano A project after

2   the 2005 reduction in force?

3   A    We were contact with Unilever.  They were the only ones

4   who expressed some interest in using a small particle-size

5   zeolite in their liquid laundry detergent.

6   Q    Okay.  If you turn seven pages in, there's a 90-day

7   critical with a date written on top, August 19th, 2005.

8   A    Okay.

9   Q    First of all, whose handwriting is that?

10  A    That's mine.

11  Q    And if you turn to the second page, it refers to nano A?

12  A    Yes, it does.

13  Q    And can you just tell the jury what's involved there?

14  A    Basically, we were obtaining customer input on potential

15  samples to Lever, which is Unilever, visit, and supply

16  samples to Lever, investigate anti-glomeration processes and

17  potential costs, develop a potential selling price, and

18  determine if acceptable, take feedback, analyze alternative

19  process to make the nano A for plastics applications, and

20  develop a sample for Novion.

21  Q    And why were you looking at an alternative process for

22  making it?

23  A    The synthesis that was developed was too expensive to

24  sell it as an additive for a laundry detergent.

25  Q    Okay.  And if you'd turn to the next page, that's a

1   revised budget for November 29th, 2005; is that correct?

2   A    That's correct.

3   Q    And it refers to nano A?

4   A    That's correct.

5   Q    And there's a reference to the description of the

6   product; is that right?

7   A    Yes, it is.

8   Q    And what does it say?

9   A    Milled 4A.

10  Q    And what does "milled 4A mean"?

11  A    We took zeolite, our standard grade product, and wet

12  milled it.

13  Q    Was that the work that was being done -- the same

14  product that was being done in the lab?

15  A    No, it's not.  This was done at our plant in

16  Jeffersonville, Indiani.

17  Q    And how did they make the product?  They just milled it

18  down?

19  A    You mean commercially, or, oh, yeah, they just put it --

20  put it in a device and it grinds it up.

21  Q    Okay.  And then if you turn to the next page, it looks

22  like you have the same business review documents that we've

23  seen before.  Do you see that?

24  A    Yes, I do.

25  Q    Including the May 2006 business report at the next --

1    the second document?

2    A    Yes.

3    Q    And if you'd turn to the budget document, which is the

4    fourth page?

5            MR. ENNIS:  And, Colleen, if you would turn back to

6    188 and put that budget document back on?

7            (Pause.)

8            And make it bigger, please?

9    BY MR. ENNIS:

10   Q    So this is from November of 2005; is that right?

11   A    This is -- the budget was put together in November of

12   2005.

13   Q    And you were budgeting, in terms of -- and, by the way,

14   there's a ranking here, 9 and 10?

15   A    Right.

16   Q    They're the lowest ranking?

17   A    That's correct.

18   Q    And you were budgeting $10,000 in 2006 for nano A?

19   A    That's correct.

20   Q    What was the purpose of that?

21   A    Primarily maintain contact with Lever while they were

22   analyzing the samples.

23   Q    And were you looking to become a toller?

24   A    For nano A?

25   Q    Yes.

1    A     No.

2    Q     Okay.  Any sales made of nano A?

3    A     No.

4    Q     Ever?

5    A     No.

6    Q     I'm going to show you what has been marked as

7    Plaintiffs' 255-G.

8              (Pause.)

9              And this purports to be the document that shows the

10   continuation of the WPC project; is that correct?

11   A     That is correct.

12   Q     Okay.  And before we get into the documents, can you

13   tell the jury what is going on with WPC, from your

14   perspective, in 2005?

15   A     From my perspective, we were in the process of

16   completing the patent application, and the goal we had set

17   was the end of September of 2005, to have that filed.  At

18   which point then we would be able to sample material to

19   potential accounts, and try to get sales.

20   Q     And in 2005, did PQ higher a consultant -- excuse me --

21   to do a market analysis?

22   A     Yes, we did.

23   Q     And would PQ have hired a market --

24             THE COURT:  Excuse me.  Was that hire or fire?

25   BY MR. ENNIS:

1   Q    Did PQ hire a consultant?

2   A    Yes, we hired a consultant.

3   Q    And the purpose of hiring the consultant was to do what?

4   A    Was for them -- they were experts in this area, and we

5   were getting market -- market data to help us decide the

6   selling price, contact names, et cetera.

7   Q    Okay.  And would PQ have hired a consultant if it didn't

8   think the product was ready for the market?

9   A    No, we would not.

10  Q    I'm going to show -- I'd like you to turn to what I've

11  marked as Tab A, and this is...

12          (Discussion held off the record.)

13  BY MR. ENNIS:

14  Q    And if you would turn -- if you'd look at 8059, and go

15  for like 30 or 40 pages, are those all documents from the

16  consultant?

17  A    (Witness complies.)

18          That's correct.

19  Q    And, in fact, I think they go from 8059 to 8159; is that

20  right, if you go to the second Tab A?

21  A    Second Tab A.

22          (Pause.)

23          That's correct.

24  Q    So approximately 100 pages of this is just the

25  consultant that was hired?

1   A    That's correct.

2   Q    And the other thing I think you talked about that was

3   going on in 2005, was you were obtaining a patent?

4   A    That's correct, a patent application.

5   Q    And is it true that there are literally hundreds of

6   pages in this binder that deal with the patent?

7   A    That's correct.

8   Q    And that was all from the process -- when did you file

9   for the patent?

10  A    We filed in September -- the end of September of 2005.

11          THE COURT:  Is there some reason for what we've been

12  going through?

13          MR. ENNIS:  Your Honor, it goes to --

14          THE COURT:  How many pages in what you're holding

15  relate to the patent?  What's the significance of that?

16          MR. ENNIS:  Your Honor, this purports to be a

17  continuation of a project, and these are the documents to

18  support it, and so the first document we've looked at is

19  reports from a consultant doing a market analysis that was

20  100 pages long, then there's hundreds of pages from the

21  patent that was submitted, and I'm just trying to show what

22  documents are being used to show that this project was

23  continuing, to show that they're consistent with what the

24  witness has testified.

25          THE COURT:  He hasn't testified yet, but go ahead.

1    BY MR. ENNIS:

2    Q    Okay.  Well, I want to go back then, and give us in your

3    opinion, or not your opinion, your testimony, what was being

4    done in 2005, on WPC?

5    A    We were doing no R and D work at that point in time.

6    All we were doing was filing the patent and then submitting

7    samples, a couple samples into the field once the patent was

8    filed.

9    Q    Okay.  And then at some point in time did a problem

10   develop with WPC?

11   A    Yes, it did.

12   Q    And what was the problem?

13   A    A water absorption problem.

14   Q    And what was the water absorption problem?

15   A    The material, when we substituted some of the poly

16   olefin for -- with the zeolite, the finished decking boards

17   started to absorb more water than what was allowed in their

18   specifications.

19   Q    Okay.  So the product this was going into was decking?

20   A    That's right.

21   Q    And, so, obviously if water gets into decking, that's a

22   problem?

23   A    That's a problem.

24   Q    All right.  And how did you find out about the problem?

25   A    The account that we submitted a sample to came back and

1    told us.

2    Q    And was that a surprise to you?

3    A    Very much so.

4    Q    And why is that?

5    A    Because we were -- again, I was led to believe that the

6    product was ready to go into the field.

7    Q    All right.  And, I'm sorry, did you find -- when did you

8    find that out?

9    A    It would have been in 2006, like some time in the first

10   quarter, roughly.

11   Q    All right.  And are there literally hundreds of pages of

12   water absorption documents in this binder?

13   A    Yes, there are.

14   Q    And that was something that Ms. Fisher was asked to look

15   at?

16   A    That's correct.

17   Q    And would she have been asked to do that if the product

18   was ready?

19   A    No, she would not.

20   Q    And, again, you had no idea of that being an issue at

21   the time of the RIF or shortly after?

22   A    That's correct.

23   Q    And has the project or have you ever sold WPC?

24   A    No, we have not.

25   Q    And have you been trying to fix the problem?

1  A    We did try for -- for quite a long time, and I don't

2  believe any work is being done on it right now.

3  Q    Okay.

4             MR. ENNIS:  That's all I have, your Honor.

5                        CROSS-EXAMINATION

6  BY MR. GOLDSHAW:

7  Q    Prior to the reduction in force in 2005, you weren't

8  even in the R and D Department, right?

9  A    That's correct.

10 Q    And it was at the time of the reduction in force that

11 you moved into the R and D Department as the zeolite R and D

12 manager, right?

13 A    I actually never reported to anyone in R and D.

14 Q    If an exhibit we've all seen a lot in this case, P-32,

15 were to state that you were moving into R and D, would --

16 A    I never moved into R and D.

17 Q    You became --

18 A    I didn't report to anyone --

19 Q    Let's put it this way --

20 A    -- in R and D.

21 Q    -- the position that you obtained was the zeolite R and

22 D manager, correct?

23 A    Yes, I think I had business development and R and D

24 manager --

25 Q    Okay.

1  A    -- all right?

2  Q    When you became the zeolite R and D manager, you then

3  became the manager responsible for the zeolite projects,

4  correct?

5  A    That's correct.

6  Q    And you were responsible for the nano A project?

7  A    That's correct.

8  Q    Which was a zeolite project?

9  A    That's correct.

10 Q    And you became responsible at that time for the biocides

11 II project, correct?

12 A    That's correct.

13 Q    Also a component, that is the silver A project, right?

14 A    That's correct.

15 Q    All zeolites projects?

16 A    That's correct.

17 Q    At the time of the RIF, you became responsible for the

18 PVC project, right?

19 A    That's correct.

20 Q    Also a zeolites project?

21 A    That's correct.

22 Q    And at the time of the RIF, you became responsible for

23 the WPC project, correct?

24 A    Correct.

25 Q    Which is also a zeolites project --

1   A    Correct.

2   Q    -- right?

3        Prior to the RIF, Bonnie Marcus was the person in

4   charge of managing the zeolites projects in R and D, correct?

5   A    I honestly don't know what she did.  I know she had some

6   function there, I just didn't know what.  I know she had wood

7   plastic composites.

8   Q    Mm-hmm.  So Bonnie Marcus, if others were to testify

9   that she was the manager responsible for all the zeolite R

10  and D projects, including the ones we just named, nano A,

11  biocides II, silver A, PVC, WPC, you wouldn't dispute that,

12  would you?

13  A    Right, as long as you left off warm mix asphalt.

14  Q    Okay.  Warm mix asphalt was assigned to you in 2004,

15  months before the reduction in force?

16  A    We -- this was one of those programs that we took on in

17  tech service when I was tech service manager.

18  Q    It was assigned --

19  A    Well, it wasn't assigned.  The calls came -- a call came

20  in and -- and we followed that protocol that I mentioned

21  earlier, that we would then look at growing that to the point

22  of sale, then turning it over to -- to a salesman.

23  Q    Well, the responsibility that you obtained over warm mix

24  asphalt, it occurred in 2004, I believe you said, right?

25  A    Okay, yeah.

1   Q    And it was responsibility given to you by Roz Kutchins,

2   right?

3   A    No, I reported to Pete Bailey in tech service.

4   Q    Was that within Michael Imbriani's unit?

5   A    Yes.

6   Q    After the reduction in force, Erin Fisher did patent

7   work on WPC, correct?

8   A    That's correct.

9   Q    And that was work that before Roman Wypart was doing, he

10  was working on, correct?

11  A    Well, then I'm not sure what you're talking about doing

12  work.

13  Q    Okay.  I'll clarify the question.

14        You said, I believe, that Erin Fisher was doing

15  patent work on WPC after you became the zeolite R and D

16  manager; is that right?

17  A    She was helping as was Bonnie and Roman in writing the

18  patent.

19  Q    Okay.

20  A    Okay.  Not doing any -- any laboratory work that I was

21  aware of.

22  Q    She was doing the type of work that Plaintiffs' Bonnie

23  Marcus and Roman Wypart were doing?

24  A    Well, she was the prime --

25  Q    Right.

1   A    -- person named on the patent.

2   Q    After the RIF, right?

3   A    Well, before the RIF.  The document that I had seen --

4   Q    Mm-hmm.

5   A    -- her name was listed first, which means she was the

6   prime person on the patent.  So I'm confused on the question

7   then.

8   Q    I wanted to know if Bonnie Marcus and Roman Wypart were

9   also working on the same patent that Erin Fisher was working

10  on after the RIF?

11  A    Well, yes.

12  Q    Okay.  And after the reduction in force, Erin Fisher

13  answered technical service questions from customers on PVC,

14  right?

15  A    That's correct.

16  Q    And that's work that Roman Wypart was doing before he

17  was fired, right?

18  A    That I don't know if he was answering questions from

19  customers.  I know he made some sales calls.

20  Q    Mm-hmm.  Erin Fisher went on some sales calls after the

21  RIF, right?

22  A    That's correct --

23  Q    And Roman Wypart --

24  A    -- but not in PVC.

25  Q    -- went on sales calls before he was fired, right?  You

1   said --

2   A    Yes.

3   Q    -- you knew that?

4   A    Yeah.

5   Q    And if Roman Wypart were to testify that he answered

6   technical service questions from customers on PVC before the

7   RIF, you wouldn't have a reason to dispute that, would you?

8   A    No, I would not.

9   Q    Erin Fisher went on -- went to conferences for WPC to

10  try to drum up businesses after the RIF, right?

11  A    That's correct.

12  Q    And Roman Wypart, before he was fired, he would go to

13  conferences for WPC to drum up businesses -- to drum up

14  business, right?

15  A    Erin went to those, from my understanding, went to some

16  of those same conferences before the RIF also, but I could be

17  wrong.

18  Q    Okay.  What I'm focusing on in my question is whether

19  before he was fired, Roman Wypart did the same sort of thing?

20  A    Could be, yeah.

21  Q    Okay.  When you learned about the problem on WPC that

22  you described --

23  A    Yes.

24  Q    -- you didn't learn about that -- you, personally,

25  didn't learn about that until after the RIF decisions had

1   already been made, right?

2   A    I didn't personally learn about it until after we had

3   submitted samples into the field.  That's correct, after the

4   RIF.

5   Q    Okay.  And when Unilever told you that they were no

6   longer interested in nano A, that was something that occurred

7   after the RIF decisions were made, too, right?

8   A    It was after the RIF, and it was a compatibility issue

9   with their -- with their material.

10  Q    And when you testified regarding the consultant that was

11  hired for WPC, and what the consultant found --

12  A    Mm-hmm.

13  Q    -- those findings by the consultant didn't come out

14  until after the plaintiffs were already fired in the RIF,

15  right?

16  A    That's correct.

17  Q    And is it fair to say that what you learned about

18  developments to projects that you inherited as the zeolite R

19  and D manager, all that information concerned events that

20  occurred after the RIF decisions were already made and the

21  plaintiffs were fired?

22  A    About nano A and such?

23  Q    All the zeolite projects, all the testimony you gave

24  about things that occurred after, it all happened after --

25  those developments all happened after the --

1   A    Correct.

2   Q    -- plaintiffs were already fired, right?

3   A    Okay.  Right.  Okay.

4        MR. GOLDSHAW:  I have nothing further.

5        THE WITNESS:  Okay.

6                    REDIRECT EXAMINATION

7   BY MR. ENNIS:

8   Q    Mr. Myszak, how much time did you spend on the warm mix

9   project in 2005?

10  A    Probably 70 plus percent of my time.

11  Q    And what about in 2006?

12  A    Probably 95 percent of my time.

13       MR. ENNIS:  That's all I have.

14       THE COURT:  You may step down.  Thank you, sir.

15       (Witness excused.)

16       MR. ENNIS:  And with that, your Honor, PQ rests

17  except for dealing with the issue of exhibits.

18       MS. EYER:  And, for the record, plaintiffs make a

19  motion for judgment as a matter of law and the issue of

20  mitigation.  We can argue it at a later time.

21       THE COURT:  All right.

22       Anybody have any more evidence to present?

23       MR. GOLDSHAW:  Yes, for rebuttal we call Yatao Hu.

24                 PLAINTIFFS' REBUTTAL EVIDENCE

25       YATAO HU, after having been first duly sworn as a

1  witness, was examined and testified as follows:

2          THE COURT:  I'm sorry, but could you sit down, and

3  talk into the microphone, and tell us your name again, and

4  spell both names.

5          THE WITNESS:  Okay.  My first name is Yatao,

6  Y-A-T-A-O, and last name H-U.

7          THE COURT:  Is that Y-A-P or Y-A-T?

8          THE WITNESS:  T as in Tom.

9          THE COURT:  T.  T as in time, okay.

10          (Pause.)

11          Go ahead.

12                      DIRECT EXAMINATION

13  BY MR. GOLDSHAW:

14  Q    Are you employed by PQ Corporation?

15  A    Yes.

16  Q    How long have you been employed?

17  A    I was hired on November --

18          THE COURT:  I'm sorry, but keep your voice up and

19  talk out loud, please.  Talk into the microphone.

20          THE WITNESS:  November 12th, 1996.

21  BY MR. GOLDSHAW:

22  Q    Mm-hmm.

23  A    So almost 13 years.

24  Q    Do you recall that there was a reduction in force

25  effecting older employees in R and D in May of 2005?

1   A    I do remember there's a reduction in force.

2   Q    All right.  Do you recall attending a meeting with the

3   new CEO, Michael Boyce, on June 1st, 2005?

4   A    Yes, I do.

5   Q    In that meeting, was the topic of the reorganization at

6   R and D discussed?

7   A    Yes.

8   Q    Did Michael Boyce make any comments regarding who was

9   responsible for the decisions for the RIF at R and D?

10  A    Decision, yes.  About reorganization, yes.

11  Q    What did Michael Boyce say on June 1st, 2005, regarding

12  who was responsible for the decision-making process for the

13  RIF at R and D?

14  A    If I still remember it correctly, that was many years

15  ago, I think that people involved Mike Imbriani, Colleen --

16  Q    That's Colleen Delmonte?

17  A    Yes.

18  Q    Okay.

19  A    And... I'm trying to remember.

20  Q    Do you recall in 2005, writing down some notes

21  pertaining to this?

22  A    Yes.

23  Q    Would it refresh your recollection if I were to provide

24  you with a copy of your notes that you could read?

25  A    Okay.

1    Q    Okay.  Your notes are at Exhibit P-179.

2              (Pause.)

3              So, now -- do you have the exhibit?

4              Let me help you.

5              (Pause.)

6              Please take a moment to review your notes, and then

7    tell me when you're done.

8    A    (Witness complies.)

9              Okay.  I'm done.

10   Q    Does that refresh your recollection?

11   A    Yes.

12   Q    Okay.  What did Michael Boyce say at that meeting on

13   June 1st, 2005, regarding who was responsible for the

14   decision-making process for the 2005 reduction in force?

15   A    Michael Imbriani, Colleen Delmonte, and Joe Caruso.

16   Q    Okay.  Did you, the following week, have a meeting with

17   Colleen Delmonte at R and D?

18   A    Yes.

19   Q    This was on June 8th, 2005?

20   A    Yes.

21   Q    Do you recall what Ms. Delmonte said at that meeting

22   regarding who was responsible for the RIF decisions at R and

23   D?

24   A    She said the decision was made by herself, Roz Kutchins,

25   Mike Imbriani, and John Lau.

1  Q    Did you ask Ms. Delmonte any questions at that meeting?

2  A    Yes, I did.

3  Q    What did you ask her?

4  A    I asked -- basically what I said is, That's different

5  than what we heard from the meeting we had with Mike Imbriani

6  -- with Michael Boyce.  And what we heard is John Lau was not

7  involved in the decision-making about the organization.  And

8  what Colleen Delmonte said is he was involved -- he made a

9  recommendation, but his recommendation was not taken.

10 Q    Mm-hmm.  When you say "his recommendation was not

11 taken," you're referring to John Lau?

12 A    Yes.

13         MR. GOLDSHAW:  Nothing further.

14         THE COURT:  Well, I do.  These notes of yours, did

15 you make the notes at the time of the meeting?

16         THE WITNESS:  No, this is after the meeting.  I was

17 talking with Bonnie Marcus and she asked me to write this.

18         THE COURT:  And you've had them in your possession

19 all this while?  Is what you're looking at a copy or is the

20 original the actual notes?

21         THE WITNESS:  This is a copy.  I don't have the

22 original.

23 BY MR. GOLDSHAW:

24 Q    When Ms. Marcus asked you to take the notes --

25 A    Mm-hmm.

1    Q    -- did she tell you --

2    A    No, not take.  This is after the meeting.  Because this

3    meeting are open to -- a specialty meeting for Mike --

4    Michael Boyce had for his whole side, and everyone was

5    invited, so I didn't feel that's anything secret when she

6    asked me to write it down.  This is after the meeting.  After

7    we talk about it.

8    Q    Okay.  When you wrote your notes, were they accurate in

9    all respects?

10   A    I -- I did what I believe was accurate at that time.

11            MR. GOLDSHAW:  Thank you.

12            THE COURT:  How long after the meeting was that?

13            THE WITNESS:  It doesn't have time over here, so I

14   cannot really give you --

15            THE COURT:  Well, you don't remember how long after

16   the meeting?  Was it a year after?  Six months after?  The

17   next week or what?

18            THE WITNESS:  No, this is at most a few days after

19   the meeting.

20            THE COURT:  Thank you.

21                    CROSS-EXAMINATION

22   BY MR. ENNIS:

23   Q    And, Ms. Hu, it's true that your notes indicate that

24   what Mr. Boyce was talking about was the reorganization of R

25   and D; isn't that right?

1   A     Yes, that's correct.

2   Q     And that's what Ms. Delmonte was talking about, the

3   reorganization of R and D?

4   A     Yes.

5              MR. ENNIS:  That's all I have.

6              THE COURT:  You may step down.  Thank you.

7              (Witness excused.)

8              MS. EYER:  At this time the plaintiffs call

9   Plaintiff Bonnie Marcus.

10             THE COURT:  She didn't hear you.

11             MS. EYER:  If I could just take a moment to get

12  these binders out of the way?

13             (Pause.)

14             BONNIE MARCUS, after having been previously duly

15  sworn as a witness, was resumed and testified further as

16  follows:

17                      DIRECT EXAMINATION

18  BY MS. EYER:

19  Q     Good morning, Ms. Marcus.

20  A     Good morning.

21  Q     Ms. Marcus, you were present in the courtroom for the

22  testimony of Ms. Kutchins --

23             THE COURT:  Yes, she's been present through

24  everybody's testimony.  Let's not waste time.

25             MS. EYER:  Okay.

1      THE COURT:  Just ask your question.

2  BY MS. EYER:

3  Q    In terms of the testimony given regarding the work that

4  continued on the zeolite projects after the RIF, at a general

5  level, is this the same type of work that you and Mr. Wypart

6  were performing before the RIF?

7  A    Yes, it is.

8  Q    Please describe?

9  A    What we were doing was what was just explained by Ed

10 Myszak also.  We were going out, looking for customers,

11 looking to see what could be done to get that product to

12 people, and the other thing we were doing was looking at

13 those materials as additives for other applications, so you

14 keep working on new applications, and commercializing new

15 applications, rather than just stopping if the first -- the

16 first thing you're going to use it in doesn't work.  You just

17 keep looking.  And that's what commercialization is, finding

18 the right customer for the right material and making the

19 right material.

20 Q    And were you and Mr. Wypart both doing work on

21 commercialization prior to the 2005 reduction in force?

22 A    Yes.

23 Q    Did you personally have commercialization experience

24 even prior to coming to PQ?

25 A    Prior to coming to PQ, that's what I'd been doing since

1   1984.  And, yes, I had commercialization experience.  As a
2   matter of fact, yesterday, or the other day when Mr. Boyce
3   said about the warm mix asphalt absorbing odors and taking
4   them out, I developed one of -- a product for Union Carbide
5   that's still one of their largest sellers, and it's an odor
6   remover, and that's what it does.  You put it in as a
7   zeolite, and it's sold as an odor remover, and it's being
8   used in -- mostly in personal care products and other things
9   like that.

10          But this is something that's been done for a while,
11   and, yes, I developed that.  And then when I went to -- and I
12   did other ones.  I did floor polish, and window polish, and
13   deodorants, and a whole bunch of different applications for
14   zeolites.  That was my job.

15          And then when I came to PQ, I started with Zeolist,
16   and their whole business is developing new materials and
17   getting them to the customer.  And my first job was working
18   with them to get an auto catalyst program set up, so you
19   could put zeolists inside auto catalysts, and take out the --
20   the stuff that the catalytic converter doesn't get.  And this
21   is a very important thing.  It was being more and more
22   regulated.  And I was working on diesel and stuff, and going
23   to customers, to Johnson Mathi, and Corning, and all the big
24   guys to try and figure out how we could get this material in.
25          So I did those and I did a number of other

1   applications for Zeolist.  And then when I went to

2   exploratory, one of the first ones that I started working on

3   was this MMA project, which was being used in a plastic for a

4   company called Lucite, and I worked on that, because we

5   couldn't make the material for them, but it was a good

6   market.

7          So we started working with tollers, and I helped,

8   Yatao and I actually veted tollers in both China and Korea

9   and we may have gone to another country.  And we picked a

10  toller that we thought was going to work.  And as late as --

11  I think it was either January or February of 2005, it was

12  just before the RIF, I went to Korea with the customer to

13  show them the plant, and explain to them how we were going to

14  get the material made, got the material done in a test trial,

15  brought it back, tested it, gave it to the customer, and they

16  passed it and we were chosen as the supplier.

17  Q    Ms. Marcus, as far as you know, the MMA project that you

18  were working on at the time of the 2005 RIF, has that gone on

19  to be commercially successful?

20  A    I believe it has because there was a large two-page

21  article in Chemical and Engineering News about two weeks ago,

22  about them opening some gigantic plant in Singapore using the

23  process, and they identified the catalyst, and we had been

24  the chosen supplier.

25          So I would assume that they bought it from PQ, and

1    that they were going to build another plant, it said in the

2    article, and that because they were so successful, they had

3    sold themselves to Mitsubishi for $1.6 billion.

4    Q    Let's come back to talking some more about the other

5    individual projects that you were working on at the time of

6    the RIF.

7    A    There were others besides MMA, but that...

8    Q    First of all, let me ask you:  Did you hear Mr. Myszak's

9    testimony here this morning, and did that testimony confirm

10   that a number of these projects, in fact, continued after the

11   2005 RIF?

12   A    Yes.

13   Q    And please hold up the two binders that appear before

14   you, that are in front of you on the stand, if you can?

15   A    (Witness complies.)

16        To pick these up, I think I have to stand up to do

17   it.  Okay.

18   Q    You've reviewed all of these documents, correct?

19   A    Yes, I did.

20   Q    And did all of them relate to the continuation of

21   projects that you or Mr. Wypart were working on after the

22   2005 RIF?

23   A    Yes.

24   Q    Could you take a look at the first tab, Tab A?

25   A    (Witness complies.)

1            And this is P-255?

2    Q    That's correct.

3    A    Okay.  Yes, ma'am.

4    Q    The documents that appear behind this tab, what project

5    do they relate to?

6    A    They relate to biocides II, which Mr. Myszak said was

7    silver, but there were other materials that we were looking

8    at, and we had filed some patent disclosures with the Legal

9    Department earlier looking at other PQ products, such as

10   silicates and some of the other zeolites.  We were not just

11   looking at silver.

12   Q    And this was a project that you were working on at the

13   time of the 2005 RIF, correct?

14   A    Correct.

15   Q    If you could direct your attention to the first document

16   that appears behind the tab?

17   A    (Witness complies.)

18   Q    And for the benefit of the jury, could you read the

19   title?

20   A    Work Performed on Silver A Biocide Around May 2005,

21   Compiled by Ken Berg.

22   Q    And what does this document show?

23   A    This document's the work that he did on silver -- the

24   silver A portion of the biocides project.

25   Q    And does it reflect any work continuing after the time

1   of the 2005 RIF?

2   A    Yes, it goes up to December.

3   Q    Mr. Myszak testified earlier that there wan an FDA

4   registration or FDA filing that was put in after the time of

5   the 2005 RIF.  Are you familiar with the purpose of such a

6   filing?

7   A    Yes, I am.  Well, we had gotten one for PVC, and it's a

8   very long, very onerous process that you have to go through

9   for the Government in order to be able to put a product in

10  anything that goes to a consumer in any way.  So it's not

11  just if it's going to go into plastic that's going to wrap

12  the stuff, but some of these materials like the silver A is

13  being used in washing machines now, and countertops and

14  stuff.  And because food would touch that, and you would eat

15  the food, you must do an FDA thing, and this one was started

16  in March of 2005.

17        And it's a very long, very tedious process.  The FDA

18  one for the PVCs took us months and months and months to

19  gather the data and get it in, and get it done.  It's a very

20  onerous project.

21  Q    Is that the type of project that you would undertake if

22  you were not intending to continue doing work in an area?

23  A    If I were the business manager, I wouldn't spend money

24  to do it, unless I knew it was going to go.

25  Q    If you could take a look now at a document that has been

1   marked PQBM-7889, which is a memorandum dated June 17th,

2   2005?  It's about two-thirds of the way through.

3              And it's here if you want to look at the chart.

4   It's 7889.

5              (Discussion held off the record.)

6   BY MS. EYER:

7   Q    It's got blocks on the front page.

8   A    Blocks?  Oh.

9   Q    As a true science person, they probably mean something

10  else, but they looked to me like blocks.

11  A    Sorry.  These blocks?

12  Q    Yes.

13  A    Oh, okay.  Actually, they are blocks.

14  Q    So I was right.

15  A    That's right.

16  Q    Let me ask you:  What does this document relate to?

17  A    This is using the biocide part that relates to polymer

18  wood composites, where we were trying to put in a variety of

19  different materials including the silver A and another

20  product, and in order to test these, it's not a matter of

21  just putting the stuff in the chamber, you have to work out

22  the formulation of the plastic that you want to put in, you

23  have to work out how that formulation's best going to work,

24  and Roman was doing that.

25             Then you have to make all those strips, and those

1    chips to go into the -- into the chamber, and this was

2    pictures of what happened to them after they were in the

3    chamber.

4    Q    And is the type of testing that's described here the

5    same type of testing that was being performed before the RIF?

6    A    Yes, on a variety of materials, not just silver.

7    Q    And here the results -- it's June 17th, 2005 -- the

8    results are being reported to Erin Fisher and Ed Myszak.  Who

9    would those results have been reported to prior to the RIF?

10   A    They would have been reported to Roman and me.  We were

11   running the project.

12   Q    Let's talk now about Tab B.

13   A    Tab B.

14   Q    Could you please tell us what project do those documents

15   relate to?

16   A    This is the MMA project that I mentioned about going to

17   Korea in January or February, and with the customer to get it

18   going.

19   Q    And were you able to determine from these documents

20   whether any of your own work on MMA continued after the RIF?

21   A    Yes, the stuff I was doing was continued by a person I

22   think who had the same title as I did, Cindy Conner.  And she

23   was handling some of it.  It was going to be transferred at

24   the end of 2004, but we had to continue doing the technical

25   work on it in 2005, and that's why I went to Korea.

1   Q    Let's take now -- let's take a look now at Tab C.

2   A    Tab C.

3   Q    Am I correct that these documents relate to the nano A

4   project?

5   A    Correct.

6   Q    And are you able to tell whether PQ continued any work

7   on the nano A project after the RIF, based on the documents

8   that were produced?

9   A    The ones that were produced, yes.

10  Q    And let me ask you:  Are you able to ascertain whether

11  PQ produced all of the documents relating to work on the nano

12  A project after the RIF?

13  A    I'm not sure that they produced all of the documents on

14  any of the projects because we had specifically asked for lab

15  books, and lab books are where you have your official

16  documents as to how the project is going, you know, those are

17  legal documents that you would use to support a patent,

18  because they have to be signed and sworn after you -- you

19  know, you write down what you did in the lab, you sign it,

20  and you get somebody to witness it, so it's legal.  So when

21  you go to put a patent in, it's got the date that it's really

22  done.

23       We got none of those, and we didn't get anything

24  saying from anybody at PQ that any of these projects were

25  officially cancelled, which is something we would have done

1    if we had decided to no longer work in an area, and go on to

2    something else.

3    Q    Let me ask you specifically in relation to the lab

4    books.  Is that something that would -- where information

5    would be recorded if there was any work at all done?

6    A    Yes.

7              MS. MALLOY:  Objection, relevance.

8              THE WITNESS:  Oops, sorry.

9              THE COURT:  Objection overruled.  The answer was in.

10   BY MS. EYER:

11   Q    I'll ask you in relation to nano A specifically, do you

12   have reason to believe that a patent was filed on nano A

13   after the 2005 RIF?

14   A    Yes.

15   Q    And what was your basis for that understanding?

16   A    A lot of times I look --

17   Q    I'll direct you to the document specifically.

18   A    Well, I could tell you what I also knew.

19             Somebody told me, but I usually go on the website

20   and check to see what's been filed in the patent areas in

21   zeolites, because it's interesting to see what people are

22   working on.

23   Q    And did PQ ever produce the patent application that they

24   filed for nano A?

25   A    I never saw it.

1  Q    And did you review the documents relating to projects in

2  this case?

3  A    Yes.

4  Q    How much time would you say it takes to put together a

5  patent application?

6  A    It depends.  You can take from six months to a couple of

7  years, and then a lot of times what you do is you put a

8  patent together just enough so you can get it and go out

9  there without being scooped.  And then you do what's called a

10 CIP, which is a continuation in part, so you continue working

11 on the material to optimize it, and trying other stuff.  And

12 instead of filing a whole new patent on that, you tack it on

13 to the original patent.

14       And you can do that, you know, up until the time the

15 patent's awarded its extra things.  I mean, if you want to

16 rack up the number of patents, you could do it as separate,

17 but generally speaking, it's cheaper and easier to do it as a

18 CIP.

19 Q    Given the amount of time that filing a patent takes, is

20 that something that you would ordinarily do if you had --

21       MS. MALLOY:  Objection to leading.

22 BY MS. EYER:

23 Q    -- just continued work in an area?

24       THE COURT:  Objection overruled.

25       THE WITNESS:  I'm sorry.  I don't --

1   BY MS. EYER:

2   Q    Let me ask you again:  Given the amount of time that it

3   takes to put together a patent, is that something you would

4   ordinarily do if you did not intend to continue work in an

5   area?

6   A    No.

7   Q    Are you able to tell from these documents whether any of

8   your own work on nano A continued?

9   A    The management certainly did.  These are the same types

10  of reports and the same types of information that I would

11  have been given on any of these topics, any of these

12  projects, if I were still there.  I'd be either writing them

13  or receiving them.

14  Q    Could I direct your attention now to Tab E?

15  A    E?

16  Q    Yes.

17  A    (Witness complies.)

18       Okay.

19  Q    These documents relate to the PVC area; is that correct?

20  A    Correct.

21  Q    You heard Mr. Myszak's testimony that there were two of

22  these documents where PVC was not referenced; is that

23  actually accurate?

24       And I'll direct your attention, it's midway through

25  the packet.  The first one I believe is dated August 1st,

1    2005.  The second one is dated -- oh, they're both dated

2    August 1st, 2005.  They are -- the first one is, Subject, ICD

3    Monthly Summary, the second one is Subject, Analytical

4    Operation Summary.

5    A    The second one is analytical operation summary?

6    Q    Yes.

7    A    Oh, I see.  Okay.

8         In the first one where it says, "Industrial

9    Chemicals Group Support," and it says, "66 samples were

10   processed in this period," under "Zeolites" in the last

11   bullet it says, "Advera 401PS and 402F were compared by IR

12   spectroscopy for the plastic additive application."

13        Those two materials, Advera 401PS and Advera 401F,

14   were the product names that we were selling into this area

15   with.  Those were the --

16   Q    So that would be --

17   A    -- products.

18   Q    The brand name for PVC; is that right?

19   A    Yeah.

20   Q    Okay.

21   A    For different kinds of -- they would go into different

22   types of PVC, but they were PVC products.  There's more than

23   one kind of PVC.

24   Q    And if I could direct your attention to the second

25   document as to which Mr. Myszak claims there was no reference

1   to PVC?  There's also a reference in that document to Advera

2   401PS and Advera 401F, correct?

3   A    Correct.

4   Q    And that would be PVC brand names?

5   A    Correct.

6   Q    In relation to the tech service calls on PVC, if I could

7   direct your attention to the e-mails that appear at the back

8   of the PVC tab?

9   A    (Witness complies.)  Okay.

10  Q    Those are documents that were -- let me ask you first:

11  Do you know whether those documents, those e-mails from Erin

12  Fisher to Roman Wypart, were they produced by PQ in this

13  litigation?  You may take a moment to take a look.

14  A    No, they're all dated Wypart -- stamped -- I don't

15  remember what the stamp's name is -- but you know where you

16  put down who they got it from, and this says these came from

17  Roman Wypart.  He produced them.

18  Q    As far as you know, were any e-mails ever produced by PQ

19  relating to this issue?

20  A    I don't think so.  I didn't see them, and if they had

21  been, they would have been gathered together in this.

22  Q    Is there any reason to believe that the occasions on

23  which Erin Fisher contacted Roman are the only occasions on

24  which she received tech service calls?

25  A    No, because she also talked to me, and to Dick Hinchey.

1   We both answered questions for her also.  And they were, you

2   know like, This customer approached me and wanted to know why

3   something would do this?  Can you and Dick give me a hand?

4   You know, and you'd say to her, Get an SCM, get this, see

5   what's happening.  So, yeah, she --

6   Q    I'll now direct your attention to the binder, which is

7   labeled Tab G, 255-G.

8            (Pause.)

9   A    Okay.

10  Q    Do all of the documents that appear in this binder

11  relate to work that was done on WPC after the RIF?

12  A    Yes.

13  Q    And that's the project that both you and Mr. Wypart were

14  working on before the RIF; is that correct?

15  A    Yes.

16  Q    And are you able to determine from the documents that

17  were produced, whether any of your or Mr. Wypart's work in

18  this area continued?

19  A    Yes, there was a lot of work in here, and I know before

20  they were talking about the hundreds of pages that was done

21  by the consultant, but if you look at it, actually, probably

22  about half of it is the proposal that the consultant put in,

23  then there was the revised proposal after talking again, and

24  then the report is in the front.  So there's a report, a

25  proposal, and a revised proposal, and that is something that

1    costs, you know, anywhere from 15 to 25 to $30,000 to get

2    done.  And it's not -- they're not cheap.

3    Q    Let me ask you:  Getting a market study done by a

4    consultant, is that something that you would do if you did

5    not intend to continue work in that area?

6    A    Again, if I were running the project, unh-unh.  No,

7    sorry.

8    Q    Mr. Myszak testified specifically in relation to work

9    that continued to prepare a patent.  Were you and Mr. Wypart

10   working on the patent for WPC before you were terminated?

11   A    Yes, and we worked on it after we were terminated.

12   Q    And could you, please, clarify what you mean by that?

13   A    The patent -- the -- we had done enough work to be able

14   to get a patent.  We hadn't done enough work to be able to

15   say we've finished the project and it's ready to go.

16          We said it's ready to go to the patent.  And we

17   started writing it, and I started writing it with the outside

18   patent attorneys, and it wasn't done when we got RIF'd or

19   fired.  So they asked us to come back, and I came back I

20   think twice to meet with Ed Myszak and the lawyers about

21   getting it done.  And Roman consulted with them for one day

22   of it and I think he went for another day also.

23   Q    So this was work that you and Mr. Wypart were hired on a

24   temporary basis to do by PQ after you were terminated?

25   A    I wasn't hired.  I just did it.

1  Q    Okay.  So you didn't get paid for that work?

2  A    No.

3  Q    Okay.  At this time you can close up that binder.

4  A    Okay.

5  Q    And I'll direct your attention to the other binder that

6  appears in front of you, Exhibit P-4-A, as to which there has

7  been prior testimony in this case.  Do you see the part of

8  the e-mail string in P-4-A, that is labeled "From:  Colleen

9  Delmonte to Rosalyn Kutchins, cc Michael Imbriani," dated

10 September 23rd, 2004?

11 A    Yes, it's the first one.

12 Q    In this e-mail Ms. Delmonte states, among other things,

13 "Roughly a fully-loaded head in R and D costs 200K."

14         Do you have any understanding what that's a

15 reference to?

16 A    Yes, whenever you work someplace, you charged out as a

17 fully-loaded head in that it covers your -- the overhead for

18 the building, it covers your salary, it covers your -- the

19 assets that you use in the building, and all that sort of

20 stuff.  And for any person in R and D, from the technicians

21 up to the managers, the way you did this was instead of

22 saying, Okay, you used the steam for two hours today, you

23 used it for one hour, so I'm going to charge you double for

24 steam.  You can't do that.

25         So you take all of the expenses, and you divide them

1   by the number of people, and you say, That's how much it

2   costs to keep a person here.  And R and D is always higher

3   because of all the, you know, extra stuff.  Glassware we

4   break and stuff like that.

5         And I'd always been told a fully-loaded head in R

6   and D was approximately $200,000.  I believe that Zeolist,

7   because of its complexity, billed out at slightly higher.

8   Q    When you say "billed out," was this billing out -- who

9   is this billing out to specifically?

10  A    The business units.

11  Q    Ms. Marcus, you were 60 years old at the time you were

12  fired by PQ, correct?

13  A    Yes.

14  Q    Did you want to stop working at that time?

15  A    No.

16  Q    How long was it before you started working full-time

17  hours again, and here I'm talking about full-time hours, not

18  necessarily a permanent job?

19  A    I started working -- when I -- when I first started with

20  Tricad, it was a consulting basis, and I really enjoyed it.

21  It was going back to doing what I like to do.  It was, you

22  know, product development, helping them get their materials

23  out, and I know in November I went to China for them for two

24  weeks -- November of 2005 -- I went to China for them for a

25  couple of weeks to be able to try and get products that we

1   could sell through our company, or that our company could

2   sell to them.

3            And, so, I was working pretty much -- I was working

4   full-time hours, and I was charging them as a consultant, but

5   I felt a little guilty, so I didn't charge them all that I

6   should have, and that's when they started talking to me in

7   the spring about that they felt that wasn't fair, but they

8   couldn't afford my original salary, would I work full time

9   for half salary?

10           And I really wanted to work, so I said, Yes, I

11  really would like to do that.  I would, you know, I want to

12  work, so, yeah, I did, I took it, and I've continued looking

13  for other things, but, you know...

14           THE COURT:  Well, excuse me, but if my memory

15  serves, you were asked, How long was it until you started

16  working full time?  Have you ever answered that question?

17           THE WITNESS:  No, I'm sorry.

18           I started putting in full-time hours for them

19  probably around October of 2005.

20           THE COURT:  Thank you.

21  BY MS. EYER:

22  Q    So that would be within five months of the 2005 RIF --

23           THE COURT:  Everybody can count.

24           MS. EYER:  Okay.  Thank you, your Honor.

25           THE COURT:  What's your next question?

1   BY MS. EYER:

2   Q    What happened to your job at Tricad, Ms. Marcus?

3            MS. MALLOY:  Your Honor, this is inappropriate

4   rebuttal.  The damages are part of her case.

5            THE COURT:  I can't help that.

6            Go ahead.

7   BY MS. EYER:

8   Q    What happened to your job at Tricad, Ms. Marcus?

9   A    Tricad sold itself to Sudkime (ph), a German company.

10  They wanted to buy the plant and the product line, so they --

11  they got rid of everybody who wasn't directly related to the

12  plant.  There were a couple of sales people and maybe one

13  marketing person.

14  Q    Have you been able to find full-time work since you were

15  laid off from Tricad?

16  A    No.

17  Q    And how has that made you feel, to be unable to find

18  full-time work?

19  A    Well, I felt really lousy, and I -- I must say, this is

20  really reinforced how I feel, how bad I feel, and -- and to

21  hear that somebody else got what I was doing, you know, just

22  -- and I started late.  I wanted to continue.  I didn't get

23  into the work force until late.  I really wanted to do this

24  job.  I really liked the job and I guess hearing that, you

25  know, somebody else is doing what I did, and listening to

1   that is -- it's humiliating.  Just leave it at humiliating.

2   Q    When you say somebody else is doing what you did, what

3   is that a reference to, Ms. Marcus?

4   A    When Ed Myszak sits here and says what he was doing,

5   he's doing the same job I was doing.

6            MS. EYER:  I have nothing further of this witness.

7            THE COURT:  Anything further?

8                          CROSS-EXAMINATION

9   BY MS. MALLOY:

10  Q    Cindy Conner never worked in R and D; is that correct?

11  A    No, she didn't.  She had the same title, but she wasn't

12  as technical.

13  Q    Okay.  And she worked in a business unit; is that

14  correct?

15  A    She reported to a business unit, yes.

16  Q    Okay.  And Exhibit P-255, that's a document that you

17  prepared with your lawyers?

18  A    Yes.

19  Q    Okay.  And it's based on information that you've gone

20  through in these various binders?

21  A    Yes, primarily given to us by PQ.

22  Q    Okay.  And your last day of work was about the end of

23  June '05; is that correct?

24  A    Yeah.

25  Q    Okay.  Isn't it true that in 2006, you earned around

1   $6,000 -- I'm sorry -- 2007, you earned around $6,000?

2   A    Probably.

3   Q    And in 2008, you earned around $7,000?

4   A    Correct.

5   Q    And in the year 2009, you've not earned any income at

6   all?

7   A    No, I have.

8   Q    Have you given that information to your attorneys,

9   because we don't have it?

10  A    Well, I haven't billed for it, because part of it was

11  done the week before last, and I got another job last week

12  during the lunch break.

13  Q    Okay.

14  A    Another consultant job.

15  Q    Well, it's now November something.  How much income have

16  you earned in --

17  A    Very little.

18  Q    Please let me finish the question.

19  A    I'm sorry.

20  Q    I'm so sorry.

21       How much income have you earned in the year 2009?

22  A    Very little.  I don't think I have earned anything,

23  because there's no consulting out there.

24  Q    Okay.

25       MS. MALLOY:  I have nothing further.

1          THE COURT:  You haven't actually received the money

2    yet?

3          THE WITNESS:  For the two jobs that I'm doing now,

4    no.

5          THE COURT:  Thank you.

6          MS. MALLOY:  I have nothing further.

7          THE COURT:  You may step down.  Thank you.

8          THE WITNESS:  Thank you.

9          (Witness excused.)

10         MS. EYER:  At this time the plaintiffs call Roman

11   Wypart.

12         THE COURT:  No, we'll take a ten-minute recess.  The

13   jury needs a rest.

14         (The jury exited the courtroom.)

15         (A recess was taken from 11:29 o'clock a.m. until

16   11:43 o'clock a.m.)

17         (The jury entered the courtroom.)

18         THE COURT:  Be seated, please.

19         Proceed.

20         MS. EYER:  At this time the plaintiffs call Roman

21   Wypart to the stand.

22         ROMAN WYPART, after having been previously duly

23   sworn as a witness, was examined and testified further as

24   follows:

25         THE COURT:  Mr. Wypart, you're still under oath.

1                          DIRECT EXAMINATION

2    BY MS. EYER:

3    Q    Sir, there's been some testimony relating to

4    commercialization during this trial.  Do you personally have

5    any experience with the commercialization of products?

6    A    Yes, I do.  I've been involved in commercializations of

7    product in two previous jobs before.

8              THE COURT:  Could you do it a little louder, please,

9    and close to the microphone?

10             THE WITNESS:  Yes, I was involved in

11   commercialization of new products and new applications on two

12   previous jobs before I joined PQ.

13   BY MS. MALLOY:

14   Q    And what about at PQ itself?

15   A    Yes, at PQ I was involved in working with various

16   customers, working on their formulations, and these customers

17   gave their formulations to the plants.  One of them was Owens

18   Corning, which used zeolite for PVC siding applications.

19   Q    And did you have any involvement in enticing customers,

20   otherwise making sales in relation to products at PQ?

21   A    Yes, in 2005, I was -- I was involved with many new

22   customers who are not using zeolites, and I was working with

23   them to help develop formulations for their applications.

24   Q    Did you do any marketing work in the PVC or WPC area

25   before the RIF?

1   A    Yes, I did.  Based on -- on -- on the customer's product

2   portfolio, I've chosen the customers who look like they were

3   the best targets for applications where zeolite could be

4   used, and contacted with them, visited them, gave them

5   presentations which I previously gave at the conferences, and

6   also develop new data for them as they were -- as it was

7   required.

8   Q    Sir, do you know, does PQ have any patents in the PVC

9   area?

10  A    Yes, PQ has currently three patents in PVC area.  The

11  last patent is WPC patent, which also includes blends of

12  zeolite and wood -- wood fibers with polyethylene property in

13  it also with PVC.

14  Q    Are you listed as one of the inventors on each of these

15  patents?

16  A    Yes, I am.

17  Q    Is Ed Myszak listed as an inventor on any of these

18  patents?

19  A    He's not listed on any of them.

20  Q    Do you know if PQ has gone on to make sales in relation

21  to any of these patented products?

22  A    Yes, they did.  In area of polymer wood composites, they

23  tried to -- to make sales after the patent was issued, but I

24  fortunately -- the patent was for step, the formulations were

25  not optimized for practical customer applications, and for

1   his equipment.

2   Q    Let me ask you specifically in relation to the other two

3   PVC patents, do you know if PQ has gone on to make sales of

4   those products?

5   A    Yes, I mean, those -- those products are being sold at

6   present time for many customers, for siding, PVC windows

7   applications, and also PVC pipe applications.

8   Q    And were you involved in those sales efforts?

9   A    Yes, I was.

10  Q    Coming back to WPC, you eluded to during their

11  testimony, Ms. Kutchins and Mr. Myszak mentioned a water

12  absorption issue with WPC; is that what you were alluding to

13  just now?

14  A    (No response.)

15  Q    Or let me just ask you:  Were you present for that

16  testimony?

17  A    Yes, I was present for that -- for that testimony.

18  Well, zeolite in equilibrium state has about 20 percent of --

19  of crystalline water.  During the processing with polymers,

20  loses roughly about 40 percent of that water.  After -- I

21  mean, the extrusion when the product is formed, it will

22  eventually -- it will pick up that water and still stabilize.

23  I mean --

24  Q    So let me ask you:  Before the RIF, were you aware that

25  WPC would absorb some water?

1    A    Yes, I knew that.

2    Q    And in a correct WPC formulation, does the water

3    absorption property cause any problems with the product?

4    A    I don't believe so.

5    Q    Is there any standard WPC formulation or is that

6    something that would be developed customer-by-customer?

7    A    There is no standard WPC formulation.  Each customer

8    will require a formulation optimize for his process.

9    Q    And is water absorption one of the issues that you would

10   be looking at in developing the correct formulation for each

11   customer?

12   A    Yes, I would.

13   Q    In relation to the testimony that they developed a

14   formulation for a specific customer after the RIF, and there

15   was some water absorption problems that Ms. Fisher wasn't

16   able to resolve, are you surprised to hear that she was

17   unable to resolve those issues?

18   A    I'm not surprised, because Erin did not have any

19   experience with scale-up, any experience dealing with

20   customers, and -- and based on Ed Myszak's testimony, he was

21   involved with customers maybe, you know, in plastic's

22   applications 20 years ago.

23   Q    Do you have experience and/or expertise in resolving

24   those types of formulation issues?

25   A    Yes, I do.

1    Q    Sir, you heard Ms. Fisher's testimony that after,

2    immediately after the RIF, 80 to 85 percent of her job was

3    taken up with your job duties, correct?

4    A    Correct.

5    Q    And, as far as you know, would Ms. Fisher be the person

6    in the best position to know what work she took over from

7    you?

8    A    Yes, she would.

9    Q    And why is that?

10   A    We -- we interacted -- I mean, we worked very closely,

11   we were a team, I always inform her what I was doing at

12   certain customer, what was the next project on which we

13   supposed to work.  That way she knew all what was going on in

14   area of -- of new customers development.

15             MS. EYER:  I have nothing further, your Honor.

16             MS. MALLOY:  No questions, your Honor.

17             THE COURT:  You may step down.  Thank you, sir.

18             (Witness excused.)

19             Anything further?

20             MS. EYER:  Nothing further from the plaintiffs, your

21   Honor, subject to the admission of a number of documents both

22   sides have reserved.

23             THE COURT:  Okay.  We can do that after the jury

24   goes out for lunch.

25             Members of the jury, you can leave for lunch now.

1   Because we couldn't estimate the schedule appropriately,

2   you're going to get a free lunch today.  I hope the taxpayers

3   don't object.

4            (Laughter.)

5            We have some legal matters to go over while you're

6   out, and we'll recess until -- you better make it 1:45.

7   You'll have plenty of time for lunch.

8            (The jury exited the courtroom.)

9            THE COURT:  Be seated.

10           Let's get the exhibits that you haven't offered yet.

11           MS. EYER:  Plaintiffs just wanted to confirm there's

12  a number of exhibits that we have either admitted or wanted

13  to confirm or wanted to move at this time, and if I could

14  just read the list for the record, and defendant's can state

15  any objection?

16           THE COURT:  Do opposing counsel have a similar list?

17           MR. ENNIS:  Yes, we do.

18           THE COURT:  That you can follow while she reads it,

19  because she reads very rapidly, as I recall.

20           MS. EYER:  I have e-mailed the list, so they know in

21  advance, and we have -- they're only a limited number as to

22  which there are any objections.

23           THE COURT:  If you think she's telling the truth

24  when she says it's the same list, then go ahead.

25           MS. EYER:  I can wait for Peter to get out the list.

1          MR. ENNIS:  I think I am ready, your Honor.

2          MS. EYER:  All right.  The list is 7, 8, 11, 12, 16,

3    20, 32, 32-A, 45, 46, 52, 53, 83, 85, 131, 149, 177, 188,

4    227, 228, 233, 234, 235, 236, 237, 238, 240, 241, 241, 250,

5    252, 254, 254-A, 255, 255-A, B, C -- no -- 255 and then 255-A

6    through G, 256, 256-A, 257, 257-A, 258, 258-A, 259, 259-A,

7    262, 262-A, 263, 263-A, 264, 264-A, 274, 284, 286, 287, 288,

8    289, 290, and 292.

9          THE COURT:  Do any of them have any conceivable

10   relevance to this case?

11         MS. EYER:  Yes, your Honor, we believe that all of

12   them are relevant to this case.

13         MR. ENNIS:  And, your Honor, for the record, we are

14   objecting to 149, which is a succession planning document

15   from 2003.

16         THE COURT:  What kind of --

17         MR. ENNIS:  Succession planning --

18         THE COURT:  Oh, yes.

19         MR. ENNIS:  -- from 2003.  We are objecting to 233

20   through 242, those are all of Dr. Thomas, the statistician's

21   tables and exhibits.  We are objecting to the summaries as

22   being misleading, the summary of the documents.  That's 255

23   through I think 264.

24         THE COURT:  What are they summarizing?

25         MS. EYER:  Respectfully, your Honor, these are

1   charts that we had understood defendants had stipulated to to

2   the admission.  I understand they object or they do not --

3   they contest their accuracy, but these are, for example, the

4   continuation of research project charts, also charts that we

5   reviewed with Mr. Doran relating to who were members at the

6   CD Group, what funding people received.  And both the older

7   individuals and the younger individuals, who was retained,

8   and who was not.  They're summaries of documents produced by

9   the defendants.

10          THE COURT:  Well, let's take a deep breath.

11          Those summary exhibits can come in, but the

12   statistician's chart don't.

13          MS. EYER:  Respectfully, your Honor, I believed you

14   already ruled on that, and that they were admitted into

15   evidence.

16          THE COURT:  That doesn't mean that I ruled

17   correctly.

18          MR. ENNIS:  And that would --

19          MS. EYER:  Well, let me ask your Honor?  I mean,

20   these charts are charts that Dr. Thomas testified to, they

21   relate directly to our analysis --

22          THE COURT:  Right.

23          MS. EYER:  -- that she presented here in court.

24          THE COURT:  And the jury heard him testify.

25          MS. EYER:  Her testify.

1        THE COURT:  Or her.  I mean her.

2        We're not going to --

3        MR. ENNIS:  And I objected at the time.  We filed a

4   motion to exclude them and they were -- you reserved judgment

5   on them.

6        Your Honor, moving to the supporting documents to

7   all the summaries, that's 255-A through G, and all of those,

8   we would object to any document that is not produced by PQ.

9   So there are documents that they produced that are hearsay

10  documents, they haven't been identified by anyone.  So to the

11  extent that there is a document, a supporting document from

12  PQ, we'll agree to them.

13       MS. EYER:  Respectfully, your Honor --

14       MR. ENNIS:  I haven't finished.  Thank you.

15       So to the extent that there is a document -- any

16  documents in there that are, for example, they have e-mails

17  from witnesses who've testified, but haven't identified any

18  of these e-mails, so I would object to those on hearsay

19  grounds.

20       MS. EYER:  And, respectfully, your Honor, the

21  defendants have never raised any such objection before this

22  time.

23       THE COURT:  Well, you just offered them now.

24       MS. EYER:  The authenticity objection, if it's to be

25  raised, has to be raised --

1              MR. ENNIS:  We objected to them.

2              MS. EYER:  You absolutely did not object to those --

3              MR. ENNIS:  Yes, we did.

4              MS. EYER:  -- summary documents.

5              MR. ENNIS:  Yup.

6              MS. EYER:  You said that you do not believe the

7    summary charts were accurate, but you never objected to the

8    supporting documentation?

9              MR. ENNIS:  We objected prior --

10             MS. EYER:  The plaintiffs obviously at this point --

11             MR. ENNIS:  -- to the trial.

12             MR. GOLDSHAW:  May I make one comment, your Honor?

13             THE COURT:  My question is addressed to all the

14   lawyers in the courtroom, if there are any.  What makes you

15   think that a jury can possibly be confronted with all of

16   these papers, and be expected to read them all, and reach a

17   verdict while we're all still alive?  This is idiotic.

18             The whole way the case has been tried on both sides

19   is idiotic.  The notion that you put a witness on the stand

20   and the first thing you do is present some document to the

21   witness, so they can read it, or you can point out something

22   in it, that's not the way to try a case, for heaven's sake.

23   You get the testimony from the witnesses.

24             We're going to recess until 1:30, so far as you guys

25   are concerned, and you're going to get together and you're

1   going to decide which of these documents you really want the

2   jury to have, because the rest of them are a waste of

3   everybody's time.

4            Recess until 1:30.  Recess until then.

5            (A luncheon recess was taken from 11:57 a.m. o'clock

6   until 1:49 o'clock p.m.)

7            THE COURT:  Good afternoon.

8            ALL:  Good afternoon, your Honor.

9            THE COURT:  So, we have resolved the controversies

10  concerning the exhibits?

11           MS. EYER:  As to the summaries -- I'm sorry, the

12  supporting documents to the summaries, we have resolved that

13  issue.  Plaintiffs have pulled out certain documents that

14  defendants objected to.  We have also agreed to withdraw our

15  request to admit P-284.  And I think the only remaining issue

16  was as to 149, which is the succession plan, defendant -- it

17  was our understanding that you had ruled that that was in,

18  but defendant wanted to verify that.

19           THE COURT:  I don't recall ruling one way or the

20  other.

21           MR. ENNIS:  That's what I thought, your Honor.

22           MS. EYER:  Okay.

23           THE COURT:  Who -- what -- who authenticated it?

24  Somebody --

25           MR. ENNIS:  I was objecting to it, the 2003

```
 1   succession planning document from PQ that had nothing to do
 2   with the RIF.
 3              MS. EYER:  And respectfully, your Honor, it was
 4   authenticated by Kevin Doran, their head of HR.  It is their
 5   official succession plan and it includes age information in
 6   it.  There has been testimony throughout this trial that --
 7              THE COURT:  May I see it, please?
 8              MS. EYER:  Yes.  I think, respectfully, your Honor,
 9   there is a copy of it in the binders that appear behind you
10   on the shelf.
11              THE COURT:  That's possible.  May I see a copy of
12   it, please?
13              (Laughter.)
14              MS. EYER:  Sure.
15              (Pause.)
16              THE COURT:  How many pages?
17              MS. EYER:  It's a large plan, the --
18              THE COURT:  Several hundred?
19              MS. EYER:  -- the specific part -- there's a
20   biography for Ms. Marcus that appears in that document with
21   her date of birth on it.
22              MR. ENNIS:  And, your Honor, I think the testimony
23   from Mr. Doran was it wasn't used as -- it had nothing to do
24   with the reduction in force.
25              MS. EYER:  And --
```

80

1          MR. ENNIS:  And it's from 2003, before his time as

2     HR director.

3          MS. EYER:  And, respectfully, your Honor, there's

4     been testimony that this was -- the succession planning was

5     part of a company-wide effort to bring younger individuals

6     into the business, Ms. DelMonte and Mr. Imbriani were a part

7     of that effort and --

8          THE COURT:  Well, did they say that they're planning

9     to get rid of old people?

10         MR. ENNIS:  No, your Honor, and that -- and we

11    disagree on the characterization of the testimony, that

12    certainly is not in that document; in fact, that document

13    lists Ms. Marcus as succeeding somebody younger than her

14         MS. EYER:  And of course we all know that that is

15    not what ultimately happened after the age information was

16    circulated.

17         THE COURT:  You would be amazed how little we all

18    know.

19         MS. EYER:  And, again, we would dispute -- in terms

20    of the testimony, Rosalyn Kutchins did testify that there was

21    an effort to bring younger individuals into the business

22    specifically in relation to the succession-planning effort.

23         THE COURT:  My ruling is that this exhibit, whatever

24    it's number was, 149, does not come into evidence; it's

25    remote in time and its probative value is outweighed by the

1   length of time it would take the jury to even glance through

2   it, let alone understand it.

3          Anything else we can cause trouble with?

4          MR. ENNIS:  Yes, your Honor.  Defendants would move

5   for judgment under Rule 50 at this time.

6          THE COURT:  Yes.  I am not going to grant either set

7   of motions for judgment as a matter of law because I think

8   that there are issues which you deserve the right to argue to

9   the jury.

10          MR. ENNIS:  And, your Honor, two other things.

11   Defendant would move to admit the following exhibits:  D-1,

12   D-2, D-3, D-6, D-9, D-13, D-16, D-18, D-22, D-23, D-26,

13   D-36-C, D-40, D-56 and D-62.

14          MS. EYER:  And, your Honor, we have no objection

15   with the understanding from counsel that 36-C is not the

16   version that we originally received but just the charts that

17   were prepared for Ms. DiGirolamo's testimony.

18          MR. ENNIS:  That is correct, your Honor.

19          THE COURT:  I see a head being nodded in agreement.

20          MR. ENNIS:  Yes.

21          THE COURT:  They will be received.

22          (Defendant's Exhibit Numbers 1, 2, 3, 6, 9, 13, 16,

23   18, 22, 23, 26, 36-C, 40, 56 and 62 received into evidence.)

24          MR. ENNIS:  And, your Honor, just for the record, we

25   would also move for judgment on the issue of front pay.  We

1   are now four years past the original termination and it's the

2   defendant's position that the damages should be limited, if

3   at all, to back pay in this case.

4          THE COURT:  We'll cross that bridge when the jury

5   has responded to it.

6          MR. GOLDSHAW:  Related to that, your Honor, the last

7   time I think we had an agreement, which I think should be

8   made part of the record, that the defendant's position is

9   that it would -- reinstatement would be inappropriate.

10          THE COURT:  What would be inappropriate?

11          MR. GOLDSHAW:  Reinstatement.

12          MS. EYER:  Reinstatement.

13          MR. GOLDSHAW:  Which would be a decision for --

14          MR. ENNIS:  That is correct, your Honor.

15          THE COURT:  That is stipulated?

16          MR. ENNIS:  Yes.

17          THE COURT:  That you're not -- you don't want to

18   reinstate it?

19          MR. ENNIS:  Not at this time, your Honor.

20          THE COURT:  It's now or never.

21          (Laughter.)

22          THE COURT:  Okay.

23          MS. EYER:  And then I think the last remaining issue

24   is jury instructions.  We had submitted --

25          THE COURT:  I plan to instruct in accordance with

1    the requests for charge submitted by both sides, which are

2    very similar, and my proposal is to use the very same verdict

3    form we used last time, which is very similar to what each of

4    you has submitted.

5              MS. EYER:  And plaintiffs have no objection to using

6    the charge that was submitted last time.

7              THE COURT:  Pardon?

8              MS. EYER:  Plaintiffs have no objection to using the

9    charge that was submitted last time.

10             THE COURT:  Okay.

11             MR. ENNIS:  With the only point being that it calls

12   for front pay, which is for -- it's an equitable remedy for

13   your Honor to decide.  So, front pay is advisory.

14             THE COURT:  Well, that won't go to the jury anyway.

15             Everybody happy or reasonably happy?

16             Is the jury finished eating their sumptuous meal?

17             THE DEPUTY CLERK:  Yes.

18             THE COURT:  Bring them in.

19             (Pause.)

20             THE COURT:  Who is going to argue for whom?

21             MR. GOLDSHAW:  Scott Goldshaw for the plaintiffs.

22             MS. MALLOY:  I will do it, your Honor, for PQ.

23             THE COURT:  Okay.

24             MS. MALLOY:  Unless you want us to switch sides or

25   something?

1         (Laughter.)

2         THE COURT:  My role is to furnish rebuttal to both

3    arguments.

4         (Laughter.)

5         (Jury in at 1:56 o'clock p.m.)

6         THE COURT:  Good afternoon.

7         THE JURY:  Good afternoon, your Honor.

8         THE COURT:  I hope you enjoyed the free lunch.

9         (Laughter.)

10        THE COURT:  You may be seated, please.  Thank you.

11        We have now heard all of the evidence in the case

12   and we are now going to hear the arguments of counsel.  Under

13   our rules, the plaintiff's counsel argues first, then the

14   defendant's counsel argues, then the plaintiff may have a

15   brief rebuttal, if they want.  This is, as I said earlier,

16   because the plaintiff has the burden of proof.

17        Proceed.

18        MR. GOLDSHAW:  Good afternoon.  It's nice to be able

19   to address you directly once again.

20        PQ's own witnesses have admitted that Michael

21   Imbriani, Rosalyn Kutchins and Colleen DelMonte have a past

22   history of age discrimination at PQ.  As part of the 2005

23   RIF, these same three people picked out the older workers in

24   R and D for termination, and everybody selected for

25   termination in R and D was 55 and older, no exceptions.  It's

1  | not terribly difficult to figure out what was going on here.

2  | Time again, at every juncture in this entire RIF

3  | selection process, the company consistently targeted the

4  | older workers for termination and kept the younger

5  | counterparts.  Bonnie Marcus, director of Marketing

6  | Development -- manager of Marketing Development, she was one

7  | of four.  They got rid of the one over 55, they kept the

8  | three under age 55.  Plaintiff Roman Wypart was one of five

9  | Research Engineering Fellows; they fired the three who were

10 | over 55, they kept the two who were under 55.  There were 14

11 | people in the Corporate Development Group, they fired the

12 | four who were over 55 and they kept all ten under the age of

13 | 55.

14 | At the time of the RIF, they needed a manager for

15 | Zeolite R and D, where Bonnie Marcus was working.  They

16 | bumped her out, fired her, and brought in another younger

17 | worker from another department into R and D to take her

18 | place.  Instead of keeping Roman Wypart in his position, they

19 | bumped him out and they put a 35-year-old, Erin Fisher, with

20 | far less qualifications and experience, who took over, in her

21 | words, 80 to 85 percent of his job.

22 | Eric Senderov, Dick Henchey, Al Beehan, Eleanor

23 | Tickner, John Slabogin, all employees over 55 who were RIFed

24 | and younger employees took over all of their job duties.

25 | There were lots of employees who were assigned to

1   the Corporate Development projects that were supposedly

2   eliminated.  They fired every single one who was over the age

3   of 55 and they kept all the ones under age 55 to continue

4   working on those projects.  There were lots of people funded

5   with Corporate Development funds from the holding company,

6   they fired every single one over the age 55 and for all the

7   ones under the age of 55 they found money elsewhere in the

8   company to continue to fund their salaries and none of them

9   were fired.  The list goes on and on and on.

10          At every juncture in this process, at every

11  opportunity, the company consistently selected the older

12  workers for termination and consistently kept the younger

13  counterparts.  This pattern is unmistakable in this RIF and

14  we all know that actions speak louder than words.  PQ's

15  actions show that they targeted the older workers time and

16  time again.

17          Now, given what we know about the culture of this

18  corporation and about the people responsible for these RIF

19  decisions, it's hardly surprising to see this pattern of

20  consistently targeting the older workers.  In the years

21  leading up to the reduction in force there was a corporate

22  objective, which was company-wide in scope, to make the

23  company younger and get, in Rosalyn Kutchins' own words,

24  quote, "younger individuals," close quote.  This is all

25  admitted by PQ's own witnesses.  And as part of that

1    corporate objective to get the company younger Mr. Imbriani,

2    the head of the largest business unit in the entire

3    organization, directly ordered Rosalyn Kutchins to engage in

4    age discrimination about two years prior to the RIF.  The

5    first day of trial, Rosalyn Kutchins directly admitted that

6    in the years leading up to the RIF Mr. Imbriani directly

7    ordered her to engage in age discrimination and, despite her

8    initial resistance, she found out the hard way that when Mr.

9    Imbriani tells you to discriminate you better shut up and do

10   it.  She was reprimanded by her boss and the discrimination

11   that Imbriani ordered went through anyway, the employee was

12   demoted and Roz Kutchins got a younger employee to replace

13   her.

14        All of this is admitted by PQ's own witnesses.  And

15   by the time of the 2005 RIF Roz Kutchins was on board, she

16   got the message, she knew what Mr. Imbriani wanted from her

17   and, shortly after the layoff decisions were announced, she

18   told Bonnie Marcus at a lunch that it was time for her to go

19   graciously and leave the door open to younger employees.

20        Let's take a minute to discuss what Imbriani and

21   Kutchins actually said about how they went about making these

22   recommendations which led to the termination of the

23   plaintiffs and the older workers.  Colleen DelMonte said that

24   she picked out the people who she thought were the weakest

25   performers at their jobs and, similarly, Roz Kutchins said

1   when she was deciding who would fill various positions she

2   chose the best person for the job.  Well, Kutchins and

3   DelMonte didn't know hardly anything about these people they

4   were recommending for termination except that they were among

5   the older employees; they didn't know their day-to-day work,

6   they didn't know their performance, they didn't look at their

7   performance evaluations and they didn't even speak to their

8   manager.  You know, when you don't know much about somebody

9   and you decide that the older employees are the losers,

10  that's age discrimination, that's what it is, and that's

11  exactly what happened here.

12          Remember that this process that led to the

13  termination of the plaintiffs and other older workers at the

14  hands of Imbriani, Kutchins and DelMonte, it started months

15  before the RIF, back in the previous year of 2004 when they

16  were all having discussions, Imbriani, Kutchins and DelMonte

17  having discussions on reducing head count in anticipation of

18  the sale.  And John Lau knew what they were up to way back

19  then.  More than six months before the RIF he told Bonnie

20  Marcus that the layoffs were coming and, when they come, they

21  were going to target the older workers, and we all know he

22  was exactly right.

23          PQ's basic tactic in this trial has been to try to

24  ask you to ignore the obvious, and the obvious is that the

25  people with the past history of age discrimination picked out

1    the older workers as part of this RIF and got them fired.

2            I want to now take a look at the various excuses

3    that PQ has put forth in this litigation.  I hope you all can

4    see this demonstrative.  These are the various excuses that

5    PQ has put forth at different periods of time and it keeps

6    changing, you can see.  Back in 2006, their position to the

7    EEOC was the entire CD Group was eliminated; that was proven

8    false and then they changed it.  In 2008, their official

9    position in this litigation -- here, do you remember these

10   documents I put up on the other easel?  They took a totally

11   different position.  They didn't say the CD Group was

12   eliminated, they said that there was this process where the

13   business units decided which projects to continue and the

14   plaintiffs' research projects were eliminated, that's what

15   they said in their sworn official position in this litigation

16   as to why they were fired.  That was proven false too and

17   now, in 2009, they have changed again, and in this trial they

18   at least seem to be taking the position that the plaintiffs'

19   salaries were funded by the holding company and that's why

20   they were fired.  We all know, if you tell the truth, you

21   don't need to change your story and, if you did nothing

22   wrong, you don't have to lie to cover up what you did.

23   That's what PQ is doing, they keep generating explanation

24   after explanation as they're proven false.  But this isn't a

25   game, this is about real people's lives and it's about why

1   they were fired.  It's not about can you come up with a

2   reason that might fit the evidence if you get enough tries,

3   it should be about telling the truth.

4         Let's take a look at these explanations a little

5   more carefully one-by-one.  The first explanation to the EEOC

6   in 2006.  This is an exact quote, what they said to the EEOC,

7   "The entire CD Group was eliminated," end quote.  Proven

8   false.  The entire CD Group was not in fact eliminated, only

9   four of the 14 employees in the group were fired.  Just as a

10  reminder, talking about this exhibit which some of the

11  witnesses have -- this is the CD Group, 14 employees, only

12  the ones 55 and older fired, everyone under was not.

13        Let's look at their explanation.  And this was

14  proven false, this is what they came up with next.  It's that

15  document over there, right?  "Based on the events, the

16  holding company decided to stop funding the CD Program and

17  then, as a result, the business units to discontinue the

18  plaintiffs' projects," that's their explanation.  This

19  document over here is an outright lie, I think that's clear

20  by this point in the trial.  The events that PQ has used to

21  justify the plaintiffs' termination did not take place until

22  after they were already fired, Colleen DelMonte admitted

23  that, John Lau admitted that and Kevin Doran, the head of

24  Human Resources, admitted that.  And PQ's own organizational

25  announcement, the one dated 6/16, three weeks after the RIF,

1   at that point in time of that document it's clear these

2   decisions have not yet been made.

3        There's more.  Plaintiffs' projects were not

4   eliminated, five out of the six of those projects continued.

5   Those were the documents that Ms. Marcus testified to earlier

6   today, I won't dig them out because I have -- I am in danger

7   of overwhelming you with documents, I'm probably very guilty

8   of that and I apologize.  So, I'll spare you that one, but I

9   hope you remember.  The projects that they were working on

10  weren't discontinued, they were continued by the younger

11  workers who weren't fired.  And it's false for another reason

12  as well.  You can't say the plaintiffs were fired because the

13  projects were discontinued when the younger employees

14  assigned to the exact same projects were not fired.  None of

15  them were fired, not a one.

16       Let's look at PQ's next explanation.  This is the

17  one that they always seem to be advancing in this lawsuit,

18  although exactly what they're saying still was not all

19  together clear.  But they seem to be saying for the first

20  time in 2009 -- I just have to pause for a minute -- if you

21  tell the truth, it shouldn't take you four years to come up

22  with your story and settle in on a story, it shouldn't take

23  four years.  But this is what they have come up with in 2009,

24  the plaintiffs' salaries were funded by the holding company.

25  Well, the first thing to make note of here is that that's not

1   an explanation at all.  Saying that you're not going to fund

2   someone's salary is just another way of saying you're going

3   to fire them; it doesn't explain why you're choosing not to

4   fund their salary, it's just an empty explanation.  And in

5   this case, even when they're trying to explain the

6   plaintiffs' salaries were funded through the holding company

7   and not funded by the business units, PQ doesn't say why

8   Imbriani, Kutchins and DelMonte, the proven discriminators,

9   chose to provide alternate funding for the younger employees

10  -- because they found money for all of them, right? -- and

11  then they couldn't find the money for the 55-and-older

12  employees.

13          It's also important to note in relation to their

14  current explanation that PQ's official documents contradict

15  their position that the plaintiffs were in fact 100-percent

16  funded out of the holding company.  You recall I went over

17  this in a drawn-out and perhaps at times painful examination

18  with Dr. Lau, who didn't want to answer my questions.  The

19  documents just did not support, they did not support the

20  position that they're 100-percent funded through the holding

21  company.  None.  Where are they?  If these are the documents

22  important enough to justify firing the plaintiffs, where are

23  they?

24          It's also -- I would also like to note that PQ

25  retained all the employees under 55 who were funded through

1   the holding company, including younger employees who were

2   100-percent funded by the holding company like Erin Fisher,

3   the person that took over Roman Wypart's job.  This

4   explanation is garbage, they're not telling you the truth.

5          I will say that no matter what iteration or

6   explanation they come up with, I think that it's clear that

7   to some extent they're trying to confuse you by continuing

8   changing.  You know, it's very hard to hit a moving target,

9   they keep changing their position.  But there is a constant,

10  which I think makes it clear, the constant is that, under any

11  explanation, it's always the older workers who get fired.

12  Whatever criteria they throw up, it's always the older

13  workers over 55 who are getting fired and the younger workers

14  who are not.  And the other constant is that Imbriani,

15  Kutchins and DelMonte, the proven discriminators with the

16  past history, are always in the center of the mix and pulling

17  the strings.

18         You have three basic questions to answer in this

19  case; the first is whether it is more likely than not that

20  the plaintiffs were fired based on their age.  That's the

21  legal standard, more likely than not.  If you conclude that

22  the plaintiffs -- it is more likely than not that the

23  plaintiffs were fired based on their age, you are required to

24  return a verdict in their favor.  And lawyers and sometimes

25  judges are fond of explaining to jurors this concept of this

1  burden of proof by saying if you imagine a scale where you

2  put all the plaintiffs' evidence on one side and all the

3  defendant's evidence on the other and, under the standard, if

4  the scale tips ever so slightly toward the plaintiffs, you

5  must find in favor of the plaintiffs.  And here there is so

6  much evidence of discrimination, this scale is tipped way

7  down.  We don't even need all the pieces of evidence we have

8  in order to get the scale to tip.  And so the correct answer

9  to the first question is, yes, it is more likely than not the

10 plaintiffs' age is what got them fired and, therefore, you

11 should return a verdict in their favor.  That's the first

12 question.

13         The second question you're required to answer is,

14 what is the harm that the plaintiffs have suffered?  Under

15 the law, if a person is terminated as a result of their age,

16 in violation of the law, they are entitled and they deserve

17 to be compensated.  And the plaintiffs really suffered two

18 kinds of harm, monetary -- you know, financial harm and non-

19 financial.  We had an expert economist, Andrew Verzilli,

20 calculate carefully all of the losses to both of the

21 plaintiffs.  He looked at their loss of salary and benefits

22 and subtracted out the salary and benefits they were able to

23 obtain following their unlawful termination.  He presented

24 those figures to you in a neat little table, they are

25 Exhibits P-227 and P-228, and you'll have those back with you

1   in the jury room, 227 and 228.

2          As to Roman Wypart, PQ has not disputed his

3   calculations in any way.  And so when you get to the question

4   for his past and future economic damages, go right to the

5   chart, it's 227, write down the numbers.

6          Now, they have attempted to provide an alternate

7   calculation for Bonnie Marcus.  Their so-called expert, who

8   admitted that she is not familiar with the field of zeolites

9   where the plaintiff Bonnie Marcus worked, provided different

10  calculations based on a made-up position that does not exist

11  and attributed a made-up salary, which did not exist, and

12  pretended that Bonnie Marcus got this made-up position at the

13  made-up salary, so she could subtract out the numbers and

14  lower the figure.  In contrast, Mr. Verzilli used the actual

15  numbers, Ms. Marcus' actual salary and her actual earnings

16  following the termination, and that's why his numbers are

17  obviously the ones that are correct.  So, for Plaintiff

18  Bonnie Marcus, when you get to the financial damages, you

19  should go to P-227.

20         Once you have filled in their financial damages,

21  your job isn't done yet, they still haven't been made whole.

22  You can't undo the stress, the frustration and the

23  humiliation that they suffered upon their termination based

24  on their age.  The best that you can do and what the law

25  requires you to do is to try to come up with an amount of

1   money that can fairly, fairly compensate them for that harm,

2   which was very real.  In order to do that, you need to take a

3   moment to try to understand the experience of Roman Wypart

4   and Bonnie Marcus upon their termination.

5           What do we know about Roman Wypart?  Well, at the

6   time he was working for PQ he was earning a six-figure salary

7   and he was living in an apartment with a $700-a-month rent.

8   Think about that.  Why?  Because he wanted to send his money

9   to his children, to support his family, that's what was

10  important to him.  And when he was fired for more than a year

11  he had no income, no way to support his family, didn't know

12  when he would get another job or what it would pay.  And he

13  had to deal as a parent with the shame of not being able to

14  provide for his own children.  And, as a parent, he felt his

15  kids' pain too.  And he explained to you that, due to the

16  stress, of this financial situation that he did not deserve,

17  it was not -- it was thrust upon him, his children, he would

18  have to deal with them crying, they did poorly in school and,

19  as a parent, he felt that pain and that's part of what his

20  experience was as well.

21          Now, you have to think about what his experience was

22  and the shame when he had to move back in with his ex-wife

23  because he didn't have enough money to put a roof over his

24  head.  And when you've taken a moment to really think about

25  what the experience was like for Mr. Wypart, I ask you to do

1   your best for a very hard job and trying to come up with an

2   amount of money that is fair, that is fair to compensate him

3   for that harm.

4           And for Bonnie -- Bonnie Marcus is a tough woman.

5   Okay?  She started her career late, she went to college and

6   she decided that she wanted to go into the field of zeolites;

7   it might not have been my first choice, it's her love.  Okay?

8   She wanted to go into zeolites.  And it was a man's world at

9   the time, there were not a lot of women in the field, but she

10  was not deterred.  She went straight ahead and, through hard

11  work and through her skill and ability, she ascended to the

12  point where she was a leader in her field, dozens of patents,

13  awards, et cetera, et cetera, all kinds of accolades.  And

14  when you try to determine what it will take to make her

15  whole, you need to try to do your best to understand what she

16  experienced when, at age 60, she was put on the shelf before

17  her life's work was done.  And try to understand the

18  frustration and the shame that she experienced in wanting to

19  work, having the ability to contribute, being in a well-known

20  position and being cast aside because of her age.  And, when

21  you've taken the time to try to understand that experience, I

22  ask you to do your best and come up with an amount that is

23  fair, that you believe is fair to compensate her for that

24  very real harm she suffered too.

25          The last question that you will be required to

1   answer is whether the discrimination against the plaintiffs

2   was willful.  How much more willful can it be when the

3   discrimination comes at the hands of the head of the largest

4   business unit, who is also, don't forget, the person who was

5   in charge of EEO compliance in his division.  How much more

6   willful can the discrimination be when the head of HR is

7   tracking the ages of the employees who are on the termination

8   list and, under his watch, sees the ages jump by more than

9   ten years, up to 62, and does absolutely nothing about it?

10  Nothing.  And how much more willful can it be when the

11  discrimination comes shortly after there is a corporate

12  objective established to make the company younger and to

13  bring in younger individuals?  Certainly the answer to the

14  question of whether the discrimination is willful is yes.

15          I want to touch on another point.  PQ in this case

16  has tried everything they could to distract your attention

17  away from Imbriani, Kutchins and DelMonte, the people with

18  the past history of discrimination, and they have tried to

19  put up John Lau, another manager in the company who they have

20  tried to take responsibility for these decisions.  Well, the

21  CEO of the company, Michael Boyce, told you himself.  The big

22  Exhibit P-32 with the recommendations by Imbriani, Kutchins

23  and DelMonte, Boyce testified that those were the

24  recommendations that were selected.  But, even more

25  importantly, whatever role, theoretical or actual, John Lau

1   may have played in this decision, under the law, if Imbriani,

2   Kutchins and DelMonte influenced the decision and got the

3   plaintiffs fired based on their age, under the law, that's

4   discrimination.  That's it, you don't need to figure out

5   beyond that exactly how this crazy process worked.  If they

6   influenced the decision and it led to their termination based

7   on age, that's all the law requires.

8          I'm going to sit down in a moment and it's going to

9   be the turn of Liz Malloy to speak on behalf of PQ

10  Corporation and, when she does, I don't know which

11  explanation she's going to put forward in the closing

12  argument.  But I ask you to remember, whatever explanation

13  she tries to put forward to explain why the older workers

14  were terminated and why the plaintiffs in particular were

15  terminated, I ask you to remember that, whatever criteria she

16  advances, under the same criteria it was always the older

17  workers who were fired and the younger workers retained.  And

18  I ask you to remember, under any explanation, it was

19  Imbriani, Kutchins and DelMonte who influenced the decision,

20  who had the power, who controlled the money and who got them

21  fired based on their age.

22          Thank you.

23          (Pause.)

24          MS. MALLOY:  Good afternoon.  I stood here a week

25  ago, just about this time, and asked you to listen patiently

Ms. Malloy                           100

1   and carefully to the evidence, and that you would have an

2   opportunity by the end of the case to hear the whole story.

3   And I talked to you about the fact that I appreciated your

4   honesty in the jury pool room where you said that you agreed

5   that you could put behind you whatever predispositions you

6   might have about employers and judge the evidence squarely on

7   the facts in front of you.  And, when I told you that, I

8   didn't know we would be at the end of a World Series and a

9   SEPTA strike.  So, I very much do appreciate your patient and

10  careful listening.  And this is the end of the case, this is

11  the time for us to be quiet and for you to retreat to the

12  jury room and finally have an opportunity to talk about the

13  case among yourselves.

14       And let me emphasize two points right now.  Judge

15  Fullam will instruct you on the law which is to apply.  And I

16  don't agree with everything Mr. Goldshaw said about the law

17  that will apply, but that's for the Court, it's only for the

18  Judge to instruct you on the law.  But you are the finders of

19  fact, it is your recollection and your conclusions as to the

20  facts which control.

21       Now, I'm not going to summarize all the evidence

22  here, you would probably kick me out of the room before I

23  could finish that, but I just want to talk about a couple key

24  points that I would like you to keep in mind when you retreat

25  to the jury room for your deliberations.

1    Plaintiffs ignore the real reasons and the real

2    process that took place here, and I'll talk about that in a

3    couple minutes, but first I want to talk about what the

4    plaintiffs' argument is.  The plaintiffs' argument is P-32.

5    Correct?  The big chart.  No doubt about it, you'll remember

6    that number.  And when you go to the jury room you will have

7    the documents, you'll actually have P-32 in the Plaintiffs'

8    Exhibits and you'll have the Defendant's Exhibits as well,

9    and you can look at them again.  But plaintiffs' argument is

10   that the recommendations set forth in P-32, the memo by Ms.

11   Kutchins and Ms. DelMonte to Mr. Imbriani and Mr. Boyce are

12   what caused the layoff decisions in this case, are what

13   caused the selection decisions of Mr. Marcus -- I'm sorry, of

14   Ms. Marcus and Mr. Wypart, and they want you to believe that

15   Ms. DelMonte and Ms. Kutchins and Mr. Imbriani acted with

16   some discriminatory motive.  And let me give you a couple

17   reasons why this whole theory of their case should be

18   rejected by you.

19        First of all, focus on something as simple as the

20   time line.  P-32 is a memo which is dated May 16th of 2005.

21   And you'll see Defendant's Exhibit 62, which is an e-mail

22   from Ms. DelMonte to Mr. Imbriani, May 16th of 2004,

23   forwarding P-32.  Mr. Boyce testified that he received P-32

24   on May 20th.  Take a look at P-32, the fax line is still

25   across the top, and that's his handwriting on this memo.  So,

1   he wrote on the memo that he received by fax on May 20th.

2   May 20th was a Friday, May 25th was the day the layoff

3   decisions were communicated and that was a Wednesday.  and

4   there's been testimony on this, but you can put all the data

5   together yourself when you take the documents in the room.

6   P-45 is an e-mail from Ms. Kutchins dated Tuesday, June 7th.

7   So that's a good date for you to go back an calculate the

8   days as you do your deliberations.

9        So, Boyce receives this memo on May 20th, this memo

10  which plaintiffs believe contains the recommendations that

11  led to the layoff in R and D.  But what happened before May

12  20th?  Ms. Marcus testified that Dr. Lau went to her house

13  the Friday before the layoff.  That's May 20th, the Friday

14  before the layoff.  And Ms. Marcus also testified that Dr.

15  Lau called her -- remember when she was on that conference in

16  Wisconsin? -- called her in advance of the visit to her house

17  to tell her for the first time that she and Mr. Wypart were

18  going to lose their jobs.  So, this is all before Boyce even

19  received this so-called recommendation that the plaintiffs so

20  sternly believe was the one that was followed and which led

21  to the layoff.

22       And I have put together just a brief time line for

23  you to look at, but you can certainly put those dates, piece

24  those dates together for yourself.  So, if you read

25  backwards, May 25th is the communication, first official

1  communication of the layoff, 20th, May 20th, is when Dr. Lau

2  goes to Ms. Marcus' house and when Mr. Boyce receives P-32.

3  According to Ms. Marcus' own testimony, it was one or two

4  days before that, the 18th or the 19th, when Dr. Lau called

5  her at the conference.

6          You'll also have in evidence and you'll recall Dr.

7  Lau's testimony of two memos that he wrote on the 6th and the

8  9th to Mr. Doran, summarizing and communicating the various

9  ideas that he had for the layoff.  And the sale of the

10  company is where the colors change on that chart, February of

11  2005.

12          Now, that's the simple time line.  There's other

13  reasons in addition why should reject the plaintiffs'

14  argument that Mr. Imbriani, Ms. DelMonte and Ms. Kutchins

15  concocted up this whole thing, so to speak, as they say.

16          Mr. Boyce made the finding decisions and Mr. Lau

17  made the decisions as to what people would be selected.  And

18  we'll review that process in a minute, but you remember Mr.

19  Boyce's testimony, he has over 30 years of experience in the

20  chemical business.  He testified that he has done this

21  before, that it is his own opinion, as somebody who has

22  worked as a chemist and worked in chemical companies, that if

23  research is not supported and paid for by the business units

24  it's not worth doing, that the business units need to be

25  excited enough about doing this research.  So, he has

1   eliminated corporate-funded research, R and D, at other

2   companies and he testified that he made that decision in this

3   case.

4          Mr. Boyce's testimony is that nobody gave him ideas

5   or recommendations about who should be fired in R and D

6   except -- except -- what did he say?  He said the only person

7   in R and D who was recommended for layoff by Imbriani,

8   DelMonte and Kutchins was Dr. Lau, that's the only person

9   that they talked to him about.  So, you would need to find

10  that Mr. Boyce is lying, is lying to you about all these

11  issues, to believe the plaintiffs' case here.

12         Let's talk more about this discriminatory motive

13  that plaintiffs believe comes from Imbriani, DelMonte and

14  Kutchins.  Let's talk about Ms. Kutchins first.  She was 54

15  at the time of the layoff, she had worked for the company for

16  28 years, I believe was her testimony.  The plaintiffs want

17  you to believe that Ms. Kutchins was so afraid of Imbriani,

18  so afraid and intimidated by Imbriani, because more than two

19  years later he told her to demote Ed Myszak, that she was so

20  afraid of that that she would continue to lie and to choose

21  older workers on P-32 because she thought Imbriani wanted a

22  younger work force.  That is plaintiffs' case here.

23         Take a look at P-32.  I'm sorry to keep telling you

24  that, I know you will.  When you look at P-32, this is the

25  memo written by Kutchins and DelMonte, the second paragraph

1   from the bottom, "We recommend that Mr. Myszak take over this

2   new position in R and D."  If she were so intimidated by Mr.

3   Imbriani, don't you think that would be the last name that

4   would show up on her recommendation?  It's because

5   plaintiffs' case makes no sense, makes absolutely no sense.

6          Ms. Kutchins also, when she was testifying about the

7   Detergent Zeolite funding going away, who did she pick?  This

8   is Exhibit D-13.  She picked Henchey and Senderov to stay.

9   Henchey and Senderov are older than Ms. Marcus and Mr.

10  Wypart.  Plaintiffs' Exhibit 16 is the compilation of all the

11  names and the ages at the time of the RIF and the parties

12  have stipulated that that is true.

13         Ms. Marcus testified as to this lunch.  Four people

14  were at this lunch where Ms. Kutchins purportedly said

15  something about younger employees like Erin Fisher.  Mr.

16  Myszak was at the lunch and doesn't remember the comment, Ms.

17  Kutchins denies the comment.  Erin Fisher, Bonnie Marcus'

18  friend, was at this lunch.  And Ms. Fisher is not available

19  to testify at trial, her deposition was read in.  She says,

20  I remember where we had lunch, I remember what I ate, I don't

21  remember any comment about that by Ms. Kutchins.

22         Ms. DelMonte, the next person who plaintiffs believe

23  had some discriminatory animus that flows through this memo

24  to these selection decisions.  Ms. DelMonte was 45 at the

25  time of the layoff.  You have not heard any testimony about

1  any discriminatory animus by DelMonte.  What have the

2  plaintiffs told you?  She was close to Imbriani, that's all.

3  They want you to make this giant leap of logic that,

4  therefore, she would discriminate because Mr. Imbriani two

5  years ago made a comment, which we agree was wrong?  This was

6  before the sale, was before the current ownership.  And, if

7  that happened, we agree it's wrong, I'm not making excuses

8  for that, but plaintiffs are making this giant leap of faith

9  that, therefore, Ms. DelMonte, because she was close to her

10 boss, has a motive to discriminate.

11      Who did Ms. DelMonte want to get rid of?  The only

12 person, the only name in R and D that she gave to Mr. Boyce

13 who she preferred to see gone, was Dr. Lau.  It was Ms.

14 DelMonte's opinion that the people on P-32 were weak

15 performers.  She's a business unit manager, she's got a right

16 to her opinion.  Ms. Marcus' own notes, her handwritten

17 notes, confirm that Dr. Lau told her in '03 and '04 that she

18 had a personality conflict with the women.  Have you ever had

19 a personality conflict with somebody?  Does that mean you

20 have a motive to discriminate against somebody on some

21 unlawful basis?

22      And let's talk about Mr. Imbriani finally.  He was

23 age 61 at the time of the layoff, he no longer works for the

24 company.  Plaintiffs want this one comment by Mr. Imbriani to

25 Ms. Kutchins to fire or demote Ed Myszak, made in March of

1  '03, they want you to draw from that a pattern of

2  discrimination, a culture of discrimination.  There's no

3  evidence of that and they have not shown you any.  They have

4  not shown you that PQ preferred at this time a younger work

5  force, they have not shown you any hiring statistics that

6  only younger people were hired or older people were fired.

7  There's no evidence of that.  They have all this information;

8  if that evidence substantiated it, they would show you.  All

9  they have is one comment made in a totally different

10  circumstance in March of '03.

11          If you scream bad words at your spouse two years

12  ago, does that always make you a bad person?  Does that mean

13  you'll never make a decision again that won't be a wrong

14  decision?  If your sixth-grade kid gets in trouble, gets in

15  trouble in school, bad trouble assume, does that mean he'll

16  never be given a fair chance?  Does that mean he's always a

17  bad kid?  That's the argument that the plaintiffs want you to

18  believe, that Mr. Imbriani's one comment so polluted the work

19  force that even two years later, with different management,

20  with different owners, that every decision by PQ, if any of

21  it flowed from the Industrial Chemicals Division will be a

22  discriminatory decision, and they have certainly given you no

23  proof of that.

24          Let me briefly talk about how this decision was

25  made.  R and D was a small part of the company, it was

1   business unit-funded.  In 2001, the former CEO came up with

2   this idea, let's have a Corporate Development Group.  And the

3   charter for establishing this is in PQ's documents, it's

4   Defendant's Exhibit 1.  And this Corporate Development Group

5   was going to be different on a couple grounds.  The research

6   was going to be funded from the holding company, from general

7   corporate assets, and the reason for that was because the

8   business units didn't want to fund research that didn't have

9   a quick turn-around time.  So, this would be exploratory

10  research, would typically have a longer cycle, and that the

11  business units didn't have to pay for it.

12          And the other important part of this and it's in

13  D-1, the 2001 document, was that people could work in the

14  Corporate Development Group in different percentages of time,

15  it specifically says fractions of people.  So, there were

16  some people in the Corporate Development Group full-time and

17  there were some people less than full-time, there were some

18  people 0.2, 0.3, 0.1.  Dr. Lau was the only person who kept

19  those budgets.  Ms. Marcus didn't keep those budgets, Mr.

20  Wypart didn't have anything to do with budgeting.  Dr. Lau

21  had to be responsible to have money, to have funding, to pay

22  people's salaries, he was the vice president of R and D.

23  Look at his documents, it's Exhibit 2 and Exhibit 3.  They're

24  not hard to follow, especially when you're holding them close

25  up.  He had a 2004 budget, and it has various columns and it

1   has people 0.5, it has people 100-percent, it's got people

2   0.1 and 0.2.  Plaintiffs want to group this whole Corporate

3   Development Group and lead you to believe that it's 15

4   people.  If you look at everybody who ever worked on a

5   Corporate Development project, who was ever funded 0.1, 0.2,

6   0.3, that's correct, but you need to look at the specific

7   funding.

8          2004 proceeded as a normal year until the end of the

9   year.  So, John Lau's budgets, manpower matrices will show

10  you in 2004 what percentage of funding came from Corporate

11  Development.  Mr. Wypart had 100-percent funding from

12  Corporate Development, Ms. Marcus had 50 percent from

13  Corporate Development and 50 percent from the Detergent

14  Zeolite.  The company goes up for sale in the fall of 2004

15  and the CEO at that time says, we're not going to hire

16  anybody and we're not going to fire anybody.  So, everything

17  is just going to stay the same.  So, the 2005 budget is never

18  approved.  If you look at Exhibit 2, which are Dr. Lau's

19  matrices, the 2005 numbers are what are proposed.  Okay?  It

20  was never approved, so it is proposed.  They show no funding

21  for Ms. Marcus and they show 50-percent funding for Mr.

22  Wypart.  How did they get paid?  They got paid from the

23  holding company, the holding company which funded the

24  Corporate Development Program.

25          There's no evidence that Dr. Lau fabricated or lied

1    to you.  What Dr. Lau was trying to explain, if you heard

2    this when Mr. Goldshaw wasn't talking during his examination,

3    what Dr. Lau said was our first column is 2004 funding, the

4    second column on this document was proposed 2005 funding, and

5    the last column was what really happened.  And the column --

6    this is a document I prepared -- the column to show, to

7    illustrate something that happened, because there was no

8    budget approved for 2005, there's not a manpower matrix to

9    show you, Dr. Lau repeatedly told Mr. Goldshaw this was

10   holding company money.  It was holding company money, not

11   Corporate Development Program money, because technically the

12   Corporate Development Program was never approved after 2004.

13           And what else did he say?  We had to pay people;

14   these are people in my department, we had to pay them.  You

15   don't just get a check if it's not from somewhere.  Where did

16   it come from?  It came from holding funding, holding company

17   money based on the sale of the company and the CEO saying, no

18   hires, no fires.

19           So, who is selected in R and D and why?  Ms. Marcus

20   is selected because the holding company money attributed to

21   the Corporate Development Program was eliminated.  There's no

22   change of position.  I couldn't even see all of Mr.

23   Goldshaw's charts, but I know they were change of position.

24   When you think about this issue, go back to the Exhibit D-9,

25   which is the organizational announcement.  This is the

1    announcement that came out at the time.  What does it say?

2    "The Corporate Exploratory Development projects will no

3    longer be funded by corporate" -- what's corporate?  The

4    holding company -- "will no longer be funded by corporate

5    and, therefore, the respective businesses will determine

6    which aspects of those projects they continue to fund."

7    There's been no change of position in this.

8              Mr. Wypart was selected for the layoff for the same

9    reason, his funding went away.  Dr. Senderov is not a

10   plaintiff here, you've heard him testify.  He was selected

11   for the same reason as well, his funding went away.  And

12   there were four others.  Dick Henchey, undisputed, Dick

13   Henchey had told Dr. Lau he was going to retire.  And Lau

14   said, wait until the company is sold and maybe you can get a

15   better deal.  Is that discrimination?  Al Beehan was a

16   chemist, a surface chemist, his work went away.  Callahan was

17   an officer supervisor, her position was eliminated.  And

18   Slabogin and Tickner both received severance packages,

19   Slabogin in the amount of 110,000 and Tickner in the amount

20   of 72,000.

21             You've heard PQ witnesses be asked, there's no piece

22   of paper where Dr. Lau recommends Ms. Marcus and Mr. Wypart.

23   There would be no piece of paper.  Once -- think about it

24   logically -- once Mr. Boyce made the decision that the

25   funding was eliminated there was no other conclusion here.

1  The people who were supported by the funding were the people
2  who were selected for layoff.
3         I'm trying to think of a way to put this in sort of
4  logical terms and the example I thought of is, Thanksgiving
5  is coming up, it's one of my very favorite holidays.  And a
6  lot of businesses have lunches before Thanksgiving and
7  there's turkey and pumpkin pie and all that kind of stuff.
8  So, what if you're in charge of the lunch and the CEO of the
9  company says, I'm not going to fund that, we're not going to
10 fund that, we're not going to pay for that lunch this year.
11 You're not going to write a memo saying, I recommend the
12 lunch be cancelled.  Right?  The decision is done.  When the
13 funding is eliminated, the people who were being funded by
14 that money were chosen for layoff.  Those who were not chosen
15 for layoff, there were two, there were only two other people
16 who were 100-percent funded by Corporate Development money,
17 that is Erin Fisher, who was the low-level technician with
18 the marine biology, and Reggie Thompson, and Reggie Thompson
19 was 54 and he operated equipment in the pilot plant.
20        So, there's no change of position.  When the funding
21 is eliminated, the program is eliminated, the projects are
22 eliminated.  The projects are only Corporate Development
23 projects because they're funded by the Corporate Development
24 Program and the Corporate Development Group ceased to exist.
25 We'll talk a minute about the people who were, you know, 0.3

1   and 0.2 and 0.1, et cetera.

2          Don't lose sight in all these facts of the issue

3   that you need to decide.  You will be instructed that the

4   plaintiffs have the burden of proving age discrimination,

5   they have the burden of proving as to each one of their

6   plaintiffs that they would not have been fired but for their

7   age.  That's a very high burden, but for their age, that age

8   was the reason.

9          When you retire to the jury room -- and I'm almost

10  done, thank you for listening -- when you retire to the jury

11  room, you'll be given a verdict form and the first question

12  will go to liability, have you -- have the plaintiffs met

13  their burden of proving -- and Judge Fullam will give you

14  that as to each plaintiff whether you can find by a

15  preponderance of the evidence that age was the but-for cause

16  of PQ's decision.  If your answer to that is no, you don't

17  need to go any further.  That's the first question; if the

18  answer is no, you don't need to go any further.  And let me

19  make it perfectly clear, based on the evidence in this case,

20  it's PQ's position that your answer to the first question

21  will be no, that plaintiffs haven't met their burden of

22  proving that they were each fired because of their age.  But

23  the way our system works is you get all the questions at the

24  same time.  So, I just very briefly want to talk about

25  damages and let me talk about Ms. Marcus.

1          Ms. Marcus has an obligation to use reasonable

2    efforts to find employment and that's a decision that you

3    judge the facts, whether she used reasonable efforts to find

4    employment.  You heard her testimony, she didn't use one

5    recruiter.  Mr. Wypart, on the other hand, his testimony was

6    he used 13 to 16 recruiters.  She sent out one resume, one

7    resume.  In your mind, as the finders of fact, did she use

8    reasonable efforts to find comparable employment?  Her

9    husband is a renowned zeolite chemist, he didn't do anything

10   to help her find a job.  She talked to a neighbor and the

11   neighbor told her that the pharmaceutical industry was laying

12   off.  So that wipes out the whole pharmaceutical industry and

13   you never follow up on that?  You also heard testimony by

14   Neil Miller and Neil Miller said that he heard Ms. Marcus on

15   two occasions say that she hoped that she got a package

16   because she wanted to retire.  Dr. Senderov, who is older

17   than Ms. Marcus, found a job, Mr. Wypart found a job.  So

18   that is for you to decide.  Based on the evidence, Ms. Marcus

19   did not use reasonable efforts to find employment and it

20   would be our position that you should not award her any

21   damages.  And her skill set is really broad.  Do you remember

22   when I asked her that question?  She can market just about

23   anything, was practically her answer.

24          Let's talk about the projects.

25          If you could do the chart with the other people?

Ms. Malloy                    115

1          Plaintiffs contend that the projects continued.

2    There were no CD projects that continued, because after the

3    CD money went away there were certainly not CD projects

4    anymore.  And they don't contend, you heard no evidence that

5    any of this work continued to be funding out of the holding

6    company.  Look at Exhibit 9, the business units would

7    determine what to be funded.

8          Now, Mr. Wypart testified that he spent 75 percent

9    of his time on PVC and 25 percent of his time on WPC.  This

10   is like the alphabet-soup case, isn't it?  PVC, Ms. Fisher --

11   Ms. Fisher's testimony was read in and Ms. Fisher said that

12   there was no development work done on PVC because it was

13   selling itself.  On WPC, this is the stuff that goes into the

14   Trek decking, the patent was almost done, it was going to go

15   to market, and then there was the problem with the water

16   absorption.  This was product that was never sold, absolutely

17   never sold.  So, Mr. Wypart contends that Mr. Myszak, who was

18   only two years younger than Mr. Wypart,  Mr. Wypart was 56

19   and Mr. Myszak was 54, he contends that he took over his job.

20   Mr. Myszak never worked in R and D.  Mr. Myszak worked for PQ

21   for 28 years, he worked with Roz Kutchins for 24 of those

22   years.  Is there anything discriminatory about picking

23   somebody who has a proven track record while reporting to you

24   of commercialization?  And Ms. Fisher is not similarly

25   situated to Mr. Wypart, she was an hourly employee until

1   practically the last week of the layoff.

2          And let's talk about Ms. Marcus.  Remember Ms.

3   Marcus' testimony?  I think this is quite clear.  What did

4   she do?  I asked her a couple times.  She managed people, she

5   managed projects, she compiled reports, she played an

6   umbrella role, and she supervised Wypart and Fisher.  I'm not

7   sure she's even testified how those skills would be used if

8   in the event that she stayed.  But Ms. Marcus compares

9   herself to Ed Myszak, who was 54 at the time of the RIF,

10  employed by PQ for 24 years, had a number of positions within

11  the business unit marketing Commercial projects and worked

12  under Ms. Kutchins for 54 -- I'm sorry, for many, many years.

13         Phil Connelly was somebody who had 0.2 of his time

14  allocated to Corporate Development projects in 2004.  He

15  continued to have a job, he had funding for the rest of his

16  job.  He picked up some duties and more.

17         Ken Burgh, Mr. Burgh is the person who finished the

18  -- we've heard this described so many different ways, the bug

19  chambers, you know, we put the stuff in the chamber to see if

20  the mold would grow.  He was 50 years old, employed by PQ for

21  20 years, ten and 20 percent of his time allocated to

22  Corporate Development projects.

23         And, finally, we have briefly mentioned Erin Fisher

24  and Reggie Thompson, very different levels and different

25  work.

1          So, what happened to all this work?  You've heard

2    testimony about this all day today.  When you're finally able

3    to talk about the case, you'll be an expert.  Nano-A, the

4    laundry detergent, was never sold; it was given to the

5    customer, it was formulated for the customer, the customer

6    didn't want it, it didn't work in their formulation.  MMA, it

7    had been a Commercial project for some period of time, it was

8    not a Corporate Development project.  They were building a

9    plant to make it, there's no research and development work

10   left on that.  Biocides, Ken Burgh finished that.  TSPQ, that

11   project was cancelled.

12         This was a reduction in force.  The very nature of a

13   reduction in force is that good employees may lose their

14   jobs.  It affected over 50 people.  We have explained to you

15   why individuals were let go and we have also showed you that

16   people over the age of 55 were retained.  This is my last

17   chart for you.  Plaintiffs, who want to paint this gross

18   picture of unbelievable age discrimination have never been

19   able to answer for you why these people in R and D, in this

20   little R and D unit, were retained.  As I told you in the

21   beginning of the case, PQ had legitimate reasons for

22   selecting the plaintiffs for layoff and legitimate reasons

23   why it kept the people that it kept.

24         There's things in life, whether you're big or small,

25   old or young, corporate or individual, that you don't like,

1 that you don't control, and I'm sure the plaintiffs felt that

2 way about their layoff, but that doesn't mean that PQ was

3 wrong and that doesn't mean that there was any discriminatory

4 animus and that doesn't mean that the law has been violated.

5        On behalf of PQ, we thank you for your time over the

6 last five or six days.  We very much appreciate your

7 important role in this system.  We ask you to return a

8 verdict in favor of PQ, finding that the plaintiffs have not

9 met their burden of proof.

10       Thank you.

11       THE COURT:  You may have a brief rebuttal.

12       MR. GOLDSHAW:  Thank you.

13       Ms. Malloy just said in essence that sometimes bad

14 things happen in life, it doesn't mean anyone did anything

15 wrong, and she said that in a RIF the nature of it is that

16 people lose their jobs.  As general principles, that's all

17 true.  What makes it not just life is when somebody targets

18 just the older workers for the bad things to happen and what

19 makes the RIF unlawful is not that you're reducing force, but

20 that you're consistently selecting the older workers based on

21 their age.  That's what the law is and that's the problem.

22       Ms. Malloy has mentioned this chart, which she blew

23 up, and she said we've never been able to answer it.  Not one

24 to back down from a challenge, I'm going to answer it right

25 now.  It's true that there were older people who weren't

1    fired.  I'm going to ask you to think of this:  If you heard

2    that a company had eight people they had to fire and they

3    chose all women, would you say, well, they didn't fire all

4    the women.  So, the fact that they always choose the woman

5    every time they have a chance, that doesn't mean there's a

6    pattern.  Or if they consistently choose the minority, do you

7    have to fire all the minorities to see a pattern that every

8    time you have a chance to fire somebody you pick on the

9    minority?  The argument doesn't make sense.

10        I think that she also gave me a gift when she said

11   that we're hanging our hat on one comment by Michael

12   Imbriani, because it gives me a chance to remind you of all

13   the things we are hanging our hats on.  We're not talking

14   about a comment, we're talking about a directive to a

15   subordinate to engage in age discrimination, Ms. Kutchins

16   told you that.  We're talking about it being part of a

17   corporate-wide objective by upper management, including

18   Imbriani and DelMonte, to make the company younger.  We're

19   talking about people, the three of them, the testimony was

20   that the three of them made a joint recommendation on P-32

21   and they assumed that the older people are the ones that

22   should go without knowing anything about them.

23        Let me clear about something, this is very -- I want

24   to emphasize this as much as I can -- there is no dispute

25   that it was Imbriani, Kutchins and DelMonte who chose to keep

1  Erin Fisher and not Roman Wypart, and there is no dispute

2  that it was through that evaluation process that Ms. Kutchins

3  described that Ed Myszak took over Bonnie Marcus' job.  It

4  was Imbriani, Kutchins and DelMonte who were making these

5  decisions.

6          Liz Malloy, I was a little surprised, tried to tell

7  you that that big memo, P-32, wasn't the document that

8  actually got the plaintiffs fired.  I was going to try to

9  avoid taking this out, but...

10         (Pause.)

11         MR. GOLDSHAW:  This is Michael Boyce's handwriting

12 all over the document.  He's writing down exactly what their

13 proposal is and the names, he's underlining portions of the

14 document.  And he looks at the termination list, he crosses

15 out one name and everyone else gets fired.  It is obvious,

16 Michael Boyce testified, remember, that this was the

17 recommendation that was selected.  That's why there's no

18 recommendation anywhere from John Lau to fire the plaintiffs.

19 And remember that these are the folks that had the power,

20 that controlled the money; these are the folks that decided

21 who to fund and who not to fund and, thus, who to fire and

22 not to fire.  I don't want to belabor that point, I apologize

23 if I have.

24         Liz Malloy tried to draw some sharp distinction by

25 using two different colors about the sale of the company.  Do

1  you remember that chart where she said before and after the

2  sale?  I don't want that to create confusion.  If you

3  remember, Imbriani, Kutchins and DelMonte from way back in

4  the fall were already talking about reducing head count; in

5  January, before Boyce arrived on the scene, they had already

6  created those organizational charts to reorganize R and D,

7  which they planned to present to Kevin Doran, the head of HR;

8  and those are the recommendations that practically mirrored

9  the recommendations that were accepted in May and you can see

10  it.  And you have to ask yourself, how did these three people

11  back in January propose a structure that turned out almost

12  identical to what happened if they're not the people who were

13  responsible for it and they're not the people whose

14  recommendations were accepted?

15       I think that there was an awful lot of -- I can see

16  Ms. Malloy mentioned a number of things in an effort, I

17  think, to confuse you or to try to win the case by innuendo,

18  and I want to set them straight.  Okay?  PQ has admitted,

19  Kevin Doran, head of HR, during his testimony, that level of

20  position had nothing to do with the RIF decisions.  So, why

21  is she talking to you about it?  He has admitted in his

22  testimony to you that the level of salary had nothing to do

23  with the RIF decisions.  So, why is she talking to you about

24  that?  This is a constant -- it is an attempt -- how about

25  this?  I think she mentioned a personality conflict.

1    Personality conflict has never been contended by anybody to

2    be the basis for the termination of Ms. Marcus.  The first

3    time that was ever -- I don't know if Liz Malloy directly

4    said it or just tried to drop a hint -- was in closing

5    argument.  Ms. DelMonte took the stand, she didn't say she

6    picked Bonnie Marcus because of a personality conflict.

7            And I think it's really telling -- I want to --

8    there's another point to be had here.  If you don't really

9    know somebody and you just know they're one of the older

10   managers in R and D and you don't like them, that's not

11   called a personality conflict; that's called prejudice, it's

12   discrimination.  She had no basis for -- we have no evidence

13   whatsoever of any basis for any proposed purported

14   personality conflict and, as jurors, it's your duty to make a

15   finding based on the evidence that's presented.  So, please

16   do not let this innuendo distract you from the task at hand.

17           As best I could follow, Liz Malloy tried to smush

18   together as best she could these changing excuses, this chart

19   I gave out to you before.  No matter how smooth you talk,

20   saying an entire group of people is eliminated is not the

21   same as saying the work they were doing was discontinued and

22   it's not the same as saying that there's no funding for their

23   salaries.  It's like -- I hope this works, bear with me, I'm

24   kind of doing it live -- if you decide to fire the short-

25   order cook, it's different to fire him to say, look, we just

1   don't have enough money for your job, you got to go, versus,

2   you know what, we make such great salads, no one is ordering

3   the hamburgers anymore, we don't need your position.  That's

4   two different explanations.  I hope when I sit down I don't

5   realize my metaphor blew it.  But the point is that these are

6   different explanations and the one that she seems to be

7   relying on, surprisingly, is this.  She's talking about Dr.

8   Lau is the one who kept the official records and she said

9   he's the one who would know?  This was -- I hope you remember

10  this, in a way I hope you don't, because I don't think it was

11  very pleasant, but I took him painfully one-by-one, he listed

12  the source, his supposed source, and it's not true, his

13  numbers are not true.  I mean, this explanation, when it

14  comes down to it, requires you to just take the word of Dr.

15  John Lau and I respectfully submit to you that he hasn't

16  earned your trust.

17          (Pause.)

18          MR. GOLDSHAW:  Just a comment on this notion that

19  you shouldn't award Ms. Marcus any damages for her losses.  I

20  think that what Ms. Malloy is trying to do is point to you a

21  couple of facts and spin them.  Ms. Marcus has always gotten

22  her jobs through networking.  She is a high level in her

23  profession and the way you get jobs is not by looking in the

24  newspapers and looking for zeolite managers being advertised,

25  because that's just not the way it works.  She knows the

1   industry, she knows everyone in the region, and she talked

2   and she networked.  She has taken jobs that she has had an

3   opportunity to take, she's never turned one down.  And you

4   have to form your own assessment as if she seems like the

5   kind of woman who is just done and doesn't want to work

6   anymore, because I think the evidence is clear that she does

7   and she still has a lot to contribute.  She's got a lot of

8   gas left in the tank and she is not washed up, not this

9   person.  You have heard her testify and you can form your own

10  assessment.

11       I think that it's hard in rebuttal when you prepare

12  on the spot to be organized and I hope I haven't been all

13  over the place and covered the points.

14       (Pause.)

15       MR. GOLDSHAW:  Oh, and I'm reminded that I shouldn't

16  forget to remind you that this notion that following the RIF

17  there was a shift to commercialization and that somehow

18  relates to why the plaintiffs got fired.  Both Roman Wypart

19  and Bonnie Marcus were doing commercialization before the

20  RIF, they have done it all along, and there has never been

21  any explanation by anybody as to why they could not continue

22  to do the commercialization work that was done after the

23  reduction in force.  I'm being told I covered the point.

24       So, thanks very much.  I look forward to the results

25  of your deliberations.

1          THE COURT:  Members of the jury, we're going to take

2     a very brief recess at this point, and I will ask you to

3     consult with each other in the jury room and decide whether

4     you want to finish it up -- or try to finish it today or wait

5     until tomorrow.  My instructions to you will last perhaps 20

6     minutes to a half hour and, if you think you want to continue

7     tonight, we'll do that, otherwise we'll do it in the morning.

8          So, we'll take a ten-minute recess now while you

9     decide.

10          (Jury out at 3:08 o'clock p.m.)

11          (Court in recess; 3:08 to 3:22 o'clock p.m.)

12          THE COURT:  It has been reported to me by a reliable

13     source that the jury wants to come back tomorrow and not go

14     any farther today.  So, we will recess until tomorrow

15     morning, 10:00 o'clock.

16          ALL:  Thank you, your Honor.

17          (Court adjourned at 3:22 o'clock p.m.)

18                                    * * *

126

```
1                              INDEX
2   WITNESSES                  D     C    RD    RC
3   Edward Myszak
4     By Mr. Ennis             2          38
5     By Mr. Goldshaw                31
6   Yatao Hu
7     By Mr. Goldshaw          39
8     By Mr. Ennis                   43
9   Bonnie Marcus
10    By Ms. Eyer              44
11    By Ms. Malloy                  65
12  Roman Wypart
13    By Ms. Eyer              68
14                          - - -
15  Closing Argument by Mr. Goldshaw - Page 84
16  Closing Argument by Ms. Malloy - Page 99
17  Rebuttal Argument by Mr. Goldshaw - Page 118
18  EXHIBITS                        RECEIVED IN EVIDENCE
19  D-1, 2, 3, 6, 9, 13, 16, 18, 22,          81
20    23, 26, 36-C, 40, 56 and 62
21                          - - -
```

CERTIFICATION

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Geraldine C. Laws, CET                Dated 12/14/09
Laws Transcription Service